UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANCY O'LOUGHLIN, )<br><br>Plaintiff )<br><br>v. )<br><br>MASSACHUSETTS BAY )<br>TRANSPORTATION AUTHORITY )<br>and )<br>JOSEPH CARTER )<br>and )<br>MICHAEL MULHERN, )<br><br>Defendants ) | C.A. No. 04-10933 JLT |

## DEFENDANT MICHAEL MULHERN'S STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendant Michael Mulhern ("Mulhern") submits this Statement of Material Facts in support of its Motion for Summary Judgment.

1.    In November, 1983, Plaintiff commenced employment with the Police Department of Defendant Massachusetts Bay Transportation Authority ("MBTA") as a patrol officer. (Ex. A, First Amended Complaint ("Complaint"), ¶11.) In February 2003, following the disbandment of the division Plaintiff had been heading, the MBTA reassigned her to the position of Detective Unit Commander, (Id., ¶13), but she suffered no reduction in rank or pay. (Id.) On August 5, 2003, the MBTA again reassigned Plaintiff, this time to head of the Detail Unit, (Id., ¶14), and again, Plaintiff suffered no reduction in rank or pay. (Id., ¶14.)

2.    On October 17, 2003, Plaintiff filed a Charge of Discrimination (the "Charge") with the Massachusetts Commission Against Discrimination naming only the MBTA and Defendant Joseph Carter ("Carter") as defendants. Mulhern was not named. (Id., ¶23.)

3.      Mulhern did not become aware that Plaintiff had filed the Charge until after this lawsuit was commenced, and he never discussed the Charge with Carter or anyone else. (Ex. B, Mulhern Tr., 8/4/05, 16:1-23:2.)

4.      In April 2004, the MBTA Police Department commenced a criminal investigation unrelated to Plaintiff, in response to allegations that the criminal record background check (or "CORI") system had been used for improper purposes by certain MBTA employees. During the course of this investigation, investigators came across recordings of a tape-recorded MBTA telephone line. While listening to these taped conversations, investigators learned that Plaintiff had made several derogatory remarks about her superiors, including Carter, to her colleagues. (Ex. C, Carter Tr., 1/6/06, 113:2-115:21; Ex. D, Carter Tr., 2/6/06, 14:2-23, 17:3-14; see also Ex. E, M00057-58.)

5.      On March 8, 2004, Plaintiff was relieved of duty with pay and assigned to duty at her home because, *inter alia*, her comments violated MBTA policy. (Ex. E, M00057-59.) The MBTA Hearing Officer also found that Plaintiff had allowed subordinate offices "to engage in disrespectful diatribes against other MBTA police personnel." (Ex. F, M000110.)

6.      On March 20, 2006, the American Arbitration Association ("AAA") rendered an Award requiring the MBTA to reinstate Plaintiff to her former position and make her whole for any lost pay and benefits resulting from her demotion. (Ex. G, Arbitration Award, p. 29.) While the AAA found Plaintiff's comments to be "immoderate, ill-considered and unprofessional", (Id., p. 22), the AAA ultimately concluded that her comments did not cause any harm to the MBTA Police Department or impair Plaintiff's supervisory effectiveness. (Id., pp. 20-29.)

7.      On March 10, 2004, *Boston Globe* reporter MacDonald Daniel ("Daniel") called MBTA Press Secretary Joseph Pesaturo to inquire about a story Daniel had read in the Boston

Herald claiming that the MBTA Police Department had been investigating something known as the "Where's Waldo" incident.[1] (Ex. H, Daniel Tr., 1/20/06, 10:22-11:21.) Pesaturo got Mulhern on the line and the three had a telephone discussion. (Id., 10:20-24, 11:1-3.)

8.    When Mulhern, Pesaturo and Daniel had their discussion, Mulhern was not aware that Plaintiff had filed the Charge. (Ex. B, Mulhern Tr., 8/4/05, 87:14-22.)

9.    During this conversation, Mulhern told Daniel that the investigation involved more than the "Where's Waldo" incident and that it also involved the misuse of the CORI system, (Ex. H, Daniel Tr., 1/20/06, 12:2-12, 13:9-13), but that the discipline had nothing to do with the "Where's Waldo" incident. (Ex. B, Mulhern Tr., 8/4/05, 62:13-16.)

10.    The testimony differs on the issue of whether Mulhern told Daniel that Plaintiff was involved in the investigation:  Daniel testified that Mulhern confirmed that Plaintiff was involved in the investigation and that Plaintiff was suspended, (Ex. H, Daniel Tr., 1/20/06, 20:18-21:1); Mulhern testified, by contrast, that he told Daniel that he would not confirm or deny Plaintiff's involvement in the investigation. (Ex. B, Mulhern Tr., 64:15-17.)

11.    Regardless, it is true that the investigation involved more than the "Where's Waldo" incident and included the misuse of the CORI system, (Ex. I, Nancy O'Loughlin Tr., 12/23/05, 324:4-6; Ex. D, Carter Tr., 2/6/06, 116:8-12), that Plaintiff was involved in the investigation, in that her misconduct was discovered during the investigation, (Ex. D, Carter Tr., 2/6/06, 14:18-23) and that she was suspended because of the investigation. (Ex. C, Carter Tr. 1/6/06, 113:2-114:7; Ex. B, Mulhern Tr., 40:15-41:9, 42:7-15.)

12.    Moreover, there is no dispute that Mulhern never told Daniel that the allegations against Plaintiff were of a criminal nature, could lead to criminal charges against her, or were

---

[1] Briefly, the "Where's Waldo" incident involves claims that certain members of the MBTA Police Department had put up "Where's Waldo" posters as a way of expressing their opinion that Carter was not regularly in the office. (Ex. B, Mulhern Tr., 8/4/05, 56:4-9.)

- 3 -

related to the alleged CORI violations. (Ex. H, Daniel Tr., 1/20/06, 22:3-5, 28:12-29:3, 30:18-21; Ex. B, Mulhern Tr., 8/4/05, 64:18-22, 78:4-7.)

13.     In fact, Mulhern was adamant in his testimony that he tried to dissuade Daniel from this notion, which Daniel had apparently conceived before his conversation with Mulhern. (Ex. B, Mulhern Tr., 8/4/05, 62:5-64:22.) Daniel further testified that the only reason he believed that criminal charges might be involved is because he knew from his own experience that CORI violations could be criminal and one of the union officials he spoke to about the case might have mentioned it to him. (Ex. H, Daniel Tr., 1/20/06, 57:10-58:20.)

14.     The next day, March 11, 2004, an article was published in the *Boston Globe* authored by Daniel. The article states, *inter alia*, that:

> Three MBTA police officers were suspended after an investigation showed they were illegally checking background records to either dig up dirt on colleagues or track down addresses and phone numbers of attractive women who caught the eye of male officers, an agency official and two others who were briefed on the investigation said yesterday.
>
> They said a lieutenant who allegedly encouraged the officers' activities also was suspended.[2]
>
> The probe could lead to criminal charges against the four, Massachusetts Bay Transportation Authority officials said, and more officers face suspension.
>
> MBTA officials would not release the names or ranks of the four who were suspended with pay this week.
>
> But speaking on condition of anonymity, the official and two others briefed on the probe said one was Lieutenant Nancy O'Loughlin, sister of former MBTA police chief Thomas J. O'Loughlin, who now heads the Milford Police Department.[3]

---

[2] Daniel testified that he does not remember if Mulhern said that Plaintiff encouraged the officer's activities. (Ex. H, Daniel Tr., 1/20/06, 18:14-18.) Mulhern's testimony that he would not confirm or deny Plaintiff's involvement in the investigation and that he told Daniel that Plaintiff was not facing criminal charges implies that he did not tell Daniel that Plaintiff encouraged the officers' activities.

[3] Both Daniel and Mulhern testified that Mulhern was not the source for this part of the article which states that Plaintiff is the sister of Thomas J. O'Loughlin; in fact, Mulhern knows that Plaintiff is not the sister of Thomas J. O'Loughlin so there is no way he could be the source for this information. (Ex. G, Daniel Tr., 1/20/06, 46:22-47:3; Ex. B, Mulhern Tr., 8/4/05, 74:17-23.)

(Ex. J, NOL 0002.)

15.    To the extent the article implies that Plaintiff is among the "four" against whom criminal charges could be brought, the article is false; however, it is not expressly stated in the article that Plaintiff is among the "four", (see Ex. J), and Daniel and Mulhern both testified that Mulhern was not Daniel's source for this part of the article.[4] (Ex. H, Daniel Tr., 18:19-24, 19:1-19; Ex. B, Mulhern Tr., 8/4/05, 78:4-7.)

