```
 1        lawsuit, did you have any knowledge
 2        of Nancy O'Loughlin being moved to the
 3        detail unit in the MBTA police department
 4        in August of '03?
 5   A.   I will tell you that I don't understand
 6        how the department is organized, although
 7        the senior below the senior levels,
 8        I don't know the significance of one
 9        assignment versus another.  I certainly
10        don't have any recollection if it was --
11        you know, if somebody informed me of
12        such, it was certainly not significant
13        enough for me to remember.  I don't have
14        any recall.
15   Q.   That's all we're here to find out
16        today, sir.  Prior to knowing you were
17        a defendant in this lawsuit, did you have
18        any knowledge of Nancy O'Loughlin being
19        suspended from her position in the MBTA
20        police department in March of '04?
21   A.   My recollection is that there was an
22        investigation into police misconduct
23        within the department, internal police
24        misconduct, involving a collection of
```

1       police officers and their behavior on

2       some taped lines.  Some of it involved

3       Lieutenant O'Loughlin as well as another

4       lieutenant and subordinates.  My

5       recollection is that investigation

6       resulted in discipline for up to six

7       people, including Nancy O'Loughlin,

8       but I don't recall the exact nature

9       of the discipline.

10  Q.  And do you recall when you first became

11       aware of that investigation?

12  A.  Yes.

13  Q.  When was that?

14  A.  I don't remember the exact time frame,

15       but I remember receiving a call from

16       the chief, or I may have met him, and

17       he may have shared it during one of our

18       breakfast meetings that we have from

19       time to time, but I do remember the

20       chief informing me of some egregious

21       conduct.

22  Q.  Do you recall what he said to you?

23  A.  He told me that there was pretty vile

24       conversations on taped lines within

```
 1        the police department.  That they were

 2        conducting an investigation into it,

 3        and he would keep me apprised of the

 4        developments.

 5   Q.   And did he tell you which officers were

 6        involved in these vile conversations?

 7   A.   I remember he -- the only two names I

 8        remember -- well, the only two names I

 9        remember are Flemming and O'Loughlin.

10        I think there was four other people

11        involved.  Two of whom were accessing

12        the state CORI system, the system we

13        use to do background, the system law

14        enforcement agency does -- uses to do

15        background checks.

16   Q.   He never informed you that Nancy

17        O'Loughlin had done that, did he?

18   A.   No.  I think he informed me otherwise.

19        I think I specifically asked, because

20        the part of the conversation that most

21        concerned me was when he told me that

22        some of the officers were involved in

23        potentially criminal misconduct.

24   Q.   Did he explain to you how some of them
```

1      I said,

2              "No, I don't know anything

3      about Where's Waldo."

4      And he said that the reporter had been

5      informed by a number of sources that the

6      chief was mad, because members of the

7      department put up Where's Waldo posters,

8      and making fun of the chief, because

9      he wasn't around allegedly, and that

10     the reason for this discipline was

11     retaliation against those officers,

12     because they put up posters about him.

13     I told Pesatoro that that was absolutely

14     nonsense.  The discipline had nothing to

15     do with Where's Waldo.  He says,

16              "Do you know what the

17     discipline is about?"

18     I said,

19              "Yes, I do.

20     Then he says,

21              "Then you better talk to

22     the reporter, because if you don't,

23     this story is going to be about police

24     officers getting disciplined for Where's

1     remember Mr. Daniel saying to you, and

2     everything you remember saying to Mr.

3     Daniel in that conversation in March

4     of 2004?

5  A.  This is all to the best of my

6     recollection.  I can remember talking

7     to Mac Daniel, and the primary objective

8     in my mind was to knock down the story,

9     you know, to put to rest this whole

10    allegation that people were being

11    disciplined in retaliation for putting

12    up Where's Waldo posters, which I thought

13    utter nonsense.  I explained to Mac

14    Daniel that the discipline involved

15    had nothing to do with Where's Waldo

16    posters.  I explained to him, in general

17    terms, what the nature of the rules

18    violations were that precipitated the

19    discipline.  He pressed me on the Where's

20    Waldo stuff quite a bit.  I recall that

21    I was pretty effective in getting him

22    to believe, appropriately so, that the

23    discipline had nothing to do with Where's

24    Waldo.  A fair amount of conversation was

1    about this Where's Waldo stuff.

2            The conversation turned to

3    the details of which I was very reluctant

4    to give him any.  He was knowledgeable

5    that some of the conduct would result

6    in potential criminal charges, or could,

7    let me say, could result in potential

8    criminal charges.  Somebody had given

9    him Nancy O'Loughlin's name.  And he was

10   going to include her in the story that

11   she could be potentially found -- she

12   could be facing potential criminal

13   charges.  I told him that was absolutely

14   not true.  That he had misinformation.

15   And I warned him he best not go down that

16   road, because nothing could be further

17   from the truth.  I thought I pretty

18   effectively dissuaded him from his notion

19   that Nancy O'Loughlin was going to be

20   potentially confronted with criminal

21   charges.  I told him it was absolutely

22   not true.  She had nothing to do with the

23   so-called CORI violations.  And I warned

24   him not to write that in the newspaper

 1          article.   I did so with the same vigor
 2          that I addressed the Where's Waldo issue,
 3          and the same vigor that I addressed the
 4          issue when somebody called Nancy a rogue
 5          cop a few years earlier.
 6                   He then badgered me for
 7          names of police officers involved in
 8          the discipline.   I would not give him
 9          those names.   He went back to Nancy
10          O'Loughlin, and said, "Okay, if she
11          is not involved in any criminal
12          investigation, is she one of the
13          individuals involved in the
14          investigation?"   He badgered me quite a
15          bit.   To the best of my recollection, I
16          wouldn't confirm or deny whether or not
17          she was involved in the investigation.
18          But I have crystal clear recall that I
19          told him that she was absolutely not
20          involved in any allegations of criminal
21          misconduct, crystal clear recollection
22          of that.
23    Q.    Is there anything else about the
24          conversation with Mr. Daniel that

1          should not be attributed to me,

2          because they were inconsistent with

3          my conversations with the reporter.

4     Q.   What are the inaccuracies in the article,

5          sir?

6     A.   It seems to indicate that said

7          lieutenant, who allegedly encouraged the

8          officers activities, was also suspended.

9          The problem could lead to criminal

10         charges against the four.  You know, it's

11         subject to interpretation, but I think

12         some people might interpret this as --

13         could interpret this to mean that that

14         lieutenant was involved with the CORI

15         violations.  And certainly I have no

16         knowledge of that, as I stated earlier.

17    Q.   Anything else inaccurate in the article?

18    A.   Yeah.  It says that Lieutenant Nancy

19         O'Loughlin was sister of MBTA Police

20         Chief Thomas O'Loughlin.  I definitely

21         was not the source of that information,

22         because, as I said earlier, I knew

23         otherwise.

