confirmed by Department documents. In her testimony, O'Loughlin repudiated these coarse remarks she made about the citizens of Hingham and the police and represents that her words to MacKay were not accurate renditions of what she in fact said to Sgt. Corcoran, but were, "a bit of bravado . . . you know to make yourself look good in the eyes of your co-workers."

In the same conversation, O'Loughlin is heard trying to recollect the name of Sergeant Corcoran whom O'Loughlin described as redheaded. When Sgt. MacKay said that someone named Feltrup knows Sgt. Corcoran, and referred to him as an older guy with red hair, O'Loughlin replied "Tell him its fucking red, the retard [referring to Feltrup]." O'Loughlin also, on the same date told Officer MacKay of a conversation that she had with Sergeant Corcoran where she reports she told Corcoran, "Look it. I'm being punished so anything I can do to help you guys out, you must let me know and I'll back you 100 percent. I said, it may not go beyond me, but whatever you want I'll do." Officer MacKay replied "yeah" and O'Loughlin replied, "I don't give a fuck." In her testimony, Ms. O'Loughlin stated that the "I don't give a fuck" statement meant, "I don't care. I'll do whatever they want me to do." Ms. O'Loughlin stated her reference to being "punished" referred to her being reassigned to the detail operation.

The next recorded conversations of note occurred on February 17, 2004, three days after the Dudley Square murder. In a recorded conversation, she told Officer MacKay, "I just called to see if there is any command staff around tonight, or they are all, you know, so worried about the 15th swearing in on Friday that they can't worry that some kid got stabbed." ... "we have a chief who won't even show." At the hearing, O'Laughlin did not disavow her harsh statements about Chief Carter but reiterated that she and other officers were "disgusted" by the incident and that their anger led to coining the "No-Show Joe" nickname for Carter.

On the same day, O'Loughlin and MacKay criticized Chief Carter's response to the murder— an expanded police presence in Dudley Square in the form of directed patrols where officers assigned to Dudley Station were ordered not leave the T Station as

part of a priority assignment. In the conversation, Officer MacKay told Ms. O'Loughlin, "They don't give a fuck who is down there." O'Loughlin responded in agreement. Mr. MacKay then stated that he thought that Chief Carter was "doing a hell of a fucking job," to which Ms. O'Loughlin responded "What is this the fourth murder under his tenure, under his watch...I don't think there's been four murders is the 20 years I've been on."

On the same day, Ms. O'Loughlin is overheard in a conversation with Officer Rubino about Deputy Chief Thomas McCarthy in which Officer Rubino referred to seeing Chief McCarthy (who he refers to as "little Tom") giving a press conference and says he thought Deputy Chief McCarthy's "head was going to blow up then." Ms. O'Loughlin replied, "You know, I'd love to know where he is getting the 35 people that he's going to put at Dudley," a reference to the common feeling among officers that there were not enough officers available to work the existing assignments. Officer Rubino then recounted an incident in which Chief McCarthy screamed at him. Ms. O'Loughlin responded, "Oh, and who the hell did you people think they were?" and asked, "Did he stomp his feet too?" Officer Rubino responded that Chief McCarthy "looked like Khrushchev banging the desk with his shoe." O'Loughlin replied, "Who the hell do you think you people are?" Also on that day, O'Loughlin said to Officer Rubino, "Well it's great when your command staff won't even show up to a murder." Officer Rubino, responded "twice" and Ms. O'Loughlin responded, "No, four times, buddy."

Also on February 17, 2004, O'Loughlin telephoned Officer MacKay, and after Officer MacKay said hello, O'Loughlin replied "You pork man," to which MacKay replied "Oh, yeah." Ms. O'Loughlin then asked, "you cloning?" to which MacKay replied "I'm going to rest now, okay?" Both then laughed, and O'Loughlin said to MacKay, "Dumb fuck." During her testimony, Ms. O'Loughlin said that in saying "dumb fuck," she was teasing MacKay.

On February 18, 2004, Ms. O'Loughlin and Officer MacKay are overheard in a long discussion over a Boston Globe article implying that Chief Carter believed delays in union contract negotiations played a role in the death of the murder victim. In the

conversation O'Loughlin asked MacKay, "Can you believe he said that." Officer MacKay responded "Un-fucking believable." Ms. O'Loughlin then said "Can't do anything about it," Officer MacKay responded, "Yup," and Ms. O'Loughlin responded, "are you shitting me, you dope?" MacKay then told O'Loughlin "they had a meeting with their PR guy today so we'll see what happens in tomorrow's newspaper, apology, but it's not going to cut it. We're going to launch our missile and then we're even, okay" to which O'Loughlin responded, "yup." At another point on the same date, Officer MacKay discussed with O'Loughlin Chief Carter's letter to the Boston Globe in response to the article. Officer MacKay told. O'Loughlin, "Let me see, I happen to have a copy of it right here...Letter to the Editors...and he writes–" which was followed by Ms. O'Loughlin saying, "saying what—I'm a fucking moron?"

On March 1, 2004, Ms. O'Loughlin and Officer MacKay discuss an incident they had heard about where a police officer told other officers that his mail carrier had criticized the MBTA police force, telling the officer, "You people should have been ashamed of yourself. You call yourself cops. You're not cops; you're security guards." O'Loughlin asked Officer MacKay, "Who the fuck is this guy?" and then stated, "I would have fucking pummeled him." O'Loughlin's stated at the hearing that this was just "banter," and that, "I probably would have done the same thing the kid did, shut the door."

Also that day, MacKay and O'Laughlin engage in extended gossip over the appearance of Deputy Chief Martino at a function where MacKay relates that an Officer Gillespie had told him that the pregnant woman standing next to Deputy Chief Martino at a press-conference was Martino's girlfriend. O'Loughlin responded by saying, "Really" and "Very nice," and then stated "All right, yeah, now she's got him by the balls." Officer MacKay continued, saying that what Officer Gillespie said has to be confirmed and that he didn't know if he could take it as "etched in stone." Ms. O'Loughlin responded, "Unbelievable. They should be fucking ashamed of themselves." In her testimony, O'Loughlin stated that she and MacKay take monogamy very seriously

and she was upset that "a member of the command staff was openly cheating on his wife." After Ms. O'Loughlin's testimony at this hearing, the parties stipulated that the woman in question was actually Deputy Chief Martino's daughter, though this fact was apparently not known to Ms. O'Loughlin at the time of the incident, and during her testimony.

On March 2, 2004, O'Loughlin and MacKay discussed the investigation that Chief Carter had initiated to determine who was posting the "No-show Joe" posters. In the conversation, O'Loughlin referred to Officer Hennessey, who O'Loughlin stated was rumored to be one of the subjects of the investigation. In the conversation, MacKay stated that Deputy Chief McCarthy was taking control of the investigation and that "he's doing more things now than he did for the murders down there at Dudley."O'Loughlin responded, "No kidding, I heard that he supposedly pulled out a fingerprint card between the letters I and P. I said, Yeah, okay." Officer MacKay responded, "Oh, God.". O'Laughlin then said, " I said you got to be—and when they find out who did it, if they found out who did it, what are they going to discipline him for? There is no crime there. It's a political satire." Later in the conversation Ms. O'Loughlin stated, "Okay, if that's conduct unbecoming, when we have ranking officers running around with extramarital affairs." In her testimony, Ms. O'Loughlin stated that "everybody was talking about" that someone had pulled a fingerprint card, and that she did not think she was revealing anything because it was "gossip around the station."

