Nancy O'Loughlin

309

1    before he became general manager as well as after?

2        A.   Yes.

3        Q.   Is there any respect in which you feel that

4    the discrimination against you changed in nature or

5    extent because Michael Mulhern became the general

6    manager?

7        A.   No.   Just in his position as general

8    manager.   No, nothing.

9        Q.   Given that it is your contention that the

10   discrimination against you was occurring before he

11   was the general manager, is it also your contention

12   that Bob Prince, his predecessor, discriminated

13   against you on the basis of gender?

14       A.   Yes.   In his position.

15       Q.   Was there somebody before Mr. Prince at a

16   point in time when you believe you were being

17   discriminated against?

18       A.   Yes.   But don't ask me who it was because I

19   don't remember.

20       Q.   For the duration of the several year period

21   when you believe you were being discriminated

22   against on the basis of gender, you would contend

23   that the general manager had some responsibility for

24   that by virtue of being general manager?

Nancy O'Loughlin

310

1       A.   Yes.

2       Q.   Do you contend that Michael Mulhern was

3   aware that you were being subjected to gender

4   discrimination?

5       A.   I don't know the answer to that question.

6       Q.   Do you have any basis for believing that he

7   knew that other people were allegedly discriminating

8   against you on the basis of your gender?

9       A.   I don't have anything to add to that.  I

10  don't know.

11      Q.   Did you yourself ever discuss with

12  Mr. Mulhern that you believed you were the victim of

13  gender discrimination?

14      A.   No.

15      Q.   Did anyone else ever report to you that they

16  had told Mr. Mulhern that they thought you were the

17  victim of gender discrimination?

18      A.   No.

19      Q.   Do you believe Mr. Mulhern to be an

20  individual who discriminates generally on the basis

21  of gender?

22      A.   I don't know him well enough to answer that

23  question.

24      Q.   Do you have any basis to contend that he is

Nancy O'Loughlin

311

1    a person who discriminates against on the basis of

2    gender?

3        A.   I'm not qualified to answer that question.

4    I don't know.

5        Q.   Do you have information from any source of

6    Mr. Mulhern engaging in gender-biased or

7    discriminatory behavior?

8        A.   No.

9        Q.   Now, you have alleged in your complaint that

10   Mr. Mulhern retaliated against you by speaking to

11   the Bay State Banner and Boston Globe reporters; is

12   that correct?

13       A.   Yes.

14       Q.   I'll come back to the specifics of the

15   contention regarding the reporters in just one

16   moment, but can you tell me whether there are any

17   other respects apart from the reporters in which you

18   believe that Mr. Mulhern retaliated against you for

19   asserting gender claims?

20       A.   No.   Basically the articles.

21       Q.   Now you told us a moment ago  -- let me just

22   ask you this instead:   What causes you to believe

23   that the statements allegedly made by Mr. Mulhern to

24   the reporters were made in retaliation for your

Nancy O'Loughlin

312

1    assertion of your right to be free of gender

2    discrimination?

3        A.   Because they were false.  They were false

4    statements.  He knew they were false statements and

5    he made them knowingly.  They were false and it was

6    -- I believe it was done because I had asserted my

7    rights.

8        Q.   Do you have any basis for your belief that

9    it was done because you had asserted your rights

10   other than the fact that one event followed the

11   other?  That is, that he made the statements after

12   you had made your charges?

13       A.   No.

14       Q.   I'd like to look at the statements with you.

15           MS. LUKEY:  Did we mark those last time?

16           MR. EDWARDS:  No, we didn't.

17           (Discussion off the record.)

18           MS. LUKEY:  I apologize, one of these is

19   in the on-line version, but if I may I'll mark as

20   the next exhibit the Bay State Banner article of

21   March 18, 2004 with a byline of Yawu Miller.

22           (Exhibit No. 34 marked

23           for identification.)

24   BY MS. LUKEY:

Nancy O'Loughlin

313

1      Q.  If you would take a moment, Officer

2   O'Loughlin, and just review this to yourself I'm

3   going to be asking you questions about the aspects

4   in which you believe it to be false.

5               (Pause.)

6      A.  Okay.  What was your question?

7      Q.  I'll ask you specific questions going

8   through it.

9               As you notice, in the beginning it

10  references three MBTA police officers who were

11  suspended after an investigation found that they

12  were using the department's computer system to check

13  on colleagues and find phone numbers and addresses

14  of certain women.  Is there anything untruthful in

15  that paragraph?

16     A.  There was only one officer and it was one

17  woman.  It was more a curiosity thing, not that they

18  caught the eye of the male officer.

19     Q.  That particular paragraph doesn't have any

20  reference to you, does it?

21     A.  No.

22     Q.  The next paragraph "Also caught up in the

23  sweep was Lieutenant Nancy O'Loughlin, who allegedly

24  helped facilitate the officers' misuse of police

Nancy O'Loughlin

314

1    reports according to news reports."

2           MR. NOTIS:  Objection.  You read that

3    incorrectly.

4           MS. LUKEY:  Let me try it again.  I said

5    police reports.  Sorry.

6    BY MS. LUKEY:

7       Q.  "Also caught up in the sweep was lieutenant

8    Nancy O'Loughlin, who allegedly helped facilitate

9    the officers' misuse of police records according to

10   news reports."

11          Now, is there anything inaccurate in

12   that paragraph?

13      A.  I didn't help facilitate anything.

14      Q.  Were you alleged to have helped facilitate

15   --

16      A.  No.

17      Q.  So there were no allegations made against

18   you at any point regarding helping to facilitate

19   misuse of police records; is that correct?

20      A.  That's correct.

21      Q.  Now, the paragraph ends by noting that the

22   source of this information is other news reports.

23   Do you see that?

24      A.  Yes.

Nancy O'Loughlin

315

1    Q.   Do you have any basis for believing that

2    there was a source for this paragraph other than

3    other news reports?

4    A.   I believe it was Mike Mulhern.

5    Q.   On what do you base your belief that it was

6    Michael Mulhern?

7    A.   Based on the fact that he was the one that

8    spoke to Mack Daniel.

9    Q.   On what do you base your belief that

10   Mr. Mulhern spoke to Mack Daniel?

11   A.   Because Mack Daniel informed Tom O'Loughlin

12   that Mr. Mulhern spoke to him.

13   Q.   What did Tom O'Loughlin tell you about his

14   conversation with Mack Daniel?

15   A.   He told me that Mack Daniel stated that the

16   source was Michael Mulhern.  Michael Mulhern was the

17   one that released my name to the newspaper.

18   Q.   Did he tell you anything else about his

19   conversation with Mack Daniel?

20   A.   I don't think so.

21   Q.   Did he tell you what Mr. Mulhern allegedly

22   said to Mack Daniel, the Globe reporter, other than

23   releasing your name?

24   A.   That I was the subject of a criminal

Nancy O'Loughlin

316

1   investigation.

2      Q.  Just so I'm clear that I understand, Tom

3   O'Loughlin told you that Mack Daniel informed him

4   that Michael Mulhern said you were the subject of a

5   criminal investigation; is that correct?

6      A.  Yes.

7      Q.  Do you have any source for your belief that

8   Michael Mulhern was the source of information in the

9   Bay State Banner report or the Globe report that

10  we'll in a moment apart from what Tom O'Loughlin

11  told you?

12     A.  No.

13     Q.  And what, if any, relationship, by marriage

14  or otherwise, do you have to Tom O'Loughlin?

