UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NANCY O'LOUGHLIN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-10933 JLT |
| | ) | |
| MASSACHUSETTS BAY | ) | |
| TRANSPORTATION AUTHORITY, | ) | |
| JOSEPH CARTER, and MICHAEL | ) | |
| MULHERN, | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS MASSACHUSETTS BAY TRANSPORTATION AUTHORITY AND JOSEPH CARTER[1]

## I.     INTRODUCTION

Plaintiff Nancy O'Loughlin ("O'Loughlin"), an officer in the Massachusetts Bay

Transportation Authority's (the "Authority") Transit Police Department (the

"department"), filed a 10 Count Amended Complaint in which she alleges that the

Authority and Defendant Joseph Carter ("Carter") discriminated against her on the basis

of her sex and retaliated against her, in violation of Title VII of the Civil Rights Act of

1964 and G.L. c. 151B.  She also alleges violations of 42 U.S.C. §1983 and G.L. c. 12

§11I and 11H, the Massachusetts Civil Rights Act, and she contends that the Authority

defamed her.  Defendants now move for summary judgment on all counts of the

Amended Complaint.

---

[1]Plaintiff alleges that Defendant Michael Mulhern was the General Manager of the Authority at all times relevant to her complaint.  (Complaint, ¶ 9)  In the event Mr. Mulhern submits a motion for summary judgment, the Massachusetts Bay Transportation Authority and Joseph Carter incorporate that motion and all arguments therein by reference, as if set forth fully herein.

What emerges from the summary judgment record is a picture of O'Loughlin as an officer who was dissatisfied with Carter, the new Chief of Police, and with his initiatives for the department. She has improperly couched her dissatisfaction as unlawful discrimination. O'Loughlin's claims must fail because she cannot point to any admissible evidence that the defendants took any employment action based on a discriminatory or retaliatory motive and she cannot produce evidence that she was defamed by the Authority or any of its agents. Based on this memorandum, the attached Statement of Undisputed Facts and the Affidavit of Joseph Carter, defendants respectfully request the Court to grant this motion for summary judgment.

## II.    UNDISPUTED FACTS

Plaintiff Nancy O'Loughlin ("O'Loughlin") has been an officer with the Authority's Transit Police Department since 1983. (Statement of Undisputed Facts, ¶ 1) (hereinafter SUF) She was promoted to lieutenant in 1996. (Id.) O'Loughlin has developed an expertise for investigating graffiti related crime and it is something she likes doing. (Id.) Defendant Joseph C. Carter ("Carter") has been the Chief of the Transit Police Department since January 23, 2003. (Id., ¶ 2) He has held leadership positions in law enforcement for over twenty-five years, most notably as the chief of the Oak Bluffs, Massachusetts police department and as a Superintendent (the highest uniformed rank) in the Boston Police Department. (Id.) Carter is a member of and is supported by the National Association of Women Law Enforcement Executives ("NAWLEE"). (Id.) O'Loughlin is the only female officer ever to accuse Carter of sex discrimination. (Id., ¶ 65)

**Thomas O'Loughlin Becomes Chief of the Department And Places O'Loughlin In Command Of A Newly Created Specialized Unit**

In October 1997, Thomas O'Loughlin became chief of the department.  (Id., ¶ 6) One of his initiatives was creating and placing O'Loughlin in command of an Anti-Crime Unit ("ACU").  (Id., ¶ 7)  The ACU was an undercover (plainclothes) unit designed to address "quality of life" issues such as disorderly conduct, simple assaults, batteries, petty larcenies, and panhandling.  (Id.)  At its height ACU had 10 officers.  (Id., ¶ 8)

**The ACU Becomes the Target of Criticism**

The ACU employed a "zero tolerance" policy, which meant that anyone who committed a quality of life offense would be arrested.  (Id.)  Over time, the ACU generated a lot of negative publicity for the Authority and was heavily scrutinized because of allegations by critics that the ACU arrested too many young children for minor offenses and engaged in racial profiling by targeting minority youth.  (Id., ¶¶ 9, 11, 12)  O'Loughlin was identified in newspapers as being one of the worst offenders in the allegedly rogue ACU.  (Id., ¶ 9)  The ACU was also criticized by officers within the department, including then Deputy Chief William Fleming and then Deputy Chief Anne McCall.  (Id., ¶ 10)  O'Loughlin did not believe that the ACU would have been controversial if it had been commanded by a man.  (Id., ¶ 14)

**The ACU Is Disbanded And O'Loughlin Is Assigned Back To Headquarters**

In mid 2001, then Chief O'Loughlin disbanded the ACU and assigned O'Loughlin to the position of "Officer in Charge ("OIC")", which is the same "desk lieutenant" position to which she had been assigned by Chief O'Donovan in 1996 (a job she did not like, but tolerated).  (Id., ¶¶ 15, 16)

**O'Loughlin Is Assigned To Command The Detective Unit**

On July 26, 2002, former Chief O'Loughlin simultaneously assigned O'Loughlin and Lieutenant Joseph Leuchte, respectively, to the positions of day and night shift commanders of the detective unit. (Id., ¶ 17)  He also assigned O'Loughlin to conduct graffiti investigations when they arose. (Id.)

## Derogatory Postings About O'Loughlin And Others Appear On An Internet Website

In June 2002, a posting appeared on an external Internet website that contained racist, sexist, and nasty comments about Chief O'Loughlin, his secretary, his wife, O'Loughlin, and other members of the department. (Id., ¶ 18)  Chief O'Loughlin reported the posting to the Authority's Office of Diversity and Civil Rights and Fleming initiated an investigation in an attempt to discovery who posted the information. (Id.) The investigation continued until 2003, when Deputy Chief Fleming learned that the District Attorney had determined that no crime had been committed. (Id.)  It was never determined who posted the comments. (Id.)

