UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANCY O'LOUGHLIN,<br>          Plaintiff,<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY,<br>JOSEPH CARTER, and MICHAEL<br>MULHERN,<br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     C.A. No. 04-10933 JLT |

**STATEMENT OF UNDISPUTED MATERIAL FACTS
OF DEFENDANTS MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY AND JOSEPH CARTER**

Pursuant to Local Rule 56.1, Defendants Massachusetts Bay Transportation

Authority ("the Authority") and Joseph Carter (collectively "the defendants") submit this

statement of material facts of record as to which there are no genuine issues to be tried.

1.     Plaintiff Nancy O'Loughlin ("O'Loughlin") has been an officer with the

Authority's Transit Police Department since 1983. See O'Loughlin Deposition, Volume

I, pp. 15-16 (hereinafter "NOL I"), true and accurate excerpts of which are attached

hereto as Exhibit 1.[1] O'Loughlin was promoted to sergeant in 1989 and to lieutenant in

1996. (Id., pp. 32, 37) During her time with the department, O'Loughlin developed an

expertise for investigating graffiti related crime and it is something she likes doing. (Id.,

pp. 36-37)

2.     Defendant Joseph C. Carter ("Carter") has been the Chief of the Transit

Police Department since January 2003. See Carter deposition Volume I, p. 6 ("Carter I"),

---

[1] Testimony from Volume II and III of O'Loughlin's deposition is also cited herein. True and accurate
excerpts of Volumes II and III are attached hereto as Exhibits 2 and 3, respectively.

true and accurate excerpts of which are attached hereto as Exhibit 5.[2]  From June 1998

until January 2003, he was chief of the Oak Bluffs, Massachusetts police department.

(Id., p. 6)  Prior to that, Carter served for twenty-one (21) years with the Boston Police

Department (BPD"), where he attained the rank of Superintendent, the highest uniformed

rank in that department.  (Id., pp. 7-9)  Carter is a member of and is supported by the

National Association of Women Law Enforcement Executives ("NAWLEE").  (Id., p.

96)  He has given talks to the organization about opportunities for women in law

enforcement and in support of NAWLEE's agenda.  (Id., pp. 98-99)

       3.       The ranks of officers in the department in ascending order are patrol

officer, sergeant, lieutenant, captain, deputy chief, and chief.  (NOL I, pp. 26-27)  The

Chief of Police manages the department.  See Thomas O'Loughlin deposition, p. 21

(hereinafter "TOL"), true and accurate excerpts of which are attached hereto as Exhibit 4.

Though the organizational structure of the department changes from time to time at the

discretion of the chief, the department consists generally of three major divisions: Patrol

Operations, Investigative Services, and Administrative Services.  (NOL I, pp. 29-30)  The

Chief of Police appoints deputy chiefs who are responsible for managing each of the

divisions.  (TOL, pp. 21, 23)

**O'Loughlin Believes That She Was Sometimes Mistreated Because Of Her Familial
Relationships**

       4.       O'Loughlin believed that she was resented by other officers at times

because of her familial relationship to high ranking officers in the department.  (NOL I,

pp. 20-21)  O'Loughlin's first cousin is William "Bill" Bratton (now the chief of the Los

Angeles Police Department), who became chief of the department shortly after she was

---

[2] Testimony from Volume II of Carter's deposition is also cited herein.  True and accurate excerpts from
Volume II are attached hereto as Exhibit 6.

hired in 1983. (Id., p. 16) She married Francis ("Frank") O'Loughlin, who retired from the department as a lieutenant in 1999. (Id., pp. 16-18) Frank's brother, John O'Loughlin, was a Deputy Chief. (Id., p. 19) Thomas O'Loughlin, Frank and John O'Loughlin's first cousin, was chief from 1997-2002. (Id., pp. 18-19) O'Loughlin also believes that she was sometimes treated unfairly by officers who were attempting to "get at" these officers, particularly John O'Loughlin and Thomas O'Loughlin. (Id., pp. 22-25) Among the ways officers tried to get at John and Thomas O'Loughlin through O'Loughlin were by circulating rumors that she received preferential treatment, by posting sexually explicit Internet postings about her, and by posting cartoons about her around the department. (Id., pp. 23-25)

     5.     In 1996, after O'Loughlin was promoted to lieutenant, former Chief O'Donovan assigned her to the position of "desk lieutenant". (Id., pp. 37-38) O'Loughlin found the position "tolerable", but there was nothing in particular she liked about it – she would rather have been in the street. (Id., p. 43; NOL II, p. 217) Prior to making the assignment, Chief O'Donovan did not ask O'Loughlin whether she wanted the position. (NOL I, p. 39)

**Thomas O'Loughlin Becomes Chief of the Department**

     6.     In October 1997, Thomas O'Loughlin became chief of the department. (TOL, p. 6) One of his deputies was William Fleming (Fleming), who was appointed to command Investigative Services. (Id., pp. 23-24) Fleming and O'Loughlin are friends; they joined the department and went through the police academy together. See Fleming

3

deposition Volume I, pp. 15-16 ("Fleming"), true and accurate excerpts of which are
attached hereto as Exhibit 7.[3]

**Chief O'Loughlin Places O'Loughlin In Command Of The Newly Created Anti-Crime Unit**

      7.      One of Chief O'Loughlin's initiatives was the staffing of an Anti-Crime
Unit ("ACU"). (TOL, pp. 30-31) The ACU was an undercover (plainclothes) unit
designed to address "quality of life" issues such as disorderly conduct, simple assaults,
batteries, petty larcenies, and panhandling. (Id., p. 27; NOL I, pp. 44, 47, 52) Chief
O'Loughlin placed O'Loughlin in command of the ACU. (NOL I, p. 44)

      8.      At its height, the ACU consisted of 10 officers. (Id., p. 49) The ACU
employed a "zero tolerance" policy, which meant that anyone who committed a quality of
life offense would be arrested. (Id., pp. 54-55) The unit went out and "hit hard," letting
people know that they would be arrested for quality of life violations. (Id.)

**The ACU Becomes the Target of Public Criticism**

      9.      Over time, the ACU became very controversial and generated a lot of
negative publicity for the Authority. (Id., pp. 69, 90-91; Fleming I, p. 67) The ACU was
criticized for arresting too many youths, particularly younger children, for minor, quality
of life offenses. (Fleming I, p. 51) In addition, critics of the unit charged the ACU with
unfairly targeting minority children for arrest and engaging in racial profiling. (NOL I, p.
58; Fleming I, pp. 62-63; TOL, pp. 50-51) It was alleged that the ACU was overzealous,
that the zero tolerance policy was out of control, and that the members of the unit were
rogue officers. (NOL I, pp. 69, 73) O'Loughlin was identified in newspapers as being
one of the worst offenders of the allegedly rogue ACU. (Id., p. 82; Ex. 10)

---

[3] Testimony from Volumes II and III of Fleming's deposition is also cited herein. True and accurate
excerpts from Volumes II and III are attached hereto as Exhibits 8 and 9, respectively.

