# Exhibit 1

# O'Loughlin
## vs.
# MBTA, et al.

# Deposition of Nancy O'Loughlin

Volume I

July 11, 2005
pp 1-163

**JonesReporting**
COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Nancy O'Loughlin

Page 14

1    A. No.
2    Q. Where do you live, Officer O'Loughlin?  What
3  city?
4    A. Weymouth.
5    Q. And how long have you lived there?
6    A. Since 1978, when we moved there.  There was
7  a brief stint in '86 where I moved out and back in
8  in '87.
9    Q. Are you married?
10    A. Yes.
11    Q. And how long have you been married?
12    A. It will be 16 years in August.
13    Q. And what is your husband's name?
14    A. Francis.
15    Q. Do you have children?
16    A. Yes.
17    Q. What is the age and sex of each of your
18  children?
19    A. I have two daughters, one is 15 and one is
20  13.
21    Q. Can you give a brief history of your
22  education since high school?  Formal education.
23    A. I graduated from high school in 1978.  In
24  the fall of '78 I enrolled at Northeastern

Page 15

1  University and graduated with honors in 1983.
2    Q. What was your major?
3    A. Criminal justice.
4    Q. Any subsequent formal education?
5    A. I did a course at Babson for supervisors,
6  command training.
7    Q. And when was that?
8    A. I don't recall off the top of my head.
9    Q. Was it while you were with the MBTA?
10    A. Yes.
11    Q. Why did you apply to the MBTA?
12    A. When I took a Civil Service exam you were
13  automatically entered onto the MBTA's list.  I was
14  actually called by four different departments at the
15  same time.
16    Q. And what departments were those?
17    A. State Police, the MDC, the T and Weymouth.
18    Q. Now, with Weymouth, this was before the MCAD
19  complaint?
20    A. Yes.
21    Q. So Weymouth called you and then refused to
22  hire you; is that what happened?
23    A. Yes.
24    Q. When did you begin at the MBTA?

Page 16

1    A. November 11th, 1983.  No, I'm sorry,
2  November 15th, 1983.
3    Q. Now, are you related to Bill Bratton?
4    A. Yes.
5    Q. How?
6    A. He's my first cousin.
7    Q. Are you close?
8    A. No.
9    Q. Were you ever close?
10    A. No.
11    Q. He held a position at the MBTA at one time?
12    A. Yes.
13    Q. What position was that?
14    A. Chief of police.
15    Q. Do you know what years?
16    A. I know when I got hired he wasn't the chief,
17  but shortly after I got hired he became the chief.
18  So I would say late 1983.  I think he was there
19  until 1985.
20    Q. Did you ever report to him?
21    A. Directly?
22    Q. Directly.
23    A. No.
24    Q. Does your husband, Francis, work at the

Page 17

1  MBTA?
2    A. Yes.
3    Q. What years did he work at the MBTA?
4    A. I believe he came on in 1971 and he retired
5  in 1999.
6    Q. Did you ever report to him?
7    A. Yes.
8    Q. And when was that?
9    A. In 19 -- when I first came on.  Before I
10  made rank.
11    Q. In '83?
12    A. Well --
13    Q. When you say before you made rank, what do
14  you mean?
15    A. While I was a patrolman I reported to him.
16  It would be in the late '80s.  Mid '80s.
17    Q. And what was his position at that time?
18    A. He was a sergeant.
19    Q. Were you married then?
20    A. No.
21    Q. And that's the only time you reported to
22  him?
23    A. That I can recall.
24    Q. Did Francis O'Loughlin achieve a higher rank

5 (Pages 14 to 17)

Page 18

1  in the MBTA police?
2  A. Yes.
3  Q. What rank did he achieve?
4  A. Lieutenant.
5  Q. When was that?
6  A. I don't know.
7  Q. Did he retire as a lieutenant?
8  A. Yes.
9  Q. Are you related to Tom O'Loughlin?
10  A. No.
11  Q. Is your husband related to Tom O'Loughlin?
12  A. Yes.
13  Q. How?
14  A. Cousin.
15  Q. First cousin?
16  A. I believe so.
17  Q. Have you ever reported to Tom O'Loughlin?
18  A. Everybody reports to the Chief, but
19  directly, no. Directly I would have reported to the
20  Deputy Chief.
21  Q. Tom O'Loughlin was the Chief?
22  A. Yep.
23  Q. What years was he the Chief?
24  A. I believe he came on in '97, late '97, and

Page 19

1  left in 2003, I believe. Or it may have been 2002.
2  I'm not sure what year he left.
3  Q. Was John O'Loughlin an MBTA police officer?
4  A. Yes.
5  Q. Is he related to your husband?
6  A. Yes.
7  Q. What is their relationship?
8  A. Brother.
9  Q. Is John O'Loughlin deceased?
10  A. Yes.
11  Q. When did he pass away?
12  A. 2000, I believe.
13  Q. And what was his rank in the police
14  department at that time? Did he retire?
15  A. Yes.
16  Q. What did he retire as?
17  A. Deputy Chief.
18  Q. Did you ever report to him?
19  A. No.
20  Q. Now, you said you weren't close to Bill
21  Bratton. Were you or are you close to Tom
22  O'Loughlin?
23  A. I consider him a friend, but not a close
24  friend.

Page 20

1  Q. You don't socialize with him?
2  A. On rare occasions.
3  Q. What about with John O'Loughlin before he
4  passed? Were you --
5  A. Yes.
6  Q. You socialized with him?
7  A. Yes.
8  Q. Good friends?
9  A. Yes.
10  Q. During the time you've been at the MBTA have
11  you heard allegations or learned of any kind of
12  resentment people might have had against you because
13  of your relationship to Tom O'Loughlin or John
14  O'Loughlin or Frank O'Loughlin or Bill Bratton?
15  Have you heard of any resentment?
16  A. Have I heard of anything?
17  Q. Yes.
18  A. Yes.
19  Q. What have you heard? What kind of things?
20  A. That I was taken care of, that I got
21  preferential treatment. Along those lines.
22  Q. Have you heard the phrase that you were
23  untouchable because of your relationship to them?
24  Or are we saying the same thing?

Page 21

1  MR. NOTIS: Objection. You can answer.
2  A. I can't say that I've ever heard that
3  phrase, no.
4  Q. Do you think you were taken care of because
5  of your relationship to those gentlemen?
6  A. Absolutely not.
7  Q. Have you ever felt that you were treated
8  unfairly because of your relationship to either of
9  those gentlemen?
10  A. Yes.
11  Q. In what ways and when?
12  A. Well, right from the academy it was -- I
13  would say I was placed under more stringent
14  guidelines than anybody else so that there would be
15  no perception of favoritism.
16  Q. And who placed you under those stringent
17  guidelines?
18  A. I think it was Bratton himself made it aware
19  -- made it known that he didn't want me to have any
20  special treatment so that the inference couldn't be
21  made that I was being taken care of.
22  Q. But the phrase "stricter" makes me think you
23  thought it was worse than it ordinarily would have
24  been. Did you feel that way, that you were treated

6 (Pages 18 to 21)

Nancy O'Loughlin

Page 22

1 worse than you would have been had you not been
2 related to Bill Bratton?
3         MR. NOTIS:  Objection.  You may answer.
4     A.  I think I was watched a lot closer than
5 anyone else.  That's what I feel.
6     Q.  What about subsequent to Bill Bratton's
7 tenure at the MBTA?  Did you continue to feel that
8 you were treated worse because of your relationship
9 to Tom O'Loughlin or, when he came, Frank O'Loughlin
10 and John O'Loughlin?
11     A.  I think the -- I don't know if you would
12 term it gossip or rumors perpetuated more, yes.  I
13 think that I was the victim of some of this
14 treatment in an effort to get at these people.  And
15 I think that I was targeted at times to get at these
16 people.
17     Q.  When you say "this treatment," what
18 treatment are you talking about?  The first thing
19 that you said, you were subjected to "this
20 treatment."  What treatment?
21     A.  The treatment with the newspaper articles
22 that went out about the anticrime unit, the
23 discussions that were held at roll call, the
24 allegations that we were under investigation by the

Page 23

1 Attorney General's office and that type of thing.
2     Q.  Did you think those things were done because
3 of your relationship to Tom O'Loughlin?
4     A.  I think they were an attempt to get at that
5 Chief as well as an attempt to get me, yes.
6     Q.  Then you don't think those things happened
7 because of your gender?
8     A.  Well, that's not what I'm saying.  You asked
9 me a specific question and I'm giving you a specific
10 answer.
11     Q.  Take your time.  Answer any way you want and
12 clarify.
13     A.  Do I think that I've been targeted
14 specifically because I'm a female also?  Yes.  It's
15 a whole atmosphere.  It's a whole -- the word
16 escapes me that I want to use right now.
17     Q.  Maybe a little later on we'll go through
18 specific instances and you can tell me whether you
19 think this is an effort to get at Tom O'Loughlin or
20 whether you think it's directed at you because of
21 your gender.  We can deal with that later.
22         Do you think you were treated unfairly
23 because of your relationship to John O'Loughlin?
24     A.  Yes.  It would be the same thing.  It would

Page 24

1 be rumors, it would be --
2     Q.  Can I ask you what kind of rumors?
3     A.  That -- well, your words, I was
4 untouchable, or I got preferential treatment, or I
5 got taken care of.  That type of thing.
6     Q.  And was it the same thing with Frank
7 O'Loughlin as well?
8     A.  Not so much Frank.
9     Q.  Now, with John O'Loughlin, Tom O'Loughlin
10 -- well, with Bratton, you said you think it came
11 from him?
12     A.  Mm-hmm.
13     Q.  With John O'Loughlin and Tom O'Loughlin it
14 came from others trying to get at those two
15 individuals through you?
16     A.  Yes.
17     Q.  Aside from gossip, what kind of actions are
18 we talking about?
19     A.  Internet postings that were sexually
20 explicit.  There were cartoons posted around the
21 department.  There was -- that's all I can think of
22 off the top of my head.
23     Q.  And can you relate those two instances,
24 sexually-explicit internet postings and cartoons

Page 25

1 posted around the department, to either John
2 O'Loughlin or Tom O'Loughlin or both?
3     A.  I think it was more Tom than John.
4     Q.  Aside from gossip, how did people try to get
5 at John O'Loughlin through you?  And what I mean by
6 that is what happened to you as a result of people
7 trying to get at John O'Loughlin?
8     A.  I can't think off the top of my head right
9 now.  He's been gone for a long time.
10     Q.  John?
11     A.  Yes.
12     Q.  When did he leave the department?
13     A.  I think it was around like '95.  But I'm not
14 certain.  I know he was sick for a while.
15         MR. EDWARDS:  Would you mark this
16 please.
17         (Exhibit No. 3 marked
18         for identification.)
19 BY MR. EDWARDS:
20     Q.  Do you recognize the document you were just
21 handed?  It's marked as Exhibit 3.
22     A.  It's a general order.
23     Q.  And what is a general order?
24     A.  It's a document that goes out

7 (Pages 22 to 25)

Nancy O'Loughlin

Page 26

1  departmentwide.  This general order is I think an
2  update to the department manual.
3       Q.  Are police officers expected to adhere to
4  general orders that go out like this?
5       A.  Yes.
6       Q.  And what is this one about, please?
7       A.  The organization of the department.
8       Q.  And I wanted to get that into evidence and
9  you can refer to it if you like.
10          Generally, what is the structure of the
11  MBTA police department?  There's the Chief at the
12  top and then what's the command structure?
13          MR. NOTIS:  Can we get a time period on
14  that?
15          MR. EDWARDS:  I'll let her tell me
16  whatever she needs to tell me.
17  BY MR. EDWARDS:
18       Q.  Generally the structure.  There's the Chief
19  --
20          MR. NOTIS:  Well, objection.  What
21  period of time are you talking about?  We all know
22  it's changed over the years.
23          MR. EDWARDS:  Well, I'll let her tell
24  me.

Page 27

1          MR. NOTIS:  Go ahead.
2  BY MR. EDWARDS:
3       Q.  Structure now.
4       A.  From the bottom down?  You go patrolman,
5  sergeant, lieutenant.  There's a rank of captain, I
6  don't think currently there's any captains.  There's
7  Deputy Chief and then there's Chief.
8       Q.  Is Dolores Ford Murphy a captain?
9       A.  Her Civil Service rank I believe is captain
10  but she's currently a Deputy Chief.
11       Q.  You're saying there is nobody currently
12  serving as a captain?
13       A.  Yes.
14       Q.  There are people with the Civil Service rank
15  of captain?
16       A.  Yes.
17       Q.  Now I think your counsel is right.  Over
18  time the structure has changed; is that right?  I
19  mean, there have been --
20       A.  Yes.
21          MR. NOTIS:  Wait for the question.
22  BY MR. EDWARDS:
23       Q.  Has there been a superintendent at one point
24  or other ranks?

