# Exhibit 2



COPY

# O'Loughlin
# vs.
# MBTA, et al.

# Nancy O'Loughlin

## Volume 2

December 23, 2005
pp 164-359

**Jones Reporting**
COMPANY

Two Oliver Street, Suite 804
Boston, MA 02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Nancy O'Loughlin

Page 177

1    Q. You're familiar with those policies?
2    A. Yes.
3    Q. What should a supervisor do who is aware of
4  harassment or discrimination?
5    A. Then or now? It's changed over the years.
6    Q. Okay. When did it change?
7    A. I don't know.
8    Q. Then when?
9    A. When I first came on as opposed to now.
10  There's a difference.
11    Q. Has it changed over the past five years?
12    A. With the exception of the Office of
13  Diversity changed the reporting of it. I don't know
14  when they came into being.
15    Q. Okay. Right now today -- let's say when you
16  held the rank of lieutenant within the past five
17  years, if a supervisor became aware of harassment or
18  discrimination what was he or she supposed to do?
19    A. You're supposed to notify your superiors and
20  you're supposed to notify the Office of Diversity, I
21  believe.
22    Q. What was the change?
23    A. There was no Office of Diversity prior.
24    Q. But there has always been a requirement to

Page 178

1  report it somewhere, to your supervisor or to
2  diversity when diversity came into being, that
3  office?
4    A. I believe so, yes.
5    Q. Does a supervisor have an obligation to stop
6  harassment or discrimination of which he or she is
7  aware?
8    A. Yes.
9    (Exhibit No. 17 marked
10    for identification.)
11  BY MR. EDWARDS:
12    Q. Do you recognize this document?
13    A. Yes.
14    Q. And what is this, please?
15    A. It's a report of a hostile work environment.
16    Q. And in the heading section in the upper
17  right-hand corner --
18    MR. EDWARDS: Actually this document has
19  been marked as Exhibit 17.
20  BY MR. EDWARDS:
21    Q. -- Bates stamp number M 226. In the
22  heading section it says to Org. Diversity from
23  Lieutenant N. O'Loughlin. That's you, correct?
24    A. Yes.

Page 179

1    Q. Subject, hostile work environment right?
2    A. Yes.
3    Q. When was this prepared? You wrote this?
4    A. Yes.
5    Q. When did you write it?
6    A. That would have been I want to say 2000.
7    Q. The year 2000. And in the second paragraph
8  it says "I have been an employee of the MBTA police
9  department for 18 years." You came on in --
10    A. I came on in '83.
11    Q. So 2000, 2001?
12    A. Yes.
13    Q. And you submitted this document to
14  diversity?
15    A. I believe I submitted it to the Deputy Chief
16  for forwarding to the organization of diversity.
17    Q. Who was the deputy chief at the time?
18    A. I believe it was John Mahoney.
19    Q. Now, I thought you had testified that you
20  had never submitted a complaint to organizational
21  diversity?
22    A. I submitted it to Deputy Mahoney.
23    Q. With instructions to --
24    A. I just forwarded it up the chain of command.

Page 180

1    Q. Why did you not submit it to organizational
2  diversity?
3    A. Because I believe that you have to submit it
4  through your superiors. Or that was my
5  understanding. I may be wrong but, that was my
6  understanding.
7    Q. Did you discuss this document with Deputy
8  Chief Mahoney?
9    A. I don't believe so. Or I don't recall right
10  now.
11    Q. Did you discuss it with Tom O'Loughlin?
12    A. I don't believe so.
13    Q. He was the Chief at the time?
14    A. I believe so, yes.
15    Q. In 2000?
16    A. Yes.
17    Q. Now, the allegations in this complaint have
18  nothing to do with Chief Carter. He wasn't even
19  there, correct?
20    A. Correct.
21    Q. The allegations have nothing to do with
22  Michael Mulhern, correct?
23    A. I don't think Mulhern was general manager
24  yet. I think it was Bob Prince. But I don't know

5 (Pages 177 to 180)

Page 189

1    A.  I reported it through this document.
2    Q.  Did you ever speak to the Police Chief and
3  tell him that officers were leaving you and members
4  of your unit in a position where they might be
5  seriously hurt or killed?
6    A.  I believe when I suggested that the unit be
7  temporarily disbanded that was one of the reasons.
8    Q.  I asked you about the letter.  Have you
9  looked for that letter?
10    MR. NOTIS:  Objection.  What letter?
11  BY MR. EDWARDS:
12    Q.  The letter recommending that the unit be
13  disbanded?
14    A.  No, I have not.
15    Q.  It was my understanding that you were going
16  to look for it.  Can you do that, please?
17    A.  I'll look for it.  My office was moved when
18  I was out on hiatus and I don't have all my files so
19  I don't know where it is.  I will look but I don't
20  know if I can get my hands on it.
21    Q.  Thank you.
22    Now, you never filed a complaint outside
23  of the police department on any of the issues  -- or
24  you did not file an outside complaint in 2000

Page 190

1  regarding any of the issues in this document, did
2  you?
3    A.  No.
4    Q.  You didn't go to the MCAD?
5    A.  I went to the MCAD at a later point, yes.
6    Q.  When did you go to the MCAD?
7    A.  2003 I think.
8    Q.  I think we have the complaint a subpoena an
9  exhibit.  This document that's marked as Exhibit 1?
10    A.  Yes.
11    Q.  That's when you went to the MCAD?
12    A.  Yes.
13    Q.  But during the 2000, 2001 time period when
14  you created the document we just looked at, you
15  didn't do anything other than give that document to
16  Deputy Chief Mahoney?
17    A.  Correct.
18    Q.  Did you discuss any of these complaints with
19  Deputy Chief Fleming?
20    A.  I know I discussed the cartoons with him
21  because I remember showing him one of the cartoons.
22  There were some things that I discussed with him but
23  I don't think it was relative to this particular
24  document.  I believe he was in the union at the time

Page 191

1  that McDonough made the radio transmission, so he
2  knows about that.
3    Q.  Did you discuss any of your complaints with
4  Deputy Chief Ann McCall?
5    A.  No.
6    Q.  Now, we talked about a rumor that you heard,
7  and you can tell me if I'm stating it improperly, a
8  rumor that you heard that Chief Carter had been
9  demoted by Bill Bratton when they were both at the
10  Boston Police Department?
11    A.  That's correct, that's a rumor that was
12  going around.
13    Q.  Do you think that that had anything to do
14  with the way in which you described Chief Carter's
15  actions towards you, the ones that you claim are
16  adverse?  Do you think that had anything to do with
17  -- I don't know, your dissatisfaction, for want of a
18  better word, with the way you were treated by Chief
19  Carter?
20    A.  No.
21    Q.  Now, before Chief Carter came to the MBTA
22  police department you were asked to submit a memo
23  responding to certain questions; do you recall that?
24    A.  Yes.

Page 192

1    Q.  How did you find out about that?  Who told
2  you to write that?
3    A.  If it's the document I'm thinking about, I
4  think all supervisors got it.
5    Q.  I'll actually show it to you.
6    A.  Is that the one about the mission of the
7  department?
8    Q.  I'll give it to you.  I don't want to
9  characterize it.
10    (Pause.)
11    (Exhibit No. 18 marked
12    for identification.)
13  BY MR. EDWARDS:
14    Q.  This is a document you prepared in response
15  to a request to provide information for Chief
16  Carter?
17    A.  This is the document I prepared.  I don't
18  remember what the auspices of the document was for
19  but yes, this is the one I was thinking of.
20    Q.  And the front page  -- and this is Exhibit
21  18.  The front page cover sheet says, "Sir, I
22  respectfully report that enclosed you will find a
23  copy of my resume as well as a response to the
24  questions posed for a comprehensive briefing."

Nancy O'Loughlin

Page 193

1    You don't recall who asked you to
2  prepare this?
3    A. No, I don't.
4    Q. On the second page you list three major
5  challenges facing your command, correct?
6    A. Yes.
7    Q. The first is labeled A, "The primary
8  challenge my command is the lack of adequate
9  manpower," correct?
10    A. Yes.
11    Q. And you asked for additional members of the
12  graffiti, slash -- well, the vandal squad.
13    A. Yes.
14    Q. That was during the time that you were doing
15  vandal work?
16    A. Yes.
17    Q. B, "The secondary challenge facing my
18  command is the lack of adequate equipment," correct?
19    A. Yes.
20    Q. Something that caught my eye here, the third
21  paragraph -- I mean third sentence in that
22  paragraph reads "It should also be noted." Do you
23  see that?
24    A. Yes.

Page 194

1    Q. "It should also be noted at this time of
2  domestic terrorism outlying rail and rail facilities
3  are a choice target to strike to inflict vast damage
4  with minimal chance of being caught. In order to
5  adequately target areas appropriation of ATVs and/or
6  dirt bikes would facilitate timely entry into
7  inaccessible areas otherwise reached only on foot
8  requiring officers to walk several miles."
9    Was one of your duties with the vandal
10  squad to be alert for terrorism?
11    A. Yes.
12    Q. Is there special training for that?
13    A. At this time there wasn't.
14    Q. Did the MBTA, to the best of your knowledge,
15  participate in any joint terrorism task force or
16  have a terrorism squad?
17    A. I know there's an officer assigned to the
18  FBI's joint terrorism traffic force. I don't know
19  when that came about. And there's been some
20  training on property for it.
21    Q. Have you been to that training?
22    A. Yes.
23    Q. When did you go?
24    A. I don't know. It was after 2001.

