Exhibit 3

# O'Loughlin
## vs.
# MBTA, et al.

# Nancy O'Loughlin

### Volume 3

February 1, 2006
pp 360-573

**JonesReporting**
COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Nancy O'Loughlin

Page 377

1   Q.  Do you have any reason to believe that
2   Chief Carter removed him from that position because
3   of his gender?
4   A.  Not because of his gender, no.
5   Q.  Because of any type of discrimination?
6   A.  I believe he removed him from that position
7   because he was Carter's -- he was Carter's
8   competition in appointment for chief.
9   Q.  Chief Carter already had the job, didn't
10  he?
11  A.  Chief Carter -- Billy was a -- excuse me.
12  Billy was a deputy chief when Carter came on board.
13  He was acting chief before Carter was appointed.  I
14  believe that Carter removed him from his position
15  because he was his competition for chief.
16  Q.  And on what do you base that?
17  A.  It's just my belief.
18  Q.  And who was the third deputy chief when
19  Chief Carter arrived?
20  A.  I believe it was Mahoney.
21  Q.  At some point, Deputy Chief Mahoney was no
22  longer a deputy chief?
23  A.  That's correct.
24  Q.  Do you have any reason to believe that he

Page 378

1   was no longer a deputy chief because of his gender?
2   A.  No.
3   Q.  Do you have any reason to believe that he
4   was no longer deputy chief because of any
5   discrimination?
6   A.  I don't know why he was reassigned.
7   Q.  And again, I think we covered this, so
8   forgive me.  In your experience on the police
9   force, isn't it customary for a new chief to
10  appoint his own command staff?
11  A.  Sometimes, yes.  Not all the time, but yes,
12  sometimes.
13  Q.  Would you say most of the time?
14      MR. NOTIS:  Objection.  You may answer.
15  Q.  (BY MR. EDWARDS)  Well, let me back up.
16  Let me ask it this way.  Would it be more unusual
17  for -- in your experience for a chief to retain the
18  same command staff or to bring in his own people?
19      MR. NOTIS:  Objection.  You can answer.
20  A.  Um, in my experience, I'm going to have to
21  say no.  The chiefs that I have been under, with
22  the exception, I think, of Tom O'Loughlin, all
23  maintained the same command staff.
24  Q.  (BY MR. EDWARDS)  Tom O'Loughlin completely

Page 379

1   changed his command staff?
2   A.  I -- yes.  Yes, he did.  Yes.
3   Q.  And he did that relatively early in his --
4   he did that when?  As soon as he got there?
5   A.  I don't know when he did it, but it was
6   done.
7   Q.  Okay.  Now, at some point, Chief Carter
8   presented a competitive process for selecting
9   deputy chiefs; do you understand -- is that your
10  understanding?
11  A.  I know there was a selection process, yes.
12  Q.  Did you understand that it was a
13  competitive examination?
14  A.  I really didn't care, so I don't know.
15  Q.  Okay.
16      (Exhibit 37 marked for identification.)
17  Q.  Do you recall seeing that document?
18  A.  Do I recall seeing it?
19  Q.  Yes.
20  A.  No.  I was on vacation when it came out.
21  Q.  This is a memorandum from -- signed by
22  Chief Carter dated December 18th, 2003?
23  A.  That's what it says.
24  Q.  Okay.  And the subject is deputy chief

Page 380

1   appointees, Dolores Ford-Murphy, John Martino and
2   Thomas McCarthy.  You understood that those three
3   people assumed the position of deputy chief at some
4   point?
5   A.  Yes.
6   Q.  Did you understand that they assumed the
7   position of deputy chief in December of 2003?
8   A.  It's dated 2003, so yeah.
9   Q.  Well, aside from this document, did you
10  understand that they assumed the position of deputy
11  chief in December 2003?
12  A.  I don't remember when they assumed it.
13  Q.  Okay.
14  A.  But according to the document, it was
15  December.
16  Q.  The first sentence reads, as a result of a
17  competitive exam process, effective Friday,
18  December 19th, these people will be promoted to the
19  rank of deputy chief.  You have no recollection of
20  a competitive exam process for deputy chief?
21  A.  It didn't concern me, so I don't -- I'm
22  sure it took place, but it didn't concern me, so I
23  didn't concern myself with it.
24  Q.  What do you mean it didn't concern you?

6 (Pages 377 to 380)

Nancy O'Loughlin

Page 381

1    A. I wasn't interested. It wasn't part of my
2  job. It didn't impact me.
3    Q. So then you paid it no mind?
4    A. I didn't take part in any -- any type of a
5  competitive exam process, no.
6    Q. And you didn't want to be a deputy chief?
7    A. No.
8    Q. Did Anne McCall take part in this process?
9    A. I don't know.
10   Q. Did Bill Fleming take part in this process?
11   A. I don't know.
12   Q. You never spoke with either of them about
13 it?
14   A. I was on vacation.
15   Q. Well, before, at any point?
16   A. No, not that I recall.
17   Q. Now, you mentioned that you thought --
18 again, let me back up, and I apologize. Do you
19 have any reason, any evidence, anything you've
20 heard that leads you to believe that Deputy Chief
21 Ford-Murphy was not promoted to deputy chief as a
22 result of a competitive exam process?
23   A. I stated earlier in my deposition I think
24 he was told to put her in that position.

Page 382

1    Q. Right, but you don't know who allegedly
2  told him that?
3       (Witness gesturing.)
4    Q. And nobody ever told you that Chief Carter
5  was told to put her in that position?
6    A. That's just my opinion.
7    Q. And as I recall, you thought he was told
8  that because she filed a complaint in the past?
9    A. That's correct.
10   Q. Now, her complaint was against Chief
11 O'Donovan; is that right?
12   A. I believe so.
13   Q. And Chief O'Donovan preceded Tom
14 O'Loughlin?
15   A. That's correct.
16   Q. Do you -- do you have reason to believe
17 that Tom O'Loughlin was told to put Deputy
18 Ford-Murphy into a deputy chief's position?
19   A. I don't know, no.
20   Q. He wasn't -- she was not a deputy chief
21 under Tom O'Loughlin?
22   A. No, Anne McCall was.
23   Q. Anne McCall was?
24   A. That's correct.

Page 383

1    Q. Do you have any reason to believe that Tom
2  O'Loughlin was told to put Anne McCall into the
3  deputy chief's position?
4    A. No.
5    Q. Do you know whether she is -- she has ever
6  filed a complaint?
7    A. Who?
8    Q. Anne McCall.
9    A. I don't know.
10   Q. In your experience, had any other chiefs
11 instituted a competitive examination process as a
12 means of selecting deputy chiefs?
13   A. I don't know.
14   Q. You don't recall or --
15   A. I don't know. I don't know.
16   Q. Have you ever aspired to the position of
17 deputy chief under any chief?
18   A. No.
19   Q. That's a job you just didn't want?
20   A. No.
21   Q. I'm going to direct your attention to
22 paragraph 19, and paragraph 19 alleges that you
23 have been subjected to a pattern and practice of
24 gender discrimination which Chief Carter has

Page 384

1  followed and has continued? Is that a correct
2  understanding of paragraph 19?
3    A. Yes.
4    Q. And you list ways in which you've allegedly
5  been discriminated against?
6    A. That's correct.
7    Q. Number one, for a long period of time,
8  Lieutenant O'Loughlin was the only superior officer
9  assigned to the detective unit who was deliberately
10 not provided with an office. Now, when you say
11 superior officer, are you talking about sergeants
12 and lieutenants?
13   A. Yes.
14   Q. Who had offices in that unit?
15   A. Leuchte had an office. Gillespie had an
16 office. Moynahan had two offices.
17   Q. Why did Moynahan have two offices?
18   A. I don't know. He had one upstairs and one
19 downstairs.
20   Q. Did you -- now, at the time -- now, this is
21 before Chief Carter?
22   A. No, this is during chief -- no, he was
23 there when this happened, too.
24   Q. Okay. When you were first assigned to

