# Exhibit 5

**Page 3**

1

2          UNITED STATES DISTRICT COURT
3    FOR THE DISTRICT OF MASSACHUSETTS
     C.A. NO: 04-10933-JLT    VOLUME I
4    ***************************************
     NANCY O'LOUGHLIN,
5              Plaintiff
           vs.
6    MASSACHUSETTS BAY TRANSPORTATION
     AUTHORITY and JOSEPH CARTER and MICHAEL
7    MULHERN,
              Defendants
8    ***************************************

9

10

11        DEPOSITION of JOSEPH C. CARTER,

12   a witness called on behalf of the Plaintiff,

13   pursuant to the Massachusetts Rules of

14   Civil Procedure, before Lisa E. Berkland,

15   a Certified Shorthand Reporter and Notary

16   Public in and for the Commonwealth of

17   Massachusetts, at the offices of Prince,

18   Lobel, Glovsky & Tye, 585 Commercial

19   Street, Boston, Massachusetts, on Friday,

20   January 6, 2006, commencing at 1:30 p.m.

21

22

23        LISA E. BERKLAND, CSR
          P.O. Box 286
24        Westwood, MA 02090
          (508) 850-5171

---

**Page 2**

1

2    APPEARANCES:

3    LAW OFFICE OF MITCHELL J. NOTIS
        (By Mitchell J. Notis, Esquire)
4       370 Washington Street
        Brookline, Massachusetts 02445
5       (617) 566-2700
           On behalf of the Plaintiff.

6

7    PRINCE, LOBEL, GLOVSKY & TYE
        (By Joseph L. Edwards, Esquire)
8       585 Commercial Street
        Boston, Massachusetts 02109-1024
9       (617) 456-8131
           On behalf of the
10          Defendant/MBTA.

11   WILMER HALE
        (By Gregory M. Reiser, Esquire)
12      60 State Street
        Boston, Massachusetts 02109
13      (617) 526-6527
           On behalf of Defendant/Michael
14         Mulhern.

15

16   ALSO PRESENT:
     Timothy F. Cullen, Special Counsel, MBTA
17   Police Department, Office of the Chief

18

19

20

21

22

23

24

---

**Page 3 (INDEX)**

                    I N D E X

2    WITNESS:         DIRECT   CROSS
     JOSEPH CARTER
3    (By Mr. Notis)      4

4

5

6

7              E X H I B I T S

8    Number    Description    Page

9    1     Complaint                    32

10   2      3/8/04 correspondence 104

11

12

---

**Page 4**

1            P-R-O-C-E-E-D-I-N-G-S

2         MR. NOTIS:  Same stipulations,

3    Gentlemen?

4         MR. EDWARDS:  That's fine.

5         MR. NOTIS:  The same

6    stipulations as in the previous

7    depositions, which are all objections,

8    with the exception of objections as to

9    form, are reserved until the time of

10   trial; and all motions, including motions

11   to strike, are reserved until the time of

12   trial.

13        I assume the witness will

14   reserve his right to read and sign the

15   transcript, and if it's not signed within

16   30 days of being sent to Mr. Edwards,

17   then it will be deemed to be read and

18   signed.  We will waive notarization and

19   filing.  Is that acceptable to everyone?

20        MR. EDWARDS:  It is.

21        MR. REISER:  That's fine with

22   me.

23        That, JOSEPH C. CARTER, having

24   first been duly sworn, on oath, deposes

Page 5

1  and testifies as follows:
2         DIRECT EXAMINATION
3  BY MR. NOTIS:
4  Q. Would you state your name for the record,
5     sir?
6  A. Joseph Carter, C-a-r-t-e-r.
7  Q. Chief Carter, are you the current Chief
8     of the MBTA Police Department?
9  A. Yes, I am.
10 Q. And you are one of the defendants in this
11    lawsuit, sir?
12 A. Yes, I am.
13 Q. Okay.  Do you reside in Boston, sir?
14 A. No.
15 Q. Okay.  What is your educational
16    background, Chief Carter?
17 A. I have a Bachelor's degree, two Master's
18    degrees.
19 Q. Can you tell me when you got those
20    degrees and where you got them from, sir?
21 A. I received my Bachelor's degree in 1988
22    from Leslie University.  I received my
23    Master's in Criminal Justice
24    Administration in 1989 and received a

Page 6

1  Master's in Strategic Studies from the
2  Army War College in 2002.
3  Q. And the criminal justice degree, where
4     did you get that from?
5  A. I'm sorry.  Atlanta University.  I didn't
6     say that.
7  Q. And, obviously, sir, you are currently
8     employed?
9  A. Yes.
10 Q. Okay.  How long have you been employed by
11    the MBTA Police Department?
12 A. Since January 23, 2003.
13 Q. And that's the day you were sworn in as
14    Chief?
15 A. Yes.
16 Q. Immediately prior to that, what job did
17    you hold?
18 A. I was the Chief of Police of the Oaks
19    Bluff, Massachusetts Police Department.
20 Q. And how long did you hold the position of
21    Chief of the Oaks Bluff Police
22    Department?
23 A. From June of 1998 until January of 2003.
24 Q. And prior to being employed by Oaks

Page 7

1  Bluff, where were you employed?
2  A. The City of Boston.
3  Q. You were employed by the City of Boston
4     Police Department?
5  A. Yes.  It was one of the departments I
6     worked for.  I worked for two
7     departments.
8  Q. What were the two departments?
9  A. Boston Penal Department, Suffolk House of
10    Correction; and the Boston Police
11    Department.
12 Q. Which was the job immediately prior to
13    being the Chief at Oaks Bluff?
14 A. The Boston Police Department.
15 Q. You left the Boston Police Department in
16    1998 then?
17 A. Yes.
18 Q. And what was your rank when you left the
19    Boston Police Department?
20 A. Superintendent.
21 Q. Can you tell me -- I don't understand how
22    the Boston Police Department hierarchy is
23    set up.  Can you explain to me where the
24    position of superintendent fit in?

Page 8

1  A. Superintendent is the highest uniform
2     rank of the department.  The department
3     is organized with the lowest rank being
4     police officer.  Going up the ladder
5     would be sergeant, lieutenant, captain,
6     deputy superintendent, and
7     superintendent.  The CEO of the
8     department, if you will, is the police
9     commissioner; and the superintendents
10    report to the police commissioner.
11 Q. Okay.
12 A. And in between those ranks would be
13    detective ranks.  So police officer, then
14    there is detective, then sergeant,
15    sergeant detective, lieutenant,
16    lieutenant detective, captain, captain
17    detective.  Those are also associated
18    ranks.
19 Q. As superintendent with the Boston Police
20    Department, did you have specific
21    responsibilities for any area or section
22    of the department?
23 A. I had a range of responsibilities during
24    my tenure as a superintendent.  I was a

Page 13

1  about, did they claim -- even if they
2  didn't name you as a defendant, did they
3  claim that you had somehow acted unfairly
4  toward females?
5  A. Not that I recall.
6  Q. Okay. During the time that you were
7  employed at the Boston Police Department,
8  were there ever complaints of any sort
9  made that you did not treat females
10  fairly?
11  A. No.
12  Q. During the time that you have been Chief
13  of the MBTA Police Department, other than
14  the present case, have there been any
15  complaints of any sort made against you
16  that you did not treat females fairly?
17  A. No.
18  Q. Is it correct then that between the time
19  you served in the Boston Police
20  Department, the Oaks Bluff Police
21  Department and the MBTA Police
22  Department, Nancy O'Loughlin's case is
23  the only time that it's been claimed you
24  treated female subordinates unfairly?

Page 14

1  A. Yes.
2  Q. Have you been named as a defendant in any
3  other charges of discrimination of any
4  sort in relation to your role as Chief of
5  the MBTA Police Department?
6  A. No.
7  Q. You haven't been named as a defendant in
8  any MCAD charges pending against the
9  department?
10  A. Not that I'm aware of, no.
11  Q. Okay. Have you been named as a defendant
12  in any other lawsuits alleging
13  discrimination on any basis?
14  A. None. None that I'm aware of, no.
15  Q. Are you named as any defendant in any
16  other lawsuits pending against the MBTA?
17  A. No.
18  Q. To your knowledge, sir, are there any
19  grievances pending against you claiming
20  that you treated female employees
21  unfairly?
22  A. No.
23  Q. So Nancy O'Loughlin's complaint here, is
24  this the only time you have been accused

Page 15

1  of treating female subordinates unfairly
2  because of their sex?
3  A. It's the only one I'm aware of.
4  Q. Okay. Can you tell me briefly, Chief,
5  the process by which you became Chief of
6  the MBTA Police Department?
7  A. I responded to a professional
8  advertisement, "Chiefs" magazine and
9  fulfilled the requirements -- they were
10  looking for a Letter of Intent, resume,
11  generally.
12  Q. Okay. Do you recall when it is you sent
13  in your Letter of Intent or resume?
14  A. In the fall of --
15  Q. '02?
16  A. It would have been '02, yes.
17  Q. Okay. And then I take it there was some
18  sort of interview process?
19  A. Yes, there was.
20  Q. Do you recall when you found out you were
21  going to be selected?
22  A. For?
23  Q. For chief.
24  A. Okay. I didn't know whether you meant

Page 16

1  selected for the interview. You just
2  went from --
3  Q. Thank you.
4  A. Selected for the chief?
5  Q. Actually for the job.
6  A. In December of '02. I don't recall the
7  date, but I recall it was December.
8  Q. Okay. Now, how soon after the offer was
9  made to you did you state that you would
10  be accepting the position?
11  A. Within a week.
12  Q. Okay. Prior to that, sir, had you
13  contacted any friends, professional
14  acquaintances who had worked for the MBTA
15  Police Department, to find out what the
16  department was like?
17  A. Yes.
18  Q. Who had you contacted?
19  A. Nadine Taylor-Miller, who was at the time
20  a deputy chief in the department.
21  Q. Anyone other than Nadine Taylor-Miller?
22  A. That was the only person that I knew
23  well.
24  Q. You knew her from the Boston Police

Page 21

1  several times that I spoke to him in
2  furtherance of me taking the position.
3  Q. Those all kind of blend together a bit?
4  A. Not kind of; they do blend together.  I
5     had a number of conversations because I
6     requested some things of him in
7     preparation of me coming on board, et
8     cetera.
9  Q. During the conversations with Bill
10    Flemming, whether before or after,
11    whatever the case may be, did Nancy
12    O'Loughlin's name come up?
13 A. Not specifically, that I recall.
14 Q. Okay.  Do you recall, by the way, at the
15    time you came in -- at the time you were
16    sworn in, I should say, -- well, let me
17    rephrase that.
18        Did you appoint new deputy
19    chiefs once you came in?
20 A. No.
21 Q. Okay.  You left in place the people who
22    had been deputies under Flemming?
23 A. Yes.
24 Q. Who were they?

