Exhibit 6

Page 1

VOLUME II
PAGES 1-125
EXHIBITS 1-3

COMMONWEALTH OF MASSACHUSETTS
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS
CIVIL ACTION NO.: 04-10933-JLT

NANCY O'LOUGHLIN,                    )
                                     )
                    Plaintiff,       )
                                     )
vs.                                  )
                                     )
                                     )
MASSACHUSETTS BAY                    )
TRANSPORTATION AUTHORITY AND         )
JOSEPH CARTER AND MICHAEL            )
MULHERN,                             )
                                     )
                    Defendant.       )

CONTINUED DEPOSITION OF JOSEPH C.

CARTER, a witness called on behalf of the Plaintiff

in the above-entitled cause, taken before Dawn

Mack-Boaden, Notary Public in and for Commonwealth

of Massachusetts, pursuant to the Massachusetts

Rules of Civil Procedure, at the Law Offices of

Prince, Lobel, Glovsky & Tye, 585 Commercial Street,

Boston, Massachusetts, on Monday, February 6, 2006,

commencing at 10:00 a.m.

c99c714e-2845-4a01-b6ae-0b1dcf43424a

Page 6

1  with pay.
2      Q.  And assigned to duty at her home?
3      A.  And assigned to remain home; and if she was
4  to leave, to notify the department to be available.
5      Q.  Okay.  And her gun and her badge and her
6  cruiser were taken away?
7      A.  Yes.
8      Q.  Okay.  And I'll be asking you later about
9  the details of that.  But in a general way, for our
10  discussion, why was it that she was placed on
11  administrative leave?
12      A.  Due to the severity and scope of the
13  investigation of alleged violations of policy rules
14  and procedures of the department.  That's the
15  reason.
16      Q.  Okay.  Fine.  And those violations of
17  policy rules and procedures of the department, that
18  investigation came about as a result of hearing then
19  Lieutenant O'Loughlin on some tape recorded
20  conversations?
21      A.  Yes.
22      Q.  Okay.  And when did you first listen to
23  those tape recorded conversations, sir?
24      A.  Several weeks beforehand.  I don't have the

Page 7

1  exact date when.
2      Q.  Okay.
3      A.  But in two -- early 2004.
4      Q.  Okay.  And why is it anyone was listening
5  to those tapes -- well, strike that.
6          What tape conversations was it that were
7  being listened to?
8      A.  That I listened to?
9      Q.  Well, initially you; and then I'll ask you
10  about some others, sure.
11      A.  I listened to tapes that had alleged
12  violations of the policies of the department as it
13  related to the conduct and the speech and the manner
14  of speech of particular personnel.
15      Q.  Understood.  I'm kind of going to a more
16  basic level.  Were these tapes of phone lines the
17  MBTA has?
18      A.  Yes; identified as the 1205 -- 1-2-0-5 --
19  line.
20      Q.  And what is the 1205 line usually used for?
21      A.  It's a line that's in the dispatch, slash,
22  communication area of the department, and officers
23  generally call that line for warrant checks or for
24  other types of queries in the department.

Page 8

1      Q.  So is that phone line really devoted to
2  that type of use:  Warrant checks and --
3      A.  No.  It is also a fall back number to the
4  emergency line.  They jump if the line is busy, and
5  that is one of the lines that the public or someone
6  from outside of the department in need of an
7  emergency of the transit police department would
8  call.
9          So that officer in that dispatch area --
10  it's a room within the dispatch area -- would have a
11  responsibility to answer that as an emergency line.
12      Q.  Okay.  And it's on a routine basis -- on a
13  regular, daily basis -- that calls in and out on
14  that line are tape recorded?
15      A.  It is a line that is publicly known within
16  the department among all of the personnel, in
17  writing as well, and everyone's been noticed that it
18  is a recorded line.
19          It's a line that has the sort of universal
20  tone signal that alerts the caller and anyone who
21  uses that line that the line is being recorded.
22      Q.  I know some times when you call in -- when
23  one calls to a police station, you're told right
24  away this phone call is being recorded.  It doesn't

Page 9

1  say anything like that, does it?
2      A.  No.  The answerer -- the employee of the
3  department is required to tell people that.
4      Q.  Okay.
5      A.  And especially members of the public.  But,
6  again, it's common knowledge among all employees of
7  the department.  So they don't tell each other, Your
8  line's being recorded.
9      Q.  Sure.
10      A.  You can hear there being, every so many
11  seconds, the tonal beep that signifies that you're
12  on a recorded line.
13      Q.  Okay.  And, again, the answering of that
14  line, is -- is one officer every day assigned to do
15  nothing but answer that line?
16      A.  No.  There are several officers responsible
17  for intake of -- we don't have 911 -- but the
18  222-1212 line; and, again, it jumps to a number of
19  lines if the officers who are answering the phone
20  calls get backed up.
21      Q.  Are these the people who would be working
22  in the dispatch center?
23      A.  They're all sworn police officer personnel,
24  and they all work in the dispatch center.

Page 10

1    Q.  How many --
2    A.  Or communication center.
3    Q.  How many usually work at one time?
4    A.  Three to maybe five, six personnel,
5  depending on the time of day and what types of
6  activities the department could be engaged in.
7    Q.  Okay.  Now, the calls in which Lieutenant
8  O'Loughlin was involved in were discovered as part
9  of another investigation; is that correct?
10    A.  Yes.
11    Q.  Okay.  And what other investigation was
12  going on when these were discovered?
13        MR. EDWARDS:  Objection.  You can
14    answer.
15        THE WITNESS:  There was a criminal
16    investigation being undertaken by the
17    investigative services division on another
18    matter, and they discovered the exchange
19    between members of the department.
20  BY MR. NOTIS:
21    Q.  And what was that other matter?
22        MR. EDWARDS:  Objection.
23        THE WITNESS:  I'm not entirely clear
24    what that matter was.

Page 11

1  BY MR. NOTIS:
2    Q.  Do you know if that other matter involved
3  members of the department?
4    A.  I'm not entirely sure today.  I don't
5  recall.
6    Q.  Did you know at the time?
7    A.  At the time, I believe it was alluded to
8  the investigation or the type of investigation.  I
9  do not recall what it is today.
10    Q.  And you don't recall if some other member
11  of the department was the subject of that
12  investigation?
13    A.  I don't recall.
14    Q.  And you don't recall if any particular
15  individual was the subject of the investigation?
16    A.  I don't --
17        MR. EDWARDS:  Objection.
18        THE WITNESS:  Sorry.  I don't recall.
19  BY MR. NOTIS:
20    Q.  Okay.  Do you recall if the investigation
21  involved some state troopers claiming that employees
22  in the dispatch room had been rude to them?
23        MR. EDWARDS:  Objection.
24        THE WITNESS:  I don't recall.

Page 12

1  BY MR. NOTIS:
2    Q.  Do you recall if the investigation in any
3  way involved Thomas O'Loughlin?
4        MR. EDWARDS:  Objection.
5        THE WITNESS:  I never recall that as
6    being a part of it.
7  BY MR. NOTIS:
8    Q.  Okay.  All right.  Now --
9    A.  Or him being a part of it.
10    Q.  Okay.
11    A.  By name or otherwise.
12    Q.  Who was conducting this investigation that
13  then discovered allegedly improper remarks by
14  Lieutenant O'Loughlin?
15    A.  I don't recall the members that were
16  involved.
17        But this was brought to my attention by
18  Deputies McCarthy and Ford Murphy, who are both
19  deputy chiefs.  One is responsible -- McCarthy,
20  specifically -- for the investigative services
21  division, and Ford Murphy was the deputy chief in
22  charge of administrative services division and
23  professional standards.
24    Q.  Do you recall who it was that was listening

Page 13

1  to the tapes and then heard these conversations of
2  Lieutenant O'Loughlin?
3    A.  Don't recall.
4    Q.  Was it Gloria Andrews Ward?
5    A.  Again, I don't recall.
6    Q.  Okay.  When did you first become aware that
7  in the course of this other investigation being
8  conducted it was found that allegedly improper
9  remarks were made by Lieutenant O'Loughlin and a
10  number of the other people you disciplined for this
11  matter?
12    A.  I don't know if I understand your question.
13    Q.  Okay.  Well --
14    A.  Particularly when I earlier testified that
15  I don't recall when, meaning the specific date and
16  time.  It was early 2004.  So I don't recall when --
17    Q.  Well --
18    A.  -- a particular person who was the subject
19  of the investigation came to my attention.
20    Q.  You don't recall that at all?
21        MR. EDWARDS:  Objection.
22        THE WITNESS:  No.
23  BY MR. NOTIS:
24    Q.  Okay.  Do you recall any individual --

c99c714e-2845-4a01-b6ae-0b1dcf43424a

Page 14

1  strike that.
2      I understand you don't recall the date
3  issue, sir.  But do you recall at some point being
4  made aware that allegedly improper conversations had
5  been discovered in the course of doing another
6  investigation?
7      A.  Yes.
8      Q.  Okay.  How did you learn about that?
9      A.  Again, it was brought to my attention by
10  two deputy chiefs, specifically, Ford Murphy and
11  McCarthy --
12      Q.  Okay.
13      A.  -- who brought the matter to my attention.
14      Q.  What did they say to you?
15      A.  Generally, that an investigation was being
16  conducted by investigative services where they had
17  to listen to the 1205 line.
18      While they were listening to the line, they
19  overheard conversations that they deduced to be
20  violative of policy rules, procedures, and core
21  values of the department.  They had copies of tapes.
22  I listened to the tape for a short period of time.
23  They left the tapes with me.
24      And that's how they brought it to my

Page 15

1  attention.
2      Q.  Did they mention -- well, and I understand
3  you don't recall the date.
4      Do you recall, though, meeting with them
5  and discussing this with them?
6      A.  Yes.
7      Q.  Was anyone else present?
8      A.  No.
9      Q.  Did you give them any orders or
10  instructions once they said that to you?
11      A.  I'm not sure of the order; but I know that
12  I listened to the entire tape that they gave me --
13  not with them there.
14      I know that within a short period of time,
15  I told them to continue and expand the scope of time
16  in which to go back and listen to tapes based on the
17  conversations and to continue that and to keep me
18  updated if there was any discovery of any further
19  violations.
20      Q.  In that first tape they gave you, was Nancy
21  O'Loughlin recorded on that tape?
22      A.  I don't recall.
23      Q.  In the initial investigation -- the one
24  which they were doing that you don't recall the

Page 16

1  subject of -- was Nancy O'Loughlin a subject of that
2  investigation?
3      A.  I don't recall that being told to me, no.
4      Q.  Do you know if she was?
5      A.  I don't recall any member of the department
6  being the subject of the first investigation.  It
7  was a criminal investigation that I'm pretty certain
8  was external to members of the department, and in
9  doing that investigation was when they overheard the
10  conversations involving internal members of the
11  department.
12      Q.  So this was a criminal investigation?
13      A.  Yes, it was.
14      Q.  All right.  And, at the time, Nancy
15  O'Loughlin was one of your lieutenants?
16      A.  Yes.
17      Q.  Wouldn't you recall if there was a criminal
18  investigation in to the activities of one of your
19  lieutenants?
20          MR. EDWARDS:  Objection.  I think he
21      answered that she wasn't.
22  BY MR. NOTIS:
23      Q.  No; I asked him wouldn't he recall --
24  wouldn't you recall if there was a criminal

