Exhibit 7

## Page 1

```
                    Volume: 1
                    Pages: 1-191
                    Exhibits: 1-13

         UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
              C.A. No. 04-10933 JLT

      * * * * * * * * * * * * * * * *

      NANCY O'LOUGHLIN,

              Plaintiff,

      vs.

      MASSACHUSETTS BAY TRANSPORTATION
      AUTHORITY, JOSEPH CARTER, and
      MICHAEL MULHERN,

              Defendants.

      * * * * * * * * * * * * * * * *

         DEPOSITION of WILLIAM FLEMING, a
      witness called by counsel for the Defendants
      MBTA and Joseph Carter, taken pursuant to Rule
      30 of the Massachusetts Rules of Civil
      Procedure before Alene M. Jennette, Certified
      Shorthand Reporter and Notary Public in and for
      the Commonwealth of Massachusetts, at the
      offices of Prince, Lobel, Glovsky & Tye, LLP,
      585 Commercial Street, Boston, Massachusetts
      on Friday, December 16, 2005, commencing at
      11:00 a.m.
```

## Page 2

```
APPEARANCES:

BY MITCHELL J. NOTIS, ESQ.
370 Washington Street
Brookline, Massachusetts 02445
    On Behalf of the Plaintiff

PRINCE, LOBEL, GLOVSKY & TYE, LLP
By Joseph L. Edwards, Esq.
585 Commercial Street
Boston, Massachusetts 02109
    On Behalf of the Defendants MBTA
    and Joseph Carter

WILLIAM CUTLER PICKERING
HALE and DORR, LLP
By Gregory M. Reiser, Esq.
60 State Street
Boston, Massachusetts 02109
    On Behalf of the Defendant Michael Mulhern

ALSO PRESENT:
Ms. Mary Katherine Heller, Law Clerk
Prince, Lobel, Glovsky & Tye, LLP
```

## Page 3

INDEX

| WITNESS: | DIRECT | CROSS |
|---|---|---|
| WILLIAM FLEMING | | |
| By Mr. Edwards | 4 | |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Special Order, 6/13/01 | 90 |
| 2 | Special Order, 7/26/02 | 121 |
| 3 | Briefing Summary, 1/13/03 | 132 |
| 4 | Briefing Summary, 1/17/03 | 134 |
| 5 | Briefing Summary, 1/7/03 | 139 |
| 6 | Briefing Summary, 1/7/03 | 148 |
| 7 | Transition Report, 1/6/02 | 149 |
| 8 | O'Loughlin Resume and Briefing Summary, 1/7/03 | 152 |
| 9 | Letter, 1/8/03 | 157 |
| 10 | Transitional Report, 1/7/03 | 159 |
| 11 | Letter, 1/7/03 | 160 |
| 12 | Memo, 1/13/03 | 162 |
| 13 | The Plan of Action with Attachment | 169 |

(Exhibits attached.)

## Page 4

PROCEEDINGS
* * * * *

WILLIAM FLEMING, a witness called for examination by counsel for the Defendants MBTA and Joseph Carter, having been satisfactorily identified by the production of his Commonwealth of Massachusetts Police Department Identification Card and duly sworn by the notary public, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. EDWARDS:

Q. Good morning.
A. Good morning.
Q. Would you please state your name?
A. William Fleming.
Q. My name is Joseph Edwards. I represent the MBTA and Chief Joseph Carter in this action that was brought by Nancy O'Loughlin. What is your current position and current rank?
A. Lieutenant.
MR. NOTIS: Excuse me, Joe. Can you just inform the lieutenant of his right to read

**Page 9**

Q. And you are currently employed by the MBTA?
A. Yes.
Q. And how long have you been with the MBTA Police Department?
A. Twenty-two years.
Q. And you started out as a patrol officer?
A. Yes.
Q. And you moved up through the ranks?
A. Yes.
Q. When did you make sergeant? Is that the next rank up from patrol officer?
A. Yes. Um, I -- I'm taking a guess at this date. In the '90s.
Q. Early '90s?
A. Yes, I'm just taking a guess.
Q. And when did you make lieutenant?
A. In the '90s. Three or four years after I was a sergeant.
Q. Mid '90s, late '90s?
A. I didn't review anything, so I'd say late '90s.
Q. Have you ever held a specialty

**Page 10**

position?
A. Several.
Q. What is a specialty position?
A. A specialty position, as defined by the department, would be -- I was a K-9 officer. That takes specialized training, a job that requires -- so I was a K-9 officer. I served as a homeless liaison, which I would consider a specialty.
Q. What did you call it?
A. Homeless liaison.
Q. Homeless liaison?
A. Yes. I served as detective sergeant. I served in detectives.
Q. As a patrol officer?
A. No.
Q. As a --
A. Supervisor.
Q. What rank were you then?
A. Sergeant.
Q. When was that, roughly?
A. That was under Chief O'Donovan in the '90s.
Q. Any other specialty positions?

**Page 11**

A. Deputy chief, chief.
Q. When did you serve as deputy chief?
A. For the tenure of Thomas O'Loughlin, I believe 2000. Probably slightly before 2000. Probably '99 or '98 to when Chief O'Loughlin left. 2002 or...
Q. Have you ever served in a position you didn't like at the MBTA?
A. I didn't really like the interim chief's position.
Q. The interim chief?
A. Yeah. But that's an -- I -- presently my position, details, I don't -- I'll reserve judgment on that.
Q. You are currently in the detail unit?
A. Yes.
Q. Are you commander of the detail unit?
A. Yes.
Q. How long have you been in that position?
A. A week.
Q. Oh, since you --
A. Yes.
Q. Where were you prior to becoming

**Page 12**

commander of the detail unit?
A. I was assigned to TPSA 3.
Q. What is that?
A. That's an area district that would be -- governed Quincy, Dorchester, up -- could go down as far as Lakeville.
Q. It's a patrol district?
A. Yes.
Q. Okay. If an officer is assigned to a position he or she doesn't like -- if, for instance, it turns out you don't like the detail unit -- is there a mechanism to challenge that assignment, a formal mechanism within the police department?
    MR. NOTIS: Just to clarify, if you say an officer, Mr. Edwards, are you talking about a patrol officer or any level employee of the police department?
    MR. EDWARDS: Let's start with a patrol officer.
    MR. NOTIS: Thank you.
A. If a patrol officer does not like his or her assignment, he could request to be transferred. That just happened a week ago.

