# Exhibit 9

**Page 1**

```
                    VOL. III
                    Pp. 1 - 273
                    Exhibits 15 - 23

            UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS

                 C.A. NO. 04-10933 JLT

* * * * * * * * * * * * * * * * *

NANCY O'LOUGHLIN,

     Plaintiff

VS.

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY, JOSEPH CARTER, AND
MICHAEL MULHERN,

     Defendants

* * * * * * * * * * * * * * * *
```

Continued Deposition of WILLIAM FLEMING, a witness called by counsel for the Defendants, Massachusetts Bay Transportation Authority and Joseph Carter, pursuant to the applicable rules, before Lorreen Hollingsworth, CSR/RPR, CSR NO. 114793, and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Prince, Lobel, Glovsky & Tye, LLP, 585 Commercial Street, Boston, Massachusetts, on Tuesday, April 4, 2006, at 10:20 a.m.

**Page 2**

APPEARANCES:

MITCHELL J. NOTIS, ESQUIRE
  370 Washington Street
  Brookline, Massachusetts 02445
  On behalf of the Plaintiff,
  Nancy O'Loughlin

JOSEPH L. EDWARDS, ESQUIRE
  Prince, Lobel, Glovsky & Tye, LLP
  585 Commercial Street
  Boston, Massachusetts 02109
  On behalf of the Defendants,
  Massachusetts Bay Transportation Authority and
  Joseph Carter

GREGORY M. REISER, ESQUIRE
  Wilmer Cutler Pickering Hale and Dorr LLP
  60 State Street
  Boston, Massachusetts 02109
  On behalf of the Defendant,
  Michael Mulhern

**Page 3**

INDEX

| Deposition of: | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| WILLIAM FLEMING | | | |
| (by Mr. Edwards) | 4 | | 186 |
| (by Mr. Notis) | | 109 | |

EXHIBITS

| No. | | For Ident. |
|---|---|---|
| 15 | The two-page document from the Guardroom website, Bates M174 and M175 | 17 |
| 16 | The memo dated 7/3/02 to Frank Oglesby from Thomas O'Loughlin, Bates M340 and M341 | 23 |
| 17 | The memo dated 9/19/02 to distribution from William Fleming, Bates No. M5 | 27 |
| 18 | The memo to file from Mark Gillespie, Bates M343 through M345 | 27 |
| 19 | The memo dated 3/3/03 to William Fleming from Mark Gillespie, Bates M3469 | 31 |
| 20 | The letter dated 9/16/04 to William Fleming from Joseph Carter | 55 |
| 21 | The letter dated 4/16/04 to William Fleming from Joseph Carter | 258 |
| 22 | The letter dated 9/19/04 to William Fleming from Joseph Carter | 261 |
| 23 | The memo dated 12/8/03, Bates 465 through 467 | 261 |

**Page 4**

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the deposition will be read and signed by the witness, under the pains and penalties of perjury, and that the sealing, filing, and notarization of the deposition are waived.

It is further stipulated and agreed that all objections, except as to form, and motions to strike are reserved until the time of trial.

WILLIAM FLEMING, a witness called on behalf of the Defendants, Massachusetts Bay Transportation Authority and Joseph Carter, having first been duly sworn, deposes and says as follows:

CONTINUED DIRECT EXAMINATION
BY MR. EDWARDS

Q  Good morning, Lieutenant.
A  Good morning, Joe.
Q  You were already back in your position the last deposition?

Page 5

1  A  Yes.
2  Q  Actually, I don't want to rehash what we've
3     already talked about, but there's going to
4     be some overlap, so I'm going to ask you to
5     bear with me right from the beginning.
6         One of the things I do want to
7     go back to briefly is the discussion we had
8     about the time when you were interim chief.
9     That was from the time Tom O'Loughlin left
10    in about August 2002 until January 2003
11    when Chief Carter came on, right?
12 A  Correct.
13 Q  In terms of the role you saw for Nancy
14    O'Loughlin, do you remember we discussed
15    Tom O'Loughlin having put her in charge of
16    detectives and doing graffiti
17    investigations?
18 A  She was not put in detectives.
19 Q  I'm sorry?
20 A  She wasn't put in charge of detectives.
21 Q  She wasn't day shift detective?
22 A  I would have been in charge of detectives.
23 Q  But you were interim chief?
24 A  Not at the time he put her in.

