# Exhibit 12



# Report of Investigation
## Of Citizen Complaints To MBTA Police Department

By Rudolph F. Pierce*

## INTRODUCTION

On July 11, 2001 I agreed to review the process by which the MBTA Police

Department ("the Department") handled citizen complaints filed against its police

officers. From newspaper articles I have read and from statements made to me after my

appointment, it appears that my assignment resulted from an increasing number of

complaints from parents of students riding the "T", groups in various communities and

politicians, particularly the Black Caucus of the Massachusetts Legislature, who claim to

- be recipients of complaints from constituents about treatment they or others close to them

received or witnessed at the hands of MBTA police officers.

Because there may be varying expectations about what I am doing, let me

describe my approach to the assignment carefully. In the course of my work, I reviewed

(i) pertinent Massachusetts statutes; (ii) the Department Manual of Policies, Rules and

Procedures ("the Manual"); and (iii) approximately 188 case files (see Attachment A)

containing citizen complaints for the period 1997-2001. Also I met with various persons

including the Chief and Deputy Chief of the Department and members of state

legislature's Black Caucus. Many of the persons with whom I met supplied additional

written materials; for example, the transcript of the hearing dated May 23, 2001 *In The*

*Matter Of: Massachusetts Black Legislative Caucus In re: MBTA Police*

*Misconduct/Public Hearing*, a 1998 report entitled *Cultural Diagnostic of the MBTA*

*Police Department* which was prepared by Linder & Associates, Inc. of New York for the

---

* I was ably assisted in this project by Pamela Signorello, an associate at Goulston & Storrs, P.C.

M000409

General Counsel of the MBTA, and newspaper articles covering various events involving MBTA police officers.

I did not speak to any complainants or to any officers complained against. In other words, I made no effort to independently determine whether a complaint was true, justified or, for that matter, an overstatement of the events it described. I started from the premise that once a complaint was made, the Department had an obligation to treat it seriously and to process it appropriately. Obviously, I understand that the gravity of some complaints are, by their nature, more serious than others. Nonetheless, each complaint, in my judgment, has to be handled in an appropriate fashion so that the process of review and investigation will be seen by complainants, the officers complained against and members of the general public as having integrity. In my experience, complainants and those complained against will not always concur with the outcome of the review and investigation; however, if the process is perceived as fair, it will retain the respect of the general public and those who use it. Indeed, it may be said that there is no place where the fairness of the process is more important than at the intersection of the general public and those who protect it.

Complaints were filed by persons who reside all over Suffolk County, in Cambridge and in a few other cities and towns near Boston. They were filed by African-Americans, whites, Latinos and Asians. The complainants were parents of students, adults who had been arrested or detained at MBTA stations or elsewhere, motorists who received motor vehicle citations and others who did not, but found the officer's conduct objectionable, and a few passengers who witnessed MBTA police behavior that they

thought was inappropriate. As a group, parents of young people, mostly students, filed the greatest number of complaints.

## THE MBTA POLICE

The Department was established under Chapter 664 of the Acts of 1968.[1] Prior to 1968, MBTA property and vehicle protection was provided by a special unit of the Boston Police Department paid for by the MBTA.[2] The original Department was comprised of 35 officers working out of a one-room office at Dudley Station terminal.[3] Since then, the Department has grown to 230 officers and 10 civilians[4] and now runs its own Academy for its officers and officers from other agencies.[5]

The overall mission of the Department is to protect the lives and safety of MBTA patrons, its employees and the public in general.[6] The Department is also charged with the responsibility of protecting the MBTA from vandalism and malicious destruction.[7] The majority of the Department's efforts are focused on patrol in Boston and surrounding communities.[8]

---

[1] See Chapter 664 of the Acts of 1968 (as amended by Chapter 829 of the Acts of 1970, Chapter 251 of the Acts of 1976 and Chapter 329 of the Acts of 1993).
[2] See Commonwealth v. Mottola, 10 Mass. App. Ct. 775, n.8 (1980), review denied 441 N.E.2d 1042.
[3] See http://www.mbtapolice.com/department/history.html (last visited Oct. 30, 2001).
[4] See id.
[5] See http://www.mbtapolice.com/faq/index.html (last visited Oct. 30, 2001).
[6] See supra note 3.
[7] See id.
[8] See id.

GSDocs-1063715-1
11/16/2001 11:05 AM

M000411

## THE DEPARTMENT'S AUTHORITY

The statute that established the Department in 1968 also expressly conferred on its officers the same powers and duties conferred or imposed on police officers in the cities and towns under M.G.L. c. 41, Section 98.[9] Hence, MBTA police officers may carry weapons, question, search, detain and arrest individuals, suppress riots, and disperse assemblies throughout the territorial jurisdiction of the MBTA.[10]

The Department has primary jurisdiction over MBTA property and vehicles in each of the 175 cities and towns within the MBTA district.[11] As such, one might expect MBTA officers to concentrate their police efforts on MBTA-related activities. However, MBTA officers' general police powers are not so restricted. That the Department's primary responsibility may involve MBTA-related people and property in no way precludes Department officers from exercising police powers in non-MBTA related matters. For example, MBTA officers have been expressly granted concurrent jurisdiction with officers of cities and towns to issue citations for motor vehicle violations.[12] Under Chapter 664, MBTA police officers may provide general police

---

[9] See supra note 1 ("Such police officers shall have, within the territorial limits of the authority, the powers and duties which are conferred or imposed upon police officers of cities and towns under the provisions of [M.G.L. c. 41, Section 98], and shall have the powers and duties which are conferred or imposed upon police officers under [M.G.L. c. 159, Section 93] to the same extent as though they had been appointed on petition of the authority..., and the provisions of said [Section 98] and of said [Section 93] shall apply to such police officers in the exercise of the aforesaid powers and duties.").

[10] See M.G.L. c. 41, Section 98.

[11] See supra note 3. For a list of the 175 cities and towns comprising the MBTA district, see M.G.L. c. 161A, Section 1.

[12] See M.G.L. c. 90C, Section 1 (defining "police chief" as, among other things, "the chief of the Massachusetts Bay Transportation Authority police department); see also M.G.L. c. 90C, Section 2 (authorizing MBTA police officers to issue citations for motor vehicle violations). MBTA officers may only issue citations within the 175 cities and towns comprising their territorial jurisdiction. See Commonwealth v. LeBlanc, 407 Mass. 70, 74 (1990) ("Nowhere in c. 90C is there any provision expanding the territorial authority of police officers.").

