EXHIBIT 33

Page 1

1                                    VOLUME I

                                     PAGES 1 - 71

2                                    EXHIBITS: 1-3

3              UNITED STATES DISTRICT

        FOR THE DISTRICT OF MASSACHUSETTS

4

                         C.A. NO. 04-10933-JLT

5

6   NANCY O'LOUGHLIN,                )

         Plaintiff,                  )

7                                    )

    vs.                              )

8                                    )

    MASSACHUSETTS BAY                )

9   TRANSPORTATION AUTHORITY and     )

    JOSEPH CARTER and MICHAEL        )

10  MULHERN,                         )

         Defendants.                 )

11

12

13          DEPOSITION OF MACDONALD DANIEL, taken on

14   behalf of the Defendant, Michael Mulhern,

15   pursuant to the Federal Rules of Civil

16   Procedure before Tina M. Sarcia, Registered

17   Professional Reporter and Notary Public

18   within and for the Commonwealth of

19   Massachusetts, at the law offices of Wilmer,

20   Cutler, Pickering, Hale and Dorr, LLP, 60

21   State Street, Boston, Massachusetts, on

22   Friday, January 20, 2006, commencing at 2:06

23   p.m.

24

Page 70

1  DEPONENT'S ERRATA SHEET
2  AND SIGNATURE INSTRUCTIONS
3
4      The original of the Errata Sheet has
5  been delivered to Jon Albano, Esq.
6      When the Errata Sheet has been
7  completed by the deponent and signed, a copy
8  thereof should be delivered to each party of
9  record and the ORIGINAL delivered to Gregory
10  Reiser, Esq. to whom the original deposition
11  transcript was delivered.
12
13      INSTRUCTIONS TO DEPONENT
14
15      After reading this volume of your
   deposition, indicate any corrections or
16  changes to your testimony and the reasons
   therefor on the Errata Sheet supplied to you
17  and sign it.  DO NOT make marks or notations
   on the transcript volume itself.
18
19  REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20  COMPLETED AND SIGNED ERRATA SHEET WHEN
21  RECEIVED.
22
23
24

Page 71

1  ATTACH TO THE DEPOSITION OF MACDONALD DANIEL
   CASE:  O'LOUGHLIN V MBTA
2
3      ERRATA SHEET

4  INSTRUCTIONS:  After reading the transcript
   of your deposition, note any change or
   correction to your testimony and the reason
5  therefor on this sheet.  DO NOT make any
   marks or notations on the transcript volume
6  itself.  Sign and date this errata sheet
   (before a Notary Public, if required).  Refer
7  to Page 70 of the transcript for errata sheet
   distribution instructions.
8
   PAGE LINE
9      CHANGE:
       REASON:
10     CHANGE:
       REASON:
11     CHANGE:
       REASON:
12     CHANGE:
       REASON:
13     CHANGE:
       REASON:
14     CHANGE:
       REASON:
15     CHANGE:
       REASON:
16     CHANGE:
       REASON:
17     CHANGE:
       REASON:
18     CHANGE:
       REASON:
19
20     I have read the foregoing transcript
   of my deposition and except for any
21  corrections or changes noted above, I hereby
   subscribe to the transcript as an accurate
22  record of the statements made by me.
23
24     MACDONALD DANIEL     DATE

19 (Pages 70 to 71)

1 statement about that he makes on the record
2 about Joe Carter. When asked him to go on
3 the record about other things, that he
4 refused.
5 Q. Did he say or confirm or deny that the
6 officers involved had, in fact, engaged in
7 illegal conduct?
8 A. No. I just think he told me about the scope
9 of the investigation. I can't recall whether
10 he used the word "illegal".
11 Q. Did he just say that an investigation was
12 being conducted to see if illegal activity
13 had occurred?
14 A. It was pretty bare bones from Mulhern.
15 Q. And he did not say criminal charges would be
16 brought against Nancy O'Loughlin; is that
17 right?
18 A. No. I believe that statement in the article
19 came from Joe Pesaturo's quote.
20 Q. And I'm sorry if I already asked this again.
21 That was the last conversation you had with
22 Mulhern about this?
23 A. About this.
24 Q. About the subject matter of this article?

