EXHIBIT 35

```
                                                        Page 1
 1                                        VOLUME I
                                          PAGES 1 - 66
 2                                        EXHIBITS: 1-4
 3            UNITED STATES DISTRICT
         FOR THE DISTRICT OF MASSACHUSETTS
 4
                          C.A. NO. 04-10933-JLT
 5
 6   NANCY O'LOUGHLIN,                    )
          Plaintiff,                      )
 7                                        )
     vs.                                  )
 8                                        )
     MASSACHUSETTS BAY                    )
 9   TRANSPORTATION AUTHORITY and         )
     JOSEPH CARTER and MICHAEL            )
10   MULHERN,                             )
          Defendants.                     )
11
12
13        DEPOSITION OF MELVIN YAWU MILLER, taken
14   on behalf of the Defendant, Michael Mulhern,
15   pursuant to the Federal Rules of Civil
16   Procedure before Tina M. Sarcia, Registered
17   Professional Reporter and Notary Public
18   within and for the Commonwealth of
19   Massachusetts, at the law offices of Wilmer,
20   Cutler, Pickering, Hale and Dorr, LLP, 60
21   State Street, Boston, Massachusetts, on
22   Friday, January 20, 2006, commencing at 10:00
23   a.m.
24
```

Page 10

1  A. Banner Publications, Incorporated.
2  Q. Does that company own a newspaper called the
3     Bay State Banner?
4  A. It does.
5  Q. Do you write articles for that newspaper?
6  A. I do.
7  Q. What is your position with Banner
8     Publications, Incorporated?
9  A. My current position is senior editor.
10 Q. Are you the senior editor of the Bay State
11    Banner?
12 A. Yes. It also publishes the Boston Banner,
13    which is essentially the same paper.
14 Q. Do you know who Thomas O'Loughlin is?
15 A. I do.
16 Q. Do you know him personally? Do you have a
17    personal relationship with him?
18 A. I don't have a personal relationship with
19    him. I'd say I probably interviewed him
20    probably half a dozen times.
21 Q. Did those interviews occur during the time
22    that he was chief of the T police?
23 A. That's correct.
24 Q. Did you ever discuss Nancy O'Loughlin with

Page 11

1     Thomas O'Loughlin?
2  A. I don't recall ever discussing Nancy
3     O'Loughlin with Thomas O'Loughlin.
4  Q. Did you speak to any of the parties in this
5     lawsuit before coming here today?
6  A. No. Between the time I received the subpoena
7     and now, I have not spoken to any of the
8     parties in the lawsuit.
9  Q. Do you understand that you had a right or an
10    opportunity to seek legal counsel before
11    coming here today?
12 A. I may have read that. I don't recall.
13 Q. Did you decline to have the representation
14    before coming here today?
15 A. Yes.
16 Q. Now, you believe you may have interviewed
17    Mr. Mulhern at least two times, but aside
18    from interviews, have you ever had any
19    conversations with Mr. Mulhern?
20 A. There was a journalist named Robert
21    Washington. He was a transportation
22    columnist for The Herald. He left The Herald
23    -- I don't recall what year -- shortly before
24    Mulhern left the MBTA, and he had a going

Page 12

1     away party I think it was JJ Foley's, and I
2     saw Mr. Mulhern there and had a few words
3     with him.
4  Q. What did you guys discuss on that occasion?
5  A. Probably just Robert Washington and his
6     reporting.
7  Q. Do you recall an article appearing in the Bay
8     State Banner in which Nancy O'Loughlin was
9     described as a rogue cop?
10 A. Yes.
11 Q. Did you ever discuss that article with
12    Mr. Mulhern?
13 A. No, I didn't.
14    MR. REISER: I would like to mark
15    the next exhibit.
16    (Exhibit No. 2, Articles, so marked)
17 Q. I'm handing you what's been marked as Miller
18    2. This is a reproduction of Bay State
19    articles, a series of Bay State Banner
20    articles dated March 18, 2004. Turning your
21    attention to the article on this page
22    entitled MBTA Cops Suspended, can you take a
23    brief moment and look at that article and
24    tell me if you recognize that article?

