UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANCY O'LOUGHLIN, <br>       Plaintiff, <br><br> v. <br><br> MASSACHUSETTS BAY <br> TRANSPORTATION AUTHORITY, <br> JOSEPH CARTER, and MICHAEL <br> MULHERN, <br>       Defendants. | ) <br> ) <br> ) <br> )      C.A. No. 04-10933 JLT <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

### AFFIDAVIT OF JOSEPH C. CARTER

I, Joseph C. Carter, hereby depose and state:

1.　　I was sworn in as the Chief of the Massachusetts Bay Transportation Authority Transit Police Department (the "department") on January 23, 2003.

2.　　I became aware of the public controversy that surrounded the Anti-Crime Unit ("ACU"), which had been created by the previous chief, from hearing and reading contemporaneous news reports before I was selected as chief. In preparation for the interview process with the Massachusetts Bay Transportation Authority (the "Authority") I also did additional research on the department and the ACU. The ACU had been charged with enforcing a "zero tolerance policy" that allegedly targeted young children for arrest and engaging in racial profiling. The Task Force On Combating Racial Profiling (the "Task Force") had been commissioned to look into the question of whether the department engaged in racial profiling. The Task Force issued a report which concluded, in part, that a perception of racism existed that undermined the public confidence in the department. Retired judge Rudolph Pierce was hired to review citizen

complaints against officers in the department as a result of the ACU controversy. Judge Pierce also issued a report (the "Pierce Report") in which he found, in essence, that the failure of the department to employ methods other than arrest when dealing with children had a negative impact on the department's image in the community. Both reports included recommendations on how the department could be rehabilitated in the eyes of the public.

3.      When I interviewed with the Board of Directors and the General Manager of the Authority in late 2002, I emphasized my goals of restoring public trust in the department and dispelling any perception that the department engaged in racial profiling or any other form of discrimination. I also pledged, if hired, to present a Plan of Action that addressed problems in the department as well as solutions. I discussed my goal of creating a cohesive, professional department that was respected by the public by, among other things, getting the department accredited by state and federal authorities and cross training officers. I also discussed my goal of developing a more sophisticated approach to dealing with youth because of the problems inherent in having tens of thousands of students utilize public transportation each day.

4.      I was offered and accepted the chief's position in December 2002. I immediately set out to learn all I could about the department. Prior to being sworn in on January 23, 2003, I had several conversations with Interim Chief William Fleming. I asked him for transitional materials that included basic information about the department, such as accident, arrest, and crime statistics, organizational charts, the rules and regulations of the department, and budget information. I also gave him a list of questions that I wanted posed to unit commanders. Among other things, I wanted unit commanders

to identify what his or her unit did, identify problems facing the unit, state whether any morale problems existed, and identify major concerns. I also asked each unit commander how he or she would implement the recommendations contained in the Task Force and Pierce Reports.

5.    After I was sworn in, I decided to keep all commanders in place, at least in the short term, including the three deputy chiefs. The deputy chiefs reported directly to me and each commanded one of the three major divisions of the department: Patrol Operations, Investigative Services, and Administrative Services. William Fleming, who had served as Interim Chief, was the deputy chief assigned to command Investigative Services. I wanted to see how the deputy chiefs and the unit commanders functioned in the roles into which they had been placed by the previous chief.

6.    I also reviewed information on the structure of the department and the patrol plan. One thing that jumped out at me very early on had to do with the duties being performed by Lieutenant Nancy O'Loughlin. The prior chief had assigned Lt. O'Loughlin to command the detective unit on the day shift and Lieutenant Joseph Leuchte to command the detective unit on the night shift. Lt. O'Loughlin submitted a transition memo in which she indicated that she commanded two patrol officers and that her unit conducted vandalism and graffiti investigations on the commuter rail lines. A copy of the memo is attached to the Statement of Undisputed Facts as Exhibit 19. While I understood that Lt. O'Loughlin is recognized as an expert on graffiti investigations, it seemed like a waste of resources and talent to have someone of her rank only commanding two patrol officers, particularly since she indicated in her memo that the two patrol officers she commanded were proficient investigators. I believe that sergeants