16.    It is true that Plaintiff was suspended with pay. (Ex. E, M00058.)

17.    On March 18, 2004, an article appeared in the *Bay State Banner* authored by Melvin Yawu Miller ("Miller") discussing discipline undertaken against Plaintiff and three other MBTA police officers. (see Ex. K.) Miller testified that his inspiration for the article was the article authored by Daniel for the *Boston Globe*. (Ex. L, Miller Tr., 1/20/06, 15:3-6.) Both Miller and Mulhern testified that Mulhern was not the source for this article, (Ex. L, Miller Tr., 1/20/06, 9:19-20, 13:4-15, 16:12-15; Ex. B, Mulhern Tr., 8/4/05, 84:18-85:3), and Plaintiff testified that she has no knowledge to suggest that Mulhern was the source for the article. (Ex. I, Nancy O'Loughlin Tr., 12/23/05, 321:1-4.)

18.    There is no evidence that Mulhern harbored any ill-will or malice towards Plaintiff. To the contrary, Mulhern testified that he had no ill-will towards Plaintiff, (Ex. B, Mulhern Tr., 8/4/05, 82:7-17), and furthermore, Mulhern testified that he tried to prevent Daniel from writing an article that could lead to bad press for the MBTA. (Id., 94:10-21.)

19.    On a prior occasion, Mulhern even defended Plaintiff after she was referred to as a "rogue cop" by the *Bay State Banner* because Mulhern, "viewed [himself] as having

---

[4] Thomas J. O'Loughlin testified that Daniel told him that Mulhern said that Plaintiff was the subject of a criminal investigation and was Mr. O'Loughlin's sister. (Ex. M, Thomas J. O'Loughlin Tr., 12/20/05, 164:8-12.) Likewise, Plaintiff testified that Mr. O'Loughlin told her that Mulhern told Daniel that Plaintiff was the subject of a criminal investigation and that this is the sole basis for her belief that Mulhern told Daniel she was the subject of a criminal investigation. (Ex. I, Nancy O'Loughlin Tr., 12/23/05, 315:21-316:12.)

- 5 -

responsibility to protect the image of a police officer." (Ex. B, Mulhern Tr., 8/4/05, 29:1-19.)

20.    In any event, it is clear that Mulhern did not speak to Daniel as retaliation for

Plaintiff's having filed the Charge, because Mulhern did not become aware that Plaintiff had

filed the Charge until after this lawsuit had been commenced. (Ex. B, Mulhern Tr., 8/4/05, 16:1-

23:2.)

21.    Mulhern testified to having no interaction with Plaintiff during his tenure as

General Manager of the MBTA. (Ex. B, Mulhern Tr. , 8/4/05, 14:11-15:24.)

22.    Not surprisingly then, Plaintiff testified to a narrow set of facts which she alleges

form the basis of her claims against Mulhern for retaliation and interference with her civil rights

under state and federal law. At the outset, Plaintiff testified that she does not know if Mulhern

was aware of the discrimination she allegedly suffered and she does not know if anyone

informed Mulhern about such alleged discrimination. (Ex. I, Nancy O'Loughlin Tr., 12/23/05,

310:2-18.) Plaintiff has no information from any source that Mulhern engaged in discriminatory

behavior. (Id., 311:5-8.)

23.    Plaintiff claims that Mulhern made false statements to Daniel in "retaliation" for

Plaintiff's filing the Charge but admits that she has no basis for her belief other than the fact that

one event followed the other. (Id., 311:21-312:13.) This comports with Mulhern's testimony

that he did not even become aware that Plaintiff had filed the Charge until after this lawsuit had

been commenced. (Ex. B, Mulhern Tr., 8/4/05, 16:1-23:2.)

24.    Plaintiff testified that the article Daniel wrote falsely states that Plaintiff was

suspended for illegally checking police records and might be subject to criminal charges, (Ex. I,

Nancy O'Loughlin Tr., 12/23/05, 323:7-324:3), but both Mulhern and Daniel testified that

Mulhern never said that Plaintiff could be subject to criminal charges, (Ex. B, Mulhern Tr.,

8/4/05, 80:18-21; Ex. H Daniel Tr., 1/20/06, 26:15-19), and although Daniel testified that

Mulhern told him that Plaintiff had been suspended, (Ex. H, Daniel Tr. 1/20/06, 20:22-21:1),

Daniel did not testify that Mulhern told him that Plaintiff was suspended for checking police

records and Mulhern denied telling Daniel this.  (Ex. B, Mulhern Tr., 8/4/05, 64:15-21.)

     25.    Other than Mulhern's alleged conversation with Daniel, the only conduct which

Plaintiff alleges was retaliatory is:  (1) when Mulhern avoided Plaintiff, or "snubbed" her, at a

hockey game the two attended; and (2) when Mulhern did not prevent the discipline she received

for making derogatory statements about her superiors on the taped phone line.[5]  (Ex. I, Nancy

O'Loughlin Tr., 12/23/05, 340:12-20, 342:10-19, 347:10-21.)

     26.    However, Plaintiff admitted that Mulhern did not initiate her discipline, (Id.,

346:17-20), Mulhern never forced her to do anything, (Id., 340:5-7), Mulhern never made any

threatening gestures to her at the hockey game, (Id., 342:2-4), and the sole basis for her belief

that Mulhern's failure to prevent her discipline was retaliatory is her "opinion".  (Id., 344:4-14,

347:3-9.)

---

[5] Initially, Plaintiff testified that Thomas J. O'Loughlin told Plaintiff that MBTA Board Member Janice Loux ("Loux") had told Mr. O'Loughlin that Mulhern told her (Loux) that Mulhern was "going to get" Plaintiff. (Ex. I, Nancy O'Loughlin Tr., 12/23/05, 330:21-331:13.) However, Plaintiff lated admitted that Mulhern allegedly made this statement before Plaintiff filed the Charge, and, accordingly, Plaintiff does not consider this statement to be retaliatory conduct. (See Id., 347:10-21, in which Plaintiff limited alleged retaliatory acts to Mulhern's conversation with Daniel, "snubbing" her at the hockey game, and failing to prevent her discipline.)

Respectfully submitted,

MICHAEL MULHERN

By his attorneys,

/s/ Gregory M. Reiser
Joan A. Lukey (BBO #307340)
Gregory M. Reiser (BBO # 662284)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts  02109
Tel:  (617) 526-6000
Fax: (617) 526-5000
Email:  gregory.reiser@wilmerhale.com

Dated:  June 30, 2006

US1DOCS 5729919v1

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2006, I caused a true and accurate copy of the above document to be served via the Court's electronic docketing system upon Mitchell J. Notis, Esq., Law Office Of Mitchell J. Notis, 370 Washington Street, Brookline, MA  02446.

/s/ Gregory M. Reiser
Gregory M. Reiser

US1DOCS 5729919v1

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO:  04-10933-JLT

| | |
|---|---|
| NANCY O'LOUGHLIN | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| MASSACHUSETTS BAY | ) |
| TRANSPORTATION AUTHORITY | ) |
| AND | ) |
| JOSEPH CARTER | ) |
| AND | ) |
| MICHAEL MULHERN | ) |
| Defendants | ) |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## I. INTRODUCTION

1.      This is an action under M.G.L. c.151B, 42 USC §2000e, 42 USC §1983, and M.G.L. c.12 §11, for unlawful discrimination based upon gender, illegal retaliation, and interference with protected rights, as well as a claim for slander and defamation. The action is brought by Nancy O'Loughlin, a female who works for the Massachusetts Bay Transportation Authority ("MBTA") as a Lieutenant in the MBTA Police Department. Joseph Carter, at all times relevant to this Complaint, has been the Chief of the MBTA Police Department. Michael Mulhern, at all times relevant to this Complaint, has been the General Manager of the MBTA. Chief Carter, General Manager Mulhern, and other MBTA managers and supervisors engaged in the illegal practices alleged in this Complaint.

1

**JURISDICTION AND VENUE**

2.      Jurisdiction over this matter lies in this Court pursuant to 42 USC §2000e-5, 28 USC §1343, and 28 USC §1367 (Supplemental Jurisdiction).

3.      Venue in this District Court is proper because the illegal employment practices complained of herein occurred in Boston, Suffolk County, Massachusetts. Upon information and belief, the employment records related to Plaintiff's employment with Defendant MBTA are also located within Boston, Suffolk County, Massachusetts.

4.      On October 17, 2003, Lt. O'Loughlin filed a timely Charge of Discrimination on the basis of sex and retaliation with the Massachusetts Commission Against Discrimination and the US Equal Employment Opportunity Commission.