24    Q.   Could the article also be interpreted

```
 1    A.   Yes.
 2    Q.   So, it does say that?
 3    A.   Yes.
 4    Q.   Did you state to Mr. Daniel that the
 5         probe could lead to criminal charges
 6         against the four?
 7    A.   No.
 8    Q.   Do you know what MBTA official said that
 9         to Mr. Daniel?
10    A.   I have no idea.
11    Q.   It also says in the next paragraph,
12              "MBTA officials would not
13         release the names or ranks of the four
14         who were suspended", correct?
15    A.   That's what the article says, yeah.
16    Q.   But then it says,
17              "Speaking on condition of
18         anonymity the official and two others
19         briefed said one of these people was
20         Nancy O'Loughlin."
21    A.   That's what it says.
22    Q.   Did you say that to Mr. Daniel?
23    A.   No.
24    Q.   Did someone else?
```

1       did that, was it your understanding that

2       Mr. Daniel would use those remarks, but

3       just not attribute them to you?

4  A.  No, I don't.  I was pretty comfortable

5       with talking with Mac Daniel.

6  Q.  At any point in prior conversations with

7       Mac Daniel, did you tell him that you

8       would give him certain information, but

9       it had to be reported from an anonymous

10      source?

11  A.  I don't remember.  I don't remember

12      having those conversations.

13  Q.  And again sitting here today, you have

14      no knowledge of who it was who told

15      Mr. Daniel that Nancy O'Loughlin was

16      one of the officers involved?

17  A.  I have no idea who told him that.

18  Q.  And you told me earlier that you made

19      very clear to him that Nancy O'Loughlin

20      would not be subject to criminal charges?

21  A.  Yes.

22  Q.  Did you indicate that the others could

23      be subject to criminal charges?

24  A.  My recollection was there was two

1    Q.    In your conversation with Mac Daniel,

2          who was the first one to mention Nancy

3          O'Loughlin's name?

4    A.    Mac Daniel.

5                MR. EDWARDS:   I object to that

6          question, even though it's answered.

7    Q.    At the time you had your conversation --

8          strike that.  At the time you had the

9          conversation with Mac Daniel about this

10         probe, did you have any bad will towards

11         Nancy O'Loughlin?

12   A.    Absolutely not.

13   Q.    At the time that you had this

14         conversation with Mac Daniel, did you

15         have any bad will towards Tom O'Loughlin?

16                MS. LUKEY:   Objection.

17   A.    Absolutely not.

18   Q.    I understand you told Mr. Daniel that

19         Nancy O'Loughlin would not be the subject

20         of any criminal charges, correct?

21   A.    Yeah.

22   Q.    Did you indicate to Mr. Daniel that Nancy

23         O'Loughlin was involved in this probe?

24   A.    He pressed me on that.  I told you

1  but he couldn't attribute it to you?

2     MS. LUKEY:  Objection.

3     MR. EDWARDS:  Objection.

4     MS. LUKEY:  What do you expect

5  him to do, lie?  Objection.  You asked

6  him several times.

7 A. I was not conferring, and I was not

8  denying.  You have to ask the reporter

9  how he was interpreting that.  I have no

10  idea.  I know what I meant when I said

11  it.

12 Q. Did you use the phrase, I won't confirm

13  or deny it?

14 A. We're going back a few years.  That's

15  the best of my recollection.

16 Q. That you did use that phrase?

17 A. Yeah.

18 Q. In relation to the probe about the taped

19  phone lines, or the discipline to be

20  given certain officers about the taped

21  phone lines, did you ever speak about

22  that matter to any reporter from the

23  Bay State Banner?

24 A. No.

1    Q.    Did you ever speak to someone named

2          Yahwhe Miller about that?

3    A.    No.

4    Q.    And do you know if any other T officials

5          spoke to the Bay State Banner about that?

6    A.    No.

7    Q.    Do you know if the Bay State Banner

8          published an article about this matter?

9    A.    I'm not sure it came up in this

10         complaint.  As of yesterday we were

11         trying to track down the article.

12   Q.    Other than conversations with counsel,

13         and other than the conversation --

14         strike that.  The second conversation

15         with Mr. Daniel that you told me about

16         on this subject, the one that happened

17         the day after the first conversation?

18   A.    Uh-huh.

19   Q.    You have to answer yes or no, sir.

20         Rather than saying uh-huh, you have to

21         answer yes or no.

22   A.    You didn't ask me a question.  I will be

23         glad to answer the questions.

24   Q.    When you had the second conversation with

1  other sources were?

2 A. No.

3 Q. Do you know anyone who would know that?

4 A. No.

5 Q. Did you ever discuss that article,

6  Exhibit 3, with Chief Carter?

7 A. I don't think so.

8 Q. Did you ever discuss it with

9  Mr. Pesatoro?

10 A. I don't recall.

11 Q. Other than possibly counsel, have

12  you discussed it with anyone else?

13 A. No.

14 Q. At the time that you had that

15  conversation, the two conversations with

16  Mac Daniel, were you aware of the fact

17  that Nancy O'Loughlin had filed a charge

18  of discrimination against the MBTA and

19  Chief Carter?

20 A. I told you earlier I really don't think

21  so.  My recollection is that I learned

22  about that in this lawsuit.

23 Q. Did you ever take any actions to correct

24  what you felt were inaccuracies in

94

```
 1  A.  The reason why I spoke to Mac Daniel was

 2      that the press secretary informed me that

 3      the Globe was going to write a story

 4      about the police chief retaliating about

 5      Where's Waldo posters.  That was simply

 6      untrue.  So, I asked the press secretary

 7      to arrange a phone call between me and

 8      the reporter; so I could explain to him

 9      that that was not true.

10  Q.  Did you anticipate that your comments or

11      your discussion with Mr. Daniel would be

12      published in the Globe?

13              MS. LUKEY:  Objection.

14  A.  My hope was that there would be no

15      story.  I told you earlier the mode

16      I was in was to knock down the story.

17      Typically if a reporter is going to

18      write a bad story about the agency,

19      I did everything I could to prevent

20      that from happening by a clear,

21      honest presentation of the facts.

22  Q.  Did it surprise you that there was a

23      story despite your conversation with him?

24  A.  No, no, because he was badgering me, and
```

1              SIGNATURE PAGE/ERRATA SHEET

2   Re:  Nancy O'Loughlin
     Vs:  MBTA, Joseph Carter and Michael Mulhern
3   (8/4/05) - Deposition of Michael Mulhern

4       I, MICHAEL MULHERN, do hereby
    certify that I have read the foregoing
5   transcript of my testimony and it is a
    true and correct record of my testimony
6   (with the exception of the corrections,
    if any, listed below.