Ms. O'Loughlin also stated, "...if Hennessy thinks he is in danger of any type of finger pointing, then he should just let them know that he has witnessed people being in the company of other people when they have been on duty." When Officer MacKay stated "I imagine they would make an example of whoever they think it is," Ms. O'Loughlin replied "Yeah, they would try, but there's no—you can't discipline them, for what Bobby?"

On March 3, 2004, O'Loughlin and MacKay had a conversation discussing advice that she gave to Officer Jimmy Floyd. According to Ms. O'Loughlin's testimony, Officer

Floyd was going to have brain surgery and planned to take Family Medical Leave Act (FMLA) time. Officer Floyd called O'Loughlin and was crying because he had received a termination notice from the MBTA, despite the fact that a union official and Deputy Chief Martino had okayed the FMLA time. O'Loughlin told Officer MacKay, "I said, brother [referring to Officer Floyd], they can't do that to you. You had a Union official sit down with you and that little puke [referring to Deputy Chief Martino], and he gave you the okay to do?" As the conversation over Floyd's situations continued, she told MacKay "Don't deal with [union president] Greg Lee. Deal with Brian Carey [union vice president] to give you the advice that you need." O'Loughlin also told Officer MacKay, "I told him, Jimmy [referring to Officer Floyd], get a lawyer, and sue them for harassment." Ms. O'Loughlin testified that she advised Floyd to speak to the Union Vice President rather than the President, because she knew Union Vice President Carey was familiar with FMLA time because he has a disabled child and had used FMLA leave. O'Loughlin said that an hour later, Deputy Chief Martino informed Officer Floyd that the termination notice had been sent in error.

Also on that day, O'Loughlin also spoke with MacKay about Patrolmen's Union Business Agent Paul Burns' alleged ineffectiveness in dealing with the administration on the issue of overtime pay for an Officer Zelinski. In her testimony, O'Loughlin stated that Officer Zelinski approached her for advice. In the transcripts of the taped conversations she tells Officer MacKay, "and I looked at Zelinski and I said are you shitting me, kid. You're paying this guy 700 bucks a week. You think he's actually going to tell you the truth?"

On March 8, 2004, Officer O'Loughlin was called to Chief Carter's office, told that she was put on administrative leave and escorted out of the building. According to Ms. O'Loughlin's testimony, she was then confined to her house, and on the same day, the MBTA also responded to Ms. O'Loughlin's MCAD complaint.

On April 16, 2004, O'Loughlin received notice of a hearing that under Massachusetts General Laws Chapter 31. On May 14, 2004, formal charges were issued

as well as a notice of suspension. The Chapter 31 hearing took place on May 21, 2004 and June 15, 2004. At no point during the investigation was O'Loughlin asked to make a statement, nor did she volunteer to do so. Deputy Chiefs Dolores Ford-Murphy and Thomas McCarthy conducted the investigation. O'Loughlin did not testify at the Chapter 31 hearing.

On August 9, 2004, the Chapter 31 Hearing Officer submitted a report, finding that there was just cause to find that O'Loughlin violated the policies practices and procedures as charged. On August 19, 2004, Chief Carter demoted O'Loughlin from Lieutenant to Police Officer. O'Loughlin and the Union subsequently appealed the decision to this forum.

In March 2005, prior to the first arbitration date, according to the testimony of Chief Carter and Sgt. Corcoran, Chief Carter telephoned Sgt. Corcoran. According to Sgt. Corcoran, Chief Carter asked Sgt. Corcoran if he had put anything in writing in regard to the Hingham detail and whether he had any issues with Officer O'Loughlin. Sgt. Corcoran, in his testimony stated that he told Chief Carter that he had no issues with Officer O'Loughlin and thought she handled the issues in a very professional manner.

**EMPLOYER POLICIES, RULES AND PROCEDURES:**

**Supervisory Span of Control**

**MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 62, Section 2.0, also reference Chapter 101, Section 1.0** states in part, "It is the policy of the Department that all Supervisors will immediately report all violations of law committed by Officers under their command or control through the chain of command. Furthermore, all Supervisors will immediately report through the chain of command violations of Department policies, rules or procedures committed by Officers under their command or control that require further disciplinary action. Failure to do so, in either case will be considered neglect of duty. The reports will include a recommendation concerning any further action or disposition."

**Duties And Responsibilities of All Supervisors**

**MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 62, Section**

3.0 states in part, "Supervisors will ensure that all subordinates perform their duties in a professional, efficient and effective manner, and act in compliance with all Department policies, rules and procedures..."

**Loyalty and Integrity**

**MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 101, Section 2.1** states, "A Police Officer shall be faithful to his/her Oath of Office, Oath of Honor, Code of Ethics, the principles of professional police work and the Goals and objectives of the Department. He/she shall not allow personal motives to govern his/her decisions and conduct. The public demands that the integrity of its Police Officers be above reproach. The dishonesty of a single Police Officer may cast suspicion on the entire Department. Each Police Officer must scrupulously avoid any conduct that might compromise the integrity of themselves, fellow Police Officers, or the Department."

**Interference With Work**

**MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 101, Section 2.11** states, "Police Officers shall not interfere with cases assigned to other Officers except with the consent of the assigned Officer. Officers shall not unnecessarily interfere with the work or operation of any unit of the judicial system."

**Behavior**

**MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 101, Section 2.3** states, "Police Officers whether on or off duty shall be governed by the ordinary and reasonable rules of good conduct and behavior, and shall not commit any act tending to bring reproach or discredit upon themselves or the Department. "Conduct Unbecoming a Police Officer" shall include that which tends to indicate that the Police Officer is unable or unfit to continue as an MBTA Police Officer or tends to impair other employees or the operation or the Department. Both sworn and civilian members of the Department shall conduct themselves, at all times, both on and off duty, in such a manner as to reflect most favorably on the Department."

Discourtesy

**MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 101, Section 3.7** states in part, "No employee shall conduct him/herself in a manner that is rude, impolite, contemptuous or insolent to or about a Superior Officer, or a fellow employee, or representatives of other agencies, or to the public."

Harassment-Supervisor and Manager Responsibilities

**MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 101, Section 3.18 Section VI** states in part, "It is the responsibility of each supervisor and manager to enforce terms of this policy. Supervisors, managers or department heads who become aware of incidents of harassment in their departments, even in the absence of a formal complaint, should take immediate and appropriate actions to eliminate the conduct. Supervisors and managers must also report all incidents to the Office of Diversity and Civil Rights."

POSITIONS OF THE PARTIES- DISCUSSION

The Employer contends that the record plainly shows that O'Laughlin violated the Department's rules as alleged in the demotion action: O'Loughlin's many disparaging, unprofessional and sometimes vulgar remarks in reference to Department Command Staff and civilians in violation of the Department's rules; . O'Loughlin allowed and encouraged subordinates to make contemptuous and insolent remarks about superiors, neglecting her responsibility to ensure that her subordinates abide by Department rules; by so doing she subverted Chief Carter's efforts to maintain high standards of professionalism in the Department. The Employer claims that because Ms. O'Loughlin knew MacKay's role as a source of gossip and innuendo in the Department, she knew or should have known that MacKay would likely broadcast all of her disparaging comments to other officers.