15     A.  He's my husband's cousin.

16     Q.  At the point in time when you had this

17  conversation with Tom O'Loughlin, had he left the

18  employ of the MBTA?

19     A.  Yes.

20     Q.  And how did he come to be speaking with you

21  on this subject?

22     A.  I don't remember.

23     Q.  Did he contact you?

24     A.  I believe  -- you know what, I don't really

Nancy O'Loughlin

317

1    remember whether he called me or I called him.

2        Q.   Do you recall whether you ever discussed

3    with Mr. O'Loughlin the Bay State Banner article

4    which we have marked as Exhibit 34 or whether you

5    only discussed with him the Boston Globe article?

6        A.   I think it was primarily the Globe article,

7    but I think we may have touched on this.  But it was

8    primarily the Globe article.

9        Q.   Now the Globe article, which I'll mark in a

10    moment, was one week earlier than the Bay State

11    Banner article.  Is it your memory that

12    Mr. O'Loughlin called you after both articles had

13    appeared or immediately after the Globe article had

14    appeared?

15        A.   I don't remember whether he called or I

16    called and I don't remember in relation to the

17    articles when it was.

18        Q.   So you're not sure whether your conversation

19    was with him was after both articles or only after

20    the Boston Globe article?

21        A.   I don't remember.

22        Q.   Now going back to Exhibit 34, which is the

23    Bay State Banner article, would you tell me whether

24    you find there to be anything inaccurate in the next

Nancy O'Loughlin

318

1   two paragraphs, paragraphs 3 and 4, the MBTA

2   spokesman paragraph and the ongoing investigation

3   paragraph.

4           (Pause.)

5       A.   Okay.  No.

6       Q.   Will you look at the next paragraph, please,

7   under former "Police Chief Thomas O'Loughlin."  That

8   paragraph.

9       A.   Yes.

10      Q.   Is there anything in that paragraph which

11  you believe to be inaccurate?

12      A.   Yes.

13      Q.   Would you tell us what it is.

14      A.   We didn't apply heavy-handed tactics and we

15  disbanded I believe in 2001 and we didn't have

16  numerous citizen complaints.

17      Q.   Do you have any reason to believe that the

18  information contained in this paragraph, which talks

19  about the anticrime unit, was provided to the

20  reporter by Michael Mulhern?

21      A.   No.

22      Q.   If you go to the next paragraph, is there

23  anything inaccurate in that paragraph?

24      A.   No.

Nancy O'Loughlin

319

1    Q.   And if you go to the next paragraph, the one

2    that begins, "Current MBTA police Chief Carter,"

3    would you tell us whether there's anything

4    inaccurate in that paragraph.

5                (Pause.)

6    A.   I can't comment on that one because I don't

7    know whether that's true or not.

8    Q.   At the top of the next page there is a

9    single-sentence paragraph which reads, "sources say

10   O'Loughlin's luck changed after Carter took office."

11   Is there anything inaccurate in that paragraph?

12   A.   I think that's just an opinion.

13   Q.   And in the next paragraph, about being

14   assigned to a desk job, is that accurate?

15   A.   I was assigned to a desk job but I didn't

16   have any type of relationship with Carter, so

17   contentious relationship is not true.

18   Q.   You did not consider your relationship with

19   the Chief to be contentious?

20   A.   No.

21   Q.   If you would read to yourself the last two

22   paragraphs and tell me if there is anything you

23   believe to be inaccurate in those.

24   A.   No.   No.

Nancy O'Loughlin

320

1    Q.  So if I understand correctly, in this
2    article you believe that the information contained
3    in the first two paragraphs is inaccurate with
4    regard to you and was provided by Mr. Mulhern; is
5    that right?
6        A.  Yes.
7        Q.  And your basis for that belief is one
8    conversation that you had with Tom O'Loughlin either
9    after the Globe article or after both articles had
10   appeared?
11       A.  Yes.
12       Q.  Did you ever ask Mr. O'Loughlin  -- I'm
13   sorry, did you ever ask Mr. Mulhern if he had in
14   fact provided information to the reporter in the Bay
15   State Banner?
16       A.  No.
17       Q.  Do you know whether Mr. Mulhern ever had a
18   conversation with the reporter for the Bay State
19   Banner?
20       A.  No.
21       Q.  Do you know whether the reporter for the Bay
22   State Banner was relying on information contained in
23   the earlier Globe article?
24       A.  I don't know.

Nancy O'Loughlin

321

1      Q.   So you don't actually have any knowledge at

2  all to suggest that Mr. Mulhern directly provided

3  information to the Bay State Banner; is that right?

4      A.   That's correct.

5      Q.   Next let's take a look at the Globe article,

6  which is actually dated one week earlier, March 11,

7  2004.

8                  (Exhibit 35 marked

9                  for identification.)

10  BY MS. LUKEY:

11      Q.   Why don't you take a moment to skim that to

12  yourself so you have the context and then I'll come

13  back and go through it paragraph by paragraph where

14  relevant.

15                  (Pause.)

16  BY MS. LUKEY:

17      Q.   If you would look at the first paragraph,

18  please, is there information that you believe to be

19  inaccurate?

20      A.   Yes.

21      Q.   What is that?

22      A.   There were only two officers that were

23  accused of illegally checking background records and

24  it wasn't to dig up dirt on colleagues, it was

Nancy O'Loughlin

322

1  relative to a crime that had been committed.  And

2  there was only one license plate run and it was a

3  matter of curiosity, not because the woman caught

4  the eye of the officer.

5      Q.  Do you have any basis for believing the

6  information in that paragraph was provided to Mack

7  Daniel by Michael Mulhern?

8      A.  Other than that Mulhern was the one speaking

9  to Daniel, no.

10     Q.  And again you believe Mulhern was speaking

11 to Daniel because that's what Tom O'Loughlin told

12 you?

13     A.  Yes.

14     Q.  If we look at how Mack Daniel described his

15 sources, he refers to an agency official and two

16 others who were briefed on the investigation.  Do

17 you have any information as to who those persons

18 were?

19     A.  Other than Mulhern, no.

20     Q.  By the way, the first paragraph doesn't have

21 anything to do with you, does it?

22     A.  No.

23     Q.  The second paragraph says, "They said a

24 lieutenant who allegedly encouraged the officers'

Nancy O'Loughlin

323

1    activities also was suspended."  Do you know to whom

2    the personal pronoun "they" relates?

3        A.  I believe it was Mulhern.

4        Q.  And is that based on your conversation with

5    Mr. O'Loughlin again?

6        A.  Yes.

7        Q.  Were you suspended at this point in time?

8        A.  Relieved of duty with pay, yes.

9        Q.  And what was the reason for which you were

10   actually relieved of duty with pay?

11       A.  It was violation of department policy.

12       Q.  With regard to what?

13       A.  Phone conversations.

14       Q.  Were you relieved from duty with pay because

15   of any of the conduct regarding checking police

16   records allegedly improperly by subordinates?

17       A.  No.

18       Q.  The third paragraph says, "The probe could

19   lead to criminal charges against the four, Mass. Bay

20   Transportation Authority officials said, and more

21   officers face suspension."

22             Is there anything inaccurate in that

23   paragraph?

24       A.  I was never the subject of any criminal

Nancy O'Loughlin

324

1  charges.  Actually there were only two officers who

2  were the subject of criminal charges and they were

3  dismissed.

4      Q.  Were the charges related to using police

5  records inappropriately?