## Chief O'Loughlin Leaves the Department

In July 2002, Chief O'Loughlin left the department and Deputy Chief Fleming became the interim chief. (Id., ¶ 19)  Fleming and O'Loughlin are personal friends and they have worked together over the years. (Id., 6)

## Fleming Creates Another Specialized Unit For O'Loughlin To Command

O'Loughlin maintains that after Fleming became interim chief, he created and placed her in command of a unit designated the "vandal squad" to address vandalism and graffiti. (Id., ¶ 20)

## Carter Is Appointed To The Position of Chief

On January 23, 2002, Joseph Carter was sworn in as the new Chief. (Id., ¶¶ 21, 22) Before he was sworn in, Deputy Chief Fleming wrote him a memo in which he cautioned: "morale issues arise from rumors, innuendoes and lies that are spread by a small minority of officers that have undermined the command staff at the MBTA Police . . . . As I warned you at our meeting, they will attack you and the fight has already started . . . . The cancer that exists in this police department continues." (Id., ¶ 24) Fleming did not tell Carter who he thought were the "cancers" in the department. (Id.)

**Carter Wants O'Loughlin To Command The Detective Unit**

O'Loughlin testified that a short time into his tenure, Chief Carter disbanded the vandal squad and assigned her to command the detective unit. (Id., ¶ 28) While Chief Carter does not recall whether he actually disbanded a vandal squad, after he became Chief, he determined that it was a waste of resources and talent to have a lieutenant (O'Loughlin) commanding only two patrol officers. He wanted O'Loughlin, rather than Sgt. Gillespie, to command the detective unit. (Id.)

**O'Loughlin Does Not Want To Command The Detective Unit And Believes That Chief Carter Is Discriminating Against Her**

O'Loughlin did not want to command the detective unit because she considered it a "desk job." (Id., ¶ 30) She claimed that being in command of the detective unit hurt her chances for advancement (Id.) She did not lose rank or salary on account of the reassignment. (Id.) O'Loughlin testified that Chief Carter reassigned her because he did not like women. (Id.)

According to both former Chief O'Loughlin and Chief Carter, in the police field, detective positions are viewed as prestigious. (Id., ¶ 32) Fleming thought O'Loughlin had been assigned to a "choice" position. (Id.) Prior to O'Loughlin, the last female

officer to command the detective unit was Delores Ford-Murphy, who was later appointed by Chief Carter to the position of deputy chief in December 2003. (Id., ¶ 33)

**Carter Assesses The Department**

Based on information he gathered about the department both before and after he became chief, Carter concluded that there were serious morale problems in the department. (Id., ¶¶ 24, 25, 35, 36) In particular, officers expressed a concern about unfair discipline and favoritism. (Id., ¶ 36) Chief Carter believed that the chain of command had deteriorated and that officers showed a profound disrespect for the command staff, superior officers, and for each other. (Id.) He resolved to change the culture of disrespect and improve morale. (Id., ¶ __)

**Chief Carter Presents His Plan Of Action And Core Values**

In June 2003, Chief Carter released a "Plan of Action" for the department. (Id., ¶ 37) The Plan of Action described seven "core values", which were to "serve as the cornerstone of the department's revised disciplinary system." (Id., ¶ 38) Chief Carter indicated that "priority status will be given to the investigation of any allegation of misconduct regarding one or more of [the] core values". (Id., ¶ 39)

The core values most relevant to this case are: (1) truthfulness (officers were expected to "admit mistakes . . . and take responsibility for their decisions even when it is not in their own best interests to do so"); (2) professionalism ("[i]nternal criticism offered secretly and without constructive basis will be unacceptable and dealt with harshly"); (3) treating all persons with dignity and respect ("[t]his statement represents the true nature of policing at its best. Procedures will be established to detect bias in its earliest manifestations, both internally and externally, so that dignified and respectable treatment

can be assured"); and (4) integrity (officers will not be held to one standard at work and another while off duty; officers should be "committed to adhering to the highest standards of integrity whether on or off duty"). (<u>Id.</u>, ¶ 37) Officers, including O'Loughlin, signed an Oath of Honor, in which they pledged to uphold the values of the department.

**O'Loughlin Does Not Pursue An Available Promotion.**

After the Plan of Action was released, Chief Carter instituted the first ever competitive process to fill the deputy chief positions. (<u>Id.</u>, ¶ 41) O'Loughlin did not apply for the promotion because she never aspired to be a deputy chief. (<u>Id.</u>)

**Carter Reassigns O'Loughlin And Lt. Leuchte Out Of The Detective Unit**

Chief Carter decided to move O'Loughlin and Lt. Leuchte out of the detective unit because he was not satisfied with the job they were doing and because he did not believe they were the best officers to oversee the changes he planned in the detective unit. (<u>Id.</u>, ¶¶ 42-44, 46) Carter thought O'Loughlin and Lt. Leuchte displayed similar deficiencies. (<u>Id.</u>, ¶ 43) Among other things, Carter did not believe he was getting the type of reports he should have from an investigative unit, and he believed that O'Loughlin was spending more time investigating than managing the detective unit. (<u>Id.</u>, ¶ 42) On August 8, 2003, Chief Carter met separately with O'Loughlin and Lt. Leuchte and informed them that they would be reassigned. (<u>Id.</u>, ¶ 49)

**O'Loughlin Is Assigned To Command Another Unit; Lt. Leuchte Is Not**

Chief Carter told O'Loughlin that he was reassigning her to command the detail unit because he needed someone with her administrative skills to command that unit. (<u>Id.</u>, ¶ 49) He did not place Lt. Leuchte in another command position and, instead,

reassigned him to the patrol unit because of the deficiencies he displayed while managing the detective unit. (Id., ¶ 50)  As a consequence of her move to the detail unit, O'Loughlin was no longer responsible for conducting graffiti investigations. (Id., ¶ 52) Chief Carter did not think this was a problem because he understood from O'Loughlin that the police officers she commanded in the so-called vandal squad were "highly proficient" graffiti investigators. (Id.)

**Chief Carter Places An Experienced Lieutenant In Command Of The Detective Unit**

Chief Carter placed Lieutenant Thomas McCarthy in command of the entire detective unit, replacing both O'Loughlin and Lt. Leuchte because he believed that Lt. McCarthy, who had been a deputy chief under Chief O'Donovan and a past commander of the detective unit, was better able to implement the changes he planned in the detective unit than Lt. Leuchte and O'Loughlin. (Id., ¶ 46)  Chief Carter later promoted Lt. McCarthy to the position of deputy chief. (Id., ¶ 67)

**O'Loughlin Alleges That Her Removal From The Detective Unit Was Discriminatory**

Even though she did not want to command the detective unit and she was moved on the same day as Lt. Leuchte, a man, O'Loughlin testified that she believed Chief Carter reassigned her from the detective unit commander position because she was female. (Id., ¶ 47)  Deputy Chief Fleming did not believe that Carter removed O'Loughlin from the detective unit because of her sex. (Id., ¶ 48)

**Chief Carter Assigned O'Loughlin To Command The Detail Unit Because He Needed Strong Leadership In The Unit**

The detail unit is responsible for many functions associated with the assignment and oversight of paid detail assignments, including those associated with the "Big Dig."