**The ACU Is Also The Target Of Criticism From Within The Department**

10.     Internal critics of the ACU alleged that the unit failed to make "quality arrests", which are arrests that result in convictions. (NOL I, pp. 55-56) Despite his friendship with O'Loughlin, Fleming was critical of the ACU because he did not agree with the zero tolerance approach. (Fleming I, pp. 45, 64) Deputy Anne McCall, who was responsible for Internal Affairs and processing citizen complaints against officers, also did not agree with the arrests being made by the ACU. (Id., pp. 66-67; TOL pp. 53-54)

**Public Fallout From The ACU**

11.     The growing number of complaints against the ACU prompted the Massachusetts Legislative Black Caucus to hold a public hearing on the question of whether the department unfairly targeted minority youth. (NOL I, pp. 63-64; TOL, pp. 61-62) Secretary of Transportation Kevin Sullivan formed a task force to investigate the claims of racial profiling. (TOL, p. 66) In March 2002, the resultant "Task Force On Combating Racial Profiling" (hereinafter "the Task Force") issued a report containing its findings and recommendations (hereinafter "Task Force Report")(NOL I, p. 107; Ex. 11) Among other things, the Task Force found that the actions of officers created a "perception of racism" that contributed to an erosion of "public confidence in the MBTA Police" and that the department's practices (including employing the zero-tolerance policy) had a racially discriminatory impact. (NOL I, pp. 109-110; Ex 11, p. 7)

12.     Secretary Sullivan also appointed retired Superior Court Judge Rudolph Pierce to review the manner in which Internal Affairs processed citizen complaints against officers, including those alleging racial profiling. (TOL, pp. 67, 70; NOL I, pp.

86-87) On November 16, 2001, Judge Pierce issued a report that included his findings

and conclusions (hereinafter "the Pierce Report). (TOL, pp. 70-71; Ex. 12) He found,

among other things, that the failure of some officers to find alternatives to arrest

produced "angry parents, agitation from community groups, complaints filed with the

Department and local politicians and the inevitable lawsuits." (Ex 12, p. 19) Lisa

Thorau-Gray, an attorney with the Suffolk University Law School Juvenile Justice

Center, sued the Authority and individual officers, including O'Loughlin, Chief

O'Loughlin, and several members of the ACU, alleging that children were unfairly

targeted for arrest. (TOL, p. 83; NOL I, p. 58)

      13.    ACU members were teased by other officers, who referred to the ACU as

the "child abduction unit" in the hallways and over the paging system. (NOL I, pp. 59-

61) O'Loughlin could not identify any officer who made negative comments about the

ACU. (Id., pp. 62-63)

      14.    Notwithstanding the breadth of the controversy surrounding the ACU,

O'Loughlin did not accept that it had a harmful effect on the Authority or that the public

perception of the Authority was impacted negatively. (Id., pp. 128-29) O'Loughlin also

testified that she does not believe the ACU would have been controversial if it had been

commanded by a man. (Id., pp. 135-36)

**The ACU Is Disbanded And O'Loughlin Is Assigned To Headquarters**

      15.    In mid 2001, Chief O'Loughlin disbanded the ACU and assigned its

members back to uniformed positions. (NOL I, p. 136; TOL, pp. 87-88)

      16.    On June 7, 2001, Chief O'Loughlin assigned O'Loughlin to the position of

"Officer in Charge ("OIC")" on the first shift. (NOL I, pp. 136-37; TOL, pp. 98-100; Ex

13) This was the same "desk lieutenant" position to which O'Loughlin had been assigned by Chief O'Donovan in 1996. (NOL I, pp. 136-137) The reassignment was effective on the same day the order was issued. (Id., pp. 138-39; Ex 13) Chief O'Loughlin did not ask O'Loughlin whether she wanted that position prior to making the reassignment. (Id., p. 137; TOL pp. 100-101) The position required O'Loughlin to remain in headquarters – it was not part of her duties to patrol the streets. (TOL, p. 101) O'Loughlin did not have a problem with the position even though she would rather have been on the street. (NOL I, pp. 139-140)

**O'Loughlin Is Assigned To Command The Detective Unit**

17.    In July 2002, Chief O'Loughlin reassigned O'Loughlin from the position of OIC/ desk lieutenant to the position of day shift commander of the detective unit. (NOL II, pp. 221-24; TOL, p. 134; Ex 14) As part of her duties, he also made her responsible for conducting graffiti investigations when they arose. (TOL, pp. 135-37) By the same order, Chief O'Loughlin assigned Lieutenant Joseph Leuchte to command the detective unit on the night shift. (TOL, pp. 134-35; Ex. 14) Chief O'Loughlin did not ask O'Loughlin whether she wanted the position and the position was not posted. (TOL, pp. 137-38) The chief has the authority to assign lieutenants to positions at his discretion. (Id., p. 138)

**Derogatory Statements About Department Employees Are Posted On A Website**

18.    In June 2002, racist, sexist, and nasty comments about Chief O'Loughlin, his secretary, his wife, O'Loughlin, and other male and female members of the department appeared on an Internet website called Guardroom.com. (TOL, pp. 126-128; Ex. 15) Chief O'Loughlin reported the posting to the Authority's Office of Diversity and

Civil Rights. (TOL pp. 129-130; Ex. 16) Deputy Chief Fleming initiated an investigation to determine whether the comments were posted from inside the department. (Fleming III, pp. 19-20) The investigation continued until 2003, when Fleming learned that the District Attorney had determined that a crime had not been committed. (Id., pp. 32-35) It was never determined who posted the comments. (Id., p. 20)

**Chief O'Loughlin Leaves the Department And Fleming Becomes Interim Chief**

19.    In July 2002, Chief O'Loughlin left his position with the Authority and Deputy Chief Fleming became interim chief. (Id., p. 5; NOL II, pp. 224-25)

**Fleming Creates Another Specialized Unit For O'Loughlin To Command**

20.    O'Loughlin testified that Deputy Chief Fleming assigned her from the position of commander of the detective unit to command of a vandal squad in which she commanded two patrol officers investigating vandalism and graffiti on the commuter rail lines. (NOL I, pp. 140-41; NOL II, p. 227)

**Carter is Appointed To the Position of Chief**

21.    During the Fall of 2002, Joseph Carter applied for the position of Chief of Police. (Carter, I, p. 15) During the interview process, Carter discussed his vision for the department with the Authority's General Manager and Board of Directors. (Carter Aff., ¶ 3) Among other things, he discussed his intent, if appointed chief, to create a six month plan of action that addressed problems and necessary improvements in the department. His goals included creating a cohesive, professional department, getting the department accredited by state and federal authorities, developing a more sophisticated approach to dealing with youth, ensuring that the department was prepared to meet the challenges

posed by the threat of terrorism to the transit system, dispelling any public perception that the department engaged in racial profiling, and restoring public trust in the department. (Id.)

22.    Carter was offered and accepted the position of chief in December 2002. (Carter I, pp. 15-16) O'Loughlin thought that Fleming rather than Carter should have been appointed chief. (NOL I, p. 158) Fleming returned to his position of deputy chief, overseeing Investigative Services. (Fleming I, p. 165)

**Carter Begins Familiarizing Himself With The Department And Assessing Its Strengths And Weaknesses**

23.    Prior to actually assuming command of the department, Carter asked Deputy Chief Fleming to gather transitional materials for his review. (Carter Aff., ¶ 4; Fleming I, pp. 119-20) Among other things, Carter asked him to have each commander submit a memo responding to questions about their command and identifying major problems, primary concerns, and morale issues. (Carter Aff., ¶ 4) Carter wanted commanders to specify what they would do to address the findings of the Task Force and Pierce reports. (Id., ¶ 4) Fleming gathered the materials, including memos from lieutenants about their commands. (Fleming I, pp. 119-20)

24.    On January 13, 2003, Deputy Chief Fleming prepared a briefing summary for Carter in which he wrote, among other things:

> morale issues arise from rumors, innuendoes and lies that are spread by a small minority of officers that have undermined the command staff at the MBTA Police . . . . As I warned you at our meeting, they will attack you and the fight has already started . . . . They have already tried to destroy my reputation . . . . The cancer that exists in this police department continues and they are now attacking the civilian staff".
> (Carter Aff., ¶ 9; Fleming I, p. 121; Ex. 17, p. 2)