Page 28

1       A.  Yes.
2       Q.  Or other positions?
3       A.  Yes.
4       Q.  Such as major?  Has there been a major?
5       A.  Yes.
6       Q.  But as of right now the chain of command, so
7  to speak, is as you described it?
8       A.  Yes.
9       Q.  Now, organizationally the department has
10  changed over time as well, right?  I mean, there
11  have been different units in different places and
12  things like that?
13       A.  Yes.
14       Q.  I'm going to ask you to turn to the last
15  page of the document I just handed you, or you were
16  just handed.  Bates stamp number M00091.
17          MR. NOTIS:  The last page of the
18  document I have is 89.
19       A.  I don't have it.
20          (Discussion off the record.)
21          MR. NOTIS:  Again, same thing, are we
22  going to mark this?
23          MR. EDWARDS:  Yes.  It actually should
24  be -- there should be one attached to everybody's

Page 29

1  copy; I don't know why it's not.
2          MR. NOTIS:  Why don't we do it -- for
3  clarity, why don't we mark it as Exhibit 4 since it
4  isn't attached to Exhibit 3?
5          MR. EDWARDS:  All right.  The
6  organizational chart, December.
7          You don't have it either?
8          MS. LUKEY:  No.
9          (Exhibit No. 4 marked
10  for identification.)
11          MR. NOTIS:
12          (Discussion off the record.)
13  BY MR. EDWARDS:
14       Q.  If you recall, just take a quick look at
15  that, or take a look at it.  Was this the structure
16  of the MBTA police department as of December 2003?
17       A.  To the best of my knowledge, yes.
18          (Discussion off the record.)
19       Q.  What I was wondering is generally over the
20  years has there always been a patrol division?
21       A.  Yes.
22       Q.  Has there always been an investigative unit
23  in some form or fashion?
24       A.  Yes.

Nancy O'Loughlin

Page 30

1    Q. Administrative unit?
2    A. I don't think there was always an
3    administrative unit.
4    Q. There was somebody that did those functions?
5    A. Yes.
6    Q. Now, who determines the structure of the
7    department such that a general order like this one
8    can be issued?  Is that the prerogative of the
9    Chief?
10    A. Yes.
11    Q. Now, you mentioned that you began as a
12    patrol officer?
13    A. Yes.
14    Q. What was your job when you first began at
15    the MBTA police?  I mean, did you patrol -- what
16    did you do as a patrol officer, I guess?
17    A. As as a patrol officer you follow the
18    directives of your superiors.  You proactively
19    patrol and ensure the safety of the passengers.
20    Q. How long did you do that?
21    A. About six years.  Well, strike that.  I did
22    it like five years and then I became a canine.
23    Q. What does that mean?
24    A. Canine officer, you handle a dog.  It's a

Page 31

1    little bit different.  You have a little bit of a
2    different patrol function.
3    Q. What is the difference?
4    A. The difference is you're utilized in a
5    different fashion.  You respond to calls for service
6    from other departments.  At the time that I did the
7    canines, we were responsible primarily for the
8    commuter rail system.
9    Q. How did you become a canine officer?
10    A. You apply and then you go through I believe
11    it's an 18-week school.
12    Q. Do you bid on the position?
13    A. You apply for the position.
14    Q. Is there such a as bidding for positions?
15    A. You bid for your shift, not your position.
16    Q. You apply for positions?
17    A. Yes.
18    Q. And who makes the selection?  Well, who made
19    the selection that you were to become a canine
20    officer, by title if not by name?
21    A. I believe it was Chief Maloney.
22    Q. So the Chief made the decision in this case,
23    as far as you know?
24    A. Yes, sir.

Page 32

1    Q. How long did you remain a canine officer?
2    Oh, until '89.  What happened in '89?
3    A. I was promoted to sergeant.
4    Q. And after you were promoted to sergeant what
5    was your job?
6    A. After I was promoted to sergeant I was no
7    longer allowed to work the dog because the
8    regulations ruled that a supervisor is responsible
9    for supervision and not the handling of the canine,
10    in which you are responsible to supervise the people
11    under your command.
12    Q. Now, you were in a union at the time?
13    A. There were no unions at the time.
14    Q. In '89?
15    A. (Witness shook head.)  I don't believe so.  I
16    could be wrong.  Wait a minute.  I'm thinking
17    lieutenants.  Yes, there was a sergeants union, I
18    believe.  Well, I take that back.  I don't know.  I
19    don't know when the unions came about.  There's
20    always been a patrolman's union.
21    Q. And you were a member of the patrolmen's
22    union?
23    A. Yes.
24    Q. What is a specialty position?

Page 33

1    A. A specialty position would be a canine, the
2    detectives are considered specialty, or someone
3    assigned to customs or the airport, motorcycle,
4    those are specialty.
5    Q. What makes a position a specialty position?
6    A. I honestly don't know why they're considered
7    specialties.
8    Q. Are specialty positions  -- well, they're
9    not necessarily out of the mainstream of patrol
10    because a canine officer patrols?
11    A. Correct.
12    Q. Now, you mentioned that you went to
13    supervisory school at Babson?
14    A. Yes.
15    Q. Do you recall whether that was when you were
16    a sergeant?
17    A. I believe it was when I was a sergeant but
18    I'm not positive.
19    Q. A sergeant is considered a supervisor?
20    A. Yes.
21    Q. Sergeant and above?
22    A. Yes.
23    Q. When you first made sergeant, how many
24    people would you have supervised generally, if it's

9 (Pages 30 to 33)

Nancy O'Loughlin

Page 34

1  possible to answer that?
2      A. It would be a shift, so it would probably be
3  at least ten people.
4      Q. What do you mean, it would be a shift?
5      A. You would be in charge of a shift. There
6  would be a lieutenant that would be the desk
7  lieutenant in charge of the shift, but a sergeant is
8  the street supervisor that would be in charge. The
9  lieutenant is ultimately in charge and you answer to
10 the lieutenant, but the patrolmen on the shift would
11 report to you first and then to the lieutenant.
12     Q. The sergeant would be on the street?
13     A. A sergeant is a first line supervisor, yes.
14     Q. And the lieutenant would, you said, be a
15 desk lieutenant?
16     A. Yes.
17     Q. How many chiefs have you served under? You
18 mentioned Bratton.
19     A. I think this is my fifth.
20     Q. Can you name them?
21     A. Well, actually it would be as the sixth. I
22 think I was hired by Chief Wayland.
23     Q. Wayland?
24     A. Yes.

Page 35

1      A. Then Bratton came in, then Maloney, then
2  O'Donovan and then O'Loughlin and now Chief Carter.
3      Q. Did you have any relationship with Chief
4  Wayland? Did you know him to speak to him?
5      A. No.
6      Q. What about Chief Maloney?
7      A. I knew Chief Maloney. I had worked for him
8  as an intern when I was in college when he was in
9  Boston.
10     Q. Did you get along with him?
11     A. Yes.
12     Q. Did you consider him a friend?
13     A. No.
14     Q. No problems with him?
15     A. No.
16     Q. What about Chief O'Donovan?
17     A. Just as Chief.
18     Q. Did you get along with him?
19     A. Yes.
20     Q. No problems?
21     A. No, sir.
22     Q. What about Chief O'Loughlin?
23     A. I knew him before he came on the job,
24 basically through family functions, but other than

Page 36

1  that, no.
2      Q. You got along with him?
3      A. Yes.
4      Q. No problems to speak of?
5      A. No.
6      Q. I think it's pretty clear that you have a
7  particular expertise in graffiti investigations; is
8  that right?
9      A. Yes.
10     Q. How did you obtain that expertise? And
11 when?
12     A. I've been investigating graffiti-related
13 crime since 1984. It's mostly experience gained
14 through investigation over the years. I've spent
15 some time with the New York vandal squad. I've had
16 contact with numerous other, for lack of a term,
17 vandal squads throughout the country.
18     Q. Is that who generally conducts graffiti
19 investigations, are vandal squads?
20     A. Yes. The remaining is just self-taught and
21 exposure to the culture.
22     Q. Throughout the course of your career with
23 the MBTA you've done graffiti investigations?
24     A. Yes.

Page 37

1      Q. You like doing it?
2      A. Yes.
3      Q. And you are no doubt good at it?
4      A. Yes.
5      Q. You instruct others?
6      A. Yes.
7      Q. You've testified as an expert witness on
8  graffiti investigations?
9      A. Yes.
10     Q. I'm going to ask you to look at the
11 complaint that we marked as Exhibit 2. Is it 2?
12     A. Yes.
13     Q. I'm going to ask you to turn to paragraph 12
14 and in paragraph 12 it talks about you becoming a
15 lieutenant in 1996; is that correct?
16     A. Yes.
17     Q. Now, what do you have to do to become a
18 lieutenant? You were a sergeant at that point?
19     A. Yes.
20     Q. What do you have to do?
21     A. You take an exam.
22     Q. And is that it? Once you take the exam are
23 you a lieutenant? If you pass?
24     A. At that point in time when I was promoted

Nancy O'Loughlin

Page 38

1    there was an exam and then they establish a
2    promotional list and you are promoted off the list.
3        Q.  How were you placed on the list?
4        A.  According to your grade.
5        Q.  And in other words, you took the exam, you
6    were placed on the list --
7        A.  Promotional list, yes.
8        Q.  And then you were appointed to the position
9    of lieutenant?
10       A.  Yes.
11       Q.  Who appointed you to the position of
12   lieutenant?
13       A.  Chief O'Donovan.
14       Q.  It is also here that you supervise the
15   patrol division.  Is that the desk lieutenant
16   position that you were referring to?
17       A.  Yes.
18       Q.  And what do you do in that position?
19       A.  You monitor the dispatch area and you
20   monitor what's going on in the street.  You are
21   responsible for prisoners and the day-to-day
22   operation.
23       Q.  Did you like the position of desk
24   lieutenant?

Page 39

1        A.  Did I like it?
2        Q.  Yes.
3        A.  It was part of the job.
4        Q.  There are other lieutenants that do
5    different things?  Every lieutenant is not a desk
6    lieutenant?
7        A.  That's correct.
8        Q.  Now, how did you come to be assigned to the
9    position as a desk lieutenant?
10       A.  That was the position that I was given.  I'm
11   assuming it was from the Chief.
12       Q.  You said Chief O'Donovan?
13       A.  Yes.
14       Q.  He didn't discuss it with you?
15       A.  No.
16       Q.  He didn't ask you whether you wanted to be a
17   desk lieutenant?
18       A.  No, sir.
19       Q.  Do you think he was required to do that?
20       A.  I don't know.
21       Q.  It didn't bother you that he didn't ask you
22   whether you wanted to be a desk lieutenant?
23       A.  Did it bother me?
24       Q.  Right.

Page 40

1        A.  No.  As a new lieutenant, absolutely not.
2        Q.  Okay.  Would it have been different if you
3    were a more seasoned lieutenant?  I mean, is that
4    what I should take away from your answer?
5        A.  As a more seasoned lieutenant there would be
6    more opportunities available because you have
7    experience.
8        Q.  A desk lieutenant position is for
9    inexperienced lieutenants?
10       A.  Not necessarily, but as a new lieutenant I
11   was in no position to question anything.
12       Q.  Well, you know, we're going to talk about
13   this whole process a little later, but generally
14   speaking are you in a position to question
15   assignments?  I mean, other than kind of cosmically,
16   but in terms of challenging the Chief about an
17   assignment?
18           MR. NOTIS:  Objection.  Go ahead.
19       A.  Personally I don't question, but it can be
20   done, yes.
21       Q.  What is the mechanism to do it?
22       A.  The lieutenant would appeal up the chain of
23   command.
24       Q.  Okay.  Or you could just go to the Chief and

Page 41

1    ask about it, right?
2        A.  (Witness shook head.)
3            MR. NOTIS:  Answer out loud.
4        A.  No.
5        Q.  You would not do that?
6        A.  You're supposed to adhere to the chain of
7    command.
8            I apologize.
9        Q.  That's all right.
10           Now, as a desk lieutenant how many
11   sergeants generally, and I know it changes, but on
12   average would be under your command roughly?
13       A.  That's hard to say because it changes all
14   the time.  But there would be at least three.
15       Q.  How many patrol offers?
16       A.  It could range anywhere, depending on the
17   shift, from 10 to 30.
18       Q.  Is there a rule of thumb about how many
19   patrol offers each sergeant should supervise?
20       A.  There's generally a span of control.  I
21   believe it's five to one.
22       Q.  What does that mean?
23       A.  Five patrolman to one sergeant.
24       Q.  When you say span of control, what do you

11 (Pages 38 to 41)

Nancy O'Loughlin

Page 38

1  there was an exam and then they establish a
2  promotional list and you are promoted off the list.
3      Q. How were you placed on the list?
4      A. According to your grade.
5      Q. And in other words, you took the exam, you
6  were placed on the list --
7      A. Promotional list, yes.
8      Q. And then you were appointed to the position
9  of lieutenant?
10     A. Yes.
11     Q. Who appointed you to the position of
12 lieutenant?
13     A. Chief O'Donovan.
14     Q. It is also here that you supervise the
15 patrol division. Is that the desk lieutenant
16 position that you were referring to?
17     A. Yes.
18     Q. And what do you do in that position?
19     A. You monitor the dispatch area and you
20 monitor what's going on in the street. You are
21 responsible for prisoners and the day-to-day
22 operation.
23     Q. Did you like the position of desk
24 lieutenant?