Page 195

1    Q. Now, ATV is all-terrain vehicles?
2    A. Yes.
3    Q. If you will turn to the next page please,
4  N 445, number 4, reports impact. You indicate that
5  your morale and the morale of the officers under
6  your command is high, correct?
7    A. Yes.
8    Q. And the officers under your command at this
9  time would have been Victor Diaz and Daniel
10  Sullivan?
11    A. Yes.
12    Q. "This unit looks forward to working with the
13  Chief to implement the recommendations of the Task
14  Force Report on Racial Profiling as well as the
15  findings of the Honorable Justice Rudolph Pierce.
16  This unit also looks forward to working with the
17  Chief to implement any other goals and objectives as
18  determined by him." Correct?
19    A. Yes.
20    Q. And that is a true sentiment, you looked
21  forward to implementing the task force report
22  recommendations?
23    A. Yes.
24    Q. And the recommendations of -- or some

Page 196

1  recommendations, because I didn't think you agreed
2  with all of them, of Rudolph Pierce?
3    MR. NOTIS: Objection.
4    A. I don't remember what I stated. I know I
5  didn't agree with all of the things, but it doesn't
6  mean I wouldn't implement them.
7    Q. Okay. Thank you.
8    Now, page M 447, number 6, expertise.
9  Second to the last sentence in paragraph 6A, "both
10  officers," do you see that?
11    A. Yes.
12    Q. "Both officers" -- and you're talking about
13  Daniel Sullivan and Victor Diaz -- "are highly
14  proficient in the art of graffiti investigation and
15  prosecution having been under my tutelage for some
16  time. Both officers are also proficient in
17  documenting and photographing damage, invaluable
18  tools when preparing and investigating a case."
19    Did I read that correctly?
20    A. Yes.
21    Q. Is it fair to say that you taught Daniel
22  Sullivan and Victor Diaz how to investigate and
23  prosecute graffiti crimes?
24    A. I was teaching them, yes.

9 (Pages 193 to 196)

Page 197

1  Q.  And that they were proficient, correct?
2  A.  To a degree, yes.
3  Q.  You don't have any qualifiers in this
4  paragraph?
5  A.  No.
6  Q.  Now when Chief Carter came along he spoke to
7  officers at some point?
8       MR. NOTIS:  Objection.
9  BY MR. EDWARDS:
10  Q.  Did he speak to -- did he have an
11  all-officers meeting at some point?
12  A.  I don't know.
13  Q.  Did you ever attend a meeting with many
14  other officers when Chief Carter first became on
15  board?
16  A.  I don't recall.
17  Q.  Do you recall attending a meeting in which
18  he discussed his vision for the department?
19  A.  No.
20  Q.  Did you ever attend a meeting in which he
21  discussed what he hoped to accomplish?
22  A.  I don't recall, sir.
23  Q.  Do you recall ever hearing him discuss --
24  again, whether you agree or not that it's necessary

Page 198

1  -- did you hear him discuss restoring the faith and
2  trust of the public in the MBTA police department as
3  a goal of his?
4  A.  No.
5  Q.  Did you ever hear him talk about getting the
6  department accredited as one of his goals?
7  A.  No.
8  Q.  Have you ever heard him talk about terrorism
9  as a serious threat to the transit system?
10  A.  No.
11  Q.  Now, the context of my question was when
12  Chief Carter first came on board.  But have you ever
13  heard him talk about that?
14       MR. NOTIS:  Objection.
15  BY MR. EDWARDS:
16  Q.  Have you ever heard him talk about terrorism
17  as a threat to the transit system?
18  A.  I don't ever remember hearing him talk,
19  period, sir.  There may have been memos out, but I
20  don't ever remember hearing him talk.
21  Q.  I'm not sure I understand.  What do you
22  mean?
23  A.  I never physically heard him speak.  I don't
24  know whether there's been something in writing.  I

Page 199

1  know terrorism, there has probably been memos about
2  it but I don't remember off the top of my head.  But
3  I never actually heard him speak.
4  Q.  Now let's look at the complaint.  We had
5  that marked as Exhibit 2.  I direct your attention
6  to paragraph 13.  Now, the first sentence indicates
7  that Joseph Carter became the Chief in January 2003,
8  correct?
9  A.  Yes.
10  Q.  Second sentence, "As one of his first
11  actions as chief, Chief Carter disbanded
12  Lt. O'Loughlin's division and she was moved to the
13  position of detective unit commander."  Is that
14  correct?
15  A.  Yes.
16  Q.  Now, are we talking about the three-person
17  vandal unit?
18  A.  Yes.
19  Q.  And first of all, who were you reporting to?
20  Who was your immediate report?
21       MR. NOTIS:  Objection.
22  BY MR. EDWARDS:
23  Q.  At this time?
24       MR. NOTIS:  Right now?

Page 200

1       MR. EDWARDS:  No.
2  BY MR. EDWARDS:
3  Q.  At the time when Chief Carter disbanded the
4  unit?
5       MR. NOTIS:  Before or after?  That's
6  what I'm looking for.
7  A.  You confused me.
8  Q.  Who did you report to as head of the vandal
9  unit?
10  A.  Deputy Fleming.
11  Q.  Who did you report to after the vandal unit
12  was disbanded?
13  A.  Fleming.
14  Q.  Now, how did you find out that the unit was
15  going to be disbanded?
16  A.  I was informed by Fleming.
17  Q.  And he told you it was the Chief's decision?
18  A.  Yes.
19  Q.  Did he tell you why?
20  A.  No.
21  Q.  Did you ask him why?
22  A.  I don't believe so.
23  Q.  You think it was disbanded because of your
24  gender?

10 (Pages 197 to 200)

Nancy O'Loughlin

Page 201

1    A. Yes.
2    Q. What did you see or hear that gave you that
3  idea?
4    A. The fact that Chief Carter never dealt
5  directly with me.
6    Q. Well, you know, we've talked over the course
7  of this deposition about chain of command. Wouldn't
8  the proper chain of command have been for the Chief
9  to notify the Deputy Chief to notify the lieutenant?
10    A. That's the normal course of action, but when
11  the Chief comes down to the unit and continually
12  speaks to a lower ranking officer instead of
13  speaking to you, it's quite evident that he doesn't
14  want to deal with you.
15    Q. Who did Chief Carter deal with, Sullivan or
16  Victor Diaz?
17    A. He mostly dealt with Sergeant Gillespie.
18    Q. Sergeant Gillespie wasn't in the vandal
19  unit, was he?
20    A. The vandal unit was part of the detective
21  unit and he dealt with Sergeant Gillespie.
22    Q. This is before the unit was disbanded, the
23  vandal unit?
24    A. No, I'm sorry, it was after. Prior to that

Page 202

1  he spoke to Fleming and through Fleming, me.
2    Q. That's my question.
3    A. I'm sorry, I misunderstood you. I
4  apologize.
5    Q. I do as well.
6      Would it not have been the normal chain
7  of command for your Chief to talk to Fleming and
8  Fleming to talk to you?
9    A. Yes.
10    Q. So there's nothing wrong with that in terms
11  of protocol?
12    A. No.
13    Q. Do you know if anybody else in the
14  department contributed to Chief Carter's decision to
15  disband your three-person unit?
16    A. I have no idea.
17    Q. You just don't know?
18    A. I have no idea.
19    Q. Did you ever hear or do you have reason to
20  believe that Mark Gillespie contributed to that
21  decision?
22    A. Yes.
23    Q. Yes, you have reason to believe that Mark
24  Gillespie contributed?

Page 203

1    A. I believe that Gillespie voiced some --
2  yes.
3    Q. What do you think Mark Gillespie voiced that
4  impacted the Chief's decision?
5    A. That it was a useless unit.
6    Q. And what makes you think that Gillespie said
7  that?
8    A. Comments he's made since then, the fact that
9  he would try to reassign my people when I was absent
10  and take them off assignments I had given them and
11  redirect them. It was a power thing.
12    Q. Okay. So when you were out, Gillespie --
13  he was a sergeant at the time?
14    A. Yes.
15    Q.    -- would try to take Diaz, -- was he a
16  sergeant at the time?
17    A. No, they were both patrolmen.
18    Q. When did Victor Diaz make sergeant?
19    A. Victor Diaz is not a sergeant.
20    Q. He's still a patrol officer?
21    A. Yes.
22    Q. So Sergeant Gillespie would take, or try to
23  take, Diaz and Sullivan off of assignments that you
24  gave them and reassign them to what? General

Page 204

1  investigations?
2    A. Whatever he wanted to assign them to.
3    Q. And he didn't have the authority to do that
4  when you were out?
5    A. Not if they had been given specific
6  assignments, no. They answered to me; they didn't
7  answer to him.
8    Q. I'm still not clear on how these units work.
9  Sergeant Gillespie supervised the detective unit?
10    A. Sergeant Gillespie and Lieutenant Leuchte
11  were in charge of the general detective division. I
12  was in charge of the vandal squad at that point
13  specifically.
14    Q. How many detectives did Sergeant Gillespie
15  supervise?
16    A. Maybe five.
17    Q. And the detectives under his command
18  conducted general investigations?
19    A. Yes.
20    Q. And your unit conducted graffiti and
21  vandalism?
22    A. And commuter rail issues, yes.
23    Q. Do you know whether Sergeant Gillespie ever
24  told Deputy Fleming or Chief Carter that his unit

11 (Pages 201 to 204)

Page 205

1    needed more detectives?
2        A. I don't know.
3        Q. Have you ever heard Sergeant Gillespie say
4    that? Has he ever said it to you or around you?
5        A. No.
6        Q. Were you ever told or did you ever hear that
7    Chief Carter thought that graffiti and vandalism was
8    not as high a priority as perhaps Tom O'Loughlin
9    thought it was as an explanation for the unit being
10    disbanded?
11        A. No, I never heard that.
12        Q. Is that a decision that the chief of police
13    can make? Can he determine that your unit was of
14    less priority than perhaps you thought it was?
15        A. Yes.
16        Q. It was certainly within his authority to
17    disband the unit, correct?
18        A. Yes.
19        Q. And the fact of the disbandment in and of
20    itself is not discriminatory in your mind, is it? I
21    mean, the chief can do it if he wants?
22            MR. NOTIS: Objection.
23    BY MR. EDWARDS:
24        Q. What I'm trying to get to, and I think I

Page 206

1    phrased it poorly, what was it about the disbanding
2    of this unit specifically that made you think it was
3    based on your gender?
4        A. The fact that it was the only unit that was
5    disbanded. And I was the only ranking female
6    officer in charge of a unit.
7        Q. Now, over the course of his first several
8    months in office Chief Carter made many changes,
9    didn't he?
10        A. I'm sure he did.
11        Q. Were you angry about the unit being
12    disbanded?
13        A. I wasn't angry. Disappointed.
14        Q. Did you express that disappointment to
15    Deputy Fleming?
16        A. I think basically I just shut my mouth and
17    did my job.
18        Q. The other members of your unit were, as far
19    as you could tell, disappointed as well?
20        A. Yes.
21        Q. Did you ever hear that members of your unit
22    thought that Mark Gillespie caused your unit to be
23    disbanded?
24        A. Did I ever hear that?