Nancy O'Loughlin

Page 381

1    A.  I wasn't interested.  It wasn't part of my
2  job.  It didn't impact me.
3    Q.  So then you paid it no mind?
4    A.  I didn't take part in any -- any type of a
5  competitive exam process, no.
6    Q.  And you didn't want to be a deputy chief?
7    A.  No.
8    Q.  Did Anne McCall take part in this process?
9    A.  I don't know.
10    Q.  Did Bill Fleming take part in this process?
11    A.  I don't know.
12    Q.  You never spoke with either of them about
13  it?
14    A.  I was on vacation.
15    Q.  Well, before, at any point?
16    A.  No, not that I recall.
17    Q.  Now, you mentioned that you thought --
18  again, let me back up, and I apologize.  Do you
19  have any reason, any evidence, anything you've
20  heard that leads you to believe that Deputy Chief
21  Ford-Murphy was not promoted to deputy chief as a
22  result of a competitive exam process?
23    A.  I stated earlier in my deposition I think
24  he was told to put her in that position.

Page 382

1    Q.  Right, but you don't know who allegedly
2  told him that?
3    (Witness gesturing.)
4    Q.  And nobody ever told you that Chief Carter
5  was told to put her in that position?
6    A.  That's just my opinion.
7    Q.  And as I recall, you thought he was told
8  that because she filed a complaint in the past?
9    A.  That's correct.
10    Q.  Now, her complaint was against Chief
11  O'Donovan; is that right?
12    A.  I believe so.
13    Q.  And Chief O'Donovan preceded Tom
14  O'Loughlin?
15    A.  That's correct.
16    Q.  Do you have reason to believe
17  that Tom O'Loughlin was told to put Deputy
18  Ford-Murphy into a deputy chief's position?
19    A.  I don't know, no.
20    Q.  He wasn't -- she was not a deputy chief
21  under Tom O'Loughlin?
22    A.  No, Anne McCall was.
23    Q.  Anne McCall was?
24    A.  That's correct.

Page 383

1    Q.  Do you have any reason to believe that Tom
2  O'Loughlin was told to put Anne McCall into the
3  deputy chief's position?
4    A.  No.
5    Q.  Do you know whether she is -- she has ever
6  filed a complaint?
7    A.  Who?
8    Q.  Anne McCall.
9    A.  I don't know.
10    Q.  In your experience, had any other chiefs
11  instituted a competitive examination process as a
12  means of selecting deputy chiefs?
13    A.  I don't know.
14    Q.  You don't recall or --
15    A.  I don't know.  I don't know.
16    Q.  Have you ever aspired to the position of
17  deputy chief under any chief?
18    A.  No.
19    Q.  That's a job you just didn't want?
20    A.  No.
21    Q.  I'm going to direct your attention to
22  paragraph 19, and paragraph 19 alleges that you
23  have been subjected to a pattern and practice of
24  gender discrimination which Chief Carter has

Page 384

1  followed and has continued?  Is that a correct
2  understanding of paragraph 19?
3    A.  Yes.
4    Q.  And you list ways in which you've allegedly
5  been discriminated against?
6    A.  That's correct.
7    Q.  Number one, for a long period of time,
8  Lieutenant O'Loughlin was the only superior officer
9  assigned to the detective unit who was deliberately
10  not provided with an office.  Now, when you say
11  superior officer, are you talking about sergeants
12  and lieutenants?
13    A.  Yes.
14    Q.  Who had offices in that unit?
15    A.  Leuchte had an office.  Gillespie had an
16  office.  Moynahan had two offices.
17    Q.  Why did Moynahan have two offices?
18    A.  I don't know.  He had one upstairs and one
19  downstairs.
20    Q.  Did you -- now, at the time -- now, this is
21  before Chief Carter?
22    A.  No, this is during chief -- no, he was
23  there when this happened, too.
24    Q.  Okay.  When you were first assigned to

Nancy O'Loughlin

Page 413

1  the BDU's. I don't remember.
2      Q.  What is BDU's?
3      A.  It's a -- they look like black pajamas.
4  It's a special SOT uniform, or it's a uniform we
5  use when we're on a high terror alert.
6      Q.  So that is a special distinctive garb if
7  they're involved in some operation?
8      A.  Yes.
9      Q.  And the SOT team does a lot of different
10 things like terrorism and hostages, dealing with
11 hostages?
12      MR. NOTIS:  Ob-- that's all right.  If
13 you understand the question.
14      A.  Yes.
15      Q.  (BY MR. EDWARDS)  Okay.  But as you recall,
16 there may have been one dressed in this black garb,
17 but you don't recall specifically?
18      A.  That's correct.
19      Q.  You do recall that Sergeant Albanese was
20 not dressed in it?
21      A.  I'm pretty sure he wasn't.
22      Q.  Did Sergeant Albanese say anything to you
23 that was threatening?
24      A.  Threatening?

Page 414

1      Q.  Yes.
2      A.  I really don't remember the conversation.
3  I do remember that he said they had been called
4  back to the station for something, but I don't
5  remember anything more.
6      Q.  At the time you spoke with Sergeant
7  Albanese, did you have any reason to believe that
8  his presence had anything to do with you?
9      A.  No.  As far as -- when I spoke to him, as
10 far as I knew, I was there for a meeting.
11      Q.  And after you walked away from Sergeant
12 Albanese, you still thought you were just going to
13 a meeting?
14      A.  That's correct.
15      Q.  So there was nothing in what Sergeant
16 Albanese said to you that caused you to feel
17 threatened; is that fair to say?
18      A.  That's correct.
19      Q.  Okay.  You weren't afraid of him?
20      A.  No.
21      Q.  Did he have his weapon out?
22      A.  Did he have his weapon out?
23      Q.  Yes.
24      A.  No.

Page 415

1      Q.  He was carrying a weapon?
2      A.  Yes.
3      Q.  His service weapon?
4      A.  Yes.
5      Q.  Any other firearms that you noticed?
6      A.  I don't remember.
7      Q.  Did any of the other SOT members have their
8  weapons out?
9      A.  I don't believe so.
10      Q.  Did any of the other SOT members act in a
11 way or say anything that you perceived as
12 threatening?
13      A.  The only -- I really didn't have
14 conversation with the other SOT members other than
15 when we walked by them upstairs and they were
16 standing there, we realized -- not when we were
17 going in, but when we were coming out -- they were
18 there for me, to protect the chief from me.
19      Q.  This was -- you didn't see them on your way
20 up?
21      MR. NOTIS:  Objection.
22      A.  I saw them on my way up, but as far as I
23 knew, until I got in that room, I was going to a
24 meeting.

Page 416

1      Q.  (BY MR. EDWARDS)  Oh, I see.  I see.  So
2  there was nothing threatening, intimidating or
3  anything along those lines as you walked into this
4  room where the deputy chiefs were?
5      A.  That's correct.
6      Q.  After you came out, did any of the SOT team
7  members act in a way that you perceived as
8  threatening?
9      A.  That I perceived as threatening?
10      Q.  Yes.
11      A.  After I came out of the room, the mere fact
12 that they were there was threatening.
13      Q.  And why was it threatening?
14      A.  Why were they there; to protect from what?
15      Q.  I'm sorry.  I'm talking about your feelings
16 about --
17      A.  I'm telling you my feelings.
18      Q.  Well, my question, though, is did they act
19 in a way that made you feel threatened?
20      A.  And I'm telling you that their mere
21 presence up there threatened me.
22      Q.  Did the SOT officers say anything to you?
23      A.  I don't recall.
24      Q.  Did they make any gestures that you

15 (Pages 413 to 416)

Page 417

1  perceived as threatening?
2      A.  Their mere presence there was a threat.
3      Q.  But in terms of gestures, you didn't see
4  any that threatened you?
5      A.  I answered your question, sir.  Their mere
6  presence there threatened me, period.
7      Q.  Did any of the SOT team members act
8  different toward you after you came out than they
9  did as you were going in?
10     A.  I don't remember.
11     Q.  Did any of the deputy chiefs say anything
12  to you during the course of relieving you of duty
13  with pay that you perceived as threatening?
14     A.  The whole scenario was threatening, period,
15  end of story.  I've been there for 20 plus years
16  with no discipline, and then I'm brought up and
17  executed, period.  The whole situation was
18  threatening, the way it was done, the calling you
19  up and telling you you're coming for a meeting.
20  They weren't even truthful or forthcoming.  It was
21  deceptive.  Their practices were unethical and
22  deceptive.
23     Q.  Were you in fear -- I'm sorry.  I didn't
24  mean to cut you off.  Please.