Page 22

1  A. Flemming, Anne McCall, John Mahoney.
2     Nadine Taylor-Miller had already left the
3     department and gone back to Boston when I
4     came on board.
5  Q. Okay.  Subsequent to that, have your
6     deputies changed at all?
7  A. Yes.
8  Q. Tell me every way in which the
9     arrangement of deputies changed, please?
10       MR. EDWARDS:  Objection.  You
11    can answer.
12 Q. Did there come a point when you appointed
13    new or different deputies?
14 A. Yes.
15 Q. Tell me about that, please?
16 A. As part of my plan of action for the
17    department, we devised a competitive
18    system for the rank of deputy chief.  It
19    consisted of an exam, a written exam.  It
20    consisted of a panel interview, a chief's
21    interview, and a review of
22    qualifications.  And people were ranked
23    and selected from that process for deputy
24    chief.

Page 23

1  Q. Okay.  And who was selected?
2  A. Dolores Ford-Murphy, John Martino and
3     Thomas McCarthy.
4  Q. If you can recall, sir, at the time you
5     became Chief, what knowledge did you have
6     of Nancy O'Loughlin?
7  A. Clearly, my knowledge of her was based on
8     what she submitted to Deputy Flemming,
9     which was a request of mine from her, and
10    it was -- in detail, it included her
11    resume, an overview of the area she
12    commanded, what problems she saw in that
13    unit, what issues generally she saw in
14    the department.  I believe I asked for
15    recommendations as to how they would fix
16    the problems, particularly around the
17    lack of public trust and confidence.  So
18    I got that from her.
19 Q. Okay.
20 A. And that was the basis of my knowledge
21    about her.
22 Q. Did you know anything about her prior to
23    applying for the position of Chief of the
24    MBTA Police Department?

Page 24

1  A. Not specifically.
2  Q. Did you know anything generally about
3     her?
4  A. That she commanded the unit that was the
5     focal point of the task force report.
6  Q. How is it that you knew that prior to
7     your application to be MBTA chief?
8  A. Because I also read news reports that
9     surrounded that entire matter as well,
10    and I conducted an independent search of
11    newspaper articles.  Some I already had
12    read over time.  But I wasn't competing
13    for the position.
14 Q. As a result of your reading those
15    newspaper articles, did you form any
16    opinions about Nancy O'Loughlin?
17 A. Not in particular.
18 Q. As a result of reading those articles,
19    did you form any opinions about the unit
20    she headed, the anti-crime unit?
21 A. Yes.
22 Q. And what were those opinions, sir?
23 A. That it was sound to remove the unit from
24    its function in the department.

Page 25

1  Q. Based on what? Let me rephrase that.
2     Why was it sound to remove the unit from
3     its function in the department?
4        MR. EDWARDS: Objection. You
5     can answer.
6  A. Based on the controversy that the unit
7     allegedly caused for the department and
8     within the community.
9  Q. Okay. Had you formed any opinion as to
10    whether the unit had engaged in any
11    wrongful activities or misconduct?
12 A. Again, my knowledge was based on the
13    substance and the findings of the report.
14 Q. You knew, though, that Nancy O'Loughlin
15    had been head of the anti-crime unit?
16 A. Yes, I knew that.
17 Q. Okay. Now, you are familiar with what's
18    called the "Detail Unit" within the MBTA
19    Police Department?
20 A. Yes, I am familiar with it.
21 Q. When is the first time you became
22    familiar with the Detail Unit within the
23    MBTA Police Department?
24 A. Prior to taking the position and studying

Page 26

1     the makeup of the department and its
2     organization, that it is a unit, part of
3     the organizational structure of the
4     department.
5  Q. Was there ever a time that you were
6     informed that the assignment of a
7     superior officer to head the Detail Unit
8     was deemed the punishment assignment?
9  A. No.
10 Q. Did anyone ever inform you of that?
11 A. I learned it through this entire process
12    and the discipline in this matter and
13    associated folks in this matter.
14 Q. When you say "this process" and "this
15    matter," you mean the lawsuit we are here
16    about today?
17 A. Well, it was the discipline that led to
18    the lawsuit.
19 Q. Okay. Are you aware that Lieutenant
20    Flemming has testified he informed you
21    when you came in as Chief that the
22    position of head of the Detail Unit was
23    deemed a punishment assignment for a
24    superior officer?

Page 27

1        MR. EDWARDS: Objection. You
2     can answer.
3  A. No.
4  Q. Did you ever have any conversation with
5     Lieutenant Flemming about whether or not
6     a superior officer being assigned to the
7     Detail Unit would be deemed a punishment
8     position?
9  A. I never recall that conversation.
10 Q. Did you ever have any conversation with
11    Lieutenant Flemming in which he informed
12    you that an assignment of John Martino to
13    head the Detail Unit had been a
14    punishment assignment?
15       MR. EDWARDS: Objection.
16 A. No.
17 Q. If Lieutenant Flemming testified that he
18    had such a conversation with you, would
19    he be lying?
20       MR. EDWARDS: Objection. You
21    don't have to answer the question.
22 A. It's not for me to rule on it. I'm
23    telling you he didn't have that
24    conversation with me.

Page 28

1  Q. Okay. Just so I'm clear, when was the
2     first time then that you heard that it
3     was felt by some that assignment to the
4     Detail Unit is a punishment assignment?
5  A. When I was getting sued.
6  Q. Okay. But not before that?
7  A. No.
8  Q. Okay. Have you ever discussed with John
9     Martino his assignment to the Detail
10    Unit?
11 A. Again, all associated with this case, the
12    discipline and everything else. It
13    wasn't until all of this arose that that
14    was exposed to me.
15 Q. Okay. When you had that discussion with
16    John Martino, was counsel present?
17 A. Don't know. I'm sorry, I
18    don't recall. Counsel would be -- I
19    mean, he is the counsel of the
20    department. It could have been at a
21    command staff meeting.
22 Q. I'll ask the question, and then these
23    gentlemen can do what they want to do.
24    (Indicating.)

Page 29

1 Q. What conversation about his
2   assignment to the Detail Unit did you
3   have with John Martino?
4 A. Don't recall the specifics.
5 Q. Do you recall him telling you that he at
6   one point had been assigned to head the
7   Detail Unit?
8 A. What I can tell you is I don't recall a
9   sit-down meeting that was specifically on
10  the Detail Unit.
11 Q. Right.
12 A. I recall conversations that I had with
13  command staff members just about this
14  case and a number of things that were
15  related to it.
16 Q. All right.  What I want to do for a
17  moment is focus on anything you remember
18  about conversations you had with Martino
19  about his assignment to the Detail Unit.
20 A. Nothing other than he was assigned to it
21  at one time.  That's the general gist of
22  it.
23 Q. Do you recall him indicating to you in
24  any way that he felt his assignment to

Page 30

1   the Detail Unit was a punishment
2   assignment?
3 A. I don't recall that.
4 Q. Do you recall him saying to you anything
5   to the effect that Tom O'Loughlin's
6   assignment of him to the Detail Unit was
7   either a punishment or retaliation?
8 A. No, I don't recall that either.
9 Q. Okay.  You are aware of the fact that he
10  filed suit against the department in
11  relation to that?
12 A. Again, only in the time frame of this
13  whole matter that I have learned all of
14  that.  Some I heard from him and some I
15  have heard from other people.  So, again,
16  that all blends together.
17 Q. Okay.
18 A. I don't believe John Martino sat me down
19  and told me from A-to-Z as it related to
20  his matter.
21 Q. Do you have any knowledge of any superior
22  officers in the department testifying at
23  any point in federal lawsuits that the
24  assignment of a superior officer to the

Page 31

1   detail unit was a punishment assignment?
2       MR. EDWARDS:  Objection.  You
3   can answer.
4 A. No.
5 Q. Do you have any knowledge of John Martino
6   ever testifying that the assignment of a
7   superior officer to the Detail Unit would
8   be a punishment assignment?
9       MR. EDWARDS:  Objection.
10 A. No.
11 Q. Do you have any knowledge of Tom McCarthy
12  ever testifying that the assignment of a
13  superior officer to the Detail Unit was a
14  punishment assignment?
15 A. No.
16 Q. Do you have any knowledge of Bill
17  Flemming ever saying that?
18 A. No.
19 Q. I'm sorry if I asked you this a moment
20  ago, but Flemming never told you that, in
21  his opinion, the assignment of Martino to
22  the Detail Unit was a punishment
23  assignment?
24 A. No.

Page 32

1 Q. Okay.
2       MR. NOTIS:  Let's mark this as
3   Exhibit 1.
4       (Exhibit 1, marked for
5   identification.)
6 Q. Take a look at the document which has
7   been handed to you which is marked as
8   Exhibit 1 and tell me what that is,
9   please?
10 A. It says it's a Complaint, Civil Action
11  Number 04-10933-JLT, "Nancy O'Loughlin,
12  Plaintiff, versus Massachusetts Bay
13  Transportation Authority and Joseph
14  Carter and Michael Mulhern, Defendants."
15 Q. It says it's the First Amended Complaint,
16  correct?
17 A. Yes.
18 Q. Going briefly back to that Detail Unit
19  discussion, in your opinion, Chief, is it
20  a punishment to assign a superior officer
21  to head the Detail Unit?
22 A. No, it is not.
23 Q. Okay.  What are the responsibilities of
24  the head of the Detail Unit?

Page 33

1 A. To manage and administer all of the
2   functions of that department. It is
3   essentially a multi-million dollar
4   business that requires someone with
5   detail skills and ability to manage not
6   only the administration, but the people
7   that are assigned to it on a day-to-day
8   basis.
9 Q. Is it a difficult job?
10 A. In what context?
11 Q. In any context. Let me ask you a better
12   question.
13       Does it require administrative
14   skills to perform the job?
15 A. Yes.
16 Q. What type of administrative skills?
17 A. Someone who is an experienced manager and
18   supervisor, familiar with department
19   policies, practices and procedures,
20   experience with managing and supervising
21   people. I mean police officers.
22 Q. You said it's a multi-million dollar
23   business, essentially?
24 A. Yes.