Page 17

1  investigation in to the activities of one of your
2  lieutenants?
3      A.  I think I testified to that.  I don't
4  recall anyone internally being the subject of that
5  first investigation.  It was involving external
6  people.
7      Q.  Right; and I asked you --
8      A.  It was a criminal investigation, and it
9  didn't involve anybody from the department.
10      But in doing that was when they heard the
11  conversations between people in the department.
12      Q.  So the first investigation did not involve
13  Nancy O'Loughlin; correct?
14      A.  Correct.
15      Q.  That's all I'm looking for.  Thank you.
16  Okay.  If the first investigation did not involve
17  Nancy O'Loughlin -- well, strike that.
18      Who was the person who was actually
19  listening to the tapes in the first investigation?
20          MR. EDWARDS:  Objection.  You can
21      answer.
22          THE WITNESS:  Don't know.
23  BY MR. NOTIS:
24      Q.  Okay.  Whoever it was that was listening to

Page 14

1  strike that.
2      I understand you don't recall the date
3  issue, sir. But do you recall at some point being
4  made aware that allegedly improper conversations had
5  been discovered in the course of doing another
6  investigation?
7      A. Yes.
8      Q. Okay. How did you learn about that?
9      A. Again, it was brought to my attention by
10  two deputy chiefs, specifically, Ford Murphy and
11  McCarthy --
12      Q. Okay.
13      A. -- who brought the matter to my attention.
14      Q. What did they say to you?
15      A. Generally, that an investigation was being
16  conducted by investigative services where they had
17  to listen to the 1205 line.
18      While they were listening to the line, they
19  overheard conversations that they deduced to be
20  violative of policy rules, procedures, and core
21  values of the department. They had copies of tapes.
22  I listened to the tape for a short period of time.
23  They left the tapes with me.
24      And that's how they brought it to my

Page 15

1  attention.
2      Q. Did they mention -- well, and I understand
3  you don't recall the date.
4      Do you recall, though, meeting with them
5  and discussing this with them?
6      A. Yes.
7      Q. Was anyone else present?
8      A. No.
9      Q. Did you give them any orders or
10  instructions once they said that to you?
11      A. I'm not sure of the order; but I know that
12  I listened to the entire tape that they gave me --
13  not with them there.
14      I know that within a short period of time,
15  I told them to continue and expand the scope of time
16  in which to go back and listen to tapes based on the
17  conversations and to continue that and to keep me
18  updated if there was any discovery of any further
19  violations.
20      Q. In that first tape they gave you, was Nancy
21  O'Loughlin recorded on that tape?
22      A. I don't recall.
23      Q. In the initial investigation -- the one
24  which they were doing that you don't recall the

Page 16

1  subject of -- was Nancy O'Loughlin a subject of that
2  investigation?
3      A. I don't recall that being told to me, no.
4      Q. Do you know if she was?
5      A. I don't recall any member of the department
6  being the subject of the first investigation. It
7  was a criminal investigation that I'm pretty certain
8  was external to members of the department, and in
9  doing that investigation was when they overheard the
10  conversations involving internal members of the
11  department.
12      Q. So this was a criminal investigation?
13      A. Yes, it was.
14      Q. All right. And, at the time, Nancy
15  O'Loughlin was one of your lieutenants?
16      A. Yes.
17      Q. Wouldn't you recall if there was a criminal
18  investigation in to the activities of one of your
19  lieutenants?
20      MR. EDWARDS: Objection. I think he
21      answered that she wasn't.
22  BY MR. NOTIS:
23      Q. No; I asked him wouldn't he recall --
24  wouldn't you recall if there was a criminal

Page 17

1  investigation in to the activities of one of your
2  lieutenants?
3      A. I think I testified to that. I don't
4  recall anyone internally being the subject of that
5  first investigation. It was involving external
6  people.
7      Q. Right; and I asked you --
8      A. It was a criminal investigation, and it
9  didn't involve anybody from the department.
10      But in doing that was when they heard the
11  conversations between people in the department.
12      Q. So the first investigation did not involve
13  Nancy O'Loughlin; correct?
14      A. Correct.
15      Q. That's all I'm looking for. Thank you.
16  Okay. If the first investigation did not involve
17  Nancy O'Loughlin -- well, strike that.
18      Who was the person who was actually
19  listening to the tapes in the first investigation?
20      MR. EDWARDS: Objection. You can
21      answer.
22      THE WITNESS: Don't know.
23  BY MR. NOTIS:
24      Q. Okay. Whoever it was that was listening to

Page 30

1    administrative leave with pay.
2       Q.  Do you recall if, at the time, you were --
3    well, after you were initially made aware of this
4    allegation and you were given the tapes, some time
5    went by while the matter was further investigated;
6    correct?
7          MR. EDWARDS:  Objection.  What
8       allegation?  Are we talking about the
9       complaint?
10         MR. NOTIS:  Strike that.
11   BY MR. NOTIS:
12      Q.  At some point, Ford Murphy and McCarthy
13   made you aware that Nancy O'Loughlin may have made
14   improper statements on the tapes; correct?
15      A.  Yes.
16      Q.  And you then told them to further
17   investigate that; correct?
18      A.  When I --
19         MR. EDWARDS:  Objection.  But you can
20      answer.
21         THE WITNESS:  When I listened to the
22      tape, I never listened to a tape that was
23      solely directed at Nancy O'Loughlin.  I
24      listened to a tape that had violations of

Page 31

1       several officers, to include Nancy.  So it
2       was never like just an investigation that
3       targeted Nancy.
4          It was a number of officers, and Nancy
5       was one of them, involved in conversations.
6    BY MR. NOTIS:
7       Q.  Right.  And after Ford Murphy and McCarthy
8    made you aware of these allegations -- strike that
9    -- made you aware that Nancy O'Loughlin and other
10   employees had made statements which were allegedly
11   improper, you told them to continue with their
12   investigation.
13         MR. EDWARDS:  Objection.
14   BY MR. NOTIS:
15      Q.  Is that correct?
16      A.  No.
17      Q.  Then what's wrong with what I just told
18   you?  What's incorrect about it?
19      A.  Is that again, not particularly recalling
20   the order, I recall listening to the tapes that they
21   had produced to me and I listened to them and told
22   them to expand the scope of the investigation; go
23   back for a period of time and continue forward until
24   we were satisfied that we had sufficient evidence

Page 32

1    against the employees.
2       Q.  Okay.  And after you gave them that order,
3    then what happened?
4       A.  They continued with their investigation.
5       Q.  And then what happened?
6       A.  Then they uncovered, I think other sworn
7    employees, that were involved in conversations as
8    well.
9       Q.  When you say others, in addition to who?
10      A.  In addition to Nancy O'Loughlin.
11      Q.  So when she -- when they initially came to
12   you, she was the only one they mentioned?
13         MR. EDWARDS:  Objection.
14         THE WITNESS:  No.  Again, my testimony
15      was it was a number of officers; but it was
16      those officers, Nancy, and then there were
17      other officers.
18   BY MR. NOTIS:
19      Q.  Okay.  And once they came to you with that
20   information, then what happened?
21      A.  Then I recall directing that the tapes be
22   transcribed and that a very clear analysis be done
23   of the particulars in terms of the conversation
24   versus the corresponding violations of department

Page 33

1    policy.
2       Q.  Who did you direct to do that analysis?
3       A.  The two deputies that were in charge of the
4    investigation.
5       Q.  Ford Murphy and McCarthy?
6       A.  Yes, sir.
7       Q.  And then did they then do that analysis?
8       A.  Yes.
9       Q.  Did they give you any documents describing
10   their analysis?
11      A.  Yes.  And those documents are essentially
12   the charging documents against the officers that
13   were under investigation and charged with various
14   violations as a result of the recordings on the 1205
15   a line.
16      Q.  You say they were essentially those
17   charging documents.  Were they something in addition
18   to that?
19      A.  No; they were particularly those documents.
20   Excuse my choice of words.
21      Q.  Well, the charging documents are documents,
22   aren't they, directed from you to the individuals?
23      A.  I got similar documents from the deputies
24   as it related to those charges.  Then they're

Page 34

1  essentially transposed with me charging them if I
2  find just cause on the evidence that was submitted
3  to me by them.
4      Q.  And --
5      A.  And there is no substantial change as to
6  what they found and what was communicated to those
7  charged.
8      Q.  And those initial documents, those were
9  sent from Ford Murphy and McCarthy to you?
10         MR. EDWARDS:  Objection.
11  BY MR. NOTIS:
12      Q.  Is that correct?
13      A.  From -- I believe -- I recall that they
14  came from Ford Murphy; but they could have come from
15  one or both of them.
16      Q.  How long a period of time expired between
17  when you received the document from either Ford
18  Murphy or both Ford Murphy and McCarthy and when you
19  notified Nancy O'Loughlin that she would be placed
20  on administrative leave?
21      A.  Don't recall.
22      Q.  Was it more than a week?
23         MR. EDWARDS:  Objection.
24         THE WITNESS:  Don't recall.  It wasn't a

Page 35

1      long period of time, but don't recall.
2  BY MR. NOTIS:
3      Q.  Okay.  And did you discuss with anyone what
4  action would be appropriate in light of what you had
5  been made aware of was on the tape?
6      A.  I don't know if I understand your question.
7      Q.  The decision to assign Nancy O'Loughlin to
8  duty at home -- did you discuss that decision with
9  anyone?
10      A.  Yes.  I discussed it with the command
11  staff.
12      Q.  Okay.  On what occasions?
13      A.  At a command staff meeting.
14      Q.  At one or more command staff meetings?
15      A.  At least one.
16      Q.  Do you know if it was more than one?
17      A.  Don't recall.
18      Q.  Do you know who was present at that command
19  staff meeting?
20      A.  Members of the command staff.
21      Q.  Do you know if they were all present?
22      A.  Don't recall.
23      Q.  When you discussed that with them, did you
24  discuss this as a decision you had already made or

Page 36

1  did you seek their input as to what discipline would
2  be appropriate?
3      A.  I don't recall the exchange.
4      Q.  You recall nothing of the exchange?
5      A.  I recall a discussion concerning the
6  officers who were the subject of the 1205
7  investigation being placed on administrative leave
8  with pay.
9      Q.  How many of these individuals were placed
10  on administrative leave with pay?
11      A.  Several; and I don't recall the exact
12  number without refreshing my memory.
13      Q.  And do you recall the substance of the
14  discussion at all?
15      A.  About the investigation itself, what was
16  essentially uncovered in terms of the conversations,
17  my determination that there was just cause to charge
18  them.  Don't recall anything else.
19      Q.  Do you recall any of your command staff
20  commenting upon this at the meeting?
21      A.  Again, I do not recall the exchange; but
22  what is clear is there was no one who was against
23  the discussion or who thought that anything was
24  contrary than the action that was taken.

Page 37

1      Q.  So at this meeting, you informed the
2  command staff that you had determined there was just
3  cause to take action?
4         MR. EDWARDS:  Objection.  That's not
5  what he said.
6         MR. NOTIS:  I believe it is.
7         THE WITNESS:  No; I never said that I
8  informed them.  I said I don't recall the
9  exchange.
10         You asked me a question whether one of
11  them brought it up.  I don't recall.
12         Did we talk about it at a command staff
13  meeting?  I believe that's what I testified
14  to.  But I don't recall the exchange.
15  BY MR. NOTIS:
16      Q.  At the time of that command staff meeting,
17  had you determined at that point there was just
18  cause to take action?
19      A.  Yes.
20      Q.  Okay.  And did you present that to the
21  command staff?
22      A.  I don't recall the exchange.  Sorry.
23      Q.  In making the decision -- in arriving at
24  the decision that there was just cause to take

Page 38

1    action, had you consulted with anyone?
2        MR. EDWARDS: Objection. You can
3    answer.
4        THE WITNESS: I believe at least Ford
5    Murphy and/or McCarthy, as they had
6    conducted the investigation and presented
7    the report as to the charges -- the analysis
8    that I had asked for -- as well as the
9    transcripts of the conversations.
10   BY MR. NOTIS:
11       Q. Had you -- did you discuss with them
12   whether there was just cause to take action?
13       A. I don't recall.
14       Q. Other than Ford Murphy and McCarthy, is
15   there anyone else you discussed with whether there
16   was just cause to take action?
17       A. I don't recall discussing with anyone
18   whether or not there was just cause. I found just
19   cause, and I didn't confer with anybody to come to
20   my decision.
21       I came up with my decision after they
22   presented that they found cause to go forward with
23   charges. I reviewed it and concurred with those
24   charges that were presented to me.