**Page 13**

1  It doesn't mean it will be granted.
2  Q. How is that request made?
3  A. I don't know how this particular
4  officer did it. I would imagine he goes to his
5  supervisor and requests reassignment.
6  Q. Now, what ranks in the police
7  department are considered supervisory ranks?
8  A. Above the rank of sergeant. But
9  also, if in a particular situation -- my
10 interpretation of the rules and regulations --
11 if there is no supervisors available, the
12 senior officer, whoever that patrolman would
13 be, would have the capacity to take command of
14 a situation.
15 Q. What are the current ranks in the
16 MBTA Police Department in ascending order from
17 patrol officer?
18 A. Patrolman, sergeant, lieutenant, TPSA
19 commander, deputy chief, and chief of police.
20 Q. Are there any captains?
21 A. There are two civil service positions
22 held for captain by John Martino and Lori
23 Ford-Murphy. But there has not been a test for
24 captain in, say, ten years.

**Page 14**

1  So for -- you know, they would be --
2  if they were -- that would revert back to the
3  civil service position, if something happened
4  to them. But there is no position of captain,
5  theoretically, because of the absence of a
6  test.
7  Q. Lori Ford-Murphy and John Martino are
8  not currently serving in their civil service
9  rank of captain?
10 A. No.
11 Q. In what positions are they serving?
12 A. Deputy chief.
13 Q. If, say, a sergeant, lieutenant -- a
14 sergeant or a lieutenant does not like the
15 position to which he or she is assigned, is
16 there a mechanism for that officer to challenge
17 the assignment?
18 A. I will answer -- when I was interim
19 chief, John Martino sent me a letter or
20 requested a reassignment from the detail unit.
21 Q. Okay.
22 A. I thought it was a punishment
23 assignment, and I reassigned him.
24 Q. So it would be by request an officer

**Page 15**

1  could ask --
2  A. It wouldn't be -- he could --
3    (Court reporter instructs parties
4    to speak one at a time.)
5  Q. A sergeant or lieutenant could ask to
6  be transferred?
7  A. Yes. It doesn't mean that he would
8  get it. But you can request anything.
9  Q. Okay. How long have you known Nancy
10 O'Loughlin?
11 A. Twenty-two years.
12 Q. And how did you meet her?
13 A. Police Academy.
14 Q. You were in the academy together?
15 A. Yes.
16 Q. Are you friends?
17 A. Yeah.
18 Q. Social friends?
19 A. We don't -- we don't travel in the
20 same circle. She's friends with my wife.
21 Q. Has that been for 22 years as well --
22 A. No.
23 Q. -- that friendship?
24 A. Well, we have always been friends,

**Page 16**

1  but, you know, we're like most friends. We've
2  had arguments and everything else.
3  Q. Now, does Nancy O'Loughlin work with
4  you now?
5  A. No.
6  Q. Where does she work?
7  A. She works in TPSA 3.
8  Q. Did she work with you prior to a week
9  ago?
10 A. Yes. We worked together.
11 Q. Do you know what this case is about?
12 A. I'd prefer to have you explain it to
13 me.
14 Q. I'm interested in what you think it's
15 about.
16 A. I believe Nancy is -- believes that
17 she was unfairly treated.
18 Q. Have you discussed this case with
19 her?
20 A. We have talked about it in the past,
21 you know, yeah. Not discussed the case,
22 because I didn't know where this case was
23 going. It's just, you know, some of the -- the
24 incidences that she was accused -- you know,

## Page 45

1 nationwide to address quality-of-life issues.
2     Q. You agree with that approach?
3     A. Not to the extreme of zero tolerance,
4 no, I don't.
5     Q. Just generally?
6     A. I agree that you have to address
7 quality-of-life issues.
8     Q. And you supported the anti-crime unit
9 in the beginning?
10     A. Yes.
11     Q. Who made requests for the anti-crime
12 unit to address school breaks and drug dealing?
13     A. That would have been the -- I do
14 remember seeing a report from Lieutenant
15 McCarthy to address problems at Forest Hills.
16 But there could have been requests from other
17 lieutenants to whoever the commanders were.
18     Q. And what was he asking for?
19     A. He was probably asking for help to
20 address -- between the hours of one and three,
21 because of the large amounts of school kids we
22 transport, there was, for a combination of
23 factors, several issues that had to be
24 addressed from -- everywhere from kids just

## Page 46

1 rough-housing and terrorizing older people, up
2 to and including large fights, up to and
3 including stabbings and just incidents that
4 would break out that usually were spilled over
5 to us from school issues, from the schools.
6     Q. So you're saying that Lieutenant
7 McCarthy asked for this plain-clothes unit to
8 go to Forest Hills?
9     A. I'm just doing it by memory. I
10 remembered that he requested it for drug
11 problems. I don't know if he requested it for
12 the school breaks.
13     Q. He requested undercover officers?
14     A. He requested the anti-crime unit.
15     Q. He requested the anti-crime unit, who
16 are undercover officers?
17     A. Yes.
18     Q. To address the drug problem?
19     A. At Forest Hills.
20     Q. You're not sure whether he asked
21 for --
22     A. No.
23     Q. -- the ACU to address other issues?
24     A. Yes, no.