Page 6

1  Q  Okay. Let me show you the order, if I can
2     get my hands on it.
3         You were deputy chief --
4  A  Yes.
5  Q  -- at the time Tom O'Loughlin left?
6  A  Yes.
7  Q  And one of your responsibilities was
8     investigative services?
9  A  I was in charge of investigative services,
10    correct.
11 Q  Who was in charge of the day-to-day
12    detectives --
13 A  I was.
14 Q  -- if you recall? All right. Nancy
15    O'Loughlin worked for you?
16 A  Yes.
17 Q  I have to make sure I have the right order.
18    There are several. Here it is. I'm going
19    to show you what we marked as Exhibit 2,
20    and that's the order assigning Nancy
21    O'Loughlin to the detective unit.
22 A  It's an order assigning civil officers to
23    different -- but Nancy O'Loughlin is one of
24    them, yes.

Page 7

1  Q  And to what position is she being assigned?
2  A  Day shift.
3  Q  Day shift what?
4  A  Commander.
5  Q  Of what?
6  A  It would be of the detective unit.
7  Q  That's the position I'm talking about.
8  A  Okay.
9  Q  Okay. She's also supposed to do graffiti?
10 A  Correct.
11 Q  That was per Tom O'Loughlin's command?
12 A  Yes.
13 Q  Or order, rather.
14 A  Yes.
15 Q  I understood you to have testified that
16    when you became interim chief, you had
17    another vision for what Nancy O'Loughlin
18    was to do, is that correct?
19 A  That's correct.
20 Q  And that vision involved her conducting
21    investigations with a vandal squad, right?
22 A  It was the creation of a vandal squad,
23    right.
24 Q  And she was going to --

Page 8

1  A  Yes.
2  Q  -- command a vandal squad, okay?
3  A  Correct.
4  Q  Instead of being commander of the day shift
5     on detectives or in addition to?
6  A  If the vandal squad had come into effect, I
7     probably would have moved her and moved
8     somebody else into that position.
9  Q  I guess that's my question. And maybe I
10    phrased it improperly.
11        But your vision was to -- for
12    her to do vandal investigations --
13 A  Yes.
14 Q  -- on the Commuter Rail?
15 A  No, it would be the whole -- plus Commuter
16    Rail crime, but it would also -- the vandal
17    squad would encompass the whole system.
18        It could be buses; it could be
19    train yards; it could be office facilities.
20    But we have a serious graffiti problem. We
21    have it to this day.
22 Q  But at any rate, that was your vision?
23 A  Yes.
24 Q  And you were going to create or build out

Page 17

1  what?
2  A  That was probably a year or two previous to
3     him leaving.
4  Q  Before Chief --
5  A  Yes.
6  Q  -- Chief O'Loughlin left the police
7     department? (Handing.)
8  A  This is not the web page I'm talking about.
9  Q  Okay. But have you seen this?
10 A  Yes.
11        MR. EDWARDS: Can we get that
12     marked, please.
13 A  Yes, I made this web page on several
14    occasions with my wife.
15        (Exhibit No. 15, The two-page
16        document from the Guardroom
17        website, Bates M174 and M175,
18        was marked for
19        identification.)
20 Q  Now, this is a copy of something that
21    appeared on a website?
22 A  One website, yes, the Guardroom website.
23 Q  And this has derogatory statements about
24    several people, correct?