-4-

M000412

services to a town or city upon the request of the mayor, chief of police or selectmen of such town or city.[13]  In such cases, Department police officers have the authority of police officers within such town or city limits, except as pertains to the service of process.[14]

Even without such an explicit request for their services, MBTA police officers may, pursuant to the plenary powers granted them under M.G.L. c. 41, Section 98, exercise general police powers in any city or town within their territorial limits, whether or not their efforts seek to redress an MBTA-related situation.  In fact, the Manual encourages Department officers to take police action when encountering serious situations unrelated to the MBTA.[15]  The Manual also explicitly recognizes that Chapter 664 of the Acts of 1968 "provided that MBTA Police Officers have the same authority on city or town property as they have on MBTA property."[16]  And certainly, it goes without saying that the Department's officers may question and arrest an individual off MBTA

---

[13] *See supra* note 1.  It appears that this provision does not restrict MBTA officers' activities to the 175 cities and towns within the territorial jurisdiction of the MBTA.

[14] *See id.*

[15] *See* the Manual, at 1-3 (effective date 12/15/90) ("Incidents that are clearly in the jurisdiction of another agency and which are not MBTA-related, will be handled in the following manner: On site arrests for serious situations are both necessary and encouraged.") (emphasis in original); *see also* the Manual, at 3-1 (effective date 12/15/90) ("Officers of the MBTA Police Department will observe criminal activity or will have crimes reported to them that are not directly related to the MBTA.  As Police Officers vested with authority by the Commonwealth, MBTA Police Officers have a responsibility to ensure that proper action is taken, either by himself or herself – if appropriate – or by the relevant local or state police agency having primary jurisdiction.").

[16] *See* the Manual, Chapter 1, Section 1.0 (effective date 12/15/90).

M000413

property where the offense originates on MBTA property and is related to the protection of an MBTA passenger.[17]

Beyond conferring general police powers upon MBTA police officers, Chapter 664 of the Acts of 1968 also conferred upon Department officers the authority of railroad, street railway and steamboat officers under M.G.L. c. 159, Section 93. Under this statute, MBTA officers are authorized to preserve order on the premises, cars, vehicles and boats of the MBTA by means of passenger ejection and warrantless arrest. The Appeals Court of Massachusetts, commenting on the interplay between c. 41, Section 98 and c. 159, Section 93, recognized the broad grant of police and territorial authority vested in MBTA police officers:

> Although the powers and duties conferred on police officers under c. 159, Section 93 are, for the most part, limited to the premises of transportation companies, there is no such limitation on the powers of police officers of cities and towns under c. 41, Section 98. Since the statute explicitly confers upon the MBTA police the powers of both G.L. c. 41, Section 98 and G.L. c. 159, Section 93, we find no indication of a legislative intent to confine the authority of MBTA police to MBTA premises. To the contrary, St. 1968, c. 664, is a legislative statement that MBTA police officers are to have broader powers than railroad and other police officers governed by c. 159, Section 93.[18]

In other words, the Department provides a full range of law enforcement services. Its officers are charged with the primary responsibility of protecting riders, employees, property and interests of the MBTA.[19] These officers regularly investigate crimes such as auto thefts, robberies, assaults and other felonies or misdemeanors occurring within the

---

[17] *See* Commonwealth v. Mottola, 10 Mass. App. Ct. 775 (1980), *review denied* 441 N.E.2d 1042 (MBTA police officers had authority to question and arrest the defendant at East Boston High School where he had "accosted or annoyed" an MBTA passenger on MBTA property nearly five hours prior to arrest).
[18] *Id.* at 780.
[19] *See* the Manual, at 3-1 (effective date 12/15/90).

GSDocs-1063715-1
11/16/2001 11:05 AM

M000414

MBTA district.[20]  Additionally, they investigate transit-related crimes, such as fare evasion, smoking and other "quality of life" violations.[21]  However, as the statutes and case law make clear, MBTA police officers are not confined to these MBTA-related activities.  They are vested with the same general police powers enjoyed by police officers in the cities and towns, and MBTA police officers can and do exercise these broader powers.

I include this information about the jurisdiction of the MBTA police and the sweep of its authority because the case files I reviewed indicate that many people do not understand the extent of the MBTA police officers' authority.  The general public's lack of knowledge of the breadth of this authority is best illustrated in the complaints I reviewed which arose out of traffic stops.  *"You don't have authority to ticket me."* *"You're not a real cop." "Get a real cop over here." "What are you doing, go away."* These and other similar statements were reportedly made to officers complained against as a result of encounters occurring during traffic stops.  Following these statements, no doubt the situations deteriorated.  The complaints from these situations typically involve allegations that the officers were overly aggressive, rude or otherwise made inappropriate comments.  More than any of the other complaints I read, these cases revealed a real sense that MBTA police officers, as Rodney Dangerfield might say, *"Don't get no respect."*

Additionally, the reach of the Department's jurisdiction to 175 cities and towns presented another problem revealed in a few of the cases I reviewed.  Because the Department has only one booking and lockup facility located at its headquarters at 240

---

[20] *See supra* note 5.
[21] *See supra* note 5.

GSDocs-1063715-1
11/16/2001 11:05 AM

M000415

Southampton Street in Boston, all persons arrested by MBTA police officers, whether in Boston or in cities or towns distant from Boston, are transported to this facility. In the complaints I read involving the arrest of juveniles, parents frequently complained that hours passed before they learned of their youngsters' arrest. In addition to those complaints, parents of youngsters arrested in the cities and towns outside of Boston (e.g., Brockton, Haverhill) often expressed shock after they learned that their youngster had been transported to MBTA headquarters in Boston for booking and incarceration.

## CITIZEN COMPLAINTS

Chapter 120, Section 1 of the Manual provides: "[t]he Department, being cognizant of its responsibilities to the public and its employees, will process and investigate all complaints of employee misconduct." In Section 2 appears the statement "... all citizens have the right to initiate a complaint concerning police operations or behavior and receive a fair, thorough and timely response."

The complaint process is often initiated by a written complaint. However, the process can be initiated by letter or by a telephone call.[22] Complaints initiated by telephone are supposed to be referred either to the Duty Supervisor or to the Shift Commander.[23] In the files I reviewed, there was evidence of the complaint process being triggered through each of these methods. Once a complaint is received, Section 7.1 of the Manual requires:

The Secretary in the Administrative Services Division to:

---

[22] It was reported to me that complaints attempted to be made via telephone did not always work in the manner prescribed by the Manual. I was told that some complainants were informed that they were required to go to MBTA Headquarters and file their complaints in person. I did not verify these reports.
[23] *See* the Manual, Ch. 120, Section 5.

- acknowledge receipt of the complaint by preparing a letter to the complainant from the Chief of Police (the letter will indicate that he/she will hear from the Department within thirty (30) days;

- complete the necessary entry in the Citizen Complaint Log for each Citizen Complaint Form received;

- assign a Citizen Complaint (CC) Number;

- file the original; and

- forward one copy to the Chief of Police for review, and a second copy to the Deputy Chief of Administrative Services for appropriate action.