1 A. To the best of my recollection.
2 MR. REISER: We'll mark the next
3 exhibit.
4 (Exhibit No. 3, Amended complaint,
5 so marked)
6 Q. I'm handing you now what's been marked as
7 Daniel 3, and this is the First Amended
8 Complaint and Demand For Jury Trial, and this
9 is the complaint in this lawsuit. Have you
10 seen this document before?
11 A. I don't believe I have.
12 Q. Can you turn to page 9, paragraph 30. If you
13 would just look at the first sentence where
14 it says, "The MBTA official who spoke with
15 the Boston Globe reporter, and who released
16 Lieutenant O'Loughlin's name to the Boston
17 Globe reporter, was the MBTA General Manager,
18 Michael Mulhern."
19 You might want to look at the
20 preceding paragraph where it talks about a
21 March 11, 2004 Boston Globe article. Is that
22 the article we were just talking about, or
23 does that refer to the part we were just
24 talking about?

1 A. I think that was wrong. I think the article
2 appeared on March 12th. It was the 11th.
3 Q. Are you confirming you think it was the 11th
4 after looking at the exhibit?
5 A. Yes.
6 Q. So then turning to paragraph 30, that first
7 sentence, do you think that's a true
8 statement?
9 A. The first sentence?
10 Q. Uh-huh.
11 A. Yes.
12 Q. Turning to the next page up at the top, it's
13 the first complete sentence on that page,
14 "Mr. Mulhern falsely led the Boston Globe
15 reporter to believe (and to write his news
16 stories) that the allegations against
17 Lieutenant O'Loughlin were of a criminal
18 nature, and could lead to criminal charges
19 against her." Do you think that sentence is
20 true?
21 A. No, I don't.
22 Q. What's not true about that sentence?
23 A. Mulhern didn't mention anything about
24 allegations against O'Loughlin were of a

1 criminal nature and could lead to criminal
2 charges against her, not like the falsely led
3 the Boston Globe reporter.
4 MR. REISER: Nothing further at this
5 time.
6 EXAMINATION BY MR. NOTIS
7 Q. Mr. Daniel, my name Mitchell Notis, and I
8 represent Nancy O'Loughlin in this
9 litigation. How do you do?
10 A. Very well.
11 Q. Let me ask you, sir, in the conversation you
12 had with Mike Mulhern, did Mr. Mulhern say to
13 you that Nancy O'Loughlin was absolutely not
14 involved in any allegations of criminal
15 misconduct?
16 A. I can't recall. I mean, that specific
17 wording?
18 Q. Did he -- do you recall that specific
19 wording?
20 A. No.
21 Q. Did he say anything to that effect?
22 A. I really can't recall. I can't recall the
23 specifics of the conversation.
24 Q. I think you just mentioned that he didn't say

8 (Pages 26 to 29)

1 anything to you about her being involved in
2 criminal conduct, right?
3 A. No. I think the word criminal never -- as I
4 recall, it never came up. All I was asking
5 him for was to confirm with Nancy
6 O'Loughlin's name.
7 Q. So if the word "criminal" never came up, he
8 never said to you that she was absolutely
9 never involved. She wouldn't be involved in
10 criminal conduct due to this?
11     MR. EDWARDS: Objection. You can
12 answer.
13 A. I can't recall. I don't recall that
14 statement being made.
15 Q. Do you recall anything about her being
16 involved in criminal misconduct being said?
17 A. No, I don't recall. I don't believe so.
18 Q. Do you recall Mr. Mulhern saying that Nancy
19 O'Loughlin had nothing to do with the
20 so-called CORI violations?
21 A. I don't think we spoke about that, no.
22 Q. Did you -- during this conversation did you
23 indicate to Mr. Mulhern that you were going
24 to include Nancy O'Loughlin in your story,

1 and you were also going to include the fact
2 that she could be facing potential criminal
3 charges?
4 A. I think -- I can't recall what I asked him,
5 so I don't know. I was coming to Mike
6 Mulhern to confirm Nancy O'Loughlin's
7 involvement. I can't recall the specifics.
8 Q. So you don't recall then if you indicated to
9 him that you were going to say she might be
10 found criminally responsible?
11 A. I can't.
12 Q. Again, if you don't recall him saying to you
13 that that was misinformation or that was
14 absolutely not true?
15 A. No, I don't. No. Based on what I know, I
16 don't think that would -- I can't recall.
17 Based on what I reported, if he did say that,
18 I wouldn't have written the things I wrote.
19 Q. Why is that?
20 A. Because if it was a denial on his part, then
21 I wouldn't have -- read that section to me
22 again, please.
23 Q. Well, what my question to you was again, if
24 you indicated to Mr. Mulhern you were going