Page 13

1  A. I do.
2  Q. Did you write this article?
3  A. I did.
4  Q. Was Michael Mulhern a source for yours of
5     this article?
6  A. If he wasn't quoted in here, then I didn't
7     talk to him.
8  Q. Can you, please, take a look at this article
9     and see, if, in fact, Michael Mulhern is
10    quoted in this article? Do you see if
11    Mr. Mulhern is quoted in that article?
12 A. He's not quoted.
13 Q. Are you confident that Mr. Mulhern was not a
14    source of yours for this article?
15 A. I am.
16 Q. Would you, please, turn to the second
17    paragraph of this article?
18 A. Yes.
19 Q. In that paragraph it says -- the last words
20    are "according to news reports".
21 A. Yes.
22 Q. Do you recall what newspaper records you're
23    referring to in that sentence?
24 A. It was either The Globe or The Herald or

4 (Pages 10 to 13)

Page 14

1  both.
2 Q. Do you recall that both The Globe and The
3     Herald ran articles related to this subject
4     matter of this article?
5 A. I recall reading about it at least in one of
6     the daily papers.
7         MR. REISER: I would like to mark
8     the next exhibit, please.
9         (Exhibit No. 3, Reproduction of
10        article, so marked)
11 Q. I'm handing you what's been marked as Miller
12    3, and this is a reproduction of an article
13    that appeared in the Boston Globe dated March
14    11, 2004.
15        I'll just ask you to take a moment
16    to familiarize yourself with that document.
17    Please let me know when you're finished.
18        Do you recall reading that article
19    before just now?
20 A. Yes.
21 Q. Do you recall when you first read that
22    article?
23 A. Probably the day it came out in the papers.
24 Q. Was this article -- is this article one of

Page 15

1     the news reports referenced in your article?
2 A. Yes.
3 Q. Do you remember what your inspiration was for
4     writing this article, or what prompted you to
5     write your article?
6 A. I found out about it in The Globe, either in
7     The Globe or The Herald or both.
8 Q. Do you recall if you read an article in The
9     Herald about the same subject matter?
10 A. I don't recall. I read both papers every
11    day.
12 Q. Turning back to your article, do you have
13    reason to believe that you believe anything
14    in your article is false or inaccurate?
15 A. I do not.
16        MR. REISER: Let's mark the next
17    exhibit, please.
18        (Exhibit No. 4, First Amended
19        Complaint, so marked)
20 Q. I'm handing you what's been marked Miller 4,
21    and this is a copy of a jury trial filed by
22    Nancy O'Loughlin in this matter. Have you
23    seen this document before?
24 A. I have not.

Page 16

1 Q. If you would, please, turn to page 10, and
2     I'll direct your attention to paragraph 31.
3     Can you, please, just read that paragraph to
4     yourself and let me know when you're
5     finished.
6         Where it says in paragraph 31, "On
7     information and belief, Lt. O'Loughlin's name
8     was provided to the Bay State Banner reporter
9     by Mr. Mulhern in retaliation for her having
10    previously filed the October 2003 Charge of
11    Discrimination".
12        Is it true there where it says that
13    O'Loughlin's name was provided to the Bay
14    State Banner reporter by Mr. Mulhern?
15 A. No, it's not.
16        MR. REISER: I have nothing further.
17        EXAMINATION BY MR. NOTIS
18 Q. My name is Mitchell Notis, and I represent
19    the plaintiff in this action Nancy
20    O'Loughlin. Just to clear up a few things,
21    you said you interviewed Mr. Mulhern two or
22    three times, correct?
23 A. Yes.
24 Q. Are you referring to in-person meetings; is

Page 17

1     that correct?
2 A. I don't recall ever talking to him on the
3     phone.
4 Q. So not at all. Have you discussed Nancy
5     O'Loughlin at any point with any other
6     employee of the MBTA?
7 A. There was a cop who was stationed in Dudley
8     Square, and I used to ask him questions about
9     the MBTA and never got anything from him or
10    very little; but there was an officer in
11    Dudley Square I used to speak with from time
12    to time.
13 Q. And did you discuss Nancy O'Loughlin with
14    him?
15 A. I don't recall whether her name specifically
16    came up, but it's likely that it did.
17 Q. Do you recall the name of that officer?
18 A. Gregory Lee. I believe he was a union
19    representative at the time.
20 Q. Do you recall anything Mr. Lee said to you
21    about Nancy O'Loughlin?
22 A. Not specifically.
23 Q. Do you recall if he had a negative opinion of
24    her?