3

are first-line managers who command officers on the street and that officers ranked lieutenant and above are the managers of the department. I instructed Deputy Chief Fleming who commanded Investigative Services (of which the detective unit is a part) to have Lt. O'Loughlin focus on commanding the entire detective unit on the day shift rather than spending her time conducting graffiti and vandalism investigations. I did not prohibit her from conducting investigations, but I wanted her to concentrate more on overseeing and managing the detective unit, rather than on performing the job of an on the street supervisor.

7.      I learned through this lawsuit that Lt. O'Loughlin did not want to command the detective unit. She alleges that I "disbanded" the "vandal squad" she commanded and placed her in command of the detective unit because of her sex. Nothing could be farther from the truth. While I do not recall actually disbanding a vandal squad, I did want Lt. O'Loughlin to function as the commander of the detective unit – the position into which she had been placed by the prior chief. I wanted Lt. O'Loughlin accountable for the detective unit on the day shift and Lt. Leuchte accountable for the detective unit on the night shift.

8.      Over the next several months, I continued to gather information by soliciting input from many sources. I spoke with sworn officers of all ranks and civilian employees of the department. I hired outside consultants, conducted focus groups, and distributed and reviewed surveys and questionnaires that were completed by officers and civilian employees. I also met with community groups and advocates for youth to try to get an understanding of their concerns.

9.    During the information gathering stage, it quickly became apparent to me that the morale in the department was extremely low. Many officers said they were disheartened because they felt that only those officers who were favored by the chief or the command staff could be promoted or be assigned to specialty positions, such as detective. There were also complaints that discipline was not meted out fairly. I believed that officers did not respect each other, the command staff, or the public. I based this conclusion, in part, on a memo I received from Deputy Chief Fleming before I sworn in as chief, in which he cautioned me about a "cancer" he believed existed in the department which he contended had tried to destroy him, and had already set out to try to destroy me. A copy of that memo is attached to the Statement of Undisputed Facts as Exhibit 17. Deputy Chief Fleming also warned that "morale issues aris[ing] from rumors, innuendoes and lies that are spread by a small minority of officers [ ] have undermined the command staff at the MBTA Police." Deputy Chief Fleming and I discussed his assertions, but he did not identify the individual(s) he considered to be cancers in the department. Deputy Chief Fleming also made me aware of anonymous internet postings and other electronic communications that appeared to be authored by officers, but which attacked other officers in the most raunchy, profane terms. I set out to change what I saw as a culture of disrespect and improve morale, particularly by promoting fairness in discipline and promotions.

10.    In June 2003, I presented a "Plan of Action", which is a reflection of my vision for the department. A copy of the Plan of Action is attached to the Statement of Undisputed Facts as Exhibit 20. I encouraged all officers to read and become familiar with the Plan of Action.

11.    The Plan of Action included a new patrol plan and initiatives for dealing with the large number of youth who use public transportation daily. Most relevant to this case are what I described as "core values". The seven core values were basic standards of behavior to which I intended to hold all officers. I made it clear that the core values of: (1) fairness; (2) truthfulness (officers were expected to "admit mistakes . . . and take responsibility for their decisions even when it is not in their own best interests to do so"); (3) professionalism ([i]nternal criticism offered secretly and without constructive basis will be unacceptable and dealt with harshly"); (4) perseverance; (5) treating all persons with dignity and respect ("[t]his statement represents the true nature of policing at its best. Procedures will be established to detect bias in its earliest manifestations, both internally and externally, so that dignified and respectable treatment can be assured"); (6) service before self; and (7) integrity (officers will not be held to one standard at work and another while off duty; officers should be "committed to adhering to the highest standards of integrity whether on or off duty") would be the basis of a new disciplinary system. I also indicated that "priority status will be given to the investigation of any allegation of misconduct regarding one or more of [the] core values". I notified the department that I would act decisively to discipline officers who engaged in criminal conduct, untruthfulness, insubordination, excessive force, acts indicative of bias (i.e. racial, gender, etc), divulging confidential police information to unauthorized sources, and engaging in conduct that discredits the police agency or the individual in his or capacity as a police officer, whether the conduct occurs on or off duty.