5.      On March 12, 2004, Lt. O'Loughlin requested that her Charge of Discrimination pending at the Massachusetts Commission Against Discrimination and US Equal Employment Opportunity Commission be withdrawn to allow her to file suit in Court. Those requests have been granted.      On March 17, 2004 a Right to Sue letter was issued by the US Equal Employment Opportunity Commission in this matter. The Right to Sue letter was received by Ms. O'Loughlin on or after March 18, 2004. A copy of the Right to Sue letter is appended to this Complaint.

**THE PARTIES**

6.      Nancy O'Loughlin is a resident of South Weymouth, Norfolk County, Massachusetts. She is a citizen of the United States. She is female.

7.      Defendant MBTA is a political subdivision of the Commonwealth of Massachusetts pursuant to M.G.L. c.161A §2, with a principle place of business in Boston, Suffolk County, Massachusetts. The MBTA was and is Plaintiff's employer within the meaning of M.G.L. c.151B §5, and a person within the meaning of M.G.L. c.151B §4. At all times relevant to this

2

Complaint, it was Plaintiff's employer within the meaning of 42 USC §2000e, was engaged in an industry effecting commerce within the meaning of 42 USC §2000e, and in all other respects met all of the requirements for coverage under 42 USC §2000e. It is responsible for the illegal actions of Defendants Joseph Carter and Michael Mulhern set forth herein.

8.      Defendant Joseph Carter is an individual residing in Oak Bluffs, Dukes County, Massachusetts. At all times relevant to this Complaint, he was Chief of the MBTA Police Department, was one of the supervisors and managers of the MBTA Police Department, and engaged in all of the illegal and discriminatory actions alleged in this Complaint. Chief Carter is sued in his individual capacity.

9.      Defendant Michael Mulhern is an individual residing in Walpole, Massachusetts. At all times relevant to this Complaint, he was the General Manager of the MBTA, and engaged in the . illegal and discriminatory actions alleged in this Complaint. Mr. Mulhern is sued in his individual capacity.

10.     At all times relevant to this Complaint, Plaintiff performed her job in a satisfactory manner. Lt. O'Loughlin is a recipient of the Massachusetts Hanna Medal, the highest award of commendation for a police officer by the Commonwealth of Massachusetts.

**FACTUAL BACKGROUND**

11.     In November 1983, Lt. O'Loughlin started working for the MBTA Police Department. She started working for the MBTA Police Department as a Patrol Officer and worked her way up through the ranks. Lt. O'Loughlin has held the rank of Lieutenant since 1996. Lt. O'Loughlin has received numerous awards and commendations for her work during her career with the MBTA Police Department. She is and has always been a dedicated and hard working employee.

12.     Lt. O'Loughlin first achieved the rank of Lieutenant in October 1996. From October 1996 through October 1997, she served as the supervisor of the MBTA Police Department's Patrol Division. In this position, she was the supervisor of all MBTA police working on the day

3

shift. From October 1997 through June 2001, she supervised the MBTA Police Department's system-wide Anti-Crime Unit. From June 2001 through August 2002, Lt. O'Loughlin was again placed in charge of the Patrol Division. From August 2002 through February 2003, Lt. O'Loughlin was in charge of a division in the Detective Unit.

13.    In January 2003, Joseph Carter became the Chief of the MBTA Police Department. Chief Carter was sworn in to his position in late January 2003. As one of his first actions as Chief, Chief Carter disbanded Lt. O'Loughlin's division, and she was moved to the position of Detective Unit Commander. The job of Detective Unit Commander is what is referred to as a "desk job." Lt. O'Loughlin did not want a desk job. This job had previously been performed by a Sergeant. Although this move did not constitute a reduction in rank or salary, it was a move to a much lower status position, and one in which Lt. O'Loughlin's chances for advancement and job satisfaction were greatly reduced. The change in position was viewed by Lt. O'Loughlin and her coworkers as an attempt to further marginalize her role in the MBTA Police Department, and to show disrespect towards her.

14.    Lt. O'Loughlin served as the Detective Unit Commander from February 2003 through August 4, 2003. On August 5, 2003, she was moved from being the Detective Unit Commander to being the head of the Detail Unit. Although this move to the Detail Unit did not constitute a reduction in rank or salary, it was a move to a much lower status position with less overtime compensation, and one in which her chances for advancement and job satisfaction were again greatly reduced. The change in position was viewed by Lt. O'Loughlin and her coworkers as another attempt to marginalize her role in the MBTA Police Department, and to again show disrespect towards her.

15.    It is well known in the MBTA Police Department that the position of head of the Detail Unit is a punishment position for anyone above the rank of Sergeant. In recent years, several superior officers in the MBTA Police Department have testified to this fact. The position has been filled in recent years by Patrol Officers or Sergeants, other than for times when the MBTA Police Department desired to assign a superior officer to the position to punish them. The job is not appropriate for a Lieutenant or Captain to fill.

4

16.     Lt. O'Loughlin was initially replaced in her job as Detective Unit Commander by a male. This position was then held by a female Lieutenant who had been demoted from the position of Deputy Chief. It was then filled by a male Lieutenant. There was no legitimate, non-discriminatory reason to move Lt. O'Loughlin from the job of Detective Unit Commander, to replace her as Detective Unit Commander with any of the individuals who replaced her, or to install her as head of the Detail Unit. Lt. O'Loughlin would not have been moved to the Detail Unit if she was male.

17.     During the time Lt. O'Loughlin has worked with Chief Carter, in addition to the position changes set forth above, Chief Carter treated her in other ways she considers to be based upon discrimination against her due to her gender, including the following:

1.  Chief Carter refused to place in Lt. O'Loughlin's personnel file a commendation she had received from the Massachusetts Office of the Attorney General. This would not have happened if Lt. O'Loughlin was male, and in fact males have been treated to the contrary.
2.  Chief Carter refused to support Lt. O'Loughlin in relation to a male subordinate of hers who was acting in an inappropriate and insubordinate manner, instead supporting her subordinate, even though he knew that the subordinate was wrong and was not being truthful. This would not have happened if Lt. O'Loughlin was male.
3.  Despite the fact that Lt. O'Loughlin is recognized as an expert in relation to graffiti related crime and has testified as an expert on behalf of the MBTA and the Commonwealth of Massachusetts on such matters on a number of occasions, Chief Carter informed her (on the same day that he transferred her to the Detail Unit) that she would no longer be allowed to investigate and/or testify as an expert on graffiti related crime, but that her former assistant who was not recognized as an expert on these matters, would do any such testifying. This would not have happened if Lt. O'Loughlin was male.
4.  Chief Carter deliberately avoids contact with Lt. O'Loughlin so as not to have to speak with her. Chief Carter never met with Lt. O'Loughlin prior to her reassignment. He has often spoken with Sergeants under her supervision, rather than with her, which is unusual and not appropriate. This would not have happened if Lt. O'Loughlin was male.
5.  Lt. O'Loughlin was summarily and immediately moved to the Detail Unit the same day that this change was announced, rather than receiving reasonable notice as is the customary practice of the MBTA Police Department. This would not have happened if Lt. O'Loughlin was male.

5

6. On or about the day before Lt. O'Loughlin was reassigned to the Detail Unit, Chief Carter made a statement to a Deputy Chief indicating that she was not dressed properly. This was a completely inappropriate comment, as Lt. O'Loughlin was wearing business casual wear as females were allowed to do during summer months. Lt. O'Loughlin's business casual wear consisted of slacks and a collared button-down shirt.

7. For approximately the prior 20 years, Lt. O'Loughlin had been allowed to take six weeks of vacation time from Thanksgiving through Christmas. This had been allowed while she was Commander of a Unit, Commander of Detectives, and as Commander of the Day Shift. For the year 2004, she will not be allowed to take this six weeks of time off despite the fact that her duties are much less essential to the functioning of the MBTA Police Department then they have been previously.

18.    Upon information and belief, Chief Carter has treated other MBTA Police Department employees who are women in a discriminatory manner, and in general does not like working with women.

19.    During her nearly twenty-one years working for the MBTA Police Department, Lt. O'Loughlin has been subjected to a pattern and practice of gender discrimination, which Chief Carter has followed and has continued. This past pattern and practice of discriminatory treatment, has included the following:

1. For a long period of time, Lt. O'Loughlin was the only superior officer assigned to the Detective Unit who was deliberately not provided with an office.

2. Lt. O'Loughlin was the only superior officer assigned to the Detective Unit who was deliberately not provided with a detective lieutenant badge.

3. For a long period of time, Lt. O'Loughlin was the only superior officer without a computer of her own to use.

4. For a long period of time, Lt. O'Loughlin was assigned a cellular telephone which was inferior to the telephones assigned to other superior officers.