7

8   PAGE   LINE     CORRECTION

9    12    1       DELETE SECOND NOT

10   14   21     BRATTON (NO GRATON)

11   P26   7      DELETE PERIOD

12   29   10    AFTER MIND INSERT THAT

13   97   4     DELETE IT'S INSERT HE IS

14   99   22    AFFECTED ME

15

16

17

18

19

20

21     Signed under the pains and penalties
    of perjury this  27  day of
22    SEPTEMBER   , 20 05 .

23      M M
    MICHAEL MULHERN

24

**EXHIBIT C**



```
 1

 2                UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 3          C.A. NO: 04-10933-JLT       VOLUME 1

 4          ****************************************
            NANCY O'LOUGHLIN,
 5                          Plaintiff
                       vs.
 6          MASSACHUSETTS BAY TRANSPORTATION
            AUTHORITY and JOSEPH CARTER and MICHAEL
 7          MULHERN,
                          Defendants
 8          ****************************************

 9

10

11                 DEPOSITION of JOSEPH C. CARTER,

12          a witness called on behalf of the Plaintiff,

13          pursuant to the Massachusetts Rules of

14          Civil Procedure, before Lisa E. Berkland,

15          a Certified Shorthand Reporter and Notary

16          Public in and for the Commonwealth of

17          Massachusetts, at the offices of Prince,

18          Lobel, Glovsky & Tye, 585 Commercial

19          Street, Boston, Massachusetts, on Friday,

20          January 6, 2006, commencing at 1:30 p.m.

21

22

                       LISA E. BERKLAND, CSR
23                        P.O. Box 286
                       Westwood, MA 02090
24                       (508) 850-5171
```

```
 1          APPEARANCES:

 2
            LAW OFFICE OF MITCHELL J. NOTIS
 3               (By Mitchell J. Notis, Esquire)
                 370 Washington Street
 4               Brookline, Massachusetts  02445
                 (617) 566-2700
 5                    On behalf of the Plaintiff.

 6
            PRINCE, LOBEL, GLOVSKY & TYE
 7               (By Joseph L. Edwards, Esquire)
                 585 Commercial Street
 8               Boston, Massachusetts  02109-1024
                 (617) 456-8131
 9                    On behalf of the
                      Defendant/MBTA.
10

11          WILMER HALE
                 (By Gregory M. Reiser, Esquire)
12               60 State Street
                 Boston, Massachusetts  02109
13               (617) 526-6527
                      On behalf of Defendant/Michael
14                    Mulhern.

15
            ALSO PRESENT:
16          Timothy F. Cullen, Special Counsel, MBTA
            Police Department, Office of the Chief
17

18

19

20

21

22

23

24
```

1    A.    Yes.

2    Q.    Okay.    In a general way, because we will

3          certainly discuss this, why is it that

4          she was reassigned to duty at home and

5          those things were taken away from her?

6    A.    Because she was the subject of an

7          internal investigation that was being

8          conducted.

9    Q.    Subject to an internal investigation

10         about what?

11   A.    About alleged very serious and egregious

12         violations of the policy rules and

13         procedures of the MBTA Transit Police

14         Department.

15   Q.    What were those alleged serious

16         violations?

17   A.    There were several pages of them.  I need

18         to refresh my memory.  But, generally,

19         everything from conduct unbecoming, to

20         violating the ethics of the department.

21   Q.    I'm not asking you right now for section

22         numbers or anything like that.  What is

23         it she did?

24   A.    They grew out of an investigation of what

1       I call the "1205" line," where in her

2       capacity as a lieutenant, she had a

3       number of conversations with a

4       subordinate, specifically a police

5       officer, that all pointed to undermining

6       of the administration of the police

7       department.

8    Q.  Okay.  And some of those statements you

9       felt were derogatory about yourself?

10   A.  I didn't feel anything.  I heard tapes.

11      I read what was said and formed an

12      opinion that it was violative of the

13      policies of the department.

14   Q.  Okay.  What type of investigation of the

15      205 line was going on?

16              MR. EDWARDS:    Objection.  It's

17      1205.

18              MR. NOTIS:    I'm sorry.  I

19      apologize.

20   A.  There was a criminal investigation being

21      conducted by the Detective Unit, and in

22      that investigation, her conversations, as

23      well as other officers and another

24      lieutenant, were overheard.

1   Q.   Okay.  What was the subject of the

2         investigation in which her conversations

3         were overheard?

4   A.   I don't recall what that investigation

5         was.

6   Q.   Was the investigation into anything

7         involving Lieutenant O'Loughlin?

8   A.   No.

9   Q.   Okay.

10   A.   It was a criminal investigation involving

11         a criminal matter that had nothing to do

12         with internal.  It was not an internal

13         investigation.  It was an external

14         investigation.  The focus was on an

15         external individual, if that's helpful.

16   Q.   Pardon my ignorance on this, but if it

17         was an external investigation, why would

18         the Detective Unit be listening to an

19         internal phone line recording?

20   A.   Because the 1205 line is a public line

21         that is recorded.

22   Q.   Okay.

23   A.   And it's standard procedure in the

24         department and well known by written and

1

2                    COMMONWEALTH OF MASSACHUSETTS
                          COUNTY OF SUFFOLK
3                     CERTIFICATE OF REPORTER

4

5          I, Lisa E. Berkland, Certified
   Shorthand Reporter and Notary Public in
   and for the Commonwealth of Massachusetts,
6  do hereby certify that the foregoing
   deposition of JOSEPH C. CARTER was taken
7  before me on January 6, 2005.
           The said witness was duly sworn
8  before the commencement of the testimony;
   that the said testimony was taken
9  stenographically by myself and then
   transcribed.  To the best of my
10 knowledge, the within transcript is a
   true and accurate record of said
11 testimony.
           I am not connected by blood or
12 marriage with any of the said parties,
   nor interested directly in the matter in
13 controversy.
           IN WITNESS WHEREOF, I have
14 hereunto set my hand this 11th day of
   February, 2006.
15                         Notary Public
                           Lisa E. Berkland, CSR
16

17

18

   **PLEASE NOTE:  THE FOREGOING CERTIFICATION**
19 **OF THIS TRANSCRIPT DOES NOT APPLY TO ANY**
   **REPRODUCTION OF THE SAME BY ANY MEANS**
20 **UNLESS UNDER THE DIRECT CONTROL AND/OR**
   **DIRECTION OF THE CERTIFYING REPORTER**

21

22

23                              

24

**EXHIBIT D**

Page 1

VOLUME II

PAGES 1-125

EXHIBITS 1-3

COMMONWEALTH OF MASSACHUSETTS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

CIVIL ACTION NO.: 04-10933-JLT


NANCY O'LOUGHLIN,                    )
                                     )
                    Plaintiff,   )
                                     )
vs.                                  )
                                     )
                                     )
                                     )
MASSACHUSETTS BAY                    )
TRANSPORTATION AUTHORITY AND     )
JOSEPH CARTER AND MICHAEL        )
MULHERN,                             )
                                     )
                    Defendant.   )



          CONTINUED DEPOSITION OF JOSEPH C.
CARTER, a witness called on behalf of the Plaintiff
in the above-entitled cause, taken before Dawn
Mack-Boaden, Notary Public in and for Commonwealth
of Massachusetts, pursuant to the Massachusetts
Rules of Civil Procedure, at the Law Offices of
Prince, Lobel, Glovsky & Tye, 585 Commercial Street,
Boston, Massachusetts, on Monday, February 6, 2006,
commencing at 10:00 a.m.

1                          A-P-P-E-A-R-A-N-C-E-S

2

    Mitchel Notis, Esquire
3      LAW OFFICES OF MITCHEL NOTIS

       370 Washington Street
4      Brookline, Massachusetts 02445

       (617) 566-2700
5      Counsel on behalf of the Plaintiff

6

    Joseph L. Edwards, Esquire
7      PRINCE, LOBEL, GLOVSKY & TYE LLP

       585 Commercial Street
8      Boston, Massachusetts  02109

       (617) 456-8131
9      Counsel on behalf of the Defendant

10

    Gregory M. Reiser, Esquire
11     WILMER CUTLER PICKERING HALE AND DORR LLP

       60 State Street
12     Boston, Massachusetts  02109

       (617) 526-6527
13     Counsel on behalf of Defendant Michael Mulhern

14

15   ALSO PRESENT:  Timothy F. Cullen

16

17

18

19

20

21

22

23

24

Page 14

1    strike that.