The Employer argues that it should not be seen as a conventional employer, but rather the MBTA Police is a paramilitary organization with a lower tolerance in some to disciplinary issues, particularly the criticism of superior officers. It argues that the

MBTA's unique mandate to protect the life and limb and property of millions of individuals, particularly in light of the events of September 11, 2001, gives the MBTA a right to impose regulations strictly in a fashion that might not pass muster in another place and time. In the context of these heightened standards needed for paramilitary discipline, the Employer claims that Ms. O'Loughlin lost her compass and forgot to lead, forgot to set an example and neglected her duty to maintain order and neglected her duty both to her co-workers and to private citizens. The Employer asks the Arbitrator to agree that the evidence supports the conclusion that O'Laughlin neglected her sworn duties as a member of the command staff, and accordingly must be deemed no longer capable of being a supervisor and role model in the Department.

The Union's case starts with the observation that the charges against O'Loughlin do not stem from on-the-job complaints from co-workers, superiors or civilians, but, rather from the unexplained decision of Chief Carter's closest staff to listen to recorded phone lines. The Union contends that the type of "locker room" speech heard on the tapes is normal and unremarkable for police department employees and should be deemed protected under the First Amendment. With respect to the complaints arising from O'Loughlin's role in advising subordinates and the discretion that she exercised in the disciplining of employees, the Union contends that her actions were consistent with workplace norms and not a violation of departmental regulations. It argues that the objected-to conversations took place in the context of what were assumed and intended to be private phone calls in a room not open to the public with a friend while off duty. The Union cites testimony that the phone line was not intended for emergency use, and states that while the public can make requests to hear portions of tapes for court proceedings, there was nothing in the testimony that would cause these conversations to be requested by the public, nor is there evidence that O'Loughlin herself ever voiced any of the criticisms of the department or Chief Carter or of Union officers in a public setting.

The Union raises objections about the investigation of O'Laughlin's alleged misconduct, including Chief Carter's minimal involvement in the investigation, the

failure of the Employer to call the deputy chiefs who conducted the investigation to testify at the hearing, and the fact that despite the Employer did not follow it's own policy by failing to require or request that O'Loughlin make a statement, as well as the failure to interview O'Loughlin prior to charging her. The Union concludes that considering O'Loughlin's long career, her many commendations, the fact that she has virtually no prior history of disciplinary activity, and the fact that she is not accused of any criminal violations, the penalty of demotion is disproportionate and instead Ms. O'Loughlin should receive a letter of reprimand.

Charges relating to O'Loughlin's Reporting Subordinates at The Hingham Detail:

O'Loughlin is charged with violating MBTA regulations in regard to Supervisory Span of Control and Duties and Responsibilities of All Supervisors in regard to her supervision of the Hingham detail.

The Employer states that O'Loughlin became Detail Unit Commander in August 2003 and several months later; the Hingham detail became the source of complaints against the MBTA police by Hingham residents and police. The Employer cites Ms. O'Loughlin's comments to Officer MacKay in which she calls Hingham residents "rich spoiled bastards" and that, "we could give a fuck less" as injurious to community relations and setting a bad example to subordinates by legitimizing stereotyping of a community. The Employer criticizes O'Loughlin for: failing to discipline a MBTA Officer who unleashed the "vulgarity-laden tirade" at the Hingham resident; for not following up with Union President Greg Lee to make sure he had "passed the word along" to the detail officers regarding complaints that the officers were receiving, and for never issuing a letter to the officers telling them to refrain from unprofessional actions. The Employer also finds some fault with Sgt. Corcoran's testimony due to Sgt. Corcoran's apparent error when he stated that the MBTA Police detail began in the Summer of 2003 when it apparently began on October 31, 2003.

The Union paints a far more responsible picture of O'Loughlin in regard to the Hingham detail. It cites testimony from O'Loughlin and Sgt. Corcoran detailing her meeting on a regular basis with Sgt. Corcoran, his statement at the hearing that she had satisfactorily addressed any issues raised by the Hingham police department. O'Laughlin testified that she had acted to end the detail abuses identified by the Hingham police by telling Union President Lee and Officer MacKay that the problems with the details had to stop, and by banning two officers from the job after problems with the two officers persisted. The Union asserts that discipline per se was not mandated by law or department rules as Chapter 62 Section 2.0 gives an officer discretion in determining which violations of subordinates to report. Chief Carter affirmed that this reading of Section 2.0 is correct. The Union notes that O'Loughlin's testimony that she removed the officer is corroborated by Department documents, but contradicts Chief Carter who based his decision to demote O'Laughlin on his believe that O'Loughlin had not taken any action with respect to the reported problems in Hingham.

The Union faults Carter's testimony that Sgt. Corcoran, and by implication the Hingham Police Department, was dissatisfied with O'Loughlin. Sgt. Corcoran testified, contrary to Chief Carter's recollections, that Chief Carter called him with concerns about the Hingham detail before O'Loughlin took active control over supervising the details. According to Sgt. Corcoran, then, O'Loughlin was not responsible for the detail's problems that existed in the summer of 2003, rather, things improved once O'Loughlin arrived. Sgt. Corcoran also stated that O'Loughlin was very professional, that she addressed any needs he voiced in a timely and efficient manner, that he never had any problem with her on the job, and that he has no recollection of O'Loughlin making comments to him that were attributed to her in the charges. This corroborates O'Loughlin's testimony that she never insulted him or the Town of Hingham, but was "pounding her chest" and blustering when she made objectionable remarks to MacKay on the recorded line.

The Union also notes Sgt. Corcoran's testimony that Chief Carter called him just

prior to first arbitration date, asking Sgt. Corcoran about a prior phone call in which the Chief recalled that Sgt. Corcoran had allegedly complained about O'Loughlin to Chief Carter and Deputy Chief Martino. In his testimony, Sgt. Corcoran's stated that he told Chief Carter that no such conversations had taken place, and that he was pleased with O'Loughlin's work. Sgt. Corcoran testified that he had called Chief Carter to voice complaints about the detail when Deputy Martino was in charge of the detail because Deputy Martino did not return his phone calls.

I find Sgt. Corcoran's testimony to be crucial on these charges, as since he is from an outside police department, had no interest in the disposition of the matter and because of his lack of involvement in the dispute was the most objective witness on O'Laughlin's conduct as the detail officer overseeing the conduct of MBTA police officers on the construction work in Hingham. Sgt. Corcoran's testimony is most favorable to the credibility and the integrity of O'Loughlin and while it is true that his memory on the start time of the construction project is sketchy, his recollections of his conversations and interactions with O'Laughlin is on balance clearer and more credible than other witnesses. Consequently, I am inclined to believe that O'Loughlin adequately supervised the Hingham detail, and did not abuse her discretion that she had under the Department regulations with regard to disciplining subordinates. Her comments to Officer MacKay about Hingham residents were rude, but they were not public utterances, and did not affect the public's perspective on the department. In sum, there is no evidence that O'Loughlin did anything to hurt damage the department's interest in improving community relations between the MBTA and Hingham or to undermine the effectiveness of the command staff with respect to her oversight of the construction details.