6      A.  They were CORI violation charges.

7      Q.  So that is a misuse of records, is it not?

8      A.  I don't know what the technical term would

9  be.  It would be for accessing CORI inappropriately.

10      Q.  Accessing police records that were not

11  supposed to be accessed?

12      A.  Yes.

13      Q.  Do you know to whom Mr. Daniel was referring

14  when he described MBTA officials, plural?

15      A.  I believe it was Mulhern.

16      Q.  Again is that based just on what Tom

17  O'Loughlin told you?

18      A.  Yes.

19      Q.  Do you have any idea who the other MBTA

20  officials were?

21      A.  I would assume it would be Joe Pesatoro, but

22  other than that I don't know.

23      Q.  Are you assuming that because he was the

24  media  --

Nancy O'Loughlin

325

1      A.   He was the spokesperson, yes.

2      Q.   The next paragraph, "MBTA officials would

3   not release the names or ranks of the four who were

4   suspended with pay this week."

5           Do you know who the MBTA officials were

6   who would not release the names or ranks?

7      A.   No.

8      Q.   The next paragraph says, "But speaking on

9   condition of anonymity, the official and two others

10  briefed on the probe said one was Lieutenant Nancy

11  O'Loughlin, sister of the former MBTA Police Chief

12  Thomas O'Loughlin, who now heads the Milford police

13  department.  MBTA officials would not comment on

14  Nancy O'Loughlin and she could not be reached for

15  comment."

16          Do you have any understanding as to who

17  the official and two others were who provided your

18  name?

19     A.   Mulhern.

20     Q.   Again is that based on what Tom O'Loughlin

21  told you?

22     A.   Yes.

23     Q.   Do you consider it could have been

24  defamatory that you were described as Chief

Nancy O'Loughlin

326

1    O'Loughlin's sister?

2        A.   It's untrue.   Absolutely untrue.

3        Q.   Is it untrue in a way that you consider to

4    be injurious to your reputation?

5        A.   I think it was put out there for that

6    reason, yes.

7        Q.   Why would it injure your reputation to be

8    known as Chief O'Loughlin's sister?

9        A.   Because they are trying to portray an

10   atmosphere of nepotism.

11       Q.   That's how you interpreted the meaning of

12   that paragraph?

13       A.   Yes.

14       Q.   When you were hired, who was the Chief?

15       A.   When I was hired it was I believe Chief

16   Whalen.

17       Q.   Was Chief Bratton there yet?

18       A.   He came in after I was hired.  While I was

19   in the academy or just before I started the academy.

20       Q.   What is Chief Bratton's relationship to you?

21       A.   He's my cousin.

22       Q.   Do you know who the MBTA officials were who

23   would not comment on you?

24       A.   No.

Nancy O'Loughlin

327

1    Q.  If you look at the next paragraph, beginning

2    with the phrase "In several of the cases," does that

3    paragraph have anything to do with you?

4    A.  Well, it refers back to the officers being

5    charged with accessing the records and it says above

6    that that I encouraged it so yeah, it refers back to

7    me.

8    Q.  Do you know the source of that information?

9    A.  I believe it to be Mulhern.

10    Q.  Again is that based on what Tom O'Loughlin

11    told you?

12    A.  Yes.

13    Q.  Do you have any idea what Mack Daniel says

14    about who his sources were?

15    A.  Just through Tom O'Loughlin.

16    Q.  So you have no information as to what Mack

17    Daniel says with regard to who his sources were

18    other than with regard to what Tom O'Loughlin tells

19    you?

20    A.  Yes.

21    Q.  If you look down toward the bottom of the

22    first page of Exhibit 35, three paragraphs up, it

23    reads "MBTA general manager Michael H. Mulhern would

24    say only that 'MBTA Police Chief Joseph C. Carter

Nancy O'Loughlin

328

1   has my full support.  I trust his judgment.  The

2   actions he's taken are not only necessary but

3   appropriate to maintain the public's trust in the

4   MBTA police department.'"

5               Do you have any information as to what,

6   if anything, Mr. Mulhern said to Mack Daniel, apart

7   from these words which appear in quotation marks

8   attributed to Mr. Mulhern?

9       A.  You lost me.

10      Q.  Obviously we have a quote that Mack Daniel

11  has attributed to General Manager Mulhern in the

12  paragraph I just read.

13      A.  Yes.

14      Q.  Do you have any information as to what else,

15  if anything, Michael Mulhern said to Mack Daniel

16  apart from what appears in quotes?

17      A.  Only what Tom O'Loughlin told me.

18      Q.  Were you having any issues or concerns of

19  any kind with the police union during this time

20  period?

21      A.  No.

22      Q.  As a lieutenant were you a member of the

23  police union?

24      A.  Yes; the superior officers union.

Nancy O'Loughlin

329

1    Q.   Is that a different union from the union

2  representing the rank and file officers?

3    A.   Yes.

4    Q.   Did you have any issues with the union for

5  the rank and file officers?

6    A.   No.

7    Q.   Were there any problems with the union

8  during the time period when the anticrime unit was

9  having some difficulties with community activists?

10    A.   Yes.

11    Q.   During what time period was it that you were

12  having issues with the rank and file union?

13    A.   That's going to be probably '98, '99, 2000.

14    Q.   Is it your testimony that by the time of

15  this article there were no longer any concerns or

16  issues between you and the union for the rank and

17  file?

18    A.   Yes.

19    Q.   Were you having any issues or concerns with

20  Chief Carter during this time period?  The time

21  period of this article?

22    A.   Other than my discrimination complaint?

23    Q.   That or anything else.  Were you having what

24  you considered to be issues or problems with Chief

Nancy O'Loughlin

330

1    Carter at this point in time?

2        A.    I don't understand.  I filed the

3    discrimination complaint and the basis of my

4    complaints.  Those are the concerns and the actions

5    and grievances that I had with Carter.

6        Q.    And how did you get along with Chief Carter

7    in this time period after you filed this complaint?

8        A.    I came in and did my job and I never had any

9    interaction with the Chief other than when he

10   reassigned me.

11       Q.    So I am clear, the information which you

12   believe to be defamatory as to you which appears in

13   this Globe article in your opinion was conveyed to

14   Mack Daniel by Michael Mulhern; is that right?

15       A.    Yes.

16       Q.    And the basis for your opinion that Michael

17   Mulhern conveyed the information is that Tom

18   O'Loughlin told you that Mack Daniel had informed

19   him of that alleged fact, correct?

20       A.    Yes.

21       Q.    Other than the alleged information conveyed

22   by General Manager Mulhern to Mack Daniel as

23   represented to you by Tom O'Loughlin, did General

24   Manager Mulhern say or do anything that you

Nancy O'Loughlin

331

1    considered to be retaliatory?

2        A.  He made a statement to one of the board of

3    directors that he was going to get me.

4        Q.  And to whom did he make or allegedly make

5    that statement?

6        A.  Janice Loux.

7        Q.  And how did you come to believe that Michael

8    Mulhern had made such a statement to Janice Loux?

9        A.  Janice Loux told Tom O'Loughlin that he made

10   the statement and Tom O'Loughlin relayed it to me.

11       Q.  Did Janice Loux ever tell you directly that

12   there had been any such statement made to her?

13       A.  No.

14       Q.  When did Tom O'Loughlin tell you about this

15   alleged information conveyed by Janice Loux?

16       A.  That would have been on or about the day he

17   was sworn in as Chief of Police at Milford.