(Id., ¶ 51)  The commander of the detail unit administered and managed what was,

essentially, a multi-million dollar business.  (Id.)  Carter considered it an important

assignment because it has a direct correlation to the department's "community presence."

(Id.)  There were problems in the detail unit that Chief Carter needed to address and he

wanted to replace the sergeant who was then in the position.  (Id., ¶ 49)  Notwithstanding

the deficiencies Chief Carter observed in the way O'Loughlin commanded the detective

unit, he thought she could provide the type of management he needed in the detail unit,

particularly because she would no longer be responsible for conducting investigations.

(Id., ¶ 53)

**O'Loughlin Did Not Like Being Assigned To The Detail Unit**

O'Loughlin claimed that superior officers were assigned to command the detail

unit as a means of punishing them.  (Id., ¶ 54)  She testified that she believed Chief

Carter wanted to punish her because of her role in the ACU and because he did not like

females.  (Id.)  She also thought he was punishing her because of conflicts she had with

Sgt. Gillespie in the detective unit.[2]  (Id., ¶ 55)  She did not lose rank or pay as a result of

the assignment.  (Id., ¶ 54)  Chief Carter did not believe that the position of commander

of the detail unit was a punishment position – that had not been his experience with the

Boston Police Department.  (Id., ¶ 56)  He considered it a lateral move.  (Id.)

With the exception of a short period beginning when Fleming served as interim

chief, a lieutenant or a captain had served in the position of detail unit commander since

---

[2] According to Fleming, Gillespie was in constant conflict with not only O'Loughlin, but with Lt. Leuchte
and each of the other commanders in Investigative Services.  (SUF, ¶ 55)  Carter knew that O'Loughlin and
Gillespie (who commanded the unit immediately before O'Loughlin) had disagreements about the way the
detective unit should be run.  (Id.)  However, he left it to Fleming to manage the personnel in Investigative
Services.  (Id.,)  On July 31, 2003, Fleming wrote a memorandum to Gillespie in which he emphasized
that O'Loughlin and Lt. Leuchte were the primary commanders in the detective unit and that Gillespie was
subordinate to them.  (Id.)

1995. (Id., 57)  Fleming testified that he believed the position of commander of the detail

unit could be a punishment assignment for a lieutenant, but that it was also a powerful

position because the commander controlled overtime. (Id., ¶ 58)  Neither Fleming nor

anyone else told Carter that assigning a lieutenant to the position was or could be

perceived as a punishment assignment. (Id., ¶ 56)  Fleming had no reason to believe that

Carter assigned O'Loughlin to command the detail unit because he wanted to punish her.

(Id., ¶ 60)

**O'Loughlin Files An MCAD Complaint**

In October 2003, after she was assigned to the detail unit, O'Loughlin filed a

complaint with the Massachusetts Commission Against Discrimination ("MCAD"), in

which she alleged that Carter and the Authority discriminated against her because of her

gender. (Id., ¶ 65)  Outside lawyers for the Carter and the Authority filed a position

statement in response to the complaint on March 8, 2004. (Id., ¶ 77)

**Several Officers, Including O'Loughlin, Become the Subjects of an Internal
Investigation**

In early 2004, the detective unit began conducting an investigation which required

detectives to review recordings of telephone conversations made on a recorded

department telephone line. (Id., ¶ 68)  Officers use the line, which is referred to as the

"1205 line", for warrant checks and other department queries, and calls from the public

are routed to that line when the emergency line is in use. (Id.)  The conversations were

brought to Carter's attention and he authorized further investigation to determine the

extent of the violations. (Id., ¶ 69)

**Carter Believes That O'Loughlin Engaged In Conversations With Subordinate
Officers That Violate The Rules Of The Department And Core Values**

While O'Loughlin was not a subject of the original investigation, in reviewing the 1205 line recordings, investigators heard her and several male officers engaging in conversations that appeared to violate the rules and regulations of the department and the core values in the Plan of Action. (<u>Id.</u>, ¶¶ 68, 70)

**Several Officers Are Placed On Administrative Leave With Pay**

Carter decided to charge several officers, including O'Loughlin, with violations of the rules, regulations, core values, and Oath of Honor because of conversations on the 1205 line. (<u>Id.</u>, ¶ 71) He also decided to place the officers he believed committed the most egregious violations on administrative leave with pay, pending the outcome of further investigation. (<u>Id.</u>) On March 8, 2004, Police Officers Robert MacKay, Douglas Hennessey, and Ronald Jordan, and O'Loughlin (who was a lieutenant), were summoned separately to department headquarters and placed on administrative leave with pay by then Deputies Ford-Murphy, McCarthy, and Martino. (<u>Id.</u>, ¶¶ 71, 72) The deputies took each officer's service weapon, Police I.D., and badge. (<u>Id.</u>, ¶¶ 71, 72) O'Loughlin also had to surrender the keys to her take-home cruiser. (<u>Id.</u>, ¶ 72) Each officer was informed that the investigation was ongoing, and that it was expected that each would be charged with violations related to conversations on the 1205 line. (<u>Id.</u>, ¶¶ 71, 72) In addition, MacKay and Jordan were notified that they were under investigation for possible criminal offenses. (<u>Id.</u>, ¶ 71) O'Loughlin did not protest or deny the charges at the meeting. (<u>Id.</u>, ¶ 73) O'Loughlin did not experience any adverse acts between the time she filed her MCAD complaint and the day she was placed on administrative leave with pay. (<u>Id.</u>, ¶ 73)

On the day O'Loughlin and the others were placed on administrative leave, Carter instructed the deputies to ensure that members of the Special Operations Team ("SOT") were present at headquarters to protect civilian employees in case one of the officers reacted negatively to being asked to surrender his weapon, badge, or Police I.D. (Id., ¶ 75)  No SOT officer did or said anything that made O'Loughlin feel apprehensive, intimidated, or threatened. (Id., ¶ 76)