Fleming did not tell Carter who he considered to be "cancers" in the department. (Fleming I, pp. 163-65; Carter II, pp. 78-80; Carter Aff., ¶ 9)

25.     Captain John Martino wrote in his memo that: "the major morale issue facing the patrol force . . . is the fact that members of this department have been publicly labeled as rogues or racial profilers for carrying out policies put in place by the previous administration . . . . Most of the complaints arose as a result of the aggressiveness of the Anti-crime unit." (Fleming I, pp. 134-136; Ex. 18, p. 2(C))

26.     O'Loughlin wrote a transitional memo in which she described her work with the vandal squad. (NOL II, pp. 191-193; Ex. 19)  In regard to the two patrol officers she commanded, O'Loughlin wrote:

> "Officers Daniel Sullivan and Victor Diaz are assigned to this unit.  Both officers are highly proficient in the art of graffiti investigation and prosecution . . .  Both officers are also proficient in documenting and photographing damage[s] invaluable tools when preparing and investigating a case."  (Ex. 19, p. 5(6)(A))

**Carter Determines That O'Loughlin Should Concentrate On Commanding The Detective Unit**

27.     Carter was sworn in as chief on January 23, 2003.  (Carter I, p. 6)

28.     When Carter reviewed the department structure, he determined that it was a waste of resources and talent to have a lieutenant (O'Loughlin) commanding only two patrol officers and conducting trespassing and graffiti investigations.  (Carter Aff., ¶ 6) He believed that lieutenants were managers and that sergeants were first line supervisors who should supervise patrol officers on the street.  (Id.)  Carter wanted O'Loughlin managing the personnel and issues in the detective unit, rather than spending time conducting investigations herself.  (Id.)  He did not completely prohibit her from conducting all investigations.  (Id.)  While Carter does not recall whether he actually

disbanded a vandal squad, it is undisputed that he wanted O'Loughlin to act like a police manager instead of an on the street supervisor. (Id., ¶ 7; Carter I, pp. 40-42)

29.     O'Loughlin understood that as chief, Carter had the authority to disband the vandal squad and reassign her. (NOL II, p. 205)

**O'Loughlin Does Not Want To Command The Detective Unit And Believes That Carter Is Discriminating Against Her**

30.     O'Loughlin did not want to command the detective unit because she considered it a "desk job" and she did not want to be a "pencil pusher." (NOL II, p. 207) She claimed that being placed in command of the entire detective unit hurt her chances for advancement because she "wasn't doing what she did best" and because she was in a less visible position. (NOL II, pp. 207, 213-216) O'Loughlin alleges that Carter disbanded the vandal squad because he did not like women, and because he wanted to discriminate against her because of her gender and marginalize her within the department. (NOL II, pp. 200-203, 205-210, 215-16, 221) She did not lose rank or salary during the time she commanded the detective unit. (NOL II, pp. 207)

31.     O'Loughlin did not believe that former Chief O'Loughlin was attempting to marginalize or disrespect her when he originally placed her in command of the detective unit in July 2002. (NOL II, pp. 225-27)

32.     According to both former Chief O'Loughlin and Chief Carter, in the police field, detective positions are viewed as prestigious. (TOL, pp. 145-146; Carter I, p. 48) Fleming, who recommended to Chief O'Loughlin that O'Loughlin be assigned to the position, believed that the commander of the detective unit was a "choice" assignment. (Fleming II, p. 221)

33.    Prior to O'Loughlin, the last female officer to command the detective unit was Dolores Ford-Murphy who held the position in about 1991 as a captain and was promoted to deputy chief by Carter in December 2003.  (Fleming II, pp. 217-18)

34.    Since O'Loughlin was assigned to the position of commander of the detective unit, only lieutenants have held the position.  (NOL II, pp. 224-26)

**Chief Carter Continues Assessing The Department**

35.    Over the next several months, Chief Carter employed several methods to gather information about the department and assess the strengths and weaknesses of the department: he brought in outside consultants, distributed surveys and questionnaires to officers and civilian employees of the department, conducted focus groups, and talked to officers about their concerns.  (Carter Aff., ¶ 8; Fleming I, pp. 168-170)  Chief Carter also held meetings with community groups to gather information.  (Carter Aff., ¶ 8)

36.    Based on the information he gathered, including the memoranda from unit commanders, Carter concluded that there were serious morale problems in the department.  (Carter Aff., ¶ 9)  Many officers had expressed a concern that discipline was not administered fairly and that favoritism played a major role in which officers received choice assignments.  (Id.)  Carter also believed that officers showed a profound disrespect for the command staff, superior officers, and for each other.  (Id.)  Carter resolved to change the culture of disrespect, improve morale, and promote fairness in discipline and promotions.  (Id.)

**Carter Issues A Plan Of Action For The Department**

37.    In June 2003, Carter released a "Plan of Action" for the department. (NOL II, pp. 289-91; Ex. 20)  The Plan of Action included Carter's vision of transit

policing, the direction in which he wanted to move the department, problems he saw, and his proposed solutions. (Carter Aff., ¶ 10; NOL II, pp. 290-91; Ex. 20, cover memo) Carter encouraged all officers to become familiar with the Plan of Action. (Ex. 20, cover memo)

38.    The Plan of Action described seven standards Carter characterized as "core values", which were to "serve as the cornerstone of the department's revised disciplinary system". (Carter Aff., ¶ 11; NOL II, pp. 294; Ex. 20, p. 11) The core values were: (1) fairness; (2) truthfulness (officers were expected to "admit mistakes . . . and take responsibility for their decisions even when it is not in their own best interests to do so"); (3) professionalism ([i]nternal criticism offered secretly and without constructive basis will be unacceptable and dealt with harshly"); (4) perseverance; (5) treating all persons with dignity and respect ("[t]his statement represents the true nature of policing at its best. Procedures will be established to detect bias in its earliest manifestations, both internally and externally, so that dignified and respectable treatment can be assured"); (6) service before self; and (7) integrity (officers will not be held to one standard at work and another while off duty; officers should be "committed to adhering to the highest standards of integrity whether on or off duty"). (NOL II, pp. 291-95; Ex. 20, pp. 11-12)

39.    Chief Carter indicated that "priority status will be given to the investigation of any allegation of misconduct regarding one or more of [the] core values". (Carter Aff., ¶ 11; NOL II, p. 295) Carter also informed department members that criminal conduct, untruthfulness, insubordination, excessive force, acts indicative of bias (i.e. racial, gender, etc), divulging confidential police information to unauthorized sources, and "engaging in conduct, whether on or off duty, that discredits the police

13

agency or the individual in his or capacity as a police officer" would be "given the highest priority by Internal Affairs, and [that] sustained allegations will be decided and acted on by the Chief". (Ex. 20, pp. 12-13)

40.    O'Loughlin understood that Carter took the core values seriously. (NOL II, p. 295)

**O'Loughlin Does Not Apply For An Available Promotion**

41.    Once the Plan of Action was issued, Carter began making sweeping changes within the department. (Carter Aff, ¶ 12) One such change occurred on July 30, 2003, when he notified all officers that, pursuant to his Plan of Action, he was initiating a competitive process to fill the deputy chief positions. (NOL II, pp. 273-74; Carter I, p. 22; Carter Aff., ¶ 12) O'Loughlin chose not to apply for the position, even though she was eligible, because she never aspired to be a deputy chief. (NOL III, pp. 381, 383)