Page 39

1      A. Did I like it?
2      Q. Yes.
3      A. It was part of the job.
4      Q. There are other lieutenants that do
5  different things? Every lieutenant is not a desk
6  lieutenant?
7      A. That's correct.
8      Q. Now, how did you come to be assigned to the
9  position as a desk lieutenant?
10     A. That was the position that I was given. I'm
11 assuming it was from the Chief.
12     Q. You said Chief O'Donovan?
13     A. Yes.
14     Q. He didn't discuss it with you?
15     A. No.
16     Q. He didn't ask you whether you wanted to be a
17 desk lieutenant?
18     A. No, sir.
19     Q. Do you think he was required to do that?
20     A. I don't know.
21     Q. It didn't bother you that he didn't ask you
22 whether you wanted to be a desk lieutenant?
23     A. Did it bother me?
24     Q. Right.

Page 40

1      A. No. As a new lieutenant, absolutely not.
2      Q. Okay. Would it have been different if you
3  were a more seasoned lieutenant? I mean, is that
4  what I should take away from your answer?
5      A. As a more seasoned lieutenant there would be
6  more opportunities available because you have
7  experience.
8      Q. A desk lieutenant position is for
9  inexperienced lieutenants?
10     A. Not necessarily, but as a new lieutenant I
11 was in no position to question anything.
12     Q. Well, you know, we're going to talk about
13 this whole process a little later, but generally
14 speaking are you in a position to question
15 assignments? I mean, other than kind of cosmically,
16 but in terms of challenging the Chief about an
17 assignment?
18         MR. NOTIS: Objection. Go ahead.
19     A. Personally I don't question, but it can be
20 done, yes.
21     Q. Okay. What is the mechanism to do it?
22     A. The lieutenant would appeal up the chain of
23 command.
24     Q. Okay. Or you could just go to the Chief and

Page 41

1  ask about it, right?
2      A. (Witness shook head.)
3          MR. NOTIS: Answer out loud.
4      A. No.
5      Q. You would not do that?
6      A. You're supposed to adhere to the chain of
7  command.
8          I apologize.
9      Q. That's all right.
10         Now, as a desk lieutenant how many
11 sergeants generally, and I know it changes, but on
12 average would be under your command roughly?
13     A. That's hard to say because it changes all
14 the time. But there would be at least three.
15     Q. How many patrol offers?
16     A. It could range anywhere, depending on the
17 shift, from 10 to 30.
18     Q. Is there a rule of thumb about how many
19 patrol offers each sergeant should supervise?
20     A. There's generally a span of control. I
21 believe it's five to one.
22     Q. What does that mean?
23     A. Five patrolman to one sergeant.
24     Q. When you say span of control, what do you

Page 42

1  mean?
2      A.  Well, how many he can effectively supervise.
3      Q.  Now, as a desk lieutenant, to whom did you
4  report?
5      A.  I would be reporting to the captain, if
6  there was a captain.  If not a captain, the Deputy
7  Chief.
8      Q.  Were you required to write reports?
9      A.  At times, yes.
10      Q.  What sort of reports generally?
11      A.  Any report that was requested by a superior
12  officer you would have to do.  If there's a special
13  event, you're required to submit a report, an
14  after-action report about the operations.  If
15  there's a problem with a prisoner you are required
16  to generate a report.  If there's a disciplinary
17  problem you are required to generate a report.
18  Anything out of the norm.
19      Q.  What about routine -- were there any
20  standard reports, you know, field strength reports
21  or manpower reports or overtime reports, were there
22  any that you had to generate on a regular basis?
23      A.  There used to be a report that I believe had
24  to be generated on the last half, but that was years

Page 43

1  ago.  I don't recall off the top of my head.  It was
2  different when I was in details, I had reports that
3  had to go in, but I don't think as a desk lieutenant
4  I had reports that had to go in.
5      Q.  Was that the only time you worked as a desk
6  lieutenant?  I'm still thinking about when you first
7  made lieutenant.
8      A.  No.  I did it a couple of times.
9      Q.  And it's been pretty much the same each
10  time?
11      A.  Yes.
12      Q.  Did you like that position?
13      A.  It was tolerable.
14      Q.  I mean, is there anything in particular that
15  you liked about it?
16      A.  No.
17      Q.  Anything that you disliked about it?
18      A.  I liked being in the street.
19      Q.  Why is that?
20      A.  I don't know.  I just liked being in the
21  street.
22      Q.  Now --
23          MR. NOTIS:  Excuse me.  If you don't
24  mind I'd like to take a break for a minute.

Page 44

1          MR. EDWARDS:  Sure.
2          (A recess was taken.)
3  BY MR. EDWARDS:
4      Q.  In your complaint, still on paragraph 12, it
5  mentions that from October 1997 through June 2001
6  you supervised the MBTA's police department's
7  systemwide anticrime unit; is that right?
8      A.  Yes.
9      Q.  And what was the anticrime unit?
10      A.  The anticrime unit was an undercover unit
11  that targeted problem areas.
12      Q.  And how did it target problem areas?
13      A.  You would respond to the area that was
14  having the problem and proactively patrol and deal
15  with any situations that arose.
16      Q.  Now, at the time you were the supervisor of
17  the anticrime unit, who was the Chief?
18      A.  Tom O'Loughlin.
19      Q.  And how did you come to be assigned to that
20  position?
21      A.  By the Chief.
22      Q.  Was that something that you applied for?
23      A.  No.
24      Q.  Who had the position before you?

Page 45

1      A.  There really wasn't one.
2      Q.  An anticrime unit had existed in the past.
3      A.  There was a -- it was an antigraffiti unit.
4  The anticrime work was done on a sporadic basis by
5  the detectives.
6      Q.  So this incarnation of the anticrime unit
7  was new?
8      A.  Yes.
9      Q.  And whose idea was it to create this
10  anticrime unit?
11      A.  The Chief's, I believe.
12      Q.  Now, the Chief asked you if you wanted to
13  head this unit?
14      A.  The Chief basically told me that I was going
15  to.
16      Q.  He sat down and talked to you about it?
17      A.  No.  I was out injured and received a phone
18  call.
19      Q.  And what did the phone call say?
20      A.  That when I returned to duty I would be in
21  charge of an anticrime unit.
22      Q.  Could you have refused the assignment?
23      A.  I believe so.
24      Q.  So, did he ask you if you wanted to do it?

Nancy O'Loughlin

Page 46

1    A.  No.  He basically told me I was going to do
2   it and I just reported and did what I was told.
3    Q.  But you think that had you said I don't want
4   to do it it would have been all right?
5    A.  I think if you  -- I think if I had
6   expressed discomfort or suggested somebody that was
7   more suitable for it, if I didn't feel I could
8   handle it, that he may have taken that into
9   consideration.
10    Q.  Would he have been compelled to take that
11   into consideration?
12    A.  No.
13    Q.  He could have ordered you to take the
14   position?
15    A.  Yes.
16    Q.  Whether you liked it or not?
17    A.  Yes.
18    Q.  Would that have been discriminatory?
19    A.  Would that have been discriminatory?
20    Q.  Had Tom O'Loughlin ordered you to take a
21   position that you didn't want?
22    A.  I think that depends on the circumstances.
23    Q.  Did Tom O'Loughlin tell you why he selected
24   you for that position?

Page 47

1    A.  I think other than saying that he felt that
2   I was suited for the job, no.
3    Q.  Now, when you came back to work from injury
4   leave, did you sit down with the Chief and discuss
5   what this unit was going to do, how it was going to
6   look, how it was going to function?
7    A.  Initially it was myself and another officer.
8   And I believe it was maybe a few weeks after that
9   that I requested through the chain of command to
10   speak to him and informed him that two officers
11   weren't going to work, that we needed more staffing.
12   And he laid out what it was that he wanted done and
13   we went from there.
14    Q.  What did he want done?
15    A.  He wanted quality of life issues addressed,
16   he wanted problem areas addressed, and he wanted a
17   proactive unit.
18    Q.  What are quality of life issues?
19    A.  That would be the disorderly behavior, the
20   fare evasions, things along those lines.
21    Q.  Who was the first officer in the unit along
22   with you?
23    A.  That would be Victor Diaz.
24    Q.  And what was his rank at the time?

Page 48

1    A.  Patrolman.
2    Q.  Did you offer any input to Tom O'Loughlin as
3   to the mission of the anticrime unit?
4    A.  Not that I recall, no.
5    Q.  He pretty much laid out how it was going to
6   be?
7    A.  Yes.
8    Q.  And what it was to do?
9    A.  Yes.
10    Q.  And when you say you responded to problem
11   areas, who defined what the problem areas were?
12    A.  There were several ways.  We would get
13   requests from supervisors or officers that were
14   patrolling in certain areas and we would read the
15   daily journals and identify problem areas.
16    Q.  And we're talking about problem areas for
17   disorderly conduct, fare evasions?
18    A.  It could be problem areas for anything.
19   Yes, disorderly conduct, fare evasions, we looked at
20   robberies, we looked at assaults, we looked at car
21   thefts, we looked at just about everything.
22    Q.  Did you have the authority to choose where
23   you wanted to patrol or set up the anticrime unit
24   from day to day?

Page 49

1    A.  Yes, once I got a standing order for
2   specific...
3    Q.  Now, the Chief gave you more people at some
4   point?
5    A.  Yes.
6    Q.  At its greatest strength, how many officers
7   were members of the anticrime unit?
8    A.  I believe there was ten officers, one
9   sergeant and myself.
10    Q.  And how was your unit deployed?  Everybody
11   together?
12    A.  Pretty much everybody together.
13    Q.  So, it would be 12 people  --
14    A.  Oh, I'm sorry.  I'm sorry.  There was five
15   on days and five on nights.
16    Q.  You were on days?
17    A.  Yes.
18    Q.  So, you would go out with five officers?
19    A.  Yes.
20    Q.  You didn't have to stay back at
21   headquarters?
22    A.  No.
23    Q.  And would the sergeant go with five officers
24   at night?

13 (Pages 46 to 49)

Page 50

1    A. Yes.
2    Q. Who was the sergeant?
3    A. Initially it was Sergeant Spinney. Then he
4  got injured and Sergeant Ventorelli took over.
5         MR. EDWARDS: Would you mark that
6  please.
7         (Exhibit No. 5 marked
8         for identification.)
9  BY MR. EDWARDS:
10    Q. I've handed you yet another organizational
11  chart, Bates number 32808 at the top, or to the
12  right I guess.
13         MR. NOTIS: It's handwritten. It's not
14  stamped but that's the number, correct.
15         MR. EDWARDS: It is handwritten.
16  BY MR. EDWARDS:
17    Q. Over on the left-hand side of this
18  organizational chart in the last row, the second
19  block from the top, under Nadine Taylor-Miller, it
20  says patrol operations and anticrime unit. Is that
21  your unit?
22    A. Yes.
23    Q. So at least in terms of that, is this
24  organizational chart accurate as to where your unit

Page 51

1  fit into the police department as a whole?
2    A. Yes.
3    Q. It was part of the patrol unit?
4    A. Yes.
5    Q. And it's a little confusing here because it
6  appears as if you reported to two different people.
7  Is that correct?
8    A. Yes.
9    Q. You reported to Peter Shaughnessy and Nadine
10  Taylor-Miller?
11    A. Yes.
12    Q. Why did you report to both people?
13    A. One was in charge of days and one was in
14  charge of nights.
15    Q. Okay. And they were both Deputy Chiefs?
16    A. Yes.
17    Q. Which was which? Which was days and which
18  was nights?
19    A. Peter Shaughnessy was days, Taylor-Miller
20  was nights.
21    Q. Now, there are other Deputy Chiefs, William
22  Fleming and Anne McCall are also Deputy Chiefs on
23  this chart?
24    A. Yes.