Page 207

1        Q. Yes. Did they say it to you?
2        A. Yeah, I think that was said.
3        Q. Did you ever hear that Daniel Sullivan said
4    he would put a bullet in Gillespie's head for
5    causing the unit to be disbanded?
6        A. No.
7        Q. Now, in paragraph 13, that same second
8    sentence, it says "She was moved to the position of
9    detective unit commander." Correct?
10        A. Yes.
11        Q. And this is what is referred to as a desk
12    job. I'm not reading it, I'm paraphrasing it. Is
13    that correct?
14        A. Yes.
15        Q. And you didn't want a desk job?
16        A. Correct.
17        Q. Was the move to the position of detective
18    unit commander something that you considered
19    discriminatory?
20        A. Yes, in that it was -- it wasn't a
21    reduction in rank, but it was a much less visible
22    position. It hindered my professional advancement.
23        Q. But putting you in charge of the detective
24    unit itself was something you consider

Page 208

1    discriminatory?
2        A. I think the reason it was done was
3    discriminatory, yes.
4        Q. And you thought that the Chief did it
5    because he didn't like women and he wanted to
6    discriminate against you on the basis of your
7    gender, correct?
8        A. Yes.
9        Q. I take it Chief Carter didn't speak to you
10    before making that change?
11        A. No.
12        Q. Should he have?
13        A. That's his prerogative.
14        Q. So he wasn't required to do that?
15        A. No.
16        Q. And how were you informed of that?
17        A. I believe it was Deputy Chief Fleming.
18        Q. You were not issued an order moving you to
19    commander of the detective unit?
20        A. I don't remember whether an order went out
21    or not. I don't remember.
22        Q. Now, when you say -- when you write what is
23    written in the complaint, this was a much lower
24    status position, and I think you said a few minutes

12 (Pages 205 to 208)

Nancy O'Loughlin

Page 209

1 ago less visible, what does that mean?
2    A. It means that I'm not circulating in the law
3 enforcement community as much as I normally would.
4 That I'm not in the game. It's primarily an
5 administrative job and he wanted me behind a desk
6 pushing papers.
7    Q. Is that something that Deputy Fleming said
8 to you?
9    A. No.
10    Q. That's just your opinion?
11    A. That's correct.
12    Q. Now, when you previously worked as desk
13 lieutenant, you weren't circulating in law
14 enforcement, were you?
15    A. I was.
16    Q. Okay. I understood you to say that the desk
17 lieutenant job was in the station.
18    A. It is in the station but I would pull a
19 sergeant in from the street and I would go out and
20 attend community meetings and I would check on
21 people in the street. I would spend about two or
22 three hours of the shift out on the street.
23    Q. Every shift?
24    A. No, not every shift.

Page 210

1    Q. But when you say not circulating in the law
2 enforcement community, I had the impression that you
3 were talking about with other law enforcement
4 agencies. That's a misunderstanding on my part?
5    A. Well, let me clarify. When you go to a
6 community meeting you are with members of other
7 agencies. You reach out to other agencies, you
8 touch base with other agencies. That's what I mean
9 by circulating.
10    Q. Did Deputy Fleming tell you you were no
11 longer allowed to do that?
12    A. That was the impression I got.
13    Q. Did he say it?
14    A. I don't recall what was said. That's the
15 impression I got. That was the read I got off of
16 the reassignment.
17    Q. Did you ask him?
18    A. I don't think I did, no.
19    Q. Now, when you were with the vandal squad,
20 did you also take time off to go to community
21 meetings?
22        MR. NOTIS: Objection. I don't believe
23 the witness has testified she took time off to go to
24 community meetings.

Page 211

1    A. During the course of my day I would attend
2 some meetings, yes.
3    Q. And that's the part of it that you thought
4 you couldn't do as head of the detective unit, going
5 to these meetings?
6    A. The outreach.
7    Q. Did anybody else do the outreach?
8    A. I know Gillespie was active.
9    Q. When was Gillespie active?
10    A. Gillespie had his own agenda.
11    Q. My question was when was Gillespie active?
12    A. Gillespie had his own agenda. He told me he
13 reported directly to Chief Carter and I had no
14 bearing on him.
15    Q. You said Gillespie was active, correct?
16    A. Yes.
17    Q. And that was in response to my question
18 about community groups?
19    A. Yes.
20    Q. Did Gillespie go to community groups when he
21 was running the detective unit?
22    A. Oh, that I don't know.
23    Q. Well, when were --
24    A. I'm speaking after I was assigned as head of

Page 212

1 the detective unit.
2    Q. Okay. So when you were head of the
3 detective unit Gillespie went to community meetings?
4    A. When I was head of the detective unit
5 Gillespie had his own agenda. My answer to that
6 question is I believe so but I can't be positive on
7 that because he reported directly to the Chief and
8 not to me.
9    Q. Okay. So when you said he was active, that
10 really means you don't know whether he went to
11 community meetings or not?
12    A. I know he was at some meetings because I
13 know there was some problems with some of the things
14 that he did.
15    Q. Detective is a specialty position?
16    A. Yes.
17    Q. Are detectives considered somewhat elite
18 within the MBTA police force?
19    A. No.
20    Q. Do they carry a different badge?
21    A. Yes.
22    Q. How is the badge different from those of
23 other officers?
24    A. It says detective on it.

13 (Pages 209 to 212)

Page 213

1    Q. Same color?
2    A. No; they have a gold badge.
3    Q. Okay. Now, when you say your chances for
4  advancement were reduced, how was that?
5    A. Because my chances -- because I was on a
6  desk job. I wasn't out there and able to do what I
7  did best. I was restricted.
8    Q. So you believe your chance for advancement
9  was reduced because you weren't doing what you do
10  best?
11    A. That's correct. Not getting -- you know,
12  your experience isn't growing, you're confined.
13  You're a pencil pusher. You're a paper pusher.
14    Q. Tell me if you agree with this proposition
15  -- strike that.
16        To what positions could you have been
17  promoted?
18    A. Captain or Deputy Chief or Chief are the
19  only three above lieutenant.
20    Q. Now at the time there were -- and we're
21  talking about January 1993 -- there were two --
22        MR. NOTIS: Objection.
23  BY MR. EDWARDS:
24    Q. January 2003. There were two people with

Page 214

1  the Civil Service rank of captain, correct?
2    A. Yes.
3    Q. One female and one male?
4    A. Yes.
5    Q. To the best of your knowledge, in order for
6  you to have been promoted to captain would there
7  have had to be an opening as a captain, in a
8  captain's position?
9    A. Yes.
10    Q. And the Chief would have to call for what is
11  called a captain's test or exam, correct?
12    A. Yes.
13    Q. Was that done, do you know?
14    A. I don't think so.
15    Q. Deputy chiefs are promoted at the Chief's
16  discretion, correct?
17    A. They are appointed, yes.
18    Q. So I'm not quite sure how any move affected
19  your chance for advancement.
20    A. You asked about promotions. There's other
21  assignments you can be appointed to that you don't
22  have to be promoted -- customs, joint terrorism
23  task force, DEA, anything like that.
24    Q. Those are posted positions that officers

Page 215

1  request?
2    A. I don't know if they're posted or not. I
3  know they are assignments that exist.
4    Q. And you believe because you were head of the
5  detective unit that you couldn't -- well, you say
6  advancement here. Appointment to the joint
7  terrorism task force or some of the other positions
8  you named are not advancements. They're laterals,
9  right?
10    A. They're advancements in your career because
11  you are getting expertise or experience in another
12  field, so I consider them advancements.
13    Q. So you are not just talking about
14  promotions?
15    A. Yes.
16    Q. Now, you say in the last setence, "The
17  change in position was viewed by Lt. O'Loughlin and
18  her co-workers as an attempt to further marginalize
19  her role in the MBTA police department and show
20  further disrespect toward her"?
21    A. Yes.
22    Q. How did appointment to head the detective
23  unit marginalize you?
24    A. Because it restricts your dealings with

Page 216

1  other departments. You're a paper pusher. It
2  marginalizes your role.
3    Q. What co-workers saw this as an attempt to
4  marginalize you?
5    A. Almost everyone.
6    Q. For instance?
7    A. Diaz, Sullivan, the other people in the
8  detective unit. Okay.
9    Q. Now, you mentioned that Lieutet Leuchte
10  commanded a portion of the detective unit, correct?
11    A. Yes.
12    Q. Was he marginalized as far as you could
13  tell?
14    A. He was assigned to nights. He was
15  approaching retirement and he was where he wanted to
16  be. In terms of -- from my opinion, was he
17  marginalized also? Yeah. But he's at a different
18  point of his professional career than I was.
19    Q. And he liked the position, as far as you
20  could tell?
21    A. He was satisfied because he was a
22  short-timer.
23    Q. How long had he be in that position?
24    A. I don't know. But I know he had probably 18

14 (Pages 213 to 216)

Page 221

1  A. No.
2  Q. Were you resentful of Chief Carter because
3  he put you in a position of head of the detective
4  unit?
5  A. No.
6  Q. I'm not sure we answered this. When you
7  indicate in the complaint that placing you in the
8  position of head of the detective unit was intended
9  to show disrespect towards you, that's the last
10  sentence in that photograph, the last part of that
11  sentence, how did you feel disrespected by being
12  placed into that position?
13  A. Just the sheer  -- the disbanding of the
14  unit that I was commanding. It was disrespectful.
15  And then putting me in a position that was held by a
16  lesser-ranked officer was disrespectful.
17       (Exhibit No. 19 marked
18       for identification.)
19  BY MR. EDWARDS:
20  Q. Do you recognize that document I've just
21  handed you?
22  A. Yes.
23  Q. And this is Exhibit 19. What is this
24  document?