Page 418

1      A.  It was deceptive.  Their practices were
2  unfair and deceptive.
3      Q.  Were you in fear any time during that
4  meeting?
5      A.  Yes.
6      Q.  And what were you fearful of?
7      A.  I was fearful of my career.  That's what I
8  was fearful of.  Here these people are telling me
9  that I'm being relieved of duty with pay for having
10  an opinion.  Of course you're going to be afraid.
11     Q.  Were you fearful for your physical safety?
12     A.  Yeah, in a sense.  Yes.
13     Q.  In what sense?
14     A.  In the sense that I'm going to lose my job.
15  I don't know how I'm going to react to that.  I
16  don't know what I'm capable of doing to myself.  I
17  don't know what -- they've got armed guards
18  outside.  What are they going to do?  Yeah, I was
19  afraid.  Absolutely.
20     Q.  What do you mean you didn't know what you
21  were capable of doing to yourself?
22     A.  If I walked in here today and said you're
23  out of a job, see you later, what are you going to
24  do?  Do you know how you're going to react

Page 419

1  10 minutes down the road when you have a chance to
2  sit down and really digest what's going to happen?
3      Q.  Did you consider doing something to
4  yourself?
5      A.  The thought passed my mind.
6      Q.  At -- at the time you were in the meeting?
7      A.  Yeah, absolutely.  I have to go home and
8  face my husband and my kids.  Absolutely.
9  Absolutely.
10     Q.  What did you consider doing to yourself
11  during that meeting?
12     A.  Well, let's see.  The thought crosses your
13  mind, do you want to go home, do you want to slit
14  your wrist, do you want to drive into a wall, what
15  is it you want -- any number of things cross your
16  mind, and that's what crossed my mind.
17     Q.  Were you angry?
18     A.  I was upset.  I was humiliated.
19  Absolutely.  And yes, I was angry.
20     Q.  Did it cross your mind to do anything to
21  the deputy chiefs?
22     A.  No.
23     Q.  Never crossed your mind?
24     A.  Never crossed my mind.

Page 420

1      Q.  Did it cross your mind to do anything to
2  the chief?
3      A.  Never.
4      Q.  Did any member of the SOT team attempt to
5  get you to do something you didn't want to do?
6      A.  I don't know what you're asking me.
7      Q.  Did they say anything or act in a way that
8  made you think they were trying to coerce you to do
9  something you didn't want to do, anything you
10  didn't want to do?
11     A.  I'm still not getting your -- what you're
12  asking me.
13     Q.  Well, let me ask it this way.  Other than
14  your conversation with Sergeant Albanese, you never
15  had any conversation with any of the SOT team
16  members?
17     A.  Not that I recall.
18     Q.  Now, when -- when you were in the meeting
19  with the deputy chiefs, when I asked about whether
20  you were fearful for your physical safety, one of
21  the things I meant was did you think either of
22  those three individuals was going to do something
23  to you physically.
24         MR. NOTIS:  Is that a question?

16 (Pages 417 to 420)

Nancy O'Loughlin

Page 421

1    MR. EDWARDS: Yes.
2    MR. NOTIS: Well, you were explaining
3    what you meant. So are you going to ask?
4    Q. (BY MR. EDWARDS) No, what I said was, what
5    I meant was -- or I thought I did -- whether you
6    thought any of these three individuals were going
7    to do something to you physically; Deputy Chiefs
8    Martino, Ford-Murphy or McCarthy.
9    A. It all depends what you mean by physically.
10   Physically relieving me of duty, that's harming me,
11   yes.
12   Q. Well --
13   A. Do I think that they're going to come over
14   the table and attack me? No.
15   Q. Now, it was explained to you that you were
16   suspected of having violated department rules and
17   procedures during that meeting, right?
18   A. I believe so. I can't tell you exactly
19   what took place during that meeting, because once I
20   heard the relieved of duty, my mind was on other
21   things.
22   Q. Okay. Now, during the time you were
23   relieved of duty, you were paid?
24   A. Yes.

Page 422

1    Q. And I think we -- we looked at -- you were
2    considered to be on duty at home?
3    A. I was confined to my house during working
4    hours.
5    Q. Okay. This document, Exhibit 33, this is
6    the document you were given that day?
7    A. I believe so.
8    Q. I'm sorry?
9    A. I believe so.
10   Q. If I could ask you to turn to the last
11   page, or maybe the next to the last page, there are
12   three documents attached to this. One is a receipt
13   of relief from duty, a Massachusetts general laws.
14   Is that your signature?
15   A. Yes.
16   Q. And then could you turn the page, please?
17   And you received the letter, relief from duty with
18   pay letter. Are these the same documents? Oh,
19   this is notice of hearing; that's the relief of
20   duty with pay letter. That's your signature?
21   A. Mm-hmm.
22   Q. And that page would be
23   department-issued items that you were relieved of;
24   your badge, your ID, your weapon?

Page 423

1    A. Yes.
2    Q. That's your signature? Now, is it your
3    understanding that if a police officer at the MBTA
4    Police Department is suspected of or actually
5    violates a rule or procedure of the department,
6    that officer might be subject to discipline?
7    A. Depends on who it is.
8    Q. Okay. Can officers be disciplined, to the
9    best of your knowledge, based on your experience,
10   for violating rules and procedures of the police
11   department?
12   A. Yes.
13   Q. And there are various forms of discipline;
14   is that right?
15   A. That's correct.
16   Q. Could you describe, if you would, the
17   levels of discipline in the police department from
18   the lowest to the highest?
19   MR. NOTIS: Excuse me. Could we go off
20   for a second?
21   (Off the record.)
22   (Recess taken.)
23   Q. (BY MR. EDWARDS) I was asking you, Officer
24   O'Loughlin, about the steps in the disciplinary

Page 424

1    process at the MBTA -- MBTA. As you understand
2    them, what is the lowest level of discipline?
3    A. It's informal discipline.
4    Q. Informal, what does that entail?
5    A. That's just verbal -- verbal discipline.
6    Q. Is that documented? Oh, I'm sorry. I
7    didn't mean to cut you off.
8    A. It can be or it can't be. It depends on
9    the supervisor. Not everything has to be
10   documented, and some things that are documented are
11   only documented for a short period of time. And
12   then you go from informal, then there's
13   counselling, then there's a written reprimand, and
14   then there's suspensions, and then there's
15   termination.
16   Q. What is the counselling?
17   A. You basically just talk to the party and
18   point out the deficiencies or the problems and tell
19   them not to do it again.
20   Q. Is that documented?
21   A. Sometimes it is; sometimes it isn't.
22   Q. And a written reprimand is certainly
23   written?
24   A. It's written and it goes into your file for

17 (Pages 421 to 424)

Nancy O'Loughlin

Page 425

1  a period of time, and then it's pulled out.
2      Q. And then next would be suspension?
3      A. Yes.
4      Q. You didn't mention it, but demotion --
5  would demotion be next?
6      A. I don't know where demotion falls in,
7  because it's never been done before.
8      Q. No officer at the MBTA has ever been
9  demoted?
10     A. There's only been one other in the history
11 of the department, and that was a voluntary
12 demotion.
13     Q. Was that as a form of discipline?
14     A. That was a result of an allegation of
15 sexual misconduct, and it was from lieutenant to
16 sergeant.
17     Q. And when you say a voluntary demotion, what
18 does that mean?
19     A. It means that the officer involved took the
20 demotion rather than go through any disciplinary
21 proceedings.
22     Q. When was that?
23     A. I don't know. It was before I came on.
24     Q. Five years ago?