Page 34

1 Q. Is it an important assignment?
2 A. Yes, because it has direct correlation to
3   our community presence and integrity to
4   the community.
5 Q. All right. The person who holds that
6   position now is who?
7 A. Lieutenant Bill Flemming.
8 Q. All right. I take it you are of the
9   opinion that Lieutenant Flemming has the
10   administrative skills to perform that
11   job?
12 A. Yes.
13 Q. Would you have appointed him if you
14   didn't think he had the administrative
15   skills to perform the job?
16       MR. EDWARDS:  I'll object to
17   the question. You can answer.
18 A. It's not appointing. He is assigned by
19   virtue of his rank. With his range comes
20   requisite, training, ability,
21   qualifications to get to that level.
22 Q. Are you done with your answer?
23 A. I'll stop.
24 Q. I apologize if I cut you off. You are

Page 35

1   the one who had the discretion to assign
2   him to that job, correct?
3 A. I'm the final authority, yes; but deputy
4   chiefs make assignments as well.
5 Q. Well, in terms of Flemming, who was it
6   that decided to assign Flemming to head
7   the Detail Unit?
8 A. I believe it was a recommendation by
9   Deputy Martino. It was the only open
10   position at the time available for his
11   restoration to the rank of lieutenant.
12   It was open. It was formerly the
13   position that Nancy had. We needed a
14   lieutenant to go back there, and that's
15   where he went.
16 Q. You were the one who had the final say in
17   approving or disapproving that
18   assignment?
19 A. That's right.
20 Q. You wouldn't have given your approval to
21   the assignment if you didn't think he had
22   the administrative skills to perform the
23   job?
24       MR. EDWARDS:  I'll object.

Page 36

1   You can answer.
2 A. Again, he was a lieutenant. He was
3   restored to his rank. It's a
4   lieutenant's position. Clearly, by his
5   record, he possessed the skills to do
6   that job.
7 Q. Did you believe he possessed the skills
8   to do the job?
9 A. Yes.
10 Q. And did you believe he had the managerial
11   or supervisory skills to perform the job?
12 A. Yes.
13 Q. And did you believe he was familiar
14   enough with department policies and
15   procedures to perform the job?
16 A. Yes.
17 Q. And did you believe he had enough
18   experience managing and supervising
19   police officers to do the job?
20 A. Yes.
21 Q. And you believed he had the knowledge,
22   skills, experience and training to
23   perform an assignment of this importance?
24 A. Yes.

Page 37

1 Q. Okay. Let's go for a moment to the
2   assignment of -- you said she held the
3   job. Let's go to the assignment of Nancy
4   O'Loughlin to head the Detail Unit. Do
5   you recall when that was, sir?
6 A. The summer of 2004, I believe. If you
7   have a document that could refresh my
8   memory, that would be helpful.
9 Q. Let me ask you to look at Exhibit 1.
10   Take a look at Paragraph 14, if you don't
11   mind, sir.
12   (Pause.)
13 A. Okay. It's 2003.
14 Q. Okay. So Lieutenant O'Loughlin was
15   assigned to head the Detail Unit in
16   August of 2003?
17 A. That's correct.
18 Q. Who was it who made the initial
19   recommendation that Nancy O'Loughlin be
20   moved to head the Detail Unit?
21   MR. EDWARDS: Objection. You
22   can answer.
23 A. I don't recall the specifics, but it was
24   by a number of people who were in my

Page 38

1   command staff at the time, in discussion
2   with me.
3 Q. Do you recall if it was your idea
4   initially?
5 A. No.
6 Q. It was not or you do not recall?
7 A. I do not recall.
8 Q. But you do recall that there was some
9   process where this was discussed by the
10   deputy chiefs and yourself?
11 A. Yes.
12 Q. Do you recall the discussions at all?
13 A. No.
14 Q. At some point, sir, was a recommendation
15   presented to you?
16 A. Generally, they recommend to me
17   assignments within the department.
18 Q. I guess what I'm looking for is -- I'm
19   not sure of the formality or informality
20   of the process. What I'm wondering is
21   whether there was an actual written
22   recommendation or whether this was
23   something that came about through
24   discussions or was there some other

Page 39

1   process?
2   MR. EDWARDS: I'll object.
3   You can answer.
4 A. Generally, it happens through
5   discussion. It could be in written
6   correspondence that I get
7   recommendations. It could be -- it
8   could arise out of a meeting with the
9   command staff and get decided on and
10   direction given to execute it.
11 Q. All right. Do you recall what process
12   occurred in making the assignment of
13   Nancy O'Loughlin to head the detail unit?
14 A. I do not recall.
15 Q. Okay.
16 A. But I recall approving it.
17 Q. Okay. In approving the assignment of
18   Nancy O'Loughlin to head the Detail Unit,
19   did you feel that she had the
20   administrative skills to perform that
21   job?
22 A. Yes.
23 Q. In approving the assignment of Nancy
24   O'Loughlin to head the Detail Unit, did

Page 40

1   you feel that she had enough experience
2   as a manager or supervisor to perform the
3   job?
4 A. Yes.
5 Q. And in approving Nancy O'Loughlin to head
6   the Detail Unit, did you feel that she
7   was familiar enough with departmental
8   policies, practices and procedures to
9   head the unit?
10 A. Yes.
11 Q. And in appointing -- excuse me. In
12   assigning Nancy O'Loughlin to head the
13   Detail Unit, did you feel she had enough
14   experience with managing and supervising
15   police officers to head the unit?
16 A. Yes.
17 Q. And in assigning Nancy O'Loughlin to head
18   the Detail Unit, did you feel that she
19   had the skills, training, experience and
20   knowledge to perform an assignment of
21   this importance?
22 A. Yes.
23 Q. Okay. Were you, in assigning Nancy
24   O'Loughlin to head the Detail Unit,

1   intending to punish her in any way?
2  A. Never.
3  Q. Okay. Let's go to Paragraph 13 of the
4     Complaint, sir. Actually, let's go to
5     the last sentence in Paragraph 12. What
6     the sentence says is,"From August, 2002,
7     through February, 2003, Lieutenant
8     O'Loughlin was in charge of a division in
9     the Detective Unit." Do you know if
10    that's a true statement?
11 A. It sounds right, but I'm not -- I can't
12    testify that that's accurate in terms of
13    the time.
14 Q. Okay. Do you know what position Nancy
15    O'Loughlin was holding when you arrived
16    in the department?
17 A. I believe she was commanding the
18    Detective Unit. That's what I recall.
19 Q. Do you recall her working on some Vandal
20    Squad?
21 A. I recall her -- I recall one of her areas
22    of responsibility being graffiti.
23 Q. Okay. Do you recall what position she
24    held in the Detective Unit?

1  A. She was the commander and also
2     responsible for graffiti investigations.
3  Q. All right. Well, let's go to Paragraph
4     13 then. The second sentence reads, "As
5     one of his first actions as Chief, Chief
6     Carter disbanded Lieutenant O'Loughlin's
7     division, and she was moved to the
8     position of Detective Unit Commander."
9     Is that correct?
10 A. It does not sound correct, unless you
11    have a document to refresh my memory. I
12    don't recall that happening.
13 Q. Do you recall making Lieutenant
14    O'Loughlin the Detective Unit Commander?
15 A. I recall her being in the position. I
16    don't recall being the one who put her in
17    that position.
18 Q. Are you saying you didn't or you're not
19    sure?
20 A. I'm not sure.
21 Q. Okay. Do you have any recollection of
22    this job previously being performed by a
23    sergeant?
24 A. No.

1  Q. Okay.
2        MR. EDWARDS:  The unit
3     commander?
4        MR. NOTIS:  Yes.
5        MR. EDWARDS:  Okay.
6  Q. Do you have any recollection of
7     Lieutenant O'Loughlin serving as
8     Detective Unit Commander?
9  A. Yes.
10 Q. Okay. If you look at Paragraph 14 of the
11    Complaint, it says, "Lieutenant
12    O'Loughlin served as the Detective Unit
13    Commander from February, 2003 to August
14    4, 2003," correct?
15 A. That's what it says.
16 Q. Do you know if that's correct?
17 A. Again, she served as the Detective Unit
18    Commander. I can't attest to the time
19    frame without refreshing my memory with
20    documents.
21 Q. Do you recall if she served under you in
22    that position for roughly six months?
23 A. At least that.
24 Q. Okay. What do you recall about her

1     tenure as Detective Unit Commander?
2  A. I recall that I had a number of
3     conversations with then Deputy Chief Bill
4     Flemming, who was responsible for the
5     investigative services of which the
6     Detective Unit fell under, about the
7     management of the unit and specifically
8     Lieutenant Detective O'Loughlin's role in
9     the management of it.
10 Q. What do you recall about those
11    conversations?
12 A. I was concerned that I was not receiving
13    the reports that are customarily produced
14    by a unit commander, particularly of an
15    investigative unit, on the status of
16    their work.
17 Q. Okay.
18 A. As well as concerned with a number of my
19    walking around not finding the commander
20    there at the unit during critical periods
21    of the day and spending the majority of
22    her time on the streets with the people
23    that work for her.
24 Q. Okay. Did you do anything to rectify

Page 41

1 intending to punish her in any way?
2 A. Never.
3 Q. Okay. Let's go to Paragraph 13 of the
4   Complaint, sir. Actually, let's go to
5   the last sentence in Paragraph 12. What
6   the sentence says is, "From August, 2002,
7   through February, 2003, Lieutenant
8   O'Loughlin was in charge of a division in
9   the Detective Unit." Do you know if
10   that's a true statement?
11 A. It sounds right, but I'm not -- I can't
12   testify that that's accurate in terms of
13   the time.
14 Q. Okay. Do you know what position Nancy
15   O'Loughlin was holding when you arrived
16   in the department?
17 A. I believe she was commanding the
18   Detective Unit. That's what I recall.
19 Q. Do you recall her working on some Vandal
20   Squad?
21 A. I recall her -- I recall one of her areas
22   of responsibility being graffiti.
23 Q. Okay. Do you recall what position she
24   held in the Detective Unit?

Page 42

1 A. She was the commander and also
2   responsible for graffiti investigations.
3 Q. All right. Well, let's go to Paragraph
4   13 then. The second sentence reads, "As
5   one of his first actions as Chief, Chief
6   Carter disbanded Lieutenant O'Loughlin's
7   division, and she was moved to the
8   position of Detective Unit Commander."
9   Is that correct?
10 A. It does not sound correct, unless you
11   have a document to refresh my memory. I
12   don't recall that happening.
13 Q. Do you recall making Lieutenant
14   O'Loughlin the Detective Unit Commander?
15 A. I recall her being in the position. I
16   don't recall being the one who put her in
17   that position.
18 Q. Are you saying you didn't or you're not
19   sure?
20 A. I'm not sure.
21 Q. Okay. Do you have any recollection of
22   this job previously being performed by a
23   sergeant?
24 A. No.