Page 39

1        Q. So your concurrence that there was just
2    cause was made on your own without consulting with
3    anyone?
4        A. I did not consult with anyone to come up
5    with my decision to find just cause.
6        Q. Okay. Other than, possibly, your
7    attorneys, did you consult with anyone about the
8    statements made in the position statement that you
9    affirm?
10       A. No.
11       Q. And, again, it's my understanding that in
12   the meeting in which Lieutenant O'Loughlin was
13   informed of her assignment to duty at home, you were
14   not present?
15       A. Again, she wasn't assigned to duty at home.
16   She was placed on administrative leave with pay.
17       Q. I stand corrected.
18       A. And I was not present.
19       Q. Why weren't you present?
20       A. Because the deputies managed informing the
21   personnel who were affected, one of which was Nancy
22   O'Loughlin, that they were relieved of duty with
23   pay.
24       Q. Who made the decision that they would be

Page 40

1    the ones to inform the various people who were going
2    to be put on leave with pay as opposed to yourself?
3        A. I made the decision.
4        Q. Okay. And we spoke last time about the
5    fact that there was SOT team officers present in the
6    vicinity when the various individuals, including
7    Nancy O'Loughlin, were informed of their assignment
8    to leave with pay; correct?
9        MR. EDWARDS: Objection. You can
10   answer.
11       THE WITNESS: I just -- we had a
12   discussion about that in the last -- in the
13   first round of deposition, yes.
14   BY MR. NOTIS:
15       Q. Okay. And who is it that decided that the
16   SOT team officers would be present?
17       A. Me.
18       Q. And your reason for that?
19       A. Out of concern of security, my experience
20   as a hearing officer in other departments; and,
21   again, concern that when someone is relieved of
22   their badge, as well as their weapon, that there's a
23   potential that they could react negatively and cause
24   serious harm.

Page 41

1        In the area that it was happening in, there
2    are a number of unarmed members of the department;
3    and my concern was for their safety as well as other
4    members of the department that were involved in this
5    process.
6        Q. And in making this decision, you didn't
7    have any reason to believe that Nancy O'Loughlin
8    would behave badly or dangerously when informed of
9    this, did you?
10       MR. EDWARDS: Objection. You can
11   answer.
12       THE WITNESS: I had no reason to know
13   that anyone who was involved -- I had no
14   information that they would. Yet, I had
15   experience that it could happen.
16   BY MR. NOTIS:
17       Q. Okay. And we spoke previously about
18   Lieutenant O'Loughlin being the recipient of the
19   Hanna Award for Valor; correct?
20       MR. EDWARDS: Objection. You can
21   answer.
22       THE WITNESS: I don't recall what your
23   question was back and forth with the --
24   BY MR. NOTIS:

Page 46

1  you discuss this matter further at command staff
2  meetings?
3      A.  I don't recall.
4      Q.  How often are command staff meetings --
5  strike that.
6          How often were command staff meetings held
7  in the spring of 2004?
8      A.  Approximately, biweekly; sometimes weekly.
9      Q.  As need arose as well?
10     A.  I usually try to schedule them in advance
11  based on schedules of myself and other members of
12  the command staff.
13     Q.  Are notes or minutes of the meetings
14  regularly kept?
15     A.  I keep an agenda and -- yes, generally.
16     Q.  And are those -- after -- do you still have
17  notes or minutes of the command staff meetings which
18  took place in the spring of 2004?
19     A.  Yes.
20     Q.  In those minutes, are there any references
21  to Nancy O'Loughlin's assignment to leave with pay?
22     A.  I don't believe so.
23     Q.  Are there any references in those minutes
24  to this investigation?

Page 47

1      A.  Don't believe so.
2          MR. EDWARDS:  Objection.
3          MR. NOTIS:  Why don't we go off the
4      record a second.
5
6          (Whereupon, an off-the-record discussion
7      took place.)
8
9  BY MR. NOTIS:
10     Q.  Between the time that Lieutenant O'Loughlin
11  was informed of being assigned to leave with pay and
12  the time the hearing took place, did you play any
13  further role in this process, Chief?
14         MR. EDWARDS:  Objection.  You can
15     answer.
16         THE WITNESS:  Yes.
17  BY MR. NOTIS:
18     Q.  And what role was that, sir?
19     A.  Insuring that everything that was necessary
20  to put the case together was done; that there was
21  follow up -- appropriate follow up with Roxbury
22  District Court, with the district attorney; and
23  anything that was associated with the case, I was --
24  I was being updated on those various courses of

Page 48

1  action.
2      Q.  I'm sorry.  I'm a little lost.  What does
3  Roxbury District Court or the DA have to do with
4  this?
5      A.  A foundation of this case involved alleged
6  violations of CORI.
7      Q.  Right.  Yeah.
8      A.  So we conferred with the district
9  attorney's office on those violations of the law --
10  alleged violations of the law -- and preferring
11  charges against at least two officers, as I recall,
12  for criminal violations of CORI.
13     Q.  And which two officers were those?
14     A.  Well, I know, clearly, McKay.  He was, I
15  recall, sort of the foundation to all of this
16  happening.  Officer McKay.
17         And the other officer's name I don't
18  recall.
19     Q.  Was that Jordan?
20         MR. EDWARDS:  Objection.
21         THE WITNESS:  I don't recall the other
22     officer's name.  Sorry.
23  BY MR. NOTIS:
24     Q.  At no point were there criminal charges

Page 49

1  filed against Nancy O'Loughlin in relation to this
2  matter?
3      A.  No.
4      Q.  And at no point -- was there ever any
5  thought of filing criminal charges against Nancy
6  O'Loughlin in this matter?
7          MR. EDWARDS:  Objection.  You can
8      answer.
9          THE WITNESS:  I didn't have any thoughts
10     about anything.  I just made my decisions
11     based on the evidence that was presented to
12     me.
13  BY MR. NOTIS:
14     Q.  Was there ever any evidence presented to
15  you which would indicate Nancy O'Loughlin had
16  engaged in any criminal activities?
17     A.  No evidence was presented to me, no.
18     Q.  Did anyone ever suggest to you that Nancy
19  O'Loughlin had engaged in criminal activities?
20     A.  Not that I recall.
21     Q.  Okay.  Do you recall any conversations you
22  had with anyone about the actions taken against
23  Nancy O'Loughlin between March 8th, 2004 and when
24  she had the hearing?

Page 50

1    A.  If you don't mind, just say that again.
2    Q.  Do you recall any conversations you had
3  with anyone about the action you took against Nancy
4  O'Loughlin, with such conversations taking place
5  between March 8th, 2004 and the date of her hearing?
6        MR. EDWARDS.  Objection.
7        THE WITNESS:  No, don't recall.
8  BY MR. NOTIS:
9    Q.  Okay.  Did you play any role in her hearing
10  -- that investigative hearing?
11        MR. EDWARDS:  Objection.  What
12        investigative hearing?
13  BY MR. NOTIS:
14    Q.  I think you said there was a civil service
15  hearing, sir.
16        MR. EDWARDS:  Just to clarify the
17        record, I think he described it as a
18        disciplinary hearing.
19        MR. NOTIS:  That's fine.
20        THE WITNESS:  There was a -- I called
21        for a departmental disciplinary hearing
22        under Massachusetts General Laws, Chapter
23        31, Section 41, 45 that outlines what a
24        hearing is.  I called for it.

Page 51

1        And there was a disinterested hearing
2        officer appointed and conducted that
3        hearing.
4  BY MR. NOTIS:
5    Q.  Can we call that the disciplinary hearing?
6    A.  I did, but I was just trying to --
7    Q.  Well, my apologies.  For my purposes in
8  questioning you, can I refer to that as the
9  disciplinary hearing?
10    A.  You can.
11    Q.  And you'll know what I'm talking about,
12  then, if I do that?
13    A.  If we're talking about the Chapter 31
14  hearing.
15    Q.  That's what I'm talking about.
16    A.  Which I also called a civil service
17  hearing; but, yes.
18    Q.  I'll call it the disciplinary hearing.
19  Good.
20        Did you play any role in the disciplinary
21  hearing?
22        MR. EDWARDS:  Objection.  You can
23        answer.
24        THE WITNESS:  Yes; I directed that it be

Page 52

1  held.
2  BY MR. NOTIS:
3    Q.  Did you testify?
4    A.  No.
5    Q.  Okay.  Did you talk -- prior to the
6  hearing, did you speak with any of the witnesses who
7  would be testifying about their testimony?
8        MR. EDWARDS:  Objection.
9        THE WITNESS:  No.
10  BY MR. NOTIS:
11    Q.  Okay.  Other than making sure the hearing
12  took place, did you play any role in the
13  disciplinary hearing?
14    A.  In the hearing, no.
15    Q.  Did you play any role in relation to the
16  hearing other than seeing that it took place?
17        MR. EDWARDS:  Objection.  You can
18        answer.
19        THE WITNESS:  Once the findings were
20        presented by the hearing officer, I reviewed
21        those findings, as well as the evidence that
22        was presented -- documentary or otherwise --
23        and made a decision based on that.
24  BY MR. NOTIS:

Page 53

1    Q.  And your decision was that Lieutenant
2  O'Loughlin would be demoted two grades; correct?
3    A.  Based on the -- based on what was presented
4  to me, yes.
5    Q.  Okay.  And in making that decision to
6  demote Lieutenant O'Loughlin, did you confer with
7  anyone?
8    A.  Don't recall.
9    Q.  Do you recall when you made the decision as
10  to the appropriate discipline of Lieutenant
11  O'Loughlin?
12    A.  Within the seven days required by law.
13    Q.  Seven days after receiving the --
14    A.  Hearing officer's report.
15    Q.  Did you consider other disciplinary --
16  strike that.
17        Did you consider taking any lesser
18  disciplinary action against Lieutenant O'Loughlin
19  other than demoting her two grades?
20    A.  No; just stronger disciplinary action.
21    Q.  And that would have been to terminate her
22  employment?
23    A.  Yes.
24    Q.  Okay.  Is there any reason you decided to

c99c714e-2845-4a01-b6ae-0b1dcf43424a

Page 54

1  demote her two grades rather than terminate her?
2      A.  Then was when I weighed her record within
3  the department.
4      Q.  And that record within the department led
5  you to give her a lesser discipline?
6      A.  Yes.
7      Q.  What about her record led you to give her a
8  lesser discipline than termination?
9      A.  As I recall, it was based on her lack of
10  egregious discipline, based on her letters of
11  accommodation, generally.
12     Q.  You say lack of egregious discipline.  What
13  do you mean by that?
14     A.  I was -- I was confronted with what I
15  determined to be egregious discipline in this
16  instant case; and in looking in her file, did not
17  find similar types of egregious discipline in her
18  file.
19     Q.  Do you recall finding any discipline in her
20  file?
21     A.  I don't recall.
22     Q.  Do you recall finding any discipline in her
23  file that wasn't at least ten years old?
24         MR. EDWARDS:  Objection.