## Page 47

1     Q. Now, was that anti-crime unit used to
2 address other issues during school breaks?
3     A. Yes.
4     Q. Was that a problem, as you see it?
5     A. Well, there was a -- we received a
6 grant from Northeastern University, Deputy
7 Ford-Murphy, to do a study on youth-related
8 disorder. So one of the -- at the time,
9 Captain Ford-Murphy had assigned me that grant
10 because she knew I was interested in the
11 youth-related disorder.
12     One of the aspects of the study was
13 to gather intelligence. I always thought if
14 the cops were talking, you talk to the kids,
15 you reduce the anonymity, and you get better
16 intelligence.
17     So they were assigned to collect
18 FIOs, which is just, if you stop a kid for a --
19 I'll use a perfect example, truancy problems.
20 I was always interested in the high truancy
21 rates in the Boston Public Schools. If a kid
22 is wandering around the subway stations, I want
23 to know, is he afraid to go to school? Is he
24 afraid to ride the trains?

## Page 48

1     So officers were assigned to take
2 observation reports to find out why is the kid
3 hanging at the train station for several hours
4 a day.
5     Q. Let me jump in here and ask, that was
6 the kind of thing that the anti-crime unit was
7 used for at Forest Hills?
8     A. Part of it, yes. That was what --
9 when you asked for my instruction, yes, I or
10 Deputy Shaughnessy, who had the old command of
11 them. You know, he might have assigned them
12 another task.
13     Q. What is zero tolerance?
14     A. Zero tolerance is -- zero tolerance
15 against -- you just -- I describe zero
16 tolerance as Friday -- Monday you just come in
17 and say, No more of a particular crime.
18 That's -- you're not -- say, for example,
19 smoking -- or fair evasion.
20     (Court reporter interrupts for
21     clarification, and a short
22     discussion
23     is held off the record.)
24     A. Fair evasion. If the general manager

Page 49

of the T says he wants zero tolerance against fair evasion, that everybody pays their fair, you have to be able to enforce it.

So the question becomes -- you take a zero-tolerance stand toward fair evasion, so you assign officers at the turnstiles and make everybody pay their fares. And if they don't pay their fair and they refuse to leave, it becomes a -- what do you do? It then leads to trespassing arrests.

Q. How did -- or did, perhaps is a better question, the anti-crime unit implement a zero-tolerance policy?

A. The only zero-tolerance policy that I believe they were addressing was on the Commuter Rail. There was a zero-tolerance policy towards trespassing on the railroad tracks. They were assigned to zero tolerance, and they made several hundred arrests for trespassing on the railroad tracks and walking on tracks.

Q. This was the anti-crime unit?
A. Yes.
Q. On the Commuter Rail lines?

Page 50

A. Yes.
Q. Is it your testimony then that you're not aware of any other zero-tolerance initiative by the anti-crime unit on the subways?
A. There was a --
MR. NOTIS: Objection. Go ahead.
A. There was a zero-tolerance policy towards assault of employees.
MR. NOTIS: Sorry, I didn't hear that.
THE WITNESS: On employees.
Q. And you agreed with that policy?
A. Yes. Well, on assaults on employees. I don't agree -- I didn't particularly agree with the zero tolerance for trespassing on the railroad tracks. That was part of Operation Care, which I -- just to explain it, we had had several Commuter Rail deaths.

I had spoken to John DiFava of the Mass State Police at the GO Banquet, which is the Gay Officers Banquet. He lent me his helicopter. I thought that would suffice. Chief O'Loughlin decided to send the anti-crime

Page 51

unit out to arrest people for trespassing on the tracks.
Q. On the Commuter Rail?
A. It was designed for the Commuter Rail, yes.
Q. At some point, did the anti-crime unit begin receiving criticism from different quarters?
A. Yes.
Q. What type of criticism did it receive?
A. They received criticism for making too many arrests and particularly of younger kids.
Q. Arrests on the Commuter Rail?
A. Both, and the subways.
Q. What was the criticisms about making arrests?
A. That the youth were getting arrested for minor offences, quality-of-life offenses.
Q. Were they getting arrested for quality-of-life offenses?
A. Yes.
Q. What was the problem with that?

Page 52

Wasn't that the function of the anti-crime unit?
A. Yes. But it's -- the problem -- the department did not do a good job of explaining its mission of addressing school-related disorder. So if you cannot explain your mission -- I just say we had dueling factions, Northeastern University and Suffolk University.

And the Northeastern studies, which the MBTA never released for whatever their reasons were, were to address school-related disorder and to explain the problems we had and how we were losing ridership at certain hours of the day.

Whereas, Suffolk University had what I believe were distorted figures and facts to say that the MBTA police were overreaching or overstepping their commitment to the, say, for example, the quality-of-life issues.

Q. Where was the criticism coming from?
A. The media.
Q. Was there criticism that was coming from within the police department?
A. Yes.

**Page 61**

1 appointed a commission to study and determine
2 whether the MBTA was engaged in racial
3 profiling?
4     A. The Secretary did -- took two
5 actions.
6     Q. No. I want to focus on that one.
7     MR. NOTIS: Let him finish his
8 answer.
9     A. No, he appointed Judge Pierce,
10 Rudolph Pierce, to review the allegations of
11 profiling. He also -- general manager Bob
12 Prince, to my understanding, appointed a task
13 force to review not only the profiling but the
14 zero-tolerance, quality-of-life tactics of the
15 MBTA police. I'm not trying to be -- just,
16 there was just two different things. But he
17 appointed Judge Pierce to do a study.
18     Q. And there was a commission?
19     A. The task force, yes.
20     Q. A task force on combatting racial
21 profiling, correct?
22     A. Yes.
23     Q. Both of those --
24     MR. EDWARDS: Could we go off?

**Page 62**

1     (Discussion off the record.
2     Short recess taken.)
3     Q. Lieutenant, were there criticisms
4 that the an ACU was making unnecessary arrests?
5     A. Yes.
6     Q. Were there complaints that the ACU
7 was exercising its power in a racist manner?
8     A. There were complaints that the whole
9 police department did.
10     Q. I'm specifically talking --
11     A. Yes.
12     Q. -- about the ACU.
13     A. Yes, certain members of the ACU, I
14 believe.
15     Q. What members?
16     A. Whoever was sued in those lawsuits.
17 I'm not sure which ones they were.
18     Q. Sued in what lawsuits?
19     A. There were several lawsuits brought
20 forth by young people who were arrested.
21     Q. Was Nancy O'Loughlin accused of being
22 a racist?
23     MR. NOTIS: Objection. You can
24 answer.