Page 18

1  A  Correct.
2  Q  You being one of them?
3  A  Yes.
4  Q  Chief O'Loughlin?
5  A  Yes.
6  Q  Lisa Riccobene?
7  A  Yes.
8  Q  Lieutenant O'Loughlin?
9  A  Yes.
10 Q  Chief O'Loughlin's wife?
11 A  Yes.
12 Q  And Officer Cardarelli?
13 A  Yes.
14 Q  And then there are perhaps some that I
15    missed, but, the point is, a number of
16    people are attacked on this website,
17    correct?
18 A  Yes.
19 Q  In response to derogatory materials being
20    posted on web sites, did you, as deputy
21    chief, do anything?
22 A  Well, first of all, I don't consider these
23    derogatory; I consider these violent. But,
24    yes, I began an investigation.

Page 19

1  Q  And was that in your position of deputy
2     chief in charge of investigative services?
3  A  Yes.
4  Q  Have you seen that document?
5  A  Yes.
6  Q  And what is that, please?
7  A  It's a memo from Thomas O'Loughlin to Frank
8     Oglesby about derogatory statements, I
9     would say vile statements about certain
10    employees.
11 Q  And that memo is dated July 3, 2002?
12 A  Yes.
13 Q  What did you do in terms of your
14    investigation of Internet postings?
15 A  We tried to find out if the postings were
16    coming from inside the department.
17 Q  And how did you do that?
18 A  Sergeant Cowley, I believe, was contacted,
19    and he -- there was another -- they were
20    also being sent out over paid system.
21    Sergeant Cowley was checking computers, and
22    there was one date that the Guardroom.com
23    was coming from -- he had tracked it to the
24    monitor room and the former anti-crime unit

Page 20

1     office.
2  Q  Did you ever find out who was posting these
3     materials?
4  A  No.
5  Q  Did they stop at some point, as far as you
6     know?
7  A  I still get complaints about e-mails
8     about -- I've complained about it on
9     several occasions about -- ever since I've
10    had prostate cancer, I get all these Viagra
11    ads, which I think is pretty distasteful.
12 Q  What about Internet postings such as the
13    one that you have in front of you that we
14    marked as Exhibit 15?
15 A  I have no idea which -- you know, there are
16    so many web sites. I'm sure they're still
17    doing it today.
18 Q  You are aware that it's being done today?
19 A  No. I said probably there is -- this is
20    from outside the department. One officer
21    has his own website devoted to him because
22    he arrested somebody.
23 Q  Let me phrase it this way.
24       You became aware of the

Page 29

1    So I don't know, but it would
2    have been about that time. I suppose I
3    would have been. I'm not sure whether this
4    was -- it appears to be a report sent
5    either to Chief Carter or Chief O'Loughlin,
6    I'm just not sure which one.
7  Q  Why do you say that?
8  A  Because it says, "I was directed by then
9    Deputy Chief Fleming to initiate an
10   investigation."
11       So from reading it quickly, it
12   looks like it went to somebody above me.
13 Q  If I were to suggest to you that you were
14   interim chief in December of 2002 rather
15   than deputy chief, would that make a
16   difference on how you saw this?
17 A  Yes. Then it was probably directed to me.
18 Q  And the paragraph you were talking about is
19   Paragraph 4?
20 A  Yes.
21 Q  I'll read just the first sentence "In July
22   2002, after the quick topic discussion
23   postings spread throughout the department,
24   I was directed by then Deputy Chief William

Page 30

1    Fleming to initiate an investigation and
2    contact the Suffolk district attorney's
3    office."
4        Do you remember that
5    occurring?
6  A  Yes. I just don't -- in reading it again,
7    "spread through the department," I'm not
8    sure how widespread -- do you understand
9    what I mean? It would be spread in that,
10   you know -- if it was written about me or,
11   say, Nancy or something, we'd be aware of
12   it. But I'm not sure if the vast majority
13   of officers paid any attention to any of
14   this.
15 Q  So you don't know whether that particular
16   statement is accurate? Is that what you're
17   saying?
18 A  Correct.
19 Q  But you've had a chance to look through
20   this, and it appears to be recounting the
21   steps Sergeant Gillespie and others took in
22   terms of their investigation? Would you
23   agree with that?
24 A  Yes.