The files I reviewed contain evidence of the acknowledgment of complaints and each file is organized by number and the year in which the complaint was filed. Section 9.0 requires a line supervisor then to investigate the complaint. And Section 9.1 prescribes the procedure to be followed after the investigation. "Upon completion of the investigation, the Supervisor will submit a report to the Unit Commander containing the following:

- A statement of the allegations made by the complainant.

- A statement of the situation as described by the employee involved.

- A description of the facts to which the complainant and employee agree.

- A description of the issues and allegations to which the complainant and employee disagree.

- A statement of evidence which supports each side of these disagreements.

- A conclusion and statement of what occurred based upon the Supervisor's analysis of the supporting evidence.

- A recommended finding in one of the following classifications: Exonerated, Not Sustained, Sustained or Unfounded."

It appears that all complaints are sent to the Internal Affairs unit, rather than to a line supervisor, for review and investigation. However, from the case files I reviewed, there is little evidence that each element of the procedure outlined in Section 9.1 is being followed. I saw no documents which recorded "a description of the facts to which the complainant and the employee agree" or "a description of the issues and allegations to which the complainant and employee disagree." Nor did I see any documents which recorded a "statement of evidence which supports each side of these disagreements." (Emphasis supplied). And, I seldom saw evidence of an "analysis of the supporting evidence."

However, I do not want to leave the impression that because the procedure outlined in Section 9.1 is not precisely followed there is no evidence of any investigation in the files I reviewed. That impression would be inaccurate. For example, there are files which contain evidence of complainant and civilian witness interviews and other files which reveal clear efforts to locate complainants and witnesses to conduct such interviews. Moreover to be fair, it must be said that a review of the complaint and the officer's response to it, more often than not, will identify the places where the complainant and the officer(s) complained against agree and disagree. This is the point where the investigation should begin. Therefore, the most important element in Section 9.1 may be the provision that requires "a statement of evidence which supports each side of these disagreements." This requirement presumes an effort to gather information. It presumes an "investigation." Evidence of such an investigation was missing in most of the files I reviewed.

The majority of files I reviewed contained the following: a statement of complaint, a note, typically from the Deputy Chief Anne McCall to the officer(s) complained against advising him/her of the complaint and requesting a response to it, the response to the complaint provided by the officer(s) and copies of pertinent police dispatch logs. If the complainant was arrested, the file also contained the booking sheets, and sometimes the criminal complaint and other papers pertinent to the court proceeding. In many files I reviewed, I was unable to determine if the complainant or the officer complained against was interviewed either in person or by telephone. I assume that viewing the demeanor of the disputants and their witnesses, if any, is just as important in an investigation as it is in a hearing or trial.

The files containing evidence of an investigative effort beyond reviewing the statements of the parties, the dispatch logs and the booking sheets represent a minority of the ones I reviewed. Moreover, it often appeared in the cases where such effort was made that other factors such as newspaper interest or agitation from community groups prompted the additional investigative activity.

The Department's review of citizen complaints usually ends with a letter from the Chief to the complainant explaining his decision. The following is an example of such a letter.

Dear Ms. _____

On [date] you filed a complaint with this Department against Officer _____ relative to the arrest of your daughter, _____ at the [MBTA transit station].

After review of the facts and the circumstances of your daughter's arrest, it was determined that there was probable cause to place your daughter under arrest for acting in a disorderly manner and trespassing. The officer's attention was drawn to Ms. ____ because she was yelling obscenities at

other youths and causing other commuters to move away in fear. The officer was well within his authority to physically eject your daughter from the property of the MBTA. When this did not stop the escalation of your daughter's actions, Officer ____ placed her under arrest, as well as her friend who attempted to come to her aid. Officer ____ acted expeditiously to control a potentially volatile situation and excessive force was not used. The officer performed his duties in compliance with the laws of the Commonwealth of Massachusetts, as well as the rules, policies, and procedures of the MBTA Police Department.

If I may be of further assistance, please feel free to contact myself or Deputy Chief Ann McCall.

About the same time as this letter is sent, the Chief issues a Special Order indicating the disposition of the complaint which is posted and read at Department Roll Calls. Typical of such an order is the following:

Subject:        Citizen Complaint [number]
Post:           Read at Roll Calls through [date]
Distribution:   Standard Distribution

On [date] [complainant] filed a Citizen's Complaint with the MBTA Police Department claiming he was treated unprofessionally by [officer complained against] while he was at South Station on [date].

The complaint has been thoroughly investigated and classified "Exonerated." [Officer(s) by name] performed their duties in compliance with the laws of the Commonwealth of Massachusetts as well as the rules, policies and procedures of the MBTA Police Department and the established standards for a professional police officer.

"Exonerated" is a defined term in the Manual. It means "the incident did occur, but the actions of the accused were in compliance with Department policies, rules and procedures." The Special Orders issued by the Chief always indicate (i) that the officer was *exonerated*, or (ii) that the complaint was *not sustained* ("the investigation failed to discover sufficient evidence to clearly prove or disprove the allegation(s) of police misconduct"), (iii) *sustained* ("the investigation disclosed sufficient evidence to clearly prove the allegation(s) of police misconduct made in the complaint") or (iv) *unfounded*

("the investigation indicates that the facts complained of did not occur").[24]  In the 188

case files that I reviewed, only five (5) complaints filed against officers were "sustained."

In fifty seven (57) of these cases, the officers were "exonerated".  In eighteen (18) cases,

it was determined the complaints were "unfounded".  In eleven (11) others the complaints

were "not sustained."  The remaining cases were dropped, withdrawn or the review has

not been completed.

Often I found it difficult to identify the information in the file that provided the

basis for the Chief's conclusion that the officer(s) was "exonerated" or the complaints

"unfounded", unless the officers' statements were accorded total credibility and the

complainants' version of events virtually discounted.  There was seldom a document in

the files that summed up the evidence on which the Chief relied or a document that

explained why the officer's, as opposed to the complainant's, version of events was

believed.  Of course, the officers may have been right in these cases and the complainants

may have overstated or overreacted to the events which occurred.  However, without

evidence of an investigation in the files or, at least, an analysis of the credibility of the

respective parties, the Chief's conclusions become necessarily suspect.  As the Manual

states:  "The method by which police agencies handle citizen complaints can be an

important determinant of the trust and confidence the community will have in the Police

Department."[25]

The need for my assignment suggests that "the trust and confidence" of some in

the community has already been shaken.  Frankly, my review of the case files does not

leave me with "confidence" in the Department's handling of complaints.  As I indicated

---

[24] Each of these definitions is found in Section 3.0 of the Manual.
[25] The Manual, Chapter 120, Section 1.0.