1 to include in your story that Nancy
2 O'Loughlin could be facing potential criminal
3 charges and if in response he said to you
4 that was absolutely not true and you had
5 misinformation --
6 A. I don't recall that.
7 Q. If he had said that to you or something like
8 it, would you have written in your story that
9 the probe could lead to criminal charges
10 against the four?
11 A. I don't believe I would have, but I don't
12 recall that statement being made.
13 Q. Let me ask you this: Did Mr. Mulhern warn
14 you not to go down that road because nothing
15 could be further from the truth?
16     MR. EDWARDS: Objection.
17 A. I don't recall about wording.
18 Q. Did he say anything to that effect?
19 A. I don't recall. I really can't. I wouldn't
20 have written -- I don't believe I would have
21 written what I wrote had words to that effect
22 been said to me by someone like Mulhern.
23 Q. Do you recall having the impression that
24 Mr. Mulhern was trying to dissuade you from

1 writing in your story that Nancy O'Loughlin
2 could be found criminally responsible?
3 A. I don't remember that.
4 Q. And the next day after the story ran, did you
5 call Mr. Mulhern up and call him some name
6 like an asshole?
7 A. No.
8 Q. You never did that?
9 A. No.
10 Q. Did you tell him that the sources you'd been
11 given said that Mr. Mulhern completely misled
12 you?
13 A. No.
14 Q. And did he say to you the day after your
15 first conversation or the day after that
16 story ran, Mac, it's absolutely not true? I
17 gave you accurate information. It had
18 nothing to do with Where's Waldo. Did he
19 ever say that to you?
20 A. I don't recall, sir.
21 Q. And, indeed, do you recall ever having any
22 such second conversation with Mulhern?
23 A. Not to my recollection.
24 Q. Now, when you say that the information about

9 (Pages 30 to 33)

1  this possibly leading to criminal charges,
2  you got that from Pesaturo. When would you
3  get that information from Pesaturo?
4 A. That was on the first day. That would have
5  been on the 10th.
6 Q. The same day you spoke with --
7 A. The same day I spoke with Mulhern. I don't
8  know when I got it. I don't know whether he
9  said Pesaturo had given me that quote prior
10  to speaking to Mulhern or afterwards.
11 Q. I think what you said initially was -- let me
12  read my notes here. I don't want to
13  misphrase your testimony. I think you said
14  something about they may have been on a
15  speakerphone. Pesaturo may have been on and
16  off the phone during your conversations with
17  Mulhern; is that correct?
18 A. Yes. More than likely -- this wasn't just
19  one conversation once in the day. More than
20  likely was several conversations with
21  Pesaturo mainly during the day to try to set
22  something up, and typically we'd get the
23  general manager on the speakerphone later in
24  the day but just once and that would be it.

1  I don't recall the specifics of what this
2  particular day was.
3 Q. Do you have any recollection of when it was
4  you got that information about possible
5  criminal liability from Pesaturo with regard
6  to the conversation you had with Mulhern?
7      MR. EDWARDS: Objection. You can
8  answer.
9 A. I don't recall. I don't recall whether it
10  was before or after.
11 Q. Could it have been at the same time?
12 A. Possibly, sure.
13 Q. And you don't recall -- what do you recall
14  what Pesaturo said to you about that possible
15  criminal liability?
16 A. Only the quote that was in the piece.
17      MR. EDWARDS: Can you direct me to
18  where you're reading about criminal
19  liability?
20      MR. NOTIS: Sure. "The probe could
21  lead to criminal charges against the four,
22  MBTA officials said and more officers face
23  suspension".
24      MR. EDWARDS: Okay.