Page 18

1 A. No, I don't.
2 Q. Have you ever discussed Nancy O'Loughlin with
3    any other employee of the MBTA? When I say
4    "the MBTA," that's not just the uniformed
5    officers, anyone else in the MBTA?
6 A. I don't recall any conversations with any
7    MBTA officers about Nancy O'Loughlin.
8 Q. Did you speak with any MBTA about the subject
9    of the article which is Exhibit 2?
10 A. I called the press office, and usually when
11    you do an article, you call for a response
12    from the agency. I believe I spoke with --
13    may I look at the exhibit?
14 Q. Please do.
15 A. Joe Pesaturo.
16 Q. You spoke with Joe Pesaturo about the subject
17    of this article, correct?
18 A. Yes.
19 Q. Do you recall speaking with any other MBTA
20    employee about the subject of this article?
21 A. I do not recall speaking with any other MBTA
22    employee.
23 Q. Can you say sitting here today you did not
24    speak with any MBTA about the subject of this

Page 19

1    article?
2 A. Yes. If I had anything, I would have used
3    it. It would have come out in the story.
4 Q. Do you recall your conversation with Joe
5    Pesaturo?
6 A. No, I don't.
7 Q. Did you discuss Nancy O'Loughlin's name with
8    Mr. Pesaturo in that conversation?
9 A. I don't recall. It's likely I would have
10    asked him.
11 Q. Would you have asked him if -- if you go back
12    to The Globe article, sir, which is Exhibit
13    3, the only MBTA police officer's name
14    mentioned is Lieutenant O'Loughlin, correct?
15 A. Yes.
16 Q. Do you recall if you asked Mr. Pesaturo if
17    Nancy O'Loughlin was one of the officers
18    involved in this matter?
19 A. I don't recall that conversation with
20    Mr. Pesaturo.
21 Q. Would it have been your practice at that time
22    to confirm that with him in that
23    conversation?
24        MR. EDWARDS: Objection.

Page 20

1 A. I don't recall.
2 Q. You don't recall if that would have been your
3    practice or not?
4 A. No.
5 Q. Let me ask you this -- strike that.
6        Do you recall if there's any time
7    you spoke to Joe Pesaturo about Nancy
8    O'Loughlin?
9 A. No, I don't recall at any point speaking with
10    Mr. Pesaturo about Nancy O'Loughlin.
11 Q. Do you recall at any point speaking to
12    Michael Mulhern about Nancy O'Loughlin?
13 A. I do not.
14 Q. It says in your article, sir, "Also caught up
15    in the sweep was lieutenant Nancy O'Loughlin,
16    who allegedly helped facilitate the officers'
17    misuse of police records, according to news
18    reports". That's information you got from
19    news reports?
20 A. Yes.
21 Q. Can you, please, tell me where in Exhibit 3
22    is any reference to Nancy O'Loughlin
23    facilitating the misuse of police records?
24        MR. EDWARDS: Objection. You can

Page 21

1    answer the question.
2 A. I think just in the second paragraph or the
3    second sentence. "They said a lieutenant who
4    allegedly encouraged the officers' activities
5    also was suspended."
6 Q. Based upon reading this article, you assumed
7    this lieutenant was Nancy O'Loughlin?
8 A. Yes.
9 Q. And was it your understanding at the time
10    that facilitating the misuse of police
11    records was a crime?
12 A. No, I don't think I would have known that was
13    a crime.
14 Q. Based upon your review of The Globe article,
15    was it your understanding that Lieutenant
16    O'Loughlin might be subjected to criminal
17    charges?
18 A. Can you repeat the question?
19 Q. Based upon your review of the -- you've
20    testified that at least in part you base your
21    article on this Boston Globe article?
22 A. Yes.
23 Q. And my question to you was based upon your
24    review of the Boston Globe article on March