12.    After the Plan of Action was released, I began making changes in the department. For example, in response to the complaint that promotions were not fair, I

instituted what I believe is the first ever competitive process to fill the deputy chief

positions. Any officer with the rank of sergeant or above with over five years service

could participate in the process. Neither Lt. O'Loughlin nor any of the then serving

deputy chiefs participated in the competitive process.

13.     By mid-2003, I became concerned because I was not receiving the types

of reports I expected from the detective unit. I also noticed that Lt. O'Loughlin still

seemed to be spending much of her time investigating cases with officers she supervised,

rather than remaining at headquarter during critical times of the day to manage the unit. I

make it a habit to walk around headquarters to speak with people. Even when I want

information from unit commanders, I am more likely to walk to the unit than I am to

make a telephone call or send an email. I cannot remember a time when I walked to the

detective unit to get information that Lt. O'Loughlin was in the unit. I generally received

information about the unit from Sergeant Mark Gillespie. I asked Deputy Chief Fleming

on several occasions to counsel Lt. O'Loughlin about managing the unit and limiting the

time she spent conducting investigations, and he assured me that he had done so. The

management issues in the detective unit were not unique to Lt. O'Loughlin. Lt. Leuchte

displayed similar deficiencies in his command of the detective unit on the night shift.

14.     In August 2003, I informed both Lt. O'Loughlin and Lt. Leuchte that I

was reassigning them out of the detective unit. I spoke to both officers separately and

informed them of my decision. I tried to keep both meetings upbeat, and did not discuss

with either officer what I perceived to be deficiencies in the way they managed the

detective unit. I only spoke positively about their new assignments.

15.     I told Lt. O'Loughlin that I was placing her in command of the detail unit because I needed strong management in the unit. The detail unit is extremely busy and, I have described it as a multi-million dollar business. Among other things, the detail unit commander is responsible for assigning officers to paid details and keeping track of paid details. The commander of that unit must also interface with representatives of police departments within the many jurisdictions served by the Authority (where department officers are assigned to details). The detail unit commander position is also important because officers performing details are very visible to the public, and the way they perform has a direct bearing on the public perception of the department. A lieutenant currently serves in the position.

16.     The detail unit was being commanded by a sergeant when I arrived at the department and there had been problems in the unit. I wanted a lieutenant in the position. Despite shortcomings in managing the detective unit, I thought that Lt. O'Loughlin had the necessary skills to manage the unit effectively. Since she would not be responsible for conducting investigations as commander of the detail unit, I believed that Lt. O'Loughlin would be able to focus on effectively commanding the detail unit.

17.     I did not reassign Lt. Leuchte to a command position because of his deficiencies in managing the detective unit. Instead, I reassigned him as a patrol lieutenant.

18.     In addition to being a little disappointed with the way Lt. O'Loughlin and Lt. Leuchte commanded their respective shifts in the detective unit, I thought Investigative Services was top heavy with managers. I selected Lieutenant McCarthy to replace both Lts. O'Loughlin and Leuchte in the detective unit. Lt. McCarthy had

8

commanded the detective unit in the past and had served as deputy chief during a previous administration. Based on my observations to that point, I believed that Lt. McCarthy was better suited to implement the changes I planned for the detective unit than either Lt. O'Loughlin or Lt. Leuchte. From the time Lt. O'Loughlin and Lt. Leuchte commanded the detective unit, the position of detective unit commander has always been held by a lieutenant.