5. For a long period of time, Lt. O'Loughlin was the only Lieutenant required to attend roll call.

6. Pornographic and obscene comments about Lt. O'Loughlin were made on an Internet site frequently viewed by MBTA Police Department employees.

7. From 1998 through 2002 distasteful cartoons and newspaper articles were displayed on bulletin boards within MBTA Police Department Headquarters.

8. From 1998 through December 2002, false and slanderous pager messages about Lt. O'Loughlin were sent out on the department paging system.

20.     In relation to the acts set forth above showing a pattern and practice of disparate treatment directed towards Lt. O'Loughlin based upon gender, and in relation to other actions of discrimination and disparate treatment directed towards Lt. O'Loughlin, Lt. O'Loughlin's superiors were either the ones engaging in this unfair treatment, or they knew of the unfair treatment and took no actions to stop it, investigate it or rectify it.  When these actions set forth above occurred, Lt. O'Loughlin always hoped and anticipated that this improper conduct would stop by her continuing to do as good a job as she could, but the unfair treatment of her continued. Lt. O'Loughlin alleges that all of the disparate treatment she has suffered due to her gender which is alleged in this Complaint is part of a continuing violation of the laws prohibiting discrimination against Lt. O'Loughlin due to her gender.

21.     Although the discrimination against Lt. O'Loughlin due to her gender increased greatly once Joseph Carter became Chief of the MBTA Police Department, Lt. O'Loughlin was subjected to discriminatory treatment by the MBTA for many years.  That discriminatory treatment was tolerated and to some extent encouraged by Lt. O'Loughlin's supervisors for many years and the more recent discriminatory treatment she has been subjected to is a continuation of that prior discriminatory treatment.

22.     The discriminatory treatment Lt. O'Loughlin has suffered as a higher-level female employee of the MBTA Police Department, is similar to the discriminatory treatment accorded to other higher-level female employees in the MBTA Police Department, both by Chief Carter as well as his predecessors.  Upon information and belief, for many years the MBTA Police Department has had a policy and practice of tolerating and engaging in gender discrimination against female superior officers.

23.     The Charge of Discrimination in this action was filed with the Massachusetts Commission Against Discrimination on October 17, 2003.  The Defendants in the MCAD Charge were the MBTA and Chief Joseph Carter.  For a variety of reasons, the Answer of Defendants MBTA and Joseph Carter to the Charge of Discrimination filed by Lt. O'Loughlin was not filed with the Massachusetts Commission Against Discrimination until March 8, 2004.

24.     On the same day that the Answer to her Charge of Discrimination was filed by the
MBTA and Chief Carter, March 8, 2004, Lt. O'Loughlin was relieved of duty with pay and
assigned to duty at her home.  Her gun, badge, identification card and cruiser were taken away
at that time.  The gun, badge, identification card and cruiser were taken away from Lt.
O'Loughlin in order to humiliate her, and to humiliate her in the eyes of her fellow officers.

25.     Lt. O'Loughlin was informed that the reason she was being relieved of duty with pay was
the fact that the MBTA had obtained tape recorded conversations of telephone calls she was
involved in with other MBTA Police Department employees, in which she allegedly made
derogatory statements about the Chief of Police and members of the command staff.

26.     The statements which Lt. O'Loughlin was alleged to have made were not derogatory,
were made (if at all) while Lt. O'Loughlin was off duty, and were statements which for some
time had been made openly by a variety of employees of the MBTA Police Department in the
MBTA Police Department Headquarters.  The statements alleged to have been made by Lt.
O'Loughlin were largely matters of public concern.  Statements far more harsh than the ones
allegedly made by Lt. O'Loughlin had previously been made by various MBTA Police
Department employees about the prior Chief of Police with no disciplinary actions having been
taken.

27.     At the time that Lt. O'Loughlin was informed of the allegations against her and that she
was being relieved of duty with pay, several SOT ("Special Operations Team") Officers were
stationed outside the office of the Chief of Police (close to where Lt. O'Loughlin was attending
her meeting) and two others were standing outside.  The SOT team is a "SWAT" team,
commonly used to deal with barricaded suspects who are armed with firearms.  The use of SOT
team members during the meeting with Lt. O'Loughlin was intended to (and did) humiliate Lt.
O'Loughlin, by erroneously giving her subordinates the impression that she posed a physical
threat to other members of the MBTA Police Department.  These SOT Officers were removed
from their regular duties to be present within view of Lt. O'Loughlin while she was being
informed of her removal from duty.  On information and belief, these armed SOT Officers were
present merely to intimidate Lt. O'Loughlin and to make the proceedings she was involved in as

8

humiliating as possible for her. It was not regular practice or procedure to have SOT Officers present when an officer was being disciplined by the MBTA Police Department.

28.    The conduct which Lt. O'Loughlin allegedly engaged in, and for which she was relieved of duty with pay, did not, based upon past policies and practices of the MBTA Police Department, justify Lt. O'Loughlin being relieved of duty. Male employees of the MBTA Police Department have on many occasions engaged in conduct much more serious than that with which Lt. O'Loughlin was charged, but were either subjected to no discipline at all or to discipline much less serious than the discipline accorded Lt. O'Loughlin. In the past, male superior officers have received written reprimands for making disparaging remarks about their superior officers.

29.    On March 11, 2004, an article appeared in the Boston Globe with the headline "T-Police Officer suspended in Probe." The article discussed certain allegations made against Lt. O'Loughlin, and falsely stated in relation to Lt. O'Loughlin that the allegations could lead to criminal charges against her. The article falsely implied that the allegations against Lt. O'Loughlin were of a criminal nature. The article falsely implied that Lt. O'Loughlin, a highly decorated superior officer in the MBTA Police Department with 21 years of experience on the job, and the second highest ranking female in the MBTA Police Department, had engaged in criminal conduct. The article also states that an official of the MBTA stated to the Boston Globe reporter writing the story, that one of the four officers mentioned in the article was Lt. O'Loughlin. The article also falsely stated that Lt. O'Loughlin was the sister of former MBTA Police Chief Thomas J. O'Loughlin. Lt. O'Loughlin was the only MBTA Police Officer involved in the disciplinary proceedings whose name was released by the MBTA to the Boston Globe. The release of Lt. O'Loughlin's name to the Boston Globe and its inclusion in the Boston Globe story caused much pain and humiliation to Lt. O'Loughlin.

30.    The MBTA official who spoke with the Boston Globe reporter, and who released Lt. O'Loughlin's name to the Boston Globe reporter, was the MBTA General Manager, Michael Mulhern. Mr. Mulhern specifically released Lt. O'Loughlin's name to the Boston Globe reporter in order to humiliate her and cause her further emotional pain and embarrassment, all in

retaliation for her having previously filed the October 2003 Charge of Discrimination against the MBTA. Mr. Mulhern falsely led the Boston Globe reporter to believe (and to write in his news story) that the allegations against Lt. O'Loughlin were of a criminal nature, and could lead to criminal charges against her. Mr. Mulhern made these false statements to the Boston Globe reporter with the intent that this false information would be placed in the Boston Globe article and that the story in the newspaper would falsely imply that Lt. O'Loughlin had engaged in criminal conduct. It should also be noted, as further indication of Mr. Mulhern's retaliatory intention, that Mr. Mulhern was named as a Defendant in a lawsuit filed by former Chief Thomas O'Loughlin against the MBTA and others, including Mr. Mulhern. Thus, although former MBTA Chief of Police Thomas O'Loughlin had nothing to do with the situation involving Lt. O'Loughlin, Mr. Mulhern apparently attempted to cause embarrassment and humiliation to former Chief O'Loughlin by having his name mentioned in the Boston Globe article in retaliation for Chief Thomas O'Loughlin having asserted his rights as well.

31.     On or about March 18, 2004 an article also appeared in the Bay State Banner newspaper discussing the discipline of Lt. O'Loughlin and the three other MBTA Police Officers. Once again, the only officer named in the story was Lt. O'Loughlin. On information and belief, Lt. O'Loughlin's name was provided to the Bay State Banner reporter by Mr. Mulhern in retaliation for her having previously filed the October 2003 Charge of Discrimination.

32.     The actions of the MBTA in disciplining Lt. O'Loughlin on March 8, 2004, relieving her from duty, assigning her to her home, investigating her, subjecting her to disciplinary proceedings and intentionally releasing her name to newspaper reporters were all done in retaliation against Lt. O'Loughlin for having filed the October 2003 Charge of Discrimination with the Massachusetts Commission Against Discrimination and the US Equal Employment Opportunity Commission.

33.     In a further act of retaliation for having filed the October 2003 Charge of Discrimination, on or about April 5, 2004 Lt. O'Loughlin's official pager was shut off.