2           I understand you don't recall the date

3    issue, sir.  But do you recall at some point being

4    made aware that allegedly improper conversations had

5    been discovered in the course of doing another

6    investigation?

7        A.    Yes.

8        Q.    Okay.  How did you learn about that?

9        A.    Again, it was brought to my attention by

10   two deputy chiefs, specifically, Ford Murphy and

11   McCarthy --

12       Q.    Okay.

13       A.    -- who brought the matter to my attention.

14       Q.    What did they say to you?

15       A.    Generally, that an investigation was being

16   conducted by investigative services where they had

17   to listen to the 1205 line.

18           While they were listening to the line, they

19   overheard conversations that they deduced to be

20   violative of policy rules, procedures, and core

21   values of the department.  They had copies of tapes.

22   I listened to the tape for a short period of time.

23   They left the tapes with me.

24           And that's how they brought it to my

Page 17

1    investigation in to the activities of one of your

2    lieutenants?

3        A.    I think I testified to that.  I don't

4    recall anyone internally being the subject of that

5    first investigation.  It was involving external

6    people.

7        Q.    Right; and I asked you --

8        A.    It was a criminal investigation, and it

9    didn't involve anybody from the department.

10           But in doing that was when they heard the

11   conversations between people in the department.

12       Q.    So the first investigation did not involve

13   Nancy O'Loughlin; correct?

14       A.    Correct.

15       Q.    That's all I'm looking for.  Thank you.

16   Okay.  If the first investigation did not involve

17   Nancy O'Loughlin -- well, strike that.

18           Who was the person who was actually

19   listening to the tapes in the first investigation?

20           MR. EDWARDS:  Objection.  You can

21       answer.

22           THE WITNESS:  Don't know.

23   BY MR. NOTIS:

24       Q.    Okay.  Whoever it was that was listening to

Page 116

1      When the 1205 line investigation was

2  initiated, to the best of your knowledge, was it

3  initiated because of inappropriate statements made

4  by Nancy O'Loughlin -- or allegedly made by Nancy

5  O'Loughlin?

6      A.   No.   That was not the trigger, per se, no.

7      Q.   What was the trigger, per se?

8      A.   As I -- as I recall, there were

9  conversations on the line that, in particular,

10  involved what were alleged to be CORI violations;

11  and conversations between officers about that was

12  one of the initial triggers.

13      Q.   Okay.   And how did Nancy O'Loughlin come to

14  be involved at all in the 1205 line investigation?

15      A.   Because one of the officers who was engaged

16  in the criminal conduct conversations with her where

17  she had inappropriate discussions with that officer.

18      Q.   Now, the discussions you've characterized

19  as -- as inappropriate?

20      A.   Violative of the rules, policies, and

21  procedures of the department.

22      Q.   Okay.   Now, as I understand your testimony

23  before, you did not consider Nancy O'Loughlin's

24  conversations to be criminal in nature?

Page 125

1    C E R T I F I C A T E

2

3    COMMONWEALTH OF MASSACHUSETTS
     Norfolk, SS.

4

5         I, DAWN MACK-BOADEN, a Notary Public duly
     qualified in and for the Commonwealth of
6    Massachusetts, do hereby certify that:

7         JOSEPH CARTER, the witness whose testimony
     is hereinbefore set forth, was duly sworn by me, and
8    that such testimony is a true and correct
     transcription of my original stenographic notes
9    taken in the forgoing matter, to the best of my
     knowledge, skill and ability.

10

          I further certify that I am neither
11   attorney or counsel for, nor related to or employed
     by any of the parties to the action in which this
12   deposition is taken; and furthermore, that I am not
     a relative or employee of any attorney or counsel
13   employed by the parties thereto or financially
     interested in the action.

14

          IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my Notarial seal this 13th of
     February, 2006.

16

17

18                    Dawn Mack-Boaden
                      Notary Public

19

20

     My Commission Expires:  September 15, 2006
21

22

     THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES
23   NOT APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF
     THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
24   CONTROL AND/OR SUPERVISION OF THE CERTIFYING COURT
     REPORTER.

**EXHIBIT E**



# MBTA Police

**CONFIDENTIAL**



Joseph C. Carter
Chief of Police

March 8, 2004

Lieutenant Nancy O'Loughlin

**Re:    Violation(s) of MBTA Police Rules and Regulations**
**Internal Investigation Notice – Relief From Duty**

Dear Lieutenant O'Loughlin:

You are hereby notified that you are under internal investigation for violations of MBTA Police Department Policies, Rules and Regulations for the following reasons:

1. On the following dates and times you initiated or participated in conversations with a subordinate(s) Police Officer and engaged in discussions that are in violation of MBTA Police Rules and Regulations, your Oath of Office, and your Oath of Honor.

   | | |
   |---|---|
   | 12/19/03 | 7:26 PM |
   | 01/07/04 | 4:24 PM |
   | 01/26/04 | 5:34 PM |
   | 02/17/04 | 6:43 PM |
   | 02/18/04 | 5:43 PM |
   | 02/20/04 | 5:32 PM |
   | 03/01/04 | 8:46 PM |
   | 03/02/04 | 4:57 PM |

At this time it is contemplated that you will be charged with the following violations of MBTA Police Department rules and regulations:

**Department Manual Chapter 101, Section 2.1- Standards of Conduct -**
**Loyalty and Integrity, Oath of Office and Oath of Honor**

Lieutenant Nancy O'Loughlin, on diverse dates, engaged in conversation, on a tape recorded Department telephone line, with subordinate police officer(s) that was demeaning, derogatory,

M00057

CONFIDENTIAL

untruthful, vile, profane, and meant to harm the reputations of the Chief of Police and members of the Command Staff. By virtue of her rank, the oath of office, and the oath of honor, Lieutenant O'Loughlin had an affirmative responsibility to take decisive action to stem and dissuade such conversations.

**Department Manual Chapter 104, Section 4.4 - Superior Officer Insubordination**

Lieutenant O'Loughlin, on diverse dates, misused her authority by engaging in conversations, on a tape recorded Department telephone line, with subordinate police officer(s) where she ridiculed the Chief of Police and members of the Command Staff. During these conversations, she actively conspired to bring forward untruthful accusations in the media and gave explicit instruction to subordinate police officers to subvert the Chief of Police and the administration of the Police Department.

**Department Manual Chapter 101, Section 3.7 - Standards of Conduct - Discourtesy**

Lieutenant O'Loughlin, on diverse dates, participated in conversations, on a tape recorded Department telephone line, with subordinate police officer(s) where she used vulgar and obscene language to refer to the Chief of Police and members of the Command Staff. Lieutenant O'Loughlin's actions served to undermine the effective management of the Police Department.

Per MBTA Police Department Manual Chapter 105 - Standards of Conduct - Relief from Duty, you are hereby relieved of duty with pay. You are considered to be on a Monday through Friday, 7:30 AM to 3:30 PM schedule and you must provide the Department with an up-to-date home address and telephone number where you will be available for contact during the described shift hours. If it is necessary for you to leave your residence for any reason during your shift hours, you must contact me prior to the absence for approval and provide appropriate interim contact information. If you are unable to contact me, Deputy Chief John Martino will serve as an alternate contact.