<u>Reporting Subordinates Comments in Regard To The Dudley Station Murder</u>

The Employer contends that O'Loughlin's failure to correct the offensive statements of MacKay and Rubino amount to tacit approval of their bad conduct and

amounted to neglect of her responsibilities as a superior officer. The Employer points out that at no time did O'Loughlin make effort to stop or indicate disapproval of these comments. Consequently, The Employer argues, O'Loughlin undermined the authority of the command staff. The Employer also suggests that O'Loughlin's failure to report Officers MacKay and Rubino was a form of special treatment based on friendship, citing instances when O'Loughlin had disciplined officers in 1992 for minor offenses.

The Union, in response, cites the decision of the arbitrator in a case arising out of the same telephone intercepts as are at issue here, where the arbitrator found that MacKay's remarks did not violate Departmental regulations. If that is so, the Union opines, there was no violation of the rules for O'Loughlin to report. The Union states that even if MacKay or Rubino's statements were serious enough to report, Ch. 101 Section 1.0 only would have required O'Loughlin to report Officers MacKay and Rubino to superiors only if they had violated the law.

The Union also states that MacKay's comments should be seen in light of the difficult time that the Department was having at the time of the Dudley Square murder, and the fact that it is exceedingly common in workplaces for one to complain about one's boss.

While it might have been advisable for O'Loughlin to caution Officer MacKay and Rubino when their comments got out of hand, and her penchant for gossip is grounds for censure, I agree with the Union that. O'Loughlin was not clearly mandated by regulation to report the officers while she was in off-duty status. The mere fact that she listened to her friends' gripes about their bosses is not worthy of severe discipline where the record shows no consequences to the department from her participation in the recorded "bull sessions." Indeed, in the entire record, there is no persuasive evidence that O'Laughlin's gossiping and griping, however immature and offensive, had any effect on her or any subordinate officer's conduct on the job, willingness to follow orders or that her ostensible failure to act otherwise influenced the actual conduct of any officer in the department.

O'Loughlin's Comments Regarding Various Individuals and Command Staff

O'Loughlin is charged with violating MBTA regulations in regard to Loyalty, Integrity and Discourtesy, specifically being rude and impolite to superior officers and subordinates, or otherwise unprofessional. Here, the Employer cites a number of instances where O'Loughlin criticizes command staff and calls various individuals names such as "retard," "idiot," "dumb fuck," "dope," and "little puke," including calling Chief Carter a "fucking moron." The Employer states that O'Loughlin's comments reflected a gross display of contempt and disrespect for the chain of command, and that the comments were particularly deleterious as they were expressed to on-duty subordinate officers MacKay and Rubino, proving a "green light" for subordinate officers to likewise engage in these types of remarks and maintain an insolent attitude toward the chain of command. The Employer also alleges that O'Loughlin took part in purely malicious rumor mongering when she fostered the fallacy that Deputy Chief Martino's pregnant daughter was his mistress. The Employer also contends that even though O'Loughlin's comments were made while she was off-duty, they were made to on-duty officers on an official MBTA phone line. The Employer notes that Rule 2.3 requires officers to conduct themselves in such a manner to reflect favorably on the Department both on and off duty.

The Union counters that O'Loughlin's sarcastic and critical comments, many of which take place in the aftermath of the Dudley Station murder must be seen in the context of media and public criticism of the Department as a whole, and particularly Chief Carter's inference to the Boston Globe that problems with the Unions may have been responsible for the lack of coverage at Dudley Station which was particularly offensive to O'Loughlin and other officers. The Union cites Chief Carter's testimony where he admits that command staff did not show up at the murder scene, yet they had time for ceremonial events. The Union notes the frustration of O'Loughlin and other officers when MBTA police officers' work is not mentioned in a news article, provoking the statement from O'Loughlin in which she is charged for responding, "Can you blame

them?...We have a chief that won't even show." The Union also refers to Chief Carter's testimony where he acknowledges, "all managers know that police officers banter. There's locker room talk. The Union contends that given this acknowledgment and the climate at the time, it is understandable that superiors might share in subordinates' frustration.

The Union also contends that many other comments that O'Loughlin is charged with are misrepresented, taken out of context by the employer, and in some cases too vague to understand. These include O'Loughlin calling her friend Officer MacKay a "dumb fuck," which was said teasingly, and instances where Chief Carter appeared unsure who particular statements were referring to, and importantly, that he could not state the standards for determining the threshold between acceptable "banter" and actionable insults. The Union minimizes O'Loughlin's mistakes made about Officer Martino's daughter, by noting that Chief Carter was also laboring under the mistaken impression that the woman in question was Martino's wife, since Chief Carter calls her, "Martino's better half." Thus does gossip and innuendo vex both the righteous and the wicked.

While there is no question that O'Loughlin's comments were extremely critical of the Department and other individuals, my starting point is that not all criticism of a superior officer and command staff is per se actionable by an employer. In fact, if all such comments were actionable, police departments would have to devote precious resources away from protecting the public safety in an attempt to squelch out all private dissent within a department.

Employers can, however, draft reasonable regulations prohibiting insubordination and other conduct with clear restrictions on what is acceptable verbal conduct on-duty and in a more limited fashion, while off-duty. The two rules that Ms. O'Loughlin is charged with violation in this instance, (Chapter 101, Section 2.1 (Loyalty and Integrity) and Chapter 101 Section 3.7 (Discourtesy) plainly pertain to the public, on-duty actions of employers. (The Employer makes reference to another rule, Chapter 101;

Section 2.3, which limits certain off-duty behavior by officers, but. O'Loughlin is not charged with violating Chapter 2.3 on these violations. Rather, she is only charged with violating Chapter 2.3 in connection with her alleged interference with union business.)

Consequently, I find that O'Loughlin did not violate either of the rules that she is charged with violating. O'Loughlin, while off-duty, called regularly what was indisputably known as the department's gripe and groan line. She did not call with any intent to change the actions of the officers in the conversation with respect to their obligations as police officers or to undermine the authority of the Command Staff. With all the damaging actions that a disloyal or discourteous employee could take to harm the department, it is hard to see exactly how Ms. O'Loughlin's venting in this fashion harmed the department. Her comments are immoderate, ill-considered and unprofessional, but as noted before there is simply no showing that any of her ill-considered discussions with Officers MacKay and Officer Rubino affected their conduct or responsibility to carry out the orders of the command staff. If fact, in her many phone calls, she never proposes or encourages Officers MacKay or Rubino to do or not do anything. Merely voicing an opinion to another officer in a putatively private telephone conversation cannot be deemed insubordinate even if the underlying sentiment is rude and offensive.

The Employer contends that she gave other employers a green light to maintain an insolent attitude toward the chain of command, but I am not persuaded that she promoted such an attitude, or if so, that her remarks about widely perceived unfairness within the department caused any change in conduct, as opposed to reflecting the morale of the officers at that point. There is no showing that O'Loughlin intended her comments to be heard in public or to cause any change in the officers' duty to follow orders or to implement the goals identified as priorities by management.