18       Q.  So after he had left the MBTA?

19       A.  Yes.

20       Q.  What were the circumstances under which he

21   told you about this?  Were you present for his

22   swearing-in?

23       A.  Yes.

24       Q.  Is that because of your family relationship?

Nancy O'Loughlin

332

1    A.  It was because he asked me to go.

2    Q.  Did you have any understanding as to why you

3    were invited?  That is, was it because you were a

4    lieutenant in the MBTA police force or was it

5    because you were married to his cousin?

6    A.  I really didn't give it a thought.  He asked

7    and I went.

8    Q.  Were there other lieutenants from the MBTA

9    police force there?

10    A.  I don't think so.

11    Q.  Were there other family members there?

12    A.  Yes.

13    Q.  Would you give us your best memory please of

14    what he said and what you said in this conversation

15    relating to Janice Loux.

16    A.  I just remember him telling me that Janice

17    Loux relayed to him that Michael Mulhern said he was

18    going to get me.

19    Q.  If this was on the day that the Chief was

20    sworn in in Milford, it would have been at a point

21    in time earlier than the news articles; is that

22    right?

23    A.  Yes, I believe so.

24    Q.  When in relation to the filing of your MCAD

Nancy O'Loughlin

333

1    and EEOC complaints was it that Chief O'Loughlin

2    told you about this purported conversation with

3    Janice Loux?

4        A.   I think it was before I filed.

5        Q.   So before you had filed any charges,

6    according to Thomas O'Loughlin, General Manager

7    Mulhern had indicated to a member of the board that

8    he was going to get you; is that correct?

9        A.   Yes.

10       Q.   Did you have any understanding as to  -- let

11   me ask you this:  Did you know the general manager,

12   Michael Mulhern?

13       A.   I don't know him personally.  I know  --

14   like to see his face I know who he is.

15       Q.   At the point in time when Tom O'Loughlin

16   conveyed this information to you, did you know who

17   Michael Mulhern was?

18       A.   Yes.

19       Q.   You knew him to be the general manager?

20       A.   Yes.

21       Q.   Did you know him personally?

22       A.   He came on about the same time I came in.  I

23   mean, I've seen him through the years but I don't

24   know him personally.

Nancy O'Loughlin

334

1    Q.  Did you have any understanding as to why the

2  general manager would want to get you at a point in

3  time when you hadn't filed any charges?

4    A.  No.

5    Q.  Did you inquire of Tom O'Loughlin as to

6  whether he had any understanding as to why the

7  general manager would have some reason to want to

8  get you when you hadn't filed any charges?

9    A.  I don't remember doing it, no.  I kind of

10  just filed it away.

11    Q.  Well, what did you think when your husband's

12  cousin says to you oh, by the way, a member of the

13  board of directors told me that the general manager

14  wants to get you?  What was your thinking on that?

15    A.  I had no idea why and watch my back.

16    Q.  How long had Michael Mulhern been the

17  general manager as of the point in time when he

18  allegedly said this to Janice Loux?

19    A.  I don't know.

20    Q.  Did Tom O'Loughlin tell you when Janice Loux

21  had conveyed this information to him?

22    A.  I don't recall him saying it.  No.  I don't

23  remember.

24    Q.  Did he tell you when Michael Mulhern had

Nancy O'Loughlin

335

1    allegedly made the statement to Janice Loux?

2        A.   No.   Or if he did, I don't remember.

3        Q.   Did you know as of the point in time when

4    Thomas O'Loughlin conveyed that information to you

5    whether Thomas O'Loughlin was engaged in a dispute

6    or controversy with the MBTA?

7        A.   I don't know whether that was prior to him

8    -- I know he filed a lawsuit against them, but I

9    don't know in relation to time if it was prior or

10   after.   I don't know.

11       Q.   What did you understand his relationship

12   with the MBTA to be when he left the employ of the

13   MBTA?

14       A.   He left.   I never really gave it a thought.

15       Q.   Did you understand that he left voluntarily

16   or left because his contract was not renewed?

17       A.   I believe he left voluntarily.

18       Q.   You had no understanding as to whether the

19   MBTA had indicated it did not intend to renew his

20   contract?

21       A.   I had no idea what went on.

22       Q.   What was the status of Chief O'Loughlin or

23   Tom O'Loughlin's dispute with the T regarding his

24   inability to teach the SIDS course as of the point

Nancy O'Loughlin

336

1    in time when he made this statement to you?

2       A.   I don't know.   I know there's litigation.   I

3    don't know whether it was initiated prior to that or

4    after that.   I think it may have been initiated

5    prior to that but I can't be sure.

6       Q.   Did you do anything with the information

7    that Tom O'Loughlin had conveyed to you about

8    Mulhern allegedly telling Janice Loux that he was

9    going to get you?

10      A.   Other than discussing it with my husband, I

11   just filed it away.

12           MR. NOTIS:   Let's object to that.

13   Ms. Lukey doesn't want to know about any

14   conversations you had with your husband or any

15   conversations you had with me or other attorneys.

16      A.   I just filed it away.

17      Q.   Did you believe it?

18      A.   Yes.

19      Q.   You didn't know Mr. Mulhern personally and

20   you had had no direct interactions with him at this

21   point in time; is that correct?

22      A.   I don't know whether  -- I don't know

23   whether you can say I never interacted with him

24   because I don't remember over the course of 22

Nancy O'Loughlin

337

1    years.  I have interacted with him occasionally

2    during the course of my duties but the extent of

3    those  -- I can't say I never interacted with him

4    because I may have 20 years ago and I just don't

5    remember.

6        Q.  Let me rephrase it.  You didn't know Michael

7    Mulhern personally and he didn't know you personally

8    and any interaction you had with him had been

9    minimal as of the point in time that Tom O'Loughlin

10   told you of this alleged statement?

11       A.  Yes.

12       Q.  But you believed it?

13       A.  Yes.

14       Q.  Why?

15       A.  I had no reason not to believe it.  Why

16   would someone make a statement like that?

17       Q.  And you can't tell us as you sit here

18   whether you recall that Mr. O'Loughlin was already

19   engaged in a controversy with the MBTA?

20       A.  I don't know whether it was prior to that.

21   I don't know.  I really don't know.

22       Q.  Have you ever asked Janice Loux whether she

23   made this statement?

24       A.  No.

Nancy O'Loughlin

338

1      Q.  Did you ever ask Michael Mulhern whether he

2  had made the statement to Janice Loux?

3      A.  No.

4      Q.  Other than Tom O'Loughlin saying it was so,

5  has anyone ever told you whether Mr. Mulhern did or

6  did not make any such statement to Ms. Loux?

7      A.  No.

8      Q.  Given that you had not filed charges at this

9  point in time, I assume that you are not alleging

10 that this statement is indicative of any form of

11 retaliation; is that correct?

12     A.  Can you rephrase that.

13     Q.  At the time when Tom O'Loughlin told you

14 that at some point before that Michael Mulhern had

15 indicated that he wanted to get you, you had not yet

16 filed any charges, had you?

17     A.  That's correct.

18     Q.  I gather, then, that you are not alleging

19 that the conduct or statement, if made, was

20 retaliatory; is that correct?

21     A.  I don't know if I can answer that because I

22 don't know why it was made.

23     Q.  How can he retaliate against you for

24 something that hasn't happened yet?

Nancy O'Loughlin

339

1    A.  I don't know.  My answer is I don't know.

2          MR. NOTIS:  I don't know that the

3    witness understands the legal definition of

4    retaliation in the sense in which you use it.