As the 1205 line investigation continued, other officers were implicated, including Police Officer James Floyd and Fleming (who by then, had been demoted by Carter from the position of deputy chief back to his civil service rank of lieutenant). (Id., ¶¶ 64, 78) Both Floyd and Fleming were placed on administrative leave with pay. (Id., ¶ 78)

On May 14, 2004, O'Loughlin received written notice that a hearing would be held to determine whether just cause existed to discipline her. The notice included 30 instances over a several month period in which Carter believed O'Loughlin violated department rules and regulations during conversations on the 1205 line. (Id., ¶ 83) Representative of the offenses O'Loughlin committed are: (a) during an internal investigation of who created a poster with Carter's face superimposed on a "Where's Waldo" children's character, O'Loughlin told MacKay that if Officer Douglas Hennessey, who was suspected of making the poster, thinks he was in danger of being charged, he should tell someone that he had seen ranking members of the department with women other than their wives. (Id.); (b) O'Loughlin told MacKay that she advised an officer to sue the Authority for harassment, even though she was aware of the provision of the Authority's anti-harassment policy that imposes on her, as a supervisor, an affirmative duty to report any harassment or discrimination to the Authority's Office

of Diversity and Civil Rights.  (Id.); (c) She failed to take corrective action or report MacKay when he made comments about how the command staff "didn't give a fuck" about a murder at Dudley Station and when he derisively said that "Joe's [Carter's] doing a hell of a fucking job."  (Id.); (d) O'Loughlin described for MacKay how she told a Hingham Police Department supervisor: "I said, you don't understand us, we're city cops, we could give a fuck less" and that people in Hingham were "rich spoiled bastards."; (e) O'Loughlin and MacKay were discussing an incident in which a mailman made a disparaging remark to another officer about the Transit Police, and O'Loughlin told MacKay that she "would have fucking pummeled [the mailman]."; (f) O'Loughlin referred to Deputy Chief Martino as "that little puke."  (Id.)  O'Loughlin considered the statement true, and therefore, not "rude, disrespectful, contemptuous, insolent, or discourteous".  (Id.); (g) she told MacKay "its great when your command staff won't even show up for a murder"; (h) she asked MacKay if any member of the command staff was around, or whether they were "so worried about their 15th swearing in on Friday that they can't worry that some kid got stabbed."; and (i) she told MacKay that "they [the command staff] should be ashamed of themselves, they should be fucking ashamed of themselves."

At the time of these conversations, O'Loughlin says she was off duty.  (Id., ¶ 83(a))  Notwithstanding department rules and Plan of Action provisions to the contrary, O'Loughlin testified that she did not believe she had an obligation to take corrective action when she was "off duty, acting as a civilian" or when she was "shooting the breeze" or "blowing off steam" with a subordinate officer.  (Id.)  She also testified that as a lieutenant, she was only obliged to support the command staff when she was on duty.

(Id.)  It is significant that the subordinate officers with whom O'Loughlin was speaking on the recorded department telephone line were on-duty.  (Id.)

**O'Loughlin Had Been Disciplined In The Past For Making Disparaging Remarks About Another Officer On A Tape Recorded Telephone Line**

O'Loughlin had previously been disciplined for making disparaging remarks, while off-duty, about a subordinate officer on a recorded department telephone line.  (Id., ¶ 85)

**O'Loughlin Attends A Due Process Hearing But Does Not Testify**

O'Loughlin chose not to testify at her just cause hearing.  The hearing officer found just cause to sustain the charges and that O'Loughlin's conduct was "incompatible with the duties and responsibilities of a superior officer".  Just cause was also found in the cases of Fleming, Jordan, Hennessey, MacKay, and Floyd.  (Id.¶¶ 86, 87)

After the just cause finding, Carter considered terminating O'Loughlin because he felt her conduct was an egregious violation of the Plan of Action.  (Id., ¶ 88)  Carter also thought Fleming's comments were serious enough for him to be terminated.  (Id., ¶ 89) Carter ultimately decided to demote both O'Loughlin and Lt. Fleming two ranks to the rank of patrol officer.  (Id.¶¶ 88, 89)  Carter fired MacKay and Jordan, suspended Hennessey for 60 days, and suspended Floyd for 180 days.  (Id., ¶ 91)

During the entire time O'Loughlin has served on the police force, no officer had ever been demoted until she and Fleming were demoted.  (Id., ¶ 92)

**O'Loughlin And The Other Officers Arbitrate Their Discipline**

All of the officers who were placed on administrative leave arbitrated their discipline pursuant to the terms of each officer's collective bargaining agreement.  (Id.¶¶

14

95-97)  An arbitrator determined that O'Loughlin had not violated department rules and ordered her reinstated to her position as a lieutenant, with back pay.  (Id.¶ 95)  Another arbitrator reduced Fleming's discipline to a 20 working day suspension.  (Id.¶ 96)  After arbitration, MacKay was reinstated to the department and his discipline was reduced to a 5 day suspension, while Jordan was reinstated and given a 1 day suspension.  (Id.¶ 97)  Floyd's discipline was affirmed by an arbitrator.  (Id.)

Fleming does not know of any situation in which Carter treated O'Loughlin differently because of her sex.  (Id)

## III.   ARGUMENT

### A.   O'Loughlin Cannot Present Evidence Sufficient To Raise A Reasonable Inference That Carter Or The Authority Discriminated Against Her On The Basis Of Her Sex, In Violation Of G.L. c. 151B Or Title VII

Even in discrimination cases "where elusive concepts such as motive or intent are at issue," summary judgment should be awarded if the non-moving party relies upon "conclusory allegations, improbable inferences, and unsupported speculation." Straughn v. Delta Airlines, Inc., 250 F.3d 23, 33 (1st Cir. 2001)(emphasis in original).  In the absence of direct evidence, a plaintiff alleging disparate treatment must rely on the burden shifting rubric set forth in McDonnell Douglas Corp. v. Green.  411 U.S. 792, 802-05 (1973).  See Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 116 (2000)(burden shifting analysis under G.L. c. 151B).