**O'Loughlin And Detective Leuchte Are Reassigned Out Of The Detective Unit**

42.    After several months, Carter became concerned because he was not receiving the status reports from the detective unit that he expected from its commanders. (Carter Aff., ¶ 13) It also concerned him that O'Loughlin seemed to be spending a lot of time on the streets with the officers she supervised, rather than being at headquarters during critical periods of the day.    (Id.; Carter I, pp. 44-45) Carter testified that when he wanted information from the detective unit, he sometimes walked down to the unit. Inevitably, O'Loughlin was not around and Carter would have to get the information he needed from Sgt. Gillespie. (Carter Aff., ¶ 13; Carter II, pp. 90-92)

43.    Carter believed that Lt. Leuchte, who was O'Loughlin's counterpart in the detective unit on the night shift, exhibited similar deficiencies in the way he commanded his shift.  (Carter Aff., ¶ 13; Carter II, p. 47)

44.    On August 8, 2003, Carter issued an order reassigning O'Loughlin out of the position of day shift commander of the detective unit and, simultaneously, reassigning Lt. Leuchte out of the position of night shift commander of the detective unit.  (Carter Aff., ¶ 14; NOL II, p. 241; Carter I, p. 50; Fleming III, p. 44; Ex. 21)

45.    Carter had not discussed the personnel moves of O'Loughlin and Lt. Leuchte with Deputy Chief Fleming prior to making them and the reassignments surprised Fleming.  (Fleming III, 44-45)  According to Fleming, Carter never told him that he was dissatisfied with the jobs O'Loughlin and Leuchte were doing in the detective unit.  (Fleming II, p. 248-49; Fleming III. pp. 43-44, 53-54)  Fleming never heard Carter express hostility or animosity toward O'Loughlin and he never heard Carter make any negative statements about her or her work.  (Fleming II, p. 240; Fleming III, pp. 53-54)

**Carter Replaces O'Loughlin And Lt. Leuchte With A More Experienced Lieutenant**

46.    Lieutenant McCarthy was assigned to command the entire detective unit, replacing both O'Loughlin and Lt. Leuchte.  (Carter Aff., ¶ 18)  Lt. McCarthy, who had been a deputy chief under Chief O'Donovan and a past commander of the detective unit, reported to Deputy Chief Fleming.  (Fleming III, pp. 234-36; Ex. 21)  Based on his observations since he assumed command, Carter believed that McCarthy was better able to implement the changes he planned in the detective unit than O'Loughlin and Lt. Leuchte.  (Carter Aff, ¶ 18)  He also thought that Investigative Services was top heavy with managers.  (Id.)

**O'Loughlin Alleges That Her Removal From The Detective Unit Is Discriminatory**

47.    Even though O'Loughlin did not want to command the detective unit, she testified that she was performing at a high level and that she believed Carter reassigned her from the position because she was female.  (NOL II, pp. 247-48)

48.    Deputy Chief Fleming did not believe that Carter removed O'Loughlin from the detective unit because of her gender.  (Fleming II, p. 271)

**O'Loughlin Is Reassigned To Another Position Of Command; Lt. Leuchte Is Not**

49.    On the day Carter transferred O'Loughlin from the detective unit, he told her that he was placing her in command of the detail unit because of her administrative expertise.  (NOL II, pp. 232-33; Carter Aff., ¶ 15)  At the time Carter spoke with O'Loughlin about the reassignment, he tried to keep the meeting upbeat and, therefore, did not discuss his disappointment with her performance in the detective unit.  (Carter Aff., ¶ 14)  He testified that there were problems in the detail unit, that he needed strong leadership in the unit, and that O'Loughlin would be replacing the sergeant who was currently serving in the position because he wanted to place a lieutenant back into command of the unit.  (Carter I, pp. 51-52; Carter Aff., ¶¶ 15, 16)  Carter said that he was looking for her to do the job effectively.  (<u>Id.</u>)

50.    Lt. Leuchte was not placed in command of another unit.  (NOL II, p. 241) Instead, Carter assigned him as a patrol lieutenant because of the deficiencies he demonstrated as a commander of the detective unit.  (Carter I, p. 47; Carter Aff., ¶17)

**Carter Thought O'Loughlin Would Be An Effective Commander Of The Detail Unit**

51.    The detail unit is very busy and its commander is responsible for overseeing the assignment of details and overtime in compliance with the collective

bargaining agreements. (TOL, p. 148)  The commander also monitors billing and is responsible for filling and monitoring details requested by parking lot vendors and private contractors working on Authority projects, including supplying officers for about 15% of all details required because of the "Big Dig" in Boston. (TOL. Pp. 149-150)  In addition, the detail unit commander is required to interface with private contractors who order details and with other police and law enforcement agencies. (Id.)  Carter believed that the commander of the detail unit administered and managed what was, essentially, a multi-million dollar business. (Carter I, p. 33; Carter Aff., ¶ 15)  He also considered it an important assignment because it has a direct correlation to the department's "community presence and integrity to the community". (Carter I, p. 34; Carter Aff., ¶ 15)

52.    As a consequence of her move to the detail unit, O'Loughlin was no longer responsible for conducting graffiti investigations. (Carter I, pp. 77-82; Carter II, pp. 94-95; Carter Aff., ¶ 16)  If she was subpoenaed to testify as an expert in a court case, she would be allowed to testify. (Carter I, pp. 81-82; Carter II, pp. 93-95; Carter Aff., ¶ 33(c))  Carter did not think this was a problem because O'Loughlin had indicated in her transition memo (back in January 2003) that Officers Diaz and Sullivan were "highly proficient" graffiti investigators. (Carter Aff., ¶ 6; Carter II, p. 94, 113-114; NOL II, pp. 196-97; Ex. 19, p. 5)

53.    Notwithstanding the deficiencies Carter observed in the way O'Loughlin commanded the detective unit, he thought she could provide the type of management he needed in the detail unit. (Carter I, pp. 46-47)  Carter believed that O'Loughlin had the administrative skills, experience as a supervisor and manager, the training, and knowledge of departmental policies, practices and procedures to effectively command the

unit by virtue of her rank as a lieutenant. (<u>Id.</u>, pp. 39-40; Carter II, pp. 83-85)  He also

thought she would be more focused on the detail unit commander job because she would

not be responsible for conducting investigations. (Carter Aff., ¶ 16)

**O'Loughlin Does Not Like Being Assigned To The Detail Unit**

54.    O'Loughlin did not like being reassigned to command the detail unit.

(NOL II, pp. 228-229)  She claimed that superior officers were assigned to the position

only as a means of punishing them. (<u>Id.</u>)  She testified that she believed Carter wanted to

punish her because of her role in the ACU and because he did not like females. (NOL I,

pp. 129-132)  O'Loughlin did not lose rank or salary when she was assigned to command

the detail unit. (NOL II, p. 229)

55.    O'Loughlin also testified that she thought Carter wanted to punish her

because of conflicts she had with Sgt. Gillespie, who had commanded the detective unit

immediately prior to her being assigned to the position. (NOL II, pp. 254-257)  Fleming

testified that all of the lieutenants in Investigative Services complained to him about

Gillespie and that Gillespie was in constant conflict with them, particularly O'Loughlin

and Lt. Leuchte. (Fleming II, pp. 328-30, 348-49; Fleming III, pp. 227-29)  Carter knew

that Gillespie and O'Loughlin had differences related to the management of the detective

unit. (Carter Aff., ¶ 21; Carter II, pp. 90-91)  Carter is not a micro-manager, however,

and he generally left it to Fleming to manage the personnel in Investigative Services.