Page 52

1    Q. Now, did there come a time when you reported
2  directly to Chief O'Loughlin?
3    A. No. I always went to Deputy Chiefs.
4    Q. Was there a time when your reporting path
5  was no longer Peter Shaughnessy or Nadine
6  Taylor-Miller?
7    A. Yes.
8    Q. And on that occasion to whom did you report?
9    A. Deputy Chief Mahoney.
10    Q. Now, was the anticrime unit a uniformed
11  unit?
12    A. No. Plain clothes.
13    Q. Plain clothes. Is it true that officers
14  like plain clothes jobs, generally speaking?
15    A. It depends on the officer.
16    Q. Well, obviously. But generally.
17         MR. NOTIS: Objection.
18    A. It depends on the officer. Some officers
19  like it, some don't.
20    Q. Okay. Now, could you describe for me,
21  please, as best you can, a typical day for the ACU?
22  What happened? You came into headquarters and then
23  what happened?
24    A. We came into headquarters. We decided what

Page 53

1  it is that we were going to do for the day, what
2  area we were going to saturate. We left and went
3  out for the day.
4    Q. And when you say "we decided," it would be
5  you and your unit unless you had a request?
6    A. Yes.
7    Q. And when you say what area to saturate, what
8  does that mean?
9    A. Decide what area or what station or -- if
10  we were going to do the commuter rail or we were
11  going to hit Forest Hills or Quincy Center or what
12  it was we were involved in. If we were doing an
13  operation. What specifically we were targeting and
14  how we were going to target it.
15    Q. Did the anticrime unit conduct any quality
16  of life -- well, it conducted quality of life, it
17  targeted quality of life issues. Was graffiti a
18  quality of life issue that was targeted by the ACU?
19    A. Yes, we dealt with graffiti, yes.
20    Q. Is there any way to give a percentage of
21  time you spent with graffiti, targeting graffiti
22  with the anticrime unit? And you can break it down
23  any way you like.
24    A. It all depended on whether we were having

14 (Pages 50 to 53)

Nancy O'Loughlin

Page 54

1  -- there was a period when we were chasing one
2  particular tagger that was responsible for millions
3  of dollars worth of damage.  Other than that, it was
4  just during the normal course of patrol if you came
5  across it we would document it and start an
6  investigation.
7      Q.  What does the term "zero tolerance" mean as
8  it applied to the ACU?
9      A.  The ACU?  It meant it was a  -- it was a
10  level playing field across the board.  If someone
11  was guilty of trespass, then that person went
12  regardless of who it was.
13      Q.  What do you mean, "went"?
14      A.  Got arrested.
15      Q.  You had no discretion as to whether to
16  arrest?
17      A.  There's always discretion, but for the most
18  part we went out and we hit hard.  And we
19  established ourselves.  And once you establish
20  yourself then you can take a step back and employ
21  more discretion once the rules are known.
22      Q.  I'm going to try to paraphrase that.  You
23  tell me if I misstate it.
24          You would go out, saturate an area,

Page 55

1  arrest on quality of life issues, hit hard, let
2  people know that they would be arrested if they
3  violated these quality of life principles.  And once
4  that was established, then you could exercise a
5  little more discretion in whether to arrest or not?
6      A.  Yes.
7      Q.  Did I misstate anything?
8      A.  That's pretty much it.
9      Q.  Now, was the zero tolerance concept specific
10  just to the ACU or was it departmentwide?
11      A.  I don't think I can answer that.  I don't
12  know.
13      Q.  Okay.  Now, a particularly busy time for the
14  MBTA is during the time school children are using
15  the T back and forth; is that fair to say?
16      A.  Yes.
17      Q.  Would you target areas in which students
18  tended to congregate or tended to play or be
19  boisterous on T property?
20      A.  We targeted areas that were problem areas
21  that we got from the officers that were handling the
22  school breaks.  If they were having problems in a
23  particular area, we went to assist.
24      Q.  Over time did the ACU receive complaints or

Page 56

1  did you become aware of complaints that the ACU was
2  not making quality arrests?  And what I mean by that
3  is, for want of a better word, arrests that did not
4  result in conviction?
5      A.  I don't understand what you're asking me.
6      Q.  Did you ever hear the criticism that the ACU
7  was not making good arrests?
8      A.  Yes.
9      Q.  And where did that criticism come from?
10      A.  It was internal.
11      Q.  Can you identify individuals that made that
12  criticism?
13      A.  I know Lt. McCarthy was very vocal.
14      Q.  To you?
15      A.  Never to me.
16      Q.  So when you say he was vocal, to whom was he
17  vocal?
18      A.  Other members of the department.
19      Q.  And his complaint was that you were not
20  making quality arrests?
21      A.  Yes.
22      Q.  Anyone else?
23      A.  It was just throughout the department.  I
24  can't specifically  -- I know there was another

Page 57

1  sergeant who is retired that was making statements.
2      Q.  Who is that?
3      A.  Mastarelli.
4      Q.  What was McCarthy's position?  We're talking
5  about Tom McCarthy, correct?
6      A.  Yes.
7      Q.  What was his position at the time?
8      A.  I believe he was a lieutenant in charge of I
9  think the Orange Line.
10      Q.  He was a patrol lieutenant?
11      A.  Yes.
12      Q.  Did you hear allegations that the ACU
13  targeted children?  School children?  Targeted
14  school children for arrest.  Have you ever heard
15  that allegation?
16      A.  Yes.
17      Q.  And where did you hear that allegation?
18      A.  It was internal.
19      Q.  And what individuals made that criticism
20  internally?
21      A.  Lt. McCarthy.
22      Q.  Mastarelli as well?
23      A.  Yes.
24      Q.  Anyone else you can think of?

15 (Pages 54 to 57)

Page 58

1      A.  No.
2      Q.  Did you ever discuss that particular
3   allegation with Chief O'Loughlin?
4      A.  No, I don't believe so.
5      Q.  What about the issue of, or the question
6   about quality of arrests raised by McCarthy and
7   Mastarelli?  Did you discuss that with Tom
8   O'Loughlin?
9      A.  No.
10     Q.  Never?
11     A.  No.
12     Q.  And you never discussed that it targeted
13  children with Tom O'Loughlin either?
14     A.  Not to my recollection, no.
15     Q.  Have you ever heard the criticism that the
16  ACU unfairly targeted minority children?
17     A.  Yes.
18     Q.  And from whom did you hear that complaint?
19     A.  I heard it from Lisa Thura-Gray and
20  internally from Lt. McCarthy.
21     Q.  And who is Lisa Thura-Gray?
22     A.  She's a lawyer I think with the Suffolk
23  Juvenile Justice.
24     Q.  And how did you come to be aware of that

Page 59

1   complaint from Lisa Thura-Gray?
2      A.  I think the first I became aware of it was
3   allegations in the newspapers.
4      Q.  Did you discuss that allegation with Tom
5   O'Loughlin?
6      A.  Yes.
7      Q.  When did you discuss that allegation with
8   Tom O'Loughlin?
9      A.  I don't remember.  It was after it surfaced.
10     Q.  More than once you discussed it with him?
11     A.  I'm going to say probably -- probably
12  initially and then one other time.
13     Q.  Twice?
14     A.  Mm-hmm.
15     Q.  Did you ever hear an allegation that the ACU
16  would go to suburban areas to arrest white kids in
17  order to offset the statistics that were heavily
18  weighted toward minority arrests?
19     A.  No.
20     Q.  You never heard that?
21     A.  Never.
22     Q.  Now, you were teased by other officers about
23  your unit, correct?
24     A.  Yes.

Page 60

1      Q.  And what form did that teasing take?
2         MR. NOTIS:  I'm sorry, did you say about
3   her union?
4         MR. EDWARDS:  Unit.
5         MR. NOTIS:  Thank you.
6      A.  There was pages sent out, there was --
7      Q.  I'm sorry, --
8      A.  Pages.  Over the paging system.
9      Q.  What kind of pages?
10     A.  It was just different messages going out.
11  They referred to us as the child abduction unit.
12  There was comments made in the hallways.
13     Q.  Now, how do you send a page?
14     A.  I don't know.  I don't know how to do it, so
15  I don't know how it's sent.  I know that there was
16  some type of a terminal in dispatch, but I don't
17  know if that's the only way they can sent.
18     Q.  You carry the pager?
19     A.  Yes.
20     Q.  And you would receive messages that said
21  what?
22     A.  At times I received them, but I didn't
23  always receive them because there was a way to send
24  it just to patrolmen and not to supervisors, or you

Page 61

1   could send them to individuals.
2      Q.  Okay.  So there were times when you received
3   pages that were critical or teasing about the ACU?
4      A.  Yes.
5      Q.  Child abduction unit is one?
6      A.  Yes.
7      Q.  Any others?
8      A.  I don't recall right now.
9      Q.  And did your officers receive these pages
10  that you didn't get?
11     A.  Yes.
12     Q.  They came and told you?
13     A.  Yes.
14     Q.  What kind of pages did they get?
15     A.  It would be the same type.
16     Q.  And who was sending these pages?
17     A.  I have no idea.
18     Q.  What did you do about that?
19     A.  I believe at some point I reported it.
20     Q.  To whom did you report it?
21     A.  I believe it was Deputy Chief Mahoney.
22     Q.  And when was that?
23     A.  It would have had to have been probably
24  2000.

16 (Pages 58 to 61)

Nancy O'Loughlin

Page 62

1    Q. What did he do about it?
2    A. I don't know.
3    Q. Did you receive a lot of these pages or just
4    every now and then?
5    A. It wasn't consistent but there was enough
6    that it was irritating.
7    Q. And you couldn't tell who was doing it?
8    A. No, sir.
9    Q. You said comments in the hallways. Who made
10   comments in the hallways to you about this --
11   A. You would hear them as you passed. There
12   would be comments about a child abduction unit or
13   there would be comments about why are you doing
14   this, you're just making the Chief look good.
15   Things like that.
16   Q. Why are you doing it? You're just making
17   Chief Tom O'Loughlin look good?
18   A. Yes.
19   Q. How did you understand that? What did you
20   understand that to mean?
21   A. My interpretation?
22   Q. Yes.
23   A. Is that they just wanted us to go out and do
24   nothing.

Page 63

1    Q. The people that were making the comments?
2    A. Yes.
3    Q. And you can't identify anybody that made
4    these comments?
5    A. No.
6    Q. You never confronted anybody about making a
7    comment such as this?
8    A. No.
9    Q. Now, at some point the ACU began receiving
10   criticism from members of the public; is that right?
11   A. Yes.
12   Q. And what was the nature of that criticism?
13   A. That occurred after the black legislative
14   caucus held a hearing at the Dudley library.
15   Q. Why did the black legislative caucus hold a
16   hearing at the Dudley library?
17   A. It was their allegation that we were
18   targeting minority youth.
19   Q. Your unit?
20   A. Yes.
21   Q. I didn't ask you this; I guess I should.
22   Did the ACU target minority youth?
23   A. Absolutely not.
24   Q. Do you know how the black legislative caucus

Page 64

1    came to hold a hearing? Was it a public hearing?
2    A. Yes.
3    Q. Do you know how that public hearing came
4    about?
5    A. No.
6    Q. Did you attend?
7    A. No.
8    Q. Did Chief O'Loughlin attend?
9    A. Yes.
10   Q. And it was then you think the public
11   criticism began, after this hearing?
12   A. Yes.
13   Q. Did the black legislative caucus reach any
14   conclusions as a result of the public hearing?
15   A. I don't know.
16   Q. I don't think I asked you this. You
17   mentioned that you spoke to Tom O'Loughlin twice
18   about the allegation of targeting minority youth.
19   A. Yes.
20   Q. When were those times?
21   A. One was -- the first time was when the
22   allegations first arose. And the second time was
23   when I requested the unit be disbanded.
24   Q. And would the first time have been before or

Page 65

1    after the black legislative caucus?
2    A. I don't remember.
3    Q. Now, aside from teasing and things like
4    that, did any superior officers or any of your peers
5    or any of your subordinates talk to you seriously
6    about allegations around the ACU?
7    A. No.
8    Q. Were you aware of any members of the command
9    staff who were critical of the ACU?
10   A. Command staff being the deputies?
11   Q. Maybe we should clarify language. What is
12   the command staff at the MBTA police department?
13   Who makes up the command staff?
14        MR. NOTIS: Again, can we get a time on
15   your question, please.
16   BY MR. EDWARDS:
17   Q. Does it change over time?
18   A. Yes, depending on the Chief.
19   Q. Okay. Under Tom O'Loughlin, what ranks and
20   who made up his command staff around the time we're
21   talking about here?
22   A. That would have been the Deputy Chiefs and
23   the superintendent.
24   Q. And what time frame are we talking about?