Page 222

1  A. It's a reassignment of the personnel.
2  A. It's Bates stamped number M 3. This is
3  dated July 26th, 2002.
4  A. The post date, like the date, is July 19,
5  2002.
6  Q. Thank you. Up in the upper right-hand
7  corner you're referring to?
8  A. Yes.
9  Q. The memo is dated July 19, 2002. Subject,
10  reassignment of the personnel. I'd ask you to look
11  down, about four slots down. That's Joseph Leuchte?
12  A. Yes.
13  Q. And he is being reassigneded detective
14  commander, 3:30-11:30, to detectives night shift
15  commander; is that correct?
16  A. Yes.
17  Q. Had Detective Leuchte been the overall
18  commander of the detective unit?
19  A. I don't know.
20  Q. But at any rate, he is being assigned to
21  commander of the night shift, correct?
22  A. Yes.
23  Q. And you are being reassigned from surface
24  day shift commander, correct?

Page 223

1  A. Yes.
2  Q. That's the desk lieutenant position?
3  A. Yes, sir.
4  Q. To detectives day shift commander and
5  graffiti investigations, correct?
6  A. Yes.
7  Q. So, you are the day shift commander, Joseph
8  Leuchte is the night shift commander of detectives,
9  correct?
10  A. This memo came out shortly before O'Loughlin
11  left. When O'Loughlin left and Fleming was interim
12  chief it was specifically the vandal squad. It
13  wasn't day shift commander. So this was a period of
14  a couple of days or a week or something.
15  Q. But my question, though, is according to
16  this reassignment --
17  A. I'm sorry, this is on paper only. I was
18  assigned as day shift commander on paper. And then
19  he left and Fleming was the interim and then I was
20  in charge of a specific unit.
21  Q. Okay. But this is my question. We're
22  talking about July 19, 2002. This is an order
23  issued by Thomas J. O'Loughlin, correct?
24  A. Yes.

Page 224

1  Q. It is assigninging you to day shift
2  commander of detectives, correct?
3  A. Yes.
4  Q. And it is assigning Joseph Leuchte to night
5  shift commander, correct?
6  A. Yes.
7  Q. And in addition, you were to do graffiti
8  investigations, correct?
9  A. Yes.
10  Q. On the second page, Victor Diaz is assigned
11  to detectives, correct?
12  A. Yes.
13  Q. He's not assigned to graffiti
14  investigations?
15  A. Correct.
16  Q. And Daniel Sullivan is assigned to
17  detectives, correct?
18  A. Right.
19  Q. And he's not assigned to graffiti
20  investigations, correct?
21  A. Correct.
22  Q. Now, I understand what you just said as
23  after Tom O'Loughlin left Bill Fleming became
24  interim chief?

16 (Pages 221 to 224)

Nancy O'Loughlin

Page 225

1   A. Yes.
2   Q. And he changed this?
3   A. Yes.
4   Q. He put you in charge of the vandal squad?
5   A. Yes.
6   Q. And as part of the vandal squad you took
7   Officer Diaz and Officer Sullivan, who had been
8   assigned by Chief O'Loughlin to the detective units,
9   but he assigned -- they --
10  A. They were reassigned by Fleming.
11  Q. On paper? Was there paperwork?
12  A. I don't know. I don't know that.
13  Q. When Tom O'Loughlin assigned you to the
14  position of day shift detective commander, was that
15  discriminatory?
16  A. No.
17  Q. Why not?
18  A. I didn't think it was.
19  Q. Didn't it marginalize you?
20  A. If it had gone on for a period of time I
21  would think that. It didn't go on for a period of
22  time.
23  Q. We are talking about just the assignment
24  itself.

Page 226

1   A. When this order came out, no.
2   Q. Okay.
3   A. The answer to the question is no.
4   Q. Who was in the position of detective day
5   shift commander before you were assigned to this
6   position by Tom O'Loughlin?
7   A. I don't know.
8   Q. Do you have any idea what rank it was,
9   whether it was a sergeant?
10  A. I don't know.
11  Q. Did Tom O'Loughlin disrespect you by placing
12  you into the position of day shift commander of
13  detectives?
14  A. No.
15  Q. But that's the same position you say Chief
16  Carter put you in. He showed you disrespect but Tom
17  O'Loughlin did not? That's your testimony?
18  A. Yes.
19  Q. What's the difference?
20  A. That's my opinion. My opinion is based on
21  the fact that I was commander of a specialized unit
22  and I was taken out of that unit and placed in, in
23  my opinion, in a lesser position in an attempt to
24  marginalize me. That's my opinion.

Page 227

1   Q. Bill Fleming, who put in you in the vandal
2   squad, was interim chief, correct?
3   A. Yes.
4   Q. And as interim chief, if you know, he was to
5   be in that position until a permanent chief was
6   appointed, correct?
7   A. I believe so but I'm not positive on that.
8   Q. He wasn't permanent chief?
9   A. No, interim is not permanent, no.
10  Q. Interim is not permanent, correct.
11     So, what we have here is Tom O'Loughlin
12  appointed you to a position, correct?
13  A. Correct.
14  Q. Interim chief Fleming put you in another
15  position, correct?
16  A. Correct.
17  Q. Chief Carter put you back into the position
18  that Tom O'Loughlin did, correct?
19  A. Correct.
20  Q. Do you have any reason to believe that Tom
21  O'Loughlin doesn't like women?
22  A. No.
23  Q. Now, when Tom O'Loughlin placed you into the
24  position of head of the detectives on the day shift,

Page 228

1   is this something that you discussed with patrol
2   officers? Your reassignment to that position?
3   A. No.
4   Q. Did you discuss it with superior officers?
5   A. I don't believe I discussed it with anybody.
6   Q. When Chief Carter put you into the position
7   did you discuss that move with patrol officers?
8   A. I discussed it with the members of my unit.
9   Q. Did you discuss it with any superior
10  officers?
11  A. I don't think so.
12  Q. Do you know when Chief Carter selected
13  deputy chiefs?
14  A. No, I don't.
15  Q. Now, in paragraph 14, the first sentence
16  says that you were detective unit commander from
17  February 2003 through August 4th, 2003; is that
18  correct?
19  A. Yes.
20  Q. And then you were placed in the position of
21  head of the detail unit, correct?
22  A. Yes.
23  Q. And you didn't like that move?
24  A. That's a punishment assignment.

17 (Pages 225 to 228)

Nancy O'Loughlin

Page 229

1    Q. I'm sorry, my question is you didn't like
2  that move?
3    A. No, sir, I didn't like the move. It's a
4  punishment assignment.
5    Q. I understand that's your opinion.
6        MR. NOTIS: Objection.
7  BY MR. EDWARDS:
8    Q. But the move, as you indicate here, didn't
9  reduce you in rank, correct?
10    A. Correct.
11    Q. Didn't reduce you in salary?
12    A. Correct.
13    Q. What makes it a much lower status position?
14    A. It's a punishment assignment, sir. It's
15  been testified to in federal court by deputy chiefs
16  as a punishment assignment. It's known throughout
17  the department as a punishment assignment.
18    Q. My question is, though, when you talk about
19  status what are you talking about?
20    A. Talking about your status within the law
21  enforcement community and within the department in
22  general. It's seen as a punishment assignment, so
23  the message that goes out is you're being punished.
24  They're putting you there to punish you.

Page 230

1    Q. And for what did you think you were being
2  punished?
3    A. Because I was a female. He doesn't like
4  females.
5    Q. Who had been in the position before you?
6    A. A sergeant.
7    Q. Who placed the sergeant into that position?
8    A. I believe that was when Martino was removed
9  after he went to Federal Court over the punishment
10  assignments.
11    Q. Was it a male sergeant or female sergeant?
12    A. Male sergeant.
13    Q. Had a female ever been in that position
14  that you know of?
15    A. I don't know. I don't believe so, but I'm
16  not positive.
17    Q. But you don't remember from 1983 --
18    A. I don't recall a female ever being assigned
19  to that, but that doesn't mean it didn't happen.
20    Q. And because you call this a punishment
21  position, that was the attempt to marginalize you?
22    A. Yes.
23    Q. And show you disrespect?
24    A. Yes.

Page 231

1    Q. Now, why is this a punishment position in
2  your opinion?
3    A. Basically once again it's a strictly
4  clerical position.
5    Q. What does the commander of the detail unit
6  do?
7    A. They do monthly reports, they attend
8  meetings, they oversee the officers assigned to the
9  unit and they keep an eye on details in general.
10  They work with the billing liaison.
11    Q. How much money is generated by details?
12  Generally. You know, if you can come up with an
13  average amount per month.
14    A. I have no idea.
15    Q. Is that something that you had to keep track
16  of in that position?
17    A. I don't know. I don't believe I had to keep
18  track of how much was spent.
19    Q. Okay. Did you have to keep track of what
20  officers were assigned to details?
21    A. Yes.
22    Q. You made those assignments?
23    A. I assisted in that. I assigned the
24  supervisors to their details.