Page 426

1      A. No, it was before I came on, so it was back
2  in the '80's.
3      Q. So as far as you know, no officer has ever
4  been demoted other than this one time --
5      A. That's correct.
6      Q. -- at the MBTA Police Department?
7  Officers have been discharged?
8      A. Yeah, there's been a few of those.
9      Q. Can a lieutenant or a sergeant discipline a
10 subordinate officer?
11     A. What do you mean; another lieutenant or
12 someone under them?
13     Q. Someone under them.
14     A. Can they discipline? Yeah.
15     Q. A lieutenant can discipline a sergeant?
16     A. Yes.
17     Q. Is there a limit on what type of discipline
18 let's say a lieutenant can impose on a sergeant?
19     A. Any type of informal discipline they can go
20 -- they can do themselves, but if you're going to
21 document it, it has to go up the chain of command.
22     Q. Do you know whether it goes all the way to
23 the chief?
24     A. I believe it does. I'm not sure, though.

Page 427

1      Q. Have you ever disciplined anybody?
2      A. I've informally talked to officers. I've
3  only, I think, in my career written up two officers
4  for -- for discipline, and they were both for
5  insubordination, and nothing came of either one of
6  them.
7      Q. What did you discipline them for?
8      A. For insubordination.
9      Q. Yeah.
10     A. It should have at least been acknowledged.
11 Neither one of them were addressed.
12     Q. When you say neither one was addressed,
13 what do you mean?
14     A. Neither -- exactly what I said. Neither
15 one of them were addressed. I wrote -- I wrote
16 Gillespie up for insubordination, and I know the
17 chief was aware of it because it was forwarded to
18 Deputy Chief Fleming, who brought it in to the
19 chief, and he never did anything about it. He
20 never even acknowledged the fact that Gillespie was
21 written up.
22     Q. And you know that because Deputy Chief
23 Fleming told you?
24     A. That's correct. It's the chain of command.

Page 428

1      Q. So Fleming said he took it to the chief?
2      A. That's correct.
3      Q. And that the chief did nothing?
4      A. Chief never acted on it.
5      Q. Did the chief tell Fleming to act on it?
6      A. No.
7      Q. And Fleming told you that as well?
8      A. That's correct.
9      Q. Did he tell you why?
10     A. No.
11     Q. Did you ask him why?
12     A. No.
13     Q. What did you say when he told you?
14     A. I just chalked it up to Gillespie being one
15 of the favored people of the chief.
16     Q. Did you and Fleming talk about Gillespie
17 being one of the favored people of the chief?
18     A. I don't believe I talked to anybody about
19 it.
20     Q. Did you mention to Fleming at all your --
21 your belief that Gillespie was a favored person of
22 the chief?
23     A. I don't believe I talked to anybody about
24 it.

18 (Pages 425 to 428)

Nancy O'Loughlin

Page 445

```
 1        Q. (BY MR. EDWARDS) -- that referred to your
 2   conversation with Lieutenant LeRay?
 3           MR. NOTIS:  Well, objection.  It's not
 4   clear that there's any complaint that was filed
 5   that referred to the lieutenant's conversation with
 6   Mr. LeRay.
 7        Q. (BY MR. EDWARDS) Okay.  Was there a taped
 8   conversation between -- and I appreciate the
 9   correction.  Was there a taped telephone
10   conversation between you and Fernandez that was the
11   subject of a complaint by him that you know of?
12        A. You confused me with your question.
13        Q. Both parties agree that there was a taped
14   telephone conversation between the complainant,
15   which would have been Fernandez, and Sergeant
16   O'Loughlin.  Are you aware of any taped
17   conversation between you and Fernandez?
18        A. No.
19        Q. Okay.  And I think I assumed that they were
20   talking about the same conversation, because it
21   refers to dopey and lunkhead.
22        A. Yes.  Yes.
23        Q. Do you remember any other conversation that
24   you may have had, either with Fernandez or with
```

Page 446

```
 1   anybody else, in which you called him dopey and
 2   lunkhead?
 3        A. No.
 4        Q. Did you have any conversation with
 5   Fernandez or anybody else in which you used an
 6   ethnic slur in referring to him?
 7        A. No, never.
 8        Q. Okay.  Thank you.  Last question.  It's
 9   safe to assume that you never gave any testimony in
10   this case or had anything to do with anything at
11   the MCAD involving Fernandez?
12        A. Nothing.
13        Q. Okay.
14           (Off the record.)
15           (Lunch recess taken from 12:27 to
16   1:15.)
17        Q. (BY MR. EDWARDS) I have a question on
18   Exhibit 40.  This was the exhibit we looked at
19   regarding the -- the counselling you received
20   because of the statement you made to -- statements
21   made to or about Officer Fernandez.  Do you recall
22   whether when you called in on that recorded police
23   telephone line you were on or off duty?
24        A. Off duty.
```

Page 447

```
 1        Q. You were off duty at the time?
 2        A. Yeah.
 3        Q. Thank you.  That's -- what exhibit is that
 4   -- number is that, please, that I just handed you?
 5        A. 33.
 6        Q. Now, that's the document you received from
 7   the deputies on March eighth?
 8        A. Yes.
 9        Q. And paragraph one on this document, it's
10   addressed to you.  Dear Lieutenant O'Loughlin, you
11   are hereby notified that you are under internal
12   investigation for violations of MBTA Police
13   Department policies, rules and regulations.  And
14   would you agree with me that the rest of the
15   document goes through and summarizes the reasons
16   why you are under investigation?
17        A. Yes.
18        Q. Paragraph one lists eight different dates
19   in which you initiate -- allegedly initiated or
20   participated in conversations with subordinate
21   police officers and engaged in discussions that
22   violated the police rules and regulations or your
23   oath of office or your oath of honor; is that true?
24        A. Yes.
```

Page 448

```
 1        Q. And it lists different police department
 2   manual sections?
 3        A. Yes.
 4        Q. Yes?  Now, when you were given this
 5   document, do you recall what either of the deputies
 6   said to you?  Did they explain to you what this was
 7   about?
 8        A. I don't remember.
 9        Q. But you understood what it was about?
10        A. Yes.
11        Q. And it refers to conversations on a
12   recorded police department line?
13        A. Yes.
14        Q. Did you say anything to the deputies?
15        A. I believe the only thing I asked them was
16   how I was supposed to get home, because they were
17   taking my department-issued cruiser.
18        Q. Did you dispute in any way the charges?
19        A. No.
20        Q. Did you say that you weren't aware of
21   having violated any rules?
22        A. I didn't say anything other than how am I
23   supposed to get home.
24           (Exhibit 42 marked for identification.)
```

23 (Pages 445 to 448)