Page 43

1 Q. Okay.
2     MR. EDWARDS:  The unit
3   commander?
4     MR. NOTIS:  Yes.
5     MR. EDWARDS:  Okay.
6 Q. Do you have any recollection of
7   Lieutenant O'Loughlin serving as
8   Detective Unit Commander?
9 A. Yes.
10 Q. Okay. If you look at Paragraph 14 of the
11   Complaint, it says, "Lieutenant
12   O'Loughlin served as the Detective Unit
13   Commander from February, 2003 to August
14   4, 2003," correct?
15 A. That's what it says.
16 Q. Do you know if that's correct?
17 A. Again, she served as the Detective Unit
18   Commander. I can't attest to the time
19   frame without refreshing my memory with
20   documents.
21 Q. Do you recall if she served under you in
22   that position for roughly six months?
23 A. At least that.
24 Q. Okay. What do you recall about her

Page 44

1   tenure as Detective Unit Commander?
2 A. I recall that I had a number of
3   conversations with then Deputy Chief Bill
4   Flemming, who was responsible for the
5   investigative services of which the
6   Detective Unit fell under, about the
7   management of the unit and specifically
8   Lieutenant Detective O'Loughlin's role in
9   the management of it.
10 Q. What do you recall about those
11   conversations?
12 A. I was concerned that I was not receiving
13   the reports that are customarily produced
14   by a unit commander, particularly of an
15   investigative unit, on the status of
16   their work.
17 Q. Okay.
18 A. As well as concerned with a number of my
19   walking around not finding the commander
20   there at the unit during critical periods
21   of the day and spending the majority of
22   her time on the streets with the people
23   that work for her.
24 Q. Okay. Did you do anything to rectify

Page 45

1    either of those situations?
2        MR. EDWARDS: Objection. You
3    can answer.
4  A. I directed the deputy to counsel her in
5    those matters.
6  Q. Do you know if he did?
7  A. He asserted to me that he did.
8  Q. Did the situation change at all after he
9    asserted to you that he had done that?
10  A. No.
11  Q. Were you dissatisfied with Nancy
12    O'Loughlin's performance as Detective
13    Unit Commander?
14  A. Yes.
15  Q. For the reasons you just mentioned?
16  A. Yes.
17  Q. For any other reasons?
18  A. Just her general management of the unit,
19    and, again, her lack of presence
20    overseeing the administration,
21    particularly the administration of the
22    unit.
23  Q. Okay. The second sentence of Paragraph
24    14 says, "On August 5, 2003, she...,"

Page 46

1    referring to Lieutenant O'Loughlin,
2    "...was moved from being the Detective
3    Unit Commander..." --
4  A. Hold on. I'm not with you.
5        (Pause.)
6  A. I have you now.
7  Q. Let me start again. The second sentence,
8    "On August 5, 2003, she was moved from
9    being the Detective Unit Commander to
10    being the head of the Detail Unit."
11        Why did you move her to the
12    Detail Unit, sir?
13  A. We needed strong management in that
14    unit. I recall a number of conversations
15    about her potentially needing a different
16    environment, a different position, that
17    perhaps that would be helpful to her; and
18    we needed that level of management in
19    that department that was making a number
20    of moves at the time in terms of shifting
21    particularly lieutenants.
22  Q. Okay. We will talk about that in a
23    moment.
24        You said you moved her there

Page 47

1    because you needed strong management in
2    that position?
3  A. Yes.
4  Q. And you felt she could provide that
5    strong management?
6  A. Yes.
7  Q. The other moves you discussed, one of
8    them was Detective Loiter?  (spelled
9    phonetically.)
10  A. Yes.
11  Q. Why did you move Loiter?
12  A. To patrol.
13  Q. Why did you move him from the Detective
14    Unit to patrol?
15  A. For his deficiencies in management of the
16    night detectives.
17  Q. What were his deficiencies?
18  A. Very similar to Nancy's.
19  Q. Which other lieutenants did you move at
20    that time?
21  A. I don't recall the actual --
22  Q. Did you move McCarthy?
23  A. Yes.
24  Q. How was McCarthy moved?

Page 48

1  A. He was moved from patrol to detectives.
2  Q. Was detectives considered more desirable
3    than patrol?
4        MR. EDWARDS: Objection.
5  A. It has some prestige just among police
6    officers. But, nonetheless, they are
7    both very critically important positions,
8    from my perspective.
9  Q. I understand that. Do you have an
10    opinion as to whether officers under your
11    command felt that the Detail Unit had
12    less prestige than the Detective Unit?
13        MR. EDWARDS: Objection. You
14    can answer.
15  A. No.
16  Q. You don't have an opinion on that?
17  A. Repeat your question. I thought I heard
18    you.
19  Q. Do you have an opinion as to whether the
20    officers under your command felt that the
21    Detail Unit had less prestige than the
22    Detective Unit?
23        MR. EDWARDS: Objection. Do
24    you have a time period?

Page 49

1  A. I'm not aware of that at that time.
2  Q. My questions refer to that period of
3     time.
4  A. No.
5  Q. Okay.  You just mentioned to me that you
6     thought that it was felt by some that the
7     Detective Unit had more prestige than
8     patrol?
9         MR. EDWARDS:  Objection.
10 Q. I think you just testified to that,
11    Chief?
12 A. What I testified to is, among police
13    officers, being in plain clothes and
14    being a detective has a little more
15    prestige.
16 Q. And doesn't being in the Detective Unit
17    have more prestige than being in the
18    Detail Unit?
19 A. I didn't testify to that.  I don't get
20    your question.
21 Q. I'm asking, in August of 2003, was it
22    felt by officers under your command that
23    it was more prestigious to be in the
24    Detective Unit than to be in the Detail

Page 50

1  Unit?
2  A. No.  I don't recall anybody ever couching
3     that to me.
4  Q. Okay.
5  A. No.
6  Q. In your opinion, sir, is it more
7     prestigious to be a detective than in the
8     Detail Unit?
9  A. No.
10 Q. Okay.  Before moving Nancy O'Loughlin to
11    the Detail Unit from being Detective Unit
12    Commander, did you discuss that move with
13    her?
14 A. Yes.
15 Q. Did you discuss that move with her before
16    actually informing her that this was
17    going to be her new assignment?
18 A. That would have been Deputy Flemming that
19    would have been directed to speak to her
20    about the change in assignment.
21 Q. Do you recall if he actually was assigned
22    to speak to her about that?
23 A. Yes.  I know for a fact that I directed
24    him to speak to her about the assignment

Page 51

1     before she came to speak to me.
2  Q. Okay.  Do you know if he actually did
3     that?
4         MR. EDWARDS:  Objection.  You
5     can answer.
6  A. He asserted to me that he spoke to Nancy
7     and brought Nancy to my office for me to
8     talk to her.
9  Q. Did he ever inform you about his
10    conversation with her about that?
11 A. Not that I recall.
12 Q. All right.  Why don't you tell me then
13    what you recall about the conversation
14    when you were in the meeting with Nancy
15    and Flemming about that reassignment?
16 A. I indicated to her that she was being
17    transferred to that unit because of our
18    dire need for strong management, that we
19    had a number of problems in that unit, we
20    needed a lieutenant back in that unit, we
21    were moving the sergeant out, and that I
22    felt she had what we needed there, that I
23    was really looking for her to go there
24    and do the job effectively.  Then I asked

Page 52

1     her if she had any questions or any
2     issues with that reassignment.
3  Q. And her response?
4  A. She did not respond.
5  Q. She said nothing at all?
6  A. She could have grunted or made a noise,
7     but she did not.  I don't recall her
8     saying anything of substance.
9  Q. Do you recall her saying, "No, I don't
10    have any questions"?
11 A. No.
12 Q. Okay.  Did you press her for a response?
13 A. I think I asked did she hear me, and
14    she nodded, and, like, gave me a yes,
15    sir, and that was it.  That was the limit
16    of the conversation.
17 Q. Did she appear upset?
18 A. No.
19 Q. Did she appear surprised?
20        MR. EDWARDS:  Objection.
21 A. No.
22 Q. Did she appear angry?
23 A. No.
24 Q. Were you surprised that she had no

CondenseIt!™

Page 53

1 comments for you?
2 A. No.
3 Q. Did you consider this to be an
4 advancement for her?
5 A. No. It was a lateral move.
6 Q. After informing her of her reassignment,
7 did you have any discussion with Flemming
8 about this?
9 A. Just say it again, so I understand your
10 question.
11 Q. After you had the discussion with Nancy
12 O'Loughlin where you reassigned her, did
13 you have any discussion with Flemming
14 about her reassignment?
15 A. I think generally about her not having
16 anything to say; just general discussion
17 about that.
18 Q. Okay. Do you recall either immediately
19 or shortly after that discussion telling
20 Flemming that Nancy O'Loughlin was
21 dressed inappropriately?
22 A. That was during her tenure in the
23 Detective Unit. Yes, as the commander of
24 the Detective Unit. Yes.

Page 54

1 Q. Okay.
2 A. Not on an assignment to the Detail Unit,
3 no.
4 Q. So you do recall at least one discussion
5 with Flemming about Nancy O'Loughlin's
6 attire?
7 A. As the commander of the Detective Unit,
8 yes.
9 Q. How many discussions about that do you
10 recall with him?
11 A. Several.
12 Q. Just so we can be clear, you recall them
13 as being prior to O'Loughlin's assignment
14 to the Detail Unit?
15 A. I'm clearly aware that they were before
16 her assignment to the Detail Unit. It
17 was during her assignment and management
18 of the Detective Unit.
19 Q. Do you recall any discussions about her
20 attire with Flemming after you reassigned
21 her to details?
22 A. No, I do not recall a discussion with
23 Flemming.
24 Q. Tell me everything you recall about the

Page 55

1 discussions with Flemming about
2 O'Loughlin's attire while she was head of
3 the Detail Unit?
4     MR. EDWARDS: Objection. I
5 think you misstated that.
6 A. None.
7     MR. EDWARDS: You said "Detail
8 Unit."
9     MR. NOTIS: Let me rephrase
10 it.
11 Q. Please tell me, sir, everything you
12 recall about your discussions with
13 Flemming regarding Nancy O'Loughlin's
14 attire while she was head of the
15 Detective Unit?
16 A. I mentioned to him that she was not
17 wearing appropriate attire as a manager
18 and as the commander of that unit, that
19 her dress was extraordinarily casual.
20 Q. Okay. What was her attire that you were
21 commenting on?
22 A. Wearing -- I guess you would call it --
23 oh, man. Just a shirt, jeans and work
24 boots, or work shoes.