Page 55

1         THE WITNESS:  I don't recall.
2  BY MR. NOTIS:
3      Q.  At some point, did someone meet with
4  Lieutenant O'Loughlin to inform her of what her
5  discipline would be?
6         MR. EDWARDS:  Objection.
7         THE WITNESS:  Not that I recall.
8  BY MR. NOTIS:
9      Q.  And you didn't meet with her?
10     A.  No.
11     Q.  How was she informed of her discipline?
12         MR. EDWARDS:  Objection.
13         THE WITNESS:  I believe by written
14  notice.
15  BY MR. NOTIS:
16     Q.  Did you discuss with anyone what the
17  appropriate discipline for Lieutenant O'Loughlin
18  would be prior to Lieutenant O'Loughlin receiving
19  notice of that discipline?
20     A.  No.
21     Q.  Was it solely your decision as to how she
22  should be disciplined?
23     A.  It was solely my decision.
24     Q.  Can you tell me, Chief Carter, what it is

Page 56

1  that Lieutenant O'Loughlin did which merited her
2  being demoted two ranks.
3      A.  Generally, the behavior that she was found
4  -- just cause was found that she violated,
5  essentially, were contrary to the tennants of good
6  order and discipline against the tennants of being a
7  good manager and supervisor, as she was responsible
8  to be.
9          She had, in fact, in her conversations,
10  acted in a manner that was less than managerial,
11  less than supervisory; and she contributed to what
12  had been an air of discontent in the department that
13  we worked very hard as a team, the entire
14  department, to correct.  And that's generally it.
15     Q.  But what exactly did she do, though?
16     A.  Her conversations were -- again, I'd have
17  to refer to the charges to refresh my memory.
18         But she -- she, essentially, was giving
19  advice to sue the department.  Again, being a
20  manager, it's her responsibility to counsel
21  subordinates as to -- as to any problems they may
22  have.
23         But, importantly, it's also her
24  responsibility to bring to the administration -- her

Page 57

1  superior's attention -- any problems with employees
2  that they may have so that appropriate management
3  decisions could be taken to either correct or amend
4  any problems.
5          She also was instigating what we believed
6  was -- was folks who wanted to undermine the
7  administration of the department; not me in
8  particularly, but just the entire administration of
9  the department.  She contributed to that through her
10  conversations.
11         And it's not just the words; but if you
12  listen to the tapes, it's also the tone and the
13  seriousness of which she communicated her -- her --
14  either her support of or encouragement of
15  subordinates in their undermining of the
16  administration.
17     Q.  Well, sitting here today -- I'm sorry.  Was
18  there anything else, sir?
19     A.  No.
20     Q.  Sitting here today, do you recall anything
21  she actually said which you felt was a basis for
22  demoting her two grades?
23         MR. EDWARDS:  Objection.
24         THE WITNESS:  Yes.  Everything she said

Page 54

1  demote her two grades rather than terminate her?
2      A.  Then was when I weighed her record within
3  the department.
4      Q.  And that record within the department led
5  you to give her a lesser discipline?
6      A.  Yes.
7      Q.  What about her record led you to give her a
8  lesser discipline than termination?
9      A.  As I recall, it was based on her lack of
10  egregious discipline, based on her letters of
11  accommodation, generally.
12      Q.  You say lack of egregious discipline.  What
13  do you mean by that?
14      A.  I was -- I was confronted with what I
15  determined to be egregious discipline in this
16  instant case; and in looking in her file, did not
17  find similar types of egregious discipline in her
18  file.
19      Q.  Do you recall finding any discipline in her
20  file?
21      A.  I don't recall.
22      Q.  Do you recall finding any discipline in her
23  file that wasn't at least ten years old?
24          MR. EDWARDS:  Objection.

Page 55

1          THE WITNESS:  I don't recall.
2  BY MR. NOTIS:
3      Q.  At some point, did someone meet with
4  Lieutenant O'Loughlin to inform her of what her
5  discipline would be?
6          MR. EDWARDS:  Objection.
7          THE WITNESS:  Not that I recall.
8  BY MR. NOTIS:
9      Q.  And you didn't meet with her?
10      A.  No.
11      Q.  How was she informed of her discipline?
12          MR. EDWARDS:  Objection.
13          THE WITNESS:  I believe by written
14  notice.
15  BY MR. NOTIS:
16      Q.  Did you discuss with anyone what the
17  appropriate discipline for Lieutenant O'Loughlin
18  would be prior to Lieutenant O'Loughlin receiving
19  notice of that discipline?
20      A.  No.
21      Q.  Was it solely your decision as to how she
22  should be disciplined?
23      A.  It was solely my decision.
24      Q.  Can you tell me, Chief Carter, what it is

Page 56

1  that Lieutenant O'Loughlin did which merited her
2  being demoted two ranks.
3      A.  Generally, the behavior that she was found
4  -- just cause was found that she violated,
5  essentially, were contrary to the tennants of good
6  order and discipline against the tennants of being a
7  good manager and supervisor, as she was responsible
8  to be.
9          She had, in fact, in her conversations,
10  acted in a manner that was less than managerial,
11  less than supervisory; and she contributed to what
12  had been an air of discontent in the department that
13  we worked very hard as a team, the entire
14  department, to correct.  And that's generally it.
15      Q.  But what exactly did she do, though?
16      A.  Her conversations were -- again, I'd have
17  to refer to the charges to refresh my memory.
18          But she -- she, essentially, was giving
19  advice to sue the department.  Again, being a
20  manager, it's her responsibility to counsel
21  subordinates as to -- as to any problems they may
22  have.
23          But, importantly, it's also her
24  responsibility to bring to the administration -- her

Page 57

1  superior's attention -- any problems with employees
2  that they may have so that appropriate management
3  decisions could be taken to either correct or amend
4  any problems.
5          She also was instigating what we believed
6  was -- was folks who wanted to undermine the
7  administration of the department; not me in
8  particularly, but just the entire administration of
9  the department.  She contributed to that through her
10  conversations.
11          And it's not just the words; but if you
12  listen to the tapes, it's also the tone and the
13  seriousness of which she communicated her -- her --
14  either her support of or encouragement of
15  subordinates in their undermining of the
16  administration.
17      Q.  Well, sitting here today -- I'm sorry.  Was
18  there anything else, sir?
19      A.  No.
20      Q.  Sitting here today, do you recall anything
21  she actually said which you felt was a basis for
22  demoting her two grades?
23          MR. EDWARDS:  Objection.
24          THE WITNESS:  Yes.  Everything she said

Page 58

1     that she was charged with was troubling for
2     me as the chief and her in her station as a
3     lieutenant -- all of what she was charged
4     with, which was very specific and
5     articulated in the charges.
6         And, again, I don't have those in front
7     of me.
8  BY MR. NOTIS:
9     Q.  I understand that. And sitting here today,
10 can you recall any of the statements she made which
11 were inappropriate?
12        MR. EDWARDS:  Objection.
13        THE WITNESS:  Not with specificity, no.
14     Just generally.
15 BY MR. NOTIS:
16     Q.  Is it fair to say that part of the
17 inappropriateness was that you felt she was
18 disrespectful to you?
19     A.  Not me in particular, no. But the
20 department, yes. And to the administration
21 generally, yes.
22     Q.  Were there any statements she made which
23 you felt were offensive to you?
24        MR. EDWARDS:  Objection.

Page 59

1        THE WITNESS:  No.
2  BY MR. NOTIS:
3     Q.  If she had made any statements which were
4  disrespectful to you or offensive to you, would you
5  have found that to be a basis for discipline?
6        MR. EDWARDS:  Objection.
7        THE WITNESS:  There wasn't even anything
8     for me to weigh in that regard. So I can't
9     speculate.
10 BY MR. NOTIS:
11     Q.  Okay. Now, the first thing you mentioned
12 was her -- what did she do; tell someone to get a
13 lawyer?
14     A.  The first thing --
15     Q.  You started talking --
16     A.  I don't recall what the first thing was.
17     Q.  You started talking in your answer here
18 today, sir, about her encouraging someone to sue the
19 department.
20     A.  That was one element, yes.
21     Q.  Well, who did she tell to sue the
22 department?
23     A.  The other officer she was speaking to in
24 the department. I believe it was McKay.

Page 60

1        Q.  So you're saying she told McKay to sue the
2  department?
3     A.  She told another officer, who I believe was
4  McKay; but I'm not certain --
5     Q.  Right.
6     A.  -- without refreshing my memory.
7     Q.  So the one thing she did that was
8  inappropriate was to tell McKay to get an attorney
9  or to tell McKay to tell someone else to get an
10 attorney?
11        MR. EDWARDS:  Objection.
12        THE WITNESS:  No.
13 BY MR. NOTIS:
14     Q.  Then how am I -- how is that statement
15 incorrect?
16     A.  Because I said sue; but I did not use the
17 word, specifically, get an attorney.
18     Q.  Okay. It's your understanding she told
19 McKay to tell someone to sue the department?
20        MR. EDWARDS:  Objection.
21        THE WITNESS:  No.
22 BY MR. NOTIS:
23     Q.  Then what is it you feel she told McKay?
24     A.  I said I believed it was McKay. I'm not

Page 61

1  certain of the person she spoke to.
2     Q.  Okay. Then we don't know who the person
3  was, but what is your understanding of what she said
4  to the person in terms of suing the department?
5        MR. EDWARDS:  Objection.
6        THE WITNESS:  I don't recall the
7     specifics.
8  BY MR. NOTIS:
9     Q.  And you said she was -- I think you said
10 she was undermining the department in some of the
11 statements she made?
12     A.  Some of her statements were undermining or
13 contributing to the undermining or encouraging the
14 undermining of the department; all of that.
15     Q.  Do you recall, specifically, what
16 statements she made which were undermining or
17 contributing to the undermining?
18     A.  Not without looking at them.
19     Q.  Okay. The statements that you feel
20 Lieutenant O'Loughlin made which were inappropriate,
21 did the fact that Nancy O'Loughlin was a lieutenant
22 play any role in how inappropriate you felt the
23 statements were?
24        MR. EDWARDS:  Objection. I just have to

c99c714e-2845-4a01-b6ae-0b1dcf43424a

Page 58

1    that she was charged with was troubling for
2    me as the chief and her in her station as a
3    lieutenant -- all of what she was charged
4    with, which was very specific and
5    articulated in the charges.
6        And, again, I don't have those in front
7    of me.
8    BY MR. NOTIS:
9    Q.   I understand that.  And sitting here today,
10   can you recall any of the statements she made which
11   were inappropriate?
12       MR. EDWARDS:  Objection.
13       THE WITNESS:  Not with specificity, no.
14   Just generally.
15   BY MR. NOTIS:
16   Q.   Is it fair to say that part of the
17   inappropriateness was that you felt she was
18   disrespectful to you?
19   A.   Not me in particular, no.  But the
20   department, yes.  And to the administration
21   generally, yes.
22   Q.   Were there any statements she made which
23   you felt were offensive to you?
24       MR. EDWARDS:  Objection.

Page 59

1        THE WITNESS:  No.
2    BY MR. NOTIS:
3    Q.   If she had made any statements which were
4    disrespectful to you or offensive to you, would you
5    have found that to be a basis for discipline?
6        MR. EDWARDS:  Objection.
7        THE WITNESS:  There wasn't even anything
8    for me to weigh in that regard.  So I can't
9    speculate.
10   BY MR. NOTIS:
11   Q.   Okay.  Now, the first thing you mentioned
12   was her -- what did she do; tell someone to get a
13   lawyer?
14   A.   The first thing --
15   Q.   You started talking --
16   A.   I don't recall what the first thing was.
17   Q.   You started talking in your answer here
18   today, sir, about her encouraging someone to sue the
19   department.
20   A.   That was one element, yes.
21   Q.   Well, who did she tell to sue the
22   department?
23   A.   The other officer she was speaking to in
24   the department.  I believe it was McKay.