**Page 63**

1     A. I don't know if she was ever accused
2 of being a racist. But I think she was accused
3 of arresting young kids, racial profiling.
4     Q. Okay. Were there any criticisms of
5 the ACU from within the command staff? And I'm
6 talking specifically about the period of time
7 when there was media criticism and parent
8 criticism.
9     MR. NOTIS: You know, again,
10 obviously, your questions, Mr. Edwards. But
11 just so we don't get confused, if we can figure
12 out who was on the command staff during the
13 period of criticism. Because it changed.
14     A. Superintendent Thomas Komoli; Deputy
15 Chief Nadine Taylor-Miller; Deputy Chief
16 McCall; Deputy Chief John Mahoney, who replaced
17 Peter Shaughnessy; and Deputy Chief William
18 Fleming.
19     MR. NOTIS: I'm sorry. Were on the
20 command staff, or were critical of the ACU?
21     MR. EDWARDS: They were on the
22 command staff.
23     MR. NOTIS: Okay, fine. Thank you,
24 sir.

**Page 64**

1     Q. What time period were these people on
2 the command staff?
3     A. I'd say Peter was there for the first
4 two or three years of the administration. And
5 then he retired and was replaced by John
6 Mahoney.
7     Q. What time period was it when the
8 complaints we are -- we have been discussing
9 began?
10     A. I think I was probably the first to
11 complain. I can only tell you that.
12     Q. Who was?
13     A. I was.
14     Q. What did you complain about?
15     A. There were certain kids I didn't
16 think should be arrested.
17     Q. To whom did you complain?
18     A. I released the kids.
19     Q. But to whom did you make your
20 complaint?
21     A. At that time, I just told every -- I
22 just think the kids shouldn't be arrested for a
23 certain offenses, and I released them. Every
24 officer, including the anti-crime officers.

**Page 65**

1  Q. I'm sorry?
2  A. The anti-crime officers.
3  Q. You said that to the anti-crime
4  officers?
5  A. And the other officers who were
6  working there.
7  Q. You said it to Nancy O'Loughlin?
8  A. Yes.
9  Q. What did she respond?
10  A. That she was fine.
11  Q. There was, obviously, a difference of
12  opinion?
13  A. Um, well, actually, it started out
14  she came to me and wanted to -- she had said
15  that one of the kids had been booked
16  inadvertently, and it was a 12-year-old kid
17  whose father happened to be a Boston Police
18  officer. I said, Well, release all of them or
19  none of them. The age didn't mean anything to
20  me. You know, what did you arrest them for?
21      Then I received a call later. I went
22  down and spoke to the parents. The rules and
23  regulations, you know -- the least, you know,
24  method was that. And I talked to the parents.

**Page 66**

1  And they were arrested for walking on tracks at
2  Roslindale Village. And I heard the word
3  "Roslindale Village."
4      Since I pride myself on being more
5  familiar with the T than anybody else, I knew
6  that the T had placed planks across the tracks
7  to cross. So I couldn't understand why they
8  were arrested. But that's, you know, it was --
9  I spoke to the parents, and I released them.
10  Q. And Roslindale Village is on a
11  Commuter Rail?
12  A. Yes.
13  Q. Did anybody else on the command
14  staff -- and we're talking specifically about
15  the superintendent and the deputy chiefs --
16  have criticism about the way the ACU was
17  functioning?
18  A. Deputy Chief Anne McCall.
19  Q. What was her criticism?
20  A. It was just that we were taking such
21  a barrage in the media that I think Anne felt
22  that there was no choice, that the unit had to
23  be abolished for the good of everybody.
24  Q. She said that to you?

**Page 67**

1  A. Yes. Well, that she had come to me,
2  and we discussed it.
3  Q. Did you agree with her?
4  A. Yes. At that time, yes.
5  Q. So this thing got to be a big media
6  topic of discussion?
7  A. Yes.
8  Q. Or topic of the media?
9  A. That along with -- the whole MBTA
10  Police and the, you know, the MBTA Police
11  became the story.
12  Q. Did the unions criticize the ACU?
13  A. Yes.
14  Q. And what was the union's criticism,
15  generally?
16  A. The union's criticism was that they
17  had been -- that Chief O'Loughlin had mandated
18  that quality-of-life issues had to be enforced
19  and that they had -- a union official testified
20  that he didn't know where these quality-of-life
21  issues came from and, you know, we -- and
22  everything else, which I found interesting.
23  Because if you read Fixing Broken Windows, you
24  see that George Kelling was a consultant to the

**Page 68**

1  police union. And that's where he came up with
2  most of the these ideas.
3  Q. Did you suggest to this officer that
4  he should read Fixing Broken Windows?
5  A. I distributed in a memo to all
6  officers with the attachment of Chapter 6 that
7  said he used to work for the union and that I
8  don't agree with all his theories, but if you
9  have any -- when he does this research, if the
10  union has any research or anybody has any
11  research, to please give it to me.
12  Q. Were there other superior officers
13  that you know of who criticized the anti-crime
14  unit?
15  A. There were superior officers who
16  criticized and applauded them, both.
17  Q. What officers criticized?
18  A. I'm just trying to do this by memory.
19  Criticized to me? I can only speak to people
20  who criticized to me.
21  Q. Uh-huh.
22  A. Um, I remember Detective Peter
23  Pasicucco came to me.
24  Q. What was his complaint?

**Page 117**

1  I didn't know whether the interim chief's
2  position was going to last a week.
3      You know, I didn't know -- there was
4  no time frame. So I invited him, and I told
5  him, You might as well come and meet the
6  people. Because he had known Nadine
7  Taylor-Miller.
8      Q. Did you discuss the selection of
9  Chief Carter as chief with Nancy O'Loughlin?
10     A. I -- Jesus, I have no idea. I
11 probably did. Did I discuss the selection or
12 that Chief Carter was selected?
13     Q. No, discuss it.
14     A. No, I probably discussed it with a
15 bunch of people.
16     Q. Chief Carter is African-American?
17     A. Yes.
18     Q. Did you hear anyone say or hear of
19 anyone saying that he was selected for the
20 position because of his race?
21     A. Yes.
22     Q. Who?
23     A. People outside of the department
24 mostly.