Page 31

1  Q  I'm going to show you another similar
2    document.
3        (Exhibit No. 19, The memo
4        dated 3/3/03 to William
5        Fleming from Mark Gillespie,
6        Bates M3469, was marked for
7        identification.)
8  Q  What is that document?
9  A  This is from Sergeant Mark Gillespie to me
10   about the Internet investigation.
11 Q  This document appears to be the same as the
12   other one. It looks as if a couple
13   paragraphs had been added at the end?
14 A  Yes.
15 Q  Did you ask Sergeant Gillespie to write
16   this memo to you?
17 A  I remember sending to Mark an e-mail
18   requesting all his information on the
19   Internet investigation. And I got back
20   file encrypted code. I couldn't get into
21   it. But it's still on my e-mail.
22 Q  Do you recall why you asked him to do that?
23 A  Well, Mark told me that there would be --
24   his exact words were, There would be --

Page 32

1    there's a grand jury convening and that
2    there will be subpoenas flying all over the
3    place.
4  Q  About Internet postings?
5  A  Yes.
6  Q  Okay. And if I'm understanding you
7    correctly at that point you asked him to
8    follow up the information that he had?
9  A  Yes.
10 Q  And part of that information resulted in
11   this memo?
12 A  Yes.
13 Q  The memo is dated March 3, 2003?
14 A  March 3 -- 3/3/03.
15 Q  Did you discuss the Internet investigation
16   with Chief Carter?
17 A  Yes.
18 Q  Did he order you not to investigate the
19   Internet, your postings, anything else?
20 A  We discussed it. Then what happened --
21   just follow my train -- what happened
22   then -- Mark Gillespie played me a recorded
23   phone call from the district attorney's
24   office that said there's no crime. There's

Page 33

1  nothing here, Mark, but to keep it on file.
2  And I looked at him and I said, I thought
3  we were going through with this. And then
4  Mark said that the chief didn't want to go
5  forward with it.
6       Now, I remember saying to the
7  chief later on, Chief -- it was a passing
8  conversation. And I said, I think it's
9  important, but, you know, it's your
10 decision. And he didn't really say
11 anything. I think he looked a little
12 confused. And I think he said, I never
13 said that and just walked away.
14      So I wasn't exactly sure what,
15 you know -- I have a DA phone call; I had
16 Gillespie originally telling me subpoenas
17 and grand jury is going to be convened;
18 then Gillespie tells me the chief is not
19 interested. So at this point I'm throwing
20 up my hands.
21      And the chief, to me, had a
22 puzzled look on his face that was, like, he
23 didn't know what I was talking about. And
24 I don't think he knew what Gillespie was

Page 34

1  talking about.
2  Q  Did you attempt to explain to him what you
3     were talking about?
4  A  No, because it was just a busy -- he was
5     going on to something else. He was just
6     walking by my office.
7  Q  He had been on the job two months?
8  A  Yes.
9  Q  Not even that. He didn't come on
10    January 1, 2003, did he?
11 A  No.
12 Q  He came sometime in the month?
13 A  I think he came on -- and only because I
14    remember talking to the chief about this
15    that the -- because the interim chief and
16    everything -- I had to use vacation time,
17    and I didn't want him to think that I
18    was some kind of slug the day he gets there
19    and I go on vacation. So I ran that by him
20    first. That was the end of December, I
21    think.
22 Q  So on the outside, he was there two months
23    when this memo was written?
24 A  Correct.

Page 35

1  Q  As far as you know, there was no further
2     investigation into Internet postings?
3  A  As far as I know, it was dropped after
4     that. Like I said, I asked for Mark's file
5     and it's still on my e-mail. I just
6     couldn't get into it. We were going on to
7     something else.
8  Q  And as far as you know, the district
9     attorney said there was no crime?
10 A  Right.
11 Q  Okay.
12 A  Now, I'm told that the -- there was further
13    Internet investigation.
14 Q  And who told you that?
15 A  I believe it was Lieutenant Venturelli.
16 Q  And when was that?
17 A  That wasn't too long ago. He told me that
18    Tom O'Loughlin was being investigated.
19 Q  By whom?
20 A  Sergeant Gillespie. Or Lieutenant
21    Gillespie it would be at the time.
22      I was told that Gillespie had
23    tried to gain access to the Milford police
24    computers, and there was something to do