-13-

M000421

above, the majority of complaints I reviewed do not appear to be receiving the investigative work they require. This is particularly troubling because citizens are encouraged to use the complaint process whenever they feel mistreated by MBTA police officers. Indeed, in several of the newspaper articles given to me covering meetings between Department representatives and individuals and groups claiming mistreatment by MBTA police officers, Department representatives are quoted encouraging people to file complaints. Therefore, if the Department is to avoid (a) the situation where increasing numbers of citizens who desire to use the process become dismissive of it because it lacks integrity; and (b) the equally undesirable situation where police officers become indifferent to the process because, as to them, it has no teeth, the complaint process must be fixed. Given the absence of evidence of investigations and the paucity of complaints that have been sustained, the Special Orders issued by the Chief and read to the officers at Roll Call undoubtedly conveys the message that the complaint process is a paper tiger. It promises much to the general public but, operationally, leaves police officers with very little to worry about.

## INTERNAL AFFAIRS

The primary responsibility of the Department's internal affairs function is to respond to allegations of serious and/or criminal misconduct against the MBTA Police Department and its employees.[26]

The Internal Affairs unit is charged with the responsibility of reviewing and investigating complaints from any source made against officers of the Department. Since November, 1997, this unit has been under the command of Deputy Chief Anne McCall.

---

[26] The Manual, Ch. 121, Section 1.0.

GSDocs-1063715-1
11/16/2001 11 05 AM

M000422

Until recently, she had been a one-woman unit. No other officers were assigned to assist her. Internal Affairs does not even have full-time secretarial support. Further, Internal Affairs is not Deputy Chief McCall's only responsibility. She is also responsible for departmental training and court-case management. In the training area, she has a staff of three and is responsible for (i) running the MBTA's Police Academy, which has graduated eight classes since 1998; (ii) its in-service training; (iii) its CPR certification program; (iv) its officers' firearm proficiency certification program; (v) preparing legal updates; and (vi) other forms of special training programs, e.g., sensitivity and terrorism training. Deputy Chief McCall estimated that her training responsibility consumes 20-30 percent of her time.[27] In the court-case management function, Deputy McCall is assisted by three detectives and one lieutenant. Together, they are responsible for ensuring that all of the Department's cases are properly prepared for trial. Deputy Chief McCall estimates that this responsibility consumes an additional 15-20 percent of her time.

In May of this year, Sergeant Gloria Andrews Ward became the first officer to be assigned full time to the Internal Affairs unit. Together with Deputy Chief McCall, she is responsible for reviewing and investigating all citizen and internal Department complaints made against police officers. On average, the unit receives sixty civilian complaints and ten internal ones per year according to Deputy Chief McCall. This level

---

[27] I note that in Linder & Associates, Inc.'s 1998 report appears the following statement: *For the size of the force and the importance of training inherent in police work, training administration at MBTA PD is not adequately staffed. There is only one training officer who is also regularly assigned tasks in other areas such as background investigations.* (emphasis supplied) p. 29. It appears that the staffing of the training function has been increased at the expense of Internal Affairs.

of staffing is hardly optimum to perform the required tasks. Deputy Chief McCall would like a lieutenant to be assigned full time to the unit. With this additional officer, she believes the unit will have sufficient capability to adequately handle the unit's caseload and to investigate officers in each one of the Department's collective bargaining unions.

MBTA police officers are members of three different unions: a patrolmen's union, a sergeant's union and a union comprised of superior officers, i.e., lieutenants and captains. The Chief and Deputy Chief agree that members of one union cannot be expected to investigate other members of the same union. For this reason, patrolmen are not assigned to Internal Affairs and Sergeant Andrews Ward will not be expected to investigate members of the sergeants' union.

The Chief also agrees that the Internal Affairs unit is understaffed. However, currently he feels that the Department does not have the budget to expand the ranks of its sergeants and superior officers. According to the Chief, the Department is budgeted for nineteen (19) sergeants, ten (10) lieutenants, two (2) captains, four (4) deputy chiefs and one (1) superintendent, in addition to himself. All of these positions are filled, according to the Chief, with officers who have one or more responsibilities which prohibit them from taking on an additional assignment in Internal Affairs. Overtime has been reduced, I am told, because of MBTA budgetary constraints. In other words, despite its need for additional personnel, no one else will be assigned to Internal Affairs for the foreseeable future. Unless the caseload is reduced, Internal Affairs will continue to lack the resources to carry out its responsibilities.

## OTHER IMPRESSIONS

No one should be surprised that after reading 188 case files, an assortment of newspaper articles and other materials about the Department and listening to various people talk about policing the transit system, I have formed impressions about the job MBTA police officers are asked to perform.

There is no question that the majority of men and women who serve as MBTA police officers do their jobs in a courteous and highly professional manner. Moreover, as one who grew up with a mother who rode the "T" for over forty years, as she traveled from our apartment in Roxbury then Mattapan to her job in Park Square, I have no doubt about the need for uniformed police on the transit lines. I have heard almost a lifetime of stories about my mother's experiences as a passenger. They were not always pretty.

Like all police officers on the street, MBTA officers have and exercise enormous discretion. When to arrest is a question with which police officers are often faced. When a crime of violence occurs or when the crime involves the possession or distribution of drugs, the question is not so often when to arrest, but rather who to arrest. Do we have the right perpetrator? But the question of when to arrest is especially relevant to MBTA police officers because their arrests are often for offenses such as trespass, disorderly conduct, loitering and fare evasion,[28] the kinds of offenses that people commit at transit stations or along railroad rights of way.

It was reported that when school is in session approximately 20,000 students travel on the "T" every day. Alas, not all of these students are well-mannered. Some do not show the proper respect for authority. They can be playful, loud and rude. Their

---

[28] The majority of persons arrested in the cases I reviewed were arrested for these offenses.

M000425

language is sometimes vulgar. All of this conduct can be annoying, if not threatening to adults, particularly senior citizens who wait in stations and ride the trains. This after-school situation alone presents fertile soil for conflict between MBTA police officers and young people using the transit system. Many of the cases I reviewed had their origins in this environment.

The ability to exercise restraint while being confronted by "attitude" from disrespectful juveniles, often showing off for their friends, is a persistent challenge for MBTA police officers. Doubtlessly, the majority of officers handle this challenge with maturity and professionalism. However, some of the cases I read suggest that some officers overreact to this behavior. And these overreactions result in complaints being filed not only by those who claim to be victimized but also from persons the officers want to protect – other passengers. Consider this excerpt from a letter I received from a resident of South Boston.