1 Q. Is that the one you're referring to,
2  Mr. Daniel? It's the third paragraph.
3 A. I'm actually referring to the Pesaturo quote
4  quote where he talks ninth paragraph down
5  where he actually --
6 Q. There is an ongoing criminal investigation --
7 A. Yes.
8 Q. Okay. Fine. Let's go to the third paragraph
9  though where it says, "The probe could lead
10  to criminal charges against the four, MBTA
11  officials said, and more officers face
12  suspension". I thought you testified that
13  was based on what Pesaturo had said?
14 A. That's correct.
15 Q. Now, did Pesaturo say there were four people
16  involved?
17 A. I think that's an amalgamation of different
18  facts that I had gathered during the day,
19  criminal charges, you know, from the Pesaturo
20  quote, the four from, you know, the
21  confirmations that I got throughout the day.
22 Q. And Nancy O'Loughlin from Mulhern?
23 A. Right.
24 Q. Who were the -- let's see. In the first

1  paragraph you said that the agency official
2  referred to is Mr. Mulhern. Who were the two
3  others that were briefed on the investigation
4  that you referred to there?
5      MR. ALBANO: Let me object. We have
6  an objection as to specifically identifying
7  those folks because they're confidential
8  sources, but I think the witness is prepared
9  to offer a general description.
10 A. There were two police union members or
11  officials.
12 Q. And are you willing to give me their names?
13 A. Based on my counsel's objection.
14 Q. You're refusing to answer that question --
15  let me just for the record.
16      Can you, please, tell me the names
17  of those two police union officials who were
18  referred to in the first paragraph?
19 A. I can't.
20 Q. You're refusing to answer that question based
21  on the advice of your counsel?
22 A. Yes.
23 Q. Is one of them someone named Greg Lee?
24      MR. ALBANO: Same objection.

10 (Pages 34 to 37)

1   MBTA?
2 A. I really don't recall that. I know I wrote
3   that -- I think I wrote about something about
4   that later, months later but not at that
5   time.
6 Q. What do you recall about the later story?
7 A. Just that there was something about
8   O'Loughlin filing -- I think it was -- was it
9   this lawsuit? I can't recall. I think it
10   might have been in claiming that it was in
11   retaliation for her filing the MCAD case.
12 Q. Did you ever speak to Mulhern about that?
13 A. I don't believe I did.
14 Q. Did you speak to Pesaturo about it?
15 A. I don't recall.
16 Q. After the article ran, you mentioned you had
17   a conversation with Tom O'Loughlin, correct?
18 A. That's correct.
19 Q. And you mentioned that he told you that it
20   wasn't correct that Nancy was his sister?
21 A. That's correct.
22 Q. By the way, who told you that Nancy was his
23   sister?
24 A. I believe that was one of the union

1 Q. In the conversation you had with Tom
2   O'Loughlin, did Tom ask you if Michael
3   Mulhern had told you that Nancy O'Loughlin
4   could face criminal charges?
5 A. I don't recall. All I recall that
6   conversation being about was him
7   straightening me out on what we corrected in
8   the story.
9 Q. You don't recall any discussion in that
10   conversation between you and Tom O'Loughlin
11   about whether you had spoken to Mulhern about
12   this?
13 A. No.
14 Q. Have you discussed this particular matter
15   with Michael Mulhern since the article came
16   out?
17 A. What particular matter?
18 Q. That's a bad question. Since the article
19   came out, did you have any conversations with
20   Michael Mulhern about the article?
21 A. No.
22 Q. Have you ever discussed this lawsuit with
23   Michael Mulhern?
24 A. No.

1   officials.
2 Q. Did Mulhern say anything about that?
3 A. No.
4 Q. Did O'Loughlin ask you who the MBTA official
5   mentioned in the article was?
6 A. No. I can't recall. I really can't recall.
7 Q. Did Tom O'Loughlin say to you isn't it
8   Mulhern?
9 A. I don't recall that.
10 Q. And do you recall O'Loughlin saying to you
11   isn't it Mulhern and you were acknowledging
12   that to Tom O'Loughlin?
13 A. I don't remember that, and that would be very
14   surprising to me. I wouldn't do that. I
15   don't believe I would do that.
16 Q. If Tom O'Loughlin said you did that, would
17   you be lying?
18     MR. EDWARDS: Objection.
19     MR. ALBANO: Objection.
20 A. I think yes, he would be.
21 Q. Did Tom O'Loughlin ask you if Mulhern told
22   you that Nancy O'Loughlin could face criminal
23   charges?
24 A. Say that again.