6 (Pages 18 to 21)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

Page 62

1 A. I knew she had a desk job. I don't recall
2  her being assigned to a detective unit. What
3  did I write here?
4 Q. We're looking at the first column, second
5  page, that's where I was looking.
6 A. Yes.
7 Q. Let me ask the question this way: Did you
8  understand that Nancy O'Loughlin's assignment
9  to head the detective day shift and graffiti
10  investigations was a desk job?
11 A. No.
12 Q. What was the desk job that you are referring
13  to in this article?
14 A. I don't recall what the desk job is in the
15  article. Again, I don't recall where that
16  came from.
17 Q. And you understand that Nancy O'Loughlin
18  didn't want a desk job?
19 A. I made that assumption.
20 Q. You didn't speak with anybody that told you
21  that?
22 A. I don't recall.
23     MR. EDWARDS: Thank you. I have
24  nothing else.

Page 63

1     (Whereupon the deposition was
2  concluded at 11:41 a.m.)

Page 64

1     CERTIFICATE
2
3 COMMONWEALTH OF MASSACHUSETTS
4
5
6     I, Tina M. Sarcia, a Registered
7 Professional Reporter and Notary Public in
8 and for the Commonwealth of Massachusetts, do
9 hereby certify that the foregoing transcript
10 of the deposition of YAWU MILLER, having been
11 duly sworn, on Friday, January 20, 2006, is
12 true and accurate to the best of my
13 knowledge, skill and ability.
14     IN WITNESS WHEREOF, I have hereunto
15 set my hand and seal this 7th day of
16 February, 2006.
17
18
19
20     Tina M. Sarcia, RPR
21     Notary Public
22
23
24 My commission expires: March 13, 2009

Page 65

1 DEPONENT'S ERRATA SHEET
2 AND SIGNATURE INSTRUCTIONS
3
4     The original of the Errata Sheet has
5 been delivered to Gregory Reiser, Esq.
6     When the Errata Sheet has been
7 completed by the deponent and signed, a copy
8 thereof should be delivered to each party of
9 record and the ORIGINAL delivered to Gregory
10 Reiser, Esq. to whom the original deposition
11 transcript was delivered.
12
13     INSTRUCTIONS TO DEPONENT
14
15     After reading this volume of your
   deposition, indicate any corrections or
16 changes to your testimony and the reasons
   therefor on the Errata Sheet supplied to you
17 and sign it. DO NOT make marks or notations
   on the transcript volume itself.
18
19 REPLACE THIS PAGE OF THE TRANSCRIPT WITH THE
20 COMPLETED AND SIGNED ERRATA SHEET WHEN
21 RECEIVED.
22
23
24

17 (Pages 62 to 65)

```
                                                    Page 66
 1   ATTACH TO THE DEPOSITION OF YAWU MILLER
     CASE: O'LOUGHLIN V MBTA
 2
          ERRATA SHEET
 3
     INSTRUCTIONS: After reading the transcript
 4   of your deposition, note any change or
     correction to your testimony and the reason
 5   therefor on this sheet. DO NOT make any
     marks or notations on the transcript volume
 6   itself. Sign and date this errata sheet
     (before a Notary Public, if required). Refer
 7   to Page 65 of the transcript for errata sheet
     distribution instructions.
 8
     PAGE LINE
 9        CHANGE:
          REASON:
10        CHANGE:
          REASON:
11        CHANGE:
          REASON:
12        CHANGE:
          REASON:
13        CHANGE:
          REASON:
14        CHANGE:
          REASON:
15        CHANGE:
          REASON:
16        CHANGE:
          REASON:
17        CHANGE:
          REASON:
18        CHANGE:
          REASON:
19
20        I have read the foregoing transcript
     of my deposition and except for any
21   corrections or changes noted above, I hereby
     subscribe to the transcript as an accurate
22   record of the statements made by me.
23
24        YAWU MILLER    DATE
```

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**