19.    Lt. O'Loughlin filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") in October 2003. She claimed that I discriminated against her by disbanding the unit she commanded in the detective unit (the so-called vandal squad), assigning her to command the detective unit on days, and then assigning her to command the detail unit, which she considered a "punishment" assignment. Lt. O'Loughlin had never asked me not to assign her to the command the detective unit or the detail unit and she never gave me any reason to believe that she did not like her assignments or my directives – the MCAD complaint was the first indication I had that she was in any way dissatisfied.

20.    I had never heard the assertion that assigning a lieutenant or above to the position of detail unit commander was considered a punishment assignment by department members, as Lt. O'Loughlin claimed. That certainly had not been my experience at the Boston Police Department. I considered the reassignment a lateral move that solved the problems of a lack of management in the detective unit and a lack of effective management in the detail unit. I did not have any intention of punishing Lt. O'Loughlin by assigning her to command the detail unit.

21.     I know that Lt. O'Loughlin claims that I wanted to punish her because she is a woman, because of her role in the ACU and because of disagreements she had with Sergeant Gillespie in the detective unit. I categorically deny those allegations. I am a member of the National Association of Women Law Enforcement Executives ("NAWLEE") and have always supported and advocated for women in law enforcement. I appointed a woman (Captain Dolores For-Murphy) to the position of deputy chief. In fact, in my many years in law enforcement, Lt. O'Loughlin is the first woman to ever claim that I discriminated against her on the basis of her sex. While I knew that Lt. O'Loughlin had commanded the ACU, I had not formed any opinion about her or her work based on the ACU controversy. I assigned her to command first the detective unit then the detail unit because she was a lieutenant and because I wanted lieutenants in those positions. I also knew through Deputy Chief Fleming that Sgt. Gillespie and Lt. O'Loughlin did not always see eye to eye on how best to command the detective unit. Such disagreements are inevitable in police departments. I sometimes offered instruction to Deputy Chief Fleming when there were disagreements between officers in Investigative Services. For the most part, however, I tend not to micro-manage and I let Lt. Fleming command the personnel in Investigative Services and handle any issues that arose in the manner he thought best. It never came to my attention that any situation arose that he could not handle.

22.     I am also aware of the allegations that I made a comment about the way Lt. O'Loughlin dressed and that I instructed Deputy Chief Fleming to guard Lt. O'Loughlin when she packed up to leave headquarters on the day I reassigned her to the detail unit. I do not recall making a specific comment that day about the way Lt.

10

O'Loughlin dressed. I had in the past, however, told Deputy Chief Fleming to speak to

Lt. O'Loughlin about wearing work shoes and what appeared to be work clothes when

she was commanding the detective unit, rather than the business dress I expected of

managers. I did not ask Deputy Chief Fleming to guard Lt. O'Loughlin as she packed up

to leave headquarters after her reassignment to the detail unit. I did not suspect her of

anything illicit and did not have any reason to give such a directive.

23.     In October 2003, I disciplined Deputy Chief Fleming for sending a fax

containing confidential information to a newspaper without authorization. I demoted him

from the position of deputy chief and imposed a five day suspension. Fleming returned

to his civil service rank of lieutenant.

24.     In December 2003, I appointed Captain Dolores Ford-Murphy, Captain

John Martino, and Lieutenant Thomas McCarthy to the positions of deputy chief pursuant

to the competitive process I established.

25.     In early 2004, I was notified that detectives who had been monitoring one

of the department's taped telephone lines during the course of a criminal investigation

overheard conversations between officers which suggested that the officers had violated

department rules, regulations, and core values. The particular telephone line is referred to

as the 1205 line, and is the line used by officers who need to conduct warrant and

Registry of Motor Vehicle checks. The line is also a backup to the department's

emergency line. Calls from the public are routed to the 1205 line when the emergency

line is in use.