34.    In late Spring 2004, the MBTA Police Department conducted an internal disciplinary hearing regarding the allegations against Lt. O'Loughlin. The hearing officer conducting the hearing made findings of fact based upon the hearing he conducted, in July 2004. In the findings which he made, the hearing officer found that Lt. O'Loughlin had made negative statements about Chief Carter. The hearing officer did not make any recommendations regarding discipline for Lt. O'Loughlin.

35.    The issue of what discipline, if any, to be accorded Lt. O'Loughlin as a result of the factual findings was forwarded to Chief Carter, who made the disciplinary decision. In approximately mid-August 2004 Chief Carter made his disciplinary decision regarding Lt. O'Loughlin. Lt. O'Loughlin was informed on or about August 19, 2004 that as a result of the findings of the hearing officer, Chief Carter had decided to demote her two ranks, to the rank of Patrolman.

36.    As a result of Chief Carter's decision, Plaintiff was demoted two ranks to the rank of Patrolman, and since September 2004 has been performing the duties of Patrolman for the MBTA Police Department. As a result of her demotion, and due to the demotion, Plaintiff has lost (and will continue to lose) approximately $52,000.00 per year in salary, approximately $30,000.00 per year in overtime benefits, various other benefits, and the value of her pension benefits after she retires will decrease by approximately $34,560.00 per year. The demotion has also caused Lt. O'Loughlin to suffer an extreme loss of status within the MBTA Police Department, great injury to her professional reputation, as well as much embarrassment, humiliation, and emotional pain and suffering.

11

37.    On information and belief, the MBTA Police Department has never previously
disciplined an officer by demoting the officer two ranks.

38.    The complaint in this action was served upon all Defendants several weeks before Chief
Carter made his decision to discipline Lt. O'Loughlin.

39.    Plaintiff is contesting her demotion through the grievance/arbitration process to which
her union and the MBTA are parties. Plaintiff's arbitration will not be heard for several
months.

40.    The conduct of Plaintiff as found by the hearing officer as set forth above, based upon
past policies and practices of the MBTA, and based upon the discipline of other officers who
either engaged in comparable conduct or who received comparable discipline, did not justify
the demotion of Plaintiff. Male employees of the MBTA Police Department and officers
who have not filed charges or complaints of discrimination against the MBTA Police
Department, and who have engaged in conduct more serious than the conduct found by the
hearing officer to have been engaged in by Plaintiff, were either subjected to no discipline at
all or were subjected to discipline much less severe than the discipline accorded Plaintiff.
The decision to demote Plaintiff for engaging in the conduct found by the hearing officer to
have occurred, was based upon illegal retaliation and discrimination against Plaintiff.

41.    The MBTA is fully responsible for the actions of Chief Carter, General Manager Mulhern
and any of the other supervisors and managers who engaged in improper actions against Lt.
O'Loughlin as alleged in this Complaint.

42.    By the actions set forth above, the MBTA has engaged in discrimination and illegal
retaliation against Lt. O'Loughlin and denial of her civil rights. The MBTA has also failed to
adequately investigate or stop the illegal actions against Lt. O'Loughlin, as it is obligated to do

under relevant statutes. The discrimination and retaliation Lt. O'Loughlin complains of, appears to have been sanctioned and directed by individuals on the MBTA Police Department Command Staff as well as senior managers of the MBTA. All of this has been done in order to drive Lt. O'Loughlin out of the MBTA Police Department. All of these actions as well as the actions of retaliation set forth above were part of an illegal campaign of discrimination and retaliation against Lt. O'Loughlin.

43.    The actions of the MBTA, Chief Carter and Michael Mulhern set forth above were willful, intentional and knowing.

44.    The MBTA failed to effectively and adequately remedy the discrimination and retaliation suffered by Lt. O'Loughlin. The MBTA failed to adequately investigate or stop the discrimination and retaliation being suffered by Lt. O'Loughlin.

45.    As a direct and proximate result of the illegal, discriminatory and retaliatory actions of the MBTA, Chief Carter and Mr. Mulhern towards her as alleged in this Complaint, Lt. O'Loughlin has suffered and will continue to suffer severe emotional and financial harm.

## COUNT 1:    AGAINST MBTA AND JOSEPH CARTER FOR DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF M.G.L. c.151B

46.    Plaintiff realleges and incorporates by reference as if fully set forth herein, ¶1-45 above.

47.    By their actions set forth above, Defendants MBTA and Carter have engaged in discrimination against Nancy O'Loughlin on the basis of gender, in violation of M.G.L. c.151B.

WHEREFORE, Plaintiff demands that this Court enter Judgment in her favor and against Defendants MBTA and Carter, jointly and severally, in an amount to be determined by this Court, including monies to compensate her for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, attorney's fees, and such other and further relief that this Court deems just and proper.

**COUNT II.    AGAINST MBTA FOR DISCRIMINATION ON THE BASIS OF GENDER
IN VIOLATION OF 42 USC §2000e**

48.    Plaintiff realleges and incorporates by reference as if fully set forth herein, ¶1-47 above.


49.    By its actions set forth above, Defendant MBTA has engaged in discrimination against
Nancy O'Loughlin on the basis of gender, in violation of 42 USC §2000e.


WHEREFORE, Plaintiff demands that this Court enter Judgment in her favor and against
Defendant MBTA, in an amount to be determined by this Court, including monies to compensate
her for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs,
attorney's fees, and such other and further relief that this Court deems just and proper.


**COUNT III.    AGAINST MBTA, CARTER AND MULHERN FOR RETALIATION IN
VIOLATION OF M.G.L. c.151B**

50.    Plaintiff realleges and incorporates by reference as if fully set forth herein, ¶1-49 above.


51.    In relation to her actions set forth above, Nancy O'Loughlin believed in good faith that
the MBTA and Chief Carter had engaged in wrongful discrimination and retaliation against her,
when she filed administrative charges of discrimination with the Massachusetts Commission
Against Discrimination and the US Equal Employment Opportunity Commission.


52.    In taking the actions referred to above, Nancy O'Loughlin engaged in protected activity
pursuant to M.G.L. c.151B and 42 USC §2000e.  As a result of engaging in protected activity,
she suffered an adverse action which was causally related to her having engaged in protected
activity.


53.    In taking the actions referred to above, Nancy O'Loughlin was opposing practices
prohibited by M.G.L. c.151B and 42 USC section 2000e and was directly engaging in protected
activities under M.G.L. c.151B and 42 USC section 2000e.

14

54.    Through their actions set forth above, the Defendants have coerced, intimidated, threatened and interfered with Nancy O'Loughlin in relation to her exercise and enjoyment of her rights granted pursuant to M.G.L. c.151B and 42 USC section 2000e, and have done so for her having opposed illegal practices and having asserted her rights granted pursuant to M.G.L. c.151B and 42 USC section 2000e, and having engaged in protected activity.

55.    The actions taken by Defendants, of which Nancy O'Loughlin complains, were taken against Nancy O'Loughlin due to her opposition to practices forbidden by M.G.L. c.151B and 42 USC section 2000e, and her having engaged in protected activities under MGL Chapter 151B and 42 USC section 2000e.

56.    By their actions set forth above, Defendants MBTA, Carter and Mulhern have engaged in unlawful retaliation against Nancy O'Loughlin and have interfered with Nancy O'Loughlin's exercise of her protected rights, in violation of M.G.L. c.151B.

WHEREFORE, Plaintiff demands that this Court enter Judgment in her favor and against Defendants MBTA, Carter and Mulhern, jointly and severally, in an amount to be determined by this Court, including monies to compensate her for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, attorney's fees, and such other and further relief that this Court deems just and proper.

## COUNT IV.  AGAINST MBTA FOR RETALIATION IN VIOLATION OF 42 USC Section 2000e

57.    Plaintiff realleges and incorporates by reference as if fully set forth herein, ¶1-56 above.

58.    In relation to her actions set forth above, Nancy O'Loughlin believed in good faith that the MBTA and Chief Carter had engaged in wrongful discrimination and retaliation against her, when she filed administrative charges of discrimination with the Massachusetts Commission Against Discrimination and the US Equal Employment Opportunity Commission.

15

59.    In taking the actions referred to above, Nancy O'Loughlin engaged in protected activity pursuant to M.G.L. c.151B and 42 USC §2000e.  As a result of engaging in protected activity, she suffered an adverse action which was causally related to her having engaged in protected activity.

60.    In taking the actions referred to above, Nancy O'Loughlin was opposing practices prohibited by M.G.L. c.151B and 42 USC section 2000e and was directly engaging in protected activities under M.G.L. c.151B and 42 USC section 2000e.