The internal affairs investigation into this matter is ongoing. You are hereby directed NOT to discuss this complaint or internal investigation with anyone other than the designated Internal Affairs Investigator, your attorney, or your union representative until the investigation is completed and the Chief of Police or the Commander of Administrative Services Division has advised you. You are specifically directed NOT to discuss this complaint or investigation with any witness, potential witness, employees or volunteers of the department, including your chain of command. You are further directed NOT to cause the witnesses or other persons to be contacted through any design of your own. This includes personal or telephone contact relating to this complaint or investigation.

**CONFIDENTIAL**

You are hereby informed that failure to comply with any part of this order will result in your being subjected to additional disciplinary action, up to and including termination.

DOLORES J. FORD-MURPHY
Deputy Chief


cc:    Personal File
       Chief Joseph Carter
       Deputy Chief John Martino
       Deputy Chief Thomas McCarthy

M00059

**EXHIBIT F**

# MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
## POLICE DEPARTMENT

IN THE MATTER OF                    REPORT OF THE HEARING OFFICER
LIEUTENANT NANCY O'LOUGHLIN              (pursuant to G.L. c.31, § 41)


BEFORE:                Kevin S. McDermott
                       Assistant General Counsel
                       Designated Hearing Officer
                       MBTA Law Department
                       10 Park Plaza, Suite #7760
                       Boston, MA 02116
                       (617) 222-4756


AT:                    MBTA Police Department
                       May 21, 2004  (day 1)
                                and
                       June 15, 2004  (day 2)


APPEARANCES:           Phillip G. Boyle, Esq.
                       Morgan, Brown and Joy
                       One Boston Place
                       Boston, MA 02108-4472

                                and

                       Patricia Lucek, Esq.
                       Labor Relations Representative
                       MBTA Labor Relations Department
                       10 Park Plaza, Suite #7550
                       Boston, MA 02116
                       for the Appointing Authority

                                and

                       Stephen L. Jones, Esq.
                       Jones and Mulligan
                       80 Washington Square-Building J
                       Norwell, MA 02061
                       for Lieutenant Nancy O'Loughlin


TESTIMONY:             Deputy Chief Thomas McCarthy
                       MBTA Police Department


ISSUE:     Whether just cause exists to support the charges against Lieutenant
           Nancy O'Loughlin?[1]

---

[1] This report makes no recommendation regarding the appropriate discipline, if any, to impose.

## INTRODUCTION

A hearing was held pursuant to G.L. c.31, § 41 in the matter of Lieutenant Nancy O'Loughlin ("Lt. O'Loughlin") regarding the Notice of Hearing that she received (Notice of Hearing attached). At issue is whether just cause exists to sustain the violations alleged in such Notice of Hearing. If there is a finding of just cause, also at issue is the appropriate discipline, if any, to impose. This report finds that there is just cause to sustain the alleged violations. This report makes no recommendation regarding the appropriate discipline, if any, to impose.

The facts pertinent to the issue of just cause are outlined in the Notice of Hearing, dated May 14, 2004. Simply stated, Lt. O'Loughlin spoke to Officer Robert MacKay and to Officer Carl Rubino on various occasions between December 29, 2003 and March 3, 2004 when those officers were manning the recorded "1205" line in the MBTA Police Department's Operations Center. During the course of these conversations, Lt. O'Loughlin made remarks, and allowed subordinates to make remarks, that were rank, discourteous, disparaging to her superior officers, and certainly violated the MBTA Police Department Manual of Policies, Rules and Procedures as outlined in the Notice of Hearing. The audiotapes and transcripts of these conversations were entered as evidence at the hearing.

## FACTS

The pertinent findings of facts are as follows:

1) Lt. O'Loughlin has been a police officer in the MBTA Police Department for over twenty (20) years;

2) Lt. O'Loughlin has received various awards and commendations in her career with the MBTA Police Department, including: Boston Police Academy Academic Excellence (1983); Officer of the Month (February 1984); Silas Award, US K-9 Association (1989); MBTA Police Department Humanitarian Award (1990); Boston Police Department Citation for Outstanding Service (1992); Certificate of Appreciation, Knights of Columbus (1993); Massachusetts Pride and Performance Award (1994); City of Boston Certificate for Outstanding Service (1996); Boston Police Department Certificate of Appreciation (1997); Commonwealth House of Representatives Certificate of Appreciation (1997); Boston Police Department Certificate of Appreciation (1998); Massachusetts Pride and Performance Award] (1999); George L. Hanna Medal of Valor (first female) (2000); and Certificates of Bravery from the Massachusetts House and Senate (2000);

2

M000105

3) Lt. O'Loughlin had no disciplinary issues within the MBTA Police Department prior to the Notice of Hearing at issue that is dated May 14, 2004;

4) Between December 29, 2003 and March 3, 2004, Lt. O'Loughlin made the calls that are identified and described in the Notice of Hearing. The speech by Lt. O'Loughlin and the other officers took place as described;

5) The transcripts and the audio recordings of the calls were entered as evidence at the hearing;

6) The "1205" line is a recorded phone line to the MBTA Police Department's Operations Center; and

7) At the time of the calls referenced above, Lt. O'Loughlin knew, or should have known, that her conversations were being recorded.

## LT. O'LOUGHLIN'S SPEECH IS NOT PROTECTED BY THE FIRST AMENDMENT.

The legal analysis to apply to determine whether or not a particular speech of a public employee is protected by the First Amendment has evolved since Justice Holmes' famous comment on disciplining a police officer for his speech: "The petitioner may have the constitutional right to talk politics, but he has no constitutional right to be a policeman". *McAuliffe v. City of New Bedford*, 155 Mass. 266, 216-217 (1892). Until the late 1960's, it was commonly observed that public employment was a privilege granted by the government and not a right itself. Therefore, the public employee could not claim absolute rights otherwise guaranteed a private citizen. *See, genl, Adler v. Board of Education of N.Y.C.*, 342 U.S. 485, 491-493 (1952) (the court discussed the rights/privileges distinction and essentially nullified a teacher's right to free association because of her employment by the state).

In the late 1960's, the Supreme Court recognized that governmental bodies have a dual nature. As a sovereign, the governmental body's arbitrary exercise of authority against a citizen is restricted by the Constitution. As an employer, the governmental body functions in the same manner as a private business, charged with maintaining an efficient and productive workplace.

By the same token, the public employee has a dual nature. As a citizen of the United States, the public employee enjoys the constitutional protections afforded to all citizens – including the right to free speech under the First Amendment. Yet, as an employee of the government, the public employee must expect to compromise

3

M000106

those rights in order to contribute to the efficient functioning of the governmental employer.

The first Supreme Court case to abandon the rights/privileges view was *Keyishian v. Board of Regents*, 385 U.S. 589 (1967) (requiring teachers to sign a form that they were not affiliated with certain organizations violated their First Amendment rights). The seminal case regarding free speech in the public employment setting is *Pickering v. Board of Education*, 391 U.S. 563 (1968).

In *Pickering*, the Court evaluated the discharge of a public high school teacher who was fired because of a letter he submitted to the local paper that accused the Board of Education of forcing faculty to support a tax proposal at the expense of the teacher's own views. The Board of Education held a full hearing and determined that the letter disrupted the efficiency of the school system. The teacher's employment was then terminated. The Supreme Court held that the termination violated the teacher's First Amendment right to free speech. It engaged in a balancing test, weighing the employer's needs against the employee's rights. The Court stated that a balance must be struck "between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees". Id. at 568. Thus was born the *Pickering* balancing test.