**Interference With Union Business and Failure To Report Harassment**

These charges regard the March 3, 2004 advice that. O'Loughlin gave to Officer Floyd and Officer Zelinski. O'Loughlin is charged with violations of MBTA regulations in regard to Behavior, and with regard to Officer Zelinski, the MBTA rule that outlines Supervisor and Manager Responsibilities to report unlawful harassment to management.

The Employer contends that O'Loughlin should have stayed out of matters involving the relationship between subordinate officers and their unions, and should not have given advice about how their business agent was performing nor criticized management's handling of an FMLA leave request. In the case of Officer Floyd, the Employers position is that O'Loughlin should have reported Officer Floyd's complaint to the Office of Diversity and Civil Rights in accordance with the EEO Compliance Program between the MBTA and various parties.

The Union replies that normal supervisory duties include advising subordinates on a wide variety of workplace matters, and more so when a superior possesses advanced knowledge and experience and where they believed that someone was not acting in a co-worker's interest. The Union cites O'Loughlin's testimony that she advised Officer Floyd to seek advice with regard to medical leave because Officer Carey had experience with the forms and procedures as the result of having a disabled child. The Union also notes that prior to charging Ms. O'Loughlin, the Department neglected to investigate why Ms. O'Loughlin gave this advice, and in his testimony, Chief Carter remained unaware that Officer Carey had experience with Family Medical leave due to having a disabled child.

The Union's position with regard to the other instance of alleged interference is that Officer Zelinski approached Ms. O'Loughlin for her opinion about the business agent, and Ms. O'Loughlin gave him her opinion, including her contention that the business agent was not acting in Officer Zelinski's best interest. The Union also cites testimony of Chief Carter acknowledging that there is no MBTA rule forbidding officers who are members of their own union, from giving advice to a member of a different union.

The allegation that Ms. O'Loughlin failed to report harassment regards the situation with Officer Floyd, in which a miscommunication (a mistakenly sent letter of termination to Officer Floyd) was found to have happened an hour after Ms. O'Loughlin advised Mr. Floyd. The Union contends that consequently, there was no allegation of harassment to report, just a false alarm.

I find that these charges clearly exceed the evidence presented at the hearing. The mere fact that O'Laughlin offered her opinion on these common work place concerns cannot be construed as interfering in the business of the patrol officers' union. This is not a case where she exercised her role as a superior officer to direct or dissuade a subordinate to undertake, or avoid, a course of action that would be antithetical to the interest of the subordinate's union. Her claim that management's rejection of officer's Floyd's FMLA claim was "harassment" is clearly nothing more than reactive hyperbole and not a conclusion that the officer had a cause of action under the law for improper discrimination, or that Floyd had made such a claim (as opposed to her emotional reaction to his supposed mistreatment) warranting investigation.

**Interference with Ongoing Investigation**

The Employer claims that O'Loughlin interfered with the Department's investigation by participating with MacKay in a discussion of the steps management was taking to investigate the posting of the "No-Show Joe" and by proffering her opinion on whether management had the authority to discipline an officer for making or posting what she called a satirical message.

The Union rejects this claim and notes that this was a discussion of an existing rumor where Officer Hennessey was one of the individuals being investigated! As testified by O'Loughlin, "everybody was talking about" rumors that someone had pulled fingerprint cards for officers with names from I to P. The Union states that while the investigation was private and Ms. O'Loughlin was never a party to it, all persons of rank were aware of the investigation. From my reading of the facts, I conclude that Ms.

O'Loughlin, who was not part of the investigation, lacked the ability to divulge confidential police information to unauthorized sources because she possessed no such information. There is no evidence that Ms. O'Loughlin did in fact or intended to thwart the investigation.

Other Arbitration Awards

The Employer and Union both address the weight to be given a quartet of parallel arbitration award addressing the question of just cause for police officers who like O'Laughlin, received discipline following management's review of the recorded police line.

The first award is Arbitrator Canavan's decision overturning the discharge of MacKay. The Employer asserts that MacKay's case was incorrectly rendered largely because the arbitrator did not give proper weight to the distinctive nature of police employment. There, as here, the Employer argued that where police departments are paramilitary entities, police officers are held in higher standards than in other professions. Moreover, the Employer asserts, the award in MacKay's favor ignores the special circumstances that called for Chief Carter's Plan of Action. If not incorrect, the MacKay award is not a suitable yardstick for this grievance because O'Loughlin, as a Lieutenant and part of the command staff had a higher responsibility than MacKay to be a role model and adherent to the values the Plan of Action promotes. Likewise the Employer suggests the decision of Arbitrator Garraty setting aside the demotion of Lt. Flemming is either inapplicable because Flemming did not use the same coarse and vulgar language, did not disparage other officers and Command Staff and his misconduct was only indirectly related to his supervisory functions.

In contrast, the Employer suggests that I find guidance Arbitrator Canavan's decision denying the grievance of Officer Hennessey, and a similar decision by Arbitrator Fink denying Officer Floyd's grievance, where the phone calls were found to violate the department rules and regulations at issue here, in part.

While I concur with the employer that these decisions are not authoritative, I do not agree that Arbitrator Cannavan did not consider the need for heightened discipline in a police department. Rather, Arbitrator Cannavan found that Mr. MacKay's frank comments, expressed in the "idiom of the day," were expressed in private conversations between officers, were not known to the public and caused no harm to the department. Thus, even assuming for the sake of argument, that the hierarchy of the MBTA police required more flexibility in administering its rules than might be allowed in a non-police context, if there was no demonstrable harm to the command structure from MacKay's or O'Laughlin's conversations, discipline based on putative damage to the department's standing or order in the department would still be unjustified.

Arbiter Canavan's finding in the Hennessey arbitration that just cause existed for finding some of Hennessey comments in violation of MBTA rules can be distinguished from both MacKay and this case because some or all of Hennessey's remarks were not said in private, and some of his particularly vulgar statements had nothing to do with working conditions and other public issues as is the case here. The decision in the Floyd arbitration can also be distinguished from this case, because Floyd, unlike O'Loughlin, was deemed to have violated MBTA Police harassment regulation because of he uttered a racial slur ("nigger") in violation of the department's zero tolerance policy for such offensive language.

Finally, while the Employer struggles to distinguish the Fleming arbitration and the case at hand, I find the reasoning of the Arbitrator in that case instructive. There, as here, the grievant was a lieutenant demoted because of private conversations on the recorded line with Officer MacKay. The substance of Fleming's conversations with MacKay touched on some of the same topics–the Dudley Square murder and the subsequent Globe Article– and there, as here, the demotion was based on premised on Fleming's failure to correct offensive and disparaging remarks from MacKay such as "fucking retarded" and "fucking morons." In at least one case, Lt. Fleming's language was as or more offensive than O'Loughlin's when he states to MacKay, "Better to be a

racist than a chicken... At least racist carries the connotation you can fight." It is also noteworthy that in contrast to O'Laughlin, Fleming had been subject to progressive discipline (a demotion and suspension) prior to the recent suspension and thus would have arguably warranted more severe discipline than O'Laughlin.

To sustain the demotion under the just cause standard, the Employer must show by a quantum of probative evidence that the employee engaged in conduct that was prohibited by known rules and standards, that the employee knew or should have known of the consequences of violating the department's rules, and that there is at some rational relation between the alleged infraction and the severity of the discipline, and finally, where appropriate that progressive discipline was followed.