5          MS. LUKEY:  Let me rephrase it.

6    BY MS. LUKEY:

7    Q.  As of this point in time when Tom O'Loughlin

8    was telling you about a statement allegedly made at

9    some point earlier, had you asserted any claims,

10   formally or informally, of gender discrimination?

11   A.  No.

12   Q.  Since you had not yet asserted any claims of

13   gender discrimination you are not now telling us

14   that you think he was retaliating against you,

15   Michael Mulhern, for asserting claims, are you?

16   A.  No.

17   Q.  Did Michael Mulhern ever engage in any

18   conduct that you felt was intended to coerce or

19   force you  -- did Michael Mulhern ever engage in any

20   conduct that you felt was intended to force or

21   coerce or compel you to act in a certain way or to

22   refrain from acting in any certain way?

23   A.  I think releasing my name to the press was

24   an intent to get me  -- basically get me back, I

Nancy O'Loughlin

340

1    guess, for filing the MCAD complaint.

2        Q.   It was in your view an attempt to retaliate

3    against you, correct?

4        A.   Yes.

5        Q.   Did he ever do anything that you thought was

6    intended to force you to act in a certain way?

7        A.   I don't think so.

8        Q.   Did he ever try to intimidate you?

9        A.   I never really dealt with him after  --

10   other than occasionally years ago, I haven't dealt

11   with him in years.

12       Q.   After you filed your charges did you feel

13   that he was trying to act in an intimidating way

14   toward you?

15       A.   The only other time that I dealt with him is

16   when I played in a charity hockey game for the MBTA.

17   Mulhern was there and he deliberately avoided me.   I

18   mean, he looked at me and just deliberately avoided

19   me.   But other than that I haven't had any dealings

20   with him on a face-to-face basis.

21       Q.   So he tried not to interact with you; is

22   that what you are trying to say?

23       A.   Yeah.   It was more of a slight.

24       Q.   Did you consider that intimidating?

341

1    A.  I think he was trying to send me a message.

2  I just think that was a nonverbal message to me.

3    Q.  A nonverbal message of what?

4    A.  I'll get you, or you'll pay, or whatever.

5    Q.  And that's because he didn't say hello to

6  you?

7    A.  Yeah.  Because he acknowledged a lot of

8  people there.  I was the only female there playing

9  and he looked right at me and didn't acknowledge me.

10    Q.  Other than failing to acknowledge you, did

11  he say or do anything that you thought was

12  inappropriate?

13    A.  No.

14    Q.  Were you intimidated by the fact, frightened

15  by the fact that he didn't say hello to you?

16    A.  I took it as a warning.  More of a watch my

17  back type thing.

18    Q.  Did you feel that he was threatening you?

19    A.  Well, yeah, you could construe it as a

20  threat.  Watch my back, he's going to get me, that

21  type of thing.

22    Q.  Again, the basis for your believing that he

23  was threatening you was that he didn't say hello to

24  you; is that right?

Nancy O'Loughlin

342

1       A.   That he didn't acknowledge me, yes.

2       Q.   But he made no threatening gestures of any

3    kind, did he?

4       A.   No.

5       Q.   Did he make faces at you?

6       A.   I don't remember.  I don't think so.

7       Q.   He just ignored you; is that right?

8       A.   He looked right at me and then turned his

9    back on me.

10      Q.   Did he do anything apart from not saying

11   hello to you at the hockey game and what you thought

12   that he had said to the reporters that you felt was

13   interfering with your right to pursue your gender

14   claim?

15      A.   I think that in his capacity as general

16   manager of the MBTA he could have stopped the whole

17   nonsense with the investigation.  He could have put

18   a stop to that and handled it in a completely

19   different way.

20      Q.   What did he know about the investigation?

21      A.   He was briefed on the investigation as far

22   as I know.  He could have put a stop to it and he

23   didn't.

24      Q.   And this is the investigation into your

Nancy O'Loughlin

343

1    participation in the phone call; is that right?

2        A.   Right.   I'm talking about the outcome of it.

3    The disciplinary phase of it.   He could have put a

4    stop on it and handled it in a different way but he

5    didn't.

6        Q.   And this was the investigation into

7    participation of you and four others in a

8    conversation that Chief Carter believed was

9    improper, correct?

10       A.   Yes.

11       Q.   And what you're saying is that you think

12   that you were unduly disciplined by Chief Carter and

13   that General Manager Mulhern could have stepped in

14   and prevented that; is that right?

15       A.   Yes.

16       Q.   And do you have a basis for believing that

17   the fact that General Manager Mulhern did not step

18   in and prevent the discipline was wrongful on his

19   part?

20       A.   I think he should have stepped in and put it

21   right.   The discipline was totally out of whack with

22   the MBTA's disciplinary policy.   There's a

23   progressive policy and there's no way that was

24   progressive.

Nancy O'Loughlin

344

1    Q.   And did you believe that he was retaliating

2    against you by not stepping in?

3    A.   Yes.

4    Q.   On what do you base your belief that he was

5    retaliating against you by not overriding the Chief

6    on the discipline?

7    A.   I think he was trying to send me a clear

8    message that all right, you filed your complaint,

9    this is what happens to you when you file a

10   complaint.

11   Q.   On what do you base your belief that he was

12   trying to send you a message that the discipline was

13   a function of your having filed a complaint?

14   A.   That's just my opinion.

15   Q.   And I can't recall if I asked you this, the

16   other conduct that you asserted was retaliatory,

17   besides his failure to step in on the discipline,

18   was his conversations with the reporters; is that

19   right?

20   A.   Yes.

21   Q.   On what do you base your belief that his

22   comments to the reporters were in retaliation for

23   your filing of your complaint or your assertion of

24   your rights?

Nancy O'Loughlin

345

1        A.   My name was the only name released.

2        Q.   And do you have any other basis, apart from

3    the fact that your name was the only name released,

4    for asserting that Mr. Mulhern acted in retaliation

5    when he spoke to the reporter?

6        A.   My name was the only name released.  They

7    alleged it was criminal offenses.  The whole

8    untruthfulness there that basically destroys my

9    reputation, both professionally and personally.

10        Q.   I understand what you're asserting with

11    respect to the effect of the conduct.

12        A.   Maybe I'm missing the question then.

13        Q.   What causes you to believe that what was

14    motivating Michael Mulhern was retaliation for your

15    assertion of legal rights?

16        A.   That's just my opinion.  I'm sorry.

17        Q.   You spoke briefly, I don't know if you had

18    finished this line of questioning, but you were

19    asked about the fact that you were relieved of duty

20    with pay on March 8, 2004.  Is it your contention

21    that Mr. Mulhern participated in or decided or was

22    responsible for the fact that you were relieved of

23    duty with pay on March 8th, 2004?

24        A.   I think he knew that it was going to happen

Nancy O'Loughlin

346

1    and he did nothing to stop it, yes.

2        Q.   So if I'm understanding you correctly,

3    you're asserting that you believe Mr. Mulhern should

4    have stepped in and stopped the decision of others;

5    is that right?

6        A.   Yes.

7        Q.   And what makes you believe that he should

8    have stepped in and stopped the decision of others?

9        A.   Because he's the general manager.  He's the

10   overall manager.  Again, in accordance with the

11   disciplinary policy, it's way out of line with other

12   discipline that's been handed down.