A plaintiff alleging disparate treatment based on sex must first establish, by a preponderance of the evidence, a prima facie case showing that: (1) she was member of a protected class, (2) she was performing her job satisfactorily, (3) the employer took an adverse employment action against her, and (4) her employer continued to have her

duties performed by a comparably qualified person.  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000).  Id. If the plaintiff makes out a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision(s).  If the defendant meets that burden, the plaintiff may prevail only by proving, by a preponderance of the evidence, that the reasons given for the challenged actions are a pretext for unlawful discrimination. 411 U.S. at 802-05; see Dichner v. Liberty Travel, 141 F.3d 24, 30 (1st Cir. 1998). In those cases in which a plaintiff has put forth weak prima facie and pretext evidence, summary judgment should be granted.  See Zapata-Matos v. Reckitt & Colman, Inc., 277 F.3d 40, 47-48 (1st Cir. 2002).  Burden remains at all times.

### 1.  O'Loughlin Cannot Show That Her Reassignments Were Motivated By Unlawful Considerations Of Her Sex

Summary judgment is appropriate on O'Loughlin's claims that her reassignments were discriminatory because she cannot show that she was subjected to any adverse action or that the reassignments were made "because of her sex".  Further, even if she could make out a prima facie case, she cannot present evidence that the reasons articulated by Carter for making the moves were pretexts for discrimination.

### a.  O'Loughlin's reassignments were not adverse employment actions within the meaning of Title VII and G.L. c. 151B

Unless O'Loughlin can show that she suffered an adverse action, she cannot make out a prima facie case of discrimination regarding the reassignments.  See 42 U.S.C. § 2000e-2(a)(1); G.L. c. 151B; Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998)(Title VII); MacCormack v. Boston Edison Company, 423 Mass. 652, 663 (1996)(chapter 151B).  An employment action must be more "disruptive

than a mere inconvenience or an alteration of job responsibilities to be actionable".

Marrero v. Goya of P.R., Inc., 304 F.3d 7; 24 (1st Cir. 2002); MacCormack v. Boston

Edison Company, 423 Mass. at 663-664 (a plaintiff's subjective feelings of

disappointment and disillusionment regarding a change in job responsibilities, standing

alone, do not constitute an adverse action under G.L. c. 151B)

      For the reassignment of a police officer to be considered an adverse employment

action, the officer must prove a real disadvantage by being transferred to a specific

position; it is not enough that she does not like the new position. McKenzie v.

Milwaukee County, 381 F.3d 619, 625-26 (7th Cir. 2004)(citation omitted)("a transfer

does not become an adverse employment action solely because the officer subjectively

preferred one position over another", especially where it was a lateral move and the

plaintiff retained her title, pay and benefits). Notwithstanding her preference for vandal

squad work or her asserted dislike for the detective and detail units, O'Loughlin cannot

show that her reassignments were adverse actions or discriminatory.[3]

### i.    Detective Unit Commander Position

      No reasonable fact-finder could conclude that Carter's decision to reassign

O'Loughlin from the vandal squad, where she commanded only two patrol officers, to the

position of commander of the entire detective unit constituted an adverse employment

action. O'Loughlin did not lose rank or salary as a result of the move and she had more,

---

[3] O'Loughlin's claim that Carter discriminated against her by assigning her to positions of leadership should be viewed with skepticism. Both Chief O'Donovan and Chief O'Loughlin assigned O'Loughlin to positions she did not particularly like, and she testified that she understood that a chief could reassign lieutenants at his discretion. (SUF, ¶ 17) In fact, it was former Chief O'Loughlin who originally assigned O'Loughlin to command the detective unit. (Id., ¶ 17) It should raise a red flag that she did not find that assignment discriminatory when it was made by Chief O'Loughlin, but she charged Carter with discrimination for making the very same assignment. O'Loughlin can present no rationale for what seems to be an assertion that Carter should be held to a different standard than Chief O'Donovan and Chief O'Loughlin.

17

not less responsibilities. Carter and Chief O'Loughlin, who originally assigned O'Loughlin to the position of detective unit commander, both testified that detective positions were considered prestigious, while Fleming considered the detective unit commander's position a "choice" assignment. There was no loss of status as O'Loughlin claims.

### ii.    Detail Unit Commander Position

O'Loughlin did not lose salary or rank because of her assignment to the detail unit. Officers with the rank of lieutenant and above held the position continuously from at least 1995, with the exception of the brief period when Sgt. Morris, who was assigned while Fleming was Interim Chief, commanded the unit. While Fleming testified he felt the detail unit command could be a "punishment assignment" if the person did not want the job, he believed it was nonetheless a "powerful" position in the department.[4] Notwithstanding O'Loughlin's dislike for the position of detail unit commander, it is not adverse within the meaning of Title VII or G.L. c. 151B.

### b.    O'Loughlin cannot demonstrate that the reasons Carter gave for disbanding the vandal squad and reassigning her were pretexts for unlawful discrimination.

Even if O'Loughlin could show that her reassignments were adverse, Carter presented legitimate, non-discriminatory reasons for his actions. He disbanded the vandal squad because he considered it a waste of resources to have a manager (lieutenant) supervising only two patrol officers and he thought O'Loughlin would be utilized more effectively commanding the entire detective unit. He eventually moved O'Loughlin and

---

[4] If the Court were to adopt O'Loughlin's implicit assertion that a police officer's subjective, personal feelings about a particular assignment was a proper barometer with which to gauge whether the assignment was adverse within the meaning of the antidiscrimination statutes, it would result in chaos for a paramilitary organization such as the department.

her male night shift detective unit counterpart, Lt. Leuchte, out of the detective unit on the same day because he was not satisfied with their performance and he was not confident that they could oversee the many changes he planned for the department.  Lt. McCarthy replaced both officers.[5]  Once Carter made the decision to place Lt. McCarthy in command of the detective unit, he had to reassign O'Loughlin and Lt. Leuchte to other positions.  He placed O'Loughlin in command of the detail unit because he wanted a lieutenant there to address problems in the unit that were not addressed satisfactorily by the sergeant then in charge.  It is significant that Lt. Leuchte (a male), was not given another command.