(Carter Aff., ¶ 21; Carter I, p. 60)  On July 31, 2003, Fleming, without first consulting

Carter, affirmed in a memorandum to Gillespie that O'Loughlin and Lt. Leuchte were the

primary commanders of the unit and that Gillespie was subordinate to them when he

wrote:

"Just so things are perfectly clear, Lt. O'Loughlin and Lt. Leuchte are the primary
supervisors in the Detective Unit. You are a secondary supervisor in the night
Detective unit. You have no control over the day-to-day operation of the day
detective unit unless you are standing in for a primary supervisory. You are to
have no involvement with case assignments and as you put it, questioning,
monitoring and constructively criticizing detective (sic) under your control.
(Fleming II, pp. 348-50; Ex. 22)

56.     Carter did not believe that the position of commander of the detail unit

was a punishment position. (Carter Aff., ¶ 20) It had not been considered such when he

was with the Boston Police Department. (Id.) Carter considered it a lateral move.

(Carter I, pp. 32, 53) Although O'Loughlin maintains that it was known throughout the

department that the detail unit commander was a "punishment position" for an officer

ranked lieutenant and above, Carter, who was new to the department, did not hear that

assertion until O'Loughlin initiated this litigation against him. (Carter I, p. 26-28; Carter

II, pp. 82-83, 123-24) Neither Fleming nor anyone else told Carter that assignment to the

position of commander of the detail was perceived as a punishment assignment by

members of the department. (Carter I, p. 58)

57.     O'Loughlin was not the only superior officer to have served as head of the

detail unit. In 1995, Chief O'Donovan appointed Lieutenant David LeRay to the

position. (NOL II, pp. 234-35; Ex 23) In 1999, Chief O'Loughlin removed Lt. LeRay

from the position and assigned Captain John Martino to command the detail unit. (NOL

II, pp. 236-37; TOL, p. 153-54; Ex. 24) Chief O'Loughlin considered the position just

another assignment and an administrative responsibility that the department had to fulfill,

whatever the rank of the unit commander. (TOL, p. 148) When Fleming served as

interim chief after Thomas O'Loughlin left the Authority in 2002, he posted the position

of commander of the detail unit and invited any superior officer (sergeant, lieutenant, or

19

captain) to apply for the position. (NOL, p. 237-238; Ex. 25)  Fleming ultimately

reassigned then Captain Martino out of the position of commander of the detail unit, and

appointed Sergeant Michael Morris to the position. (NOL II, p. 240; Ex. 25)

58.    Fleming testified that he believed the position of commander of the detail

unit was a punishment assignment because of the perception among the officer's peers

that the officer was being punished. (Fleming II, p. 260). However, he also believed that

it was a powerful position because the commander controlled overtime. (Fleming II, p.

262; Fleming III, pp. 145, 259)  He believed that the position was suitable for a lieutenant

or a captain only if the officer wanted to command the detail unit. (Fleming II, p. 266-

677)  Ironically, when Fleming placed Sgt. Morris in command of the detail unit,

members of the Superior Officer's Union complained that the position should be reserved

for a lieutenant or captain, rather than a sergeant. (Fleming II, pp. 260-61)

59.    Fleming testified that on the day Carter reassigned O'Loughlin to

command the detail unit, once Carter finished telling her about the reassignment and she

left the room, Carter made the statement "look at how she dresses." (Fleming II, p. 276)

Fleming did not know whether the comment was meant to be positive or negative, but

presumed that it was negative because it came immediately after O'Loughlin's

reassignment. (Fleming III, p. 184)  Carter has also commented on the way Fleming

dressed. (Fleming II, pp. 282-83)  Fleming also testified that after Carter told

O'Loughlin about her reassignment, Carter told him to guard O'Loughlin as she packed

up to leave to see what she was taking. (Fleming II, pp. 281-82)  Carter does not recall

saying that and he can think of no reason why he would have made the statement. (Carter

Aff., ¶ 22)

60.    Fleming had no reason to believe that Carter assigned O'Loughlin to command the detail unit because he wanted to punish her. (Fleming III, pp. 51-53)

61.    Fleming and O'Loughlin do not believe that any other woman has ever commanded the detail unit. (O'Loughlin II, pp. 230, 248; Fleming III, p. 54)  Thus, if it was as O'Loughlin says, a "punishment assignment," it was a punishment previously meted out only to men.

**O'Loughlin Failed To Exercise Her Prerogative Of Asking For A Reassignment**

62.    If an officer is dissatisfied with or does not like an assignment, the officer can request reassignment through the chain of command. (NOL I, pp. 40-41; Fleming I, pp. 12-15)  O'Loughlin did not ask Chief Carter not to assign her to command the detective unit or the detail unit and she did not ask Carter to reassign her out or either position. (Carter Aff., ¶ 19)

**Carter Disciplines Fleming**

63.    In October 2003, Carter demoted Fleming from the position of Deputy Chief because he faxed confidential department information to a newspaper without Carter's authorization. (Fleming III, pp. 54-56)  Fleming returned to his civil service rank of lieutenant. (Id., ¶ 54)  Carter also gave Fleming a five day suspension. (Fleming III, pp. 58-60)  Fleming does not believe that Carter disciplined him because of his gender or any other protected characteristic. (Fleming III, pp. 68-69)

**O'Loughlin Files An MCAD Complaint**

64.    In October 2003, O'Loughlin filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"), in which she alleged that Carter and the Authority discriminated against her because of her gender.  Her complaint included

21

allegations that Carter discriminated against her by disbanding the unit she commanded within the detective unit (the so called "vandal squad") and assigning her to command the detective unit, and then reassigning her from command of the detective unit to commander of the detail unit.

65.     In his over twenty-five years in law enforcement, O'Loughlin is the only female officer who has ever claimed that Carter discriminated against her on the basis of sex. (Carter I, pp. 13-15)

**Carter Appoints New Deputy Chiefs**

66.     In December 2003, Carter appointed Captain Dolores Ford-Murphy, Captain John Martino, and Lieutenant Thomas McCarthy to the positions of deputy chief pursuant to the competitive process he established. (NOL III, pp. 379-80; Carter I, pp. 22-23)

**Several Officers, Including O'Loughlin, Become the Subjects of an Internal Investigation**

67.     In early 2004, detective unit began conducting a criminal investigation which required detectives to review recordings of telephone conversations made on a recorded department telephone line. (Carter I, pp. 114-116; Carter II, pp. 6-7, 10)  The telephone line in question comes into the dispatch area at headquarters and is referred to as the "1205 line". (Carter II, p. 7)  Officers use the 1205 line for warrant checks and other department queries. (Carter II, p. 7)  When the emergency line is in use, emergency calls from the public are routed to the 1205 line. (Id., p. 8)  In order to find the conversation involving the individual who was the subject of the investigation, detectives were required to listen to a number of conversations to locate the conversation relating to

22

the incident in question. (Carter I, pp. 117-119) O'Loughlin was not a subject of the original criminal investigation. (Id., p. 115; Carter II, p. 17)

68.    In trying to locate the relevant conversations on the recorded line, detectives overheard unrelated conversations between officers that they believed might be violations of department rules, policies, and core values. (Carter I, p. 120; Carter II, p. 14) The detectives reported what they heard to Deputy Chief McCarthy, who commanded Investigative Services at the time. (Carter I, p. 120) Deputy McCarthy brought the conversations to Carter's attention. (Id.) Carter authorized Deputy Chief McCarthy and Deputy Chief Ford-Murphy, who commanded internal affairs, to conduct a further investigation of conversations on the 1205 line to determine the extent of the violations. (Carter II, p. 15)

69.    Deputy Chiefs McCarthy and Ford-Murphy made transcripts and tape recordings of the 1205 line conversations they believed were in violation of department rules and regulations and gave them to Carter. (Carter II, pp. 14-15, 30-31) He concluded that by engaging in the conversations, several officers, including O'Loughlin, had violated the rules, regulations and core values of the department. Specifically with respect to O'Loughlin, Carter believed that conversations she had with subordinates on the 1205 line undermined the proper administration of the department. (Carter I, pp. 113-114).