17 (Pages 62 to 65)

Page 66

1  When did the black legislative caucus occur?
2    A. I'm not sure. I think it was early 2001.
3    Q. And who was the superintendent?
4    A. Tom Komola.
5    Q. And who were the deputies?
6    A. It would have been John Mahoney, Ann McCall
7  and William Fleming.
8    Q. Are you aware of any of those individuals
9  being critical of the ACU?
10   A. No.
11   Q. Are you aware of any members of the
12 management of the MBTA being critical of the ACU?
13   A. What do you mean by management?
14   Q. The general manager. Outside of the police
15 department.
16   A. No.
17   Q. Are you aware of criticisms from other
18 officers that members of the ACU had carte blanche
19 to do whatever they wanted without oversight?
20   A. No.
21   Q. You never heard that?
22   A. No.
23   Q. Are you aware of criticisms from other
24 officers that the ACU had unlimited overtime?

Page 67

1    A. No.
2    Q. Did the ACU have unlimited overtime?
3    A. No.
4    Q. Did members of the ACU have the ability to
5  work a lot of overtime?
6    A. They had the ability to work. They had
7  departmentwide work and they had overtime if we were
8  targeting a special area for an operation.
9    Q. Did you work a lot of overtime?
10   A. No, not really.
11   Q. Have you ever heard Tom O'Loughlin tell
12 other officers not to criticize the ACU?
13   A. No.
14   Q. Have you heard of him doing that?
15   A. No.
16   Q. Now, did you have to write reports to Chief
17 O'Loughlin about the activities of the ACU?
18   A. I wrote reports to the Deputy Chiefs.
19   Q. And that would have been Fleming at one time
20 and then --
21   A. It would have been either Shaughnessy or
22 Mahoney or Taylor-Miller.
23   Q. Were these routine reports or reports
24 involving special incidents?

Page 68

1    A. I believe I did a weekly report and then if
2  we had a special operation going I would do an
3  additional report.
4    Q. And by a special operation you mean
5  targeting a specific place for a specific reason?
6    A. Yes.
7    Q. You did stakeout work?
8    A. For car theft, yes.
9    Q. That would be in the parking lots?
10   A. Yes.
11   Q. What about for robberies or pickpockets and
12 things like that?
13   A. There wouldn't necessarily be a stakeout.
14 You would observe in the station, but not a
15 stakeout.
16   Q. That would be not the normal course of doing
17 what you did?
18   A. Yes.
19   Q. Have you ever heard the allegation that ACU
20 was simply out of control?
21   A. No.
22   Q. Have you heard the allegation that the ACU
23 and its members should not be on the street at all?
24   A. No.

Page 69

1    Q. You never heard that?
2    A. No.
3    Q. Now, you mentioned Lisa Thura-Gray. At some
4  point the MBTA was sued by Lisa Thura-Gray, correct?
5    A. Yes.
6    Q. And what was the nature of that lawsuit?
7    A. The allegation that the MBTA was targeting
8  minority youths.
9    Q. Now, after the black legislative caucus
10 there was public criticism, you mentioned, of the
11 ACU?
12   A. Yes.
13   Q. A lot of public criticism, correct?
14   A. A fair amount, yes.
15   Q. Did you personally understand where people
16 were coming from when they were criticizing the ACU?
17   A. I don't --
18   Q. When people were saying the ACU was
19 targeting minorities, they are overzealous -- is
20 that something you heard about the ACU?
21   A. Yes.
22   Q. That, you know, this zero tolerance policy
23 is out of control. Did you hear that?
24   A. Yes.

Nancy O'Loughlin

Page 70

1  Q. Maybe I can phrase it this way: Could you
2  understand how a reasonable person might reach that
3  conclusion, even if you didn't agree with it?
4  A. No.
5  Q. You just thought they were off the wall?
6  A. Yes.
7  Q. Did you ever hear the allegation that you
8  personally were a racist because of the way the
9  policy was implemented?
10  A. No.
11  Q. Did you hear the allegation that members of
12  your unit were racist?
13  A. No.
14  Q. I mean, you had supporters as well?
15  A. Yes.
16  Q. I want to show you something, a letter.
17  (Exhibit No. 6 marked
18  for identification.)
19  BY MR. EDWARDS:
20  Q. Do you recognize this letter and the
21  document attached to it?
22  A. Yes.
23  Q. And what is that?
24  A. The first one is a letter to the general

Page 71

1  manager. The second one, I believe, is a letter
2  that was sent to an editor.
3  Q. Now, who is William Kelley? He appears to
4  be the author of this letter.
5  A. William Kelley is a Boston police officer.
6  Q. The first sentence of the letter, the first
7  page: "Enclosed is the letter which I have sent to
8  both the Boston Globe and Boston Herald defending
9  the efforts and actions of Lt. Nancy O'Loughlin and
10  the MBTA anticrime unit." Do you see that?
11  A. Yes.
12  Q. So he supports you?
13  A. Yes.
14  Q. Third paragraph down, "As for the
15  allegations that she is racist, overzealous, violent
16  and an unsympathetic leader, I beg to differ." And
17  that's what prompted me to ask whether you had heard
18  those allegations. Have you seen this letter
19  before?
20  A. Yes.
21  Q. Now, Mr. Kelley, what is his rank? Is he
22  currently a police officer?
23  A. Yes.
24  Q. What is his rank?

Page 72

1  A. Patrolman.
2  Q. Officer Kelley writes in the fourth
3  paragraph, he says, "In February of 2001 I assisted
4  Lt. O'Loughlin in the execution of a search warrant
5  at the home of a graffiti suspect. The suspect
6  resided in an upscale neighborhood in the town of
7  Melrose. It was obvious from the minute we entered
8  the large Victorian home that the suspect's parents
9  never dealt with police before."
10  Do you see that?
11  A. Yes.
12  Q. Do you recall the incident?
13  A. Yes.
14  Q. Now, I would ask you, the allegations that
15  we were discussing before about the anticrime unit,
16  the targeting minority youth and things like that,
17  we're not talking about an upscale neighborhood of
18  Melrose, correct? We're talking about inner city
19  areas, quote-unquote inner city areas?
20  MR. NOTIS: Objection.
21  A. Yes.
22  Q. What areas are we talking about? Where did
23  the complaint generate from that you were targeting
24  minority youth? What area of Boston, or any other

Page 73

1  city, did those complaints emanate from?
2  A. I believe the majority emanated from Forest
3  Hills.
4  Q. Forest Hills?
5  A. Yes.
6  Q. Any from Roxbury?
7  A. What do you mean by Roxbury?
8  (Pause.)
9  A. I don't know. I believe most of them came
10  from Forest Hills. I believe.
11  Q. They didn't come from Melrose?
12  A. I don't think so but I'm not positive.
13  Q. You heard the allegation that members of
14  your unit were rogue officers?
15  A. Yes.
16  Q. Where did that allegation emanate from? Was
17  it internal, external?
18  A. I don't know.
19  Q. How did you hear it?
20  A. I believe I first heard it from Lisa
21  Thura-Gray.
22  Q. Now, at some point the secretary of
23  transportation, Kevin Sullivan, called for a study
24  dealing with allegations surrounding the ACU; is

19 (Pages 70 to 73)

Nancy O'Loughlin

Page 82

1  it dealt with the other -- there were a hundred
2  complaints or so?
3      A.  I don't believe there were any internal
4  complaints filed.  Citizens complaints.  Let me
5  rephrase that.
6      Q.  I asked you before about your personal
7  stance about being racist and targeting juveniles.
8  And I wanted to ask you whether you understood that
9  if not widespread it was at least a consideration
10 from some quarters that the ACU was a rogue unit?
11 And I'm reading from the fifth paragraph, last
12 sentence, "Speaking about the ACU, it's a rogue unit
13 and Lt. O'Loughlin's one of the worst offenders of
14 them all."
15         Did you understand that you personally
16 were a target, or at least a subject of this
17 controversy, aside from the unit?  You personally.
18     A.  Yes.
19     Q.  Now, this is not being generated internally;
20 would you agree?
21     MR. NOTIS:  What is "this," sir?
22 BY MR. EDWARDS:
23     Q.  The allegation that the ACU was a rogue unit
24 and that Lt. O'Loughlin was one of the worst

Page 83

1  offenders is not being generated from within the
2  department?
3      A.  I don't know that for sure.
4      Q.  Do you have any reason to believe that it
5  is?
6      A.  I believe it was generated from within the
7  department.  I think that's where it all started.
8      Q.  Are we still talking about Tom McCarthy?
9      A.  Yes.
10     Q.  Anybody else?
11     A.  I don't know names, but there were other
12 individuals involved.
13     Q.  How do you know that?
14     A.  Because I know that Lisa Thura-Gray was on a
15 first-name basis with several of our officers.
16     Q.  Which officers?
17     A.  Gregory Lee and Daniel Cartarelli.
18     Q.  And what did that tell you?
19     A.  It told me that Lisa Thura-Gray was talking
20 to members of the department.
21     Q.  And did it tell you that the talk was
22 negative about you and your unit?
23     A.  Absolutely.
24     Q.  But it was a suspicion?  You never overheard

Page 84

1  a conversation?
2      A.  No, I never overheard a conversation.
3      Q.  Did you ever talk to anybody who overheard a
4  conversation or was privy to a conversation?
5      A.  No.
6      Q.  It's just a hunch?
7      A.  It's my belief.
8      Q.  The next paragraph says that the Attorney
9  General's office, the last sentence, has launched a
10 probe into the matter.  Did you know that the
11 Attorney General had initiated an investigation into
12 the complaints that came out of this whole ACU
13 controversy?
14     A.  No.
15     Q.  You've never heard that before?
16     A.  No, other than Lt. McCarthy telling people
17 that.
18     Q.  You thought it was false?
19     A.  I didn't know if it was true or not.  I just
20 know that he said it.
21     Q.  Finally here, the last paragraph, it talks
22 about Chief O'Loughlin and it reads, "Chief
23 O'Loughlin said he didn't want to lay the blame at
24 the feet of just a few officers, saying any

Page 85

1  allegation of harassment or abuse reflects badly on
2  everyone.  If people have issues with police
3  officers, it matters little if it's one or two or
4  three, he said.  I don't want to get into a cliche
5  of saying there's one or two bad apples."
6          My question is whether the Chief ever
7  said to you anything about any of your officers, you
8  have to watch that guy or he's causing us problems,
9  or anything along those lines?
10     A.  No.
11     MR. EDWARDS:  Another article from
12 around the same time period.
13         (Exhibit No. 9 marked
14         for identification.)
15         (Pause.)
16 BY MR. EDWARDS:
17     Q.  You can let me know when you've finished
18 looking that over.
19         (Pause.)
20     Q.  I've just given you another newspaper
21 article dated July 2nd, 2001, Bates stamp number
22 M000668.  And from the first sentence we can see
23 that the article is addressing the reforms called
24 for by the racial profiling task force.  Now you

22 (Pages 82 to 85)

Nancy O'Loughlin

Page 86

1  mentioned before that you knew there was such a
2  thing?
3      A.  Yes.
4      Q.  It was a task force to combat racial
5  profiling is I think the actual name of it.  And at
6  some point that task force made recommendations; is
7  that right?
8      A.  Yes.
9      Q.  Do you recall one of the recommendations
10 being that the T develop an immediate action plan to
11 deal with problem officers?
12     A.  No.
13     Q.  And again, you said that you didn't know
14 anything about complaints against officers being
15 turned over to the Attorney General's office?
16     A.  That's correct.
17     Q.  Thank you.
18         (Exhibit No. 10 marked
19         for identification.)
20 BY MR. EDWARDS:
21     Q.  This is another newspaper article that we've
22 just marked as Exhibit 10, Bates stamp 670, dated
23 July 12, 2001.  And the subject of this article is
24 the appointment by Kevin Sullivan of a superior

Page 87

1  court judge to review civilian complaints filed
2  against MBTA police officers in the past four years,
3  including those alleging racial profiling.  Do you
4  remember such an appointment?  Do you remember a
5  former superior court judge being appointed to do
6  that?
7      A.  Yes.
8      Q.  Rudolph Pierce?
9      A.  Yes.
10     Q.  And do you recall Chief O'Loughlin saying
11 that he welcomed the appointment of Judge Pierce to
12 review the complaints?
13     A.  I don't recall it but I read it here.
14     Q.  Aside from what's here do you have any
15 knowledge of whether Chief O'Loughlin welcomed the
16 study?
17     A.  I have no idea.
18     Q.  What about the study by the task force to
19 combat racial profiling?  Do you know whether Chief
20 O'Loughlin welcomed the appointment of that task
21 force?
22     A.  I have no idea.
23     Q.  What did you think about the appointment of
24 the task force on racial profiling?