Page 232

1    Q. Could you assign details to yourself?
2    A. Yeah, during the course of a normal
3  rotation. You have to go through a rotation. I
4  can't just arbitrarily assign one. There's certain
5  criteria for it.
6    Q. Did you work a lot of overtime as head of
7  the detective unit?
8    A. I worked some, yes.
9    Q. In paragraph 14 it says "Less overtime
10  compensation as head of the detail unit." Why was
11  that?
12    A. There's not as many opportunities when
13  you're in details to work overtime.
14    Q. Why is that?
15    A. Because you're strictly available for the
16  overtime that's department-wide, whereas in the
17  detective unit they have overtime that's
18  unit-specific.
19    Q. Now, how did you find out you were being
20  assigned to the detail unit?
21    A. I was called up to Chief Carter's office.
22    Q. And what?
23    A. Myself and Deputy Fleming were called in and
24  he informed me that due to my administrative

18 (Pages 229 to 232)

Nancy O'Loughlin

Page 233

1  expertise he was reassigning me to the detail unit.
2      Q. You didn't think that was true?
3      A. No.
4      Q. Did he say anything to make you think it was
5  not true?
6      A. I just didn't think it was true.
7      Q. What else did Chief Carter say about the
8  reassignment?
9      A. He told me I was to no longer perform or
10  offer assistance in investigation or prosecution of
11  graffiti cases.
12      Q. And that bothered you?
13      A. Did it bother me?
14      Q. Yes.
15      A. Yes.
16      Q. Who did he want to perform graffiti cases?
17      A. I don't know who he would want to perform
18  graffiti cases.
19      Q. You don't know whether he wanted Sullivan or
20  Diaz? You have no idea?
21      A. No idea.
22      Q. Did you perform graffiti investigation as a
23  desk lieutenant?
24      A. Yes.

Page 234

1      Q. So, as desk lieutenant you went to community
2  meetings, you conducted graffiti investigations?
3      A. Yes.
4      Q. And you supervised the patrol unit?
5      A. Yes.
6          (Exhibit No. 20 marked
7          for identification.)
8  BY MR. EDWARDS:
9      Q. I just handed you a document dated June 8,
10  1995 Bates stamp number 533; is that correct?
11      A. Yes.
12      Q. The subject is command staff reorganization.
13  Do you see that?
14      A. Yes.
15      Q. And the first sentence reads, "As part of
16  the department's command staff reorganization plan,
17  the following changes will become effective
18  Saturday, June 10th, 1995." Do you see that?
19      A. Yes.
20      Q. Now, this says it's to be read at roll
21  calls. Is this order something you would have been
22  aware of because it was read at roll calls?
23      A. Yes.
24      Q. I'm going to direct your attention to the

Page 235

1  second page. Lieutenant David LeRay is assigned
2  detail unit commander reporting to Deputy Chief John
3  Martino. Do you see that?
4      A. Yes.
5      Q. Is it your opinion that Chief O'Donovan was
6  punishing Lieutenant LeRay?
7      A. No. He was taking care of Lieutenant LeRay
8  because he wasn't fit for street duty. He had a
9  heart condition.
10      Q. So in this instance at least the position
11  was not perceived as a punishment position?
12      A. Not at this time, no.
13      Q. Had a lieutenant ever had the position
14  before Lieutenant LeRay?
15          MR. NOTIS: Objection.
16      A. I don't know. I think a patrolman had it
17  actually.
18      Q. There's nothing in the police department
19  rules and regulations that categorizes head of the
20  detail unit as a punishment position; is that
21  correct?
22      A. I don't know. I don't believe so.
23          (Exhibit No. 21 marked
24          for identification.)

Page 236

1  BY MR. EDWARDS:
2      Q. This is another supervisory personnel
3  reassignment?
4      A. Yes.
5      Q. Dated January 6th, 1999?
6      A. Yes.
7      Q. Bates number 735. This order number 1 under
8  captains is reassigning Captain John Martino from
9  commander of area B to commander of detail unit. Do
10  you see that?
11      A. Yes.
12      Q. And also under lieutenants, number 3, moving
13  Lieutenant LeRay out of the detail unit to commander
14  of training unit, correct?
15      A. Yes.
16      Q. So Captain Martino is replacing Lieutenant
17  LeRay in this position, correct?
18      A. Correct.
19      Q. So based on the two orders we've just looked
20  at, the position has gone from a lieutenant to a
21  captain, correct?
22      A. Correct.
23      Q. The position was perceived as a punishment
24  position?

19 (Pages 233 to 236)

Page 233

1  expertise he was reassigning me to the detail unit.
2      Q.  You didn't think that was true?
3      A.  No.
4      Q.  Did he say anything to make you think it was
5  not true?
6      A.  I just didn't think it was true.
7      Q.  What else did Chief Carter say about the
8  reassignment?
9      A.  He told me I was to no longer perform or
10  offer assistance in investigation or prosecution of
11  graffiti cases.
12      Q.  And that bothered you?
13      A.  Did it bother me?
14      Q.  Yes.
15      A.  Yes.
16      Q.  Who did he want to perform graffiti cases?
17      A.  I don't know who he would want to perform
18  graffiti cases.
19      Q.  You don't know whether he wanted Sullivan or
20  Diaz?  You have no idea?
21      A.  No idea.
22      Q.  Did you perform graffiti investigation as a
23  desk lieutenant?
24      A.  Yes.

Page 234

1      Q.  So, as desk lieutenant you went to community
2  meetings, you conducted graffiti investigations?
3      A.  Yes.
4      Q.  And you supervised the patrol unit?
5      A.  Yes.
6          (Exhibit No. 20 marked
7          for identification.)
8  BY MR. EDWARDS:
9      Q.  I just handed you a document dated June 8,
10  1995 Bates stamp number 533; is that correct?
11      A.  Yes.
12      Q.  The subject is command staff reorganization.
13  Do you see that?
14      A.  Yes.
15      Q.  And the first sentence reads, "As part of
16  the department's command staff reorganization plan,
17  the following changes will become effective
18  Saturday, June 10th, 1995."  Do you see that?
19      A.  Yes.
20      Q.  Now, this says it's to be read at roll
21  calls.  Is this order something you would have been
22  aware of because it was read at roll calls?
23      A.  Yes.
24      Q.  I'm going to direct your attention to the

Page 235

1  second page.  Lieutenant David LeRay is assigned
2  detail unit commander reporting to Deputy Chief John
3  Martino.  Do you see that?
4      A.  Yes.
5      Q.  Is it your opinion that Chief O'Donovan was
6  punishing Lieutenant LeRay?
7      A.  No.  He was taking care of Lieutenant LeRay
8  because he wasn't fit for street duty.  He had a
9  heart condition.
10      Q.  So in this instance at least the position
11  was not perceived as a punishment position?
12      A.  Not at this time, no.
13      Q.  Had a lieutenant ever had the position
14  before Lieutenant LeRay?
15          MR. NOTIS:  Objection.
16      A.  I don't know.  I think a patrolman had it
17  actually.
18      Q.  There's nothing in the police department
19  rules and regulations that categorizes head of the
20  detail unit as a punishment position; is that
21  correct?
22      A.  I don't know.  I don't believe so.
23          (Exhibit No. 21 marked
24          for identification.)

Page 236

1  BY MR. EDWARDS:
2      Q.  This is another supervisory personnel
3  reassignment?
4      A.  Yes.
5      Q.  Dated January 6th, 1999?
6      A.  Yes.
7      Q.  Bates number 735.  This order number 1 under
8  captains is reassigning Captain John Martino from
9  commander of area B to commander of detail unit.  Do
10  you see that?
11      A.  Yes.
12      Q.  And also under lieutenants, number 3, moving
13  Lieutenant LeRay out of the detail unit to commander
14  of training unit, correct?
15      A.  Yes.
16      Q.  So Captain Martino is replacing Lieutenant
17  LeRay in this position, correct?
18      A.  Correct.
19      Q.  So based on the two orders we've just looked
20  at, the position has gone from a lieutenant to a
21  captain, correct?
22      A.  Correct.
23      Q.  The position was perceived as a punishment
24  position?

19 (Pages 233 to 236)

Page 237

1 A. Yes.
2 Q. You thought it was a punishment position for
3 Captain Martino?
4 A. Yes.
5 Q. You thought that Tom O'Loughlin, who issued
6 this order, was discriminating against John Martino?
7 A. I thought he was punishing him.
8 Q. Did you think it was discriminatory?
9 A. I thought it was punishment. I didn't think
10 of discrimination one way or the other regarding it.
11 Q. Do you think he did it because of his
12 gender?
13 A. No.
14       (Exhibit No. 22 marked
15       for identification.)
16 BY MR. EDWARDS:
17 Q. I just handed you a memorandum dated October
18 31st, 2002, Bates number M 210, correct?
19 A. Yes.
20 Q. And this was written by William C. Fleming,
21 chief of police, correct?
22 A. Yes.
23 Q. And Chief Fleming, and he was interim chief
24 at the time; is that right?

Page 238

1 A. Yes.
2 Q. "In the very near future, I am anticipating
3 in reassigning Captain Martino to patrol operations.
4 Therefore, this would create an opening for
5 Supervisor of Details. Any supervisor interested
6 in this position should submit a letter of interest
7 to Chief William C. Fleming by Wednesday, November
8 6th, 2002."
9       Do you see that?
10 A. Yes.
11 Q. Now, we've identified supervisors as
12 sergeants and above, correct?
13 A. Yes.
14 Q. So, this is an invitation for any sergeant,
15 any lieutenant, any captain to apply; is that
16 correct?
17 A. Yes.
18       (Exhibit No. 23 marked
19       for identification.)
20 BY MR. EDWARDS:
21 Q. The document you were just handed is dated
22 November 7th, 2002, Bates number M 211. And this is
23 another order issued by William Fleming?
24 A. Yes.

Page 239

1 Q. And it is announcing the assignment of
2 Sergeant Michael Morris as supervisor of the detail
3 unit?
4 A. Yes.
5 Q. Do you know whether Sergeant Morris applied
6 for the position?
7 A. I believe he did.
8 Q. Did you view this as a punishment
9 assignment?
10 A. No.
11 Q. Why not?
12 A. Because he bid for it.
13 Q. He wanted it?
14 A. Yes.
15 Q. Is it only a punishment position if you
16 don't want to do it?
17 A. No.
18 Q. An officer doesn't want to do it?
19 A. No.
20       (Exhibit No. 24 marked
21       for identification.)
22 BY MR. EDWARDS:
23 Q. I just handed you another order issued by
24 William Fleming; is that correct?