Nancy O'Loughlin

Page 453

1    Q.  You were represented by counsel?
2    A.  Yes.
3    Q.  Members of the command staff testified?
4    A.  I believe McCarthy was the only one that
5    testified.
6    Q.  Did you testify?
7    A.  No.
8    Q.  You chose not to?
9    A.  It was under advice of counsel.
10   Q.  What did the hearing officer find?
11   A.  I believe they determined there was cause
12   for discipline.
13   Q.  On page -- paragraph 34 of your complaint
14   addresses the internal disciplinary hearing; is
15   that right?
16   A.  Yes.
17   Q.  And it's indicated in this complaint, the
18   hearing officer -- second paragraph, the hearing
19   officer conducting the hearing made findings of
20   fact based upon the hearing he conducted in
21   July 2004.  In the findings which he made, the
22   hearing officer found that Lieutenant O'Loughlin
23   had made negative statements about Chief Carter.
24   The hearing officer did not make any recommendation

Page 454

1    -- recommendations regarding discipline for
2    Lieutenant O'Loughlin.  Was it your understanding
3    that the hearing officer only determined that you
4    had made negative statements about Chief Carter?
5    A.  Say that again.
6         MR. NOTIS:  Objection.  I don't
7    understand that.
8    Q.  (BY MR. EDWARDS)  Were there other findings
9    -- were there findings other than that you made
10   negative statements about Chief Carter in the
11   hearing officer's decision?
12   A.  I don't remember.
13   Q.  Do you recall whether the hearing officer
14   made any recommendations to discipline?
15   A.  Not in my case.
16   Q.  Was it your understanding that it was the
17   job of the hearing officer to make recommendations?
18   A.  I know that he could, but I know that he
19   didn't in my case.
20   Q.  Okay.  Is it your belief that he had to or
21   should have made recommendations?
22   A.  I don't know.
23        (Exhibit 43 marked for identification.)
24   Q.  I've just handed you a document Bates

Page 455

1    stamped M 104.  Do you recognize that document?
2    A.  Do I recognize it?  No, but --
3    Q.  All right.  It is titled Massachusetts Bay
4    Transportation Authority Police Department in the
5    Matter of Lieutenant Nancy O'Loughlin, Report of
6    the Hearing Officer.  Do you recall seeing the
7    report of the hearing officer in your case?
8    A.  No.
9    Q.  You never saw it?
10   A.  I don't remember seeing it, no.
11   Q.  Oh, okay.  Do you recall a finding that you
12   allowed Officers MacKay and Rubino to engage in
13   disrespectful diatribe against other MBTA police
14   personnel?  Oh, I'm actually looking at page seven
15   of the decision.  I'm sorry.  There's a section
16   captioned just cause exists to find that Lieutenant
17   O'Loughlin violated the policies, practices and
18   procedures as charged.
19   A.  Okay.
20   Q.  Do you see that?
21   A.  Yes.
22   Q.  And what I just read was in the first
23   paragraph, three sentences down.  It's the sentence
24   that begins however, as described in the notice of

Page 456

1    hearing.
2    A.  Okay.
3    Q.  Do you see that?
4    A.  Yes.
5    Q.  She allowed Officers MacKay and Rubino to
6    engage in disrespectful diatribes against other
7    MBTA police personnel.  These officers were
8    subordinates of Lieutenant O'Loughlin.  Do you
9    recall that finding, other than just seeing it
10   here?
11   A.  No.  I see it here, but --
12   Q.  Did you understand that in part you had
13   been charged with failing to take action when other
14   officers were speaking in a disrespectful manner?
15   A.  Yes.
16   Q.  In the next paragraph, Lieutenant
17   O'Loughlin herself engaged in profanity-riddled
18   conversations regarding superior officers as
19   described in the notice of hearing; do you see
20   that?
21   A.  Yes.
22   Q.  And you understood that that was one of the
23   charges --
24   A.  Yes.

25 (Pages 453 to 456)

Nancy O'Loughlin

Page 493

1    Q. (BY MR. EDWARDS)  You mentioned that there
2  were officers who called you and questioned you
3  about your abilities, integrity and commitment?
4    A. Mm-hmm.
5    Q. Who were those officers?
6    A. Well, I spoke to Billy Kelly from Boston.
7  Let me think who else I spoke to.  I can't tell you
8  off the top of my head.  I'd have to sit down and
9  think about it.  I know Billy Kelly, because he
10  called me a couple times.
11    Q. And what did Billy Kelly say?
12    A. Well, you get the whole what's going on, is
13  there any truth to this, people are talking, that
14  type of thing.
15    Q. Did he say I have serious questions now
16  about your ability, integrity, or commitment?
17    A. No, he didn't.
18    Q. This is the same Billy Kelly who wrote a
19  letter supporting you at the ACU?
20    A. Yes.
21    Q. We have that in evidence?
22    A. Yes.
23    Q. Who else called you?
24    A. I can't tell you off the top of my head.

Page 494

1    Q. Did Billy Kelly indicate that even in the
2  face of the demotion, he still supported you?
3    A. Yes, he did.
4    Q. He believed in you?
5    A. He did, yes.
6    Q. What I'd like to do now, I'd ask you to
7  look at the amended notice of hearing, and I'd like
8  to spend some time going through this, and also
9  mark --
10      (Exhibits 45, 46 and 47 marked for
11  identification.)
12    Q. I'd like to direct your attention to the
13  second paragraph on the amended notice of hearing,
14  and we've marked that as Exhibit 42.  The second
15  paragraph, MBTA Police Department Manual of
16  Policies, Rules and Procedures, Chapter 62, Section
17  Two, and there's a reference to Chapter 101,
18  Section One.  It states in part, it is the policy
19  of the department that all supervisors will
20  immediately report all violations of law committed
21  by officers under their command or control through
22  the chain of command.  Furthermore, all supervisors
23  will immediately report through the chain of
24  command violations of department policies, rules or

Page 495

1  procedures committed by officers under their
2  command or control that require further
3  disciplinary action.  Failure to do so in either
4  case will be considered neglect of duty.  The next
5  sentence, MBTA Police Department Manual of
6  Policies, Rules and Procedures, Chapter 62, Section
7  Three, and it states that that -- what that section
8  purports to say; supervisors will ensure that all
9  subordinates perform their duties in a
10  professional, efficient and effective manner and
11  act in compliance with all department policies,
12  rules and procedures.  And if you can answer this
13  question globally, you can.  If not, we can break
14  it down.  Did you understand that it was your
15  responsibility as a supervisor to ensure that all
16  subordinates performed their duties in a
17  professional, efficient and effective manner and
18  act in compliance with all department policies,
19  rules and procedures?
20    A. When I'm on duty as a lieutenant, yes.
21    Q. And as far as you were concerned, you had
22  no obligation to do that when you are off duty?
23    A. If I'm off duty acting as a civilian or
24  acting as myself, no.

Page 496

1    Q. It's your understanding that as a
2  lieutenant in the MBTA Police Department, if you
3  see an officer or learn of an officer violating a
4  department policy, rule or procedure, you are under
5  no obligation to do anything about it?
6    A. That's not what you asked me.
7    Q. I'm asking you now.  That's the question.
8    A. It depends -- it depends on the
9  circumstances.
10    Q. Do you recall, when we looked at Chief
11  Carter's plan of action, him writing that officers
12  should act the same on duty as off duty?  Do you
13  remember that?
14    A. Yeah.
15    Q. Okay.  Under what circumstances would you
16  -- would you feel it appropriate not to ensure that
17  subordinates perform their duties in a professional
18  manner if you are off duty?  I mean, is there a way
19  you can tell me what distinguishes when you should
20  take action versus when you should not take action?
21      MR. NOTIS:  Objection.  You've asked
22  her three questions, Joe, and let's figure out
23  which one you want her to answer.
24      MR. EDWARDS:  I'm actually trying to

35 (Pages 493 to 496)

Page 497

1  clarify it. If I'm making it more murky, then I
2  apologize, and I'll try to say it in a way that's
3  understandable.
4    Q. (BY MR. EDWARDS) You testified that
5  whether a supervisor who was off duty is required
6  to ensure their subordinates perform their duties
7  in a professional, efficient and effective manner
8  and in compliance with policies, rules and
9  procedures depends on the circumstance.
10    A. That's correct.
11    Q. Can you give me an example of a
12  circumstance where you as a supervisor would not
13  feel obliged to ensure that subordinates perform
14  their duties, et cetera, et cetera in that
15  sentence? I can say the whole thing again.
16    A. This is a perfect example. I'm engaged in
17  a private conversation. I'm off duty. I'm
18  speaking to a friend. We're shooting the breeze or
19  blowing steam off or whatever. You may perceive
20  that as a violation. I don't perceive that as a
21  violation. That's just somebody blowing steam off,
22  period.
23    Q. And that's your opinion?
24    A. That's my opinion, absolutely.