Page 56

1 Q. What would you have liked her to be
2 attired in?
3 A. As a minimum, business casual attire,
4 which is what I had a discussion with the
5 deputy about.
6 Q. What do you mean by -- how would you
7 describe "business casual attire," sir?
8 A. A jacket, slacks, a business-like blouse
9 or shirt; it could be open collar.
10 Business casual.
11 Q. Okay. Did you instruct Deputy Flemming
12 to talk to O'Loughlin about that?
13 A. Yes, I did.
14 Q. Did he do that?
15     MR. EDWARDS: Objection.
16 A. Yes. He asserted to me that he did.
17 Q. Did her attire change after that?
18 A. No.
19 Q. How many times did you instruct Deputy
20 Flemming to talk to Lieutenant O'Loughlin
21 about her attire?
22 A. As I stated earlier, several times. I
23 don't have the exact number.
24 Q. Each of those times, sir, did he inform

CondenseIt!™

**Page 57**

1  you that he had spoken to her about it?
2  A. Yes, and that he would speak to her
3     again.
4  Q. Did you feel it would have been
5     inappropriate for you to have spoken to
6     Lieutenant O'Loughlin about her attire?
7  A. Yes.
8  Q. Because of the chain of command?
9  A. Yes.
10 Q. Any other reasons?
11 A. Chain of command specifically, and it was
12    the deputy's responsibility to command
13    his personnel.
14 Q. Okay. Did you ever have such a
15    conversation with Deputy Flemming after
16    seeing Nancy O'Loughlin wearing
17    chino-type pants and a button-down shirt?
18       MR. EDWARDS: Objection.
19 A. I don't recall.
20 Q. Would that have been appropriate business
21    -- appropriate casual business attire?
22 A. I don't recall the context in which you
23    asked me. I don't recall seeing
24    something and then saying something to

**Page 58**

1  him specifically to the attire you
2  described.
3  Q. Okay. If Lieutenant Flemming has
4     testified that you commented negatively
5     about Nancy O'Loughlin's appearance
6     immediately after reassigning her to the
7     Detail Unit, would he be lying?
8        MR. EDWARDS: Objection. He
9     has answered the question.
10       MR. NOTIS: No, he hasn't.
11 A. It doesn't change my testimony previously
12    because he said something. So, great.
13 Q. After Nancy O'Loughlin was reassigned to
14    the Detail Unit, did anyone in the
15    department indicate to you that they felt
16    this was an attempt to punish her, prior
17    to this lawsuit?
18 A. No.
19 Q. Did anyone indicate to you prior to this
20    lawsuit that Nancy O'Loughlin was upset
21    or dissatisfied with the reassignment?
22 A. No.
23 Q. Do you have an opinion as to how
24    Lieutenant O'Loughlin performed as head

**Page 59**

1  of the Detail Unit?
2  A. Generally, she was managing the unit.
3     That was my understanding.
4  Q. Who gave you that understanding, sir?
5  A. Deputy Martino.
6  Q. As a result of being reassigned to the
7     Detail Unit, were Lieutenant O'Loughlin's
8     chances for an advancement in the
9     department less than they would have been
10    had she remained head of the Detective
11    Unit?
12 A. None whatsoever.
13 Q. At the time Lieutenant O'Loughlin was
14    reassigned to the Detail Unit, were there
15    other lieutenant-level positions she
16    could have been reassigned to?
17 A. She was eligible for any assignment that
18    could have come open during that time, to
19    include to compete for deputy chief at
20    the time.
21 Q. And that basically would have been
22    essentially just up to your discretion?
23       MR. EDWARDS: Objection.
24 A. No.

**Page 60**

1  Q. How would it not just be up to your
2     discretion, sir?
3  A. I think I articulated the process for
4     deputy chief; to apply, to compete.
5     Unless you are asking a different
6     question --
7  Q. I am. I apologize if I confused you.
8     What I'm asking is, at the time that
9     Nancy O'Loughlin was assigned to head the
10    Detail Unit, would it have been within
11    your discretion to reassign her to any
12    other lieutenant position?
13 A. If there was a need, and the
14    recommendation was made to me, yes, I
15    could have approved a reassignment. Yes.
16 Q. As Chief, you didn't need someone to make
17    a recommendation to you, did you?
18 A. As Chief, it's been my practice not to
19    micro-manage. Again, I have a team of
20    people, and they make recommendations.
21    That's how I generally manage the
22    department. I have not gone outside of
23    that.
24 Q. I understand that. I'm not attempting to

Condenselt!™

Page 57

1   you that he had spoken to her about it?
2   A. Yes, and that he would speak to her
3      again.
4   Q. Did you feel it would have been
5      inappropriate for you to have spoken to
6      Lieutenant O'Loughlin about her attire?
7   A. Yes.
8   Q. Because of the chain of command?
9   A. Yes.
10  Q. Any other reasons?
11  A. Chain of command specifically, and it was
12     the deputy's responsibility to command
13     his personnel.
14  Q. Okay.  Did you ever have such a
15     conversation with Deputy Flemming after
16     seeing Nancy O'Loughlin wearing
17     chino-type pants and a button-down shirt?
18          MR. EDWARDS:  Objection.
19  A. I don't recall.
20  Q. Would that have been appropriate business
21     -- appropriate casual business attire?
22  A. I don't recall the context in which you
23     asked me.  I don't recall seeing
24     something and then saying something to

Page 58

1   him specifically to the attire you
2   described.
3   Q. Okay.  If Lieutenant Flemming has
4   testified that you commented negatively
5   about Nancy O'Loughlin's appearance
6   immediately after reassigning her to the
7   Detail Unit, would he be lying?
8          MR. EDWARDS:  Objection.  He
9   has answered the question.
10         MR. NOTIS:  No, he hasn't.
11  A. It doesn't change my testimony previously
12  because he said something.  So, great.
13  Q. After Nancy O'Loughlin was reassigned to
14     the Detail Unit, did anyone in the
15     department indicate to you that they felt
16     this was an attempt to punish her, prior
17     to this lawsuit?
18  A. No.
19  Q. Did anyone indicate to you prior to this
20     lawsuit that Nancy O'Loughlin was upset
21     or dissatisfied with the reassignment?
22  A. No.
23  Q. Do you have an opinion as to how
24     Lieutenant O'Loughlin performed as head

Page 59

1   of the Detail Unit?
2   A. Generally, she was managing the unit.
3      That was my understanding.
4   Q. Who gave you that understanding, sir?
5   A. Deputy Martino.
6   Q. As a result of being reassigned to the
7      Detail Unit, were Lieutenant O'Loughlin's
8      chances for an advancement in the
9      department less than they would have been
10     had she remained head of the Detective
11     Unit?
12  A. None whatsoever.
13  Q. At the time Lieutenant O'Loughlin was
14     reassigned to the Detail Unit, were there
15     other lieutenant-level positions she
16     could have been reassigned to?
17  A. She was eligible for any assignment that
18     could have come open during that time, to
19     include to compete for deputy chief at
20     the time.
21  Q. And that basically would have been
22     essentially just up to your discretion?
23          MR. EDWARDS:  Objection.
24  A. No.

Page 60

1   Q. How would it not just be up to your
2      discretion, sir?
3   A. I think I articulated the process for
4      deputy chief, to apply, to compete.
5      Unless you are asking a different
6      question --
7   Q. I am.  I apologize if I confused you.
8      What I'm asking is, at the time that
9      Nancy O'Loughlin was assigned to head the
10     Detail Unit, would it have been within
11     your discretion to reassign her to any
12     other lieutenant position?
13  A. If there was a need, and the
14     recommendation was made to me, yes, I
15     could have approved a reassignment.  Yes.
16  Q. As Chief, you didn't need someone to make
17     a recommendation to you, did you?
18  A. As Chief, it's been my practice not to
19     micro-manage.  Again, I have a team of
20     people, and they make recommendations.
21     That's how I generally manage the
22     department.  I have not gone outside of
23     that.
24  Q. I understand that.  I'm not attempting to

Page 69

1  A. No.
2  Q. Okay.  Do you recall any female other
3     than Nancy O'Loughlin ever holding that
4     position?
5  A. No.
6  Q. Okay.  I believe you testified that at
7     some point -- strike that.
8        I believe at some point you
9     testified that when you first became
10    chief, Anne McCall was one of your deputy
11    chiefs?
12 A. Yes.
13 Q. I take it at some point she left the
14    position of deputy chief?
15 A. Yes.
16 Q. Do you recall when that was?
17 A. Not without refreshing my memory.
18 Q. Any rough idea, between 2003 and now,
19    when it happened?
20 A. I believe it was in 2003.
21 Q. So within a year of when you came on
22    board?
23 A. Yes.
24 Q. Okay.  What were the circumstances of her

Page 70

1     not being a deputy chief any longer?
2  A. A discussion, one-on-one discussion with
3     her about my advancing the plan of action
4     and what I was going to require from her
5     to implement that advancement and her
6     disagreeing with the track it was taking
7     and her lack of support for that.
8  Q. In a general way, how is it that she was
9     disagreeing with your plan of action?
10 A. She didn't believe in the foundation of
11    it in terms of the reconfiguration of
12    patrol force, et cetera.  She did not
13    agree with it.
14 Q. Okay.  Did you suggest that she shouldn't
15    be a deputy chief or did she volunteer
16    that?
17 A. I suggested it, yes.
18 Q. And she then agreed with that or complied
19    with it?
20 A. She complied.
21 Q. Did she resign as a deputy chief?
22 A. She stepped down, yes.
23 Q. What position was she placed in?
24 A. Lieutenant.  That was her civil service

Page 71

1     rank.
2  Q. Okay.  What assignment was she given as
3     lieutenant?
4  A. Patrol.
5  Q. Does she still hold that?
6  A. Yes.
7  Q. Has her assignment changed at all from
8     the reassignment to patrol to now?
9  A. Not that I recall.
10 Q. You also testified that when you first
11    came on as Chief, Nadine Taylor-Miller
12    was one of your deputies?
13 A. No, I did not testify to that.
14 Q. Okay.
15 A. I testified that she was gone when I got
16    there.
17 Q. Thank you.  Okay.  You are certainly
18    correct.
19        You testified at some point
20    Dolores Ford-Murphy became one of your
21    deputies?
22 A. As a result of the competitive process
23    for deputy chief, she became a deputy.
24 Q. What position had she held before then?

Page 72

1  A. I don't recall without refreshing my
2     memory.
3  Q. Was she a captain in the civil service
4     rank, by the way?
5  A. Yes, she is a civil service captain.
6  Q. Okay.  Chief, let me ask you to take a
7     look at some of the allegations in
8     Paragraph 17 of the Complaint.  I take
9     it, by the way, you have seen this
10    document before today?
11 A. I have not read the amended document
12    before today.
13 Q. Okay.  Did you read the original
14    Complaint?
15 A. I perused the regular Complaint but did
16    not read it in detail.
17 Q. Okay.  Is it correct that at some point
18    you saw the charge filed with the
19    Massachusetts Commission Against
20    Discrimination?
21 A. Yes, I did.
22 Q. Did you read that in detail?
23 A. Yes.
24 Q. Okay.  Directing your attention to

Condenselt™

Page 77

1  how he should act in relation to the
2  dispute?
3  A. No.
4  Q. The third paragraph of that subparagraph
5    reads, "Despite the fact that Lieutenant
6    O'Loughlin is recognized as an expert in
7    relation to graffiti related crime and
8    has testified as an expert on behalf of
9    the MBTA and the Commonwealth of
10   Massachusetts on such matters on a number
11   of occasions, Chief Carter informed her
12   (on the same day that he transferred her
13   to the Detail Unit) that she would no
14   longer be allowed to investigate and/or
15   testify as an expert on graffiti related
16   crime, but that her former assistant, who
17   was not recognized as an expert on these
18   matters, would do any such testifying."
19   Is that a true statement?
20 A. No.
21 Q. Do you recall any discussions with Nancy
22   O'Loughlin about her not testifying in
23   relation to graffiti crime?
24 A. No.