Page 60

1    Q.   So you're saying she told McKay to sue the
2    department?
3    A.   She told another officer, who I believe was
4    McKay; but I'm not certain --
5    Q.   Right.
6    A.   -- without refreshing my memory.
7    Q.   So the one thing she did that was
8    inappropriate was to tell McKay to get an attorney
9    or to tell McKay to tell someone else to get an
10   attorney?
11       MR. EDWARDS:  Objection.
12       THE WITNESS:  No.
13   BY MR. NOTIS:
14   Q.   Then how am I -- how is that statement
15   incorrect?
16   A.   Because I said sue; but I did not use the
17   word, specifically, get an attorney.
18   Q.   Okay.  It's your understanding she told
19   McKay to tell someone to sue the department?
20       MR. EDWARDS:  Objection.
21       THE WITNESS:  No.
22   BY MR. NOTIS:
23   Q.   Then what is it you feel she told McKay?
24   A.   I said I believed it was McKay.  I'm not

Page 61

1    certain of the person she spoke to.
2    Q.   Okay.  Then we don't know who the person
3    was, but what is your understanding of what she said
4    to the person in terms of suing the department?
5        MR. EDWARDS:  Objection.
6        THE WITNESS:  I don't recall the
7    specifics.
8    BY MR. NOTIS:
9    Q.   And you said she was -- I think you said
10   she was undermining the department in some of the
11   statements she made?
12   A.   Some of her statements were undermining or
13   contributing to the undermining or encouraging the
14   undermining of the department; all of that.
15   Q.   Do you recall, specifically, what
16   statements she made which were undermining or
17   contributing to the undermining?
18   A.   Not without looking at them.
19   Q.   Okay.  The statements that you feel
20   Lieutenant O'Loughlin made which were inappropriate,
21   did the fact that Nancy O'Loughlin was a lieutenant
22   play any role in how inappropriate you felt the
23   statements were?
24       MR. EDWARDS:  Objection.  I just have to

Page 62

1  interject.
2      The phrase "inappropriate statements" is
3  your characterization. I don't think the
4  chief ever said inappropriate statements.
5  BY MR. NOTIS:
6      Q.  Do you understand what --
7      MR. NOTIS:  I'm sorry, are you done,
8  Joe?
9      MR. EDWARDS:  No. I think he spoke in
10 terms of violations of policies, procedures,
11 and rules. That's different from
12 inappropriate.
13     And if we want to state for the record
14 that that's the way you're using that term,
15 then I think that's fine.
16     MR. NOTIS:  I'm happy to state for the
17 record that when I use the phrase
18 "inappropriate statements", I'm referring to
19 the statements the chief found to be in
20 violation of rules, policies and procedures.
21     MR. EDWARDS:  Thank you.
22     MR. NOTIS:  Do you want to read back my
23 prior question, please.
24

Page 63

1      (The question was read back as follows:
2  "The statements that you feel Lieutenant
3  O'Loughlin made which were inappropriate,
4  did the fact that Nancy O'Loughlin was a
5  lieutenant play any role in how
6  inappropriate you felt the statements
7  were?")
8
9      THE WITNESS:  Yes; it played a vital
10 role in my decision making.
11 BY MR. NOTIS:
12     Q.  How so?
13     A.  Again, she was in a position of command
14 authority as a manager, as a supervisor of members
15 of the department of lower rank to her, and she was
16 engaged in a conversation where she was sharing her
17 inactions as a manager where she was either
18 encouraging or supporting the undermining of the
19 department in the conversations that she was having
20 with subordinates.
21     Q.  And it was your opinion that the violations
22 she committed as a result were serious violations?
23     A.  Yes.
24     Q.  And you felt that it merited serious

Page 64

1  discipline?
2      A.  Yes.
3      Q.  And she was given serious discipline?
4      A.  Yes.
5      Q.  And you feel that that punishment fit her
6  misconduct?
7      A.  Yes.
8      Q.  Are you aware of someone named Officer
9  Witscoll?
10     A.  I'm familiar with the name.
11     Q.  Are you familiar with Officer Witscoll
12 having engaged in conduct where he was viewing
13 pornography on the department computer while he was
14 on duty?
15     A.  That's sounds familiar, yes.
16     Q.  Okay. And was Officer Witscoll disciplined
17 in any way for that activity?
18     A.  I believe so.
19     Q.  And how was he disciplined, sir?
20     A.  I don't recall.
21     Q.  Isn't it correct that his only discipline
22 was a reprimand?
23     MR. EDWARDS:  Objection.
24     THE WITNESS:  I said I don't recall.

Page 65

1  BY MR. NOTIS:
2      Q.  Well, now that I said he was reprimanded,
3  does that refresh your recollection?
4      A.  I don't recall.
5      Q.  So that doesn't refresh your recollection?
6      A.  No.
7      Q.  And you obviously know Lieutenant
8  Gillespie; correct?
9      A.  Yes.
10     Q.  And was it ever brought to your attention
11 that Lieutenant Gillespie had sent, by e-mail, a
12 photograph of a victim of a crime to other people in
13 the department?
14     A.  That is news to me as of today.
15     Q.  You had never heard that before?
16     A.  I don't recall it.
17     Q.  And Lieutenant McCarthy was one of your
18 deputies; correct?
19     A.  Yes.
20     Q.  And were you aware that Lieutenant McCarthy
21 had allegedly assaulted an officer's girlfriend at a
22 function in which various officers were present?
23     MR. EDWARDS objection.
24     THE WITNESS:  That's another surprise.

1    Q.  And is it correct that both before being
2  sworn in, as well as immediately after, you had
3  discussions with acting Chief Flemming about the
4  department and its operations?
5        MR. EDWARDS:  Objection.
6        THE WITNESS:  Yes.
7        MR. EDWARDS:  Can I just make a
8  clarification.  Flemming was no lodger
9  acting chief after Chief Carter was sworn
10  in.
11        MR. NOTIS:  Understood.  I was --
12        MR. EDWARDS:  I understand.  But I just
13  don't want it to be confused on the record.
14  BY MR. NOTIS:
15    Q.  Just so we're clear, then, prior to your
16  taking office, you had discussions with Flemming in
17  his role as acting chief.
18        After -- and how about after you took
19  office; was Flemming a deputy then?
20    A.  Deputy chief, yes.
21    Q.  Okay.  Thank you.  In your discussions with
22  Flemming, did he tell you about something he
23  referred to as a cancer within the department?
24    A.  Yes.

1    Q.  And when did he tell you about that?
2    A.  In conversations -- I recall conversations
3  prior to me coming on as chief.
4    Q.  Did you ask him what he meant by that?
5    A.  I didn't have to ask him.  He was pretty
6  open and revealing about what he thought was
7  cancerous.
8    Q.  And what did he say to you he meant by
9  that?
10    A.  That there were a number of officers who
11  were, through anonymous e-mails and messaging,
12  intimidating or harassing other members of the
13  department; that they were attacking their integrity
14  and their ability to do their job.
15        Something to the effect that they were
16  going after him; that he was a victim of this -- of
17  these attacks.  I remember him using the word
18  attacks.  And that -- and that's why I recall it was
19  before I even started because I recall him telling
20  me that they had already started on me once it was
21  pretty public that I was the next police chief; that
22  I hadn't even arrived and that they were attacking
23  me.  This cancer was attacking me.
24    Q.  Did you ask him who he was talking about?

1    A.  I don't believe he offered who, and I don't
2  recall asking him specifically who; but he didn't
3  volunteer it.
4    Q.  Do you have any understanding of who he was
5  talking about?
6    A.  Members of the department, yes.
7    Q.  I understand; but, I mean, by name, do you
8  have any understanding who he was talking about?
9    A.  No; I don't recall him telling me who.
10    Q.  And I'm sorry if I just asked you this, did
11  you ask him who he was talking about -- the names?
12    A.  I don't recall that part of the discussion.
13    Q.  Sorry to jump around here, sir, but going
14  back to the taped conversations, do you know if
15  Gloria Andrews Ward played any role in listening to
16  the tapes during the investigations?
17        MR. EDWARDS:  Objection.
18        THE WITNESS:  No, I don't recall.
19  BY MR. NOTIS:
20    Q.  Do you recall an incident where someone
21  named Bishop Texera was threatened by someone on the
22  MBTA Police Department?
23    A.  I'm familiar with Bishop Texera.  Repeat
24  your question again.

1    Q.  Are you familiar with an incident where
2  Bishop Texera was in any way threatened by someone
3  in the MBTA Police Department?
4    A.  I'm familiar with Bishop Texera alleging
5  that an officer or officers had threatened him.
6    Q.  And did you do anything about that?
7    A.  Yes.  I directed that an investigation be
8  conducted whenever any member of the public, to
9  include Bishop Texera, alleges that a member of the
10  department violated policy or law.
11    Q.  And what did your investigation discover?
12    A.  I don't recall.
13    Q.  Do you recall the investigation discovering
14  that Greg Lee was -- Officer Lee was involved in
15  this matter to some extent?
16    A.  I don't recall any -- anything pointing to
17  Greg Lee.  I don't recall.
18    Q.  Greg Lee was never disciplined for that?
19        MR. EDWARDS:  Objection.
20        THE WITNESS:  I just said I don't recall
21  Greg Lee being the subject.
22  BY MR. NOTIS:
23    Q.  Is this a matter you discussed with
24  Flemming either in his role as acting chief or as

Page 82

1  deputy chief?
2      A.  Don't recall.
3      Q.  Again, my apologies if we discussed this
4  during your first day of depositions, do you recall
5  Flemming talking to you about assignment as head of
6  the detail unit being a punishment post?
7      A.  No.
8      Q.  Are you saying he didn't say that to you or
9  you just don't recall?
10     A.  Ask your question again.
11     Q.  Do you recall Flemming saying to you that
12 someone being assigned as head of the detail unit
13 was a punishment post?
14         MR. EDWARDS:  Objection.
15         THE WITNESS:  No, I don't recall.
16 BY MR. NOTIS:
17     Q.  Do you recall Flemming telling you that
18 Martino had been punished by being placed as head of
19 the detail unit?
20         MR. EDWARDS:  Objection.
21         THE WITNESS:  No, I don't recall that.
22 BY MR. NOTIS:
23     Q.  Do you have any knowledge of either Deputy
24 Martino or Deputy McCarthy having testified in a

Page 83

1  court action that for a superior officer to be
2  placed as head of the detail unit was a punishment
3  post?
4          MR. EDWARDS:  Objection.
5          THE WITNESS:  I never knew about it
6      until it was asked as a question either by
7      you as an attorney or the attorney at a
8      hearing.
9          That was the first time.  The first time
10     that I learned of that was, again, by an
11     attorney representing Nancy.
12 BY MR. NOTIS:
13     Q.  Okay.  Did Flemming discuss with you at all
14 Captain Martino's history with the department?
15     A.  I don't recall.
16     Q.  Let's focus, for a moment, if you will,
17 please, on your assigning Nancy O'Loughlin to be in
18 charge of the detail unit.  Okay?
19     A.  Okay.
20     Q.  Why did you assign her to be head of the
21 detail unit?
22     A.  As I recall, there was -- it was during a
23 period of time that I was looking at the management
24 of the investigative services division.  They were

Page 84

1  quite top heavy in management.
2          And in collaboration with discussions with
3  the command staff at the time, I made a decision to
4  move several detectives, one of which was Nancy
5  O'Loughlin, and it was -- I made a determination
6  that the best use of her talents was to assign her
7  to the detail unit as the commander at that time.
8      Q.  What talents are those?
9      A.  Being an outstanding -- as she purports --
10 administrator, having a lot of experience as a
11 lieutenant, as a sergeant; and giving the problems
12 we faced with the administration in the unit, felt
13 that having that focused back to -- where she should
14 be able to help turn it around.
15     Q.  So the time you assigned her to the detail
16 unit, you felt she was a strong administrator?
17     A.  At the time, yes.
18     Q.  And that was one of the reasons you
19 assigned her to the detail unit?
20     A.  Was to use her skills there, yes.
21     Q.  And as a matter of fact, when you met with
22 her to discuss this reassignment, you told her one
23 of the reasons you were reassigning her was because
24 of her strengths as an administrator?