**Page 118**

1      Q. Okay. Like whom?
2      A. I don't remember off-hand. People
3  would say -- people would just say that you
4  deserved the job, and he got it because of his
5  race. My recommendation was that Lieutenant
6  Herman Wheelor should have -- my position was
7  that's who I recommended. He happened to be
8  African-American.
9      Q. Did anybody there --
10     A. I thought it was time for a change,
11 too.
12     Q. In terms of what?
13     A. I thought that they should put an
14 African-American in charge.
15     Q. Why?
16     A. Because of the problems we had had.
17 That was my recommendation. I said that to
18 Billy Mitchell. It's time for change. I said
19 to Billy, I don't want the position. I said
20 Billy --
21     Q. Why did you apply?
22     MR. NOTIS: Let him finish.
23     MR. EDWARDS: I apologize.
24     A. Because of the process. If I didn't

**Page 119**

1  apply, it would look sour grapes, sour this,
2  sour that.
3      Q. Okay. Did you hear anyone within the
4  department say that Chief Carter was selected
5  because of his race?
6      A. Joe, I'm sure I did, but I didn't --
7  as I go back to you, my recommendation was for
8  Herman Miller.
9      Q. Did you hear anybody within the
10 department say that Chief Carter wasn't
11 qualified to be chief of the MBTA?
12     A. I never -- I never heard anything
13 about qualifications. His qualifications speak
14 for themselves.
15     Q. So you never heard anything about
16 that?
17     A. With all the stories and everything
18 else, I had so many stories spread about me,
19 that, to tell you the truth, any one that was
20 spread about the chief, I could top.
21     Q. Okay. Now, at some point, you had to
22 gather and prepare transition materials for
23 Chief Carter?
24     A. Yes.

**Page 120**

1      Q. That was something you undertook on
2  your own?
3      A. No. I was assisted. No, they --
4  actually, the chief -- the chief sent me a
5  draft of a memo saying he wanted all this
6  transition material.
7      Q. Okay.
8      A. People -- I instructed people to
9  gather the transition material. Captain
10 Ford-Murphy at the time was very assistant.
11 She gave me a copy of all of the transitional
12 material, and said, You should read it.
13     I made one mistake in that I don't
14 think the chief requested from lieutenants -- I
15 didn't make the mistake. Patty Guliano, who
16 was typing up the memo, put lieutenants on it.
17 So when lieutenants all submitted their
18 transitional material, it was -- I included it
19 all. Because that's, you know, because they
20 had submitted it.
21     Q. You're saying he had not asked for
22 that?
23     A. The first time he met, before he even
24 looked, he said, I didn't request from

## Page 121

 1  lieutenants. I said, Yes, that's right, but
 2  it's included anyways.
 3      Q. I want to show you...
 4          (Exhibit No. 2 marked for
 5          identification.)
 6      Q. Is that a document that you
 7  recognize, Lieutenant?
 8      A. Yes.
 9      Q. What is that, please?
10      A. That's the briefing summary. This is
11  mine that I sent to the chief of police.
12      Q. I want to direct your attention to
13  the second page. There is a heading, Morale
14  issues?
15      A. Yes.
16      Q. And you write, Morale issues arise in
17  rumors, innuendos, and lies that are spread by
18  a small minority of officers that have
19  undermined command staff at the MBTA Police.
20      A. Yes.
21      Q. What was that about?
22      A. Well, I'll give you a couple of
23  examples, Joe. I was accused along with the --
24  God, I don't know even whether it was Walter

## Page 122

 1  Prince or Billy Mitchell -- I was accused of
 2  covering up a murder at Ashmont Station that
 3  has gone on for years.
 4          I conducted an investigation into an
 5  incident that they said that I covered up -- I
 6  don't know how I covered it up; I was a
 7  patrolman at the time -- but there was an
 8  incident at Ashmont where a young man was
 9  struck by a train with an altercation with two
10  other people.
11          But there were innuendos, papers
12  drawn, investigations on the side, that I had
13  covered up a murder and a homicide
14  investigation, along with the legal department
15  of the MBTA. That even continued on to this
16  term here, where Nancy O'Loughlin approached me
17  and told me that Sergeant Gillespie was going
18  after Judge Buckley in Quincy, who covered up
19  the murder in Ashmont.
20          It was -- that's one example. There
21  was no cover-up of murder by the legal
22  department, by me, or otherwise. And the
23  reason I mention that is because an officer was
24  disciplined this year for threatening my family

## Page 123

 1  around that case.
 2      Q. Okay.
 3      A. He received a written reprimand. I
 4  was never told the outcome, but someone sent me
 5  a copy of it. Another example was Bob Prince,
 6  who is one the most decent people I know in the
 7  world.
 8          Sergeant Gillespie came to me and
 9  accused the general manager of doing -- this
10  is -- to put this on the thing is wrong, but
11  having sex with an MBTA Police Department
12  employee in exchange for getting her
13  drug-dependent niece back on the job and that
14  all the drug testing was fixed on the MBTA.
15          He interfered with an investigation
16  that the major case unit was doing. He made
17  all sorts of wild allegations. And that went
18  to court in Dorchester. Several families'
19  lives were wrecked because of unfounded
20  allegations.
21          There is just two examples that I
22  have been involved in. I was accused of
23  covering up murders, covering up -- the MBTA
24  was accused of covering up drug testing, fixing

## Page 124

 1  drug tests. Several employees were named in a
 2  public document, which was wrong. And Nancy
 3  O'Loughlin knows that.
 4          Judge Buckley -- among them, Judge
 5  Buckley, Gerry Leone, and others. It was these
 6  absurd allegations that led to several problems
 7  in the police department. Bob Prince's name,
 8  for example.
 9      Q. So the small minority of officers
10  includes Mark Gillespie?
11      A. Clearly.
12      Q. Okay. And when was it that he made
13  wild allegations?
14      A. This -- he did not start the Ashmont
15  homicide cover-up investigation. He interfered
16  with it when I did it by telling the officer
17  who brought it forward that we are going to use
18  Dr. Guy Seymour to fire him, which was never
19  true.
20          And then later, Dr. Guy Seymour, who
21  was a very good man, was -- he had what I fear
22  was -- definitely a complaint filed against him
23  and his practice, which cost him several
24  thousand dollars.