Page 36

1  with the Boston Globe where they got his --
2  O'Loughlin's IP address, something about an
3  article. I don't -- I don't -- I wasn't
4  part of that.
5  Q  Okay. But this is just something you
6     heard?
7  A  Yes.
8  Q  And as far as you know, this something that
9     you heard had nothing to do with Nancy
10    O'Loughlin, is that correct?
11 A  It had nothing to do with Nancy O'Loughlin.
12 Q  Did it have anything to do with Chief
13    Carter?
14 A  Not that I know of, no. His name never
15    came up.
16 Q  It had to do with Mark Gillespie and Tom
17    O'Loughlin?
18 A  Yes.
19 Q  Just quickly on the pager systems, you said
20    that there were pages being sent that were
21    derogatory?
22 A  Yes.
23 Q  Who was sending those pages?
24 A  I don't know.

Page 41

1  MR. NOTIS: Yes, just who was
2  chief and what year are we talking about?
3  THE WITNESS: Who was chief?
4  Tom O'Loughlin was chief.
5  MR. NOTIS: Okay, thanks.
6  Q  And what year was it?
7  A  I believe maybe 2001.
8  Q  Was Tom McCarthy a union official?
9  A  No.
10 Q  Was he ever a union official that you know
11    of?
12 A  No.
13 Q  He never held an office?
14 A  No.
15 Q  But you indicated that he was -- he had
16    been deputy chief and he didn't like no
17    longer being deputy chief?
18 A  Yes. I was assigned the task of taking
19    Tommy's badge, and he wasn't too happy, you
20    know, switching badges.
21        I said, Tommy, I didn't have
22    any say in any of these picks. And then I
23    also heard it from John Martino who was
24    much more gracious. And I said, John, I

Page 42

1  didn't make a phone call; I didn't see this
2  coming. He said, You were the one who
3  could have made a phone call. He goes, I
4  know.
5  Q  Now, during the time you were interim
6    chief, you understood that you were just in
7    place until a new chief was appointed?
8  A  Yes.
9  Q  Be it you or somebody else?
10 A  Yes. It wasn't going to be me. I knew
11    from day one it wasn't going to be me.
12 Q  And you knew that you didn't -- did you
13    have the authority to -- could you have
14    made massive restructurings of the police
15    department in that position?
16 A  In my understanding as interim chief, yes.
17 Q  But you didn't make any drastic changes or
18    did you?
19 A  I had to justify every move I made.
20 Q  But did you make any changes? And
21    "drastic" might be a nebulous kind of word.
22        But did you make any
23    substantial changes in the structure of the
24    police department?

Page 43

1  A  Well, I brought Herman Wheeler up as my
2    right-hand man. I don't think that went
3    over too well with some people.
4  Q  But that wasn't a restructuring of the
5    police department, was it, Lieutenant?
6  A  No.
7  Q  Did you do anything that you would consider
8    a significant restructuring of the police
9    department?
10 A  No.
11 Q  Now, when Chief Carter made the decision to
12    move Joseph Leuchte out of the detective
13    unit, that surprised you?
14 A  Yes.
15 Q  And until that time, had Chief Carter been
16    critical of the job Lieutenant Leuchte had
17    been doing?
18 A  I don't think he ever mentioned Joe
19    Leuchte's name one way or the other. I
20    don't even know if the chief knew who he
21    was.
22 Q  I guess -- do you just not remember or are
23    you sure he didn't say anything or fairly
24    sure?