> The majority of MBTA police officials conduct themselves with dedication and professionalism in most but not all encounters with the public. Unfortunately some officers, either through their own personal prejudices, frustration with the sense of an overwhelming job, or lack of professional training, can negate the good efforts of the entire force.
>
> I would like to recommend that you include in your evaluation an afternoon of observation at the Fields Corner T Stop between the hours of 12 pm and 4 pm this September when Boston Public Schools are in session. The first observation I think you will make is that certain police officers are very intolerant of adolescent behavior on the T irregardless of the race of the adolescent. My son and his white pals have a multitude of complaints against MBTA police officers. The second is that you are looking at the symptom of a problem. There is nothing for most kids to do after school and that is why they congregate at the T Stops.

All of the complaints I read alleging overreactions by MBTA police officers did not result from incidents involving young people. Two of the more explosive ones

GSDocs-1063715-1
11/16/2001 11:05 AM

M000426

involved arrests of adults. Again, however, the arrests were for disorderly conduct, trespass and resisting arrest. In each case, if the officers had found alternatives to arrests, the tense and unruly situations which followed could have been avoided. Of course, police officers are human beings and, no doubt, do not appreciate being cursed at or otherwise disrespected either by young people or by adults. However, an officer's need for "respect" or to demonstrate machismo in situations that produce these kinds of arrests is often counterproductive. While this motivation may produce arrests, bookings and temporary incarcerations and thereby show who is in charge; it also produces angry parents, agitation from community groups, complaints filed with the Department and local politicians and the inevitable lawsuits. No doubt there will be police officers reading these statements who will say, in one fashion or another, "it is always those who have no experience on the job who make such comments." I rejoin, the majority of officers do not make these arrests. Furthermore officers, better than anyone, know who among them are inclined to overreact. Unfortunately, it is not clear they do anything about it.

In the course of this assignment, I began to think that some of these overreactions may be a symptom of a larger problem, namely, that the job of transit policing may not be attractive for a long-term career. For many young men and women interested in police work, transit policing appears to be too limited. For example, I was told that many officers do not like working on the trains or in the stations. On the street away from MBTA premises, many people do not recognize MBTA police officers as "real cops."

M000427

Such challenges cannot help but create a self-esteem problem within the Department.[29]

Whatever the reasons, the Department has a significant turnover problem.[30]  Many young

officers, after a few years service, apply for positions with police departments in the cities

and towns.[31]

Perhaps more to the point of this assignment, I began to wonder if MBTA police

officers' constant exposure to the typical problems that arise on the trains and in the

MBTA stations, parking lots or along its rights of way (i.e., trespass, loitering, fare

evasion, vandalism), presented mostly by young people, cause these officers to lose the

ability to differentiate between these misdemeanors and other more serious offenses.

Hence, arrests become the method of choice for resolving these situations for some

officers when alternative methods may be just as effective.  MBTA police officers may

be particularly susceptible to this problem because they have little opportunity to rotate

---

[29] In Linder & Associates, Inc.'s report appears the statement:  "*A prevailing attitude* [among police officers] *was that the Authority suffered its police department out of necessity treating the officers as second-class employees.*"  (p. 62).  A similar statement was made with respect to management of the Department, "*the disrespect they* [the officers] *feel from Department management was perhaps even more acute, and certainly more direct.*"  (p.63).  These statements in the report were based on an assessment made prior to the appointment of Chief Thomas O'Laughlin.  Obviously, these statements reflected a serious self-esteem problem among MBTA police officers.
[30] I did not verify the existence of the problem by looking at employment and departure statistics; however, the turnover problem was reported to me by several people.
[31] I am told that it is advantageous for a city or town with a vacant position in its police department to fill the vacancy with an MBTA police officer because the city or town will save money by not having to pay the salary of a recruit while he/she is attending the police academy and the overtime for other officers who will be required to work additional hours to fill the vacancy until the recruit is trained.

GSDocs-1063715-1
11/16/2001 11:05 AM

M000428

into assignments involving more serious crimes that would provide them with broader experiences and thus, a better perspective from which to differentiate.

For these reasons, it appears to me that transit policing may be done more effectively if the officers were assigned for a limited period of time and then permitted to rotate into other assignments. This leads me to raise the question of whether it would be desirable to consolidate the Department with another police department. Because of the reach of the Department's jurisdiction to 175 cities and towns, it could only be consolidated realistically with the Massachusetts State Police. If such a consolidation occurred, transit policing could become one of many assignments within a more comprehensive police force. Additionally, consolidation would improve the self-esteem of MBTA officers, remove any questions in the public's mind about the officers' jurisdiction and authority and substantially reduce the turnover problem. In 1998 Linder & Associates, Inc. reported:

> One ray of hope lightened the despair for many officers. The possibility of merger with the Massachusetts State Police, or even the Boston Police Department, was energetically discussed. Beyond the immediate benefit of increased pay from such a merger, officers coveted the prospect of membership in an organization they recognized for professionalism and public respect. [32]

In May, 1991, Governor William Weld and Lieutenant Governor Paul Celluci filed legislation proposing to consolidate the duties and responsibilities of the State Police, Metropolitan Police and Capitol Police Departments into a new Department of State Police.[33] In December of that year, these Departments, as well as the division of law enforcement of the Registry of Motor Vehicles, were consolidated.[34] Numerous

---

[32] Linder & Associates, Inc.'s report, at 63.
[33] See H.R. 5669, 1991 Leg., Reg. Sess. (Mass.).
[34] See H.R. 6325, 1991 Leg., Reg. Sess. (Mass. 1991).

-21-

M000429

factors were urged in support of this consolidation. Among them, the fact that the selected Departments had overlapping jurisdictions and duplicative support and administrative functions.[35] The consolidation promised to maximize the utilization of existing resources, improve coordination and assignment of police coverage through a single chain of command, and provide more effective and efficient law enforcement.[36] Additionally, it was suggested that long-term savings would be achieved by combining the equipment, communication systems and training efforts of these Departments.[37] By now, time should have determined if these benefits have come to fruition. In any case, it seems to me that the special mission of the Department can only be strengthened by a closer, more formal association with the Massachusetts State Police.

## CONCLUSION

In my judgment, the Department's citizen complaint process is broken and needs to be fixed. It promises a review and investigation of the complaints it receives; however, the majority of files I examined revealed little evidence of any investigation. In many files, I could not even determine if the complainant and the officer complained against had been interviewed either in person or by telephone. In those cases, where it was determined that the officer's actions were justified or the complainant's allegations unfounded, often I could not find the basis for that determination in the file unless the officer's statements were fully accredited and the complainant's statements totally discounted.