1 Q. Have you ever discussed the lawsuit with any
2   attorney for Michael Mulhern?
3 A. No.
4 Q. Have you ever discussed this lawsuit with any
5   attorney for the MBTA?
6 A. No.
7 Q. Did you ever speak to Joe Pesaturo about this
8   lawsuit?
9 A. I told Joe that I was being depositioned in
10   this case, but that was about it.
11 Q. When did you tell Mr. Pesaturo that?
12 A. This morning.
13 Q. What did he say when you told him that?
14 A. Nothing.
15 Q. Literally silenced at the other end of the
16   line?
17 A. No. He just said it was okay and that was
18   it.
19 Q. Why did you tell him that?
20 A. I had to write the column today, and I needed
21   to get information from him for the column,
22   so I needed to tell him I was going to be out
23   of the office for awhile.
24 Q. Is this going to be in your column?

13 (Pages 46 to 49)

1 Q. What unions would those be?
2 A. I think I was specifically talking about the
3    MBTA police patrolman's association, so it
4    would be the union's representative of the
5    police officers.
6 Q. Now, without, again, attempting to identify
7    individuals here, are the individuals briefed
8    on this investigation as you refer to in
9    paragraph 1 of the article, are these members
10   of the police patrolman's association?
11 A. Yes.
12 Q. Did you speak with anyone from the sergeant's
13   union?
14 A. I don't believe so.
15 Q. Lieutenant's union?
16 A. No.
17 Q. Now, I know I'm repeating what people have
18   said here but paragraph 3 here, "The probe
19   could lead to criminal charges against the
20   four". I'm going to make a statement, and
21   I'm going to ask you to straighten me out if
22   I misstate it. Neither Mr. Mulhern nor
23   Mr. Pesaturo made that statement to you, "The
24   probe could lead to criminal charges against

1   the four, Massachusetts Bay Transportation
2   Authority officials said, and more officers
3   face suspension"?
4 A. This is kind of a summary of what Pesaturo
5   said in his quote down below, I believe it's
6   the ninth paragraph down. As best as I can
7   recall, I'm simply summing up the information
8   he had in that quote in higher graph here,
9   and what you said about Pesaturo not saying
10   it is not true. I believe I'm using his
11   information from that quote to write that
12   paragraph, that third paragraph.
13 Q. Let me ask it this way and I'm going to refer
14   to paragraph 9: As far as you were concerned
15   and the way you understood it -- perhaps a
16   better way to phrase it. The way you
17   understood when Joe Pesaturo said, "There is
18   an ongoing internal investigation that
19   concerns egregious violations of the
20   department's policies, rules and regulations
21   as well as allegations of criminal conduct,"
22   that led you to deduce that the probe could
23   lead to criminal charges?
24 A. Yes.

1 Q. Did you also understand that egregious
2   violations of the department's policies,
3   rules and regulations could be just that,
4   violations of policies, rules and regulations
5   but not be criminal conduct?
6 A. I don't think I was thinking that that
7   deeply. I'm not quite getting --
8 Q. Let me rephrase the question. Was it your
9   understanding that this investigation only
10   involved conduct that would possibly lead to
11   criminal charges?
12 A. No, I don't think so. I can't recall what my
13   understanding of it was; but based on that
14   quote which I wrote at that time, it would
15   seem as though there would be a mix, that
16   some could face suspension without criminal
17   charges and that criminal charges were
18   possible.
19 Q. And neither Mr. Mulhern nor Mr. Pesaturo said
20   to you that any investigation involving Nancy
21   O'Loughlin could lead to criminal charges
22   against her?
23       MR. ALBANO: I object to that. You
24   can answer.

1 A. No, nobody said Nancy O'Loughlin faces
2   criminal charges. I took the information
3   that was from Pesaturo's quote and put it up
4   there in that third summary graph.
5 Q. And neither Mr. Pesaturo nor Mr. Mulhern said
6   what conduct Nancy O'Loughlin was suspected
7   of having engaged in?
8 A. I don't recall them giving me those
9   specifics.
10 Q. When it came to your mind that there possibly
11   could be criminal charges, was it because of
12   potential CORI violations? Was that the
13   criminal conduct you were talking about?
14 A. That was my understanding.
15 Q. Did Mr. Mulhern or Mr. Pesaturo say CORI
16   violations are criminal conduct?
17 A. No.
18 Q. How did you have that understanding?
19 A. Well, I don't recall at the time. I know
20   that just as a matter of course and I recall
21   I believe one of the union officials had
22   mentioned that CORI was -- that the mission
23   use of the CORI system could lead to criminal
24   charges, but I don't think that was said -- I

15 (Pages 54 to 57)