26.     I authorized Deputy Chief McCarthy, who commanded Investigative

Services and Deputy Chief Ford-Murphy, who commanded internal affairs, to conduct a

further investigation of conversations on the 1205 line to determine the extent of the violations. They ultimately made recordings and transcripts of the conversations that were believed to be in violation of department rules, regulations, policies and core values and gave them to me for my review. After I reviewed the transcripts and the tape recordings, I decided to formally charge several officers, including Lt. O'Loughlin, with violating the rules, regulations, policies and core values of the department.

27.    Over the course of several months, Lt. O'Loughlin had engaged in conversations with patrol officers on the 1205 line in which she spoke derisively to patrol officers who were subordinate to her, about the command staff, fellow officers, and members of the public. She also allowed subordinate officers to make similar comments to her, although as a lieutenant, she had an obligation to correct the officers and counsel them not to engage in such conversations. She and the patrol officers with whom she spoke also engaged in derogatory name-calling. During one conversation, Lt. O'Loughlin told a subordinate officer that another patrol officer, who was suspected of making and posting derogatory posters about me, should charge senior officers with infidelity if that patrol officer found himself in danger of being disciplined because of the posters. She also told a patrol officer that she would have pummeled a civilian who made a derogatory statement about Transit Police. During yet another conversation, Lt. O'Loughlin indicated that she told a patrol officer to get a lawyer and sue the Authority for harassment, rather than advise the officer to report the matter to the Authority's Office of Diversity and Civil Rights, which is her obligation under the Authority's anti-harassment policy because she is a supervisor. These are just a few of the many

conversations in which Lt. O'Loughlin engaged that I believe violated the rules and regulations of the department.

28.    I believe that the statements Lt. O'Loughlin made to subordinate officers (and allowed to be made to her unchecked, by subordinate officers) on the 1205 line undermined the proper administration of the department and were indicative of a Lt. O'Loughlin's profound disregard for her role as a manager in the department. I thought she had disqualified herself from holding a leadership role in the department. Her statements were even more egregious because I had made it clear in the Plan of Action that I was dedicated to building a department in which officers respected their superiors, each other and members of the public, whether on or off duty (Lt. O'Loughlin claimed that she was off duty when she engaged in conversations on the 1205 line). It appeared to me that Lt. O'Loughlin cavalierly violated those principles.

29.    I decided to place Lt. O'Loughlin and other officers who committed what I considered egregious violations on the 1205 line on administrative leave with pay while the investigation continued. On March 8, 2004, Police Officers Robert MacKay, Douglas Hennessey, and Ronald Jordan, along with Lt. O'Loughlin met separately with Deputy Chiefs Ford-Murphy, Martino, and McCarthy and were placed on administrative leave with pay pending the completion of the investigation. The deputy chiefs took the weapon, badge and Police I.D. from each officer. In addition, they took the keys to Lt. O'Loughlin's take home cruiser. The officers were notified in writing that it was anticipated that each would be charged with violating various rules, policies, and procedures of the police department during conversations on the 1205 line. Officers MacKay and Jordan were also notified that they were under investigation for possible

13

criminal violations by conducting Board of Probation, Registry of Motor Vehicle, and Criminal Offender Records Information (CORI) checks on individuals without a legitimate law enforcement purpose. The notice given to Lt. O'Loughlin is included in the Statement of Undisputed Facts as Exhibit 26.

30.    On the day the officers were placed on administrative leave with pay, I asked the deputy chiefs to take the precaution of ensuring that members of the Special Operations Team ("SOT") were present at headquarters in order to protect civilian employees in the event one of the officers reacted negatively to being relieved of the weapon, badge, and Police I.D. Based on my experience, officers can become very volatile when faced with potential discipline, and I thought having SOT officers present was a reasonable precautionary step.