61.    Through their actions set forth above, the Defendants have coerced, intimidated, threatened and interfered with Nancy O'Loughlin in relation to her exercise and enjoyment of her rights granted pursuant to M.G.L. c.151B and 42 USC section 2000e, and have done so for her having opposed illegal practices and having asserted her rights granted pursuant to M.G.L. c.151B and 42 USC section 2000e, and having engaged in protected activity.

62.    The actions taken by Defendants, of which Nancy O'Loughlin complains, were taken against Nancy O'Loughlin due to her opposition to practices forbidden by M.G.L. c.151B and 42 USC section 2000e, and her having engaged in protected activities under MGL Chapter 151B and 42 USC section 2000e.

63.    By their actions set forth above, Defendants MBTA, Carter and Mulhern have engaged in unlawful retaliation against Nancy O'Loughlin and have interfered with Nancy O'Loughlin's exercise of her protected rights, in violation of M.G.L. c.151B and 42 USC section 2000e.

WHEREFORE, Plaintiff demands that this Court enter Judgment in her favor and against Defendant MBTA, in an amount to be determined by this Court, including monies to compensate her for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, attorney's fees, and such other and further relief that this Court deems just and proper.

16

## COUNT V.   AGAINST CARTER FOR VIOLATION OF 42 USC §1983

64.     Plaintiff realleges and incorporates by reference as if fully set forth herein, ¶1-63 above.

65.     In relation to the illegal and discriminatory actions set forth above which were taken in
his position as a supervisor and one of the MBTA Police Department's managers, Chief Carter
was acting under color of state law in depriving Plaintiff of her rights under federal law to be free
of discrimination due to gender, and to be free from retaliation for having engaged in protected
activity.  Defendant Carter's actions in violation of 42 USC §1983 set forth herein, have caused
injury to Plaintiff, in the form of serious and severe financial and emotional damages.  Chief
Carter engaged in a consistent pattern of retaliatory conduct against Lt. O'Loughlin.

66.     Chief Carter's actions in violation of 42 USC §1983 set forth herein, were done
intentionally, knowingly, and willfully with knowledge of their wrongfulness.  Defendant Carter
is directly and personally responsible for his unlawful conduct, and was personally involved in
committing the unlawful conduct.

67.     By his actions set forth above, Defendant Carter has, while acting under color of state
law, deprived Plaintiff of her rights and privileges under federal laws in violation of 42 USC
§1983.

WHEREFORE, Plaintiff demands that this Court enter Judgment in her favor and against
Defendant Carter, in an amount to be determined by this Court, including monies to compensate
her for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs,
attorney's fees, and such other and further relief that this Court deems just and proper.

## COUNT VI.  AGAINST CARTER FOR VIOLATION OF M.G.L. c.12 §11

68.     Plaintiff realleges and incorporates by reference as if fully set forth herein, ¶1-67 above.

69.    In relation to the illegal and retaliatory actions set forth above which were taken in his position as Chief of the MBTA Police Department, Defendant Carter was acting under color of state law in depriving Plaintiff of her rights under state and federal law to be free of retaliation for having engaged in protected activities. Defendant Carter's actions in violation of M.G.L. c.12 §11H set forth herein, have caused injury to Plaintiff, in the form of serious and severe financial and emotional damages. By his actions, Chief Carter has attempted to interfere by threats, intimidation, and coercion with Plaintiff's rights under state and federal law, in violation of M.G.L. c.12 §§11I and 11H.

70.    By his actions, set forth above, Defendant Carter engaged in a course of conduct designed to harass, humiliate and frustrate Plaintiff in the performance of her duties, in a deliberate and calculated effort to force her to resign her employment. Defendant Carter attempted to get Plaintiff to resign from her job and thus give up her right to work free from discrimination and retaliation. Through his threats, intimidation and coercion, Defendant Carter has attempted to interfere by his threats, intimidation and coercion with Plaintiff's rights under state and federal law, in violation of M.G.L. c.12 §§11I and 11H. Defendant Carter's actions in violation of M.G.L. c.12 §§11I and 11H set forth herein, have caused injury to Plaintiff, in the form of serious and severe financial and emotional damages.

71.    Defendant Carter's actions in violation of M.G.L. c.12 §§11I and 11H set forth herein, were done intentionally, knowingly, and willfully with knowledge of their wrongfulness. Defendant Carter is directly and personally responsible for his unlawful conduct, and was personally involved in committing the unlawful conduct.

72.    By his actions set forth above, Defendant Carter has, while acting under color of state law, attempted through threats, intimidation and coercion to deprive Plaintiff of her rights and privileges under state and federal laws in violation of M.G.L. c.12 §§11I and 11H.

WHEREFORE, Plaintiff demands that this Court enter Judgment in her favor and against Defendant Carter, in an amount to be determined by this Court, including monies to compensate

her for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, attorney's fees, and such other and further relief that this Court deems just and proper.

## COUNT VII. AGAINST MULHERN FOR VIOLATION OF 42 USC §1983

73.    Plaintiff realleges and incorporates by reference as if fully set forth herein, ¶1-72 above.

74.    In relation to the illegal and discriminatory actions set forth above which were taken in his position as General Manager of the MBTA, Mr. Mulhern was acting under color of state law in depriving Plaintiff of her rights under federal law to be free of discrimination due to gender, and to be free from retaliation for having engaged in protected activity.  Defendant Mulhern's actions in violation of 42 USC §1983 set forth herein, have caused injury to Plaintiff, in the form of serious and severe financial and emotional damages.  Mr. Mulhern engaged in a consistent pattern of retaliatory conduct against Lt. O'Loughlin.

75.    Mr. Mulhern's actions in violation of 42 USC §1983 set forth herein, were done intentionally, knowingly, and willfully with knowledge of their wrongfulness.  Defendant Mulhern is directly and personally responsible for his unlawful conduct, and was personally involved in committing the unlawful conduct.

76.    By his actions set forth above, Mr. Mulhern has, while acting under color of state law, deprived Plaintiff of her rights and privileges under federal laws in violation of 42 USC §1983.

WHEREFORE, Plaintiff demands that this Court enter Judgment in her favor and against Defendant Mulhern, in an amount to be determined by this Court, including monies to compensate her for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, attorney's fees, and such other and further relief that this Court deems just and proper.

19

## COUNT VIII.  AGAINST MULHERN FOR VIOLATION OF M.G.L. c.12 §11

77.    Plaintiff realleges and incorporates by reference as if fully set forth herein, ¶1-76 above.

78.    In relation to the illegal and retaliatory actions set forth above which were taken in his position as General Manager of the MBTA, Defendant Mulhern was acting under color of state law in depriving Plaintiff of her rights under state and federal law to be free of retaliation for having engaged in protected activities. Defendant Mulhern's actions in violation of M.G.L. c.12 §11H set forth herein, have caused injury to Plaintiff, in the form of serious and severe financial and emotional damages.  By his actions, Mr. Mulhern has attempted to interfere by threats, intimidation, and coercion with Plaintiff's rights under state and federal law, in violation of M.G.L. c.12 §§11I and 11H.

79.    By his actions, set forth above, Mr. Mulhern engaged in a course of conduct designed to harass, humiliate and frustrate Plaintiff in the performance of her duties, in a deliberate and calculated effort to force her to resign her employment.  Defendant Mulhern attempted to get Plaintiff to resign from her job and thus give up her right to work free from discrimination and retaliation. Through his threats, intimidation and coercion, Defendant Mulhern has attempted to interfere by his threats, intimidation and coercion with Plaintiff's rights under state and federal law, in violation of M.G.L. c.12 §§11I and 11H.  Defendant Mulhern's actions in violation of M.G.L. c.12 §§11I and 11H set forth herein, have caused injury to Plaintiff, in the form of serious and severe financial and emotional damages.

80.    Defendant Mulhern's actions in violation of M.G.L. c.12 §§11I and 11H set forth herein, were done intentionally, knowingly, and willfully with knowledge of their wrongfulness. Defendant Mulhern is directly and personally responsible for his unlawful conduct, and was personally involved in committing the unlawful conduct.

81.    By his actions set forth above, Defendant Mulhern has, while acting under color of state law, attempted through threats, intimidation and coercion to deprive Plaintiff of her rights and privileges under state and federal laws in violation of M.G.L. c.12 §§11I and 11H.

WHEREFORE, Plaintiff demands that this Court enter Judgment in her favor and against Defendant Mulhern, in an amount to be determined by this Court, including monies to compensate her for lost pay, lost benefits, punitive damages, emotional pain and suffering, interest, costs, attorney's fees, and such other and further relief that this Court deems just and proper.