In *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court expanded the *Pickering* balancing test. In *Connick*, the District Attorney fired an Assistant District Attorney because she circulated among her co-workers a questionnaire asking questions regarding the morale in the office and specifically asking whether employees felt pressured to work on political campaigns. Such pressure to work on political campaigns was unlawful. The District Attorney viewed the questionnaire as having the potential to cause a serious decrease in morale at the office and as attacking the capabilities of the Assistant District Attorney's superiors.

The Court ruled in the District Attorney's favor. In doing so it elaborated on the *Pickering* balancing test. The first prong in the analysis is whether the speech is a matter of public concern. If not, there is no First Amendment protection. If it is a matter of public concern, the courts must balance the value of the speech against the potential for disruption in the workplace. In the *Connick* fact pattern, the Court found the question regarding whether employees were pressured to work on political campaigns to be a matter of public concern, but the questionnaire's potential for disruption outweighed the First Amendment value of that single question. So, *Connick* elaborated on the *Pickering* analysis by viewing the degree of public concern (*i.e.*, the value of the speech) as a separate question for a court to consider. The Court also emphasized that the disruption in the workplace is the main concern behind the regulation of public employee speech.

4

M000107

The Supreme Court's third significant case in the evolution of the *Pickering/Connick* balancing test is *Waters v. Churchill*, 511 U.S. 661 (1994) (plurality). In *Waters*, Cheryl Churchill was an obstetrics nurse in a public hospital. She had a private conversation with a fellow nurse while on dinner break in the hospital's cafeteria regarding that nurse's opportunity to work in obstetrics. Her conversation was overheard by others who informed Churchill's supervisor that Churchill warned the nurse that obstetrics was a bad environment and that the supervisor was not a good supervisor. The hospital discharged Churchill because of this private conversation.

In upholding Churchill's discharge, the Court elaborated on its concern that the lower courts were not giving enough deference to the government's interest as an employer when utilizing the *Pickering/Connick* balancing test.[2] The Court stated that the "key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer...where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions [on First Amendment speech] may well be appropriate". Id. at 675. To account for the public employer's interest, the First Amendment analysis requires a court to "look to the facts as the employer reasonably found them to be". Id. at 677 (emphasis in original). See, Meaney v. Dever, 326 F.3d 283, 288 (1st Cir. 2003) (the First Circuit explained that the Waters principle that courts must defer to the employer's view of whether a governmental employee's speech was a matter of public concern was agreed upon by a majority of the Supreme Court and, thus, has the force of law.)

After elaborating on the *Pickering/Connick* analysis, the Court then viewed the speech of Churchill. She was concerned that nurses were being asked to cover in specialized units for which they had no training in order to cover staffing deficiencies at the hospital. This put the public at risk. The Court did not decide whether her speech addressed a public concern. Rather, it found that this concern was outweighed by the potential disruptiveness of her speech as found by her supervisor. The Court found that Churchill's speech: discouraged people from working in obstetrics; was unkind and inappropriate; was negative; and, if not dealt with, threatened to undermine management in the eyes of other employees. Id. at 680-681. Additionally, the Court found that Churchill's comments that it "wasn't possible" to "wipe the slate clean" between her and her supervisor reasonably made management doubt that Churchill could have a productive future at the hospital. The Court found that "As a matter of law, this potential disruptiveness was enough

---

[2] In post-hearing memoranda submitted during Officer MacKay's representation in a related case, reference was made to the Civil Service Commission decision of *Abbott v. Town of Plymouth*, CSC #D-1434 (1992). That case is helpful to illustrate why, in 1994, the *Waters* Court was so concerned with the faulty *Pickering/Connick* analysis of lower courts and administrative bodies. In the *Abbott* case, a police officer wrote publicly that the Board of Selectmen were "pigs, liars, and cheats." This was held to be protected speech. Given the Court's elaboration in *Waters*, today there would be a different outcome.

M000108

to outweigh whatever First Amendment value the speech might have had". <u>Id.</u> at 681.

Applied to the instant case, <u>*Waters*</u> provides a useful analogy. Like Churchill, Lt. O'Loughlin had a private conversation in the workplace with co-workers. Unlike the <u>*Pickering*</u> or <u>*Connick*</u> facts, Lt. O'Loughlin was not pressing a grievance with a supervisor or bringing her concerns to the public. Also, because it is a private conversation, the Supreme Court has held that the employer should look at more factors than just the content of the speech, but the context, manner and place in which it was delivered to ascertain whether the institutional efficiency of the workplace is threatened. <u>See, *Givhan v. Western Line Consolidated School District*,</u> 99 S.Ct. 693, 697 n.4 (1979). <u>See also, *Connick*,</u> 461 U.S. at 147-148 ("whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record").

In the present case, it makes no difference whether Lt. O'Loughlin subjectively thought that her calls were not being recorded at the time she made them. This is because she could have no objectively reasonable expectation of privacy in her calls. The recording of the "1205" line was and is standard practice within the MBTA Police Department. In 2000, the Appeals Court decided <u>*Dillon v. MBTA*,</u> 49 Mass. App. Ct. 309, in which MBTA employees accused the administration of violating the wire-tap statute by listening to recorded lines. Significantly, the Court found that since 1979, it was common practice for the MBTA to record lines to its operations centers. Moreover, Lt. O'Loughlin is imputed with having the knowledge that the line was recorded because she received specific notice of it and because it is general knowledge among MBTA police personnel that the "1205" line is recorded. Of course, the steady beeping heard on the audiotapes that were admitted as evidence would inform all reasonable people that the line is recorded.

Also weighing in on the calculus needed to address the First Amendment issue in this case is that law enforcement agencies are qualitatively different than other governmental branches because of their paramilitary structures and because police are entrusted with the most awesome power that a free society bestows upon its members – the power to seize one's liberty and to use lethal force to achieve its ends. Therefore, law enforcement employees are subject to greater First Amendment restraints than most other public employees. <u>See, genl, *Wagner v. Holyoke*,</u> 241 F. Supp. 2d 78, 91 (D. Mass. 2003) (quoting <u>*McMullen v. Carson*,</u> 754 F. 2d 936, 938 (11th Cir. 1985). <u>See also, *Janusatis v. Middlebury Volunteer Fire Dept.*,</u> 607 F. 2d 17, 26 (2d Cir. 1979) (greater deference must be shown to the employer when police or fire forces are involved).

The above must be understood to fully consider the three-prong First Amendment inquiry presently utilized by courts. As a court recently expressed, this

6

M000109

inquiry is: (1) a court must decide whether speech involves a matter of public concern; (2) it must weigh the First Amendment interests of the employee and the public against the government's interest in functioning efficiently; and (3) it must decide whether the protected speech was a substantial or motivating factor in the employer's action. *Bates v. MacKay*, 321 F. Supp.2d 173 (D. Mass. 2004).