Virtually all of the evidence in this case consists of recorded phone conversations that the grievant initiated while off-duty and not engaged in department business. To find the grievant in violation of Departmental regulations, one must find that the very words that the grievant used consist of misconduct per se, or that some misconduct that the grievant or dispatcher described, actually happened. What is noticeably absent in this case are statements from her superior officers, subordinates, co-workers or civilians alleging that the grievant's speech conduct, such as making negative comments about the Command Staff diminished in any way the reputation of the department or its managers. The only testimony from a witness who regularly interacted with Ms. O'Loughlin was offered by Sgt. Corcoran, who found Ms. O'Loughlin very professional and was happy with her work as a supervisor of her crew. O'Laughlin's effectiveness as a supervisor and how her employment impacted the community could have been readily discovered during the disciplinary investigation by interviewing Sgt. Corcoran. The fairness of the investigation is also tarnished by the disinterest of the department in obtaining any statement from Ms. O'Loughlin, and the appointment of Deputy Chief McCarthy—a known antagonist of O'Loughlin-- to co-lead the investigation.

Since the statements were made with the expectation of privacy and while Ms. O'Loughlin was off duty, Ms. O'Loughlin lacked clear notice that her actions were in

potential violation of Department rules. The Employer also lacked a clear policy in regard to penalties. Notably, Chief Carter, was unable to articulate a clear policy such as a table of penalties, or guidelines on how to penalize first and subsequent offences for the sorts of misconduct alleged here. Chief Carter also testified that progressive discipline is not required for violations of any of the core values within the Plan of Action. Given the fact that the core values appear to have been broadly construed to encompass practically any infraction, I have determined that despite Employer's insistence that the penalty is valid, there is no coherent basis for the severity of the penalty, the Department disregarded all of O'Laughlin's prior service record and did not consider whether a lesser penalty might correct the shortcomings in her performance.

Ms. O'Loughlin has heretofore been regarded as professional and capable officer. It is hardly news and more accurate to say that it is excessively common to complain about one's boss. The language used by O'Laughlin while spicy and intemperate is quite common fodder in any institution, and even Chief Carter admits that the type of language that Ms. O'Loughlin used is within the norm of what is heard in police banter. Where there is no evidence that prior to these incidents the rules and regulations of the department had ever been extended to encompass off-duty conversations, and no evidence that any supervisor had been demoted for failure to correct a subordinate's verbal misconduct, charges emanating from the conversations alone cannot survive just cause scrutiny. As noted in the discussion above, the facts do no support the charge that O'Laughlin had failed to control the police officers assigned to work on the Hingham details or had otherwise failed to properly represent the department in her relations with the Hingham police department and therefore those charges too cannot support the demotion.

In summary, the balance of the evidence, convinces me that the Employer did not have just cause to demote Ms. O'Loughlin. Even with the evidence seen in the best light, and with all deference to the unique and essential role that law enforcement plays in today's troubled world, the evidence properly weighed does not support the discipline

MAR. 23. 2006 9:45AM MBTA LAW DEPARTMENT NO. 0151 P. 30/30 33

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 29

imposed here. I conclude that the Employer did not have just cause to demote the grievant and accordingly the grievance is affirmed.

**AWARD**

The Employer did not have just cause to demote Ms. O'Loughlin. The grievance is allowed. O'Loughlin shall be reinstated to her former position and made whole for lost pay and benefits resulting from this demotion.

Respectively submitted,

Timothy Buckalew, Arbitrator.

**EXHIBIT H**

VOLUME I
PAGES 1 - 71
EXHIBITS: 1-3

UNITED STATES DISTRICT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 04-10933-JLT

NANCY O'LOUGHLIN, )
Plaintiff, )
)
vs. )
)
MASSACHUSETTS BAY )
TRANSPORTATION AUTHORITY and )
JOSEPH CARTER and MICHAEL )
MULHERN, )
Defendants. )

ORIGINAL

DEPOSITION OF MACDONALD DANIEL, taken on behalf of the Defendant, Michael Mulhern, pursuant to the Federal Rules of Civil Procedure before Tina M. Sarcia, Registered Professional Reporter and Notary Public within and for the Commonwealth of Massachusetts, at the law offices of Wilmer, Cutler, Pickering, Hale and Dorr, LLP, 60 State Street, Boston, Massachusetts, on Friday, January 20, 2006, commencing at 2:06 p.m.

APPEARANCES

Mitchell J. Notis, Esquire
370 Washington Street
Brookline, Massachusetts 02445
(617)566-2700
mitchnotis@aol.com
For the Plaintiff

Joseph L. Edwards, Esquire
PRINCE, LOBEL, GLOVSKY & TYE, LLP
585 Commercial Street
Boston, Massachusetts 02109
(617)456-8131
jledwards@plgt.com
For the Defendant, Massachusetts Bay Transportation Authority and Joseph Carter

Gregory M. Reiser, Esquire
WILMER, CUTLER, PICKERING, HALE & DORR
60 State Street
Boston, Massachusetts 02109
(617)526-6527
gregory.reiser@wilmerhale.com
For the Defendant, Michael Mulhern

APPEARANCES:

Jon Albano, Esquire
BINGHAM MCCUTCHEN, LLP
150 Federal Street
Boston, Massachusetts 02110
(617)951-8360
For the Deponent, MacDonald Daniel

years would you say those conversations took place?

A. From the time that I started covering the T -- from the time that he was appointed general manager to the point at which he left which was what, something like two and a half years, thereabouts.

Q. During any of those conversations, did you and Mr. Mulhern ever discuss Nancy O'Loughlin?

A. Yes.

Q. How many conversations did you discuss Nancy O'Loughlin?

A. To the best of my recollection, just the once.

Q. When did that conversation occur?

A. Before the article in question was written. So it would have been -- if I recall, it was March 10th of 2004.

Q. Was that a telephone conversation?

A. Yes.

Q. Who initiated that telephone conversation?

A. I can't say. More than likely I called Joe Pesaturo at the T and then Pesaturo got

Mulhern on the phone somehow. They called me in a follow-up conversation. I can't remember him.

Q. What prompted you to call Mr. Pesaturo on that occasion?

A. The Boston Herald the day before had an article in the paper which talked -- which was about an investigation into this Where's Waldo incident at the MBTA police department.

We didn't have that story on. So I was similarly following up to try to match it in The Globe, likely, calling Pesaturo first to see what information I could confirm, and then to then -- go from there. So as best as I can recall, I was following up on the Herald piece.

Q. Do you remember the title of The Herald article?

A. I know it was by Robin Washington who was covering the T at the time, and it had something to do with the Where's Waldo.

Q. What specifically did you and Mr. Mulhern talk about during that conversation? What did you say to him, and what did he say to

you?

A. Again, I'm sorry. I can't recall the specifics, but the general tone was that -- I think I was calling just simply to kind of confirm what was in The Herald, and Mulhern and Pesaturo were saying that the investigation involved more than just Where's Waldo's incident, and that it involved allegations over misuse of the department's CORI system, and so they were letting me know that it was -- that it involved these incidents.