13       Q.   On what do you base the belief that his

14   failure to step in was because he was retaliating

15   against you?

16       A.   I'm sorry.  It's just my opinion.

17       Q.   Is it your contention that Mr. Mulhern was

18   responsible for subjecting you to the disciplinary

19   proceedings in this case?

20       A.   No, I don't think he initiated them, no.

21       Q.   Is it basically your complaint that

22   Mr. Mulhern didn't step in and stop the penalty that

23   was imposed?

24       A.   My complaint is that he didn't step in and

Nancy O'Loughlin

347

1    assure a fair outcome.  Not such an egregious

2    outcome.

3         Q.  And again it's just your opinion that he

4    failed to step in to ensure a fair outcome because

5    of  -- I'm sorry, let me rephrase this.

6              Do you have any reason to believe that

7    his failure to step in on any of these disciplinary

8    steps was a function of retaliation?

9         A.  It's just my opinion.

10        Q.  I think I'm just about done.  I just want to

11   be sure that I understand that the conduct that

12   you're alleging constituted retaliation is as

13   follows:  Conversations with the reporter, his

14   snubbing of you at the hockey game and his failure

15   to step in when discipline that you thought was

16   inappropriate was being imposed.  Is that right?

17        A.  Yes.

18        Q.  There are no other respects in which you

19   feel that he acted in a retaliatory way; is that

20   correct?

21        A.  Correct.

22        Q.  And your belief that he was acting in

23   retaliation to your assertion of legal rights is

24   just a matter of your opinion; is that correct?

Nancy O'Loughlin

348

1      A.  Yes.

2              MS. LUKEY:  I have nothing further.

3  Thank you.

4              MR. EDWARDS:  I just have a couple of

5  questions on this.

6

7              CONTINUED DIRECT EXAMINATION

8  BY MR. EDWARDS:

9      Q.  The Globe article, Exhibit 35, I want to ask

10  you to look at the first sentence after the first

11  paragraph, after the first full paragraph.  They

12  said a lieutenant.  Do you see that?

13      A.  Yes.

14      Q.  Lieutenant Fleming was also suspended with

15  pay, was he not?

16      A.  Not on this date.  He was suspended several

17  weeks after I was.  I was the only lieutenant

18  suspended on that date.

19      Q.  Are you positive of that?

20      A.  Positive.

21      Q.  And you did say you didn't know Janice Loux?

22      A.  I know she's a member of the board of

23  directors.

24      Q.  Do you know her to speak to her?

Nancy O'Loughlin

359

1  COMMONWEALTH OF MASSACHUSETTS, SUFFOLK, SS.  )

2           COURT REPORTER'S CERTIFICATE

3           I, Doris M. Jones, Registered

4  Professional Reporter, Certified Shorthand Reporter

5  and Notary Public in and for the Commonwealth of

6  Massachusetts, do hereby certify that there came

7  before me on Friday, December 23, 2005, at the time

8  and place specified above, the person hereinbefore

9  named, who was by me duly sworn to testify to the

10  truth and nothing but the truth and thereinafter

11  examined under oath.

12           I certify that the examination was

13  reduced to typewritten transcript format under my

14  direction; and that the foregoing is a true record

15  of the testimony given by the witness.  I certify

16  further that I am neither attorney, counsel, or

17  relative of any party litigant, nor otherwise

18  financially interested in the action.

19           In witness whereof, I have hereunto set

20  my hand this 4th day of January, 2006.

21  My commission expires

22  June 4, 2010.                    *Doris M. Jones*

23                                Notary Public

24

**EXHIBIT J**



GLOBE STAFF PHOTO/JONATHAN WIGGS

MIT dean of admissions, said high school students are becoming doers instead of dreamers.
; on what students really care about instead of their numerous awards and activities.

# ...at's your pleasure?

## ...missions dean looking for students who enjoy life

### ...la Bombardieri
LOBE STAFF

n to the usual requests
:ores and Advanced
it grades, the thou-
ligh school seniors
ied to MIT this year
ire offbeat question:
imething you do for
it."
bout watching old
ing popcorn with mom.
venturing into the
andmade fishing rod.
question and a host of
en the application pro-
Jones, dean of admis-
ssachusetts Institute of
io has a rare message in
te universities: High
s should enjoy them-
id colleges should help

ist doing, doing, doing,
have three minutes to

### Humanizing the application

Dean of Admissions Marilee Jones changed MIT's freshman application
to remind prospective students that they are "human beings," not
"human doings," and that winning piles of awards isn't the only
way to show their potential.

**On the cover:** An illustration
depicts a student balancing books,
performing ballet, and holding the
scales of justice.

**Questions that ask applicants
to express who they are:**

■ We know you lead a busy life,
full of activities, many of which are
required of you. Tell us about some-
thing you do for the pleasure of it.

■ An application to MIT is much
more than a set of test scores,
grades, and activities. It's often a
reflection of an applicant's dreams
and aspirations, dreams shaped by
the worlds we inhabit. We'd like to
know a bit more about your world.
Describe the world you come from,

MIT freshman application
& financial aid information



NOL 0002

# T police officers suspended in probe

## Background records allegedly misused

### By Mac Daniel
GLOBE STAFF

Three MBTA police officers were
suspended after an investigation
showed they were illegally checking
background records to either dig up
dirt on colleagues or track down ad-
dresses and phone numbers of attrac-
tive women who caught the eye of male
officers, an agency official and two oth-
ers who were briefed on the investiga-
tion said yesterday.

They said a lieutenant who allegedly
encouraged the officers' activities also
was suspended.

The probe could lead to criminal
charges against the four, Massachusetts
Bay Transportation Authority officials
said, and more officers face suspension.

MBTA officials would not release the
names or ranks of the four who were
suspended with pay this week.

But speaking on condition of ano-
nymity, the official and two others
briefed on the probe said one was Lieu-
tenant Nancy O'Loughlin, sister of the
former MBTA police chief Thomas J.
O'Loughlin, who now heads the Milford
Police Department.

MBTA officials would not comment
on Nancy O'Loughlin, and she could
not be reached for comment.

In several of the cases, officers per-

**MBTA, Page B3**

# City seeking liquor curbs for parade in S. Boston

### By Michael S. Rosenwald
GLOBE STAFF
### and Jessica Bennett
GLOBE CORRESPONDENT

# MBTA police suspend officers during probe

► MBTA
Continued from Page B1

formed the checks while being recorded by the police department's emergency dispatch system, according to the three familiar with the investigation. One said that "a lot of the background checks were done because people had a personal ax to grind."

The three officers allegedly used vehicle license plate numbers to track down the names and phone numbers of attractive women they spotted.

MBTA officials would say little about the investigation yesterday.

"There is an ongoing internal investigation that concerns egregious violations of the department's policies, rules and regulations as well as allegations of criminal conduct," said MBTA spokesman Joe Pesaturo, who declined to say more.

MBTA General Manager Michael H. Mulhern would say only that MBTA Police Chief Joseph C. Carter "has my full support. I trust his judgment. The actions he's taken are not only necessary but appropriate to maintain the public's trust in the MBTA Police Department."

Officials with the MBTA police union declined to comment.

"There's an ongoing investigation and no other comment will be given at this point in time," said Lawrence C. Culbert, secretary to the MBTA Police Association.

Christine Cole, spokeswoman for the state Executive Office of Public Safety, which oversees the state criminal histories computer system, said she could "neither confirm nor deny the existence of an ongoing investigation."