Because Carter has presented legitimate reasons for reassigning O'Loughlin, the burden shifts to her to show that his reasons were pretextual.[6]  O'Loughlin has not set forth facts sufficient to prove that Carter's reasons for his actions are pretexts for discrimination.  It is simply not enough for her to claim that she believed that Carter "did not like women" or that she feels she was treated adversely because she is a woman.  Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 871 (1st Cir. 1997)(a plaintiff's perception of discrimination, standing alone, does not create a material issue of fact that would preclude summary judgment).

---

[5] Lt. McCarthy had substantially more experience in command positions than O'Loughlin, though they were the same rank, because he was a former commander of the detective unit and a former deputy chief. She and Lt. McCarthy were not similarly credentialed – a fact that destroys the fourth leg of O'Loughlin's prima facie case.

[6] The First Circuit has explained that "pretext" means "deceit used to cover one's tracks." Quesada-Rodriguez v. Banco Bilbao Vizcaya Argentaria, 404 F.3d 42, 45 (1st Cir. 2005)(citations omitted).  A plaintiff may not simply "impugn the veracity of the employer's justification; [she] must elucidate specific facts which would enable a jury to find that the reason given is not only a sham", but a sham intended to cover up the employer's real motive of discriminating on the forbidden basis. Id. Pretext may also be established if the plaintiff can demonstrate that similarly situated individuals were treated differently. Pardo v. The General Hospital Corporation, 446 Mass. 1, 9 (2006)(citations omitted).

Here, O'Loughlin cannot point to any word, gesture or act of Carter, or anyone else, to suggest that he was motivated by a discriminatory animus to reassign her. The fact that Carter treated a similarly situated male officer the same as he treated O'Loughlin is the best evidence that he was not motivated by considerations of O'Loughlin's sex in reassigning her.[7]

Though O'Loughlin maintains that Carter placed her into the position as a "punishment," she does not present any tangible evidence of the reason he allegedly wanted to punish her, and there is absolutely no evidence that it was because of her sex. O'Loughlin's assertion that Carter wanted to punish her because of her role in the ACU is completely speculative, and in any case, would not constitute sex discrimination.

### 2. O'Loughlin's Cannot Raise Triable Issues Of Fact Regarding Her Claims That Carter Subjected Her To Additional Discrimination

O'Loughlin claims in paragraph 17 of her complaint that in addition to her reassignments, Carter discriminated against her in seven additional ways that are best described as "minor slights." See SUF ¶ 78. As with her reassignments, O'Loughlin indicates, in a conclusory fashion, that the incidents would not have occurred had she been male. This bare assertion is insufficient to raise a triable issue of sex discrimination. Moreover, the incidents, either alone or together, do not rise to a level sufficient to invoke the protection of Title VII and G.L. c. 151B. Moreover, Carter responded to each of her allegations. Id. While both statutes are designed to address unlawful discrimination in

---

[7] The question for the Court is not whether Carter was correct in his assessment of O'Loughlin's and Lt. Leuchte's performance, but whether he unlawfully considered O'Loughlin's sex in reassigning her. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991)("Courts may not sit as super personnel departments, assessing the merits -- or even the rationality -- of employers' nondiscriminatory business decisions."). O'Loughlin has not presented any evidence that Carter did so.

the workplace, neither provides a remedy for all workplace actions that an employee does not like or finds objectionable. DeNovellis v. Shalala, 124 F.3d 298, 310-311 (1st Cir. 1997); Lattimore v. Polaroid Corp., 99 F.3d 456, 463 (1st Cir. 1996).

### 3. O'Loughlin Has Not Presented Evidence Sufficient To Show That The Authority Is Culpable For Her Untimely Complaints About Discrimination That Allegedly Occurred Prior To Carter Becoming Chief

O'Loughlin alleges that the Authority engaged in a "pattern and practice" of discrimination over the course of her entire career and she lists eight instances that are, apparently illustrative of the alleged discrimination. (Complaint, ¶ 19 and see SUF, ¶ 79) Her presentation of the alleged discriminatory acts is untimely and cannot now be considered by the Court.

In Massachusetts, a plaintiff alleging a violation of Title VII or G.L. c. 151B has 300 days from the complained of discriminatory act to file an administrative complaint with the MCAD or the United States Equal Opportunity Commission ("EEOC"). G.L. c. 151B; Brissette v. Franklin County Sheriff's Office, 235 F. Supp. 2d 63, 86 (D.Mass. 2003)(Title VII). An exception may be made to the filing deadline if it is determined that the alleged discriminatory acts are of a "continuing nature."[8] A plaintiff will be barred from filing a complaint if a reasonable person in her position "knew or should have known" that discriminatory conduct occurred and would have filed a complaint before the statute of limitations expired. Cuddyer v. Stop and Shop Supermarket Co., 434 Mass. 521, 539 (2001). To show a continuing violation under Title VII, the plaintiff must present evidence that the allegedly discriminatory conduct occurring outside the

---

[8] The continuing violation exception to the filing deadlines is based on the premise that some claims of discrimination, which involve a series of related events, have to be viewed in their totality in order to assess adequately their discriminatory nature and impact. Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 531 (2001).

limitations period "involve[s] the same type of employment actions, <u>occurred relatively frequently, and [was] perpetrated by the same managers</u> as conduct which occurred within the limitations period". <u>Brissette v. Franklin County Sheriff's Office</u>, 235 F.Supp.2d 63, 87-88 (D. Mass. 2003).

The isolated historical incidents O'Loughlin cites are completely unconnected to her current claims, and by her own admission, were not ongoing at the time Carter arrived. More importantly, this was not a situation in which O'Loughlin believed that the acts were discriminatory at the time they occurred. She chose to remain silent. <u>See</u> Complaint, ¶ __. Under the circumstances, these claims are untimely and should be dismissed.

**B.    O'Loughlin Cannot Show That She Was Retaliated Against**

O'Loughlin claims that the Authority retaliated against her by placing her on administrative leave and disciplining her, and that the Authority (and Mr. Mulhern) retaliated against her by defaming her in a newspaper because she filed a complaint with the MCAD and the Equal Employment Opportunity Commission ("EEOC"). <u>See</u> Complaint, Counts II and IV. The <u>prima facie</u> case of retaliation consists of a showing that the plaintiff engaged in a protected activity, that she suffered an adverse employment action, and that the adverse action was causally related to the protected activity. <u>Hernandez-Torres v. Intercontinental Trading, Inc.</u>, 158 F.3d at 47 (Title VII).