**Several Officers Are Placed On Administrative Leave With Pay (Relieved from duty with pay)**

70.    Based on his review of tapes of the 1205 line conversations, Carter decided to charge several of the officers, including O'Loughlin, with violations of departmental rules and policies. (Carter II, pp. 37-39) He also decided to place those

officers who in his opinion committed the most egregious violations, on administrative leave with pay pending the outcome of the investigation, which was ongoing. (Carter Aff., ¶¶ 26-29)  On March 8, 2004, Officers Robert MacKay, Douglas Hennessey, and Ronald Jordan were summoned separately to department headquarters.  Each was told by Deputies Ford-Murphy, Martino, and McCarthy that he was under investigation for violating various rules, policies, and procedures of the police department during their conversations on the 1205 line.  (Carter Aff, ¶ 29)  MacKay and Jordan were also notified that they were under criminal investigation for possible criminal violations by conducting Board of Probation, Registry of Motor Vehicle, and Criminal Offender Records Information (CORI) checks on individuals without a legitimate law enforcement purpose. (Id.)  Each of the officers was placed on administrative leave with pay while the investigation was ongoing, and each was asked to turn in his weapon, badge and Police I.D.

71.    O'Loughlin was also summoned to headquarters on March 8 to meet with the deputy chiefs.  O'Loughlin was informed that there was an ongoing internal investigation being conducted into conversations she had on the 1205 line and that she was being placed on administrative leave with pay during the investigation.  She was asked to turn in her service weapon, badge, Police I.D. and the keys to her take-home cruiser.  (Id.)  O'Loughlin received written notice that it was anticipated that she would be charged with violations of various rules and regulations of the department and the Oath of Honor because on diverse dates she:

> engaged in conversation, on a tape recorded Department telephone line, with subordinate police officer(s) that was demeaning, derogatory, untruthful, vile, profane, and meant to harm the reputations of the Chief of Police and members of the Command Staff.  By virtue of her rank, the oath of office, and the oath of

honor, Lieutenant O'Loughlin had an affirmative responsibility to take decisive action to stem and dissuade such conversations. (Ex. 26)

misused her authority by engaging in conversations on a tape recorded Department telephone line, with subordinate police officer(s) where she ridiculed the Chief of Police and members of the Command Staff. During these conversations, she actively conspired to bring forward untruthful accusations in the media and gave explicit instruction to subordinate police officers to subvert the Chief of Police and the administration of the Police Department. (Id.)

participated in conversations, on a tape recorded Department telephone line, with subordinate police officer(s) where she used vulgar and obscene language to refer to the Chief of Police and members of the Command Staff. Lieutenant O'Loughlin's actions served to undermine the effective management of the Police Department. (Id.)

72.    At the time O'Loughlin did not dispute the charges or tell the deputies that she was not aware of having committed any violations. (NOL III, p. 448)

73.    From the time she was placed in command of the detail unit until she was placed on administrative leave with pay, O'Loughlin does not recall experiencing any adverse acts. (NOL II, pp. 408-409)

74.    Carter decided that members of the Special Operations Team ("SOT") should be present at headquarters on the day O'Loughlin and the other officers were placed on administrative leave. (Carter Aff., ¶ 30; Carter II, pp. 40-41) Based on his experience, there was a possibility that an officer might react negatively to being relieved of their badge and weapon and placed on administrative leave and Carter wanted to protect unarmed, civilian employees who worked on the floor where the deputy chiefs were to meet with the officers. (Carter Aff., ¶ 30; Carter II, 40-41) It is not unusual for the Authority to have officers present when there is a potential breach of the peace, such as when an employee is being terminated from a position at the Authority. (TOL, pp. 181-82)

75.    Before O'Loughlin went upstairs to meet with the deputy chiefs on March 8, she spoke briefly with Sergeant Albanese, the commander of the SOT.  (NOL III, p. 413)  Neither Sergeant Albanese nor any other SOT members said or did anything that caused O'Loughlin to feel apprehensive, intimidated, or threatened.  (Id., p. 414-16)  At their meeting with O'Loughlin, none of the deputy chiefs said or did anything that put O'Loughlin in fear for her physical safety.  (Id., pp. 420-21)

76.    On March 8, outside lawyers for the Authority coincidentally filed the answer (known as a position statement) in response to O'Loughlin's MCAD complaint. Carter did not know the position statement would be filed that day and it had no bearing on his decision to relieve O'Loughlin and the other officers from duty with pay.  (Carter Aff., ¶ 31)

77.    Carter also decided that Fleming and police officer James Floyd would be placed on administrative leave with pay because of conversations they engaged in on the 1205 line.  (Id., ¶ 32) Both were required to relinquish their weapons, badges, and Police I.Ds.  On April 16, 2004, Fleming was placed on administrative leave because of statements he made and allowed to be made to him while he was talking on the 1205 line with a subordinate, Police Officer Robert MacKay on February 18, 2004.  (Fleming III, pp. 73-76)  Fleming was also informed in writing that a hearing would be conducted to determine whether just cause existed to discipline him for violating policies, rules and procedures of the department.  (Carter Aff., ¶ 32)

78.    On May 11, 2004, O'Loughlin filed this civil action.  In addition to claims that Carter discriminated against her on the basis of sex by assigning her to command the detective unit and the detail unit (see Complaint, ¶¶ 13 – 16; Carter Aff., ¶ 33),

O'Loughlin also claims that he discriminated against her in a series of alleged minor slights: (a) refusing to place a commendation she received from the Massachusetts Office of the Attorney General into her file; (b) refusing to support her in relation to a male subordinate; (c) prohibiting her from investigating and/or testifying on graffiti related crime, but allowing her "former assistant" to do so; (d) deliberately avoiding contact with her, and instead, speaking with sergeants in her command; (e) immediately moving her to the Detail Unit the same day that this change was announced; and (f) making a statement to a deputy chief on one occasion that O'Loughlin was not dressed properly; and not allowing her to take six weeks off between Thanksgiving and Christmas. (Complaint, ¶ 17) Carter denied discriminating against O'Loughlin and responded to each of her claims. (Carter Aff., ¶ 33)

79.     She also charges the Authority with engaging in a series of minor slights, most of which occurred prior to the time Chief Carter arrived at the department, including: (a) deliberately not providing her with an office when she was assigned to the detective unit; (b) not providing her with a detective's badge; (c) not providing her with a computer of her own to use; (d) assigning her a cellular telephone which was inferior to the telephones assigned to other superior officers; (e) requiring her to attend roll call; (f) allowing pornographic and obscene comments about her to be made on an Internet site by critics of the department; (g) allowing distasteful cartoons and newspaper articles to be displayed on bulletin boards within headquarters; (h) allowing false and slanderous pager messages about her to be sent out on the department paging system from December 1998 through 2002. (Complaint, ¶ 19) O'Loughlin thought that these acts were discriminatory

27

when they were occurring, but she chose not to file a complaint about them.  (Complaint, ¶ 20)