Page 88

1      A.  I had no problem with it.
2      Q.  What about this appointment of Rudolph
3  Pierce?
4      A.  I had no problem.
5      Q.  Let's turn to the next page.  There's a
6  statement by Paul Berne of the MBTA police
7  association.  Is that the patrolmen's union?
8      A.  Yes.
9      Q.  Do you know Paul Berne?
10     A.  Yes.
11     Q.  The seventh sentence down, "Berne said most
12 complaints Pierce would investigate stem from the
13 work of the now disbanded undercover unit, which had
14 just 11 officers."  Do you see that?
15     A.  I see it.
16     Q.  That would be your unit?
17     A.  Yes.
18     Q.  Do you know whether most of the complaints
19 were generated by people complaining about your
20 unit?
21     A.  It's not true.  Of the 11 complaints, we
22 dealt with three, one of whom was white.
23     Q.  These are talking about citizen complaints
24 that Judge Pierce is to study?

Page 89

1      A.  I don't believe that statement to be true
2  either.
3      Q.  Okay.  And in the first sentence it says
4  there are 160 complaints.  You don't think that most
5  were generated by ACU members?
6      A.  No.
7      Q.  Berne said that "The unit's hard-line
8  quality of life campaign was orchestrated by
9  O'Loughlin" -- he's talking about Tom O'Loughlin --
10 "and that its work bred animosity between riders and
11 police."
12         Do you believe that the quality of life
13 campaign bred animosity between riders and the
14 police?
15     A.  No.
16     Q.  It was a hard-line quality of life campaign?
17     A.  We were targeting quality of life issues,
18 yes.
19     Q.  And I think the word you used earlier, we
20 went at it hard?
21     A.  Yes.
22     Q.  And the campaign was orchestrated by
23 O'Loughlin  -- I don't know whether you agree or
24 disagree with the word "orchestrated" but I think we

23 (Pages 86 to 89)

Nancy O'Loughlin

Page 90

1  have already established that Chief O'Loughlin
2  created the policy; is that correct?
3      A. He gave me the assignment and I carried it
4  out.
5      Q. You mentioned a few minutes ago that you
6  thought that the complaints about the ACU began
7  internally?
8      A. Yes.
9      Q. And is it fair to say that you think that
10  someone in the police department went to Lisa
11  Thura-Gray and went to the newspapers to speak
12  negatively about the anticrime unit and you?
13      A. I think it occurred. I don't know in what
14  order it occurred. But yes, I do think it occurred.
15      Q. Do you believe that the controversy, once it
16  became public and once it generated the publicity
17  we've looked at, I mean there's much more, we could
18  pull articles from now until the cows come home --
19          MR. NOTIS: Objection.
20          MR. EDWARDS: Can I strike that? That
21  was very silly.
22  BY MR. EDWARDS:
23      Q. Would you agree that this generated a lot of
24  publicity and that what I have shown you is just a

Page 91

1  sample of articles on the ACU and this whole
2  controversy?
3      A. Yes.
4      Q. Once this became a big issue, what do you
5  think were the motives of the public in opposing the
6  anticrime unit? Those members of the public that
7  did in fact oppose the unit, the zero tolerance
8  policy, the quality of life initiative, what were
9  their motives as far as you know?
10      A. I don't know.
11      Q. What were the motives of the black
12  legislative conference in looking at complaints and
13  holding a public hearing?
14      A. I don't know.
15      Q. Do you have any reason to believe it was
16  discrimination against you because of your gender?
17      A. The black legislative caucus?
18      Q. Yes.
19      A. No.
20      Q. Lisa Thura-Gray?
21      A. I don't know.
22      Q. Well, I guess the question -- I'll restate
23  it.
24          Do you have any reason to think that

Page 92

1  Lisa Thura-Gray's opposition to the anticrime unit
2  and the zero tolerance policy and the quality of
3  life initiatives was based on her wanting to
4  discriminate against you on the basis of your
5  agenda?
6      A. I don't think so. But I don't know.
7      Q. Do you think that, given the fact that this
8  was a controversy -- and we looked at the one
9  letter that supported you and we've looked at
10  several articles that opposed the unit, so there
11  were people on both sides of the issue -- do you
12  have any reason to believe that police officers who
13  opposed the unit did so in order to discriminate
14  against you because of your gender?
15      A. Yes.
16      Q. And what gives you that idea? Why do you
17  think that?
18      A. The people that I know, or the person that I
19  know of that was involved doesn't like females.
20      Q. Tom McCarthy?
21      A. Yes.
22      Q. What gives you that impression?
23      A. Personal experience.
24      Q. What personal experience causes you to

Page 93

1  believe that Tom McCarthy doesn't like females?
2      A. After dealing with him for almost 22 years.
3      Q. Well, do you have any specific examples?
4      A. Referring to a female officer as a useless
5  piece of blankety. A useless piece of S-H-I-T.
6          MR. NOTIS: Why don't we just get the
7  words on the record here.
8          THE WITNESS: Well, I don't want to
9  offend anybody.
10          MR. NOTIS: I don't think anybody will
11  be offended as long as you're comfortable saying
12  that.
13          (Discussion off the record.)
14  BY MR. EDWARDS:
15      Q. To whom was he referring when he said that?
16      A. An officer by the name of Irene Reardon.
17      Q. When was that?
18      A. It was a few years back. I don't recall
19  exactly.
20      Q. Have you ever heard him use similar words
21  about male officers?
22      A. Not to that extent, no.
23      Q. To what extent have you heard --
24      A. Calling them useless pieces of --

24 (Pages 90 to 93)

Nancy O'Loughlin

Page 106

1    Q.  Right.  About having to resort to asking
2  that you be disbanded?
3    A.  I was more disappointed.
4    Q.  Disappointed in whom?
5    A.  Disappointed that professional police
6  officers would conduct themselves in that manner.
7    Q.  In what manner?
8    A.  In a manner where jealousy and personal bias
9  ruled their decisionmaking.
10    Q.  And who are we talking about here?
11    A.  We're talking about the McCarthy and the
12  other people that caused the problem.
13    Q.  Well, those aren't the people that caused
14  -- they didn't make you ask to have the unit
15  disbanded, did they?
16    A.  No.  You asked me how I felt.  That's how I
17  felt.  I felt disappointed.
18    Q.  Did any of your officers express anger at
19  the unit being disbanded?
20    A.  I'm going to classify their reactions more
21  as disappointment also.
22      (Exhibit No. 12 marked
23      for identification.)
24  BY MR. EDWARDS:

Page 107

1    Q.  I'm just going to ask you a couple of
2  questions about this document I just handed you.  Do
3  you recognize this document?
4    A.  It's the report of the task force on
5  combating racial profiling.
6    Q.  It's dated March 2002?
7    A.  Yes.
8    Q.  This was before the unit was disbanded,
9  correct?
10    A.  No, I believe that was after.
11    Q.  Okay.  Now, have you read this report
12  before?
13    A.  I believe I read it once before.
14    Q.  When would that have been?
15    A.  Back in March 2002.
16    Q.  Do you recall how you received this report?
17    A.  No, I don't.
18    Q.  Did you speak with Tom O'Loughlin about this
19  report?
20    A.  I don't believe so.
21    Q.  I'm looking at page 7, which includes an
22  executive summary of the report.  And I'm not going
23  to go through the whole report, I just want to --
24  if you'd like, you can kind of skim the summary

Page 108

1  because I have a couple of questions about it, just
2  so you'll have some context for my questions.
3      (Pause.)
4  BY MR. EDWARDS:
5    Q.  If it makes more sense, Officer O'Loughlin,
6  I can ask specific questions and if you need context
7  we can take time to let you read it.  Do you have a
8  preference?
9    A.  No.  Whatever you want.
10    Q.  I'm looking at the fourth paragraph, which
11  begins "In the spring of 2001..." -- do you see
12  that?
13    A.  Yes.
14    Q.  -- "public attention intensified and
15  included a hearing before the Massachusetts black
16  legislative caucus at the Dudley library."  We
17  already referenced that.  You understood that that
18  happened?
19    A.  Yes.
20    Q.  In response to complaints that the MBTA
21  police and your unit were engaged in racial
22  profiling and in an aggressive zero tolerance arrest
23  policy.  I'm paraphrasing that sentence but we've
24  already established that.

Page 109

1      MR. NOTIS:  Objection.  Is there a
2  question?
3      MR. EDWARDS:  Well, that's the preface
4  to the question.
5  BY MR. EDWARDS:
6    Q.  Have we established that this legislative
7  caucus occurred at the Dudley library?  We talked
8  about it earlier, right?
9    A.  Yes.
10    Q.  And do you agree with me that it came out of
11  the complaint lodged against the police department
12  saying that officers were racial profiling and they
13  were pursuing an aggressive zero tolerance policy,
14  right?
15    A.  I don't know what it came out of, but that's
16  what they were alleging.
17    Q.  I direct your attention to the last
18  paragraph, which I would suggest is the beginning of
19  the conclusions of the  -- the summary of the
20  conclusions of the task force.  The paragraph that
21  begins with the word "regardless."  Do you see that?
22    A.  Yes.
23    Q.  "Regardless, it is clear there is a
24  perception of racism.  This perception and an

28 (Pages 106 to 109)

Nancy O'Loughlin

Page 106

1    Q.  Right.  About having to resort to asking
2  that you be disbanded?
3    A.  I was more disappointed.
4    Q.  Disappointed in whom?
5    A.  Disappointed that professional police
6  officers would conduct themselves in that manner.
7    Q.  In what manner?
8    A.  In a manner where jealousy and personal bias
9  ruled their decisionmaking.
10    Q.  And who are we talking about here?
11    A.  We're talking about the McCarthy and the
12  other people that caused the problem.
13    Q.  Well, those aren't the people that caused
14  -- they didn't make you ask to have the unit
15  disbanded, did they?
16    A.  No.  You asked me how I felt.  That's how I
17  felt.  I felt disappointed.
18    Q.  Did any of your officers express anger at
19  the unit being disbanded?
20    A.  I'm going to classify their reactions more
21  as disappointment also.
22      (Exhibit No. 12 marked
23      for identification.)
24  BY MR. EDWARDS:

Page 107

1    Q.  I'm just going to ask you a couple of
2  questions about this document I just handed you.  Do
3  you recognize this document?
4    A.  It's the report of the task force on
5  combating racial profiling.
6    Q.  It's dated March 2002?
7    A.  Yes.
8    Q.  This was before the unit was disbanded,
9  correct?
10    A.  No, I believe that was after.
11    Q.  Okay.  Now, have you read this report
12  before?
13    A.  I believe I read it once before.
14    Q.  When would that have been?
15    A.  Back in March 2002.
16    Q.  Do you recall how you received this report?
17    A.  No, I don't.
18    Q.  Did you speak with Tom O'Loughlin about this
19  report?
20    A.  I don't believe so.
21    Q.  I'm looking at page 7, which includes an
22  executive summary of the report.  And I'm not going
23  to go through the whole report, I just want to --
24  if you'd like, you can kind of skim the summary

Page 108

1  because I have a couple of questions about it, just
2  so you'll have some context for my questions.
3      (Pause.)
4  BY MR. EDWARDS:
5    Q.  If it makes more sense, Officer O'Loughlin,
6  I can ask specific questions and if you need context
7  we can take time to let you read it.  Do you have a
8  preference?
9    A.  No.  Whatever you want.
10    Q.  I'm looking at the fourth paragraph, which
11  begins "In the spring of 2001..." -- do you see
12  that?
13    A.  Yes.
14    Q.  -- "public attention intensified and
15  included a hearing before the Massachusetts black
16  legislative caucus at the Dudley library."  We
17  already referenced that.  You understood that that
18  happened?
19    A.  Yes.
20    Q.  In response to complaints that the MBTA
21  police and your unit were engaged in racial
22  profiling and in an aggressive zero tolerance arrest
23  policy.  I'm paraphrasing that sentence but we've
24  already established that.