Page 240

1 A. Yes.
2 Q. Dated November 14th, 2002, Bates stamp
3 number M 213. And this is an order reassigning
4 Captain Martino out of the position of detail unit
5 supervisor, correct?
6 A. Mine has a different number on the bottom.
7 Mine says 211.
8       MR. NOTIS: You have the wrong document.
9       (Discussion off the record.)
10 BY MR. EDWARDS:
11 Q. Exhibit 24 is a memo from William Fleming
12 assigning Captain Martino out of the detail unit
13 position?
14 A. Yes.
15 Q. To patrol operations commander?
16 A. Yes.
17 Q. Is that a move that you would consider an
18 advancement?
19 A. Yes.
20 Q. Now, Captain Martino had already been a
21 Deputy Chief, had he not?
22 A. Yes.
23       (Exhibit No. 25 marked
24       for identification.)

Page 241

1  BY MR. EDWARDS:
2      Q. The document I just handed you is dated
3  August 4, 2003 and Bates number M 12?
4      A. Yes.
5      Q. This is Chief Carter's order assigning you
6  to be commander of the detail unit, correct?
7      A. Yes.
8      Q. Now, on the same document, Lieutenant
9  Leuchte is taken out of the detective unit as well,
10 right?
11     A. Yes.
12     Q. And he is assigned to patrol?
13     A. Correct.
14     Q. Assigned to the patrol division. It doesn't
15 indicate here that that's a commander position.
16 Where did Joseph Leuchte go within the patrol
17 division?
18     A. I think he went to 3:30. He was just a
19 street lieutenant, I believe.
20     Q. He was a commander of the shift?
21     A. I don't think so.
22     Q. And Lieutenant Thomas McCarthy went to the
23 position of detective unit commander, correct?
24     A. Yes.

Page 242

1      Q. Is this the position you had before you were
2  assigned to details?
3      A. Yes.
4      Q. Is it your opinion that Lieutenant
5  McCarthy's move to the detective unit adversely
6  impacted his ability to advance within the
7  department?
8      A. No. Lieutenant McCarthy wanted that
9  position.
10     Q. Right. But my question is whether you think
11 it adversely impacted his chance to advance.
12     A. No. Because that's where he wanted to be.
13 He didn't want to advance any further.
14     Q. But he did advance, didn't he?
15     A. They eventually made him a deputy, but in my
16 opinion no, it didn't adversely affect him because
17 that's where he wanted to be.
18     Q. Let me state it this way and you can correct
19 me if I'm wrong. Lieutenant McCarthy's assignment
20 as head of the detective unit did not affect him
21 because he wanted to be there, correct?
22     A. Correct.
23     Q. And you don't see it as adversely impacting
24 his chance for advancement?

Page 243

1      MR. NOTIS: Objection. Asked answered.
2  You can answer.
3      MR. EDWARDS: I don't understand. And
4  I'm trying to state it in a way that makes sense to
5  me.
6      A. No. My opinion is no, it didn't adversely
7  affect him.
8      Q. His advance for advancement?
9      A. No.
10     Q. I'm talking specifically --
11     A. No, it did not negatively impact Thomas
12 McCarthy, period.
13     Q. Because he wanted to be there?
14     A. Because he's a man and because he wanted to
15 be there.
16     Q. What does his being a man have to do with
17 it?
18     A. I think it's got a lot to do with it.
19     Q. What?
20     A. It's not going to impact him because he was
21 a man. There was a female in that position and it
22 impacted her significantly. My opinion is that it
23 impacted me significantly because I was a female.
24 It did not impact him because he was a male.

Page 244

1      Q. In your knowledge, as best you can remember
2  had there ever been a female head of detectives? A
3  detective commander?
4      A. I don't know.
5      Q. As far as you know within your experience
6  you are the first one?
7      A. I don't know if Ford-Murphy was ever
8  assigned to detectives as a commander, so I can't
9  answer that.
10     Q. Paragraph 16, Lt. O'Loughlin was initially
11 replaced in her job as detective unit commander by a
12 male. That's Lieutenant McCarthy?
13     A. Yes.
14     Q. The position was then held by a female
15 lieutenant who had been demoted from the position of
16 Deputy Chief; is that correct?
17     A. I don't know if that's correct or not. I
18 don't know if that's correct. That may be a
19 misquote from my attorney. I don't know if that's
20 correct or not.
21     Q. Okay. It was then filled by a male
22 lieutenant, correct?
23     A. Yes.
24     Q. And who was that male lieutenant?

21 (Pages 241 to 244)

Page 245

1    A. McCarthy. Gillespie initially in the
2 interim held the position and then they appointed
3 McCarthy.
4    Q. Okay. Who has the position now?
5    A. Gillespie. He's a lieutenant.
6    Q. So, from the time you were initially placed
7 in that position it has since been held by
8 lieutenants, correct?
9    A. Yes.
10    Q. You were the first lieutenant, but then it's
11 subsequently been McCarthy, we don't know whether
12 there was a female lieutenant, and then Gillespie?
13    A. I don't know if I was the first lieutenant
14 or not that ever held the position. I don't know.
15    Q. But within your complaint --
16        MR. NOTIS: Objection.
17 BY MR. EDWARDS:
18    Q. There was a sergeant, correct? This is your
19 complaint. You've described it. A sergeant held
20 the position?
21    A. To the best of my knowledge it was a
22 sergeant.
23    Q. Gillespie?
24    A. Yes.

Page 246

1    Q. Then you?
2    A. Yes.
3    Q. Then Lieutenant McCarthy?
4    A. Yes.
5    Q. And we don't know about the female
6 lieutenant?
7    A. I don't know about that.
8    Q. And then Gillespie again?
9    A. Yes.
10    Q. As a lieutenant?
11    A. Yes.
12    Q. Okay. Thank you. Now, McCarthy was a
13 Deputy Chief under Chief O'Donovan; is that correct?
14    A. Yes.
15    Q. So he had gone at some point from being
16 Deputy Chief to heading this detective unit;
17 correct?
18    A. Yes.
19    Q. He may have had other positions in the
20 interim, but he ended up here?
21    A. Yes.
22    Q. And then he went on to become Deputy Chief
23 again?
24    A. Yes.

Page 247

1    Q. Now, it indicates here that there was no
2 legitimate non-discriminatory reason to move
3 Lt. O'Loughlin from the job of detective unit
4 commander. Is that your position?
5    A. Yes.
6    Q. Even though you didn't like the job?
7    A. Whether I liked it or not, I was doing the
8 job. It was being performed to a high standard and
9 there was no reason to put me in a punishment
10 position from that job.
11    Q. Now, it indicates here that Lt. O'Loughlin
12 -- well, let me back up to the previous sentence.
13        There was no legitimate
14 non-discriminatory reason, and this is the last part
15 of the sentence, to replace her -- you -- as
16 detective unit commander with any of the individuals
17 who replaced her.
18        So I take it from this, and you can tell
19 me whether it's correct, that not only do you see
20 the move to details as discriminatory, you see being
21 replaced in the detective unit as discriminatory; is
22 that correct?
23    A. Replacing me with a male, yes.
24    Q. But you replaced a male, didn't you?

Page 248

1    A. I went from my position, which I was
2 performing probably above expectations, to a
3 punishment assignment for no valid reason. They
4 then replaced me with a male for no valid reason.
5 It's my opinion the only reason I was moved was
6 because I was a female.
7    Q. And that's even though, as far as you know,
8 both of these positions -- head of detectives, head
9 of details -- had always been held by males,
10 correct?
11    A. That's my position.
12    Q. Well, is that correct, as far as we know
13 both of these positions had always been held by
14 males?
15    A. I can't answer that one. I believe it's
16 just males but I can't be sure on that.
17    Q. Now, paragraph 17, you talk about other
18 discriminatory treatment by Chief Carter -- oh, I
19 am going to do paragraph 17.
20        Let me ask you, when Chief Carter
21 assigned you to the detail unit did he talk about
22 any specific problems that the unit was having?
23    A. No.
24    Q. He didn't indicate to you that he wanted

Nancy O'Loughlin

Page 253

1 through Fleming to the Chief.
2    Q. And you indicate here that Chief Carter
3 supported your subordinate? Is that what this
4 means?
5    A. Yes.
6    Q. How did he do that?
7    A. By putting me into a punishment position.
8 He doesn't deal with the insubordination. He
9 totally avoids the situation and I get punished for
10 writing him up.
11    Q. "Even though Chief Carter knew that
12 subordinate was wrong and not being truthful." How
13 do you know that?
14    A. Because Deputy Fleming had -- the
15 conversation centered around a report that Deputy
16 Fleming requested from Gillespie. I in turn relayed
17 that request or that order from the deputy. I get
18 an insubordinate, insulting and inappropriate
19 response. I write up the officer. The officer
20 never complies with the order. Fleming relays the
21 whole scenario to the Chief --
22    Q. He told you -- that's what Fleming told you?
23    A. That's what Fleming told me.
24        MR. NOTIS: Let her finish her answer.

Page 254

1    A. As a result of that I was punished. He
2 remains in the position he is. Actually, he is the
3 interim commander of the detective unit. And I get
4 sent to a lesser punishment assignment because I
5 have the audacity to write up a male subordinate.
6    Q. Now, when was Gillespie the interim
7 commander?
8    A. From the time I was put in details till the
9 time somebody else was assigned. All right, I
10 wasn't. They assigned McCarthy right away. I
11 thought there was a period. That's my mistake.
12    Q. That's Exhibit 25. So Lieutenant McCarthy
13 was immediately --
14    A. Lieutenant McCarthy was assigned.
15        (Exhibit No. 26 marked
16        for identification.)
17        (Discussion off the record.)
18 BY MR. EDWARDS:
19    Q. The document that we've just marked as
20 Exhibit 26 is a three-page document beginning Bates
21 stamp number M 300. And this is a document that you
22 wrote?
23    A. Yes.
24    Q. And what is this document about? It's

Page 255

1 addressed to Deputy Chief William Fleming?
2    A. It's about problems I was having with unit
3 supervision.
4    Q. Primarily with Detective Gillespie?
5    A. Sergeant Gillespie.
6    Q. I mean Sergeant Gillespie.
7    A. Yes.
8    Q. And did Deputy Fleming discuss this document
9 with you?
10    A. I don't know if we discussed this specific
11 document. I know we discussed the problems that I
12 was having.
13    Q. And what did Deputy Fleming --
14    A. I wrote the document, he forwarded it to the
15 Chief.
16    Q. Did Deputy Fleming take any action that you
17 know of?
18    A. I believe we were informed that he reported
19 directly to the Chief and after this document I was
20 reassigned and I believe he was subsequently
21 reassigned.
22    Q. Deputy Fleming told you what, that Chief --
23    A. Gillespie informed me that he referred it
24 directly to Chief Carter.