Page 498

1    Q. And the officer you were blowing steam off
2  with was on duty?
3    A. Yes.
4    Q. And the officer you were blowing steam off
5  with was a subordinate?
6    A. Could be.
7    Q. Well, let's talk about --
8    A. In this case, yes. Yes.
9    Q. We're talking about Officer MacKay?
10    A. Yes.
11    Q. Now -- and I've -- we've also marked as
12  exhibits Chapter 62, which is referenced in this
13  paragraph, and Chapter 101, which is referenced in
14  this. Do you have those in front of you?
15    A. Yes.
16    Q. The last sentence on this page reads
17  Lieutenant O'Loughlin violated the previous two
18  department manual sections on the following
19  occasions. On January first, Lieutenant O'Loughlin
20  stated while in a conversation on a recorded
21  telephone line with Officer MacKay --
22    A. It's January 26th.
23    Q. I'm sorry. I misread it. January 26th.
24  Thank you. Whoever did the detail one day last

Page 499

1  week fucking unleashed a vulgarity-laden tirade at
2  some poor fucking old lady down there, and she was
3  horrified. There is no evidence that she addressed
4  or recorded the violation. Do you recall making
5  that statement to Officer MacKay?
6    A. Yes.
7    Q. And did you take any action?
8    A. Yes, I did.
9    Q. What action did you take?
10    A. I spoke with the sergeant down in Hingham
11  and tried to determine which officer it was, and
12  the woman that made the complaint couldn't tell
13  whether it was an MBTA officer or a Hingham
14  officer. We couldn't go beyond that. She couldn't
15  give any specifics. We couldn't address the
16  situation.
17    Q. How many officers were there in Hingham at
18  the time?
19    A. There had to be --
20    Q. MBTA offers; I'm sorry.
21    A. It varied. It varied on a daily basis. We
22  split the detail with Hingham, and most of the
23  time, we couldn't fill it and Hingham did it.
24  There was anywhere from four to as many as eight

Page 500

1  officers down there.
2    Q. Okay. And did you indicate to Officer
3  MacKay that you didn't know whether this was an
4  MBTA police officer or a Hingham police officer?
5    A. I don't remember. This is only a piece of
6  the conversation, so I don't know if there's
7  anything else in the conversation.
8    Q. I think you can find it on page 32 of the
9  transcript that we've marked as Exhibit -- as
10  Exhibit 45, right there.
11    A. Yeah, I told him I talked to the sergeant.
12  I told him if he had a problem like that to call me
13  and we'd deal with it.
14    Q. Did you talk to the officers who had been
15  on duty in Hingham?
16    A. We couldn't ascertain who was down there,
17  whether it was Hingham or us, so I can't talk to
18  every officer who's on a detail down there. I
19  spoke to the sergeant and said if there is any
20  further problems, let me know and I'll deal with
21  them.
22    Q. And where is it that you indicated that you
23  spoke with the sergeant?
24    A. What page was that on? 32?

36 (Pages 497 to 500)

Nancy O'Loughlin

Page 557

1    Q.  Okay.  Officer MacKay, and he writes, is
2  the he referring to Chief Carter?
3    A.  He's -- he's talking about Chief Carter,
4  but I think I'm talking about myself, saying what,
5  I'm a fucking moron?  I didn't understand the first
6  one; now you got to write another one?
7    Q.  Oh, okay.  The next page -- well, the same
8  page, is Officer MacKay reading from the article to
9  you, as far as you remember?
10    A.  I think so.
11    Q.  And then, at the bottom of the page you say
12  --
13    A.  Wait a minute.  I lost the page again.
14    Q.  64.
15    A.  Okay.
16    Q.  Is it your understanding that Officer
17  MacKay is reading the article to you?
18    A.  Yes.
19    Q.  And at the bottom of the page, line 24,
20  Lieutenant O'Loughlin, we're going to arbitration.
21  So?  Officer MacKay, yeah, see, again, a lie again.
22  Lieutenant O'Loughlin --
23         MR. NOTIS:  Oh, I'm sorry, go ahead.
24         MR. EDWARDS:  This is page 65.

Page 558

1         MR. NOTIS:  Yeah, I'm with you.
2         MR. EDWARDS:  Okay.
3    Q.  (BY MR. EDWARDS)  Officer MacKay, you know?
4  Lieutenant O'Loughlin, yeah.  Officer MacKay, and
5  it just goes on with fucking stupid shit.  Did you
6  consider that exchange disrespectful of the chief
7  of police?
8    A.  No.
9    Q.  And is it fair to say that you did not
10  consider it disrespectful because it was your
11  opinion?
12    A.  It's not disrespectful because he was just
13  blowing steam off about something that happened,
14  period, two people in a private conversation.
15    Q.  The bottom of page --
16         MS. LUKEY:  I'm going to step out, but
17  keep going.
18         MR. EDWARDS:  Okay.
19    Q.  (BY MR. EDWARDS)  The bottom of page four,
20  MBTA Police Department Manual of Policies, Rules
21  and Procedures, Chapter 101, 2.11, interference
22  with work, states police officers shall not
23  interfere with cases assigned to other officers,
24  except with the consent of the assigned officer.

Page 559

1  Officers shall not unnecessarily interfere with the
2  work or operation of any unit of the judicial
3  system.  Did I read that correctly?
4    A.  Yes.
5    Q.  Now, number one at the top of the next
6  page, Lieutenant O'Loughlin violated the previous
7  department manual sections when she participated in
8  a conversation with Officer MacKay regarding an
9  ongoing investigation being conducted by Deputy
10  Chief McCarthy.  Did you interfere with an ongoing
11  investigation --
12    A.  No.
13    Q.  -- being conducted by officer -- I mean,
14  Deputy Chief McCarthy?
15    A.  No.  All we did was repeat gossip that was
16  going around the station.
17    Q.  That had to do with an investigation?
18    A.  Had to do with the Where's Waldo poster.
19    Q.  Okay.  And what is the Where's Waldo
20  poster?  What is that about?
21    A.  I never saw it, so I can only tell you what
22  I overheard.  Supposedly, that Where's Waldo
23  children's character, they took a picture of Chief
24  Carter's head and superimposed it over Where's

Page 560

1  Waldo, and then it was a Where's Joe or no-show
2  Joe, or something to that effect.
3    Q.  Okay.  But you understood that there was
4  some -- it was your understanding that there was an
5  investigation about this thing?
6    A.  All we were doing was repeating gossip.  I
7  can't believe that they would actually investigate
8  something like that.
9    Q.  Well, let's look at the bottom of page 82,
10  and I think -- well, why don't you -- I don't want
11  to read the next couple of pages out loud.  If you
12  could just take a few minutes and refamiliarize
13  yourself with -- from about 82 through 86?
14    A.  That's -- I know what it's about.  That's
15  -- that's the Where's Waldo poster, and he was --
16  he was repeating gossip that was going around the
17  station.  Everybody was talking about it; that they
18  supposedly pulled fingerprint cards and everything
19  else.  Nobody really thought he was conducting a
20  big investigation about this poster, because it's
21  just -- I mean, it's so trivial.  How could you
22  possibly put all those resources to work on
23  something like that?
24    Q.  Okay.