Page 78

1  Q. Do you have any idea what this is
2    discussing then?
3        MR. EDWARDS:  Objection.  You
4    can answer.
5  A. I know what it says.
6  Q. Does it bear any relation to any
7    discussions you had with Nancy
8    O'Loughlin?
9  A. None that I recall or I'm aware of.
10 Q. Okay.  On the day that you informed her
11   of her reassignment, did you have any
12   discussion with her about her graffiti
13   testimony?
14 A. No.
15 Q. Did you ever inform her that she was not
16   to testify in graffiti crime cases?
17 A. I never talked to her about graffiti
18   crime cases, no.
19 Q. Did you ever instruct any officer who was
20   a subordinate of yours to talk to her
21   about that?
22 A. Not specifically.
23 Q. What does that mean, sir?
24 A. What that means is, it would have been

Page 79

1  Flemming's responsibility to speak to her
2    about her transfer from the Detective
3    Unit.  As I testified earlier, when we
4    started, one of the associated
5    responsibilities was graffiti
6    investigations that she was responsible
7    for.
8  A. So he would have had a conversation with
9    her about her no longer being assigned to
10   that function and being transferred to
11   the Detail Unit and the Chief wanted to
12   talk to you about that transfer to the
13   Detail Unit.  So, generally, he would
14   have done that based on our discussion.
15 Q. All right.  Just so I can understand
16   then, in your discussions with Flemming
17   about O'Loughlin's reassignment, was
18   there discussion about her no longer
19   testifying about graffiti crime?
20 A. Not that I recall.
21 Q. Do you have any understanding as to
22   whether Flemming discussed with Nancy
23   that she shouldn't testify about graffiti
24   crime?

Page 80

1  A. No.
2  Q. Did you ever tell her she would no longer
3    be allowed to investigate graffiti crime?
4  A. No, sir.
5  Q. Do you know if Flemming ever told her
6    that?
7  A. I don't recall.  No.
8  Q. Did you instruct Flemming to tell her
9    that?
10 A. Not specifically, no.
11 Q. Did you have an opinion when you
12   reassigned Nancy O'Loughlin to details as
13   to whether she would still be allowed to
14   testify as an expert on graffiti-related
15   crime?
16 A. My opinion was she was no longer
17   responsible for that because of her
18   command of the Detail Unit and her
19   responsibilities therein.
20 Q. Well, I understand that she would no
21   longer be responsible for investigating
22   graffiti-related crime, correct?
23 A. That's correct.  Yes.
24 Q. But did that mean that she would no

Page 81

1   longer be allowed to testify as an expert
2   on graffiti-related crime?
3 A. Technically, if she was summoned to go to
4   a court of law on a case that she had
5   initiated and investigated and was
6   responsible to assist the prosecution
7   with, she would go. That's in the rules
8   within the department.
9 Q. Let me ask you this, sir: When you
10   reassigned Nancy O'Loughlin to the Detail
11   Unit, did you understand that she was
12   recognized as an expert on
13   graffiti-related crime?
14 A. Yes.
15 Q. All right. Was it your opinion that she
16   should no longer be allowed to testify as
17   an expert to assist in prosecutions?
18       MR. EDWARDS: Objection. You
19   can answer.
20 A. Ask that question again.
21 Q. Was it your opinion when you reassigned
22   her that she should no longer be allowed
23   to testify as an expert on graffiti
24   crime?

Page 82

1 A. My opinion was that was not her area of
2   responsibility because of her assignment
3   to the Detail Unit. However, if she was
4   subpoenaed or required by a Court to
5   testify, I wouldn't prohibit that.
6 Q. And you never discussed anything about
7   that with her one way or the other,
8   correct?
9 A. No, I did not have a discussion with her
10   about that.
11 Q. And you don't know if anyone else had a
12   discussion with her about that?
13 A. I do not know.
14 Q. This refers to a former assistant of hers
15   who had experience with graffiti. Do you
16   know who that was?
17 A. I know that there were two detectives
18   that worked with her on a consistently
19   regular basis.
20 Q. And who were they?
21 A. Detective Sullivan and a hispanic name.
22 Q. Dias?
23 A. Dias and Sullivan, yes. Thank you.
24 Q. You're welcome. Do you know if Diaz or

Page 83

1   Sullivan testified as an expert on
2   graffiti crime after Nancy O'Loughlin was
3   reassigned to the Detail Unit?
4 A. I do not know if she testified as an
5   expert.
6 Q. Do you know -- strike that. Well, let me
7   ask you to take a look at Subparagraph 4,
8   Chief. It says there, "Chief Carter
9   deliberately avoids contact with
10   Lieutenant O'Loughlin so as not to have
11   to speak to her." Did you ever do that?
12 A. No. I went out of my way to try to talk
13   to her.
14 Q. After her reassignment?
15 A. After her reassignment.
16 Q. Well, when is it you went out of your way
17   to speak to her?
18 A. When she was the commander of the
19   Detective Unit.
20 Q. Chief Carter never met with Lieutenant
21   O'Loughlin prior to her reassignment."
22   Is that true?
23 A. True.
24 Q. Why is that? Why had you never met with

Page 84

1   her?
2 A. Because of the first sentence. Every
3   time I tried to engage her, even with a
4   pleasantry like "good morning," she would
5   either look the other way, quickly walk
6   the other way, get into her car. She
7   would avoid me.
8 Q. Okay. Is it your testimony that prior to
9   her reassignment to detail, she would try
10   to avoid you?
11 A. Yes.
12 Q. When did you become aware of that
13   initially?
14 A. Early in my tenure in the department as
15   chief.
16 Q. Did you talk to anybody about that?
17 A. I mentioned it to Deputy Flemming.
18 Q. What did you say to him about it?
19 A. That I find it odd that every time I try
20   to speak to her, she will not either
21   acknowledge me, or she will quickly turn
22   and look the other way, or walk away, or
23   disappear quickly.
24 Q. Did you consider that insubordinate?

Page 89

1  I would talk to anybody who was in my
2  path. I would greet them, speak to them,
3  ask them about their family, ask them how
4  things were going with work, what are
5  they working on.
6 Q. I'm not at all familiar with the setup of
7  the MBTA Police Department Headquarters,
8  at Southampton Street, is it?
9 A. Yes, it is.
10 Q. Is the Detective Unit located within the
11  headquarters at Southampton Street?
12 A. Yes.
13 Q. Is it physically designated in any way?
14 A. It is clearly identified as part of the
15  unit. It has names on the door,
16  "Detective Unit."
17 Q. Very basically, sir, just tell me the
18  physical setup of Southampton Street?
19 A. The Detective Unit is on the first floor.
20 Q. Okay.
21 A. As well as the cell block and the booking
22  area, the communications and dispatch
23  area, the information management area,
24  the then community service office.

Page 90

1 Q. How many floors are there in the
2  headquarters?
3 A. Two.
4 Q. Your office is up on the second floor?
5 A. Yes.
6 Q. And the deputies are up there?
7 A. Yes.
8 Q. Who else is up on the second floor?
9 A. The Fiscal Unit, the Intelligence Unit,
10  the Planning Research/Community
11  Partnerships.
12 Q. Okay. If I walked into the first floor
13  of headquarters, would I have to go into
14  a separate door somewhere to get into the
15  Detective Unit?
16 A. If you walked into the police
17  headquarters, you would come into a foyer
18  that's a secure area. You couldn't get
19  into any unit or any other room other
20  than that foyer when you walked in.
21 Q. Okay. Someone who didn't have security
22  problems going in there, would they walk
23  into a separate room or separate door
24  where the Detective Unit was?

Page 91

1 A. They have their own door, as every office
2  does.
3 Q. Within the Detective Unit, is it a big
4  room with a lot of desks or does everyone
5  have a separate office? How does that
6  work?
7 A. There are a number of separate offices
8  reserved for officers of rank, commander,
9  sergeant detective, et cetera; and the
10  detectives have cubicles within a larger
11  space within that office area that's
12  known as the Detective Unit.
13 Q. Okay. Do you recall any occasions when
14  you would go into the Detective Unit and
15  both Sergeant Gillespie and Lieutenant
16  O'Loughlin were present, and you would go
17  to speak to Gillespie and not O'Loughlin?
18 A. No.
19 Q. Okay. Let's go to Subparagraph 5, sir.
20  It says, "Lieutenant O'Loughlin was
21  summarily and immediately moved to the
22  Detail Unit the same day that this change
23  was announced, rather than receiving
24  reasonable notice, as is the customary

Page 92

1  practice of the MBTA Police Department."
2 A. The same day that this change was
3  announced? What's the context.
4 Q. Well, the day you informed her of her
5  reassignment, that's when she was
6  reassigned, correct? There wasn't any
7  delay, was there?
8 A. I will have to read the Order to refresh
9  my memory.
10 Q. Okay. Let me ask you this: Do you have
11  any recollection of ordering Deputy
12  Flemming to watch over Lieutenant
13  O'Loughlin when she moved her things out
14  of her office in the Detective Unit?
15 A. Don't recall any such discussion.
16 Q. Do you recall telling Deputy Flemming to
17  guard her office and watch what she was
18  taking out of it after her reassignment?
19 A. Don't recall.
20 Q. Is that something you would expect to
21  have said to Deputy Flemming?
22      MR. EDWARDS: Objection. You
23  can answer.
24 A. No.

Condensel?

Page 93

1 Q. Were you at all concerned about what
2    Lieutenant O'Loughlin might be taking out
3    of her office in the Detective Unit?
4 A. I don't recall any reason.
5 Q. Okay. Are you saying that you didn't say
6    that or you just don't recall saying it?
7 A. I don't recall having any basis to even
8    have that kind of conversation. This is
9    news to me.
10 Q. Okay. Do you believe Lieutenant Flemming
11    would have any reason to make a false
12    statement about that?
13       MR. EDWARDS: Objection. You
14    can answer.
15 A. No, I have no basis to know why he would
16    say that. Again, I don't recall that
17    ever even being an issue.
18 Q. Do you believe that Lieutenant Flemming
19    has any bad will towards you?
20       MR. EDWARDS: Objection.
21 A. I'm not aware of it.
22 Q. You demoted him two ranks, correct?
23 A. I have disciplined him in the past, yes.
24 Q. Okay. He went through an arbitration and

Page 94

1    a lawsuit prior to being reinstated to
2    his lieutenant position, correct?
3       MR. EDWARDS: Objection.
4 A. I believe he went through a lawsuit, and
5    all that, yes.
6 Q. Well, you know that he did, don't you,
7    sir?
8       MR. EDWARDS: Objection.
9 A. Well, I don't know all the details.
10 Q. Okay. Fair enough.
11       MR. EDWARDS: I don't want to
12    testify here, but I don't know of a
13    lawsuit. I mean, I just don't know of
14    one.
15 Q. Let's pin this down a bit. After
16    Lieutenant Flemming was demoted to
17    patrolman, he grieved that action,
18    correct?
19 A. Yes.
20 Q. And he eventually had an arbitration,
21    correct?
22 A. Yes.
23 Q. And the arbitrator ordered him reinstated
24    to his position as lieutenant?