Page 85

1      A.  Yes; I was giving her encouragement in
2  telling her that, absolutely.
3      Q.  Were you moving her to the detail unit
4  because of any problems with her job performance?
5      A.  Yes.
6      Q.  What were those?
7      A.  That she wasn't exercising what were skills
8  as a supervisor -- as a manager of detectives.  That
9  she wasn't applying her Accumet as related
10 administratively to a job, but, practically, she was
11 exercising that part.  And I wanted her to focus on
12 the administrative end -- particularly in that unit
13 -- in her reassignment.
14     Q.  Okay.  Now, I think you stated you did this
15 after discussions with the command staff about it?
16     A.  I said I collaborated on some discussions
17 with the command staff about the moves, yes.
18     Q.  And was this during command staff meetings
19 or in one-on-one meetings with some of your command
20 staff?
21     A.  It could have been a combination of
22 meetings.
23     Q.  Do you recall Nancy O'Loughlin being
24 mentioned specifically in any of these discussions?

c99c714e-2845-4a01-b6ae-0b1dcf43424a

Page 90

1  strike that.
2      So you have no recollection of a dispute
3  between O'Loughlin and Gillespie in August of '04?
4      A.  I don't recall, in August of '04, a dispute
5  between her and Gillespie.
6      Q.  Do you recall a dispute between her and
7  Gillespie in July of '04?
8      A.  I don't recall any time frame but recall
9  that they had differences, yes.
10     Q.  Do you recall what those differences were
11 about, sir?
12     A.  About the fact that Gillespie --
13 essentially, it was like a role reversal going on.
14     Gillespie was doing what she should have
15 been doing and -- for whatever reason she wasn't
16 doing it -- and there was focus on her for that.
17     And that's -- that's the extent of my
18 understanding; so that they weren't getting along
19 because of that.
20     Q.  Did you play any role in their differences?
21         MR. EDWARDS:  Objection.
22         THE WITNESS:  Yes.
23 BY MR. NOTIS:
24     Q.  What role did you play, sir?

Page 91

1      A.  In directing deputy -- then Deputy Flemming
2  to counsel her about her management; specifically,
3  that she needed to be doing the job in the manner
4  similar to what Gillespie was doing so that
5  Gillespie could do what she's doing being more of a
6  street level supervisor.
7      Q.  Do you recall -- well, is it correct to
8  say, then, that in relation to their dispute, you
9  felt that Gillespie was correct and O'Loughlin was
10 wrong?
11         MR. EDWARDS:  Objection.
12         THE WITNESS:  One, I didn't use the word
13     dispute.  Again, they had differences.  I'll
14     say there were differences.
15         And, you know, again, I don't have any
16     specifics as to, you know, what interchange
17     they had.
18 BY MR. NOTIS:
19     Q.  Do you recall why you instructed Flemming
20 to counsel O'Loughlin rather than instructing him to
21 counsel Gillespie?
22     A.  Because I can recall -- yes.  I can recall
23 that, very specifically, that on a number of
24 occasions when I needed feedback on a case and my

Page 92

1  just managing by walking around, I'd walk down to
2  the unit and I could never find Lieutenant
3  O'Loughlin on a number of occasions.  I witnessed
4  her first thing in the morning, she's out on the
5  street with detectives that she worked with on a
6  regular basis.  So I had to rely on Gillespie to get
7  an update on a particular case.  I could never get
8  an update from her.
9      So I, therefore, instructed the deputy that
10 I should be getting my updates from her when I want
11 to know something, and she should be there managing
12 the unit administratively; not Gillespie.
13     Q.  Did you ever speak to Lieutenant O'Loughlin
14 about that?
15     A.  No.
16     Q.  Why not?
17     A.  Because I asked the deputy who was
18 specifically responsible for the management of the
19 detective division to counsel her on that; and he,
20 in fact, insured me that he had counseled her on
21 that.  That's why I did not speak to her.
22     Q.  During this period of time -- July and
23 August '04 -- was Gillespie given any special
24 treatment because of the money room investigation?

Page 93

1         MR. EDWARDS:  Objection.
2         THE WITNESS:  No.  No one who's worked
3     for me has gotten any special treatment that
4     I can recall at all.
5  BY MR. NOTIS:
6      Q.  Was Gillespie in any way involved in the
7  money room investigation?
8      A.  Not that I recall.
9      Q.  Now, when you had the meeting with Nancy
10 O'Loughlin to reassign her to the -- I'm sorry,
11 strike that -- to assign her to the detail unit
12 rather than detectives, did you speak with her about
13 whether she would be allowed to continue testifying
14 in graffiti cases?
15     A.  Don't recall.
16     Q.  And you don't recall telling her she would
17 no longer be allowed to testify in graffiti cases?
18     A.  No, I don't recall that.
19     Q.  Do you know if she was allowed to testify
20 in -- strike that.
21     Do you know if she would be allowed to
22 testify in graffiti cases after she was assigned to
23 the detail unit?
24     A.  What I can recall -- and I believe I

c99c714e-2845-4a01-b6ae-0b1dcf43424a

1  testified to this earlier to you -- is that if she
2  was ever summoned to testify, I would never hinder
3  her or anybody in the department to testify on any
4  case on behalf of the Commonwealth.
5      I can recall that I directed the deputy to
6  tell her she's no longer to be actively
7  investigating because we had other members that, in
8  fact, worked under her guidance and tutelage who
9  were still detectives and capable of engaging in any
10  investigation that we had of graffiti.
11  Q.  Why didn't you want her actively
12  investigating?
13      MR. EDWARDS:  Objection.
14      THE WITNESS:  Because her responsibility
15      was no longer investigative.  It was that as
16      the commander of the detail unit.
17      And, again, that's where one area we had
18      a problem, and she was -- I wanted her to
19      focus her attention on that and not be
20      distracted, diverted, or otherwise have any
21      barriers to her being effective as the
22      lieutenant in charge of details.
23  BY MR. NOTIS:
24  Q.  I understand you said that you would

1  certainly never interfere with her being subpoenaed
2  to testify with regard to graffiti.
3      Were you going to allow her to testify
4  regarding graffiti if she was requested to do so
5  without a subpoena?
6      MR. EDWARDS:  Objection.
7      THE WITNESS:  My testimony was I would
8      not be in the way of anybody in the
9      department, that includes Nancy, if they
10      were summoned.
11      And if she was requested -- I don't know
12      what you mean by requested.  You -- when a
13      member of the department needs to testify in
14      court or go to court, they get summoned.
15      And if she was summoned by a letter from the
16      ADA or DA, they're allowed to go.
17      I've never interceded nor injected any
18      sort of command directive that they not go
19      to court.
20  BY MR. NOTIS:
21  Q.  Immediately after --
22  A.  Nancy or anybody.
23  Q.  Immediately after informing -- strike that.
24  In the meeting you had with Nancy O'Loughlin

1  informing her she would be assigned to the detail
2  unit, was anybody else present?
3  A.  Deputy Flemming.
4  Q.  And after that -- immediately after that
5  meeting, did you comment to Deputy Flemming about
6  Nancy O'Loughlin's attire?
7  A.  I recall talking to the deputy about her
8  attire before in the context of her management; I
9  also talked about her dress.
10      I do not specifically remember talking
11  about it just that day or that day at all.
12  Q.  And what is it you said to -- recall saying
13  to Flemming about her attire?
14  A.  That she did not dress as a manager of
15  detectives.  And, again, that spoke to I wanted her
16  to manage the administrative functions of the
17  detective unit and to dress accordingly.
18      In other words, business type attire; a
19  little better than the way she was dressing.
20  Q.  All right.  Now, in assigning -- strike
21  that.
22      Where was Nancy O'Loughlin's place of --
23  physical place of work while she was with the
24  detective unit?

1  A.  One more time.  That was pretty good.
2  Q.  Okay.  Where was -- as -- I'm sorry.
3      What was Nancy's position with the
4  detective unit at that point before she was assigned
5  to details?  She was head of the detective unit?
6  A.  She was the lieutenant detective in days in
7  the detective unit, yes.
8  Q.  Okay.  And where was she supposed to be
9  physically doing her job?
10  A.  In the detective unit.
11  Q.  And that's at 240 South Hampton Street?
12  A.  Yes.
13  Q.  All right.  And as head of the detail unit,
14  where would her place of work be?
15  A.  I believe that office was in Forest Hills.
16  Q.  Okay.  So she would have to move offices?
17  A.  Physically, yes.
18  Q.  Okay.  And --
19  A.  Because they are two separate locations:
20  240 South Hampton; Forest Hills is in Jamaica Plain.
21  Q.  And after informing Nancy O'Loughlin that
22  she would be assigned to details, did you give
23  Deputy Flemming any instructions relating to Nancy
24  O'Loughlin moving things from her office?

Page 98

1    MR. EDWARDS: Objection.
2        THE WITNESS: Don't recall that
3    discussion at all.
4  BY MR. NOTIS:
5    Q.  If I told you that Deputy Flemming
6  testified that you told him to guard her office to
7  watch what she was taking out, does that refresh
8  your recollection at all?
9        MR. EDWARDS: Objection.
10       THE WITNESS: No, it does not.
11 BY MR. NOTIS:
12   Q.  Would you have said something like that to
13 him?
14       MR. EDWARDS: Objection.
15       THE WITNESS: Not for general reasons or
16    just generally, no.
17 BY MR. NOTIS:
18   Q.  At the time you assigned Nancy O'Loughlin
19 to details, was there anywhere else you could have
20 assigned her?
21   A.  I believe, at the time, that was -- of the
22 moves we were making, that was the -- one of the
23 only lieutenant assignments available.  I mean,
24 other than -- yeah; that was the -- that's what was

Page 99

1  available.
2    Q.  Could you have assigned her to days on --
3  to patrol on days?
4    A.  No; I believe that that was filled.
5    Q.  Do you recall ever reprimanding or yelling
6  at Nancy O'Loughlin about her having signed a memo?
7    A.  I can say to you unequivocally that I
8  never, ever yelled at her --
9    Q.  Okay.  Do you recall --
10   A.  -- or even had a substantive conversation
11 with her other than telling her about her transfer
12 that day in my office with Flemming present.
13   Q.  Now, you testified that one of the reasons
14 you changed Nancy O'Loughlin from being the head of
15 the detective unit was that although you felt she
16 had administrative skills, she wasn't using those
17 skills; correct?
18   A.  Correct.
19   Q.  Did you ever counsel her about that?
20   A.  Again, my testimony was I directed the
21 deputy who was responsible for managing the
22 division, and specifically her direct report, to
23 counsel her on that.
24   Q.  And that's Deputy Flemming?