### Page 133

1  Q. It's dated January 17, 2003?
2  A. Yes.
3  Q. And Bates Stamp No. 197 through 200.
4  I just want to direct your attention to two
5  places on this document. The second page at
6  the bottom you write about -- well, let me back
7  up. On the front page, the second paragraph,
8  MBTA Police Racial Profiling Task Force
9  Recommendation. Do you see that?
10 A. Yes.
11 Q. You write that, To meet the goals
12 established by the task force, several
13 positions ranging from police legal advisor to
14 civilian community services liaison have to be
15 appointed, and several training initiatives
16 must take place. And you talk about funds
17 having to be allocated. If I'm not mistaken,
18 you've already testified that you agreed with
19 the recommendations of the task force?
20 A. Yes.
21 Q. And you repeated on the second page,
22 under Key Issues, adopting the recommendations
23 of the task force on racial profiling?
24 A. Yes.

### Page 134

1  Q. On the third page, Bates Stamp 199,
2  School-related Disorders, you write, The MBTA
3  police must provide a number of alternatives to
4  the arrest of juveniles for minor offenses and
5  will make clear an unequivocal statement that
6  there is no zero-tolerance policy at the MBTA.
7  A. Yes. That was my position, formed
8  when I was the interim chief.
9  Q. This is not referring to zero
10 tolerance on the Commuter Rail line?
11 A. There was no zero-tolerance policy at
12 the MBTA.
13 Q. That's the MBTA Police?
14 A. Right.
15 Q. Across the board?
16 A. Across the board, right.
17 Q. There had been a perception that
18 there was a zero-tolerance policy?
19 A. Yes.
20 Q. Okay. That's what I wanted to ask
21 you about.
22     (Exhibit No. 4 marked for
23      identification.)
24 Q. Lieutenant, this document, Bates

### Page 135

1  Stamp No. 467, appears to be a memorandum
2  written by Captain Martino?
3  A. Yes.
4  Q. Is this something he submitted in
5  response to Chief Carter's request for --
6  A. Yes.
7  Q. -- transition materials? I just
8  wanted to direct your attention to the second
9  page of this document under Morale Issues.
10      The major morale issue facing the
11 patrol force and, in fact, the entire
12 department is the fact that the members of this
13 department have been publicly labeled as rogues
14 or racial profilers for carrying out policies
15 put in place by the previous administration.
16 Do you agree with that statement, personally?
17 A. Well, I -- I think my question was a
18 little different. But John Martino is -- that
19 was a problem. I don't know if it was a major
20 problem, but that was the problem. That was a
21 problem.
22 Q. To him or?
23 A. No, to -- I agree, with several
24 officers, yes, that we were labeled as racists

### Page 136

1  and rogues, yes.
2  Q. He continues. Most of the complaints
3  arose as a result of the aggressiveness of the
4  anti-crime unit and a vast majority of issues
5  raised in the various reports related to
6  actions that were in violation of the
7  department manual as issued in 1991 and would
8  not have occurred if the manual had been
9  followed. Is that a statement that you agree
10 with?
11 A. No. Most of the complaints were
12 not -- in my review of the Judge Pierce report
13 of complaints, I don't think the vast majority
14 of them were against the anti-crime unit. The
15 vast majority of them were against patrol
16 officers.
17 Q. Okay. What about the statement about
18 the department manual? Would these have
19 occurred if the department manual, as it
20 existed in 1991, had been followed? Do you
21 agree with that statement?
22 A. I think that many of the issues that
23 existed then exist today.
24 Q. The next page -- and I understand, I

## Page 161

A. And Deputy Chief Peter Shaughnessy and Deputy Chief Nadine Taylor-Miller.

Q. Am I to understand, then, that he was opposed to the command staff and not to the ACU?

A. He was opposed to -- he was very bitter when he was replaced as deputy chief. So it's fair to say that he -- he clearly resented certain members, certain -- the command staff. And he did not, I don't think, appreciate the fact that he had to report to either Lieutenant Wheelor or Nadine Taylor-Miller.

Q. Why? Because he had been replaced?

A. Yes.

Q. Do you think he resented reporting to her because she was a woman?

A. No. He would have resented reporting to her no matter.

Q. Do you think he resented Nancy O'Loughlin? Or let me ask the question this way. Why did he say he resented Nancy O'Loughlin, or he was opposed to Nancy O'Loughlin, I think was the more accurate

## Page 162

phrase.

A. Because I think he perceived that Chief O'Loughlin and the friends of Bill, you know, had replaced him. I didn't take his job.

Q. In a position of power and authority --

A. Yes.

Q. -- in the police department? Did you have any indication, or did you have any reason to believe that deputy -- I mean, Lieutenant McCarthy may have opposed or resented Nancy O'Loughlin because of her gender?

A. No.

Q. Now, a couple of times I've come across documents, and I'll show them to you. We've discussed a cancer in the police department. And I'll show you.

MR. EDWARDS: Mark that.

(Exhibit No. 12 marked for identification.)

Q. Is that a document you authored?

A. Yes.

Q. What is that, please?

A. That was a document to Joe Pesatauro.

## Page 163

Q. This is dated January 13, 2003, from Deputy Chief Fleming to Joe Pesatauro?

A. Yes.

Q. Could you please inform the general manager that the cancer that exists in the police department still continues? They have tried to destroy my reputation, and now they're attacking the incoming chief of police. See attached. I don't have an attachment. Do you recall what was attached?