Page 44

1  A  I'm fairly sure he never even mentioned his
2    name.
3  Q  And he certainly didn't consult you about
4    the move?
5  A  No.
6  Q  Now, what did Chief Carter say to Joseph
7    Leuchte on the day he reassigned him?
8  A  It was Joe sitting there, and the chief
9    said -- and I'm just doing this by memory,
10    so I'm not going to remember what his words
11    were.
12        I'm going to make some changes
13    and I'm going to reassign you. I don't
14    know whether it was after Joe left or
15    before, the chief asked me, Why does he
16    want to go to the 3:30 shift or something?
17    I said he's on the 3:30 shift.
18 Q  But he didn't give you or Joseph Leuchte
19    any reason for the move, did he?
20 A  No.
21 Q  And you were surprised of the move of
22    Lieutenant O'Loughlin from detectives?
23 A  Yes.
24 Q  And why were you surprised?

Page 45

1  A  Because I didn't see it coming either.
2  Q  So is it the same for both lieutenants?
3  A  It was the same day, yes.
4  Q  I mean, were you surprised at the moves for
5     the same reasons?
6  A  Yes, exact same reasons.
7  Q  Because you didn't see it coming?
8  A  Yes.
9  Q  And because Chief Carter had not said
10    anything to you about the reassignments?
11 A  No.
12 Q  Okay.
13 A  My recollection of that day was that the
14    chief had told me to meet him at 7:30.
15    Now, I was there at 7:30, but the door was
16    shut. So I never -- you have to -- you've
17    been in the chief's office. I never
18    knocked on the door or anything.
19        And then about -- I think it
20    was shortly before 9 he called me and said,
21    you know, I told you to be here at 7:30.
22    And I said, I came down and the doors were
23    shut and there was nobody here. I told the
24    secretary when the chief comes in to tell

Page 46

1     me.
2         So I think he probably would
3     have told me at that time. But it
4     wasn't -- do you understand? Because the
5     door was shut and it was my understanding
6     he wasn't in the office -- he was, I guess,
7     in the office.
8  Q  Just to clarify something in the record,
9     there's an allegation in this case that
10    when Chief Carter came to the police
11    department that one of his first acts was
12    to disband the unit Nancy O'Loughlin was
13    commanding?
14 A  Yes.
15 Q  And we talked about that last time?
16 A  Yes.
17 Q  And we identified that unit as the vandal
18    squad?
19 A  Yes.
20 Q  And it is your testimony that as far as you
21    were concerned, there was no vandal squad?
22 A  There was no vandal squad at that time.
23 Q  Okay. I wanted to touch on something about
24    the detail unit.

Page 47

1     You said that the detail unit
2     was perceived as a punishment position?
3  A  Yes.
4  Q  Throughout the department?
5  A  Yes.
6  Q  But that -- and this is the way I
7     understood the testimony -- if a person
8     wanted to be in the position such as
9     Sergeant Morris, then it wasn't a
10    punishment position?
11 A  Correct.
12 Q  See, the problem I had with that -- and
13    I'll let you try to explain it to me, if
14    you can -- is that it seems to depend upon
15    the perception of the person who was put
16    into the position as to whether it was a
17    punishment or not.
18        MR. NOTIS: Objection.
19 Q  You can answer, if the question makes
20    sense. If I need to try to rephrase it, I
21    will.
22 A  When I -- Deputy Chief Martino sued the
23    authority and claimed that the detail
24    office was a punishment assignment to him.

Page 48

1     When I came in, I viewed it as a punishment
2     assignment to him, and I put him --
3     reassigned him to patrol.
4  Q  So Captain Martino?
5  A  Yes. When I put out the memo, I asked if
6     any officer or supervisor was interested in
7     commanding the detail office.
8         Prior to that, Mike Morris had
9     called me and said he'd like to go into
10    details. So it just naturally assumes that
11    he didn't think he was being punished for
12    going to the detail office; that's what he
13    wanted to do.
14 Q  I think -- maybe it's a difficulty on my
15    part on framing the question and trying to
16    get across what I want to know.
17 A  In police work, too, some people like to
18    work, say, outside in the streets and some
19    people like to work inside an office, so to
20    speak.
21        So if you have always worked
22    out in the street or liked to work on the
23    street, if you're reassigned to an office
24    job that you don't want, the perception