---

[35] *See supra* note 33.
[36] *See id.*
[37] *See id.*

Moreover, Internal Affairs, the unit charged with the responsibility of reviewing and investigating citizen complaints, was a one-woman unit until the spring of this year, without even full time secretarial support. And Deputy Chief Anne McCall, who staffed the unit, had other important responsibilities which consumed significant periods of her time. Therefore, at the same time that the Department was encouraging citizens who felt mistreated by its officers to file complaints, it knew that the unit charged with investigating these complaints had insufficient resources to perform the task.

Beyond these conclusions, the materials I read and the persons with whom I spoke lead me to ask - should the Department be consolidated with another police department? Because of the reach of its jurisdiction to 175 cities and towns, the Department can only be consolidated realistically with the Massachusetts State Police. I will not recount the reasons here for raising this question; (see pgs. 16-21) however, consolidation may have the salient effect of improving transit policing, reducing the tension between the police and young people in particular on the transit system and improving the self-esteem of MBTA police officers.

Dated: November 16, 2001

By _____
Rudolph F. Pierce
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
617-482-1776

GSDocs-1063715-1
11/16/2001 11:05 AM

M000431

ATTACHMENT "A"

## MBTA/SOUTH STATION TRANS. CLAIMS

| | Case No. | Citizens Complaint | Arrest/Citation made by MBTA officer | Status of case |
|---|---|---|---|---|
| 1. | 97-01 | Assault | | Exonerated |
| 2. | 97-02 | Damage to car by MBTA bus/Rudeness | | No resolution indicated in this matter |
| 3. | 97-04 | Harassment/Rudeness | | No resolution indicated in this matter |
| 4. | 97-05 | Assault/Rudeness | Arrest: Disorderly conduct | Exonerated |
| 5. | 97-06 | Assault & Battery | | Case apparently dropped |
| 6. | 97-07 and 97-08 | Assault/False Arrest/Rudeness | Arrest: Resisting arrest? | Case not further pursued |
| 7. | 97-09 | Verbal assault/Unprofessional | | Unsubstantiated |
| 8. | 97-10 | Assault/Harassment | | No resolution indicated in this matter |
| 9. | 97-11 | Harassment | | Exonerated |
| 10. | 97-13 | Assault/Excessive force/False arrest | Arrest: Assault & Battery, disorderly conduct, resisting arrest | Not sustained |
| 11. | 97-14 | Harassment/Rudeness | | Exonerated |
| 12. | 97-15 | Unprofessional/Failure to respond to call for help | | Exonerated |
| 13. | 97-16 | Improper response/Fail to Act | | |
| 14. | 97-17 | Uncivil treatment/lost property/unprofessional | Arrest: Disorderly conduct | Unfounded |
| 15. | 97-18 | Failure to respond/Rudeness | | No resolution indicated in this matter |
| 16. | 97-19 | Excessive force | | Unfounded |
| 17. | 97-20 | Missing property | Arrested: Driving w/o license, uninsured/unregistered | Exonerated |
| | | | | Unfounded |

-1-

M000432

| | | | | |
|---|---|---|---|---|
| 18. | 97-21 | Unprofessional/Rude Conduct | | Exonerated |
| 19. | 97-22 | Verbal abuse/Rudeness | Citation: Speeding | Not sustained |
| 20. | 97-23 | Harassment/Rudeness | Citation: Failure to stop | Exonerated |
| 21. | 97-24 | Unprofessional conduct | Citation: Speeding | No resolution indicated in this matter |
| 22. | 97-25 | Mistreatment/discrimination | | Not sustained |
| 23. | 97-26 | Excessive force | | Exonerated |
| 24. | 97-28 | Harassment/Rudeness | Arrest: Trespassing | Exonerated |
| 25. | 97-29 | Wrongful arrest/Assault/Excessive Force | Arrest: Disorderly conduct, trespassing, resisting arrest | Exonerated |
| 26. | 97-30 | Inappropriate/Unprofessional behavior | | Sustained |
| 27. | 97-31 | Wrongful arrest/Excessive force | Arrest: warrant/delinquent to wit | Exonerated |
| 28. | 97-32 | Excessive/Unnecessary force | Citation: Unsafe passing, license and registration not in possession | Exonerated |
| 29. | 97-33 | Unprofessional conduct | | No resolution indicated in this matter |
| 30. | 97-34 | Excessive force/assault | Citation: Within 300 feet of emergency vehicle Arrested: Refusal to submit | No resolution indicated in this matter |
| 31. | 97-36 | Harassment | | Unfounded |
| 32. | 98-01 | Excessive force/Uncivil | | Closed |
| 33. | 98-02 | Rudeness/ Unprofessional conduct | | Exonerated |
| 34. | 98-03 | Assault & Battery | | Unfounded |
| 35. | 98-04 | Harassment/False arrest | Arrest: Assault | Exonerated |
| 36. | 98-07 | Excessive force | | Exonerated |
| 37. | 98-08 | Excessive force | Arrest: Trespassing | Exonerated |
| 38. | 98-09 | Assault/Excessive force | | Exonerated |

-2-

GSDocs-1049048-1

M000433

| # | Case | Complaint | Details | Disposition |
|---|------|-----------|---------|-------------|
| 39. | 98-10 | Discrimination re: disability/ unresponsive | | Not sustained – case went to trial – settled for $16K |
| 40. | 98-11 | Excessive force/Assault | | Unfounded |
| 41. | 98-12 | Unnecessary force | Arrest: Disorderly conduct | Unfounded |
| 42. | 98-13 | Assault | Arrest: disorderly, trespassing | No resolution indicated in this matter |
| 43. | 98-14 | Failure to file report | | Closed |
| 44. | 98-15 | Harassment/verbal abuse | Arrest: Lewdness; possession of Class B; warrant for shoplifting | Unfounded |
| 45. | 98-16 | Rudeness/Harassment | | Exonerated |
| 46. | 98-17 | Inappropriate response | | Exonerated |
| 47. | 98-19 | Assault | Arrest: assault & battery, disorderly, destruction of property | No resolution indicated in this matter |
| 48. | 98-20 | Excessive force/verbal assault | Arrest: disturbing the peace | Not sustained |
| 49. | 98-21 | Excessive force (allegedly resulting in a miscarriage) | | No resolution indicated in this matter |
| 50. | 98-23 | Unprofessional behavior | | Exonerated |
| 51. | 98-24 & 98-35 | Rudeness/Unprofessional behavior | Citation: not yielding to pedestrian | Sustained |
| 52. | 98-25 | Rudeness | | Exonerated |
| 53. | 98-26 | Unprofessional conduct | | Exonerated |
| 54. | 98-27 | Rudeness | | Exonerated |
| 55. | 98-28 | Excessive force | Arrest: trespassing/assault | Exonerated |
| 56. | 98-29 | Unnecessary force | | Exonerated |
| 57. | 98-30 | Unprofessional behavior | | Unfounded |
| 58. | 98-31 | Rudeness | | No resolution indicated in this matter |
| 59. | 98-32 | Wrongful search | | Exonerated |
| 60. | 98-24 and | Rudeness | | Sustained |