31.    I learned during this litigation that outside lawyers for the Authority filed the answer (called the position statement) in response to Lt. O'Loughlin's MCAD complaint on March 8, 2004. I did not know the position statement would be filed that day and it did not affect my decision to place Lt. O'Loughlin and the other officers on administrative leave with pay on that day – it was purely coincidental.

32.    As the 1205 line investigation continued, I determined that Lt. Fleming and Police Officer James Floyd had also engaged in egregious conversations on the 1205 line and decided to place them on administrative leave with pay pending the completion of the investigation. Both were required to relinquish their weapon, badge, and Police I.D. and given written notice that a just cause hearing would be held to determine whether cause existed to discipline them. Lt. Fleming was charged because of statements he made during a conversation with Police Officer Robert MacKay on February 18, 2004.

33.    On May 11, 2004, O'Loughlin filed this civil action. In addition to claims that I discriminated against her on the basis of sex by assigning her to command the detective unit and the detail unit, she also claimed that I retaliated against her because of the MCAD complaint by placing her on administrative leave with pay. I placed all of the officers on administrative leave who committed serious violations while engaging in conversations on the 1205 line and as far as I know, Lt. O'Loughlin is the only officer who had filed a complaint. I treated all of the officers exactly the same, including Lt. Fleming. In paragraph 17 of her Complaint, Lt. O'Loughlin also claimed that I discriminated against her in the following ways (my responses are in bold):

(a)    refusing to place a commendation she received from the Massachusetts Office of the Attorney General into her file. **I am not aware of the commendation Lt. O'Loughlin references, and I never place anything into any officer's personnel file.**

(b)    refusing to support her in relation to a male subordinate. I believe Lt. O'Loughlin is referring to her disagreements with Sgt. Gillespie while she was in the detective unit. **I did not involve myself in their disagreements and believe that then Deputy Chief Fleming was managing the personnel under his command. Lt. O'Loughlin never asked me for my assistance or requested my intervention.**

(c)    prohibiting her from investigating and/or testifying on graffiti related crime, but allowing her "former assistant" to do so. **This is absolutely not true. I would never prohibit any officer from testifying if that officer was duly subpoenaed to appear at a legal proceeding. When I transferred Lt. O'Loughlin to the detail unit, she was no longer responsible for investigating graffiti or any other crimes because that simply was not part of the job. I am not sure who Lt. O'Loughlin refers to as her former assistant. I did know, based on her transition memo, that Lt. O'Loughlin had trained two patrol officers on how to do graffiti investigations and she considered them to be "proficient" investigators.**

(d)    deliberately avoiding contact with her, and instead, speaking with sergeants in her command. **On the contrary, Lt. O'Loughlin always seemed to avoid me. If I came in one door, she always seemed to be going out the other, or she would turn her head or take a different**

path other than one that would bring her into contact with me. **The first time I actually spoke with her was on the day I transferred her to the detail unit in August 2004. Even then, she did not speak other than to say she understood the assignment. When I asked then Deputy Chief Fleming about Lt. O'Loughlin's behavior, which I considered a little strange, he said that it was just the way she was and that she was quiet. The behavior puzzled me, but did not bother me. Other than that, Lt. O'Loughlin was not in the detective unit when I went to seek information and I necessarily obtained the information I needed from Sgt. Gillespie or any other officer who happened to be around.**

(e)    immediately moving her to the Detail Unit the same day that this change was announced. **All three lieutenants who were affected by the order (O'Loughlin, Leuchte, and McCarthy) were also moved the same day. A copy of the transfer order is attached to the Statement of Undisputed Facts as Exhibit 21. It is not uncommon for officers to be reassigned, effective immediately.**

(f)    making a statement to a deputy chief on one occasion that O'Loughlin was not dressed properly. **I do not remember making the one comment Lt. O'Loughlin refers to, although I did ask then Deputy Chief McCarthy to speak with her about not wearing work clothes and work shoes when she was on duty as the commander of the detective unit.**

(g)    not allowing her to take six weeks off between Thanksgiving and Christmas. **Lt. O'Loughlin took the six weeks off.**

34.    On May 14, 2004, an "Amended Notice of Hearing" was sent to Lt. O'Loughlin over my signature. She was thereby notified that a disciplinary hearing would be held to determine if there was just cause for her to be "discharged, demoted, suspended, or otherwise disciplined." The notice also detailed each instance in which I believed she violated the rules, regulations, and polices of the department. A copy of the Amended Notice of Hearing is attached to the Statement of Undisputed Facts as Exhibit 28.