## COUNT IX.  AGAINST MULHERN FOR SLANDER AND DEFAMATION

82.   Plaintiff realleges and incorporates by reference as if fully set forth herein paragraphs 1-81 above.

83.   In making the false and defamatory statements of fact referred to above, and in particular making them with the desire and knowledge that the false and defamatory statements would be published in a newspaper of general circulation in the Greater Boston area, throughout the Commonwealth of Massachusetts and the United States, Mr. Mulhern knew that his statements to representatives of the Boston Globe and the Bay State Banner newspapers were false, and/or he acted with reckless disregard for their truth or falsity.  Mr. Mulhern published the false and defamatory statements about Lt. O'Loughlin.

84.   At the time that Mr. Mulhern made the false and defamatory statements referred to above about Lt. O'Loughlin, Mr. Mulhern had knowledge of the falsity of the remarks he was making to the Boston Globe reporter and/or the Bay State Banner reporter, acted with reckless disregard for the truth or falsity of the remarks he made to the Boston Globe reporter and/or the Bay State Banner reporter, acted with ill will and malice towards Lt. O'Loughlin, and excessively published the remarks he made.  The false statements made by Mr. Mulhern held Lt. O'Loughlin up to scorn and ridicule in the community.

85.   As a result of the false and defamatory statements made about Lt. O'Loughlin by Mr. Mulhern as referred to above, Lt. O'Loughlin has suffered injury to her reputation, as well as other injuries including emotional pain and suffering.

86. As is set forth above, Mr. Mulhern has published statements about Lt. O'Loughlin which are defamatory. These statements were published in bad faith, recklessly, either with actual malice toward Lt. O'Loughlin or with reckless disregard for their truth or falsity.

WHEREFORE, Plaintiff demands that this Court enter Judgment in her favor and against Defendant Mulhern, in an amount to be determined by this Court, plus interest, costs and such other and further relief that this Court deems just and proper.

## COUNT X.  AGAINST MBTA FOR SLANDER AND DEFAMATION

87. Plaintiff realleges and incorporates by reference as if fully set forth herein paragraphs 1-86 above.

88. The defamatory statements made to representatives of the Boston Globe and Bay State Banner newspapers referred to herein, were made by Michael Mulhern and/or by other representatives, employees or officials of the MBTA. The person or persons who made such statements are referred to in this Count as being "the MBTA representatives." Whether the statements were made by Mr. Mulhern or by other representatives of the MBTA or both, the MBTA is fully responsible and liable for the actions of its employees and/or representatives and/or officials in making such defamatory statements.

89. In making the false and defamatory statements of fact referred to above, and in particular making them with the desire and knowledge that the false and defamatory statements would be published in a newspaper of general circulation in the Greater Boston area, throughout the Commonwealth of Massachusetts and the United States, the MBTA representatives knew that their statements to representatives of the Boston Globe and the Bay State Banner newspapers were false, and/or they acted with reckless disregard for their truth or falsity. The MBTA representatives published the false and defamatory statements about Lt. O'Loughlin.

22

90.  At the time that the MBTA representatives made the false and defamatory statements referred to above about Lt. O'Loughlin, the MBTA representatives had knowledge of the falsity of the remarks they were making to the Boston Globe reporter and/or the Bay State Banner reporter, acted with reckless disregard for the truth or falsity of the remarks they made to the Boston Globe reporter and/or the Bay State Banner reporter, acted with ill will and malice towards Lt. O'Loughlin, and excessively published the remarks they made.  The false statements made by the MBTA representatives  held Lt. O'Loughlin up to scorn and ridicule in the community.

91.  As a result of the false and defamatory statements made about Lt. O'Loughlin by the MBTA representatives as referred to above, Lt. O'Loughlin has suffered injury to her reputation, as well as other injuries including emotional pain and suffering.

92.  As is set forth above, the MBTA representatives have published statements about Lt. O'Loughlin which are defamatory.  These statements were published in bad faith, recklessly, either with actual malice toward Lt. O'Loughlin or with reckless disregard for their truth or falsity.

WHEREFORE, Plaintiff demands that this Court enter Judgment in her favor and against the MBTA, in an amount to be determined by this Court, plus interest, costs and such other and further relief that this Court deems just and proper.

## JURY TRIAL DEMAND
## PLAINTIFF DEMANDS A TRIAL BY JURY OF ALL ISSUES AND COUNTS SO TRIABLE

Respectfully submitted,
NANCY O'LOUGHLIN
By her Attorney,

_____

Mitchell J. Notis, BBO 374360
LAW OFFICE OF MITCHELL J. NOTIS
370 Washington Street
Brookline, MA 02445
Tel.: 617-566-2700

**EXHIBIT B**

1

Volume:  I
Pages: 1 to 102
Exhibits:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 04-10933-JLT

NANCY O'LOUGHLIN,                    )
                Plaintiff            )
                                     )
                                     )
        vs.                          )
                                     )
                                     )
MASSACHUSETTS BAY TRANSPORTATION )
AUTHORITY, JOSEPH CARTER AND     )
MICHAEL MULHERN,                 )
                Defendants           )


**DEPOSITION of MICHAEL H. MULHERN,**
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth
of Massachusetts, at the Office of
Hale & Dorr, 60 State Street, Boston,
Massachusetts 02109, on Thursday, August
4, 2005, commencing at 12:00 p.m.


*  *  *  *

EYAL COURT REPORTING, INC.
4 Fanueil Hall Marketplace
South Market Building- 4th Floor
Boston, Massachusetts 02109
(617) 964-4317

```
 1          APPEARANCES (Continued):

 2

 3          MITCHELL J. NOTIS, ESQUIRE
            370 Washington Street
            Brookline, Massachusetts 02445
 4          (617) 566-6144
                On behalf of the Plaintiff
 5

 6          JOAN A. LUKEY, ESQUIRE
            GREGORY M. REISER, ESQUIRE
 7          HALE AND DORR
            60 State Street
 8          Boston, Massachusetts 02109
            (617) 526-6798
 9              On behalf of Michael Mulhern

10

11          JOSEPH L. EDWARDS, JR., ESQUIRE
            PRINCE, LOBEL, GLOVSKY & TYE
12          585 Commercial Street
            Boston, Massachusetts 02109
            (617) 456-8131
13              On behalf of MBTA, Joseph Carter

14

15

16

17

18

19

20

21

22

23

24
```

12

```
 1           litigation.  Not all litigation was not
 2           required.  If it was significant exposure
 3           or required a timely response from me,
 4           I certainly would be notified by the
 5           general counsel, but the vast majority
 6           of litigation took place below my radar
 7           screen at the agency.
 8      Q.   Just so I understand your testimony,
 9           you're saying, then, that there was
10           litigation in which the MBTA was
11           involved, which might not even
12           pass over your desk in any form?
13      A.   Probably most of it, yeah.
14      Q.   And I take it that --
15      A.   Until such time it was resolved, and
16           required a signature on my behalf.
17      Q.   And you're familiar with a Massachusetts
18           Commission Against Discrimination?
19      A.   I am.
20      Q.   And when I use the term litigation,
21           I'm also talking about the cases filed
22           against the MBTA at the Commission
23           Against Discrimination?
24      A.   Okay.
```

13

```
1    Q.   Would your answers be any different
2         then considering that?
3    A.   No.
4    Q.   I take it then that you wouldn't
5         necessarily be informed of all charges
6         in which the MBTA was made a defendant
7         at the Commission Against Discrimination?
8    A.   That's correct.  I would not be informed
9         of all charges.
10   Q.   And would you be informed of all charges
11        of discrimination if one of your
12        department heads was named a defendant?
13   A.   No.
14   Q.   During the time you were manager, were
15        you informed of all MCAD charges where
16        the chief of the MBTA Police Department
17        was named as a defendant?
18   A.   No.
19   Q.   At the time of monthly board meetings
20        of the MBTA, was there a portion of the
21        meeting devoted to a litigation report?
22   A.   Only to the extent that it would
23        require a board authorization to settle
24        litigation.
```

14

```
 1    Q.   So, is it correct, or -- well, would
 2         the board be informed of new litigation
 3         against the MBTA?
 4    A.   No.
 5    Q.   Would the general counsel be informed
 6         of all new litigation against the MBTA?
 7    A.   I don't know.
 8    Q.   Again, sir, your testimony is you
 9         would not be informed of that?
10    A.   That's right.
11    Q.   Do you know someone named Nancy
12         O'Loughlin?
13    A.   Yes.
14    Q.   And who is she?
15    A.   I'm not sure of her current position,
16         but she is a member of the MBTA Police
17         Department.
18    Q.   Do you know when you first became aware
19         of Miss O'Loughlin?
20    A.   About 20 years ago I remember her being
21         hired as Nancy Graton.  I think I was a
22         platform official at the time.
23    Q.   Do you have any recollection of her
24         rising to the level of lieutenant
```

```
 1        in the police department?
 2   A.   Yes.
 3   Q.   And do you recall when she became a
 4        lieutenant?
 5   A.   No.
 6   Q.   If I suggested to you that that was 1996,
 7        does that refresh your recollection?
 8   A.   I have no idea.
 9   Q.   Do you recall having any dealings with
10        her while she was lieutenant in the
11        police department?
12   A.   No.
13   Q.   In your last three years -- well, let me
14        strike that.  During the time you were
15        general manager, did you have any direct
16        dealings with Lieutenant O'Loughlin?
17   A.   No.
18   Q.   Do you feel if you had any dealings with
19        her at all during your time as general
20        manager?
21   A.   No.
22   Q.   You did not, or you don't recall?
23   A.   I do recall that I did not have any
24        involvement with Nancy O'Loughlin.
```