After a review of the testimony and exhibits, I find that no part of Lt. O'Loughlin's conversations involved matters of public concern. To the extent that she argues that sharing with Officers MacKay and Rubino her own personal opinions of Chief Joseph Carter, Deputy Chief John Martino and other officers is, somehow, public speech, I find that, as the Court in *Waters* found in regard to Churchill's speech concerning the public's safety in nursing assignments, the disruption caused by Lt. O'Loughlin so outweighs any value that her comments might have had that there is no First Amendment violation for holding Lt. O'Loughlin accountable for her speech.

As to the third prong of the First Amendment analysis, I find that if one excerpts the comments which might, in the broadest sense, be on matters of public concern, then viewing the remaining comments in context shows that Lt. O'Loughlin is nevertheless violating the MBTA Police Department policies, practices and procedures and causing great disruption in the workplace.

In sum, the First Amendment does not protect the speech of Lt. O'Loughlin.

## JUST CAUSE EXISTS TO FIND THAT LT. O'LOUGHLIN VIOLATED THE POLICIES, PRACTICES AND PROCEDURES AS CHARGED.

The issue whether just cause exists to sustain the charges against Lt. O'Loughlin requires little discussion. She is a superior officer who is entrusted with carrying out her duties in a respectful and competent manner. Specifically, she is to "ensure that all subordinates perform their duties in a professional, efficient and effective manner, and act in compliance with all Department policies, rules, and procedures...." MBTA Police Manual, Chapter 62, § 3.0. However, as described in the Notice of Hearing, she allowed Officers MacKay and Rubino to engage in disrespectful diatribes against other MBTA police personnel. These officers were subordinates of Lt. O'Loughlin. Moreover, she identified situations wherein other subordinate police personnel were violating their duties while performing paid details. Yet, she did nothing to address these situations. Surely she violated the letter and spirit of the above policy, rule, and procedure.

Lt. O'Loughlin, herself, engaged in profanity-riddled conversations regarding superior officers as described in the Notice of Hearing. Thus, she violated MBTA Police Department Manual, Chapter 101, § 3.7 because such language clearly meets

7

M000110

that section's prohibition against conducting one's self in a manner that is "rude, impolite, contemptuous or insolent to or about a Superior Officer ...".

Lt. O'Loughlin was also apprised of a situation of alleged harassment against a subordinate officer. Rather than addressing the situation as mandated by the MBTA Policy and Procedures for the Prevention of Harassment in the Workplace by informing the MBTA's Office of Diversity and Civil Rights, Lt. O'Loughlin merely suggested that that officer sue the MBTA. Such behavior is disruptive to the operation of the MBTA Police Department because it frustrates, rather than furthers, the MBTA's efforts to prevent harassment in the workplace.

Along this line, Lt. O'Loughlin intentionally attempted to frustrate and disrupt the efficient operation of the MBTA Police Department when she discussed with Officer MacKay the internal investigations by Deputy Chief McCarthy and discussed strategies to thwart these internal investigations.

Based on her remarks appearing in the Notice of Hearing, just cause exists to find that Lt. O'Loughlin violated MBTA Police Department Manual, Chapter 101, §§ 2.1, 2.3, 2.11, 3.7 & 3.18 and Chapter 62, §§ 2.0 & 3.0, as well as the MBTA Policy and Procedures for the Prevention of Harassment in the Workplace.

## CONCLUSION

For all the foregoing reasons, there is ample just cause to sustain all of the charges against Lt. O'Loughlin and, in the circumstances of this case, nothing in the speech of Lt. O'Loughlin warrants First Amendment protection. No recommendation for discipline is made in this report. Her attorney argues that her otherwise spotless record should be considered when making the decision regarding discipline. Indeed, she had a good record within the MBTA Police Department. However, notwithstanding her prior record, I find that her actions in this case are incompatible with the duties and responsibilities of a superior officer.

Respectfully submitted

Kevin S. McDermott
Assistant General Counsel
Designated Hearing Officer

8

M000111

**EXHIBIT G**

AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration Between

MBTA Police Superior Officers Association

-and-

Massachusetts Bay Transit Authority

A.A.A. Case No.1139-2105-04

Date Issued: March 20, 2006

Grievance: Nancy O'Loughlin, Demotion

Arbitrator: Timothy J. Buckalew

Appearances: Philip G. Boyle, Esq., for Massachusetts Bay Transit Authority (Employer); Stephen L. Jones, Esq., for MBTA Police Superior Officers Association (Union)

## ARBITRATOR'S OPINION AND AWARD

### PRELIMINARY STATEMENT

On March 21, May 25-26, August 30-31, September 1 and November 8 of 2005, the parties appeared before the Arbitrator at a hearing conducted in Boston, Massachusetts according to the terms their collective bargaining agreement and the rules of the American Arbitration Association. The following Opinion and Award is based on the evidence presented at the hearing, the parties' collective bargaining agreement and arguments made at the hearing and in post hearing memoranda which were received by February 8, 2006.

### ISSUES

By agreement:
" Was there just cause for the demotion of the grievant, and if not, what shall be the remedy?"

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 2

### BACKGROUND

      The grievant, Nancy O'Loughlin is employed by the Massachusetts Bay Transit Authority (MBTA) Police Department and was demoted from the rank of Lieutenant to Police Officer on August 19, 2004 by Chief of Police Joseph Carter following a departmental investigation and hearing. The departmental investigation focused on Ms. O'Loughlin's conversations on a recorded telephone line and based on her statements to other officers using the line, the MBTA hearing officer found O'Loughlin in violation of the MBTA Police Department's Manual of Policies, Rules and Regulations Chapter 62, Section 2.0 (Supervisory Span of Control); Chapter 62, Section 3.0 (Duties and Responsibilities of All Supervisors); Chapter 101, Section 2.1 (Loyalty and Integrity); Chapter 101, Section 2.11 (Interference with Work); Chapter 101, Section 2.3 (Behavior); Chapter 101, Chapter 101, Section 3.18, Section VI (Harassment-Supervisor and Manager Responsibilities); and Chapter 101, Section 3.7 (Discourtesy). Ms. O'Loughlin and the Union grieved the demotion. The grievance was denied and advanced to this arbitration under the parties' labor agreement.

### SUMMARY OF RELEVANT FACTS

      O'Loughlin has been employed by the Massachusetts Bay Transit Authority (MBTA) Police Department since 1983, first as a Police Officer. She earned the rank of Sergeant in 1989 and Lieutenant in 1996. During her tenure with the MBTA she has held a variety of posts and specializations: notably as a canine handler and as a graffiti investigator focusing on the prosecution of graffiti related crime. In that capacity she also was frequently called on to testify as an expert in criminal trials around the state. She has received many awards and was the first female police officer to receive the George L. Hannah Medal for Valor for preventing a stabbing. She has had perfect attendance for the past thirteen years, and seventeen of her twenty-two years on the force. Her record shows one incident of prior discipline in 1992, when she received formal counseling for calling Officer Hector Fernandez "dopey" and a "lunkhead" to a superior

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 3

officer.

In January 2003 Chief Joseph Carter became the MBTA Chief of Police,
replacing Chief Thomas O'Loughlin, a cousin of the grievant's husband. Chief Carter
made swift changes to the department. He promoted Thomas McCarthy one of his
Deputy Chiefs. Deputy McCarthy had once been a Deputy Chief previously, but had
been demoted by Chief O'Loughlin. Based on his perception that Department morale
and public trust was low, and that MBTA Police relations with the public were poor,
Chief Carter called for immediate changes in the Department with the purpose of
restoring public trust. In February 2003, he began requiring all officers to take an "oath
of honor," and in June 2003 issued a "Plan of Action" establishing new standards for
police conduct and calling for MBTA Police to be driven by a set of core values: fairness,
truthfulness, professionalism, perseverance, treating all persons with dignity and respect,
service before self, and integrity.