Q. Were both Mr. Pesaturo and Mulhern on the phone with you during the entire conversation?

A. Maybe off and on. They might have switched phones. Typically they put you on speakerphone, but I don't recall.

Q. Do you know if anyone else was on the conversation?

A. Not that I'm aware of. I usually ask if there is anybody else in the room if they put me on speakerphone.

Q. You testified this occurred in March of 2004,

you think?

A. Correct.

Q. Do you know about how many days before this article came out this conversation took place?

A. It would have been the day before. It would have been on the 10th prompted by the article in The Herald that came out on the 10th.

Q. Did Mulhern tell you that the investigation had nothing to do with Where's Waldo?

A. Yes. He told me that those were the initial reports, or he said it was more serious than that.

Q. Did Mr. Mulhern mention Nancy O'Loughlin's name during that conversation?

A. Mike Mulhern, I had been talking to other sources that day and used the opportunity to ask Mulhern to confirm whether Nancy O'Loughlin was one of the people involved, and he -- I can't recall exactly what he said, but I think he more or less said that he couldn't neither confirm nor deny that O'Loughlin was involved. My recollection of the conversation is hazy. I don't know the

A. I believe he is, yes, and that would have -- yes, I believe he is.

Q. Did he actually say that a lieutenant who allegedly encouraged the officers' activities also was suspended, or did he just confirm that statement as given to him by yourself?

A. He just confirmed that statement. Actually, I don't know if he confirmed lieutenant. I think that might have been something I simply added in writing that sentence. So he talked about Nancy O'Loughlin, and instead of putting her name there, I simply put lieutenant.

Q. Did he say that -- did he confirm or say that Nancy O'Loughlin encouraged the officers' activities and was suspended?

A. That's part of the sentence that gives me trouble. I don't remember.

Q. The next sentence, "The probe could lead to criminal charges against the four, Massachusetts Bay Transportation Authority officials said, and more officers face suspension".

Did Mulhern -- was Mulhern one of

the MBTA authority officials referenced in that sentence?

A. No, because that sentence refers to statements made by Pesaturo on the record about this -- about -- the quote is basically down below where it says, "There is an ongoing internal investigation that concerns egregious violations of the department's policies, rules and regulations as well as allegations of criminal conduct."

And it says officials there, and I think that was my fault. I think I should have been more specific in going over this, but it's not more than one MBTA official. I'm simply trying to summarize what Pesaturo said down below up higher in the story and used officials in kind of plural as opposed to the singular. I probably should have used the singular.

Q. Turning to the next sentence, "MBTA officials would not release the names or ranks of the four who were suspended with pay this week".

Is it true that Mr. Mulhern would not release to you the names or ranks of the

four who were suspended?

A. I can't remember -- I don't know if that refers to Mulhern there or not.

Q. Do you recall him providing you with any names during that conversation?

A. Not providing me. I was coming to him with a name to have him -- to get confirmation, so no.

Q. Did he confirm any of the names that you provided him with?

A. Well, based on my recollection of his statement, no, not really. No.

Q. And similarly did he deny any of the names that you gave to him?

A. No.

Q. And that includes Nancy O'Loughlin?

A. Yes, sir.

Q. So in the next sentence where it says, "But speaking on condition of anonymity, the official and two others briefed on the probe said one was Lieutenant Nancy O'Loughlin".

Is it true that Mr. Mulhern is not the official or the two others briefed on the probe that are referenced in that sentence?

A. No. Mulhern is the official. I'm using his -- yes, he is the official I'm referring to in that paragraph based on -- I recall -- thinking back -- I've tried to think about this. I believe he is -- I can't say with a lot of certainty, so I'm hesitant. I don't know.

Q. Before you testified that Mulhern didn't give you the names of anybody. All he would say in response to your questions when you would give him names is that he couldn't confirm or deny and that included Nancy O'Loughlin. That was your testimony before.

So I'm just trying to confirm or find out if that testimony would be the same as to this sentence because that would seem to contradict what you had said earlier?

A. I should probably go back to what I said earlier then. If I recall, I believe that beyond the statement of -- Mulhern is the agency official who confirmed that Nancy O'Loughlin was involved in this case. He did say that he could neither confirm nor deny, but I believe that was in a response to an

on-the-record statement which I didn't end up using.

He didn't though say that she -- that the probe could lead to criminal charges. That's based on Pesaturo's quote down below as we talked about before. You have to forgive me. It's been a long time, and I've written a lot of pieces between this one and the present day.

Q. So to the best of your understanding then, Mr. Mulhern never said to you that this probe could lead to criminal charges?

A. That's correct.

Q. However, you think he did or may have said that Nancy O'Loughlin was one of the four who were suspended; is that correct?

A. He's the agency official referred to in the lead.

Q. Referred to in the lead. Does that mean the first paragraph?

A. The first paragraph.

Q. Is he also the agency official referred to in the fifth paragraph where it says, "But speaking on condition of anonymity"?

statement about that he makes on the record about Joe Carter. When asked him to go on the record about other things, that he refused.

Q. Did he say or confirm or deny that the officers involved had, in fact, engaged in illegal conduct?

A. No. I just think he told me about the scope of the investigation. I can't recall whether he used the word "illegal".

Q. Did he just say that an investigation was being conducted to see if illegal activity had occurred?

A. It was pretty bare bones from Mulhern.

Q. And he did not say criminal charges would be brought against Nancy O'Loughlin; is that right?

A. No. I believe that statement in the article came from Joe Pesaturo's quote.

Q. And I'm sorry if I already asked this again. That was the last conversation you had with Mulhern about this?

A. About this.

Q. About the subject matter of this article?

A. I think that was wrong. I think the article appeared on March 12th. It was the 11th.

Q. Are you confirming you think it was the 11th after looking at the exhibit?

A. Yes.

Q. So then turning to paragraph 30, that first sentence, do you think that's a true statement?

A. The first sentence?

Q. Uh-huh.

A. Yes.

Q. Turning to the next page up at the top, it's the first complete sentence on that page, "Mr. Mulhern falsely led the Boston Globe reporter to believe (and to write his news stories) that the allegations against Lieutenant O'Loughlin were of a criminal nature, and could lead to criminal charges against her." Do you think that sentence is true?

A. No, I don't.

Q. What's not true about that sentence?

A. Mulhern didn't mention anything about allegations against O'Loughlin were of a

criminal nature and could lead to criminal charges against her, not like the falsely led the Boston Globe reporter.

MR. REISER: Nothing further at this time.

EXAMINATION BY MR. NOTIS

Q. Mr. Daniel, my name Mitchell Notis, and I represent Nancy O'Loughlin in this litigation. How do you do?

A. Very well.

Q. Let me ask you, sir, in the conversation you had with Mike Mulhern, did Mr. Mulhern say to you that Nancy O'Loughlin was absolutely not involved in any allegations of criminal misconduct?

A. I can't recall. I mean, that specific wording?

Q. Did he -- do you recall that specific wording?

A. No.

Q. Did he say anything to that effect?

A. I really can't recall. I can't recall the specifics of the conversation.

Q. I think you just mentioned that he didn't say

anything to you about her being involved in criminal conduct, right?

A. No. I think the word criminal never -- as I recall, it never came up. All I was asking him for was to confirm with Nancy O'Loughlin's name.

Q. So if the word "criminal" never came up, he never said to you that she was absolutely never involved. She wouldn't be involved in criminal conduct due to this?