A spokesman for the FBI, which oversees the National Crime Information Center that provides background records, said he had not heard of the MBTA probe.

Some MBTA police union officials, speaking on condition of anonymity, said more suspensions involving six to eight other officers were pending, though other union officials predicted that fewer would be disciplined.

The investigation is the latest internal problem in the troubled MBTA Police Department, where relations between Carter and the unions have become increasingly strained. Carter, a former Boston police superintendent who more recently was chief of the Oak Bluffs force, was hired by the MBTA last year and brought in from the tiny Martha's Vineyard department to improve the transportation authority's police force.

Carter arrived after the MBTA police faced accusations that it used a zero-tolerance policy, created by former Chief Thomas O'Loughlin, to harass and arrest minority teenagers. That focus on youth crime resulted in the arrest of scores of teenagers on minor infractions, which prompted allegations of racial profiling and excessive force. Carter's hiring was meant to heal that rift, MBTA board members and officials said.

After taking the job, Carter said more officers would ride the system as part of his changes.

He also touted a new policy last year to divide the transit system into sectors, where officers and their supervisors would develop long-term community contacts.

Since then, union officials say they have been left out of Carter's new assignment plans. They have also said the transit police force remains understaffed, with federal money earmarked to improve the police force being used elsewhere in the system.



# Get Unlimited Night I
# starting at 7pm.

## And right now get Unlimited Anytime Minutes for tw

**Bring your number to Sprint** and get Unlimited Night Minutes sta
That's two extra hours per weeknight—at least 2400 minutes a month. And, of cc
get unlimited minutes all weekend long.

Plus right now you'll also get Unlimited Anytime Minutes for the first two montl
Available on select new service plans starting at $50.

Plans also include:
### Nationwide Long Distance. Every minute, every day.

After two months, use the Anytime Minutes included in your plan. Available with
activation of a new line of service and a two-year Sprint PCS* Advantage Agreement.



NOL 0003

Get a Sprint PCS Vision™ Phone for $29.99*
After $170 instant or mail-in savings. Available with in-store activation of a new l
of service and a two-year Sprint PCS Advantage Agreement.

reg. $199.99
Sprint PCS Vision™ Phone VI650 by Samsung

**EXHIBIT K**

2 of 11 DOCUMENTS

Copyright 2004 SOFTLINE INFORMATION, INC.
Ethnic NewsWatch
Bay State Banner

March 18, 2004

**SECTION:** Vol. 39; No. 31; Pg. 1

**SLI-ACC-NO:** 0504BSLS 077 000013

**LENGTH:** 390 words

**HEADLINE:** MBTA cops suspended

**BYLINE:** Miller, Yawu

**BODY:**

Three MBTA police officers were suspended last week, reportedly after an investigation found they were using the department's computer system to check on colleagues and find phone numbers and addresses of women who caught the eye of male officers.

Also caught up in the sweep was Lieutenant Nancy O'Loughlin, who allegedly helped facilitate the officers' misuse of police records, according to news reports.

MBTA spokesman Joe Pesaturo confirmed that the officers were suspended with pay pending the outcome of the investigation, but would not comment on the charges.

"There is an on-going investigation," he said. "It concerns some serious breaches of department policy, procedures and regulations."

The investigation signals a significant change of fortune for O'Loughlin.

Under former police chief Thomas O'Loughlin, Nancy O'Loughlin, a cousin through marriage, appeared to escape censure, despite having led a unit that became notorious for applying heavy-handed tactics to teens for infractions as minor as trespassing. The anti-crime unit she headed was disbanded in 2002 following numerous citizen complaints and an investigation by an independent commission.

Yet before Thomas O'Loughlin left the force later that year, after his contract was not renewed, he assigned Nancy O'Loughlin to head the detectives' day shift and graffiti investigations.

Current MBTA Police Chief Carter was brought in to head the force after community activists had repeatedly called on the MBTA not to renew Thomas O'Loughlin's contract. In 2002, the MBTA settled a lawsuit filed by parents of children who were falsely arrested by MBTA police officers



Bay State Banner March 18, 2004

Sources say O'Loughlin's luck changed after Carter took office.

She was assigned a desk job and reportedly had a contentious relationship with Carter.

While press reports have alleged that Carter has struggled with MBTA police unions, community activists have generally given Carter high marks.

"I think Joseph Carter has done exactly what everyone expected him to do -- he came in, he took charge and straightened out the areas that needed to be straightened out," commented Leonard Alkins, president of the Boston Branch of the NAACP.

Article copyright The Bay State Banner.
*******************************************************

**JOURNAL-CODE:** BS

**LOAD-DATE:** June 14, 2004

**EXHIBIT L**

Page 1

1                                    VOLUME I
                                     PAGES 1 - 66
2                                    EXHIBITS: 1-4

3                UNITED STATES DISTRICT
          FOR THE DISTRICT OF MASSACHUSETTS

4

                         C.A. NO. 04-10933-JLT
5

6    NANCY O'LOUGHLIN,                )
          Plaintiff,                  )
7                                     )
     vs.                              )
8                                     )
     MASSACHUSETTS BAY                )
9    TRANSPORTATION AUTHORITY and     )
     JOSEPH CARTER and MICHAEL        )
10   MULHERN,                         )
          Defendants.                 )ORIGINAL
11

12

13        DEPOSITION OF MELVIN YAWU MILLER, taken
14   on behalf of the Defendant, Michael Mulhern,
15   pursuant to the Federal Rules of Civil
16   Procedure before Tina M. Sarcia, Registered
17   Professional Reporter and Notary Public
18   within and for the Commonwealth of
19   Massachusetts, at the law offices of Wilmer,
20   Cutler, Pickering, Hale and Dorr, LLP, 60
21   State Street, Boston, Massachusetts, on
22   Friday, January 20, 2006, commencing at 10:00
23   a.m.
24

```
 1    APPEARANCES

 2    Mitchell J. Notis, Esquire

 3    370 Washington Street

 4    Brookline, Massachusetts   02445

 5    (617)566-2700

 6    mitchnotis@aol.com

 7    For the Plaintiff

 8

 9    Joseph L. Edwards, Esquire

10    PRINCE, LOBEL, GLOVSKY & TYE, LLP

11    585 Commercial Street

12    Boston, Massachusetts   02109

13    (617)456-8131

14    jledwards@plgt.com

15    For the Defendant, Massachusetts Bay

16    Transportation Authority and Joseph Carter

17

18    Gregory M. Reiser, Esquire

19    WILMER, CUTLER, PICKERING, HALE & DORR

20    60 State Street

21    Boston, Massachusetts   02109

22    (617)526-6527

23    gregory.reiser@wilmerhale.com

24    For the Defendant, Michael Mulhern
```

Page 9

1    Q.   Do you know him personally?

2    A.   No, I don't.

3    Q.   When you say you've interviewed him several

4         times, can you give an approximate number of

5         the times you've interviewed him?

6    A.   Probably twice, at least twice.

7    Q.   Do you remember the first time that you

8         interviewed him, when that was?

9    A.   I don't.

10   Q.   Do you remember when the second time was?

11   A.   The one time that I remember, the one

12        interview I remember was at the opening of

13        the -- the ground breaking for renovations of

14        the Dudley Street station on the Fairmont

15        line.

16   Q.   Did you and Mr. Mulhern discuss Nancy

17        O'Loughlin during either of those two

18        interviews?