**1.    O'Loughlin Has Failed To Present Evidence Sufficient To Raise An Inference That Her Discipline Was Related To Her Protected Activity**

O'Loughlin's relies on the temporal relationship between the time she filed her MCAD complaint (the protected activity) and date she was placed on administrative

leave as evidence of a causal relationship between the occurrences. That reliance is misplaced. To present a <u>prima facie</u> case of retaliation based on the temporal relationship between a protected activity and an adverse action, a plaintiff must show that the time period between the two was "very close". <u>See</u> <u>Calero-Cerezo v. United States Department of Justice</u>, 355 F.3d 6, 25 (1st Cir. 2004)(citations omitted). Courts have found that periods of three and four months between the protected activity and alleged retaliatory act were insufficient to demonstrate the requisite causal connection based on temporal proximity. <u>See</u> <u>id.</u> and cases cited.

O'Loughlin filed her complaint on October 17, 2003, almost a full five months before she was placed on administrative leave in March 2004. Between the time O'Loughlin filed her complaint and the day she was relieved of duty, she did not experience any acts she thought were retaliatory. In the absence of some evidence of retaliation, 5 months is too long a period to presume a causal connection between O'Loughlin's filing of a complaint and the acts she alleges were retaliatory. <u>See</u> <u>e.g.</u> <u>King v. Town of Hanover</u>, 116 F.3d 965, 968 (1st Cir. 1997)(no causal relationship between complaint of discrimination and discipline that occurred five months later)(citation omitted).[9]

> **2.    <u>O'Loughlin Cannot Show That Carter And The Authority Were Motivated By A Retaliatory Animus To Relieve Her From Duty With Pay And Discipline Her</u>**

Carter reasonably believed that O'Loughlin engaged in conversations with subordinates on the 1205 line in which she actively encouraged and supported the

---

[9] O'Loughlin seems to suggest that a causal connection is shown because she was placed on administrative leave with pay on the same day attorneys for the Authority and Carter filed an answer to her MCAD complaint (March 8, 2004). This is without merit because answering the complaint is not a protected activity in which she engaged.

undermining of the command staff and the department.[10]  As Chief of Police, Carter had

an obligation to address speech by an officer that has the tendency to undermine the

proper functioning of the police department.  See Kokknis v. Ivkovich, 185 F.3rd 840, 845

(7th Cir. 1999) citing and quoting Khuans v. School Dist., 110, 123 F.3rd 1010, 1017 (7th

Cir. 1997)(where an employee's speech "create[s] a potential problem in maintaining

authority and discipline within [a police] department", the Chief of Police is entitled to

take preventative action). (emphasis added) Id.  Male officers, who had not filed

complaints, were disciplined by Carter for the same type of violations, in some cases

more severely than O'Loughlin.  In particular, the male lieutenant (Fleming) who was

also implicated in the 1205 line investigation received the same discipline as O'Loughlin,

even though Carter thought his violations were less egregious than hers.

When Carter assumed command of the department, he set goals, which included,

restoring the trust of the public that was eroded by the aggressive tactics of the ACU and

resultant public fallout, restoring morale in the department, and creating a culture in

which officers respected each other and the members of the communities they served.

Carter issued his Plan of Action on June 10, 2003, well before O'Loughlin filed her

MCAD complaint in October 2003 and before she was placed on administrative leave in

March 2004.  He made it clear that he intended to discipline officers who violated the

core values in the Plan of Action and in the Oath of Honor, which she signed.

O'Loughlin understood that the core values were to "serve as the cornerstone of the

department's revised disciplinary system".

---

[10] O'Loughlin maintains that she was disciplined because she made derogatory statements about Carter and the command staff on a taped police department telephone line. (Complaint, ¶ 25)  While this is not accurate, if it was, it would not constitute unlawful discrimination because it would not be because of her sex.

O'Loughlin's statements on the 1205 line were not benign observations about the department shared with friends or "blowing off steam", as she claims. Rather, they were antithetical to the chief's goals. O'Loughlin's assertion that she had a right to her opinion and could denigrate the command staff, members of the public, and fellow officers to a subordinate officer (and allow him to do the same) with impunity because she was off duty, flies in the face of department rules and regulations, and the core value of integrity, which emphasized that officers "should be committed to adhering to the highest standards of integrity whether on or off duty." (SUF, ¶¶ 38, 39, 83) Moreover, O'Loughlin was talking to subordinate officers who were on duty and she had been disciplined in the past for similar conduct.

On the 1205 line, O'Loughlin told MacKay, among other things: that a patrol officer should threaten to level charges of infidelity against high ranking officers of the department if he were implicated in an internal investigation (which is what she said she would do if faced with the same situation); that she would have pummeled someone for making a derogatory statement about the department; that she told another officer to sue the Authority, rather than exercise her obligation as a manger in the department to refer the officer to the Authority's Office of Diversity and Civil Rights, as she should have done. By her conversations, O'Loughlin displayed a profound lack of respect for the chain of command. Her complete failure to exercise leadership and authority led Carter reasonably to believe that she was incapable of holding a leadership position in the department. In short, O'Loughlin cannot show that Carter's legitimate reason for disciplining her was pretextual.

### 3.    O'Loughlin Cannot Show That She Was Defamed By The Authority Or Any Of Its Agents

Summary judgment is appropriate on O'Loughlin's claim that the Authority retaliated against her by defaming her because the Authority was not the source of the information that appeared in *The Boston Globe* or the *Bay State Banner* that O'Loughlin claims is defamatory. See Mulgrew v. Tauton, 410 Mass. 631, 632 (1991) (generally, summary judgment is favored in defamation cases). "Defamation is the publication, either orally or in writing, of a statement concerning the plaintiff which is false, and causes the plaintiff damage". Yohe v. Nugent, 321 F.3d 35, 39-40 (1st Cir. 2003). A defamatory statement is one that holds the plaintiff up to contempt, hatred, scorn or ridicule, or tends to impair his standing in the community. Id., at 40.