80.     O'Loughlin also alleged that she was placed on administrative leave in retaliation for having filed a complaint with the MCAD and that the Authority retaliated against her by defaming her in *The Boston Globe* and *The Bay State Banner*.  (Complaint, ¶¶ 29-31; Ex. 27)  She alleged that Defendant Michael Mulhern, the former General Manager of the Authority, falsely told reporters that she was implicated in a criminal investigation and that she was the sister of former Chief O'Loughlin.  (Complaint, ¶¶ 29 – 32)

81.     Mr. Mulhern did not tell Mac Daniel, the author of the *Globe* article, that O'Loughlin faced criminal charges as a result of the ongoing investigation, that she was engaged in criminal misconduct, or that she faced criminal charges.  See Daniel deposition, pp. 28-30, 56 ("Daniel"), true and accurate excerpts of which are attached hereto as Exhibit 33.  Mr. Mulhern testified that he told Mr. Daniel that it was "absolutely not true" that O'Loughlin could be confronted with criminal charges.  See Mulhern deposition, pp. 63-64 ("Mulhern"), true and accurate excerpts of which are attached hereto as Exhibit 34.  Mr. Daniel's assertion in the article that the department investigation of the four officers could result in criminal charges was based on "an amalgamation of facts" he gathered during the day, including information from an Authority spokesman, who said "[t]here is an ongoing internal investigation that concerns egregious violations of the department's policies, rules and regulations as well as allegations of criminal conduct", and from members of the police officer's union, who told him that O'Loughlin had been suspended and that O'Loughlin was former Chief

Thomas O'Loughlin's sister. (Daniel, pp. 35-36, 55-56, 46-48) Melvin Yawu Miller, the author of the article in the *Bay State Banner,* based his story on the Globe article; he did not speak with Mr. Mulhern. See Miller deposition, pp. 13-16, 20 ("Miller"), true and accurate excerpts of which are attached hereto as Exhibit 35.

82.    On May 14, 2004, O'Loughlin received an "Amended Notice of Hearing, which indicated that a disciplinary hearing would be held to determine if there was just cause for her to be "discharged, demoted, suspended, or otherwise disciplined." (Ex. 28) The letter detailed thirty instances in which Carter believed O'Loughlin violated department policies, rules and procedures and the Oath of Honor during conversations she had with patrol officers on the 1205 line. (Ex. 28; Carter Aff., ¶ 34) Specifically, O'Loughlin was charged with violating several sections of the "MBTA Police Department Manual of Policies, Rules and Procedures" (hereinafter "Manual"), including, inter alia:

a.    Chapter 62, §§ 2.0 (requiring supervisors to report immediately all violations of law or the rules of the department through the chain of command – failure to do so constitutes neglect of duty) and § 3.0 (requiring supervisors to "ensure that all subordinates perform their duties in a professional, efficient and effective manner, in compliance with all Department policies, rules and procedures"), and Chapter 101, § 1.0 (requiring supervisors to report immediately all violations of law or the rules of the department through the chain of command – failure to do so constitutes neglect of duty). (Id.) O'Loughlin was charged with violating these sections on January 26, 2004, when she told Officer Robert MacKay that "[w]hoever did the [Hingham] detail one day last week fucking unleashed a vulgarity laden tirade at some poor fucking old lady down

there, and she was horrified", and that officers "sit in their cars, because everybody down in Hingham is fucking driving by the detail, and every time they see anybody doing anything, they're fucking calling Hingham." O'Loughlin was charged because there was "no evidence that she addressed or reported the violation[s]," which according to her statements to MacKay, were violations by department officers on detail in Hingham. (Id., pp. 1 and 2)

O'Loughlin was also charged with violating the above manual sections in a conversation with MacKay on February 17, 2004, because she failed to take action or report MacKay for making comments such as, the command staff "didn't give a fuck" about a murder at Dudley Station and that "Joe's [Carter's] doing a hell of a fucking job," and during a conversation she had with Officer Carl Rubino on February 17. (Id.) Both MacKay and Rubino were on duty when the conversations took place.

Notwithstanding department rules and Carter's core values related to officers conducting themselves the same way, whether they are on or off duty, O'Loughlin testified that she did not believe she had an obligation to monitor or correct the actions of subordinates when she was "off duty, acting as a civilian" or when she was "shooting the breeze" or "blowing off steam" with the subordinate. (NOL III, pp. 494-97) She also testified that as a lieutenant, she was only obliged to support the command staff when she was on duty and that when she was off duty, she had a right to her opinion and that the subordinate she was speaking with had a right to his opinion. She believed they could express those opinions without violating department rules. (Id.)

b.      Chapter 101, §§ 2.1 (requiring officers to "be faithful to his/her Oath of Office, Oath of Honor, Code of Ethics, the principles of professional police work and the

30

Goals and objectives of the Department . . . .") and § 3.7 (prohibiting employees from

"conduct[ing] him/herself in a manner that is rude, impolite, contemptuous or insolent to

or about a Superior Officer, or a fellow employee, or representatives of other agencies, or

to the public"). O'Loughlin was charged with seventeen (17) violations of these two

provisions over the course of several months, most notably when she:

(1)    told MacKay that another officer was "such an idiot." (Ex. 28, p. 3);

(2) described to MacKay the following statement she made to an Hingham Police Department supervisor: "I said, you don't understand us, we're city cops, we could give a fuck less." (Id.);

(3) was discussing with MacKay, a situation in which a mailman made a disparaging remark to another officer about the Transit Police. (Ex. 28; NOL III, p. 535) O'Loughlin told MacKay that she "would have fucking pummeled [the mailman]." (Ex. 28);

(4) told MacKay that she stated to a supervisor with the Hingham Police Department that people in Hingham were "rich spoiled bastards." (Ex. 28; NOL III, pp. 539-41);

(5) told MacKay, "Now she's got him by the balls," referring to Deputy Chief Martino. (Ex. 28) She was talking to MacKay about Deputy Martino allegedly bringing his pregnant girlfriend to a swearing in ceremony. (NOL III, p. 545-46) O'Loughlin later found out that that the woman was Deputy Martino's daughter. (Id., pp. 546-47);

(6) told MacKay that she told another officer: "I said, brother, they can't do that to you. You had a union official sit down with you and that little puke, and he gave you the okay to do it". (Ex. 28) The "little puke" O'Loughlin was referring to was Deputy Chief Martino. (Id., p. 3; NOL III, 549) O'Loughlin considered the statement true, and therefore, not "rude, disrespectful, contemptuous, insolent, or discourteous", or a violation of department regulations. (NOL III, p. 550)

(7)  told MacKay "its great when your command staff won't even show up for a murder" (Ex. 28);

(8) she asked MacKay if any member of the command staff was around, or whether they were "so worried about their 15th swearing in on Friday that they can't worry that some kid got stabbed." (Id.);

(9) she told MacKay that "they [the command staff] should be ashamed of themselves, they should be fucking ashamed of themselves." (Id.)

c.      Chapter 101, § 2.11 (prohibiting officers from "interfere[ing] with cases assigned to other Officers except with the consent of the assigned Officer") O'Loughlin was charged with violating this provision for discussing with MacKay "strategies to use against the police administration to thwart or mitigate [an internal] investigation." (Ex. 28, p. 3) This charge arose during a time when the department was investigating a situation in which someone created and placed around the department a "Where's Waldo" poster that superimposed Carter's head on the Where's Waldo children's character. (NOL III, pp. 559-567) The apparent point of the poster was to suggest that Chief Carter was not at headquarters enough. O'Loughlin told MacKay that if the administration discovered who created the poster, there could be no discipline because it was political satire and not conduct unbecoming and officer. (Id., p. 562) She also told MacKay that if Officer Hennessey, who was suspected of making the poster, "thinks he is in danger of any type of finger pointing, then he should just contact somebody and let them know that he has witnessed people be in the company of other people when they should be on duty." (Id., p 564) O'Loughlin, as a lieutenant, was telling Patrol Officer MacKay that Patrol Officer Hennessey should accuse superior officers of having illicit sexual liaisons while on duty as a strategy to avoid discipline. She said she would do that if she were in the same situation as Hennessey. (Id., pp. 564-65)

d.      O'Loughlin was also charged with violating Chapter 101, § 3.18 (which "incorporates the MBTA policy referred to as the "MBTA Policy and Procedures for the Prevention of Harassment in the Workplace" ("it is the responsibility of each supervisor and manager to enforce the terms of this policy. Supervisors, managers, or department