Page 109

1      MR. NOTIS:  Objection.  Is there a
2  question?
3      MR. EDWARDS:  Well, that's the preface
4  to the question.
5  BY MR. EDWARDS:
6    Q.  Have we established that this legislative
7  caucus occurred at the Dudley library?  We talked
8  about it earlier, right?
9    A.  Yes.
10    Q.  And do you agree with me that it came out of
11  the complaint lodged against the police department
12  saying that officers were racial profiling and they
13  were pursuing an aggressive zero tolerance policy,
14  right?
15    A.  I don't know what it came out of, but that's
16  what they were alleging.
17    Q.  I direct your attention to the last
18  paragraph, which I would suggest is the beginning of
19  the conclusions of the  -- the summary of the
20  conclusions of the task force.  The paragraph that
21  begins with the word "regardless."  Do you see that?
22    A.  Yes.
23    Q.  "Regardless, it is clear there is a
24  perception of racism.  This perception and an

28 (Pages 106 to 109)

Nancy O'Loughlin

Page 110

1  aggressive stance toward youth have eroded public
2  confidence in the MBTA police department."
3      Did you understand that sentence to be
4  one of the conclusions of this task force at the
5  time?
6      A. I understand it to be the task force
7  conclusion, yes.
8      Q. That there is a perception of racism,
9  correct?
10     A. Yes.
11     Q. The report doesn't say that there was
12  racism?
13     A. That's correct.
14     Q. Next sentence: "Moreover, many believe
15  aggressive implementation of a zero tolerance
16  policy, along with other practices of the MBTA
17  police, had a racially discriminatory impact."
18     Was it your understanding, then, that
19  the sentence I just read was a conclusion of this
20  task force?
21     A. Yes.
22     Q. Next sentence: "While it is not clear what
23  motivated the MBTA police to arrest children, a
24  violation of law, racism, cultural ignorance, lack

Page 111

1  of training or an inability to deal with youth, it
2  appears the current philosophy and approach by the
3  MBTA police has created more problems than it sought
4  to solve and was implemented to the detriment of
5  children, particularly children of color."
6      Did you understand that to be a
7  conclusion of the task force back then?
8      A. Yes.
9      Q. Did you agree with either of those three
10  conclusions we just discussed?
11     A. No.
12     Q. Do you understand how reasonable people
13  could reach that conclusion?
14     A. No.
15     Q. Top of the next page", The task force found
16  that in an effort to reduce crime on the MBTA and
17  respond to citizen complaints about youth on the
18  system, the MBTA chose and implemented a particular
19  strategy. There is more than one way to reduce
20  crime. The path the MBTA police chose, zero
21  tolerance/quality of life, may have been successful
22  in reducing crime but has created such animosity in
23  some communities the task force believes it cannot
24  be viewed as a crowning achievement but rather a

Page 112

1  failure and an endeavor that has resulted in issues
2  elsewhere."
3      Did you understand that to be a
4  conclusion of the task force back at the time?
5      A. Yes.
6      Q. The next paragraph, just the last sentence
7  -- second sentence, "After six months of review,
8  testimony and discussion, the task force on
9  combating racial profiling believes there has been a
10  systemic failure on the part of the MBTA police
11  department to deal effectively with youth abusing
12  the system regardless of race or ethnicity."
13     Did you understand that to be a
14  conclusion?
15     A. Yes.
16     Q. Now, the task force makes recommendations
17  and I'm going to direct your attention to the
18  next-to-the-last paragraph.
19     "To regain public trust, improve staff
20  morale and strengthen relations with customers, the
21  task force feels the MBTA needs to reorient the
22  entire department in a way that both minimizes crime
23  on the system while being respectful and sensitive
24  to the communities it serves."

Page 113

1      Did you understand back in 2002 that the
2  sentence I just read was a recommendation of the
3  task force?
4      A. Yes.
5      Q. Is it your opinion that the controversy
6  surrounding the ACU, the zero tolerance policy and
7  and the quality of life initiative, negatively
8  impacted the morale of MBTA officers?
9      A. My opinion?
10     Q. Sure.
11     A. I don't know if I have an opinion on that.
12     Q. Did you see any morale problems that you can
13  reasonably attribute to the controversy surrounding
14  the ACU?
15     A. No.
16     Q. Did you think or have reason to believe that
17  there was a negative impact on the trust of the
18  public in the MBTA police department because of the
19  issues that we've been talking about, the perception
20  of racial profiling and those things?
21     A. No.
22     Q. Then would it be fair to say that you didn't
23  see a need for the MBTA to reorient the entire
24  department in a way that minimizes crime on the

29 (Pages 110 to 113)

Nancy O'Loughlin

Page 126

1  We are talking about, you will see if
2  you read it, arrests, disorderly conduct,
3  trespassing, resisting arrest.
4  "While this motivation may produce
5  arrests, bookings and temporary incarcerations and
6  thereby show who was in charge, it also produces
7  angry parents, agitation from community groups,
8  complaints filed with the department and local
9  politicians and the inevitable lawsuits."
10  Was that your experience with the ACU?
11  I mean, we can skip the part about demonstrating
12  machismo, but dealing with juveniles harshly and
13  producing arrests, bookings, was it your experience
14  that it produced angry parents, agitation from
15  community groups, complaints filed with the police
16  department, local politicians and lawsuits?
17  A.  No.  Not in the majority of cases, no.
18  Q.  Page 20, just to wrap this up.  The second
19  paragraph.  Second part of the second -- second
20  clause of the second paragraph -- first paragraph:
21  I began to wonder if MBTA police officers' constant
22  exposure to the typical problems that arise on the
23  trains and in the MBTA stations, parking lot or
24  along its right of way (i.e. trespass, loitering,

Page 127

1  fare evasion and vandalism) presented mostly by
2  young people caused these officers to lose the
3  ability to differentiate between these misdemeanors
4  and other more serious offenses.  Hence, arrest
5  becomes the method of choice for resolving these
6  situations for some officers when alternative
7  methods may be just as effective.
8  The first question is do you remember
9  hearing anything along those lines back in 2001,
10  whether or not you read it in this report, that T
11  officers sometimes didn't distinguish between
12  serious and minor offenses?
13  A.  No.
14  Q.  Do you believe that -- let me ask it this
15  way:  Have you ever seen an officer or had to
16  counsel an officer about the difference between
17  serious stuff and minor stuff?
18  A.  No.
19  Q.  Every officer you've dealt with understands
20  the difference between serious and minor offenses?
21  A.  Yes.
22  Q.  Is that because of his training at the MBTA?
23  A.  It's because you need to know that as a
24  police officer.  It's inherent in your academy

Page 128

1  training.
2  Q.  So you're trained at the academy in
3  recognizing the difference between minor and
4  serious?
5  A.  Yes.
6  Q.  Thank you.
7  Did you think that the discussions about
8  the ACU was legitimate public matter, a legitimate
9  public debate?
10  A.  I don't know what you're asking me.
11  Q.  Was it a bona fide debate or was it a sham?
12  Was somebody making it into something it shouldn't
13  be?
14  A.  I think it was made into something it
15  shouldn't be.
16  Q.  Do you believe that the controversy had a
17  harmful effect on the MBTA?
18  A.  No.
19  Q.  Do you think the controversy, whether true
20  or not, whether there was racial profiling or not,
21  that's not my issue, do you believe the controversy
22  negatively impacted the public perception of the
23  MBTA?
24  A.  No.

Page 129

1  Q.  Do you think the controversy negatively
2  impacted Tom O'Loughlin's career?
3  A.  I don't know that.
4  Q.  You never discussed it with him?
5  A.  No.
6  Q.  Is it important for a police department, any
7  police department, to have a harmonious relationship
8  with the people in the communities it serves?
9  A.  Yes.
10  Q.  Why is that important?
11  A.  You have to work together for the greater
12  goal.
13  Q.  Do you think that back around the time of
14  the ACU that the ACU in particular and the MBTA
15  police in general had a harmonious relationship with
16  each of the communities it served?
17  A.  I know as commander of the ACU I had
18  relationships with a lot of community groups that I
19  had no problem with.
20  Q.  Do you believe that the controversy
21  surrounding the ACU negatively impacted your career?
22  A.  Yes.
23  Q.  How?
24  A.  I think I was punished for it.

33 (Pages 126 to 129)

Nancy O'Loughlin

Page 130

1    Q. How were you punished?
2    A. My reassignment to details. I think this
3  whole thing stems --
4    Q. I'm sorry?
5    A. I think this whole situation stems back
6  then.
7    Q. Why do you think that?
8    A. It's just my opinion.
9    Q. Well, what have you seen, heard or read that
10  causes you to believe that?
11    A. Well, let's see. I was summarily executed
12  for having an opinion, partaking in a private phone
13  conversation when there's been far greater wrongs
14  done that weren't dealt with, even remotely the
15  same.
16    Q. Now, let's deal with these one at a time.
17  You mentioned detail unit first and I'd kind of like
18  to focus on that. How did the detail unit go back
19  to the ACU, in your opinion?
20    A. In my opinion, Chief Carter was brought on
21  board as a result of the controversy and in his
22  position as chief he set out to send me a message
23  based on the ACU and coupled with the fact that he
24  has a problem with females.

Page 131

1    Q. So it's both?
2    A. Yes.
3    Q. It's two things?
4    A. Yes.
5    Q. And what was the message that he was sending
6  you about the ACU?
7    A. That he was going to set me straight that he
8  didn't agree with our practices or punish me for the
9  negative publicity, or whatever you want to say.
10  That's my belief.
11    Q. The ACU was gone, right?
12    A. Temporarily disbanded.
13    Q. Okay. Back in 2001?
14    A. Mm-hmm.
15    Q. And it was not reinstated?
16    A. No.
17    Q. Was it?
18    A. No.
19    Q. Chief Carter came on board in 2003, correct?
20    A. Yes.
21    Q. And it is your testimony that he put you in
22  the detail unit as punishment for the ACU?
23    A. As well as his dislike for females. That
24  was after he disbanded my unit.

Page 132

1    Q. Okay. We'll talk about that.
2      But suffice it to say, just to wrap up
3  for now, is it your testimony that Chief Carter had
4  -- I mean, why would he punish you for the ACU? I
5  mean, why do you think he would punish you for the
6  ACU?
7    A. I have no idea why he would. But that's my
8  belief.
9    Q. Okay. Did he ever say that to you?
10    A. I never spoke to the man.
11    Q. Ever?
12    A. With the exception of arbitration.
13    Q. You've never said hello to him?
14    A. I never -- I've never seen him.
15    Q. What do you mean you've never seen him?
16    A. I'm not assigned to headquarters and in my
17  interim at headquarters he never dealt with me. He
18  dealt with my male subordinates.
19    Q. So from the time Chief Carter came on board
20  until now you have never spoken to him?
21    A. Never. Except at the arbitration.
22    Q. And that was less than a month ago? Or --
23    A. Back in May.
24    Q. Back in May.

Page 133

1    A. I'm sorry; when he reassigned me. I spoke
2  to him that day too.
3    Q. Reassigned you?
4    A. When he reassigned me from detectives to the
5  detail office.
6    Q. You spoke with him?
7    A. Yes. Or he spoke with me. I actually
8  didn't do any talking.
9    Q. Why not?
10    A. Not my place.
11    Q. What does that mean?
12    A. It means it's not my place. I get my orders
13  and I follow my orders. It's not my place.
14    Q. Okay. Now you said -- did you ever attempt
15  to speak to Chief Carter about anything?
16    A. No.
17    Q. And you are saying that he never attempted
18  to speak to you ever?
19    A. That's correct.
20    Q. He never said hello to you?
21    A. No.
22    Q. And to what do you attribute that?
23    A. I attribute it to the fact that he doesn't
24  like females.

34 (Pages 130 to 133)

Nancy O'Loughlin

Page 134

1   Q. Why do you think that?
2   A. Because he went around me and dealt with my
3   male subordinates all the time.
4   Q. But even that, assuming  -- I am not going
5   to concede that that's true, but let's say it's
6   true. Why does that tell you he doesn't like women?
7   A. If I'm the commander of the unit, chain of
8   command, you deal with the commander of the unit.
9   You do not go by the commander of the unit and deal
10  with a lesser supervisor. It's strictly chain of
11  command. And he went by me and dealt with a lesser
12  supervisor because he was a man.
13  Q. Okay. Chief Carter has a woman on his
14  command staff?
15  A. That is correct.
16  Q. He appointed her?
17  A. That's correct.
18  Q. How does that square with your theory that
19  he just doesn't like women?
20  A. I don't think he had a choice. She sued the
21  MBTA for discrimination in the past.
22  Q. So?
23  A. I don't think he had a choice. I think he
24  appointed her because he was told to appoint her.