Page 256

1    Q. Gillespie told Deputy Fleming that he
2 reported --
3    A. Directly to Chief Carter.
4    Q. And as you recall, you were reassigned?
5    A. I was reassigned and I believe shortly after
6 Fleming was reassigned. He was put back as a
7 lieutenant?
8    Q. Why was he put back as a lieutenant?
9    A. In retaliation for writing Sergeant
10 Gillespie up.
11    Q. And you think this was as retaliation for
12 you writing Gillespie up?
13    A. Yes.
14    Q. Not because you were a female?
15    A. I think it's part and parcel.
16    Q. When you say part and parcel, what do you
17 mean?
18    A. I think the primary reason I was reassigned
19 was because I was female. I think part of this was
20 retaliation for writing -- or having the audacity to
21 write a male subordinate up.
22    Q. Okay. And you also indicated, though, that
23 you think Fleming was retaliated against as well by
24 Chief Carter?

24 (Pages 253 to 256)

Nancy O'Loughlin

Page 257

1  A. Yes.
2  Q. For the same reason?
3  A. For --
4      MR. NOTIS: Objection.
5  A. For trying to deal with Gillespie.
6  Q. But that it nothing to do with Fleming's
7  gender?
8  A. I don't know about Fleming. I can only
9  speak for myself. I think he was reassigned for
10  retaliation.
11      (Exhibit No. 27 marked
12      for identification.)
13      MR. NOTIS: Just for the record,
14  Mr. Edwards, it looks as if the top of this document
15  and what you are going to mark as Exhibit 27 at the
16  bottom was cut off a bit.
17      MR. EDWARDS: I'll try to see if I have
18  a better copy.
19      (Discussion off the record.)
20      MR. NOTIS: On Exhibit 27, the copy I've
21  been given looks like it's been caught off at the
22  top and bottom. It appears from the little printing
23  on the top as if this was sent to Sergeant Gillespie
24  from Deputy Fleming. And on the bottom I can't tell

Page 258

1  if there was more text on the first page of this or
2  not. There may not have been but I can't tell.
3  BY MR. EDWARDS:
4  Q. Now, have you seen this document before?
5  A. No.
6  Q. Did you know that Deputy Fleming wrote a
7  memo to Sergeant Gillespie?
8  A. I believe this was the one. He wanted a
9  response to a report and I think that's what this
10  one was about. I'm not positive. There's a second
11  page on that, but I think that's what it's about.
12  Q. I'm going to direct your attention to the
13  last paragraph on the first page. "Just so things
14  are perfectly clear, Lieutenant O'Loughlin and
15  Lieutenant Leuchte are the primary supervisors in
16  the detective unit." Do you see that?
17  A. Yes.
18  Q. "You are a secondary supervisor in the night
19  detective unit. You have no control over the
20  day-to-day operation of the day detective unit
21  unless you are standing in for a primary
22  supervisor."
23      Did I read that correctly?
24  A. Yes.

Page 259

1  Q. "You are to have no involvement with case
2  assignments and as you put it, questioning,
3  monitoring and constructively criticizing detectives
4  not under your control."
5      Do you see that?
6  A. Yes.
7  Q. In your experience at the MBTA police
8  department is it customary when you as lieutenant
9  make a complaint to a Deputy Chief for the Deputy
10  Chief to respond to that complaint?
11  A. I forward it up the chain of command. I
12  don't know what the protocol is above Deputy Chief.
13  Q. Your issues about Gillespie and supervising
14  him, does this last paragraph on this front page
15  seem to indicate that Deputy Fleming is making it
16  clear to Gillespie the chain of command?
17  A. Yes. He's attempting to get the message
18  across, the message that he wasn't getting from me.
19  Q. That who wasn't getting?
20  A. That Gillespie wasn't getting. That, like
21  it or not, there was a female in charge.
22  Q. Why do you think it was because you were a
23  female?
24  A. Because I think they have problems with

Page 260

1  females in policing in general. Very tough
2  profession to be in if you're a female.
3  Q. What specifically about Gillespie makes you
4  think it was because you were female?
5  A. Because he felt he didn't have to follow
6  anything I instructed him to do. That he could do
7  anything he wanted to do.
8  Q. Do you have any reason to believe that it
9  was because he had been commanding the unit before
10  you were assigned there?
11  A. No.
12  Q. But he had been, correct?
13  A. I believe so.
14  Q. Well, you testified to it, didn't you?
15  A. I believe he was. I mean he had Leuchte on
16  nights and I think he was on days.
17  Q. Back to the complaint. 17, 3, Despite the
18  fact that Lt. O'Loughlin is recognized as an expert
19  in relation to graffiti-related crime and has
20  testified as an expert -- I'll just paraphrase it
21  rather than read it -- Chief Carter informed her,
22  and in parens on the same day he transferred her to
23  the detail unit, that she would no longer be allowed
24  to investigate and/or testify as an expert on

25 (Pages 257 to 260)

Page 273

1        AFTERNOON SESSION
2        (Exhibit No. 28 marked
3          for identification.)
4    BY MR. EDWARDS:
5        Q. You were just handed a document dated July
6    30th, 2003, M 11 is the Bates stamp number; isn't
7    that correct?
8        A. Yes.
9        Q. And actually not the second page. M 24
10   through M 27 is attached, I'll just mark them all
11   as one exhibit.
12           This is a document issued by Chief
13   Carter regarding promotional examinations for Deputy
14   Chief; is that correct?
15       A. Yes.
16       Q. Did you receive this document?
17       A. No.
18       Q. Have you ever seen it?
19       A. Yes.
20       Q. And this is an announcement by the Chief
21   that he would be  -- he was setting up a competitive
22   process for Deputy Chief?
23       A. Yes.
24       Q. There was going to be an examination, this

Page 274

1    is the second paragraph, open to acting deputy
2    chiefs, captains, lieutenants and sergeants with a
3    minimum of five years of experience, correct?
4        A. Yes.
5        Q. Did you apply for this position?
6        A. No.
7        Q. Could you have applied for this position?
8        A. Yes.
9        Q. And on the second page through the end is a
10   description of the position and what would be
11   entailed and the application process; is that
12   correct?
13       A. Yes.
14       Q. Looking at paragraph 20 of the complaint,
15   now it indicates here that your superiors were
16   engaging in unfair treatment or they knew of unfair
17   treatment and took no action to stop it, investigate
18   it or rectify it; is that correct?
19       A. Yes.
20       Q. What supervisors are we talking about?
21       A. It would be the Chief, Chief Carter.  The
22   deputies.
23       Q. Deputy Fleming?
24       A. Yes, and Martino and McCarthy.

Page 275

1        Q. Deputy Mahoney?
2        A. Yes.
3        Q. Tom O'Loughlin?
4        A. Yes.
5        Q. John O'Loughlin?
6        A. Yes.
7        Q. I'm sorry?
8        A. Yes.
9        Q. Who else?
10       A. Shaughnessey, Taylor-Miller.  That's all I
11   can recall right now.
12       Q. Taylor-Miller is a woman?
13       A. Yes.
14       Q. What is her name?
15       A. Nadine Taylor-Miller.
16       Q. But you knew you were being discriminated
17   against on the basis of your gender and as I read
18   here the second sentence, "When these actions set
19   forth above occurred, Lieutenant O'Loughlin always
20   hoped and anticipated that this improper conduct
21   would stop by her continuing to do as good a job as
22   she could, but the unfair treatment of her
23   continued."  Correct?
24       A. That's correct.

Page 276

1        Q. But in addition to hoping and anticipating,
2    you did not, or you chose not to file a formal
3    complaint?
4        A. I didn't file a formal complaint because of
5    the atmosphere a female works under in a
6    male-dominated field.  It's very hard to be a female
7    in a police profession so you shut your mouth and do
8    a good job and hope people will just notice your job
9    and leave you alone.  But it didn't work that way
10   and it got worse and worse until I was forced to do
11   something about it.
12       Q. At the time you understood you were being
13   discriminated against based on your gender based on,
14   as you say here, the acts described above, you chose
15   not to file a complaint?
16       A. I would be labeled for the rest of my career
17   and it would not end.
18       Q. But you did not file a formal complaint?
19       A. No.
20       Q. Now, paragraph 22, you talk about
21   discriminatory treatment accorded to other higher
22   level female employees of the police department.  To
23   whom are you referring?
24       A. Deputy Ford-Murphy.

29 (Pages 273 to 276)

Nancy O'Loughlin

Page 289

1    A. That's true.
2    Q. Do you know whether the former chief was
3  aware of the statements you reference here?
4    A. I don't know.
5    Q. Would you agree that different chiefs can
6  respond differently to the same circumstances? And
7  we're talking about statements here.
8    A. Yes.
9        (Exhibit No. 32 marked
10        for identification.)
11  BY MR. EDWARDS:
12    Q. I just handed you a document dated June 4,
13  2003, Bates stamp number 372. The document under it
14  begins at Bates stamp 373; is that correct?
15    A. It doesn't have a stamp on it -- oh, wait a
16  minute. Yes.
17    Q. 373?
18    A. 373.
19    Q. The top document is a memo from Chief
20  Carter?
21    A. Yes.
22    Q. And it is discussing what he calls a Plan of
23  Action. Are you familiar with the Plan of Action?
24    A. Somewhat, yes.