51 (Pages 557 to 560)

Page 561

```
 1      A.  That was just -- that was department-wide
 2  gossip.
 3      Q.  Okay.
 4      A.  I wasn't even in the station and I heard
 5  that gossip all the way down to Forest Hills.
 6      Q.  Okay.  Now, MacKay says, on the bottom of
 7  page 82 -- and I'm not going to read it all -- he
 8  says McCarthy said he's going to take control of
 9  the full investigation, and then it says tape goes
10  blank.  He's doing more things now than he did for
11  the murder down there at Dudley.  Do you see that?
12      A.  Yeah.
13      Q.  Lieutenant O'Loughlin, no kidding.  I heard
14  he's supposedly pulled out a fingerprint card
15  between the letters I and P.  I said yeah, okay.
16  Officer MacKay, oh, God.  Lieutenant O'Loughlin, I
17  said you got to be -- and when they find out who
18  did it, if they find out who did it, what are they
19  going to discipline him for?  There is no crime
20  there.  There is no violation there.  It's a
21  political satire.
22      A.  It's gossip.  That's what was going around.
23      Q.  Well, I'm -- I want to focus on what
24  appears to be -- and correct me if I'm wrong --
```

Page 562

```
 1  your opinion or your statement.  I won't
 2  characterize it.  Your statement that if the person
 3  who put the Where's Waldo poster up is discovered,
 4  that person cannot be disciplined because it's a
 5  political satire, is that your opinion?
 6      A.  That's my opinion.  If it was me, I would
 7  have taken a copy of that and I would have hung it
 8  up in my office after I framed it.
 9      Q.  But now, you are advising a subordinate
10  officer that there's nothing that the person can be
11  disciplined for because it's a political satire?
12      A.  I'm not advising him anything.  We're just
13  -- we're discussing department gossip.  That's
14  gossip, and that's my opinion of the gossip that's
15  going around.  I'm not advising him anything.
16      Q.  Well, advise is a -- I'm not saying you're
17  telling him what to do.  You are expressing an
18  opinion?
19      A.  Right.
20      Q.  Okay.  And you are also expressing the
21  opinion in line 16.  It's not conduct unbecoming?
22      A.  That's correct.
23      Q.  And line 20, is that conduct unbecoming,
24  when we have ranking officers running around with
```

Page 563

```
 1  extramarital affairs, it's your understanding that
 2  ranking officers were running around with
 3  extramarital affairs?
 4      A.  Yes.
 5      Q.  What officers would they be?
 6      A.  Let's see.  You had Gillespie who was going
 7  out with the woman that just pled guilty to
 8  stealing money from the money room.  You had
 9  Martino who was running around on his wife before
10  they got divorced.
11      Q.  How do you know that?
12      A.  Because he was seen running with his
13  girlfriend.  He had pictures of his girlfriend in
14  his office.  Gillespie was witnessed in the company
15  out to dinner and everything else with his squeeze
16  there.  And it's just -- it's department knowledge.
17      Q.  And these are things that you spoke about
18  with subordinate officers?
19      A.  It was department gossip.
20      Q.  My question, though, is you found it
21  appropriate to speak with subordinate officers
22  about that?
23      A.  From one friend to another friend,
24  absolutely.
```

Page 564

```
 1      Q.  Okay.
 2      A.  Because that's what it was, one friend to
 3  another friend.
 4      Q.  Okay.  And is it your intent -- let me back
 5  up.  If I could ask you to turn to page 84, please,
 6  Lieutenant O'Loughlin -- I'm reading page -- line
 7  three -- and if Hennessey thinks he is in danger of
 8  any type of finger pointing, then he should just
 9  contact somebody and let them know that he has
10  witnessed people be in the company of other people
11  when they should be on duty.  That is what you
12  would advise a subordinate officer to do?
13      A.  That's one friend talking to another
14  friend.  I don't know what MacKay's connection is
15  to Hennessey.  I think I've had one dealing with
16  Hennessey in the entire time.  I don't even know if
17  MacKay talks to Hennessey.  That's just a
18  hypothetical.  And if I was in his position, that's
19  what I would do, and it's one friend to another
20  friend.  It's not offering anybody advice.
21      Q.  Okay.  If you were at the other end of --
22  if you were being investigated for the Where's
23  Waldo and in danger of finger pointing, you would
24  contact somebody and tell them that you witnessed
```

52 (Pages 561 to 564)

Nancy O'Loughlin

Page 565

1    people being in the company of other people when
2    they should be on duty? That's what you would do?
3    A. Yeah.
4    Q. And as far as you are concerned, that is an
5    appropriate attitude for a supervisor to have?
6    A. That's one friend talking to another
7    friend. There's no supervisor/subordinate. It's
8    one friend to another friend.
9    Q. I'm not talking supervisor/subordinate.
10   You just said -- you just testified that's what I
11   would do?
12   A. If I was in that position and they were
13   trying to pin something on me, I absolutely would.
14   Q. And again, you obviously think it was
15   appropriate for you to relay that to a subordinate
16   officer?
17   A. That was a friend, not a subordinate
18   officer.
19   Q. He's a patrol officer?
20   A. I wasn't talking to him as a patrol
21   officer. That was one friend to another friend.
22   Q. Now, down on line 20, is this referring to
23   the same thing? Is this all about the same
24   conversation about the Where's Waldo?

Page 566

1    A. I believe so.
2    MR. NOTIS: Why don't you read what
3    he's asking you about.
4    Q. (BY MR. EDWARDS) Line 19.
5    A. I think that's what it was about, yes.
6    Q. Okay. That's not conduct unbecoming? If
7    that's conduct unbecoming, then what about the
8    situation down the Cape? What is the situation
9    down the Cape?
10   A. I think that might have been, if I'm not
11   mistaken, that some guys went down there and got
12   drunk and broke a window or something.
13   Q. What guys?
14   A. I don't know. It was just gossip going
15   around the station.
16   Q. Are you not referring to the chief of
17   police?
18   A. I don't think I am. I know he was a chief
19   down the Cape, but -- but I don't think we were
20   talking about that.
21   Q. The second part of this, March second,
22   Lieutenant O'Loughlin participated in the
23   conversation and discussed strategies to use
24   against the police administration to thwart or

Page 567

1    mitigate an internal investigation?
2    A. I think that's the one you just went over.
3    Q. I think it is as well. And just so we'll
4    be clear, in your opinion, your conversation with
5    MacKay about this whole Where's Waldo thing was
6    okay?
7    A. Yes.
8    Q. The last -- last section talks about the
9    Chapter 101, Section 3.18 that incorporates the
10   MBTA policy referred to as the MBTA policy and
11   procedures for the prevention of harassment in the
12   workplace. That's that bold section?
13   A. Yes.
14   Q. And section six of the policy, entitled
15   supervisor and manager responsibilities, states in
16   part, it is the responsibility of each supervisor
17   and manager to enforce the terms of this policy.
18   Supervisors, managers or department heads who
19   become aware of harassment in their department,
20   even in the absence of a formal complaint, should
21   take immediate and appropriate action to eliminate
22   the conduct. Supervisors and managers must also
23   report all incidents to the Office of Diversity and
24   Civil Rights. Is that your understanding of what

Page 568

1    that policy states?
2    A. Yes.
3    Q. On March third, 2004 -- I'm at number one
4    --
5    A. Mm-hmm.
6    Q. -- Lieutenant O'Loughlin stated, I told
7    him Jimmy, get a lawyer and then sue them for
8    harassment. She did not report the alleged
9    harassment to the Office of Diversity and Civil
10   Rights. Do you remember that conversation?
11   A. Yes, I do.
12   Q. And in what context was that conversation?
13   A. That was the same context as the other one.
14   That was the officer that had brain surgery and got
15   the termination notice. He called me in tears and
16   complained about it, and I told him, just like I
17   told him, you sat down and discussed it with the
18   union official and they can't do that to you. Get
19   a lawyer and sue. And about -- I don't know
20   whether it was that day or the next day, he called
21   me back and said that packet had been sent out in
22   error and it was a mistake, so there was no
23   harassment. But you didn't know that at the time you