Page 95

1 A. Yes.
2 Q. That order of the arbitrator was not
3    initially carried out, correct?
4 A. Correct.
5 Q. It was only carried out after a lawsuit
6    was brought by Lieutenant Flemming's
7    union, correct?
8 A. As I recall it, it was brought about
9    after the appeal to superior court
10    failed.
11 Q. Okay. I may stand corrected on that.
12    Fair enough.
13 A. And then I immediately executed the Order
14    of the Court.
15 Q. Okay. Fair enough. Do you believe that
16    Lieutenant Flemming has any bad will
17    towards you as a result of all that?
18 A. I don't know.
19 Q. You don't know one way or another?
20 A. I don't know at all.
21 Q. Okay. Chief, let me ask you to read to
22    yourself Paragraph 18 of the Complaint.
23       (Pause.)
24 Q. Is that true, sir?

Page 96

1 A. No, it is not. It is blatantly false.
2 Q. Okay. You don't have any problems
3    working with women?
4 A. I have a woman on my command staff. I
5    have worked with women throughout my
6    career and have a record of supporting
7    women in their advancements in policing,
8    along with I belong to the National
9    Association of Women Law Enforcement
10    Executives. I have been supported by
11    them.
12 Q. I'm sorry, you are a member of that
13    group?
14 A. Yes, I am. It's called NAWLEE, National
15    Association of Women Law Enforcement
16    Executives. I have given talks to that
17    organization.
18 Q. That's a national organization?
19 A. Yes, it is.
20 Q. Is there a Massachusetts chapter? Is
21    that how it works?
22 A. Yes, there is a chapter here in
23    Massachusetts.
24 Q. Okay. Do you believe that females have,

Page 97

1  in general, a difficult time in law
2  enforcement?
3  A. There have been instances and cases where
4  I am aware of where women have a
5  problem. But, generally, women don't
6  have a problem performing in law
7  enforcement, and, in fact, excel.
8  Q. Would you agree that women, though, face
9  resentment from male colleagues in law
10  enforcement?
11       MR. EDWARDS:  Objection.
12  A. I would not agree.
13  Q. Do you think -- would you agree with the
14  statement "It's not easy to be a female
15  in policing"?
16  A. I would not agree.
17  Q. So you think, in general, females are
18  given a fair shake in law enforcement
19  jobs?
20  A. Women in policing have the same
21  opportunities as males, and many avail
22  themselves of those opportunities,
23  compete, and do well.
24  Q. In your time as Chief of the MBTA Police

Page 98

1  Department, have you been aware of any
2  resentment of females holding superior
3  officer positions?
4  A. No.
5  Q. During the time you spent in the Boston
6  Police Department, were you aware of any
7  resentment of females holding superior
8  officer positions?
9  A. Never.
10  Q. You said you gave some speeches to that
11  organization?
12  A. As recently as last October.
13  Q. How many speeches have you given?
14  A. Several.
15  Q. Can you give me the names of the
16  different speeches?
17  A. No.
18  Q. What were the subjects of the different
19  speeches?
20  A. I believe last October I talked about
21  opportunities, in general; and, in
22  general, I talked about supporting their
23  agenda and program.
24  Q. Okay.

Page 99

1  A. Programs.
2  Q. How about any of the other speeches you
3  have given to them, what have you
4  discussed in those speeches?
5  A. They are all in the same general area of
6  speaking to areas that they are concerned
7  with in terms of their goals and
8  objectives as an organization.
9  Q. Can you give me some of those areas of
10  concern?
11  A. I just don't recall my discussion.
12  Q. Did you say you gave one last week, was
13  it?
14  A. No, I didn't. I said in October.
15  Q. Okay. I'm sorry. Is there a transcript
16  of your remarks before them available
17  anywhere?
18  A. No.
19  Q. Do you have copies of the speeches you
20  gave to them?
21  A. Extemporaneously.
22  Q. Okay. Do you know if there are any
23  records made of those remarks?
24  A. Not that I'm aware of.

Page 100

1  Q. Do you know if they are videotaped at
2  all?
3  A. I know that there are photos of me
4  speaking to them and being with their
5  leadership; and I'm in their last
6  newsletter that was just published a week
7  ago.
8  Q. Okay. Do you recall when you first
9  became aware that Nancy O'Loughlin had
10  filed a charge of discrimination against
11  you?
12  A. Say the beginning again.
13  Q. Do you recall when you first became aware
14  that Nancy O'Loughlin had filed a charge
15  of discrimination against you?
16  A. No.
17  Q. Do you recall becoming aware of it?
18  A. Yes.
19  Q. What do you remember about that?
20  A. I believe initially it was the MCAD
21  complaint and/or a complaint internal to
22  the MBTA's Office of Civil Rights.
23  Q. Well, do you remember seeing the MCAD
24  charge filed by Lieutenant O'Loughlin?

Page 113

1  A. Yes.
2  Q. Okay. In a general way, because we will
3     certainly discuss this, why is it that
4     she was reassigned to duty at home and
5     those things were taken away from her?
6  A. Because she was the subject of an
7     internal investigation that was being
8     conducted.
9  Q. Subject to an internal investigation
10    about what?
11 A. About alleged very serious and egregious
12    violations of the policy rules and
13    procedures of the MBTA Transit Police
14    Department.
15 Q. What were those alleged serious
16    violations?
17 A. There were several pages of them. I need
18    to refresh my memory. But, generally,
19    everything from conduct unbecoming, to
20    violating the ethics of the department.
21 Q. I'm not asking you right now for section
22    numbers or anything like that. What is
23    it she did?
24 A. They grew out of an investigation of what

Page 114

1     I call the "1205" line," where in her
2     capacity as a lieutenant, she had a
3     number of conversations with a
4     subordinate, specifically a police
5     officer, that all pointed to undermining
6     of the administration of the police
7     department.
8  Q. Okay. And some of those statements you
9     felt were derogatory about yourself?
10 A. I didn't feel anything. I heard tapes.
11    I read what was said and formed an
12    opinion that it was violative of the
13    policies of the department.
14 Q. Okay. What type of investigation of the
15    205 line was going on?
16    MR. EDWARDS: Objection. It's
17    1205.
18    MR. NOTIS: I'm sorry. I
19    apologize.
20 A. There was a criminal investigation being
21    conducted by the Detective Unit, and in
22    that investigation, her conversations, as
23    well as other officers and another
24    lieutenant, were overheard.

Page 115

1  Q. Okay. What was the subject of the
2     investigation in which her conversations
3     were overheard?
4  A. I don't recall what that investigation
5     was.
6  Q. Was the investigation into anything
7     involving Lieutenant O'Loughlin?
8  A. No.
9  Q. Okay.
10 A. It was a criminal investigation involving
11    a criminal matter that had nothing to do
12    with internal. It was not an internal
13    investigation. It was an external
14    investigation. The focus was on an
15    external individual, if that's helpful.
16 Q. Pardon my ignorance on this, but if it
17    was an external investigation, why would
18    the Detective Unit be listening to an
19    internal phone line recording?
20 A. Because the 1205 line is a public line
21    that is recorded.
22 Q. Okay.
23 A. And it's standard procedure in the
24    department and well known by written and

Page 116

1     electronic policy that indicates that
2     that's one of the recorded lines.
3  Q. Okay.
4  A. And the investigation, they were looking
5     into whether this person spoke on that
6     line.
7  Q. Okay. When the investigation was being
8     conducted, did they know when this person
9     they were investigating spoke on the 1205
10    line?
11 A. I recall that they had a period of
12    reference, but not a specific day. So
13    they were just listening to the tape
14    during that period of time to locate what
15    they were looking for.
16 Q. I'm sorry, do you know how broad the
17    period of time was?
18 A. No.
19 Q. I'm sorry?
20 A. No.
21 Q. Days, weeks?
22 A. I don't know. Don't recall.
23 Q. Is it your testimony that they,
24    therefore, listened to all conversations

Page 117

1   on the 1205 line during that window?
2 A. Yes.
3 Q. The conversation they were looking for
4    was when a non-police person called in on
5    the line; is that correct?
6 A. Yes.
7 Q. Okay.  So why would they then be
8    listening to conversations between MBTA
9    police personnel?
10 A. They weren't specifically looking for
11    conversations between MBTA police
12    personnel.  Generally, MBTA police
13    personnel don't talk on that line.
14 Q. I guess if you have the information, sir,
15    what I'm looking for is something a
16    little more in-depth about what this
17    thing records and how you listen to it.
18    In other words, if I was looking for a
19    conversation that I thought occurred on,
20    just for the heck of it, January 1, 2006,
21    but I didn't know when it had occurred,
22    is there a more sophisticated way for me
23    to find that conversation other than for
24    me listening to every conversation that

Page 118

1    occurred on January 1, 2006?
2 A. I believe we can hone in on a day and
3    listen to the tapes on that day; but, no,
4    there is no sophisticated way other than
5    listening to the tape.
6 Q. Okay.
7 A. If you are looking for a conversation,
8    you have to listen to the tape.
9 Q. Well, I understand that.  Is there a way
10    when listening to these conversations one
11    would know that you are going from one
12    conversation to the next?
13 A. I don't know if I understand what you are
14    leading to.
15 Q. What I'm wondering is, if these
16    detectives were listening to the
17    conversations on the 1205 line, once they
18    started hearing a conversation that was
19    between two police people, why wouldn't
20    they just skip ahead to the next
21    conversation?
22 A. Well, because you don't know when that
23    conversation ends.
24 Q. That was my question.