Page 100

1    A.  Then Deputy Flemming, yes.
2    Q.  Do you know if he ever did that?
3        MR. EDWARDS: Objection.
4        THE WITNESS: He advised me that he did
5    do that because I asked him.  He assured me
6    he had.
7  BY MR. NOTIS:
8    Q.  Did you ever offer Lieutenant O'Loughlin
9  training to improve her administrative skills or in
10 using those skills?
11       MR. EDWARDS: Objection.  You can
12    answer.
13       THE WITNESS: I was, at the time, very
14    aware, based on her record, that she had not
15    only a degree in law enforcement, which
16    would cover, in detail, management and
17    supervision, but also had attended Babson, I
18    believe, the command training institute.
19       So -- and, again, that juxtaposed with
20    her experience as a sergeant and lieutenant,
21    all of which is preceded by intense study
22    for the civil service examination for both
23    of those positions which covers management,
24    supervision, administration, and detail,

Page 101

1    that she possessed what she needed as the
2    tools to be a manager.
3  BY MR. NOTIS:
4    Q.  All right.  Now, when you eventually
5  decided what discipline to impose upon Nancy
6  O'Loughlin after the civil service hearing, you also
7  decided what discipline to impose on Flemming;
8  correct?
9    A.  Yes.  Not the same day; but, yes.
10   Q.  Okay.  And isn't it correct that you
11 imposed similar discipline on the two of them?
12   A.  Yes.
13   Q.  Okay.  Now, Flemming had a prior
14 disciplinary record, didn't he, sir?
15   A.  Yes.
16   Q.  Do you recall what his prior disciplinary
17 record was?
18   A.  Generally, yes.  It was a short period of
19 time before then that he was suspended for, I
20 believe five days, by me.
21   Q.  For what?
22   A.  Divulging confidential information, conduct
23 unbecoming.
24   Q.  And that was a serious matter?

c99c714e-2845-4a01-b6ae-0b1dcf43424a

Page 102

1    A.  Yes.
2    Q.  Why wasn't his discipline more severe than
3  Nancy O'Loughlin's, then?
4    A.  One of the mitigating factors in terms of
5  my deciding what he would get for discipline was the
6  fact that when you look at the severity, he had, in
7  totality, less instances of violations in the 1205
8  versus Nancy.
9       Nancy, in total, had a more expansive list
10  of violations.
11    Q.  And when you say more expansive, you just
12  mean in terms of numbers or the severity of them?
13    A.  The -- both.  Both the severity and the
14  number of times that she was engaged in activity
15  versus maybe one or two instances -- again, I'd have
16  to refresh my memory -- of his.
17       She was involved in a number of
18  conversations with officers that were violative
19  versus, again, his one or two violations.
20    Q.  In terms of Flemming's violations, didn't
21  you belive that one of them was racially
22  inappropriate?
23    A.  I recall something like that, yes.
24    Q.  And you didn't feel that that made his

Page 103

1  violations more severe than Nancy O'Loughlin's?
2       MR. EDWARDS:  Objection.
3       THE WITNESS:  No.
4  BY MR. NOTIS:
5    Q.  Other than the present case, are you aware
6  of any complaints against you about the way you
7  treat women at work?
8    A.  No.
9    Q.  Are you aware of any complaints that you
10  don't treat women fairly at work?
11    A.  No.
12    Q.  Are you aware of any complaints that you
13  don't treat women the same as men at work?
14    A.  No.
15    Q.  You're aware that prior to you becoming
16  chief, there were sexually explicit and offensive
17  postings on an internet site called the guard room;
18  correct?
19       MR. EDWARDS:  Objection.  You can
20    answer.
21       THE WITNESS:  I don't know the specifics
22    as you've detailed them; but, specifically
23    -- I know you're giving me that look.  I
24    don't know about the name of what it was

Page 104

1    called.
2       Yes; someone alluded to that, among a
3    number of things that were offensive to
4    people in the department, that was done
5    anonymously.
6  BY MR. NOTIS:
7    Q.  Okay.  Were you aware, when you became
8  chief, that there was an investigation into that
9  matter?
10    A.  I know that there were a number of
11  investigations that were conducted as a result of,
12  particularly, the internet postings, etc.
13       And I'm not clear, again, without
14  refreshing my memory, as to whether it was going at
15  the time, had been done, or it was something that
16  was done later.  So, no.
17    Q.  Did you play any role in putting a stop to
18  that investigation?
19    A.  I didn't stop any investigations.
20    Q.  Do you have any knowledge of any detectives
21  reporting Lieutenant Gillespie to diversity
22  regarding the way he addressed female officers?
23    A.  No.
24    Q.  Do you have any knowledge of any complaints

Page 105

1  to occupational diversity -- organizational
2  diversity about Lieutenant Gillespie?
3    A.  No.
4    Q.  Have you ever discussed Nancy O'Loughlin's
5  claims in this lawsuit with Michael Mulhern?
6    A.  No.
7    Q.  Have you ever discussed Nancy O'Loughlin's
8  claims in this lawsuit with John Martino?
9    A.  No.
10    Q.  Have you ever discussed Nancy O'Loughlin's
11  claims in this lawsuit with Thomas McCarthy?
12    A.  No.
13    Q.  Have you ever discussed Nancy O'Loughlin's
14  claims in this lawsuit with any other deputy chiefs?
15    A.  No.
16    Q.  Have you ever discussed Nancy O'Loughlin's
17  claims in this lawsuit with Mr. Grabowstiss?
18    A.  No.
19    Q.  Have you ever discussed Nancy O'Loughlin's
20  claims in this lawsuit with any union officials?
21    A.  No.
22    Q.  You do know someone named Gloria Andrews
23  Ward; correct?
24    A.  Correct.

Page 106

1    Q.   She's a female employee of the MBTA Police
2    Department?
3    A.   Yes.
4    Q.   She had previously been in the internal
5    affairs division?
6    A.   Yes.
7    Q.   And she was moved out of internal affairs;
8    correct?
9    A.   Yes.
10   Q.   And you decided to move her out of internal
11   affairs; correct?
12   A.   I approved her being moved.
13   Q.   Who was it that first decided she should be
14   moved out of internal affairs?
15   A.   I don't recall.
16   Q.   Was it you?
17   A.   I just said I don't recall.
18   Q.   So it might have been --
19   A.   But I approve all moves, and I don't recall
20   her being the subject of any discipline.  If it was
21   discipline that somebody got moved, then I make that
22   decision.
23      But a majority of moves happen because the
24   deputies recommend to me that they need to make a

Page 107

1    move or somebody needs to move or there needs to be a
2    shift changes or hours changed.  And I'll listen to
3    their recommendations or read their recommendation
4    and oftentimes approve it.
5    Q.   Do you have any knowledge sitting here
6    today of why -- strike that.
7       What position was Gloria Andrews Ward moved
8    to from IAD?
9    A.   I believe it's her present assignment.
10   Q.   Which is what?
11   A.   Court case management.  And as we talk
12   here, I also believe that she requested to be moved.
13   I recall her -- there was a request involved in this
14   that she wanted to move from internal affairs.
15   Q.   So is it your testimony that her move from
16   internal affairs came about because she had
17   requested it?
18      MR. EDWARDS:  Objection.
19      THE WITNESS:  No.  I said that I
20      believed that that was a factor in her
21      moving, a part of it was the request.
22      But it also -- I'm recalling a deputy
23      was involved in maybe recommending that she
24      be moved as well.

Page 108

1    BY MR. NOTIS:
2    Q.   What do you recall about that?
3    A.   Just what I said.
4    Q.   You don't recall which deputy?
5       MR. EDWARDS:  Objection.
6       THE WITNESS:  I recall that she worked
7       for Deputy Ford Murphy -- Delores Ford
8       Murphy -- and her bringing this to my
9       attention.
10   BY MR. NOTIS:
11   Q.   Do you have any knowledge of Gloria Andrews
12   Ward ever making any negative comments about you,
13   sir?
14   A.   No.
15   Q.   Do you know someone named Ann McCall?
16   A.   Yes.
17   Q.   And what position does Ms. McCall currently
18   hold?
19   A.   Lieutenant.
20   Q.   Was she removed from another position
21   during your time as chief?
22   A.   Yes.
23   Q.   And what position was that?
24   A.   Deputy chief.

Page 109

1    Q.   Why was she removed as deputy chief?
2    A.   Because in a conversation, she indicated
3    that she was not capable of -- of adhering or
4    administering to my philosophy and -- of management
5    -- and that -- so she couldn't represent my
6    philosophy as a member of the command staff; thus, I
7    asked her to step down and she did.
8    Q.   What aspect of your philosophy could she
9    not carry out?
10   A.   She didn't agree with the plan of action
11   and, basically, the framework -- the establishing of
12   TPSA's; just, generally, the plan of action.
13   Q.   We've established that you became aware
14   that Nancy O'Loughlin had made statements on a taped
15   line, which might have been inappropriate, in early
16   2004; correct?
17   A.   Correct.
18   Q.   Prior to becoming aware of those taped
19   statements, did you have an opinion of the quality
20   of Nancy O'Loughlin's work performance?
21   A.   Yes.
22   Q.   And what was that opinion?
23   A.   My opinion was that she was not fulfilling
24   the requirements or the responsibilities of a

c99c714e-2845-4a01-b6ae-0b1dcf43424a

Page 110

1  lieutenant detective in charge of detectives.
2     Q.  Okay.  And after she -- after that, when
3  she was moved to the detail unit in August of '04,
4  between then and when you became aware of the
5  conversations she was involved in, did you have an
6  opinion of her work as head of the detail unit?
7        MR. EDWARDS:  Objection.  You can
8     answer.
9        THE WITNESS:  No.
10 BY MR. NOTIS:
11    Q.  No opinion at all?
12    A.  None that I recall.
13    Q.  Why not?
14    A.  I just don't recall any.  Sorry.
15    Q.  Now, Nancy O'Loughlin was assigned to duty
16 at home in March of '04.  And she was demoted to
17 patrolman when, sir; do you recall?
18       I think it was August '04 -- I'm sorry.  Do
19 you recall when that was?
20    A.  Two things.  One, I don't recall when that
21 was.  Secondly, I've never assigned anybody to duty
22 at home.
23    Q.  You're correct.  My misstatement.
24    A.  She was assigned -- okay.

Page 111

1     Q.  No, no, my misstatement.  She was placed on
2  administrative leave with pay --
3     A.  Yes.
4     Q.  -- in March of '04?
5     A.  Right.  And the stipulation is if you leave
6  home, that you're supposed to notify your commander.
7     Q.  Understood.  All right.  If I told you that
8  Lieutenant O'Loughlin was demoted and then assigned
9  to duties of a patrolman in September '04, you don't
10 question that, do you?
11       MR. EDWARDS:  Objection.
12       THE WITNESS:  I could read it myself and
13    refresh my memory.
14       But if you say so, you, being an officer
15    of the court, I have confidence that you're
16    telling me the truth.
17 BY MR. NOTIS:
18    Q.  Do you have an opinion of Nancy
19 O'Loughlin's work since she was assigned to the
20 position of patrolman?
21    A.  Generally, commendable.  In fact, I know
22 there's a pending commendation for her work in an
23 arrest.
24    Q.  Do you know -- going back to O'Loughlin's

Page 112

1  relationship with Gillespie, do you know if, prior
2  to her assignment to the detail unit, Lieutenant
3  O'Loughlin wrote up Gillespie?
4     A.  Don't recall that at all.
5     Q.  Did Deputy Flemming ever tell you that
6  Nancy O'Loughlin was getting requests to do graffiti
7  investigations?
8     A.  No.  I don't recall the plural requests.
9  I'm aware of a request.  But, no.
10    Q.  And what request is that, sir?
11    A.  I believe that I was contacted by a city
12 councilor -- and I don't recall who that was, but he
13 was male -- asking could Nancy attend a community
14 meeting on graffiti.
15    Q.  Did you give her permission to do that?
16    A.  Again, my conversation was with the city
17 councilor.
18       I told him that I would assign somebody
19 there because of Nancy's new duties and
20 responsibilities at the time and she was
21 unavailable.
22    Q.  So you declined --
23    A.  So I never had a discussion with her.
24    Q.  So you declined to assign her to that