A. I'm just doing this by memory. I believe I attached the report that I talked about where the -- I was accused of sabotaging Chief Carter's interim. And that also -- there might have -- I think I -- I don't believe I attached it.

But there was -- I don't know whether there was a posting with some kind of sexual connotation. It was either addressed about me or the chief. I -- there was -- there was -- it had some kind of sexual connotation to it.

Q. Did Chief Carter ask you what the cancer in the department was?

A. We talked about it. I talked -- told

## Page 164

him it's not -- Go speak to John O'Donovan, Joe Saccardo. Talk to people who were in command positions that -- Tom Mahoney, who the chief had worked with -- that worked there. Form his own opinions.

Q. I mean, but did you --

A. That's how I phrased it.

Q. Did you identify, for instance, Mark Gillespie as being --

A. No, I did not address any officers. I told him to -- I said, Chief, I think, you know, I'm not going to -- please go talk to these outside people.

Q. Did he ask you who any of the officers were?

A. I believe he did.

Q. You said, I'm just not going to tell --

A. No, I didn't phrase it like that, Joe. I said, Chief, with all due respect, something to the effect. Go talk to these people. They believe that John O'Donovan's reputation was harmed. Joe Saccardo's reputation was harmed. And go talk to them.

**Page 165**

1  He knew most of these gentlemen. So I said, Go
2  talk to them; form your own opinion. Talk to
3  Bob Prince, Mike Mulhern.
4      Q. Did the chief ever indicate to you
5  that he spoke with those people?
6      A. No.
7      Q. Did he ever indicate in any way that
8  he understood what the cancer in the department
9  was, or who the cancers in the department were?
10     A. I -- it's -- I apologize. The word
11 "cancer" takes a different meaning when you
12 have cancer, obviously. He -- I just told him
13 to go talk to the other people.
14     Q. Now, when Chief Carter came aboard,
15 you were no longer interim chief?
16     A. Correct.
17     Q. What position did you hold?
18     A. Deputy chief of investigations.
19     Q. You resumed the role you had --
20     A. Yes.
21     Q. -- prior to becoming interim chief?
22 Did Chief Carter replace any deputies upon
23 assuming --
24     A. No.

**Page 166**

1      Q. We may have answered this earlier,
2  but was that unusual for him not to replace
3  deputies?
4      A. The previous -- well, I'm trying to
5  do it off the top of my head. The previous
6  chief, obviously, appointed within the
7  department. John O'Donovan, when he first came
8  in, brought John O'Loughlin out of retirement.
9  We also had Jimmy Marshall and Bob Cochran.
10         And then he brought on board John
11 Martino. Tom McCarthy brought in Joe Saccardo
12 and Roger Ford from the State Police. Before
13 that, Thomas Maloney, I think he only had one
14 deputy chief.
15         And Bill Bratton brought in Al
16 Sweeney as his second in command. The previous
17 chief's -- you know, when the department first
18 started, there were two retired FBI agents who
19 were the chiefs. So I'm not sure exactly how,
20 you know...
21     Q. Okay. Did Chief Carter talk to you
22 and, to the best of your knowledge, to other
23 deputy chiefs about whether your positions were
24 secure or not secure?

**Page 167**

1      A. I only remember one staff meeting
2  when he said that we were the deputies. These
3  were his deputy chiefs and stuff.
4      Q. Okay. Do you recall whether you felt
5  secure as his deputy chief going forward?
6      A. No. I think we talked about this
7  before. I said I couldn't protect my job; I
8  couldn't protect somebody else's job. I had
9  actually, at this point, I had requested to
10 be -- I had asked higher-ups on the T to just,
11 if I could be transferred out of the
12 department.
13     Q. Out of the police department?
14     A. Yes.
15     Q. Why?
16     A. I was exhausted.
17     Q. When was this?
18     A. This was when the chief came.
19     Q. Okay. And you were told no?
20     A. That was -- that was, you know, I
21 wasn't told anything. I just made the request.
22     Q. A written request?
23     A. I don't believe -- I have made that
24 request in the past, but the -- I have, but

**Page 168**

1  that was later on. I did it by a phone call.
2  I talked to Billy Mitchell, and I believe I
3  talked to Michael.
4      Q. Bill Mitchell is general counsel?
5      A. Yes.
6      Q. Michael Mulhern?
7      A. Yes.
8      Q. Did Chief Carter discuss his vision
9  for the police department with you?
10     A. Yeah. I believe different times we
11 discussed the, you know, plan of action.
12     Q. Did you have any input into the plan
13 of action?
14     A. Yes, but not as -- I would probably
15 think that Thomas McCarthy -- the chief had
16 some groups. But there was -- there is --
17 there is quotes taken out of the plan of action
18 that could directly be to attributed to me. I
19 did not have a major role in the plan of
20 action. I believe that was the chief of
21 police, and I think Bob Wasserman.
22     Q. Bob Wasserman was a consultant?
23     A. Yes.
24     Q. Did you understand that the chief

Page 165

1 He knew most of these gentlemen. So I said, Go
2 talk to them; form your own opinion. Talk to
3 Bob Prince, Mike Mulhern.
4     Q. Did the chief ever indicate to you
5 that he spoke with those people?
6     A. No.
7     Q. Did he ever indicate in any way that
8 he understood what the cancer in the department
9 was, or who the cancers in the department were?
10     A. I -- it's -- I apologize. The word
11 "cancer" takes a different meaning when you
12 have cancer, obviously. He -- I just told him
13 to go talk to the other people.
14     Q. Now, when Chief Carter came aboard,
15 you were no longer interim chief?
16     A. Correct.
17     Q. What position did you hold?
18     A. Deputy chief of investigations.
19     Q. You resumed the role you had --
20     A. Yes.
21     Q. -- prior to becoming interim chief?
22 Did Chief Carter replace any deputies upon
23 assuming --
24     A. No.