GSDocs-1049048-1

M000434

| No. | Case No. | Complaint | Incident | Resolution |
|---|---|---|---|---|
|  | 98-35 | Excessive force | Arrest: disorderly, trespassing | No resolution indicated in this matter |
| 61. | 98-34 | Harassment/wrongful arrest | Arrest: Assault and battery | Not sustained |
| 62. | 98-36 | Excessive force/wrongful arrest | Arrest: Possession of Class D | Not sustained |
| 63. | 98-37 | Unprofessional behavior | Citation: no seatbelt, marked lanes violation, no license in possession | No resolution indicated in this matter |
| 64. | 98-38 | Missing property | Arrest: trespassing, disorderly, assault & battery | Closed |
| 65. | 98-39 | Assault | Arrest: assault and battery, disorderly, trespassing | Not sustained |
| 66. | 98-40 | Missing property | Arrest: warrant for writing fraudulent checks | Exonerated |
| 67. | 98-41 | Harassment | Arrest: disorderly, trespassing | No resolution indicated in this matter |
| 68. | 98-42 | Reckless conduct |  | Exonerated |
| 69. | 98-43 | Rudeness/Verbal assault |  | Exonerated |
| 70. | 98-44 | Poor response |  | Sustained |
| 71. | 98-46 | ?Officers on trains |  | No issue – not further pursued |
| 72. | 98-47 | Assault |  | Exonerated |
| 73. | 98-48 | Harassment | Citation: double-parking | Unfounded |
| 74. | 98-49 | Rudeness | Citation: blocking crosswalk, failure to stop | Exonerated |
| 75. | 98-50 | Threatening |  | Case not further pursued "Misunderstanding" |
| 76. | 98-51 | Harassment |  | Exonerated |
| 77. | 98-52 | Assault |  | Exonerated |
| 78. | 98-55 | Wrongful search, Assault | Arrest: Assault and battery, destruction of personal property | Exonerated |
| 79. | 98-56 | Rudeness, wrongful citation |  | Exonerated |
| 80. | 98-57 | Verbal abuse/assault | Citation: speeding | Unsubstantiated |
| 81. | 98-58 | Lack of response | Arrest: disorderly | Case dismissed in court |
| 82. | 98-59 | Wrongful citation |  | Unfounded |
| 83. | 98-62 |  | Citation: failure to pull over for emergency vehicle | Exonerated |

| # | Case No. | Complaint | Details | Resolution |
|---|---|---|---|---|
| 84. | 98-63 | Vehicle wrongfully towed | | No resolution indicated in this matter |
| 85. | 98-65 | Mistreatment | | Unfounded |
| 86. | 98-66 | Improper conduct/Rudeness | | Exonerated |
| 87. | 98-67 | Rudeness/Harassment | | No resolution indicated in this matter |
| 88. | 98-68 | Assault, unprofessional behavior | Arrest: on warrant | Withdrawn |
| 89. | 98-69 | Rudeness | Arrest: refusal to show license and registration; failure to stay within lanes, harsh tire noise | No resolution indicated in this matter |
| 90. | 98-70 | Assault/Unnecessary force | | No resolution indicated in this matter |
| 91. | 98-71 | Assault & Battery | Citation: trespassing, smoking; Arrest: assault & battery, disorderly conduct, destruction of personal property | Dismissed |
| 92. | 98-72 | False arrest, harassment | Arrest: Assault and Battery | Exonerated |
| 93. | 98-73 | Assault | | Exonerated |
| 94. | 99-01 | Harassment/Missing property | Citation: Passing on the right w/accelerated speed/ Possession of dangerous weapons (knives) | Withdrawn |
| 95. | 99-02 | Missing property | Arrest: disorder conduct | No resolution indicated in this matter |
| 96. | 99-03 | Unnecessary use of force | | Exonerated |
| 97. | 99-04 | Assault/Harassment | | Closed |
| 98. | 99-05 | Harassment | | Exonerated |
| 99. | 99-06 | Rudeness | | Sustained |
| 100. | 99-07 | Improper conduct | | Exonerated |
| 101. | 99-08 | Improper procedure | Citation: excessive use of horn | Exonerated |
| 102. | 99-09 | Abusive language | Citation: smoking | Closed |
| 103. | 99-10 | Improper procedure | Citation: yellow light violation | Closed |
| 104. | 99-11 | Missing property | Arrest: Disorderly | Exonerated |
| 105. | 99-12 | Improper procedure | | Unfounded |

-5-

GSDocs-1049048-1

M000436

| # | Case | Complaint | Arrest/Citation | Resolution |
|---|---|---|---|---|
| 106. | 99-13 | Assault | | "Resolved"- not further pursued |
| 107. | 99-14 | Rudeness | Arrest: disorderly, trespassing | Closed |
| 108. | 99-15 | Improper procedure | | Unfounded |
| 109. | 99-16 | Improper procedure | | Exonerated |
| 110. | 99-17 | Lack of response from officer | | "Resolved" – not further pursued |
| 111. | 99-18 | Unprofessional | | Not sustained |
| 112. | 99-19 | Harassment | | No resolution indicated in this matter |
| 113. | 99-20 | Unprofessional behavior | | Closed |
| 114. | 99-21 | Harassment | | Unfounded |
| 115. | 99-22 | Rudeness | | Exonerated |
| 116. | 99-23 | Improper procedure | | Exonerated |
| 117. | 99-24 | Unnecessary use of force | Arrest: Disorderly | Not further pursued |
| 118. | 99-25 | Improper procedure | Citation: red light violation | Unfounded |
| 119. | 99-26 | Unprofessional behavior | | No resolution indicated in this matter |
| 120. | 99-27 | Improper procedure | Arrest: disorderly, possession of Class D | Unfounded |
| 121. | 99-28 | Improper procedure | | No resolution indicated in this matter |
| 122. | 99-29 | Assault | | No resolution indicated in this matter |
| 123. | 99-31 | Unprofessional behavior | | Suspension of officers |
| 124. | 99-32 | Assault & Battery | Arrest: Assault & Battery, disorderly, resisting arrest | No resolution indicated in this matter |
| 125. | 99-33 | Improper procedure | Arrest: disorderly | Not sustained |
| 126. | 99-34 | Assault/Harassment | | Closed |
| 127. | 99-35 | Missing property | Arrest: on warrant | Settled – not further pusued |