35.    Other officers were cited for less serious offenses on the 1205 line than those of the six officers who were placed on administrative leave, including Officer Carl

Rubino, who was charged with being untruthful and contemptuous in a conversation he had with Lt. O'Loughlin. During that conversation he described Deputy Chief McCarthy as yelling at him and looking like Khrushchev by banging his shoe on the desk. Officer Rubino received formal counseling. Sergeant Stephen Douglas was issued a letter of reprimand for allowing a subordinate to speak to him in an insubordinate and vulgar manner on the 1205 line and for not reporting or disciplining the officer.

36.    Pursuant to the collective bargaining agreement between Lt. O'Loughlin's union and the Authority, a hearing was held to determine whether "just cause" existed to discipline her. She did not testify at the hearing. The hearing officer issued a written decision explaining his finding that just cause existed to sustain the charges against Lt. O'Loughlin. A copy of that decision is attached to the Statement of Undisputed Facts as Exhibit 31. Just cause was also found in the cases of Jordan, MacKay, Hennessey, Fleming, and Floyd

37.    After the just cause findings, I considered dismissing Lt. O'Loughlin and Lt. Fleming from the department. While I thought that Lt. O'Loughlin's violations were much more serious than those of Lt. Fleming, I believed that both committed violations that warranted termination. The conversation for which violations were found in Lt. Fleming's case occurred on one day, while Lt. O'Loughlin engaged in many conversations over a period of several months. I also thought the substance of Lt. Fleming's conversation with Officer MacKay was far less egregious Lt. O'Loughlin's conversations. However, Lt. Fleming had been disciplined previously, which weighed in favor of termination. I thought both lieutenants deserved to be disciplined similarly. Rather than fire Lts. O'Loughlin and Fleming, however, I decided to demote them two

ranks to the rank of patrol officer. The fact that these officers were lieutenants and charged with upholding the rules, regulations, principles, and core values of the department was a factor in the discipline I chose to impose.

38.    I fired Officers MacKay and Jordan. I imposed a 60 working day suspension on Officer Hennessey and suspended Officer Floyd for 180 days.

39.    It is my understanding that the discipline I imposed in this case was harsher than that imposed by previous administrations. However, I believed that the discipline was warranted because I had given the officers fair warning that I intended to deal harshly with violations of the core values that tended to undermine the good administration of the department. In this case, conversations on the 1205 line were divisive and contributed to the low morale I and my managers worked hard to eradicate.

40.    Then Patrol Officer O'Loughlin arbitrated her discipline pursuant to the terms of her collective bargaining agreement. The arbitrator determined that she had not violated department rules, regulations, or policies, and ordered her reinstated to her position as a lieutenant with back pay. Patrol Officer Fleming also arbitrated his demotion. The arbitrator found that his discipline was too harsh and reduced it to a 20 working day suspension. Fleming was restored to his rank as a lieutenant and awarded back pay. The remaining officers who were relieved of duty with pay also pursued arbitration. The arbitrator reduced Officer MacKay's discipline from termination to a 5 day suspension and reduced Officer Jordan's discipline from termination to a 1 day suspension. Officer Hennessey's discipline was reduced from a 60 working day suspension to a 5 day suspension. Officer Floyd's suspension was affirmed by an arbitrator.

Signed under the pains and penalties of perjury, this 30th day of June, 2006.

_____
Joseph C. Carter