16

```
 1    Q.   Are you aware of the fact that in October

 2         of -- well, September, October of 19 --

 3         I'm sorry, 2003, Miss O'Loughlin filed a

 4         discrimination charge against the MBTA

 5         and Chief Carter?

 6              MS. LUKEY:   Is he aware today?

 7              MR. NOTIS:   Yes.

 8    A.   I know very little about Nancy

 9         O'Loughlin's charges against Chief

10         Carter, other than what I have learned

11         recently from counsel.

12    Q.   Do you recall when you first became

13         aware that Miss O'Loughlin had filed

14         discrimination charges against the

15         MBTA and Carter?

16    A.   No.

17    Q.   Do you know if it was prior to the past

18         year?

19    A.   It was from counsel.

20    Q.   I'm not asking about conversations, but

21         I do want to find out when you first

22         knew about it?

23    A.   I think it was when I was required to

24         respond to some type of complaint that
```

17

1        you might have forwarded to the agency.

2   Q.   And do you recall if that was a complaint

3        filed in the United States District

4        Court?

5   A.   I think my recollection is it was a

6        complaint naming me as a defendant in

7        a case.

8   Q.   Prior to your being aware that you were

9        named as a defendant in Miss O'Loughlin's

10       case, did you have any knowledge of her

11       having filed a charge of discrimination

12       with the MCAD?

13  A.   No.

14  Q.   Prior to --

15  A.   Let me strike that.  I don't think so.

16       In terms of my recollection, I became

17       aware of it when you served me with some

18       papers.

19  Q.   Do you recall being served with a

20       complaint at your home in Walpole?

21  A.   No.  I remember -- I'm sure I was

22       served.  I don't remember the exact --

23       you know, I do.  I have been served at

24       my home.  I don't know if it was the

18

```
 1          O'Loughlin case or another case, okay.

 2          Typically what I would do is just forward

 3          the information to counsel.

 4    Q.    Prior to becoming aware that you were

 5          a defendant in a lawsuit brought by

 6          Ms. O'Loughlin, did you have any

 7          discussions with anyone about her charge

 8          of discrimination?

 9    A.    No.

10                  MR. NOTIS:  I'm going to mark

11          this, please.

12                  (Plaintiff's Exhibit No. 1,
            MCAD Complaint, marked for
13          identification.)

14    Q.    Let me show you, Mr. Mulhern, what's

15          been marked as Exhibit 1, and give you

16          a moment to look through the different

17          pages of that document, sir.

18    A.    Uh-huh.

19                  MS. LUKEY:  Make sure you're

20          going through it carefully; so you know

21          what it is.

22    A.    It looks like an MCAD complaint.

23    Q.    Well, why don't you tell me when you're

24          done reviewing, sir.
```

1    A.   Okay.

2    Q.   Are you done reviewing the document, sir?

3    A.   Yeah.

4    Q.   What is Exhibit 1, sir?

5    A.   It appears to be a complaint by Nancy

6         O'Loughlin with a complaint against

7         Chief Joseph Carter and the MBTA filed

8         in the MCAD.  It's dated October 20,

9         2003.

10   Q.   Do you see any docket number on that

11        anywhere; so we can identify it?

12   A.   MCAD docket number 03BEM02658.

13   Q.   Have you seen this document before today?

14   A.   I don't recall.

15   Q.   Do you recall if you were made aware

16        of the facts set forth in that document

17        before today?

18           MS. LUKEY:  He's already

19        told you that he only knows about this

20        through conversations through counsel.

21        I don't want him to disclose what those

22        conversations were.

23   A.   Yeah.

24   Q.   And other than conversations with counsel

1    prior to today, have you discussed the

2    facts in that document with anyone else?

3  A.  I don't believe so, no.  Other than with

4    counsel?

5  Q.  Yes.

6  A.  No.

7  Q.  So, you don't recall when you first saw

8    that document?

9         MS. LUKEY:  He said he didn't

10    recall if you had seen that document.

11  Q.  You don't recall if you've seen that

12    before today?

13  A.  Right.

14  Q.  And other than -- strike that.  Other

15    than conversations with counsel, which I

16    don't want to know about, you don't think

17    you've ever discussed that with anyone

18    before today?

19  A.  I don't know, but I will add that as a

20    result of seeing this document, it did

21    refresh my mind of an activity that used

22    to take place at the agency where, from

23    time to time, the attorney that handled

24    MCAD cases would come down, prior to

1          responding to those cases, would ask

2          me to sign on the spot, which she

3          initialed.  Typically she would stand

4          outside my door, because she had a time

5          element to deal with.

6     Q.   Was that something where you signed

7          under oath that the facts set forth are

8          correct?

9     A.   I don't know.  I can't tell you.

10    Q.   Is that Attorney Logalbo?

11    A.   Yeah, Attorney Logalbo.

12    Q.   And if you take a look at Exhibit No. 1,

13         sir, you see that Chief Carter is named

14         as the defendant in that action in the

15         MCAD charges in addition to the MBTA?

16    A.   Yes, I do.

17    Q.   Other than conversations of which counsel

18         may have been present, have you ever

19         discussed that charge with Chief Carter?

20    A.   I don't believe so.  I don't recall ever

21         talking to him about it.

22    Q.   And other than possibly conversations

23         with counsel at anytime when you were

24         general manager of the MBTA, did anyone

1      inform you that Nancy O'Loughlin had

2      filed a discrimination charge against

3      the agency?

4  A.  I don't believe so.

5  Q.  To your knowledge, was that charge or

6      Ms. O'Loughlin having filed it brought up

7      at any MBTA board meeting while you were

8      general manager?

9  A.  I'm fairly certain it never came up.

10 Q.  To your knowledge, was either that charge

11     or the fact that Miss O'Loughlin had

12     filed brought up at any of the management

13     meetings you conducted, other than board

14     meetings?

15 A.  No.

16 Q.  Other than possibly communications with

17     counsel, have you seen any documents

18     discussing the fact that that charge

19     had been filed by Miss O'Loughlin?

20 A.  Would you repeat the question?

21              MR. NOTIS:  Do you mind reading

22     that back?

23              (The preceding question was

24     read back as requested.)

```
 1   A.   I don't believe so.  If I have seen them,
 2        I certainly don't recall.
 3   Q.   And are you familiar at all with the MCAD
 4        process?
 5                  MS. LUKEY:  You mean internally
 6        at the MBTA, or as it operates out of the
 7        MCAD?
 8   Q.   Are you familiar with how MCAD charges
 9        in which the T was named as a defendant
10        were handled at the T while you were a
11        general manager?
12   A.   The employees had the opportunity to file
13        a complaint internally, and certainly
14        we encourage that, and a certain intake
15        procedure would take place.  Threshold
16        analysis was whether or not it was a
17        civil rights violation.  If it was,
18        the complaint was assigned to an
19        investigator, and that investigator
20        would carry out an investigation, and
21        ultimately arrive at a finding.  That
22        finding sometimes required follow-up
23        action, and other times it would not,
24        if there was no finding.
```

1    A.    I have to think back when Tom -- I think

2          it was summer of '02, okay.  He came into

3          my office.  The Bay State Banner seemed

4          to have zeroed in on Nancy O'Loughlin,

5          calling her a rogue cop.  I defended her

6          reputation in the newspaper.  I don't

7          remember exactly what I said, or how I

8          did it, but certainly I viewed myself

9          as having responsibility to protect the

10         image of a police officer in my mind

11         hadn't done anything wrong.

12              I heard, after the article ran,

13         when Tom came into my office, and he sat

14         down across from me, and he expressed

15         gratitude on behalf of Nancy.  He said,

16         "You've won yourself a friend for life.

17         Nancy is grateful for the way you handled

18         the Bay State Banner and defended her

19         reputation."

20    Q.    Do you recall anything else about that

21         conversation with Tom O'Loughlin?

22    A.    No.

23    Q.    And in terms of that Bay State Banner

24         article, that article would have appeared