In June 2003, for reasons undeveloped in the record here, O'Loughlin filed a
complaint against Chief Carter and Michael Mulhern, the past General Manager of the
MBTA, with the Massachusetts Commission Against Discrimination (MCAD). The
MCAD case is currently pending. In August of 2003, Chief Carter informed. O'Loughlin
that she was being reassigned to supervise police detail operations throughout the MBTA
Police. According to O'Loughlin's testimony, Chief Carter told Ms. O'Loughlin at the
time of the reassignment, she would no longer be doing any graffiti investigations or
offering assistance as an expert to any other police departments. O'Loughlin stated that
supervising police details was considered a punishment assignment by supervisory
officers and that Deputy Chief Martino, who had once himself been demoted by Chief
O'Loughlin from Deputy Chief to detail supervisor agreed with her that it was akin to
discipline.

According to O'Loughlin, in the months preceding her March 2004 suspension,
which eventually resulted in her demotion, there was "discontent in the ranks, a feeling
that the rank-and- file wasn't being represented correctly." A key incident identified as

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 4

the source of the morale issues arose from a murder at the Dudley Square T station on
February 14, 2004. The crime received much notoriety in the press but and many
officers were alarmed and angry after a Boston Globe article quoted Chief Carter as
refusing to say whether delays in union contract negotiations had somehow played a role
in the crime. In addition there was consternation with rank-and-file officers and much
criticism of Chief Carter and the MBTA command staff for not showing up at the murder
scene at the Dudley Square T Station. One symptom of the morale problems and rancor
between the force and Chief Carter was an anonymously produced poster plastered
around the department in the style of the children's book Where's Waldo, entitled "No-
Show Joe." In response to these jibes, management initiated a departmental investigation
to locate the author of the poster and apparently decided to review the logs of recorded
telephone conversations made to a phone in the communications center commonly used
by police officers calling into the station.

The charges here came about from management's review of conversations that
Ms. O'Loughlin had between December 29, 2003 and March 3, 2004 with Officers
Robert MacKay and Officer Carl Rubino line when O'Loughlin was off-duty but Mackay
and Rubino were working. Most of these conversations are with dispatch Officer
MacKay, whom she described as both a personal friend for many years and a "central
figure in the department that everyone likes, and everyone calls and talks to if you need
some information, need to reach somebody, and also to hear rumor, gossip, scuttlebutt,
and have locker room banter." O'Loughlin knew that the particular phone line was a
recorded line, although it is not a published number for the MBTA police and is
apparently used mainly by officers calling the department for information. She also stated
that during the time period in question, Officer MacKay served as a sounding board, if
not a safety valve where everyone, including officers, Sergeants and other Lieutenants
besides her could let off steam while keeping discontent in-house.

One group of tape-recorded conversations took place between December 29, 2003
and January 7, 2004. In their meanderings, O'Loughlin and Officer MacKay at one

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 5

point discussed an individual who, Officer MacKay stated, "thought he was dragging 30 yards of fence," to which Ms. O'Loughlin, replied "He's such an idiot," which was followed by laughter. On direct examination, Chief Carter testified that he thought that the individual Officer MacKay and Ms. O'Loughlin were referring to was Union President Greg Lee. On cross-examination, Chief Carter stated that he thought the individual was Officer Sean Conway.

Also, during this same time period, Ms. O'Loughlin voiced her displeasure to Officer MacKay about the appointment of Ms. Shirley Osteen to the Police Officer's Association pension board. In her testimony, Ms. O'Loughlin stated that Ms. Osteen replaced a more vocal, active member. At one point, Ms. O'Loughlin told Officer MacKay, " That's because he [union president Greg Lee] thinks he can browbeat Shirley." and, "he [Mr. Lee] wants a stupid idiot."

Also, between December 29, 2003 and January 7, 2004, in a conversation between Ms. O'Loughlin asked Officer MacKay, Ms. O'Loughlin asked Officer MacKay, "How is No-show Joe [referring to Chief Carter]." Officer MacKay responded, "I haven't seen him since he started here. " and laughed. Ms. O'Loughlin responded by saying, "Unbelievable."

According to O'Loughlin's testimony, in either December 2003 or January 2004 her supervision of police details at the MBTA Greenbush line Construction Project in Hingham started taking more of her time as the project moved from the planning to construction phase. Around this time, she met with Deputy Chief Martino who put her in contact with Sergeant Richard Corcoran of the Hingham Police Department. According to the testimony of Sgt. Corcoran, there had been a history of problems with the Hingham MBTA detail predating Ms. O'Loughlin's arrival. Sergeant Corcoran testified that he telephoned Chief Carter prior to O'Loughlin's assignment to Hingham, but the issues were not corrected until after O'Loughlin arrived. Sgt. Corcoran said that she met with. O'Loughlin on almost a daily basis after she assumed supervision of the details. He described. O'Loughlin as very professional and responsive to the concerns and

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 6

complaints of the Hingham police. O'Loughlin's states that after talking with Sgt.
Corcoran, she informed Patrolmen Union President Greg Lee that this was high profile
detail work that MBTA police could lose if the officers working there did not do the
right thing. Chief Carter, in his testimony, believed that Sergeant Corcoran telephoned
him, not before, but after O'Loughlin arrived at Hingham and that the Town's complaints
about the work of MBTA police officers continued unabated under the grievant's watch.

Several serious charges against O'Laughlin relate to conversations she had with
Officer MacKay over the Hingham details. On January 26, 2004, Ms. O'Loughlin told
Officer MacKay, 'that whoever did the detail one day last week fucking unleashed a
vulgarity-laden tirade at some poor fucking old lady down there, and she was horrified.
If you have a problem like that, just call me...[Officer MacKay responds "yeah" and
laughs]...and I'll talk to the guy. You know I'm sure you have your fair share of
knuckleheads. We have more than our share."

On the same day, Ms. O'Loughlin and Officer MacKay discussed the problem of
MBTA detail officers in Hingham not attending to their duties. According to Ms.
O'Loughlin's testimony, she spoke with Officer MacKay, knowing that Officer MacKay
would "put the word out to the troops" that Sgt. Corcoran's concerns needed heeding. In
recorded conversations, Ms. O'Loughlin told Officer MacKay that Sgt. Corcoran told her
"I'm not trying to bust your balls. I'm just trying to ...you don't understand the people
down here, " to which. O'Loughlin claims on the phone to MacKay that she told
Sergeant Corcoran "Yeah, I do. They are rich spoiled bastards...you don't understand us.
We're city cops. We could give a fuck less." Ms. O'Loughlin went on to tell Officer
MacKay, " But I understand what you're saying, but they are going to fuck the details up
for themselves, so I have to talk to Colbert [referring to a union officer] tomorrow and
tell them just to give these guys a heads up because I met with the Sergeant [referring to
Sgt. Corcoran] and he's not a bad shit."

Ms. O'Loughlin eventually banned two officers from the detail who were a
continuous problem, and subsequently informed Deputy Chief Martino of this, which is