MR. EDWARDS: Objection. You can answer.

A. I can't recall. I don't recall that statement being made.

Q. Do you recall anything about her being involved in criminal misconduct being said?

A. No, I don't recall. I don't believe so.

Q. Do you recall Mr. Mulhern saying that Nancy O'Loughlin had nothing to do with the so-called CORI violations?

A. I don't think we spoke about that, no.

Q. Did you -- during this conversation did you indicate to Mr. Mulhern that you were going to include Nancy O'Loughlin in your story,

MBTA?

A. I really don't recall that. I know I wrote that -- I think I wrote about something about that later, months later but not at that time.

Q. What do you recall about the later story?

A. Just that there was something about O'Loughlin filing -- I think it was -- was it this lawsuit? I can't recall. I think it might have been in claiming that it was in retaliation for her filing the MCAD case.

Q. Did you ever speak to Mulhern about that?

A. I don't believe I did.

Q. Did you speak to Pesaturo about it?

A. I don't recall.

Q. After the article ran, you mentioned you had a conversation with Tom O'Loughlin, correct?

A. That's correct.

Q. And you mentioned that he told you that it wasn't correct that Nancy was his sister?

A. That's correct.

Q. By the way, who told you that Nancy was his sister?

A. I believe that was one of the union

officials.

Q. Did Mulhern say anything about that?

A. No.

Q. Did O'Loughlin ask you who the MBTA official mentioned in the article was?

A. No. I can't recall. I really can't recall.

Q. Did Tom O'Loughlin say to you isn't it Mulhern?

A. I don't recall that.

Q. And do you recall O'Loughlin saying to you isn't it Mulhern and you were acknowledging that to Tom O'Loughlin?

A. I don't remember that, and that would be very surprising to me. I wouldn't do that. I don't believe I would do that.

Q. If Tom O'Loughlin said you did that, would you be lying?

MR. EDWARDS: Objection.

MR. ALBANO: Objection.

A. I think yes, he would be.

Q. Did Tom O'Loughlin ask you if Mulhern told you that Nancy O'Loughlin could face criminal charges?

A. Say that again.

A. No, nobody said Nancy O'Loughlin faces criminal charges. I took the information that was from Pesaturo's quote and put it up there in that third summary graph.

Q. And neither Mr. Pesaturo nor Mr. Mulhern said what conduct Nancy O'Loughlin was suspected of having engaged in?

A. I don't recall them giving me those specifics.

Q. When it came to your mind that there possibly could be criminal charges, was it because of potential CORI violations? Was that the criminal conduct you were talking about?

A. That was my understanding.

Q. Did Mr. Mulhern or Mr. Pesaturo say CORI violations are criminal conduct?

A. No.

Q. How did you have that understanding?

A. Well, I don't recall at the time. I know that just as a matter of course and I recall I believe one of the union officials had mentioned that CORI was -- that the mission use of the CORI system could lead to criminal charges, but I don't think that was said -- I

think that was just an overall kind of statement about misusing CORI. I don't think it wasn't directed at any one particular person charged in this case or as part of this case.

Q. I'm not sure I understand. Could you say that again, please. I'm not sure I understood it.

A. I'm not sure I understood it.

MR. ALBANO: What's the pending question?

Q. What made you understand that CORI violations could be a criminal violation or something like that?

A. I knew that before I covered this story. I've covered issues, kind of CORI violations, in past jobs that I've done, and I believe that one of the union officials that I talked to for this story had mentioned it while I was talking to them.

Q. Did the two others who were briefed, the union officials indicate whether this was some sort of formal briefing that they received?

# EXHIBIT I

VOL. 2

PAGES 164-359

EXHIBITS: 15-35

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10933JLT

- - - - - - - - - - - - - - - - - - -

NANCY O'LOUGHLIN,

Plaintiff,

vs.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, JOSEPH CARTER and MICHAEL MULHERN,

Defendants.

- - - - - - - - - - - - - - - - - - -

DEPOSITION OF NANCY O'LOUGHLIN

Friday, December 23, 2005

10:20 a.m.

Prince, Lobel, Glovsky & Tye, LLP

585 Commercial Street

Boston, Massachusetts 02109

Court Reporter: Doris M. Jones, RPR

APPEARANCES:

LAW OFFICE OF MITCHELL J. NOTIS
By Mitchell J. Notis, Esq.
370 Washington Street
Brookline, Massachusetts 02445
(617) 566-2700
On behalf of the Plaintiff

PRINCE, LOBEL, GLOVSKY & TYE, LLP
By Joseph L. Edwards, Esq.
585 Commercial Street
Boston, Massachusetts 02109
(617) 451-8131
On behalf of the Defendants Massachusetts Bay Transportation Authority and Joseph Carter

WILMER CUTLER PICKERING HALE and DORR, LLP
By Joan A. Lukey, Esq.
60 State Street
Boston, Masssachusetts 02109
(617) 526-6798
On behalf of Defendant Michael Mulhern

CROSS EXAMINATION

BY MS. LUKEY:

Q. Can you tell me, please, whether you are alleging that Michael Mulhern discriminated against you on the basis of your gender.

A. I'm alleging that Michael Mulhern committed defamation and slander and by being -- I'd have to read the complaint, but I believe by being the onus, the head of the MBTA, that he is guilty of discrimination for allowing it to happen.

Q. So if I am understanding you correctly, I know that you have a count against him for retaliation which we will address in a moment and you have a count against him for libel which I will come back to and you have a count against him under the Civil Rights Act, which I am not altogether clear on exactly what the allegations are, but let me see if I can ask a more precise question.

Did Michael Mulhern himself personally engage in any conduct toward you that you felt was discriminatory on the basis of gender?

A. I would have to say that -- yes, based on the statements that were made in the newspaper and where my name was the only name released, being a

female I would say that played a part in it, yes.

Q. Now when you say the statements in the newspaper, you are referring to a Boston Globe article by a reporter, Mr. Daniel, and a Bay State Banner article by a reporter named Mr. Miller; is that correct?

A. Yes.

Q. If I understand you correctly, you are now contending that the fact you believe Michael Mulhern gave them information which you consider to be defamatory was in and of itself discriminatory on the basis of gender; is that right?

A. Yes.

Q. Could you tell me please on what you base your belief that Michael Mulhern made the statements which you believe he made to the reporters because of your gender?

A. You confused me.

Q. I'm sorry.

What causes you to believe that the allegedly defamatory statements were made against you because you're a woman?

A. Because I'm the only woman involved and my name was the only name used.

Q. Apart from the fact that you are the only woman among the several officers involved in the situation and your name was the only name released, do you have any other basis for saying that Mr. Mulhern made allegedly defamatory statements because you were a woman?

A. No.

Q. Other than the fact that he allegedly made those statements to the reporters, is there any other respect in which you contend that Mr. Mulhern discriminated against you? That is, that he personally discriminated against you?

A. I'm going to have to say just as the figurehead, the overseer of the MBTA.

Q. Meaning that he was the general manager at some point in time?

A. Yes. That was the phrase that was running around over here.

Q. Do you remember when it is that Michael Mulhern became the general manager? Just approximately.

A. I have no idea.

Q. Is it your contention that you were being discriminated against on the basis of your gender