19   A.   I don't think I ever discussed Nancy

20        O'Loughlin with Mr. Mulhern.

21   Q.   I probably should have done this in the

22        beginning, but can we just back up, and can

23        you, please, tell me who your current

24        employer is?

Page 13

```
 1   A.   I do.

 2   Q.   Did you write this article?

 3   A.   I did.

 4   Q.   Was Michael Mulhern a source for yours of

 5        this article?

 6   A.   If he wasn't quoted in here, then I didn't

 7        talk to him.

 8   Q.   Can you, please, take a look at this article

 9        and see, if, in fact, Michael Mulhern is

10        quoted in this article?  Do you see if

11        Mr. Mulhern is quoted in that article?

12   A.   He's not quoted.

13   Q.   Are you confident that Mr. Mulhern was not a

14        source of yours for this article?

15   A.   I am.

16   Q.   Would you, please, turn to the second

17        paragraph of this article?

18   A.   Yes.

19   Q.   In that paragraph it says -- the last words

20        are "according to news reports".

21   A.   Yes.

22   Q.   Do you recall what newspaper records you're

23        referring to in that sentence?

24   A.   It was either The Globe or The Herald or
```

Page 14

1        both.

2    Q.   Do you recall that both The Globe and The

3         Herald ran articles related to this subject

4         matter of this article?

5    A.   I recall reading about it at least in one of

6         the daily papers.

7              MR. REISER:  I would like to mark

8         the next exhibit, please.

9              (Exhibit No. 3, Reproduction of

10             article, so marked)

11   Q.   I'm handing you what's been marked as Miller

12        3, and this is a reproduction of an article

13        that appeared in the Boston Globe dated March

14        11, 2004.

15             I'll just ask you to take a moment

16        to familiarize yourself with that document.

17        Please let me know when you're finished.

18             Do you recall reading that article

19        before just now?

20   A.   Yes.

21   Q.   Do you recall when you first read that

22        article?

23   A.   Probably the day it came out in the papers.

24   Q.   Was this article -- is this article one of

Page 15

1        the news reports referenced in your article?

2    A.   Yes.

3    Q.   Do you remember what your inspiration was for

4         writing this article, or what prompted you to

5         write your article?

6    A.   I found out about it in The Globe, either in

7         The Globe or The Herald or both.

8    Q.   Do you recall if you read an article in The

9         Herald about the same subject matter?

10   A.   I don't recall.  I read both papers every

11        day.

12   Q.   Turning back to your article, do you have

13        reason to believe that you believe anything

14        in your article is false or inaccurate?

15   A.   I do not.

16             MR. REISER:  Let's mark the next

17        exhibit, please.

18             (Exhibit No. 4, First Amended

19             Complaint, so marked)

20   Q.   I'm handing you what's been marked Miller 4,

21        and this is a copy of a jury trial filed by

22        Nancy O'Loughlin in this matter.  Have you

23        seen this document before?

24   A.   I have not.

Page 16

```
 1    Q.   If you would, please, turn to page 10, and
 2         I'll direct your attention to paragraph 31.
 3         Can you, please, just read that paragraph to
 4         yourself and let me know when you're
 5         finished.
 6              Where it says in paragraph 31, "On
 7         information and belief, Lt. O'Loughlin's name
 8         was provided to the Bay State Banner reporter
 9         by Mr. Mulhern in retaliation for her having
10         previously filed the October 2003 Charge of
11         Discrimination".
12              Is it true there where it says that
13         O'Loughlin's name was provided to the Bay
14         State Banner reporter by Mr. Mulhern?
15    A.   No, it's not.
16              MR. REISER:  I have nothing further.
17              EXAMINATION BY MR. NOTIS
18    Q.   My name is Mitchell Notis, and I represent
19         the plaintiff in this action Nancy
20         O'Loughlin.  Just to clear up a few things,
21         you said you interviewed Mr. Mulhern two or
22         three times, correct?
23    A.   Yes.
24    Q.   Are you referring to in-person meetings; is
```

Page 64

1                    C E R T I F I C A T E

2

3        COMMONWEALTH OF MASSACHUSETTS

4

5

6              I, Tina M. Sarcia, a Registered

7        Professional Reporter and Notary Public in

8        and for the Commonwealth of Massachusetts, do

9        hereby certify that the foregoing transcript

10       of the deposition of YAWU MILLER, having been

11       duly sworn, on Friday, January 20, 2006, is

12       true and accurate to the best of my

13       knowledge, skill and ability.

14              IN WITNESS WHEREOF, I have hereunto

15       set my hand and seal this 7th day of

16       February, 2006.

17

18

19

20                       Tina M. Sarcia, RPR

21                       Notary Public

22

23

24       My commission expires:  March 13, 2009

**EXHIBIT M**

Volume _____ I

Pages _____ 1 - 188

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * *

NANCY O'LOUGHLIN                    *

          Plaintiff,        *

- vs. -                             *          C.A. 04-10933-JLT

                           *

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY and    *
and JOSEPH CARTER
and MICHAEL MULHERN                 *

         Defendants.       *

* * * * * * * * * * * * * * *


    DEPOSITION of THOMAS J. O'LOUGHLIN, a witness called by

and on behalf of the Defendant, in accordance with the

provisions of the rules of the Massachusetts Rules of Civil

Procedure, before Michael C. Janey, a Notary Public in and for

the Commonwealth of Massachusetts, at the offices of PRINCE,

LOBEL, GLOVSKY & TYE, 585 Commercial Street, Boston,

Massachusetts, 02109 on Tuesday, December 20, 2005, commencing

at 10:15 a.m.

**JANEY ASSOCIATES**

**P. O. Box 365355**
**Boston, MA 02136-0003**
**(617) 364-5555**
**Fax (617) 364-5550**

APPEARANCES:


Mitchell J. Notis, Attorney at Law, law offices of MITCHELL J. NOTIS, 370 Washington Street, Brookline, Massachusetts, 02445, (617) 566-2700; on behalf of the Plaintiff and Witness.


Joseph L. Edwards, Jr., Attorney at Law, law offices of PRINCE, LOBEL, GLOVSKY & TYE, 585 Commercial Street, Boston, Massachusetts, 02109, (617) 456-8000; on behalf of the Defendants.


Joan A. Lukey, Attorney at Law, law offices of WILMER, CUTLER, PICKERING, HALE and DORR, LLP, 60 State Street, Boston, Massachusetts, 02109, (617) 526-6798; on behalf of the Defendants.

1        it was Mike Mulhern.  He said I got this
2        information from Mike Mulhern.
3            And I said, you know, then that's just not
4        true.  Because Mike Mulhern knows, he absolutely
5        knows that Nancy O'Loughlin is not my sister, so
6        I'm going to assume he knows the other parts of it,
7        as well.
8    Q.    Did Mr. Daniel indicate to you that Mike
9        Mulhern had told him both that Nancy O'Loughlin was
10       the subject of criminal investigation or
11       proceedings and that she was your sister?
12   A.    Yes.
13   Q.    Did Mr. Daniel confirm for you that the
14       article was intended to be read as identifying
15       Lieutenant Nancy O'Loughlin as one of the, I
16       believe it is four officers who were the subject of
17       criminal investigations?
18   A.    Can you ask me that again?  I'm sorry.
19   Q.    Yes.  Did he actually say to you that it was
20       his intent in writing the article to identify
21       Lieutenant O'Loughlin as one of the officers
22       referenced earlier in the article as being
23       investigated for criminal conduct?
24   A.    I believe so because he was surprised when I