Neither Mr. Mulhern nor any agent of the Authority told Mac Daniel, the author of the *Globe* article, that O'Loughlin had engaged in criminal behavior or was subject to criminal charges. (SUF, ¶ 82) Moreover, Mr. Mulhern did not make any false statement of fact to Mr. Daniel that would allow a jury to find that defamation occurred.[11] Mr. Mulhern never spoke with Melvin Yawu Miller, the author of the *Bay State Banner* article. (Id.) As there was no publication of false material to the *Globe* or *Bay State Banner*, summary judgment is warranted on this claim.[12]

### 4.  The Decision Of An Arbitrator Does Not Make Carter's Decisions Regarding O'Loughlin Retaliatory

The fact that an arbitrator did not agree with Carter's decision to discipline O'Loughlin is not evidence that Carter acted with a retaliatory motive. The arbitrator was measuring Carter's actions against the collective bargaining agreement between

---

[11] Mr. Mulhern did not tell Mac Daniel that O'Loughlin was former Chief O'Loughlin's sister, but even if he had, the statement is not defamatory.

[12] Summary judgment is appropriate on O'Loughlin's common law defamation claim against the Authority (Count X) for the same reason.

O'Loughlin's union and past practice in the department. Though the discipline Carter meted out was harsh by department standards (no officer had been demoted since O'Loughlin joined the department in 1983), it was harsh across the board. There is no evidence that O'Loughlin was disciplined more harshly than or not treated the same as the five men who were placed on administrative leave because she filed a complaint.

### C.    O'Loughlin Cannot Prevail On Her Claim Under 42 U.S.C. § 1983

To succeed on a claim alleging a violation of 42 U.S.C. § 1983, O'Loughlin "must show both the existence of a federal constitutional or statutory right, and some deprivation of that right as a result of defendants' actions under color of state law". 42 U.S.C. § 1983; Watterson v. Page, 987 F.2d 1, 2 (1st Cir. 1993)(citation omitted). This claim must fail because O'Loughlin cannot prove that Carter discriminated or retaliated against her in violation of Title VII, the only federal statute she alleges.

### D.    O'Loughlin Has Not Raised A Jury Issue As To Whether Carter Violated G.L. c. 12, § 11I

In order to prevail on a claim under G.L. c. 12, § 11I, the Massachusetts Civil Rights Act ("MCRA"), a plaintiff must show inter alia, that an interference or attempted interference with protected rights was by means of threats, intimidation, or coercion. G.L. c. 12, § 11I; Swanset Development Corp. v. City of Taunton, 423 Mass. 390, 395-396 (1995) and cases cited. O'Loughlin alleges that Carter violated the statute by retaliating against her for engaging in a protected activity. (See Complaint, ¶¶ 68-72.) For purposes of the MCRA, a threat "involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm", intimidation is "putting [another] in fear for the purpose of compelling or deterring conduct," and coercion is "the application of such force, either physical or moral, as to constrain him to do against his

will something he would not otherwise have done." <u>Planned Parenthood League of Massachusetts, Inc. v. Blake</u>, 417 Mass. 467, 474 (1994). O'Loughlin's claims under the MCRA fail for three independent reasons.

First, Carter did not deprive her of a protected right when he disciplined her because his acts were not retaliatory. O'Loughlin and the male officers who committed the gross violations of the policies, rules, and procedures of the department, were all disciplined. Second, even if it could reasonably be found that Carter had deprived O'Loughlin of a protected right, she has not put forth any evidence that the alleged deprivation occurred by way of threats, intimidation, or coercion. Third, the claim is barred by the exclusivity provisions of G.L. c. 151B, the state law remedy for employment discrimination. <u>Butler v. RMS Technologies, Inc.</u>, 741 F.Supp. 1008, 1011 (D.Mass. 1990).

**E.    Carter Is Entitled To Qualified Immunity On The MCRA And § 1983 Claims**

The doctrine of qualified immunity protects government officials from personal liability for civil damages under 42 U.S.C. § 1983 and G.L. c. 12, §§ 11H and I.[13] <u>Jarrett v. Town of Yarmouth</u>, 309 F.3d 54 (1st Cir. 2002)(citations omitted). On summary judgment, the Court must determine "whether a reasonable official could have believed his actions were lawful, in light of clearly established law and the information possessed by the official at the time he acted." <u>Clancy v. McCabe</u>, 441 Mass. 311, 317 (2004) <u>citing and quoting Febus-Rodriguez v. Betancourt-Lebron</u>, 14 F.3d 87, 91 (1st Cir. 1994)(citation omitted).

---

[13] <u>See Guierrez v. Massachusetts Bay Transportation Authority</u>, 437 Mass. 396, 403 (2002)(qualified immunity principles as developed under federal law protect public officials charged with violations of the Massachusetts Civil Rights Act)(citations omitted).

Each of Carter's actions regarding O'Loughlin was objectively reasonable. Reassigning officers is something that is done routinely within police departments. He initially decided to have O'Loughlin command the detective unit, a position to which she had originally been assigned by former Chief O'Loughlin. When Carter determined that she and Lt. Leuchte were not suited to oversee the changes he planned for the unit, he transferred them both on the same day and replaced them both with a more experienced lieutenant. Making the reassignments was a reasonable act, and one that was well within Carter's prerogative as Chief of Police.

The summary judgment record makes clear that Carter had every reason to believe that the disciplinary action he took against O'Loughlin (and the other officers) was lawful. He had given officers fair notice of the standards to which they would be held. When he became aware of possible violations of the rules, regulations, and policies of the department, he authorized an internal affairs investigation, something he is undisputedly authorized to do. He gave proper notice to O'Loughlin of the charges against her and notified her that she would have the opportunity to participate in the just cause, due process hearing. Carter disciplined O'Loughlin only after a just cause finding.

Out of the full spectrum of disciplinary actions he could have taken, Carter chose to demote O'Loughlin, rather than terminate her employment. Under the circumstances, and based on the information at his disposal at the time of each of his decisions, Carter did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." He is entitled to qualified immunity.

## IV.    CONCLUSION

For all of the above reasons, the Authority and Joseph Carter respectfully request the Court to grant their motion for summary judgment.

Respectfully submitted,

DEFENDANT MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY AND
JOSEPH CARTER
By their attorneys,


/s/ Joseph L. Edwards, Jr._____
Walter B. Prince, BBO# 406640
Joseph L. Edwards, Jr., BBO# 564288
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, MA  02109
(617) 456-8000