32

heads who become aware of incidents of harassment in their departments, even in the absence of a formal complaint, should take immediate and appropriate actions to eliminate the conduct. Supervisors and managers must also report all incidents to the Office of Diversity and Civil Rights"). O'Loughlin was charged with violating this provision when she told MacKay that she advised an officer to get a lawyer and sue the Authority for harassment. (Ex. 28, p. 5; NOL III, pp. 568-69) Again, O'Loughlin abdicated her responsibility as a superior officer and manager in the department; she did not report the alleged harassment as she should have, she simply told the alleged victim that she would sue if she was in his situation. (NOL III, pp. 569-70) O'Loughlin was aware of the provision that imposes on her, as a supervisor, a duty to report any harassment or discrimination of which he or she becomes aware to the Authority's Office of Diversity and Civil Rights ("ODCR"). (NOL II, pp. 177-178) She did not make such a report.

A copy of Chapters 62 and 101 and the "MBTA Policy and Procedures for the Prevention of Harassment in the Workplace" are attached hereto as Exhibit 29.

**Additional Officers Are Implicated In The 1205 Line Investigation**

83.     Other officers were cited for less serious offenses on the 1205 line than those of the six officers who were placed on administrative leave. (Carter I, pp. 131-32) Officer Carl Rubino was charged with being untruthful and contemptuous in a conversation he had with O'Loughlin in which he described Deputy Chief McCarthy as yelling at him and looking like Khrushchev by banging his shoe on the desk. Rubino received formal counseling. (Carter Aff., ¶ 34) Sergeant Stephen Douglas was issued a

letter of reprimand for allowing a subordinate to speak to him in an insubordinate and vulgar manner on the 1205 line and for not reporting or disciplining the officer. (Id.)

**O'Loughlin Understood The Possible Consequences Of Her Actions**

84.     O'Loughlin also understood that an officer could be disciplined for conversations on a recorded telephone line that violated department policy, even if the officer was off duty. In 1992, she was disciplined by her brother in law, John O'Loughlin, for referring to a subordinate officer as "dopey" and a "lunkhead" when she was speaking on a recorded police department telephone line to another lieutenant. (NOL III, pp. 435-41; Ex. 30) O'Loughlin was off duty at the time she called in to the station to speak with the lieutenant. (NOL III, p. 446-47)

**O'Loughlin Attends A Due Process Hearing But Does Not Testify**

85.     Pursuant to the collective bargaining agreement between O'Loughlin's union and the Authority, a hearing was held to determine whether "just cause" existed to discipline her. O'Loughlin chose not to testify at the hearing. (NOL III, p. 453) The hearing officer issued a detailed decision explaining why he determined that just cause existed to sustain the charges against her. (Exhibit 31) He concluded that O'Loughlin's conduct was "incompatible with the duties and responsibilities of a superior officer". (Id.)

86.     Just cause was also found in the cases of Jordan, MacKay, Hennessey, Fleming, and Floyd. (Carter Aff., ¶ 35)

87.     Carter had originally considered terminating O'Loughlin from the department because of the seriousness of her violations. (Carter Aff., ¶ 36; Carter II, pp. 53-54) He ultimately decided to demote her two levels to the rank of patrol officer.

(Carter Aff., ¶ 36; Carter II, pp. 53-54) On August 19, 2004, Chief Carter notified O'Loughlin in writing that he was demoting her to the rank of patrol officer. (Ex. 32) In his opinion, the statements O'Loughlin made to subordinate officers (and the statements she allowed subordinates to make to her unchecked) undermined the good order of the department, were not the actions of a good supervisor, and contributed to the morale issues he and other managers were trying to correct. (Carter Aff., ¶¶ 28, 36; Carter II, pp. 56-58) The fact that O'Loughlin was a lieutenant played a critical role in the discipline Carter imposed on her. (Carter Aff., ¶ 36; Carter II, pp. 61-64) He thought her conduct exemplified the most egregious violations of the standards he outlined in his Plan of Action and disqualified her from a leadership position in the department. (Carter Aff., ¶¶ 28, 36)

88.    Carter also considered terminating Fleming (who was then a lieutenant) from the department because of his violations. (Carter Aff., ¶ 36) He believed that Fleming's violations were far less serious than O'Loughlin's because there were fewer violations, and they occurred during the course of a single day, while O'Loughlin's occurred over the course of several months. (Id.; Carter II, pp. 101-103) He nonetheless also considered terminating Fleming from his position with the Authority after just cause was found in his case. He decided to demote Fleming two ranks to the rank of patrol officer. (Carter Aff., ¶ 36; Carter II, pp. 101-103) Carter considered Fleming's prior discipline (for divulging confidential information) in determining that a two-level demotion was appropriate. (Carter Aff., ¶ 36; Carter II, pp. 101-103)

89.    Fleming thinks that someone convinced Carter that the officers who were speaking on the 1205 line were engaged in a rebellion within the department. (Fleming

III, pp. 102-103)  He believes that if one listened to the telephone calls and considers the

posters about the chief, one could conclude that there was a clique attempting to

undermine the chief.  (Fleming III, pp. 102-104)

90.    Carter fired MacKay and Jordan.  (Carter Aff., 37)  Hennessey received a

60 working day suspension and Floyd received a 180 day suspension.  (Carter Aff., ¶ 37)

91.    During the entire time O'Loughlin has served on the police force, no

officer had ever been demoted before she and Fleming were demoted for their

conversations on the 1205 line.  (NOL III, pp. 425-26)

92.    Carter understood that the discipline he imposed was harsher than that

imposed by previous administrations.  (Carter Aff., ¶ 38; Carter II., p. 119)  However, he

believed that harsh discipline was warranted because officers who committed violations

on the 1205 line undermined his efforts to improve the morale of officers in the

department.  (Carter Aff., ¶ 38)

**O'Loughlin Amends Her Civil Complaint**

93.    On January 6, 2005, O'Loughlin amended her civil complaint to include

claims related to her demotion.

**O'Loughlin Arbitrates Her Discipline**

94.    O'Loughlin arbitrated her discipline pursuant to the terms of her collective

bargaining agreement.  (Carter Aff., ¶ 39)  The arbitrator determined that she had not

violated department rules, regulations, or policies, and ordered her reinstated to her

position as a lieutenant with back pay.  (Id.)

95.    Fleming also arbitrated his demotion.  (Id.)  The arbitrator found that his

discipline was too harsh and reduced it to a 20 working day suspension.  (Id.)  Fleming

36

was restored to his rank as a lieutenant and awarded back pay. (Id.) The remaining officers who were relieved of duty with pay also pursued arbitration. (Id.) The arbitrator reduced MacKay's discipline from termination to a 5 day suspension and reduced Jordan's discipline from termination to a 1 day suspension. (Id.) Hennessey's discipline was reduced from a 60 working day suspension to a 5 day suspension. (Id.) Floyd's suspension was affirmed by an arbitrator. (Id.)