Page 135

1   Q. Why do you think that?
2   A. That's just my belief.
3   Q. I mean, do you have a factual basis for --
4   other than a hunch?
5   A. That's my belief, sir.
6   Q. Let me phrase it like this: Can you point
7   to any act, word, writing that suggests or hints at
8   Chief Carter being forced to appoint a woman to his
9   command staff?
10  A. Well, there's an Attorney General's decree
11  about discrimination. I don't know if that has
12  staffing involved in it. So I don't know how to
13  answer that question. I don't know, would be my
14  answer.
15  Q. Well, the decree is not specific to the
16  police department, is it?
17  A. I've never seen the decree. I think it's
18  T-wide but I don't know if it specifically mandates
19  staffing, so I don't know.
20  Q. I'm just going to -- I want to wrap this
21  up. We've spent enough time on it.
22      I just want to ask you, would the ACU
23  have created a controversy and ultimately been
24  disbanded, in your opinion, had it been commanded by

Page 136

1   a man?
2   A. No.
3   Q. Okay.
4   A. Can I have a quick bathroom break?
5   Q. Absolutely.
6       (A recess was taken.)
7
8   BY MR. EDWARDS:
9   Q. After the ACU was disbanded, you went back
10  to the patrol unit?
11  A. Yes.
12  Q. Is that the order transferring you back?
13  A. Yes.
14  Q. Signed by Chief O'Loughlin?
15  A. Yes.
16  Q. Now, is this the --
17      MR. NOTIS: Are we going to mark this?
18      (Exhibit No. 14 marked
19      for identification.)
20  BY MR. EDWARDS:
21  Q. We spoke this morning about a second time
22  you were desk lieutenant. Is that this time?
23  A. Yes.
24  Q. Now, this is June 7th, 2001, this order.

Page 137

1   This was right after the ACU was disbanded or right
2   around that time?
3   A. Yes.
4   Q. Now, did you talk to Tom O'Loughlin about
5   this assignment prior to him making it?
6   A. About where he was going to assign me?
7   Q. Yes.
8   A. No.
9   Q. Did he ask you if you wanted to be assigned
10  to the position of desk lieutenant?
11  A. No.
12  Q. Should he have?
13  A. If he had, I would have expressed, but did
14  he have to?  No.
15  Q. You would have expressed?
16  A. I would have expressed whatever it was I was
17  looking for.
18  Q. Oh, you would have told him what you wanted?
19  A. Yes.
20  Q. But once he made the assignment -- well,
21  actually, how do you find out about assignments like
22  this?
23  A. This is how you find out.  (Indicating)
24  Q. I mean, you find out the day it comes out?

35 (Pages 134 to 137)

Nancy O'Loughlin

Page 138

1    A. It came out the 7th. Well, I would have got
2  a phone call at some point prior to that, either
3  from a deputy or a captain, saying effective this
4  date this is where you will be.
5    Q. Now, this is dated June 7th and it's
6  effective the same date. Was that a problem?
7    A. Well, it was a Monday through Friday, so I
8  would have to look back. Usually assignments take
9  effect on Saturday, because the pay period runs
10 Saturday through Friday.
11   Q. But what I'm asking is just because it takes
12 effect immediately?
13   A. No. That was at my request, that it take
14 effect immediately.
15   Q. So you knew about it ahead of time and --
16   A. No. When I turned in the resignation or the
17 disbandment for the anticrime I requested that it
18 take effect immediately, so that my reassignment
19 would be immediate.
20   Q. Why did you do that?
21   A. I just felt it was necessary.
22   Q. It's not customary for reassignments to take
23 place immediately?
24   A. No. It's customary for reassignments to

Page 139

1  take place on a Saturday.
2    Q. But obviously they can take place
3  immediately?
4    A. Yes.
5    Q. Now, this OIC, is that officer in charge?
6    A. Yes.
7    Q. And that's the equivalent of desk
8  lieutenant?
9    A. Yes.
10   Q. Did you hand Tom O'Loughlin the letter?
11   A. Yes.
12   Q. And did he read it while you were there?
13   A. Yes.
14   Q. Did he make any comment on it?
15   A. Not that I recall.
16   Q. I mean, you just stood there and he said
17 nothing?
18   A. I don't remember what he said.
19   Q. Now, there's a night desk lieutenant as well
20 as a day?
21   A. Yes.
22   Q. And you didn't have a problem with the
23 position even though you would have rather been on
24 the street?

Page 140

1    A. Right.
2    Q. Going back to the complaint, paragraph 12.
3  I'm going to look at the second part, the part on
4  page 4.
5    MR. NOTIS: Which is the complaint?
6    MR. EDWARDS: That's Exhibit 2, the
7  complaint.
8    A. I'm sorry, what page?
9    Q. Page 4, which is actually the second --
10 it's part of paragraph 12. You talk about, in the
11 last sentence, that you were in charge of a division
12 in the detective unit from August 2002 through
13 February 2003, right?
14   A. Yes.
15   Q. And what was this division?
16   A. Actually there's -- it should be I believe
17 -- well, it might have been early February. It was
18 the antigraffiti commuter rail division. It was
19 like a vandalism squad.
20   Q. Who had been in command of that division
21 prior to you taking it over?
22   A. There wasn't any.
23   Q. So this was another new unit for you?
24   A. Yes. Well, strike that. I had -- back in

Page 141

1  like '93, '94 I did a systemwide antigraffiti unit,
2  but that got disbanded in '96 when I got promoted.
3  So this could be kind of a continuation of that.
4    Q. Well, that was under a different Chief?
5    A. Yes.
6    Q. Did you approach Chief O'Loughlin about this
7  division?
8    A. No.
9    Q. He just decided to do it and put you in
10 charge of it?
11   A. Yes.
12   Q. Did you discuss it with him, I guess is a
13 better question.
14   A. No, I didn't.
15   Q. Did you tell him at any time that you were
16 ready to move from patrol?
17   A. No.
18   Q. Now, how many officers were in this unit?
19   A. I had myself and two officers.
20   Q. And who were those officers?
21   A. Victor Diaz and Dan Sullivan.
22   Q. Diaz had been in the ACU, correct?
23   A. Yes.
24   Q. Had Sullivan been in the ACU?

36 (Pages 138 to 141)

Nancy O'Loughlin

Page 146

1  Q.  And I'm talking about --
2  A.  Just like an activity report.
3  Q.  What is that?
4  A.  Like a synopsis of your activity for the
5  week.
6  Q.  Okay.  Did you submit reports to him for
7  unusual things?
8  A.  Yes.
9  Q.  But the regular report was an activity
10 report once a week?
11 A.  More or less, yes.
12 Q.  Anything you disliked about that position?
13 A.  No.
14 Q.  Loved it?
15 A.  I liked it.
16 Q.  When did Chief O'Loughlin leave the MBTA?
17 A.  I think it was in late 2002.  But I'm really
18 not sure exactly when he left.  I know it was 2002,
19 but I don't know when.
20 Q.  Okay.  When was this anti graffiti squad
21 created?
22 A.  I think in August.
23 Q.  Was it just before the Chief left?
24 A.  It was either just before or just after.  I

Page 147

1  don't recall if he was there or had just left.  I
2  think it was just before he left.  I think it was
3  just before he left.
4  Q.  And you made the decision on what the
5  division did each day?
6  A.  Yes.
7  Q.  Was it something that the three of you
8  discussed?  Did the other officers have a say or did
9  you pretty much decide?
10 A.  No, it was pretty open.  I'd discuss it with
11 them.
12 Q.  In that position did you have the authority
13 to approve overtime?
14 A.  No.  It had to go through the deputy.
15 Q.  The deputy never delegated to you the
16 authority?
17 A.  No.  I always checked with him before.
18 Q.  What about with the ACU?
19 A.  The ACU, I believe I checked with the deputy
20 too before I...
21 Q.  Did you yourself work a lot of overtime?
22 A.  With the vandal squad I worked more than I
23 did with the anticrime.
24 Q.  Okay.  You essentially assigned yourself

Page 148

1  overtime, correct?
2  A.  Yeah.  I'd get it approved, yes.
3  Q.  Now, were you aware of complaints about the
4  antigraffiti squad?
5  A.  No.
6  Q.  None?
7  A.  No.
8  Q.  Well, I'll go through it anyway.
9      You've never heard anybody say that that
10 squad had unlimited overtime and the other officers
11 were resentful?
12 A.  No.
13 Q.  Did you ever hear that those officers
14 weren't pulling their weight in the detective
15 division?
16 A.  No.
17 Q.  I mean, you were part of the detective
18 division?
19 A.  We were separate.  We worked out of the
20 detective unit, but we were separate.
21 Q.  You were detectives, though, right?
22 A.  Yes.  But we were specifically geared toward
23 the commuter rail, so we handled the commuter rail
24 section.

Page 149

1  Q.  Who was in charge of the detective unit?
2  A.  At that point I believe it was Sergeant
3  Gillespie.  And there was a lieutenant on nights,
4  Lt. Leuchte.  L-E-U-C-H-T-E.
5  Q.  Now, Sergeant Mark Gillespie?
6  A.  Yes.
7  Q.  Are you and Gillespie contemporaries?  You
8  came on the force around the same time?
9  A.  Yes.
10 Q.  The same with Fleming?
11 A.  Yes.
12 Q.  How many detectives were in the detective
13 unit at the time, if you recall?
14 A.  I don't recall.
15 Q.  Did you get along with Gillespie?
16 A.  Yes.
17 Q.  Were you friends?
18 A.  No.
19 Q.  I mean social friends.
20 A.  No.
21 Q.  Did anybody ever tell you or did you ever
22 hear that the antigraffiti squad should be
23 disbanded?
24 A.  No.

38 (Pages 146 to 149)

Nancy O'Loughlin

Page 158

1    Q.  Did you think Chief Carter was a good choice
2   for Chief?
3    A.  I think Billy Fleming should have gotten the
4   job.
5    Q.  But I'm asking now about your opinion about
6   Chief Carter.
7    A.  At that point I didn't have an opinion.
8    Q.  Why do you think the MBTA chose Chief Carter
9   for its Chief?
10    A.  I don't know.
11    Q.  No opinion?
12    A.  No.
13    Q.  Do you think he was a deserving candidate?
14    A.  I don't think I'm qualified to answer that.
15    Q.  Well, you're qualified to have an opinion.
16    A.  I don't know.
17    Q.  Okay.  Did you ever say or did you ever
18   hear anybody say at the MBTA that Chief Carter
19   was selected for the position because of his race?
20    A.  Yes.  I've heard it as scuttlebutt, yes.
21    Q.  He's African-American, correct?
22    A.  Yes.
23    Q.  When you say you've heard it as scuttlebutt,
24   who did you hear say that?

Page 159

1    A.  I don't recall who said it.  I just know
2   I've heard it.
3    Q.  Did you ever say it?
4    A.  No.
5    Q.  Do you think that?
6    A.  I don't know.
7    Q.  Do you know anything about what Chief Carter
8   was told coming into the department about problems,
9   what he could expect in dealing with the police
10   department and things like that?
11    A.  No.
12    Q.  Any idea what his mandate was or what he saw
13   as his mandate coming into the department?
14    A.  No.
15    Q.  Did anybody say or did you hear anybody
16   express the opinion that Chief Carter wasn't
17   qualified to be Chief of the MBTA?
18    A.  No, I don't think I heard that.
19    Q.  Never?
20    A.  No, I don't believe I did.
21    Q.  When Chief Carter came on board, were you
22   ever present at a meeting when he discussed his
23   expectations, what he saw as his mandate?
24    A.  I think he had one staff meeting.  But I'm

Page 160

1   not positive.
2    Q.  What do you mean, all staff?
3    A.  Yes.
4    Q.  How many officers are there?
5    A.  I think there's like 184 officers.
6    Q.  Now, at some point you and other supervisors
7   were asked to respond to certain questions
8   Chief Carter had about issues with your command,
9   your vision of the department, whether you had
10   morale problems.  There was a series of questions,
11   right?
12    A.  Yes.
13    Q.  You did that?
14    A.  Yes.
15    Q.  Other supervisors did it?
16    A.  Yes.
17    Q.  Now, I think -- well, the last question.
18   One of the things that the Chief asked was your
19   impression and what should be done about the report
20   on racial profiling, correct?
21    A.  I don't recall.  I mean, I know there was a
22   series of questions but I don't know what the
23   questions were.
24       MR. EDWARDS:  I think now is going to be

Page 161

1   a good time to stop.  It's right at 4:30.
2       (Whereupon the deposition was adjourned
3   at 4:30 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

41 (Pages 158 to 161)