Page 290

1    Q. And that's what's attached?
2    A. Correct.
3    Q. Beginning on page 373, Bates stamp 373,
4  correct?
5    A. Correct.
6    Q. And this is to be mentioned at roll call
7  through June 10th, 2003, standard distribution,
8  correct?
9    A. Correct.
10    Q. What is standard distribution?
11    A. It goes department-wide.
12    Q. Second paragraph, second sentence, "I
13  encourage you all to pick up a copy in the afternoon
14  in the duty supervisor's office and to familiarize
15  yourself with the different facets of the plan. I
16  will be conducting a number of roll calls to further
17  explain plan details and to answer any questions
18  that you might have."
19        Do you remember understanding that you
20  were encouraged to pick up copies of this Plan of
21  Action?
22    A. Yes.
23    Q. Did you pick up a copy?
24    A. I don't think I had -- I think I had

Page 291

1  copies.
2    Q. Did you read it?
3    A. Yes.
4    Q. Next paragraph, "This Plan of Action
5  presents the vision for policing the MBTA transit
6  system throughout the Greater Boston area. It draws
7  upon the findings of a comprehensive review of MBTA
8  police issues, structure, standards and strategies
9  and sets forth a blueprint for how policing will be
10  conducted in the future."
11        Did you understand that that is what
12  this document was?
13    A. Yes.
14    Q. Among other things it lays out a new patrol
15  plan?
16    A. Yes.
17    Q. That's the TPSA plan?
18    A. Yes.
19    Q. Is that plan in use now?
20    A. Yes.
21    Q. This plan talks about what Chief Carter sees
22  as problems the MBTA needs to address and needs to
23  overcome?
24    A. Yes.

Page 292

1    Q. I'm just going to ask you to turn to Bates
2  stamp number 388, page 11 of the document. At the
3  top it's labeled Core Values.
4    A. Yes.
5    Q. Did you understand that Chief Carter had
6  what he referred to as core values?
7    A. Yes.
8    Q. And number one is fairness; do you see that?
9    A. Yes.
10    Q. Number two, truthfulness?
11    A. Yes.
12    Q. Under truthfulness, the last sentence,
13  "Truthfulness means that all employees, from the
14  very top of the organization to the bottom, admit
15  mistakes when they are made and take responsibility
16  for their decisions even when it is not in their own
17  best interests to do so."
18        Had you read that before?
19    A. Yes.
20    Q. Professionalism, which is number 3, do you
21  see that?
22    A. Yes.
23    Q. Last sentence on this page, "Internal
24  criticism offered secretly and without constructive

33 (Pages 289 to 292)

Nancy O'Loughlin

Page 293

1 basis will be unacceptable and dealt with harshly."
2 Do you see that?
3 A. Yes.
4 Q. Did you understand that Chief Carter
5 intended to deal with secret criticism harshly?
6 A. Yes.
7 Q. Number 4, perseverance. You see that that's
8 another core value? The next page.
9 A. Yes.
10 Q. Treating all persons with dignity and
11 respect, number 5.
12 A. Yes.
13 Q. You understood that was a core value?
14 A. Yes.
15 Q. "This statement represents the true nature
16 of policing at its best. Procedures will be
17 established to detect bias in its earliest
18 manifestations, both internally and externally, so
19 that dignified and respectable treatment can be
20 assured."
21 A. Yes.
22 Q. 6 is service before self?
23 A. Yes.
24 Q. And number 7 is integrity. Do you see that?

Page 294

1 A. Yes.
2 Q. Now, the last full paragraph -- actually,
3 under integrity, the last sentence, that begins
4 "they know." Do you see that?
5 A. No.
6 Q. At the top of the right-hand column.
7 A. Okay.
8 Q. It is discussing MBTA police officers and
9 the fact that officers cannot be held to one
10 standard while they are at work and to a different
11 standard the rest of the time. Do you see that?
12 A. Yes.
13 Q. "On the contrary," this reads, "they are
14 committed to adhering to the highest standards of
15 integrity whether on or off duty."
16 Do you see that?
17 A. Yep.
18 Q. And the next paragraph, these seven core
19 values, and I'll paraphrase, will serve as the
20 cornerstone of the department's revised disciplinary
21 system. Do you see that?
22 A. Yep.
23 Q. One last thing, the last paragraph says
24 However, priority status will be given to

Page 295

1 investigating any allegation of misconduct regarding
2 one or more of these core values. Specifically, the
3 following seven offenses will be given the highest
4 priority by Internal Affairs, and sustained
5 allegations will be decided and acted upon by the
6 Chief."
7 Do you see that?
8 A. Yes.
9 Q. Criminal conduct, correct?
10 A. Yes.
11 Q. "Untruthfulness; insubordination; excessive
12 force; acts indicative of bias, e.g., racial,
13 gender, etcetera; divulging confidential police
14 information to unauthorized sources. And engaging
15 in conduct, whether on or off duty, that discredits
16 the police agency or the individual in his or her
17 capacity as a police officer."
18 Do you see that?
19 A. Yes.
20 Q. You understood, then, as early as June 4th,
21 2003 that these were things that Chief Carter took
22 seriously; is that correct?
23 A. Yes.
24 Q. Now, on the date you were relieved of duty

Page 296

1 with pay, which was March 8, 2004, how did that day
2 unfold? What happened?
3 A. It was a normal day. I was called by Deputy
4 Martino and told to come to the station for a
5 meeting. I came to the station and McCall was the
6 duty supervisor. I had a brief conversation with
7 her. She was called upstairs for a meeting. The
8 SOTT team was called back to the station for a
9 meeting for something, nobody really knew what. At
10 2 o'clock I went upstairs. I observed the SOT team
11 standing outside the Chief's office and outside the
12 meeting room. I proceeded into the meeting and was
13 summarily executed.
14 Q. You mean you were relieved of duty with pay?
15 A. That's correct.
16 Q. You weren't executed?
17 A. Executed in my eyes.
18 Q. What time was the SOT team called to the
19 station?
20 A. They were there when I got there.
21 Q. So you said they were called --
22 A. Well, in order for the SOT team to be
23 mobilized they have to respond to headquarters. I
24 saw members of the SOT team when I arrived.

34 (Pages 293 to 296)

Nancy O'Loughlin

Page 297

1          (Discussion off the record.)
2    BY MR. EDWARDS:
3      Q.  I'm sorry?
4      A.  There were members of the SOT team in the
5    station when I arrived.
6      Q.  So you don't know how long the SOT team had
7    been there?
8      A.  No, I don't.
9      Q.  Now, the SOT team is special operations
10   team?
11     A.  Yes.
12     Q.  How many members did you see?
13     A.  I saw the commanding officer, I saw one -- I
14   believe three others.  So I believe that would be
15   five in all.
16     Q.  How many officers are part of the SOT team?
17     A.  I have no idea.
18     Q.  And it's described here as a SWAT team; is
19   that correct?
20     A.  What paragraph?
21     Q.  27.
22     A.  It says SOT, special operations team.  I'm
23   sorry, I see where you mean.  It says SWAT team.
24   It's the same thing.

Page 298

1      Q.  Now, where did you see these officers
2    positioned?
3      A.  I saw two posted outside of Chief Carter's
4    office.  There was one in the hallway leading from
5    his office to the meeting room and there was two
6    outside the meeting room.
7      Q.  Okay.  You said there was a commanding
8    officer and three others.  So there were four?
9      A.  No, I said there was five.  I saw the
10   commanding officer, and four others.
11     Q.  And four others.
12     A.  Yes.
13     Q.  Now, what other officers were suspended from
14   duty with pay that day?
15     A.  The only one I knew of for sure that day was
16   Officer McKay.
17     Q.  And was he before or after you?
18     A.  He was right after me.
19     Q.  What happened?  You came to the
20   headquarters, you passed SOT team members.  Are
21   there civilians that work in that part of the
22   building?
23     A.  When I first saw the SOT officers they were
24   downstairs.  When I proceeded up to the meeting

Page 299

1    there was two posted outside of the Carter's office,
2    there was two posted outside of the meeting room,
3    and there was one in the hallway.  On the second
4    level of the building there are civilians, yes.
5      Q.  How many were downstairs?
6      A.  They were all downstairs when I first came
7    into the station.
8          MR. NOTIS:  For the record, how many
9    what?
10   BY MR. EDWARDS:
11     Q.  How many special operations officers?
12     A.  They were downstairs when I first saw them
13   and some time passed when I went up for the meeting.
14   When I went up for the meeting they were upstairs.
15     Q.  Oh, you were early for the meeting?
16     A.  Yes.
17     Q.  Did you speak to them?
18     A.  I believe I had brief conversation with
19   Albanese, the commanding officer.
20     Q.  What is his rank?
21     A.  He's a lieutenant now.  I believe he was a
22   sergeant then.
23     Q.  And so you go into the meeting and what
24   happens?

Page 300

1      A.  I'm relieved of duty with pay.
2      Q.  Who is there?
3      A.  Martino, Ford-Murphy and McCarthy.
4      Q.  And who did the speaking?
5      A.  Mostly McCarthy, I believe.  Ford-Murphy did
6    some but I think McCarthy did the majority of it.
7      Q.  And those were three deputy chiefs?
8      A.  Yes.
9      Q.  And what was said to you that you can
10   recall?
11     A.  That there was an ongoing investigation and
12   I was suspended until the conclusion of the
13   investigation.
14     Q.  And what was the investigation about?
15     A.  Telephone conversations.
16     Q.  And did either of the deputy chiefs tell you
17   that these telephone conversations were in violation
18   or they thought they were in violation of police
19   department policies?
20     A.  I don't remember what was said.
21         (Exhibit No. 33 marked
22         for identification.)
23   BY MR. EDWARDS:
24     Q.  You were just handed a document dated March

35 (Pages 297 to 300)