53 (Pages 565 to 568)

Nancy O'Loughlin

Page 565

1   people being in the company of other people when
2   they should be on duty? That's what you would do?
3       A. Yeah.
4       Q. And as far as you are concerned, that is an
5   appropriate attitude for a supervisor to have?
6       A. That's one friend talking to another
7   friend. There's no supervisor/subordinate. It's
8   one friend to another friend.
9       Q. I'm not talking supervisor/subordinate.
10  You just said -- you just testified that's what I
11  would do?
12      A. If I was in that position and they were
13  trying to pin something on me, I absolutely would.
14      Q. And again, you obviously think it was
15  appropriate for you to relay that to a subordinate
16  officer?
17      A. That was a friend, not a subordinate
18  officer.
19      Q. He's a patrol officer?
20      A. I wasn't talking to him as a patrol
21  officer. That was one friend to another friend.
22      Q. Now, down on line 20, is this referring to
23  the same thing? Is this all about the same
24  conversation about the Where's Waldo?

Page 566

1       A. I believe so.
2          MR. NOTIS: Why don't you read what
3   he's asking you about.
4       Q. (BY MR. EDWARDS) Line 19.
5       A. I think that's what it was about, yes.
6       Q. Okay. That's not conduct unbecoming? If
7   that's conduct unbecoming, then what about the
8   situation down the Cape? What is the situation
9   down the Cape?
10      A. I think that might have been, if I'm not
11  mistaken, that some guys went down there and got
12  drunk and broke a window or something.
13      Q. What guys?
14      A. I don't know. It was just gossip going
15  around the station.
16      Q. Are you not referring to the chief of
17  police?
18      A. I don't think I am. I know he was a chief
19  down the Cape, but -- but I don't think we were
20  talking about that.
21      Q. The second part of this, March second,
22  Lieutenant O'Loughlin participated in the
23  conversation and discussed strategies to use
24  against the police administration to thwart or

Page 567

1   mitigate an internal investigation?
2       A. I think that's the one you just went over.
3       Q. I think it is as well. And just so we'll
4   be clear, in your opinion, your conversation with
5   MacKay about this whole Where's Waldo thing was
6   okay?
7       A. Yes.
8       Q. The last -- last section talks about the
9   Chapter 101, Section 3.18 that incorporates the
10  MBTA policy referred to as the MBTA policy and
11  procedures for the prevention of harassment in the
12  workplace. That's that bold section?
13      A. Yes.
14      Q. And section six of the policy, entitled
15  supervisor and manager responsibilities, states in
16  part, it is the responsibility of each supervisor
17  and manager to enforce the terms of this policy.
18  Supervisors, managers or department heads who
19  become aware of harassment in their department,
20  even in the absence of a formal complaint, should
21  take immediate and appropriate action to eliminate
22  the conduct. Supervisors and managers must also
23  report all incidents to the Office of Diversity and
24  Civil Rights. Is that your understanding of what

Page 568

1   that policy states?
2       A. Yes.
3       Q. On March third, 2004 -- I'm at number one
4   --
5       A. Mm-hmm.
6       Q. -- Lieutenant O'Loughlin stated, I told
7   him Jimmy, get a lawyer and then sue them for
8   harassment. She did not report the alleged
9   harassment to the Office of Diversity and Civil
10  Rights. Do you remember that conversation?
11      A. Yes, I do.
12      Q. And in what context was that conversation?
13      A. That was the same context as the other one.
14  That was the officer that had brain surgery and got
15  the termination notice. He called me in tears and
16  complained about it, and I told him, just like I
17  told him, you sat down and discussed it with the
18  union official and they can't do that to you. Get
19  a lawyer and sue. And about -- I don't know
20  whether it was that day or the next day, he called
21  me back and said that packet had been sent out in
22  error and it was a mistake, so there was no
23  harassment.
24      Q. But you didn't know that at the time you

Page 569

1  spoke with the person, with the officer. And you
2  said it was Officer Floyd?
3      A. It was Officer Floyd.
4      Q. Okay. You didn't know whether that was
5  harassment or not?
6      A. No.
7      Q. You did not advise Officer Floyd to go to
8  the Office of Diversity and Civil Rights, did you?
9      A. No.
10     Q. And you didn't call the Office of Diversity
11  and Civil Rights?
12     A. No.
13     Q. You told him to get a lawyer and sue the
14  MBTA?
15     A. That's correct.
16     Q. And in your opinion, that is an appropriate
17  response of a manager, a supervisor on the police
18  force to give to a subordinate officer?
19     A. Again, that's one friend talking to another
20  friend.
21     Q. Well, you were talking to Officer Floyd,
22  weren't you?
23     A. He's a friend. He called me as a friend --
24     Q. Okay.

Page 570

1      A. -- and asked me what I would do, and I told
2  him what I would do. And then it worked itself out
3  within a day. It wasn't a situation. It was an
4  error. It's a moot point.
5      Q. Were you at home when he called you?
6      A. Yes, I was.
7      Q. Is it your opinion that because he called
8  you at home, that you were free from the
9  requirements of the -- the policy for the
10  prevention of harassment in the workplace?
11     A. It's one friend to another friend. If he
12  calls me and asks me as a friend, I'm going to
13  advise him as a friend.
14     Q. Okay. So again, just to be clear, where it
15  says it is the responsibility of each supervisor
16  and manager to enforce the terms of this policy,
17  and one of the -- one of the terms of the policy is
18  for supervisors, managers, or department heads to
19  -- who become aware of incidents, even in the
20  absence of a formal complaint, to take prompt
21  appropriate action and make a report to the Office
22  of Diversity and Civil Rights, in your opinion,
23  that doesn't apply because you and Officer Floyd
24  were friends?

Page 571

1      A. It may have worked out differently if in
2  fact it continued, but it was a moot point because
3  it was an error, and I found that out within a day,
4  so it's a moot point. If it had continued, I may
5  have acted differently.
6          MR. EDWARDS: I don't think we're going
7  to go through this. I'll just enter this.
8          (Exhibit 48 marked for identification.)
9          MR. EDWARDS: Let's take like five
10  minutes. I think I'm done.
11         (Off the record.)
12         (Recess taken.)
13         MR. EDWARDS: I have no more questions.
14         MS. LUKEY: And I was allowed to
15  interrupt in a question earlier on in the day, so I
16  have no questions.
17         MR. NOTIS: Fine. I don't have any
18  questions.
19         (Whereupon the deposition was adjourned
20  for the day at 4:43 p.m.)
21
22
23
24

Page 572

1  COMMONWEALTH OF MASSACHUSETTS
2  MIDDLESEX, ss.
3
4      I, Marianne R. Wharram, Certified Shorthand
5  Reporter, Registered Professional Reporter and
6  Notary Public in and for the Commonwealth of
7  Massachusetts, do hereby certify that
8  NANCY O'LOUGHLIN, the witness whose deposition is
9  hereinbefore set forth, was duly identified and
10  sworn by me and that such deposition is a true
11  record of the testimony given by the witness.
12     I further certify that I am neither related to
13  or employed by any of the parties in this action,
14  nor am I financially interested in the outcome of
15  this action.
16     In witness hereof, I have hereunto set my hand
17  this 13th day of February, 2006.
18
19     _____
20     Marianne R. Wharram, CSR/RPR
21     Notary Public
22     CSR No. 1426S96
23  My commission expires:
24  August 7, 2009

54 (Pages 569 to 572)