Page 119

1 A. No, there isn't anything sophisticated
2    that says between this time and this
3    time, this is Joe Carter and Mitchell
4    Notis.  You have to listen to it to hear
5    it through, and then you pick up the next
6    conversation.
7 Q. It's not like an answering machine that
8    says you have 14 messages, and once you
9    hear Message Number 1, you flip to Number
10    2?
11 A. No.  It's just a continuous loop.  It's
12    time stamped in going through the
13    conversation.
14 Q. Do you know if these detectives wee
15    instructed that they should ignore
16    conversations which clearly had nothing
17    to do with this investigation?
18 A. I don't believe that they were instructed
19    to not listen for anything.  They were
20    conducting an investigation, as they
21    normally would conduct an investigation,
22    that required them to listen to the
23    tapes, and that's what they were doing.
24    They came across in listening to the

Page 120

1    tapes these other conversations.
2 Q. All right.  How was all that brought to
3    your attention, Chief?
4 A. Through Deputy Chief McCarthy.
5 Q. So these detectives had brought this to
6    the attention of McCarthy?
7 A. He was the detective commander.  The
8    detectives worked for him and brought
9    that to his attention, and he in fact
10    brought it to my attention.
11 Q. In what manner did he bring it to your
12    attention?
13 A. I believe it was by telephone, and then
14    in my office.
15 Q. Do you recall what he said to you?
16 A. No.
17 Q. You have no recollection of it?
18 A. Generally, it was about the detectives
19    were doing a criminal investigation; they
20    heard conversations between a number of
21    officers in listening to the tape that
22    could possibly be in violation of policy.
23 Q. That's what McCarthy said to you?
24 A. Generally, that's what the conversation

Page 121

1    was about.
2 Q. Do you recall when you first became aware
3    of that?
4 A. Time wise?
5 Q. Yes.
6 A. No.
7 Q. Do you recall how much time expired
8    between when you first became aware of
9    that and when you took disciplinary
10   action against the officers whose
11   conversations were overheard on the tape?
12       MR. EDWARDS:  Objection.
13 A. Many months.
14 Q. Many months.  Okay.  Do you recall if --
15   strike that.
16       Do you recall when you first
17   became aware that Lieutenant O'Loughlin
18   was one of the people on the tapes that
19   might have said inappropriate things,
20   supposedly?
21 A. Early on in the investigation.
22 Q. Okay.  Did that surprise you?
23 A. The entire matter surprised me, not any
24   particular officer or lieutenant.  The

Page 122

1    whole scenario was surprising.
2 Q. At the time you found out that one of the
3    people on the tape was Nancy O'Loughlin,
4    did you know that she had filed a
5    discrimination charge against you?
6 A. I don't recall that being any basis for
7    decision or understanding.  Again, I
8    don't recall when that happened.  I know
9    that this happened, and we initiated an
10   investigation.
11 Q. All right.  Just so I can be clear for
12   the record, because I don't think you
13   exactly answered my question, do you
14   recall if at the time you found out Nancy
15   O'Loughlin was one of the people on the
16   tapes that you knew she had filed a
17   discrimination charge against you?
18 A. I did not know.
19 Q. Okay.
20 A. Nor was that a factor in how I moved
21   about my business.  It didn't motivate me
22   one way or the other.
23 Q. Okay.  At the time when -- strike that.
24   Again, Nancy O'Loughlin and the others

Page 123

1    were initially disciplined on March 8,
2    2004?
3       MR. EDWARDS:  Objection.
4 A. No.
5 Q. Well, how would you describe what
6    happened on March 8, 2004?
7 A. They were placed on administrative leave
8    with pay.  No one was disciplined until
9    after a hearing, where just cause was
10   found under Chapter 31 --
11 Q. I stand corrected.  I take it there were
12   discussions prior to placing Nancy
13   O'Loughlin on administrative leave about
14   what should be done about her, correct?
15       MR. EDWARDS:  Objection.
16 A. No.
17 Q. Well, who made the decision to place her
18   on administrative leave?
19 A. Well, your question is very specific to
20   Nancy.  There were a number of people
21   involved.  There was a discussion about
22   all of the people.  She was not singled
23   out for any reason.  She was part of the
24   investigation, as was a number of people.

Page 124

1 Q. Okay.  I wasn't -- well, strike that.  I
2    take it there were discussions about
3    placing these various people, including
4    Nancy O'Loughlin, on administrative
5    leave, correct?
6 A. Yes.
7 Q. How long did those discussions go on for?
8 A. It was a very short period of time.
9 Q. Okay.
10 A. I mean, days.
11 Q. Who was involved in those discussions?
12 A. At least deputy -- all the deputies were
13   involved in the discussions.  But, in
14   particular, it would have been McCarthy
15   and Ford-Murphy.  McCarthy because -- I
16   tasked both McCarthy, as the Detective
17   Unit Commander, where this emanated from,
18   and Ford-Murphy, who is responsible for
19   professional standards and internal
20   affairs to conduct an investigation
21   jointly.
22 Q. By the way, when you said all the
23   deputies were involved, you were involved
24   as well?

Condensit!

## Page 121

1     was about.
2  Q. Do you recall when you first became aware
3     of that?
4  A. Time wise?
5  Q. Yes.
6  A. No.
7  Q. Do you recall how much time expired
8     between when you first became aware of
9     that and when you took disciplinary
10    action against the officers whose
11    conversations were overheard on the tape?
12        MR. EDWARDS:  Objection.
13  A. Many months.
14  Q. Many months.  Okay.  Do you recall if --
15    strike that.
16        Do you recall when you first
17    became aware that Lieutenant O'Loughlin
18    was one of the people on the tapes that
19    might have said inappropriate things,
20    supposedly?
21  A. Early on in the investigation.
22  Q. Okay.  Did that surprise you?
23  A. The entire matter surprised me, not any
24    particular officer or lieutenant.  The

## Page 122

1     whole scenario was surprising.
2  Q. At the time you found out that one of the
3     people on the tape was Nancy O'Loughlin,
4     did you know that she had filed a
5     discrimination charge against you?
6  A. I don't recall that being any basis for
7     decision or understanding.  Again, I
8     don't recall when that happened.  I know
9     that this happened, and we initiated an
10    investigation.
11  Q. All right.  Just so I can be clear for
12    the record, because I don't think you
13    exactly answered my question, do you
14    recall if at the time you found out Nancy
15    O'Loughlin was one of the people on the
16    tapes that you knew she had filed a
17    discrimination charge against you?
18  A. I did not know.
19  Q. Okay.
20  A. Nor was that a factor in how I moved
21    about my business.  It didn't motivate me
22    one way or the other.
23  Q. Okay.  At the time when -- strike that.
24    Again, Nancy O'Loughlin and the others

## Page 123

1     were initially disciplined on March 8,
2     2004?
3        MR. EDWARDS:  Objection.
4  A. No.
5  Q. Well, how would you describe what
6     happened on March 8, 2004?
7  A. They were placed on administrative leave
8     with pay.  No one was disciplined until
9     after a hearing, where just cause was
10    found under Chapter 31 --
11  Q. I stand corrected.  I take it there were
12    discussions prior to placing Nancy
13    O'Loughlin on administrative leave about
14    what should be done about her, correct?
15        MR. EDWARDS:  Objection.
16  A. No.
17  Q. Well, who made the decision to place her
18    on administrative leave?
19  A. Well, your question is very specific to
20    Nancy.  There were a number of people
21    involved.  There was a discussion about
22    all of the people.  She was not singled
23    out for any reason.  She was part of the
24    investigation, as was a number of people.

## Page 124

1  Q. Okay.  I wasn't -- well, strike that.  I
2     take it there were discussions about
3     placing these various people, including
4     Nancy O'Loughlin, on administrative
5     leave, correct?
6  A. Yes.
7  Q. How long did those discussions go on for?
8  A. It was a very short period of time.
9  Q. Okay.
10  A. I mean, days.
11  Q. Who was involved in those discussions?
12  A. At least deputy -- all the deputies were
13    involved in the discussions.  But, in
14    particular, it would have been McCarthy
15    and Ford-Murphy.  McCarthy because -- I
16    tasked both McCarthy, as the Detective
17    Unit Commander, where this emanated from,
18    and Ford-Murphy, who is responsible for
19    professional standards and internal
20    affairs to conduct an investigation
21    jointly.
22  Q. By the way, when you said all the
23    deputies were involved, you were involved
24    as well?

Page 129

1  than one day. The hearing officer
2  rendered a written decision based on the
3  evidence that was presented. I reviewed
4  the hearing officer's report, the
5  evidence that was submitted to support
6  that decision, and I made a decision to
7  discipline a number of people.
8  Q. Okay.
9  A. Did I answer the question?
10 Q. That's what I was looking for. Just so
11    I'm clear, in the hearing officer's
12    decision, the hearing officer found
13    facts, if I'm correct, but did not
14    recommend any particular discipline,
15    correct?
16 A. He recommended -- yes, a finding as to
17    the standard of proof in the charges that
18    were before him for the individual
19    officers, yes, but did not recommend what
20    the discipline should be.
21 Q. And in terms of Lieutenant O'Loughlin,
22    you were the one who decided on her
23    discipline?
24 A. Yes.

Page 130

1  Q. Did you do that in consultation with
2     anyone else?
3  A. What I can say is that I did have a
4     discussion with the deputies on my
5     decision, but I didn't consult them for
6     their approval or disapproval.
7  Q. At that point in time, sir, had you made
8     your decision, when you consulted with
9     them -- strike that.
10          Was your consultation with them
11    to inform them of your decision?
12 A. Yes.
13 Q. So you had made the decision when you
14    talked to them about it?
15 A. Yes.
16 Q. Just so we are clear, if you could --
17    just so I'm clear, who are the other
18    officers involved in this investigation
19    who were placed on administrative leave?
20 A. Oh, my God. Flemming -- do you have them
21    all there?
22 Q. Well, I have some documents.
23 A. McKay, Jordan. I'm sorry to use last
24    names.

Page 131

1  Q. That's all right.
2  A. Jordan. Oh, my God. Jordan, McKay,
3     Flemming, O'Loughlin, Hennessey, and
4     Sergeant Douglas, Floyd. That's it.
5  Q. So that's Floyd, Douglas, Hennessey,
6     O'Loughlin, McKay, Flemming and Jordan,
7     correct?
8  A. Yes. Again, I would have to review my
9     reports or the reports. This really
10    doesn't tell me what I want to say, so
11    can I say it?
12 Q. Yes, sure.
13 A. I don't believe the sergeant there --
14 Q. Douglas?
15 A. Yes, was placed on administrative leave.
16    I don't think he was placed on
17    administrative leave.
18 Q. Okay. Of these people, was everyone,
19    other than Douglas, placed on
20    administrative leave?
21 A. I believe so.
22 Q. Why was Douglas not placed on
23    administrative leave?
24 A. Because I believe very early on -- I

Page 132

1  recall when he was confronted with the
2  charges that were alleged against him, he
3  immediately admitted to them, wanted to
4  offer an apology, was embarrassed, was of
5  the utmost candor and integrity and
6  stepped up to the plate, and said, you
7  know, "I don't want to lose my job."
8  That's what I recall around him. With
9  the union, we agreed on -- they agreed to
10 accept the discipline that I handed out
11 to him.
12 Q. What was the discipline for Douglas?
13 A. He received a written reprimand.
14 Q. Okay. And, eventually, what was Floyd's
15    discipline?
16 A. I would have to -- I know I just flipped
17    through it. I don't recall
18    specifically.
19          Yes, Douglas --
20 Q. Hold off for a second, Chief.
21          (Pause.)
22 Q. I think you were answering something,
23    sir?
24 A. Yes. Floyd received a six-month