Page 113

1  particular job?
2        MR. EDWARDS:  Objection.
3        THE WITNESS:  Again, my conversation
4     with the city councilor was he requested
5     that she attend the meeting, and I assured
6     him that one of the people who was an expert
7     that she attested to was of the same level
8     of competence as she was as an expert in
9     graffiti investigation would be at that
10    meeting.  And that was the conversation.
11 BY MR. NOTIS:
12    Q.  Who was that?
13    A.  It was either Diaz or Sullivan.
14    Q.  And you felt that Diaz and Sullivan had the
15 same level of competence in graffiti investigations
16 that O'Loughlin did?
17    A.  Yes; because it was purported by her that
18 they had it.
19    Q.  She told you that?
20    A.  No; she wrote it.  I believe I read
21 paperwork to that when I came on the job --
22    Q.  That --
23    A.  -- and took over as chief.
24    Q.  That they were skilled or that their skill

c99c714e-2845-4a01-b6ae-0b1dcf43424a

Page 114

1   level was the same as hers?
2           MR. EDWARDS: Objection.
3           THE WITNESS: That they had high skill
4       level as she possessed.
5   BY MR. NOTIS:
6       Q.  Do you know someone named Janet Jones?
7       A.  No.
8       Q.  Or Janet Rivera Jones?
9       A.  Yes.
10      Q.  Okay.  And who is that?
11      A.  She is a civilian member of the department.
12      Q.  And in the course of your duties as chief,
13  you've interacted with her?
14      A.  Yes.
15      Q.  And has she ever been brought to tears as a
16  result of her interactions with you, sir?
17          MR. EDWARDS: Objection.
18          THE WITNESS: No; never.
19  BY MR. NOTIS:
20      Q.  How about Rena Harrison; do you
21  know someone -- how do you get along with Janet
22  Rivera Jones?
23      A.  Good.
24      Q.  And how about Rena Harrison; do you know

Page 115

1   her?
2       A.  Yes.
3       Q.  Has she ever been reduced to tears due to
4   her interactions with you, sir?
5           MR. EDWARDS: Objection.
6           THE WITNESS: Not that I recall.
7   BY MR. NOTIS:
8       Q.  How about Maria Beeno; do you know her?
9       A.  Yes.
10      Q.  Has she ever been reduced to tears due to
11  her interactions with you?
12      A.  No.
13      Q.  Did you ever have any difficulties in
14  interacting with Beeno, Harrison, or Jones?
15      A.  No.
16          MR. NOTIS: I have no further questions.
17          MR. EDWARDS: I just have a couple of
18      questions, I think.
19
20          CROSS-EXAMINATION
21  BY MR. EDWARDS:
22      Q.  Sir, you were asked -- and I think we
23  clarified it, but I need you to elaborate, if you
24  could.

Page 116

1           When the 1205 line investigation was
2   initiated, to the best of your knowledge, was it
3   initiated because of inappropriate statements made
4   by Nancy O'Loughlin -- or allegedly made by Nancy
5   O'Loughlin?
6       A.  No.  That was not the trigger, per se, no.
7       Q.  What was the trigger, per se?
8       A.  As I -- as I recall, there were
9   conversations on the line that, in particular,
10  involved what were alleged to be CORI violations;
11  and conversations between officers about that was
12  one of the initial triggers.
13      Q.  Okay.  And how did Nancy O'Loughlin come to
14  be involved at all in the 1205 line investigation?
15      A.  Because one of the officers who was engaged
16  in the criminal conduct conversations with her where
17  she had inappropriate discussions with that officer.
18      Q.  Now, the discussions you've characterized
19  as -- as inappropriate?
20      A.  Violative of the rules, policies, and
21  procedures of the department.
22      Q.  Okay.  Now, as I understand your testimony
23  before, you did not consider Nancy O'Loughlin's
24  conversations to be criminal in nature?

Page 117

1       A.  No.  I said no.
2       Q.  Okay.
3       A.  I testified that.
4       Q.  Okay.  Now, when you made the decision that
5   demotion was an appropriate response to the just
6   cause finding from the impending hearing officer,
7   was it any one statement that Nancy O'Loughlin made
8   that caused you to reach that decision?
9       A.  No, it wasn't any one statement.  It was
10  the total number of statements that she made in
11  depth, as well as the tone of those statements that
12  were the reason.
13      Q.  Okay.  Now, at any time after you made the
14  decision to demote then Lieutenant O'Loughlin, did
15  anybody on the command staff indicate to you that
16  they thought the punishment was too severe?
17      A.  No one ever communicated that to me from
18  the command staff.
19      Q.  Did the union representatives ever indicate
20  to you that they thought the punishment was too
21  harsh after it was imposed?
22      A.  I believe that -- well, in my tenure, every
23  punishment I've imposed -- from a reprimand to a
24  day -- the union is not in agreement with unless we

c99cf714e-2845-4a01-b6ae-0b1dcf43424a

Page 118

1  have a specific agreement on discipline.
2      So I don't recall how they -- whether I got
3  a letter or how it was communicated, but I know the
4  union was not supportive of the demotion.
5      Q.  Now, other officers involved in the 1205
6  line investigation were also disciplined?
7      A.  Yes.
8      Q.  All of those officers were not demoted; is
9  that right?
10     A.  They were either at the lowest rank in the
11 department; and the two people that were of rank
12 were demoted.
13     Q.  When you say of rank, are you speaking
14 about the male lieutenant who was involved in that
15 investigation?
16     A.  Flemming.  Yes; Lieutenant Flemming.
17     Q.  Okay.  And he was demoted two ranks as
18 well?
19     A.  Yes.
20     Q.  Were any of the other officers suspended?
21     A.  Yes.
22     Q.  Some of the officers were terminated from
23 their positions with the MBTA?
24     A.  Yes.

Page 119

1      Q.  Because of their involvement with the 1205
2  line?
3      A.  Yes.
4      Q.  Okay.  Has it been brought to your
5  attention that the punishment you imposed across the
6  board because of the 1205 line misconduct was
7  harsher across the board than punishment usually
8  doled out by the MBTA Police Department?
9      A.  Sorry?
10     Q.  Was it your understanding that your
11 punishment was more harsh because of the 1205 line
12 violations than discipline that was generally
13 administered by the MBTA Police Department?
14     A.  I think, yes.
15     Q.  Okay.  Why was your punishment so harsh
16 compared to that doled out in the past by the MBTA
17 Police Department?
18     A.  That in the prior administration and other
19 administrations, there were violations that were
20 either not acted on, or when they were acted on, the
21 punishment was -- was not appropriate and that it
22 was lesser than what folks felt should have been
23 meted out.
24     Q.  Now, you were asked whether you were told

Page 120

1  that the position of head of the detail unit was a
2  punishment position.  Did you consider it a
3  punishment position?
4      A.  No, I did not.
5      Q.  Now, when Nancy O'Loughlin was moved from
6  the detective unit, she was not the only lieutenant
7  moved from that unit, was she?
8      A.  No.
9      Q.  Who else was moved?
10     A.  Lieutenant Loyta.
11     Q.  And they were moved the same day?  I'm
12 sorry, did you conclude your answer?
13     A.  Lieutenant Loyta, yes.
14     Q.  They were moved the same day?
15     A.  Around the same time.  I'm not sure if it
16 was the same day or around the same period of time.
17     Q.  Okay.  Approximately, how many officers
18 have you disciplined since you assumed command of
19 the police department?
20     A.  Approximately, 20.  Approximately.
21     Q.  Do you have any knowledge of whether
22 derogatory postings about MBTA police officers are
23 still appearing on any internet sites?
24     A.  I have no knowledge of there being any

Page 121

1  presently.
2      Q.  Nobody's brought that to your attention?
3      A.  No.
4      Q.  Okay.
5          MR. EDWARDS:  I don't have anything
6      else.
7          MR. REISER:  Nothing for me.
8          MR. NOTIS:  I have a few on redirect.
9
10         REDIRECT EXAMINATION
11 BY MR. NOTIS:
12     Q.  Are you aware, Chief, of there having been
13 animosity between Tom McCarthy and Nancy O'Loughlin
14 at any point in time?
15     A.  No.
16     Q.  Are you aware of there having been
17 animosity between John Martino and Nancy O'Loughlin
18 at any point in time?
19     A.  No.
20     Q.  Let me just see if I have the list correct.
21 The various individuals who you disciplined as a
22 result of the 1205 line investigation were Floyd,
23 Douglas --
24     A.  Take your time.  Floyd, Douglas.  Go ahead.

c99c714e-2845-4a01-b6ae-0b1dcf43424a

Page 122

1    Q.  Floyd, Douglas, Hennessey, Nancy
2  O'Loughlin, McKay, Flemming, and Jordan; is that
3  correct?
4    A.  All of those names sound correct.
5    Q.  Any others you can think of?
6    A.  I can't think of any.
7    Q.  Okay.
8    A.  I have to rely on you.
9    Q.  Thank you.  All right.  Now, in terms of
10  Floyd, what was Floyd's punishment?  Was that a six
11  months suspension?
12      MR. EDWARDS:  Objection.
13      THE WITNESS:  Don't recall.
14  BY MR. NOTIS:
15    Q.  Was Floyd -- did Floyd contest his
16  discipline?
17    A.  I believe everybody contested their
18  discipline except for the sergeant.
19    Q.  And who was that -- the sergeant?
20    A.  Say the names again, if you don't mind.
21    Q.  No, no.
22    A.  Please.
23    Q.  Floyd, Douglas --
24    A.  Douglas.

Page 123

1    Q.  Okay.  So he didn't contest it?
2    A.  No.
3    Q.  Okay.  Was Floyd's discipline -- well, did
4  Floyd's discipline go to arbitration?
5    A.  I believe so.
6    Q.  And was his discipline overturned?
7    A.  I don't recall what -- I know that the
8  terminations got vacated and Flemming's got vacated.
9  They, like, affirmed that there was just cause for
10  discipline; but my discipline was -- you know, they
11  downgraded my discipline.
12    Q.  In all of the cases?
13    A.  No.  I just said I recall the terminations.
14  I recall Flemming.  And I don't recall the status of
15  the others in terms of -- I believe they were
16  reduced.  Again, they were reduced.
17    Q.  So that would be Hennessey and Floyd?
18    A.  I'd have to refresh my memory --
19    Q.  Fair enough.
20    A.  -- on what happened with who.
21    Q.  I know you've testified that, in your
22  opinion, being assigned to head of the detail unit
23  was not a punishment position; correct?
24    A.  I never was aware that it was a punishment

Page 124

1  position.
2    Q.  That was my next question to you, sir.  Do
3  you know if being placed as head of the detail unit
4  was ever perceived by MBTA officers as being a
5  punishment position?
6    A.  Never --
7      MR. EDWARDS:  Objection.  You can
8  answer.
9      THE WITNESS:  Never knew of that until
10  all of this.  The first I learned of it was
11  from an attorney.
12      MR. NOTIS:  Okay.  I have no further
13  questions.
14      MR. REISER:  Nothing for me.
15
16  (Whereupon, the deposition was concluded at
17  1:15 p.m.)
18
19
20
21
22
23
24

Page 125

1  CERTIFICATE
2
3  COMMONWEALTH OF MASSACHUSETTS
   Norfolk, SS.
4
5    I, DAWN MACK-BOADEN, a Notary Public duly
   qualified in and for the Commonwealth of
6  Massachusetts, do hereby certify that:
     JOSEPH CARTER, the witness whose testimony
7  is hereinbefore set forth, was duly sworn by me, and
   that such testimony is a true and correct
8  transcription of my original stenographic notes
   taken in the foregoing matter, to the best of my
9  knowledge, skill and ability.
10
     I further certify that I am neither
11  attorney or counsel for, nor related to or employed
   by any of the parties to the action in which this
12  deposition is taken; and furthermore, that I am not
   a relative or employee of any attorney or counsel
13  employed by the parties thereto or financially
   interested in the action.
14
     IN WITNESS WHEREOF, I have hereunto set my
15  hand and affixed my Notarial seal this 13th of
   February, 2006.
16
17
18    Dawn Mack-Boaden
     Notary Public
19
20
   My Commission Expires:  September 15, 2006
21
22
   THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES
23  NOT APPLY TO ANY REPRODUCTION AND/OR DISTRIBUTION OF
   THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT
24  CONTROL AND/OR SUPERVISION OF THE CERTIFYING COURT
   REPORTER.

c99c714e-2845-4a01-b6ae-0b1dcf43424a