Page 166

1     Q. We may have answered this earlier,
2 but was that unusual for him not to replace
3 deputies?
4     A. The previous -- well, I'm trying to
5 do it off the top of my head. The previous
6 chief, obviously, appointed within the
7 department. John O'Donovan, when he first came
8 in, brought John O'Loughlin out of retirement.
9 We also had Jimmy Marshall and Bob Cochran.
10     And then he brought on board John
11 Martino. Tom McCarthy brought in Joe Saccardo
12 and Roger Ford from the State Police. Before
13 that, Thomas Maloney, I think he only had one
14 deputy chief.
15     And Bill Bratton brought in Al
16 Sweeney as his second in command. The previous
17 chief's -- you know, when the department first
18 started, there were two retired FBI agents who
19 were the chiefs. So I'm not sure exactly how,
20 you know...
21     Q. Okay. Did Chief Carter talk to you
22 and, to the best of your knowledge, to other
23 deputy chiefs about whether your positions were
24 secure or not secure?

Page 167

1     A. I only remember one staff meeting
2 when he said that we were the deputies. These
3 were his deputy chiefs and stuff.
4     Q. Okay. Do you recall whether you felt
5 secure as his deputy chief going forward?
6     A. No. I think we talked about this
7 before. I said I couldn't protect my job; I
8 couldn't protect somebody else's job. I had
9 actually, at this point, I had requested to
10 be -- I had asked higher-ups on the T to just,
11 if I could be transferred out of the
12 department.
13     Q. Out of the police department?
14     A. Yes.
15     Q. Why?
16     A. I was exhausted.
17     Q. When was this?
18     A. This was when the chief came.
19     Q. Okay. And you were told no?
20     A. That was -- that was, you know, I
21 wasn't told anything. I just made the request.
22     Q. A written request?
23     A. I don't believe -- I have made that
24 request in the past, but the -- I have, but

Page 168

1 that was later on. I did it by a phone call.
2 I talked to Billy Mitchell, and I believe I
3 talked to Michael.
4     Q. Bill Mitchell is general counsel?
5     A. Yes.
6     Q. Michael Mulhern?
7     A. Yes.
8     Q. Did Chief Carter discuss his vision
9 for the police department with you?
10     A. Yeah. I believe different times we
11 discussed the, you know, plan of action.
12     Q. Did you have any input into the plan
13 of action?
14     A. Yes, but not as -- I would probably
15 think that Thomas McCarthy -- the chief had
16 some groups. But there was -- there is --
17 there is quotes taken out of the plan of action
18 that could directly be to attributed to me. I
19 did not have a major role in the plan of
20 action. I believe that was the chief of
21 police, and I think Bob Wasserman.
22     Q. Bob Wasserman was a consultant?
23     A. Yes.
24     Q. Did you understand that the chief

**169**

1 brought in focus groups or had focus groups?
2     A. Yes, I just said that, yes.
3     Q. That he distributed questionnaires?
4     A. Yes.
5     Q. That he tried to -- let me ask the
6 whole question. Was it your understanding that
7 he tried to gather information from many
8 different places --
9     A. Yes.
10     Q. -- to formulate the plan of action?
11     A. Yes.
12     Q. And what was the plan of action, as
13 you understand it?
14     A. Well, the plan of action, the main
15 focus of it was that, as you review the
16 transitional material there, everybody thought
17 that the patrol plan should be revamped. So it
18 was divided up into sectors called TPSAs or
19 service districts, the five districts.
20     Q. Do you agree with the creation of
21 TPSAs?
22     A. Yes.
23     (Exhibit No. 13 marked for
24     identification.)

**170**

1     Q. Do you recognize -- I gave you two
2 separate documents, Lieutenant. They're
3 actually marked together. Do you recognize
4 those two documents?
5     A. Yes.
6     Q. And what are they, please?
7     A. The plan of action and a memo.
8     Q. Do you recall whether the chief spoke
9 with the entire staff about his plan of action?
10     A. I think the chief talked to everybody
11 about certain -- I -- he talked to a number of
12 people.
13     Q. Well, I mean, in terms of announcing
14 it and letting people know --
15     A. Yes.
16     Q. -- that it was available?
17     A. You asked me if I agreed with the
18 plan of action. Yes, I did. The other caveat
19 was the hundred-day plan. And that's what I
20 didn't -- I couldn't -- it was impossible to do
21 within a hundred days. That's the part I
22 disagreed with.
23     Q. It was impossible to do what, put
24 together the plan?

**171**

1     A. Put together a plan of action and
2 implement it.
3     Q. So it took a little longer than a
4 hundred days?
5     A. I was impossible because of the --
6 you couldn't do the infrastructure, and that's
7 what I believed held up the implementation of
8 the plan, was the infrastructure. I had
9 attempted to revamp the Quincy substation for
10 the vandal squad, and I was not having any luck
11 getting money. So I just -- I told the chief,
12 There is no way you can do this in a hundred
13 days. Because that isn't how the T works.
14     Q. The front page of the actual plan of
15 action, the memo is No. 372, dated June 4,
16 2003.
17     A. Yes.
18     Q. The actual plan of action begins on
19 Page 373, and it's dated June 2003. Do you see
20 that, at the bottom of the page?
21     A. The date June 2003, June 4, 2003; is
22 that the one we're looking at?
23     Q. Yes. Well, the actual plan of action
24 is dated June 2003.

**172**

1     A. Yes.
2     Q. Thank you. Now, on page -- it's
3 actually the page just like Page 1 of the plan.
4 There's several pages that aren't numbered, and
5 then Page 1, Bates No. 378. The second
6 paragraph, second sentence, the paragraph
7 begins, Since beginning. Do you see that?
8     A. Yes.
9     Q. The second sentence, Earlier in
10 April, a strategic issues retreat was held
11 bringing together the senior MBTA management,
12 police employee leaders, state and local
13 officials, as well as various constituencies
14 throughout the Boston community. Do you
15 remember this retreat?
16     A. I -- if this -- if this was the
17 meeting at Northeastern University, I was
18 there.
19     Q. Okay. It took place in April of
20 2003?
21     A. I -- I was at the meeting in
22 Northeastern University. I don't know if that
23 is the strategic retreat you're talking about,
24 but there was a meeting in Northeastern, an