-6-

| # | Case | Complaint | Details | Resolution |
|---|---|---|---|---|
| 128. | 99-36 | Rudeness | | No further action |
| 129. | 99-37 | Improper procedure | Arrest: assault & battery, disorderly | Exonerated |
| 130. | 99-38 | Unnecessary use of force | Arrest: Assault & Battery, disorderly | No resolution indicated in this matter |
| 131. | 99-39 | Improper arrest | Arrest: disorderly, resisting arrest | No resolution indicated in this matter |
| 132. | 99-40 | Unnecessary use of force | Arrest: Assault & Battery | No resolution indicated in this matter |
| 133. | 99-41 | Assault/Unprofessional behavior | Arrest: DUI and citation | No resolution indicated in this matter |
| 134. | 99-42 | Excessive force, improper arrest | Arrest: disorderly, trespassing | No resolution indicated in this matter |
| 135. | 99-44 | Unprofessional behavior | | No resolution indicated in this matter |
| 136. | 99-45 | Unprofessional behavior | | No resolution indicated in this matter |
| 137. | 99-64 | Excessive force | | No resolution indicated in this matter |
| 138. | 99-75 | Improper procedure/Excessive force | Arrest: trespassing/possession of Class D | Exonerated |
| 139. | 00-01 | Harassment/ Unprofessional behavior | | Exonerated |
| 140. | 00-02 | Rudeness | Citation: excluded busway | No resolution indicated in this matter |
| 141. | 00-03 | Speeding (MBTA police) | | No resolution indicated in this matter |
| 142. | 00-04 | Rudeness | Arrest: delinquent to wit; conspiracy to violate drug laws, resisting arrest | Exonerated |
| 143. | 00-05 | Assault, damaged property | Arrest: on warrant | Exonerated |
| 144. | 00-06 | Damage to personal property | | Unsubstantiated |

GSDocs-1049048-1

M000438

| | | | | |
|---|---|---|---|---|
| 145. | 00-07 | Rudeness | Verbal trespass warning | Not sustained |
| 146. | 00-08 | Harassment | | Exonerated |
| 147. | 00-09 | Unprofessional behavior | Citation: fare evasion | No resolution indicated in this matter |
| 148. | 00-10 | Harassment | | No resolution indicated in this matter |
| 149. | 00-11 | Harassment | | Closed |
| 150. | 00-12 | Assault & Battery, Unnecessary use of force, Unlawful search of car | Arrest: failure to yield, refusing to stop, refusal to produce license & registration, resisting arrest, | No resolution indicated in this matter |
| 151. | 00-13 | Theft, Unprofessional behavior | | Unfounded |
| 152. | 00-14 | Harassment | Citation: trespassing | Exonerated |
| 153. | 00-15 | Theft | Arrest: distribution of Class A | No resolution indicated in this matter |
| 154. | 00-16 | Improper violation | Citation: failure to signal | Exonerated |
| 155. | 00-17 | Unprofessional/Assault | Arrest: domestic violence | No resolution indicated in this matter |
| 156. | 00-18 | Lack of Notification | | No resolution indicated in this matter |
| 157. | 00-19 | Harassment, Unnecessary use of force | | No resolution indicated in this matter |
| 158. | 00-20 | Wrongful arrest, Harassment | Arrest: delinquent to wit, trespassing | No resolution indicated in this matter |
| 159. | 00-21 | Abusive/Harassment | Arrest: trespassing, loitering | No resolution indicated in this matter |
| 160. | 00-22 | Rudeness, Unprofessional behavior | Citation: Unregistered operation | No resolution indicated in this matter |
| 161. | 00-23 | Rudeness, improper issuing of citation | Citation: double-parking | No resolution indicated in this matter |
| 162. | 00-24 | Harassment, inappropriate | | No resolution indicated |

-8-

GSDocs-1049048-1

M000439

| | | behavior | Citation: diving through an excluded busway | in this matter |
|---|---|---|---|---|
| 163. | | Improper issuing of citation | Citation: diving through an excluded busway | Exonerated |
| 164. | 00-25 | Assault | | No resolution indicated in this matter |
| 165. | 00-26 | Harassment | | No resolution indicated in this matter |
| 166. | 00-27 | Assault & Battery | Citation: Operating to endanger, failure to submit license | Resolved at criminal trial |
| 167. | 00-28 | Assault/Rudeness | Arrest: destruction of personal property, destruction of real property, assault & battery, resisting arrest | No resolution indicated in this matter |
| 168. | 00-29 | Wrongful issuance of citation | Citation: smoking | Complainant informed they can appeal. No further action taken |
| 169. | 00-30 | Rudeness, wrongful issuance of citation | Citation: failure to obey traffic; stopping on crosswalk | No resolution indicated in this matter |
| 170. | 00-31 | Assault & Battery | | No resolution indicated in this matter |
| 171. | 00-32 | Rudeness, wrongful arrest | Arrest: trespassing | Exonerated |
| 172. | 00-33 | Lack of action by MBTA police | | No resolution indicated in this matter |
| 173. | 00-34 | Rude, wrongful issuance of citation | Citation: red light violation | No resolution indicated in this matter |
| 174. | 00-35 | Harassment/unprofessional behavior | | Closed |
| 175. | 00-36 | Inappropriate response (complaint by T employees re: MBTA police) | | No resolution indicated in this matter |
| 176. | 01-01 | Wrongful arrest | Arrest: lewd acts, disorderly | No resolution indicated in this matter |
| | 01-02 | | | |

-9-

GSDocs-1049048-1

M000440

| | | | | Withdrawn |
|---|---|---|---|---|
| 177. | 01-03 | Rudeness | Citation: failure to stop, marked lane violation, breakdown lane violation | No resolution indicated in this matter |
| 178. | 01-04 | Unprofessional/Threatening | | No resolution indicated in this matter |
| 179. | 01-05 | Bring wrongfully frisked | | No resolution indicated in this matter – appears no further action pursued |
| 180. | 01-06 | Inappropriate behavior | | No resolution indicated in this matter |
| 181. | 01-07 | Inappropriate response, rudeness | | No resolution indicated in this matter |
| 182. | 01-08 | Wrongful towing of car | Citation: obstruction of fire lane | No resolution indicated in this matter |
| 183. | 01-09 | Discrimination | | No resolution indicated in this matter |
| 184. | 01-10 | Rudeness | | No resolution indicated in this matter |
| 185. | 01-11 | Rudeness, Inappropriate behavior | | No resolution indicated in this matter |
| 186. | 01-12 | Unnecessary force | | No resolution indicated in this matter |
| 187. | 01-13 | Wrongful issuance of citation, wrongfully towed, disrespectful treatment | Citation: bus stop lane violation | No resolution indicated in this matter |

-10-

GSDocs-1049048-1

M000441