**UNITED STATES DISTRICT COURT**
DISTRICT OF MASSACHUSETTS

C.A. No. 04-10933-JLT

—————————————————————

**NANCY O'LOUGHLIN**
*Plaintiff*

v.

**MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY**
**and**
**JOSEPH CARTER**
**and**
**MICHAEL MULHERN**
*Defendants*

—————————————————————

**OPPOSITION OF PLAINTIFF NANCY O'LOUGHLIN TO
MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS
MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
AND JOSEPH CARTER**

I.    <u>**INTRODUCTION**</u>

"…and she was also - - you know, and it's not easy to be a female in policing. And she was a more than qualified female who had done her time, you know, suffered some pretty bad beatings over the years, too, for her fearlessness.  And she was - - the one thing that everybody will agree there is that she was a hard worker… and certain officers resent female officers for getting positions, getting certain positions…"

*Testimony of Former MBTA Interim Chief William Fleming regarding a general description of Nancy O'Loughlin, at Fleming Deposition Volume I, p. 57.*

"Question: Would you agree that women, though, face resentment from male colleagues in law enforcement?
Answer: I would not agree.

1

> Question:  Do you think -- would agree with the statement "It is not easy to be a female in policing."
> Answer:  I would not agree.
> Question:  So you think, in general, females are given a fair shake in law enforcement jobs?
> Answer:  Women in policing have the same opportunities as males, and many avail themselves of those opportunities, compete and do well.
> Question:  In your time as Chief of the MBTA Police Department, have you been aware of any resentment of females holding superior officer positions?
> Answer:  No.
> Question:  During the time you spent in the Boston Police Department, were you aware of any resentment of females holding superior officer positions.
> Answer:  Never. …"

*Testimony of MBTA Chief of Police Joseph C. Carter, Carter Deposition Volume I, p. 97-98.*

Plaintiff Nancy O'Loughlin, through counsel, hereby opposes the Motion for Summary Judgment filed in this action by Defendants Massachusetts Bay Transportation Authority ("MBTA") and Joseph Carter.

In summary (as is set forth in much greater detail in the Motion for Summary Judgment filed by Defendants) Lieutenant O'Loughlin claims that for most of her career with the MBTA Police Department, up to and including the present date, she has been subjected to unfair treatment and discrimination due to her sex, female.  At particular issue in this case, are a transfer of Lieutenant O'Loughlin from the Detective Unit to being Head of the Detail Unit with the MBTA Police in August of 2003, and the suspension and later double demotion of Lieutenant O'Loughlin in March of 2004 and August of 2004.

Lieutenant O'Loughlin claims that her transfer to the Detail Unit was based upon discrimination against her due to her sex, by MBTA Chief of Police Joseph Carter.  Lieutenant O'Loughlin claims that her suspension with pay in March 2004, and her demotion to Patrolman in August 2004, constituted both discrimination against her due to her sex as well as illegal retaliation for having exercised her right to file charges and lawsuits alleging discrimination, again by Chief Joseph Carter.[1]  Lieutenant O'Loughlin also claims that false statements in a Boston Globe

---

[1] Throughout this Brief, Ms. O'Loughlin is referred to as Lieutenant O'Loughlin.  As is discussed in the Brief itself, Lieutenant O'Loughlin contested her double demotion from Lieutenant to Patrolman through a Union Grievance Procedure, and in March  2006, an arbitrator reversed the disciplinary action taken against her by Chief Carter, ordered her reinstated to her position of Lieutenant and ordered that she be paid full back pay.

article about her involvement in an MBTA investigation and possible criminal charges stemming from that investigation, constituted slander of her and additional retaliation by the MBTA and/or its General Manager, Michael Mulhern.

As to her transfer from the Detective Unit to the Detail Unit, Plaintiff asserts that Summary Judgment must be denied on this particular issue both due to the existence of a genuine dispute as to material issues of fact regarding the transfer, as well as the fact that various evidence exists which proves that the reasons advanced by the Defendants for the transfer are merely a pretext for discrimination.  The issues of fact in dispute involve whether the position as Head of the Detail Unit was viewed within the MBTA Police Department as a punishment position, and whether Chief Carter had been informed that the position was viewed as a punishment position. The facts indicating that the reasons given for the transfer were merely a pretext for discrimination, include testimony that there was no reason for the transfer to take place, the fact that the Plaintiff could have been transferred to a different position, hostile remarks made by Chief Carter regarding Plaintiff at or shortly after the time of the transfer, the general credibility issues presented by Chief Carter's testimony, and a comparison between the treatment afforded Plaintiff and a male Lieutenant who was transferred at the same time she was.

As to the suspension and later double demotion of Lieutenant O'Loughlin, the Motion for Summary Judgment must be denied on this issue due to the existence of facts tending to show that the justification for the suspension and demotion advanced by Defendants is merely a pretext for discrimination.  The evidence of pretext includes the timing of the suspension, the timing of the demotion, the prior discrimination and hostility of Chief Carter against Plaintiff, the credibility issues presented by Chief Carter, remarks and conduct engaged in by Chief Carter subsequent to the demotion, a comparison of the disciplinary records of Plaintiff with a male Lieutenant who was demoted at the same time as was Plaintiff, the slander of Plaintiff in the Boston Globe and the conduct of Defendants subsequent to the receipt of the Arbitration Decision in Plaintiff's favor.

## II.    <u>FACTUAL BACKGROUND</u>

In light of the extremely voluminous factual background set forth in the Summary Judgment Motion filed by Defendants MBTA and Carter (as well as the additional factual background set forth in the related Summary Judgment Motion of Defendant Mulhern) Plaintiff is not setting forth the facts of this matter other than to the extent to which she disagrees with the factual background set forth by the Defendants in their two Motions, or to the extent that she feels

additional facts are necessary. Plaintiff has, however, filed simultaneously with this Motion the required Statement of Facts (SOF) required by Local Rule 56.1.

As is adequately set forth in the Factual Statements advanced by Defendants, by the summer of 2003, Nancy O'Loughlin was a Lieutenant with the MBTA Police Department who had over 20-years of service with the force. She was an experienced officer who had served in a variety of command positions. Prior to August of 2003 (and indeed until March of 2004), Lieutenant O'Loughlin had never received any "formal" discipline in her job with the MBTA Police Department. SOF at par. 47. As of August 2003, Lieutenant O'Loughlin had served under Joseph Carter (in his position as Chief of MBTA Police Department) for approximately 7 months. As of August 2003, Lieutenant O'Loughlin was serving as one of the Commanders of the Detective Unit. In August of 2003, Chief Carter ordered Lieutenant O'Loughlin transferred from Commander of the Detective Unit to the Commander of the Detail Unit. The Detail Unit Commander position is a desk job dealing with the administration of departmental overtime.

## ASSIGNMENT TO THE DETAIL UNIT WAS VIEWED AS A PUNISHMENT ASSIGNMENT WITHIN THE MBTA POLICE DEPARTMENT

William Fleming (formerly the interim Chief of the MBTA Police Department, later a Deputy Chief under Chief Carter and then a Lieutenant) testified at his deposition that assignment to the detail unit position in the MBTA Police Department was viewed as a punishment assignment. Fleming testified that it was considered "the Siberia of the Police Department." Several former Chiefs had assigned superior officers to the Detail Unit in order to punish them. Being Head of the Detail Unit would inhibit an officer's opportunity for advancement under the regime in power at the time of his or her appointment to the Detail Unit. It was perceived as a punishment assignment. SOF at par. 1.

Lieutenant O'Loughlin also viewed the assignment to the detail unit as being a punishment assignment. According to Lieutenant O'Loughlin, Deputy Chiefs of the MBTA Police Department have testified in Federal Court that it was a punishment assignment, and that it was known throughout the Department as being a punishment assignment. SOF at par. 2.

## PRIOR TO TRANSFERRING NANCY O'LOUGHLIN TO BE HEAD OF THE DETAIL UNIT, CHIEF CARTER KNEW THAT THE POSITION OF HEAD OF THE DETAIL UNIT WAS VIEWED WITHIN THE MBTA POLICE DEPARTMENT AS A PUNISHMENT POSITION

Shortly after Chief Carter became Chief of the MBTA Police Department, in the course of explaining various personnel moves he had made as interim Chief, then Deputy Chief Fleming informed Chief Carter, that Deputy John Martino had been punished by a former Chief by being placed in the Detail Unit. Deputy Chief Fleming informed Chief Carter that the Detail Unit position was viewed as a punishment position. Deputy Fleming had this discussion with Chief Carter about the Head of Detail Unit being a punishment assignment, prior to Nancy O'Loughlin being assigned to the Detail Unit. Deputy Fleming testified that other than for special health considerations or if a person specifically requested the position, assignment of someone above the rank of Sergeant to Head the Detail Unit was never appropriate, and that the position was viewed throughout the Department as a punishment position.  SOF at par. 3.

To the contrary, Chief Carter testified that he was never told that the assignment of a superior officer to Head the Detail Unit was a punishment assignment. Chief Carter specifically denied that he had ever had a conversation with Deputy Chief Fleming in which Fleming informed him that the assignment of Deputy Martino to the Detail Unit had been a punishment assignment. Chief Carter testified that there was never a time that he was informed that the assignment of a superior officer to Head the Detail Unit was deemed a punishment assignment.  SOF at par. 4.

**THE ASSIGNMENT OF NANCY O'LOUGHLIN TO BE HEAD OF THE DETAIL UNIT WAS A PUNISHMENT ASSIGNMENT**

Former interim Chief Fleming testified that it was indeed a punishment assignment to place Nancy O'Loughlin as Head of the Detail Unit. He testified that there was no reason to transfer Nancy O'Loughlin from the Detective Unit to the Detail Unit. Then Deputy Chief Fleming was "stunned" when Chief Carter transferred Nancy O'Loughlin to be Head of the Detail Unit.  SOF at par. 5.

**CHIEF CARTER DID NOT INFORM DEPUTY CHIEF FLEMING OF HIS INTENTION TO TRANSFER NANCY O'LOUGHLIN TO THE DETAIL UNIT BEFORE ACTUALLY INFORMING NANCY O'LOUGHLIN OF THAT TRANSFER**

Then Deputy Chief Fleming testified that Chief Carter did not discuss moving Nancy O'Loughlin to the Detail Unit with him prior to making that move, and indeed never said anything about it to him. Prior to the change, Chief Carter had never indicated to Deputy Fleming that he was in any way dissatisfied with the job Nancy O'Loughlin was doing in the Detective Unit. Deputy Fleming first learned of Nancy O'Loughlin's assignment to the Detail Unit when she was called into Chief Carter's office along with Deputy Fleming. SOF at par. 6.

To the contrary, Chief Carter testified that prior to Nancy O'Loughlin being informed of her being assigned to the Detail Unit, he had discussions with Deputy Chief Fleming about that assignment of Nancy O'Loughlin to that unit. Chief Carter stated that he specifically recalled discussing this matter with Deputy Fleming. SOF at par. 7.

Chief Carter testified that Deputy Fleming had been directed to speak to Nancy O'Loughlin about her change in assignment to the Detail Unit prior to her speaking with Chief Carter. Chief Carter stated that he "directed him to speak to her about the assignment before she came to speak to me." Chief Carter claims that Deputy Fleming told him that "he spoke to Nancy and brought Nancy to my office for me to talk to her." Chief Carter also claimed that Deputy Fleming would have had a conversation with Nancy O'Loughlin about no longer being assigned to the Detective Unit and the Graffiti Investigation function and being transferred to the Detail Unit and that the Chief wanted to speak to her about that transfer to the Detail Unit. Chief Carter testified that Deputy Fleming "would have done that based on our discussion." SOF at par. 8.

**IMMEDIATELY AFTER INFORMING NANCY O'LOUGHLIN THAT SHE WAS BEING TRANSFERRED TO THE DETAIL UNIT, CHIEF CARTER MADE NEGATIVE COMMENTS ABOUT THE WAY NANCY O'LOUGHLIN DRESSED**

Immediately after informing Nancy O'Loughlin that she was being transferred to the Detail Unit, while leaving that area with Deputy Fleming, Chief Carter stated to Deputy Fleming "look at the way she dresses." Deputy Fleming took this to be a negative comment. Deputy Fleming did not feel there was anything inappropriate about the way Nancy O'Loughlin was dressed at the time. SOF at par. 9.

According to Chief Carter, on several occasions prior to informing Nancy O'Loughlin of her transfer to the Detail Unit, in other words, while she was still Commander of the Detective Unit, he informed Deputy Fleming that Nancy O'Loughlin was dressed inappropriately. He claims that he instructed Deputy Fleming to talk with Nancy O'Loughlin about that and that Deputy Fleming claimed that he did indeed speak to Nancy O'Loughlin about that. SOF at par. 10.

**CHIEF CARTER INSTRUCTED DEPUTY FLEMING TO GUARD NANCY O'LOUGHLIN'S OFFICE AND WATCH HER WHILE SHE WAS EMPTYING OUT HER OFFICE**

The same day that Chief Carter informed Nancy O'Loughlin that she was being transferred to the Detail Unit, he instructed Deputy Fleming to "go down and guard her office to watch what she

6

was taking out of her office." By guarding her office, Deputy Fleming understood that to mean to make sure that "she does not take anything out that she is not supposed to." Deputy Fleming did not recall that being done at the Police Department prior to that date.  SOF at par. 11.

The same day that Nancy O'Loughlin was transferred, Lieutenant Leuchte, a male, was also transferred.  Deputy Fleming was not instructed to guard Lieutenant Leuchte's office.  SOF at par. 12.

Chief Carter testified that he did not recall instructing Deputy Fleming to guard Nancy O'Loughlin's office and watch what she was taking out after her reassignment.  SOF at par. 13.

## NANCY O'LOUGHLIN'S TRANSFER TO THE DETAIL UNIT WAS NOT NECESSARY

In the opinion of Deputy Chief Fleming, Nancy O'Loughlin was doing a good job in her work as the Detective Unit Commander. In the mind of Deputy Fleming, there was no reason to transfer Nancy O'Loughlin from the Detective Unit to the Detail Unit.  SOF at par. 14.

At the time that Nancy O'Loughlin was assigned to the Detail Unit, she could have been assigned back to the position she had previously held in the Patrol Unit. Deputy Fleming had no idea why Nancy O'Loughlin was assigned to the Detail Unit instead of to the Patrol Unit.  SOF at par. 15.

## AT VARIOUS TIME CHIEF CARTER EXPRESSED EITHER A DISLIKE OF NANCY O'LOUGHLIN OR AN APPARENT DESIRE TO DISCIPLINE HER

As is set forth above, after informing Nancy O'Loughlin of her transfer to the Detail Unit, Chief Carter had Deputy Fleming guard Nancy O'Loughlin's office and watch her while she was cleaning out her office in the Detective Division.  Additionally, shortly after informing Nancy O'Loughlin of her transfer, Chief Carter made negative remarks about Nancy O'Loughlin's clothing.  SOF at par. 16.

At one point, which appears to be while Nancy O'Loughlin was in the Detective Unit, Chief Carter berated Deputy Fleming and yelled at him because Deputy Fleming had allowed a memo to be signed and distributed by Nancy O'Loughlin when he (Deputy Fleming) was out of work due to an emergency. Chief Carter did this despite the fact that other officers in the Detective

Unit (including individuals at the patrol level) had issued memos under their names.  SOF at par. 17.

At some point apparently between April, 2005 and April, 2006, Chief Carter was overheard by a superior officer stating "vengeance will be mine" due to the lawsuits which had been filed against him. It was Deputy Fleming's belief that this statement was made by Chief Carter in relation to the lawsuit filed by Nancy O'Loughlin as well as an additional lawsuit regarding a similar matter. Deputy Fleming testified of his knowledge regarding an incident when Nancy O'Loughlin was on patrol [apparently after August, 2004 when she was demoted] in which several superior officers including Deputy Chief Martino and Chief Carter were made aware that a female patrol officer was in the Stop & Shop Supermarket in Quincy doing shopping.  Chief Carter, Lieutenant Herman Wheeler and Deputy Martino immediately went to the Stop & Shop and obtained the surveillance tape.  It was Deputy Fleming's belief that Deputy Martino and Chief Carter thought that they had caught Nancy O'Loughlin in an act of misconduct and had been so interested in the matter and wanted to immediately obtain a surveillance tape specifically because they had thought they had caught Nancy O'Loughlin in an act of misconduct.  SOF at par. 18.

At the time that Chief Carter informed Nancy O'Loughlin of her transfer to the Detail Unit, he also informed her that she was no longer to perform or offer assistance in the investigation and prosecution of graffiti cases. Chief Carter did this despite the fact that Nancy O'Loughlin was an expert in graffiti investigations. Indeed, Deputy Fleming stated in his deposition that Nancy O'Loughlin was "the number 1 expert in the Northeast" regarding graffiti, and that other officers just did not have the capability as did Nancy O'Loughlin to do these types of investigations. SOF at par. 19.

Nancy O'Loughlin wrote up Sergeant Gillespie for insubordination and inappropriate behavior. Her disciplinary write-up was forwarded to Chief Carter, but Chief Carter took no action.  The very next day, Nancy O'Loughlin was transferred to the Detail Unit.  SOF at par. 20.

## MISCELLANEOUS FACTS TESTIFIED TO BY CHIEF CARTER

Chief Carter does not agree that woman face resentment from male colleagues in law enforcement. Chief Carter does not agree that it is not easy to be a female in policing.  During his time as Chief of the MBTA Police Department, Chief Carter has not been aware of any resentment of females holding superior officer positions.  During the time that Chief Carter spent

on the Boston Police Department he was not aware of any resentment of females holding superior officer positions.  SOF at par. 21.

Chief Carter recalls being served with this lawsuit at his home in Oak Bluffs.  Chief Carter was in fact served with this lawsuit on July 27, 2004 when a copy of the Summons and Complaint were served in hand to his wife in Oak Bluffs.  This service upon Chief Carter's wife occurred approximately three weeks before Nancy O'Loughlin was informed that she was being demoted two ranks as a result of a disciplinary decision made by Chief Carter, and presumably less than three weeks after Chief Carter made his disciplinary decision.  SOF at par. 22.

Chief Carter signed the Affirmation contained in the Position Statement submitted by himself and the MBTA in response to Nancy O'Loughlin's Charge of Discrimination on March 4, 2004. Chief Carter does not recall how much time went by between when he first saw the MCAD Charge and when he signed the Verification.  Chief Carter signed the Verification 4-days before the Position Statement was submitted to the MCAD.  The date on which the Position Statement was submitted to the MCAD, March 8, 2004, was the same date on which Nancy O'Loughlin was informed that she was being suspended with pay.  SOF at par. 23.

With regard to the decision to demote Nancy O'Loughlin from Lieutenant to Patrolman which was made in August, 2004, this decision was made by Chief Carter.   It was solely Chief Carter's decision as to how severely Nancy O'Loughlin should be disciplined.  SOF at par. 24.

In relation to the acts of alleged misconduct for which Nancy O'Loughlin was suspended and then demoted, Chief Carter testified that there were never any criminal charges against Nancy O'Loughlin and there was nothing he knew which would have given him reason to believe that Nancy O'Loughlin could have been subjected to criminal charges. SOF at par. 25.

Chief Carter claims that he has never discussed Nancy O'Loughlin's claims in this lawsuit with MBTA General Manager Michael Mulhern.  SOF at par. 26.

## MISCELLANEOUS FACTUAL STATEMENTS MADE BY FORMER INTERIM CHIEF FLEMING

In describing Nancy O'Loughlin, former Chief Fleming stated the following: "You know, and it's not easy to be a female in policing. And she was a more than qualified female who had done

her time, you know, suffered some pretty bad beatings over the years, too, for her fearlessness. And she was—the one thing that everybody will agree there is that she was a hard worker." SOF at par. 27.

When Nancy O'Loughlin was promoted to Lieutenant there was resentment towards her.  Nancy O'Loughlin's promotion (which was accomplished by the utilization of calling for "lists" of qualified females) resulted in several lawsuits being filed by white, male officers who resented the fact that a female had been promoted over them who may have had lower test scores.  SOF at par. 28.

**MBTA GENERAL MANAGER MICHAEL MULHERN INFORMED BOSTON GLOBE REPORTER MAC DANIEL THAT NANCY O'LOUGHLIN WAS ONE OF THE MBTA OFFICERS UNDER INVESTIGATION, AND HE FURTHER INFORMED REPORTER DANIEL OF THE FALSE INFORMATION THAT NANCY O'LOUGHLIN COULD BE SUBJECT TO CRIMINAL CHARGES.  MR. MULHERN DID THIS KNOWING THAT THE INFORMATION HE WAS PROVIDING REGARDING LIABILITY FOR CRIMINAL CHARGES WAS FALSE.**

From February, 2002 through May, 2005, Michael Mulhern was the General Manger of the MBTA. In his position as General Manger, both the General Counsel of the MBTA and the Chief of the MBTA Police Department reported directly to him.  SOF at par. 29.

During 2004, Mr. Mulhern was informed that an investigation was going on regarding alleged police misconduct within the MBTA Police Department, having to do with certain police officers and their behavior on phone lines which were taped.  He was aware that some of this involved Lieutenant O'Loughlin as well as another Lieutenant and subordinate officers.  Mr. Mulhern became aware of the investigation when he was informed of it by Chief Carter.  From the time that he first learned of the investigation until the time of his deposition, Mr. Mulhern never had any reason to believe that Nancy O'Loughlin had been involved in any potentially criminal misconduct regarding the acts being investigated.  SOF at par. 30.

Mr. Mulhern does not recall whether in any conversations he had with Chief Carter about the investigation or its aftermath, he was informed that Nancy O'Loughlin had discrimination charges pending against the MBTA.  SOF at par. 31.

In March of 2004, Mr. Mulhern spoke to Boston Globe Reporter Mac Daniel regarding the investigation of the statements made on the recorded phone lines.  SOF at par. 32.

Mr. Mulhern testified that during the course of their conversation, he informed Mr. Daniel that it was absolutely not true that Nancy O'Loughlin could face criminal charges, that Mr. Daniel was not to "go down that road" with his story, because "nothing could be further from the truth" and that he "warned" Mr. Daniel not to write that in his newspaper article. Mr. Mulhern claims that Reporter Daniel said to him "okay, if she is not involved in any criminal investigation, is she one of the individuals involved in the investigation," thus implying that he (Mr. Mulhern) informed Reporter Daniel that Nancy O'Loughlin was not subject to criminal charges. Mr. Mulhern testified that he had "crystal clear recall that I told him that she was absolutely not involved in any allegations of criminal misconduct, crystal clear recollection of that." SOF at par. 33.

Mr. Mulhern claims that the day after he first spoke with Mac Daniel about this matter, Mr. Daniel "called me up and called me an asshole, because the sources he had been given said that I completely misled him." Mr. Mulhern claims that in response to Reporter Daniel's questions whether Nancy O'Loughlin was involved in the investigation, he (Mr. Mulhern) stated that he would neither confirm or deny whether or not Nancy O'Loughlin was involved in the investigation. SOF at par. 34.

Mr. Mulhern claims that at the time he had the conversation with Mr. Daniel he did not have any bad will against Nancy O'Loughlin. SOF at par. 35.

Mr. Mulhern claims that after he found out that he was a party to this suit, he called Chief Carter and had a very brief conversation with him regarding the fact that the suit had been filed. SOF at par. 36.

To the contrary, Reporter Mac Daniel testified that in his conversation with Mr. Mulhern nothing came up regarding Nancy O'Loughlin being involved in criminal conduct. Mr. Daniel does not recall Mr. Mulhern stating that Nancy O'Loughlin was absolutely never involved in criminal conduct and he does not recall Mr. Mulhern saying to him that it was either misinformation or absolutely not true that Nancy O'Loughlin might be found criminally responsible. However, Mr. Daniel also testified that if Mr. Mulhern had indeed said these things to him, he (Mr. Daniel) would not have written the things he wrote in his article. Specifically, if Mr. Mulhern had said the things he claimed he said to Mr. Daniel, Mr. Daniel does not believe he would have written in his story that the probe could lead to criminal charges against the four individuals referred to in his story (of whom Nancy O'Loughlin was one). Mr. Daniel did not recall Mr. Mulhern warning him "not to go down that road because nothing could be further from the truth" but Mr. Daniel also stated that he did not believe he would have written what he wrote had words to that

effect been said to him by someone like Mr. Mulhern.  Mr. Daniel did not recall having the impression that Mr. Mulhern was trying to dissuade him from writing in his story that Nancy O'Loughlin could be found criminally responsible.  Mr. Daniel also stated that he did not recall having a second conversation with Mr. Mulhern about this matter, and that he specifically did not call Mr. Mulhern a name such as "asshole," and that he did not tell Mr. Mulhern that the sources he had been given said that Mr. Mulhern had misled him.  SOF at par. 37.

Mr. Daniel testified that in speaking to Mr. Mulhern, Mr. Mulhern stated that he could neither confirm nor deny that Nancy O'Loughlin was involved in the investigation.  When a statement such as a source saying that they could "neither confirm or deny a certain fact" is made to Mr. Daniel, that meant to him that it was an indication that he was on the right track, that the statement was better than a firm denial, and that to some degree it meant that the information was true but the source could not acknowledge that.  SOF at par. 38.

Mr. Mulhern was the "agency official" that was referred to in Mr. Daniel's article.  SOF at par. 39.

The information that Mr. Daniel wrote in his story about an investigation about allegations of criminal conduct was based upon statements made to him by Joseph Pesaturo.  Mr. Pesaturo is the MBTA's spokesperson.  Mr. Daniel was not sure whether he spoke to Mr. Pesaturo and Mr. Mulhern at the same time, whether they were both on the phone or whether a speakerphone was involved.  It was Mr. Pesaturo who stated that the probe could lead to criminal charges.  Mr. Daniel was not sure whether or not Mr. Pesaturo was on the phone during his conversations with Mr. Mulhern.  He was also not sure whether he had received the quote regarding criminal charges from Mr. Pesaturo before or after speaking to Mr. Mulhern.  SOF at par. 40.

It was Mr. Mulhern who was the "agency official" who confirmed that Nancy O'Loughlin was involved in the investigation.  SOF at par. 41.

Mr. Daniel did not know if Mr. Mulhern was aware that Mr. Pesaturo had indicated that there were allegations of criminal conduct involved in the investigation and he did not know if Mr. Mulhern was present or on the phone when Mr. Daniel was given that information by Mr. Pesaturo.  SOF at par. 42.

12

Former MBTA Chief of Police Tom O'Loughlin also testified in this action.  Mr. O'Loughlin testified that he spoke to Mac Daniel regarding the Boston Globe article in which Nancy O'Loughlin was named and which it was indicated that the four officers involved (including Nancy O'Loughlin) could be subject to criminal charges.  Mr. Daniel indicated to Tom O'Loughlin that he obtained his information from Mike Mulhern.  SOF at par. 43.

Mr. Daniel indicated to Tom O'Loughlin that Mike Mulhern had told him both that Nancy O'Loughlin was the subject of a criminal investigation or proceedings as well as that she was Tom O'Loughlin's sister.  Tom O'Loughlin testified that he was informed by Mr. Daniel that it was Mike Mulhern who had informed him that Nancy O'Loughlin was one of the officers subject to the investigation and was also the subject of investigation for criminal conduct.  SOF at par. 44.

Former Chief Tom O'Loughlin testified that in a legal proceeding, Deputy Chief Martino and Former Deputy Chief McCarthy had testified that the assignment of a superior officer to the Detail Unit would be a punishment assignment.  SOF at par. 45.

### THE CONDUCT ENGAGED IN BY THEN LIEUTENANT FLEMING WAS MORE SEVERE THAN THE CONDUCT ENGAGED IN BY LIEUTENANT O'LOUGHLIN, AND MERITED MORE SEVERE DISCIPLINE

In October of 2003, Deputy Fleming was demoted by Chief Carter and given a five day suspension.  Chief Carter had claimed that Deputy Fleming had released certain information without authorization.  As a result of the disciplinary action, Deputy Fleming was demoted to the grade of Lieutenant.  Additionally, under the prior Police Chief, Thomas O'Loughlin, Lieutenant Fleming had been disciplined as well.  The discipline received by Lieutenant Fleming on that occasion was two or three punishment tours, during which Mr. Fleming had to work without pay.  After he was demoted by Chief Carter, then Lieutenant Fleming filed a grievance over his demotion.  The demotion was eventually taken to arbitration.  As a result of the arbitration, the arbitrator ruled that Lieutenant Fleming's demotion to patrolman should be overturned and that he should be reinstated to the position of Lieutenant, but he was given a twenty day suspension in relation to a remark he had made.  The remark Lieutenant Fleming made consisted of words stating that he felt it was better to be called a racist than a coward.  SOF at par. 46.

Prior to being suspended with pay by Chief Carter, during her 21-years with the MBTA Police Department, Nancy O'Loughlin had not received any formal discipline prior to Chief Carter suspending her and then demoting her, nor was there any discipline in her personnel file at that

time.  The only prior discipline, formal or informal, which Nancy O'Loughlin had previously received was some 11-years previously when in 1992 she received an informal counseling for having supposedly called another employee a "lunk-head."  SOF at par. 47.  As is discussed in greater detail below, the Arbitrator who overturned Plaintiff's demotion noted in his decision at page 27 that Lieutenant Fleming's disciplinary record (when compared with that of Plaintiff), arguably called for Lieutenant Fleming receiving more severe discipline than did Plaintiff.

## THE MBTA HAS CONTINUED TO RETALIATE AGAINST NANCY O'LOUGHLIN AFTER THE FILING OF THIS LAWSUIT

After being demoted by Chief Carter from Lieutenant to Patrolman, Nancy O'Loughlin utilized the Union Grievance Process to contest her demotion.  After many days of hearings and extensive briefing, an arbitrator issued a decision in which he determined that Nancy O'Loughlin's discipline was not warranted, and he ordered her reinstated to her position of Lieutenant with full back pay.  SOF at par. 48.

The Arbitration Decision ordering Nancy O'Loughlin reinstated to the position of Lieutenant with full back pay was issued in March 2006.  Despite that, it was not until approximately six weeks later that Nancy O'Loughlin was again receiving Lieutenant's pay.  It was not until approximately eight weeks later than Nancy O'Loughlin received even a portion of the back pay to which she was entitled.  Even as of the current date, the MBTA has not made Nancy O'Loughlin whole as was required by the Arbitration Award.  Specifically, the MBTA has failed to pay her approximately $23,000.00 of back pay to which she claims she is entitled, and she has not been allowed to be placed in one of the variety of command positions she would have bid for and would have received if not for her demotion.  Additionally, the MBTA has not placed now Lieutenant O'Loughlin in a meaningful work assignment as a Lieutenant.  Lieutenant O'Loughlin's coworkers refer to her as the Lieutenant in Charge of Nothing.  Her duties consist of low level clerical work duties which is not suitable for  Lieutenant to perform, and she does not supervise any other employees.  Chief Carter still refuses requests from other police departments and others asking that Nancy O'Loughlin be allowed to work with them on graffiti crime matters.  SOF at par. 49.

III.    **ARGUMENT**

**LIEUTENANT O'LOUGHLIN'S TRANSFER TO THE DETAIL UNIT CONSTITUTED DISCRIMINATION AGAINST HER ON THE BASIS OF HER SEX.**

In relation to the August of 2003 transfer of Lieutenant O'Loughlin to the Detail Unit, there are two genuine issues of material fact which prevent Summary Judgment from being granted on this issue. Additionally, various facts are present which indicate that the reasons advanced by Defendants for transferring Lieutenant O'Loughlin to the Detail Unit were merely a pretext for discrimination.

The first genuine issue of material fact involves whether or not the position of Commander of the Detail Unit was viewed as a punishment assignment by the MBTA Police Department. As is set forth in the "Factual Background" section of this Brief, assignment to the Detail Unit was indeed viewed as a punishment assignment. Lieutenant Fleming (formerly the interim Chief of the MBTA Police Department and later a Deputy Chief under Chief Carter) testified that the Detail Unit Command was a punishment assignment. He went so far as to state that the assignment was considered the "Siberia of the Police Department." Several former Chiefs had assigned superior officers to the Detail Unit in order to punish them. Several Deputy Chiefs had even testified in Federal Court that the position of the Commander of the Detail Unit was a punishment assignment.

Most importantly, Lieutenant Fleming testified that prior to the transfer of Lieutenant O'Loughlin to the Detail Unit, he (then Deputy Chief Fleming) had specifically stated to Chief Carter that the Detail Unit position was viewed as a punishment assignment and that one of the Deputy Chiefs had been punished by a former Chief by being placed in the Detail Unit.

To the contrary, Chief Carter testified that he never had the conversation with Deputy Chief Fleming, in which Mr. Fleming informed him that the Detail Unit was a punishment assignment. Chief Carter denied he ever had this conversation, and he denied ever being informed that the Detail Unit assignment was viewed as a punishment assignment.

Defendants assert that the position as Head of the Detail Unit was an important position and was not a punishment assignment. There exists a genuine issue of material fact as to whether or not this position was a punishment assignment. If indeed it was viewed as a punishment assignment,

the transfer to Lieutenant O'Loughlin to that position is suspect, and a false reason was given for her transfer.

The second genuine issue of material fact which bears upon the transfer to the Detail Unit is whether or not Chief Carter knew that the position was deemed a punishment assignment. In light of the complete contradiction between the testimony of Chief Carter and the testimony of Lieutenant Fleming, there is a genuine issue of material fact as to whether Chief Carter was aware of this fact. If indeed Chief Carter knew that the assignment was a punishment assignment, his transfer of Nancy O'Loughlin to that position is suspect as being discriminatory.

However, if the Court that Defendants have advanced legitimate, non-discriminatory reasons for Lieutenant O'Loughlin having been transferred from the Detective Unit to the Detail Unit, Summary Judgment on this issue must be denied as there are a variety of facts proving that the supposedly "nondiscriminatory reason" for Lieutenant O'Loughlin transfer was merely a pretext for discrimination against her on the basis of her gender. Those various facts proving pretext are the following:

1.    The contradictions between the testimony of Lieutenant Fleming and Chief Carter regarding whether or not Lieutenant Fleming informed Chief Carter that the Detail Unit was viewed as a punishment assignment, bears upon Chief Carter's credibility in this action. Due to the completely contradictory nature of the testimony on this important point, and the fact that for purposes of this Motion Lieutenant Fleming's testimony must be viewed as being correct, Chief Carter's credibility on this issue as well as on any related issues, is negated. Chief Carter did not testify that he did not recall the conversations with Lieutenant Fleming, he stated that they never occurred. As Lieutenant Fleming's testimony must be taken as the correct version of what transpired between the two men, the inescapable conclusion is that Chief Carter is not being truthful in his testimony on this issue. The reasonable inference to be drawn after concluding that Chief Carter is not credible on this issue, is that Chief Carter's testimony on the other issues in this case is not credible either. Accordingly, the Court must not give any weight to Chief Carter's testimony that there were legitimate, nondiscriminatory reasons for transferring Nancy O'Loughlin to the Detail Unit. Those "reasons" must be viewed as merely a pretext for discrimination.

2.    Similarly for the purposes of this Motion, it must be held that the position of Head of the Detail Unit was indeed a punishment post. Based upon the weight which must be given to Lieutenant Fleming's testimony, the conclusion which must be drawn at this

point in these proceedings is that Chief Carter transferred Nancy O'Loughlin to the Detail Unit with knowledge that he was transferring her to a position which was viewed by the Department as a punishment assignment, and that other superior officers and non-superior officers in the Department would know that by this assignment he was punishing Lieutenant O'Loughlin.

The fact that Chief Carter was purposely transferring Lieutenant O'Loughlin to a punishment assignment contradicts his claim that there were legitimate, nondiscriminatory reasons for the transfer. Both that, and the fact in and of itself that Lieutenant O'Loughlin was being transferred to a punishment assignment, proves that the reasons advanced for the assignment were merely a pretext for discrimination.

3.  Lieutenant Fleming testified that when the transfer of Nancy O'Loughlin to the Detail Unit was made (which occurred when Mr. Fleming was a Deputy Chief) there was no reason to his knowledge to transfer Nancy O'Loughlin from the Detective Unit to the Detail Unit. Deputy Chief Fleming was "stunned" when Chief Carter transferred Nancy O'Loughlin to the Detail Unit. Deputy Chief Fleming was Lieutenant O'Loughlin's immediate supervisor, and at the time he was satisfied with Nancy O'Loughlin's job performance.

    The fact that Nancy O'Loughlin's immediate supervisor could think of no reason to transfer her and was satisfied with her performance, indicates that the transfer was a pretext for discrimination.

4.  Lieutenant Fleming testified that when Nancy O'Loughlin was transferred out of the Detective Unit, it was not necessary for her to be transferred to the Detail Unit. Rather, Lieutenant O'Loughlin could have been transferred to the Patrol Unit instead. What this indicates is that rather than transferring Nancy O'Loughlin to the Patrol Unit, Chief Carter specifically decided to transfer her to a position which she and others in the Department would view as a punishment assignment.

    The fact that Chief Carter chose to transfer Nancy O'Loughlin to a punishment assignment rather than to an assignment which would not be viewed as a punishment, belies any claim that the transfer was either to improve administration in the Department or to carry out a broader reorganization. The reasons advanced for the transfer are a pretext for discrimination.

5.  Chief Carter's credibility regarding the transfer is indicted by another factual dispute as well. Specifically, Lieutenant Fleming testified that he had no knowledge of the transfer of Nancy O'Loughlin to the Detail Unit until Chief Carter met with then Deputy Chief Fleming and Lieutenant O'Loughlin and informed them both of the transfer. Lieutenant Fleming claims that prior to the change itself, Chief Carter had

never indicated to him that he was in any way dissatisfied with the job that Lieutenant O'Loughlin was doing in the Detective Unit, and that he had no prior knowledge of the change. To the contrary, Chief Carter testified that prior to Nancy O'Loughlin being informed of her transfer, he had discussions about this matter with Deputy Chief Fleming, that he specifically recalled these discussions, that he had directed Deputy Chief Fleming to speak to Nancy O'Loughlin about the change in assignment and that Deputy Chief Fleming confirmed to him that he had spoken to Lieutenant O'Loughlin.

Either Lieutenant Fleming or Chief Carter is not telling the truth about this aspect of the transfer. For the purposes of this Motion, it must be assumed that Lieutenant Fleming's version of the facts is the correct one. Once again, the fact that it must be assumed that Chief Carter is not telling the truth about the procedural aspects of the transfer, both destroys his credibility as to the other matters he had testified to and proves that the reasons he has advanced for the transfer were merely a pretext for discrimination.

6.    Chief Carter's behavior immediately after informing Nancy O'Loughlin of the transfer to the Detail Unit indicates his hostility to her and is further evidence of pretext. Specifically, immediately after informing Nancy O'Loughlin of the transfer, Chief Carter stated to then Deputy Chief Fleming that he should "look at the way she dresses." Deputy Chief Fleming understood this to be a negative comment regarding Nancy O'Loughlin, and he (Deputy Chief Fleming) did not feel that there was anything inappropriate about the way Nancy O'Loughlin was dressed at the time.

7.    Chief Carter contradicts this testimony once again. Chief Carter claims that the comments about inappropriate dress were made prior to the transfer, that he instructed Deputy Chief Fleming to discuss her inappropriate dress with Lieutenant O'Loughlin and that Deputy chief Fleming claimed that he did indeed speak to Lieutenant O'Loughlin about the matter.

This negative comment about Lieutenant O'Loughlin's attire (particularly in light of the fact that Lieutenant O'Loughlin was not dressed inappropriately) can only be viewed as a hostile, sexist comment which further indicates pretext.

8.    After informing Nancy O'Loughlin of her transfer to the Detail Unit, Chief Carter instructed then Deputy Chief Fleming to "go down and guard her office to watch what she was taking out of her office." Deputy Chief Fleming understood this to mean to make sure that Lieutenant O'Loughlin did not remove anything from the office that she was not supposed to remove. This was an unusual procedure. It clearly indicates a distrust of Lieutenant O'Loughlin and hostility towards her.

Additionally (as is discussed below) Chief Carter did not instruct Deputy Chief Fleming to guard the office of a male Lieutenant who was also transferred that same day.

Chief Carter testified that he did not recall instructing Deputy Chief Fleming to guard Lieutenant O'Loughlin's office and watch what she was taking out.

The order to guard Lieutenant O'Loughlin's office proves hostility toward her by Chief Carter and proves that the reasons advanced for the transfer were a pretext for discrimination.

9.  At the time of her transfer to the Detail Unit, Lieutenant O'Loughlin was recognized both inside and outside the MBTA Police Department as an expert on graffiti crime. Despite that reputation, in the course of informing Lieutenant O'Loughlin of her transfer, Chief Carter instructed her that she was no longer to be involved in investigations of graffiti crime.  In light of Lieutenant O'Loughlin's recognition as an expert in this area, the requests which were made for her to testify in this area and the importance to the MBTA of such testimony, there was no nondiscriminatory reason for Chief Carter to instruct Lieutenant O'Loughlin that she would no longer be allowed to be involved in graffiti investigations, other than to further discriminate against her.[2]

10. A comparison of the way Lieutenant O'Loughlin was treated when she was transferred with the treatment of a male Lieutenant indicates pretext as well.

On the same day that Lieutenant O'Loughlin was informed of her transfer to the Detail Unit, Lieutenant Leuchte, a male, was also transferred.  However, Lieutenant Leuchte was not transferred to a punishment assignment, no hostile comments were made about him immediately after he was informed of the transfer, and Deputy Chief Fleming was not instructed to guard his office while he was moving things out of it.

This disparity in treatment between Lieutenant O'Loughlin and a male Lieutenant who was transferred at the same time (also supposedly for administrative reasons), is evidence that Lieutenant O'Loughlin's transfer was discriminatory.

11. While Lieutenant O'Loughlin was in the Detective Unit, Chief Carter berated Deputy Chief Fleming and yelled at him for allowing a memo to be signed and distributed by Nancy O'Loughlin while Deputy Chief Fleming was out of work due to an

---

[2] Defendants have attempted to deal with this issue by having Chief Carter assert that he would not have prevented Nancy O'Loughlin from complying with a subpoena ordering her to testify in Court.  The distinction which Defendants do not mention, is that although Chief Carter might not have prevented Lieutenant O'Loughlin from testifying pursuant to a valid subpoena, he was, and is, indeed preventing her from investigating graffiti crime (and implicitly also preventing her from testifying in situations when she was not actually subpoenaed).

emergency.  Chief Carter did this despite the fact that other officers in the Detective Unit, including individuals at the (lower) patrol level had issued memos under their names.  This unjustified hostility toward Lieutenant O'Loughlin indicates that the transfer (which would have occurred at most months after the memo incident) was discriminatory.

For all of the foregoing reasons, the Summary Judgment Motion of Defendants must be denied as to the August 2003 transfer of Lieutenant O'Loughlin to the Detail Unit.[3]

## THE SUSPENSION OF NANCY O'LOUGHLIN WITH PAY IN MARCH 2004 AND HER DEMOTION FROM LIEUTENANT TO PATROL OFFICER IN AUGUST 2004 CONSTITUTE SEX DISCRIMINATION AND ILLEGAL RETALIATION.

As the Court is aware, in the spring of 2004, the MBTA conducted an investigation of various police officers engaging in allegedly inappropriate conversations on recorded telephone lines. As to Lieutenant O'Loughlin, the conversations for which she was criticized essentially consisted of either griping about management of the MBTA Police Department (including Chief Carter) and using vulgar language during conversations she had with subordinates while she was off-duty.

Lieutenant O'Loughlin's demotion was eventually overturned by an Arbitrator in a Decision issued in March 2006.  It is worth noting certain of the language of that Decision at this point in this Brief.  Specifically, the Court is referred to the following excerpt from the Decision which is contained on pps. 28 and 29 of that Decision (the Decision is appended to Defendant's Brief):

> "Given the fact that the core values appear to have been broadly construed to encompass practically any infraction, I have determined that despite employer's insistence that the penalty is valid, there is no coherent basis for the severity of the penalty, the Department disregarded all of O'Loughlin's prior service record and did not consider whether a lesser penalty might correct the shortcomings in her performance.

---

[3] Defendants mention in passing in their Brief that the transfer to the Detail Unit was not an "adverse action" which would qualify as discrimination.  The very opposite is true.  In light of the fact that the position was viewed as a punishment assignment and therefore had much lower status than other positions within the MBTA Police Department, it constituted a sufficient change in Nancy O'Loughlin's working conditions to be an adverse action which could be discriminatory.  Additionally, although the recent U.S. Supreme Court decision in Burlington Northern v. White, 126 S.Ct. 2405 (2006) deals specifically with claims of retaliation (as opposed to discrimination) that decision makes clear that courts determining whether actions taken against employees are severe enough to be actionable, should not be constrained by such factors as whether the action being questioned specifically resulted in a loss of employment or loss of pay.

Ms. O'Loughlin has heretofore been regarded as professional and capable officer. It is hardly news and more accurate to say that it is excessively common to complain about one's boss. The language used by O'Loughlin while spicy and intemperate is quite common fodder in any institution, and even Chief Carter admits that the type of language that Ms. O'Loughlin used is within the norm of what is heard in police banter. …The employer did not have just cause to demote Ms. O'Loughlin. Even with the evidence seen in the best light, and with all deference to the unique and essential role that law enforcement plays in today's troubled world, the evidence properly weighed does not support the discipline imposed here."

Earlier in the Arbitration Decision (at pps. 26-27) the Arbitrator compared the discipline meted out to Lieutenant Fleming with the discipline accorded Lieutenant O'Loughlin. He stated the following:

"Finally, while the employer struggles to distinguish the Fleming Arbitration and the case at hand, I find the reasoning of the Arbitrator in that case instructive. There, as here, the grievant was a Lieutenant demoted because of private conversations on the recorded line with Office McKay. The substance of Fleming's conversations with McKay touched on some of the same topics—the Dudley Square murder and subsequent Globe article—and there, as here, the demotion was based on premised on Fleming's failure to correct offensive and disparaging remarks from McKay such as "fucking retarded" and "fucking morons." In at least one case, Lieutenant Fleming's language was as or more offensive than O'Loughlin's when he states to McKay, "better to be a racist than a chicken…at least racist carries the connotation you can fight." **It is also noteworthy that in contrast to O'Loughlin, Fleming had been subject to progressive discipline (a demotion and suspension) prior to the recent suspension and thus would have arguably warranted more severe discipline than O'Loughlin**." (emphasis added)

To again place this matter in temporal context, the investigation of the statements on the tape-recorded telephone lines occurred in the spring of 2004. Although Nancy O'Loughlin's initial charge of gender discrimination was filed with the Massachusetts Commission Against Discrimination in October of 2003, due to various extensions granted to the MBTA in filing its response, the MBTA's Position Statement denying Lieutenant O'Loughlin's charges of gender discrimination was not filed with the MCAD until March 8, 2004. March 8, 2004 was the very same day that Lieutenant O'Loughlin was informed of her suspension with pay due to the statements on the recorded lines. Even more importantly, the Position Statement that the MBTA filed with the MCAD contained an Affirmation signed by Chief Carter, which was dated several days earlier, March 4, 2004. The reasonable inference here is that Chief Carter reviewed the MBTA's

lengthy Position Statement some days prior to March 4, 2004.  In other words, at exactly the time Chief Carter was weighing whether Nancy O'Loughlin should be disciplined at all for the statements made on the recorded lines, he was reviewing the MBTA's response to her charge of gender discrimination.[4]

An even stronger temporal connection arises between the Complaint in this lawsuit and the double demotion of Lieutenant O'Loughlin.  Specifically, Chief Carter acknowledged that he recalls being served with the Complaint in this action at his home in Oak Bluffs, Massachusetts.  Chief Carter was in fact served with the Complaint and Summons in this action on July 27, 2004.  The service was made in hand upon Chief Carter's wife. Accordingly, Chief Carter's wife was served with the Complaint and Summons in this action no more than three weeks prior to Chief Carter issuing his decision that Lieutenant O'Loughlin would be demoted from Lieutenant, down two grades to the rank of Patrol Officer.  It is simply contrary to common sense to believe that the fact that Chief Carter knew he had just been sued in Federal Court by Lieutenant O'Loughlin for gender discrimination, was not a factor in his decision to demote Lieutenant O'Loughlin.  Chief Carter would have become aware of the Federal lawsuit at virtually the same time he was making the demotion decision.   In light of the undue severity of his discipline of Lieutenant O'Loughlin as well as the disparity in discipline accorded to her and a male Lieutenant (as discussed below), it should be clear that Lieutenant O'Loughlin's demotion constituted illegal retaliation for complaining of sexual discrimination, and/or was itself sexual discrimination.  To whatever extent Chief Carter may be a seasoned and professional Chief of Police, he is asking the Court to believe that he acted contrary to human nature by claiming that he did not consider the fact that he was just named in a Federal lawsuit in deciding about the severity of discipline to meted out to Lieutenant O'Loughlin back in August, 2004.

Various facts in this case prove that the supposedly nondiscriminatory reasons for Lieutenant O'Loughlin's demotion are in reality just a pretext for either retaliation or gender discrimination.  Those facts tending to prove pretext are set forth below.

---

[4] Defendant claims in its Brief that there is no temporal relationship between the protected activity of filing a Charge of Discrimination and the suspension of Lieutenant O'Loughlin some five months later.  Defendant is misrepresenting the timing of this matter in making that claim.  Although the Charge was indeed filed some five months prior to the initial suspension, it was only a matter of days or weeks prior to the MBTA's filing of its Position Statement, in other words while MBTA was responding to the Charge, that the discipline occurred.  In light of this close temporal connection between the discipline and the action on the Charge by the MBTA, a presumption of retaliation must arise.

1.   As was discussed in detail in the earlier section of this Brief, in transferring Nancy O'Loughlin to a punishment position, the Detail Unit, in August of 2003, Chief Carter was engaging in gender discrimination against Lieutenant O'Loughlin. The various facts tending to prove that the transfer to the Detail Unit constituted gender discrimination, as well as the fact that Chief Carter engaged in such gender discrimination, is strong evidence that the decision to subject Lieutenant O'Loughlin to a double demotion approximately one year later, was either another instance of gender discrimination or constituted retaliation for the prior charges of discrimination.

2.   Similarly, the fact that approximately one year prior to the double demotion Chief Carter had purposely assigned Lieutenant O'Loughlin to a punishment position (whether or not it was for reasons of gender discrimination) is evidence of preexisting hostility, dislike and animus against Lieutenant O'Loughlin. It is reasonable to infer that this hostility existed one year later, and therefore that the supposed reasons for the demotion were merely a pretext.

3.   In the earlier section of this Brief the question of Chief Carter's credibility was raised in detail. In light of Chief Carter's lack of credibility in relation to the various issues surrounding the transfer to the Detail Unit, it must be presumed that Chief Carter's statements regarding the reasons for his decision to impose a double demotion upon Lieutenant O'Loughlin in August of 2004 are untrue as well.[5]

4.   Chief Carter's remark at some point between April 2005 and April 2006 that "vengeance will be mine" (which was testified to by Lieutenant Fleming) apparently made in reference to this and other lawsuits, is direct evidence of pretext, and/or discrimination or retaliation in the demotion of Lieutenant O'Loughlin.[6]

---

[5]An additional inconsistency arises between the testimony of MBTA General Manager Mulhern and Chief Carter. Mr. Mulhern claimed that after he found out that he was a party to this suit, he called Chief Carter and had a brief conversation with him regarding the fact that the suit had been filed. SOF at 37. To the contrary, Chief Carter has testified that he has never discussed Nancy O'Loughlin's claims in this lawsuit with Mr. Mulhern. SOF at 26.

[6] Plaintiff asserts that this statement should not be excluded from the Court's consideration as being hearsay, due to general indicia of reliability of the statement. Specifically, neither Lieutenant Wheeler (the person who overheard the statement) nor Lieutenant Fleming (the person to whom the overheard statement was repeated and who testified to the statement) have any pecuniary interest in this lawsuit and there has been no evidence set forth on which to believe that they are either biased or not truthful witnesses. As to Chief Carter himself, the statement would be an admission.

Lieutenant Fleming testified that it was his belief that this statement was made by Chief Carter in relation to this lawsuit as well as an additional lawsuit regarding a similar matter.

This "vengeance" statement by Chief Carter would indicate not only that Chief Carter is the type of person who would be likely to retaliate against a subordinate who had challenged his authority or exercised rights under the discrimination laws but additionally, that he had indeed done so in relation to Lieutenant O'Loughlin.

5.    Lieutenant Fleming also testified that subsequent to Nancy O'Loughlin's demotion, Chief Carter and Deputy Chief Martino went out of their way (in an unusual fashion) to obtain a surveillance tape from a Stop & Shop Supermarket, due to their belief that they had "caught" Nancy O'Loughlin in an act of misconduct.  This undue diligence in responding to a possible act of minor misconduct (which in fact did not involve then Patrol Officer O'Loughlin) indicates the ongoing hostility Chief Carter had toward Nancy O'Loughlin and tends to prove that his actions in demoting her were discriminatory or retaliatory.

6.    In attempting to justify Lieutenant O'Loughlin's demotion, Defendants place great emphasis on the fact that at the time Lieutenant O'Loughlin was subjected to a double demotion, a male Lieutenant who was involved in the tape recorded conversations, Lieutenant Fleming, was also subjected to a double demotion.  Defendants claim that as Lieutenant Fleming was a male and had not filed a charge or complaint of discrimination, his demotion is proof that Nancy O'Loughlin's demotion was neither retaliatory nor discriminatory.   In reaching this conclusion, Defendants omit certain important facts.

Significantly, and as was noted by the Arbitrator deciding Nancy O'Loughlin's Arbitration case, Lieutenant Fleming had been the subject of prior serious discipline before being involved in the tape recorded conversation investigation. Specifically, Chief Carter had demoted Mr. Fleming from Deputy Chief down to Lieutenant, and had suspended him for five days, for allegedly making public certain confidential information without any authorization.  Mr. Fleming had also been disciplined for other matters under a prior Chief, Tom O'Loughlin.  To the contrary, Nancy O'Loughlin

had not been the subject of any prior formal discipline during her 20-plus years of service with the MBTA Police Department.[7]

Defendants' argument that Lieutenant Fleming's alleged misconduct was the equivalent of Lieutenant O'Loughlin's misconduct is simply untenable, particularly in light of the facts that Lieutenant Fleming had a serious history of prior discipline including a demotion and suspension, and that at least one of Lieutenant Fleming's comments on the recorded line could be viewed as having racial overtones.  As was stated by the Arbitrator and quoted earlier in this Brief, Lieutenant Fleming's actions and prior disciplinary history "would have arguably warranted more severe discipline than O'Loughlin."

Lieutenant O'Loughlin should have received less severe discipline than did Lieutenant Fleming.  The only reason that Lieutenant O'Loughlin received the same discipline as did Lieutenant Fleming, was to enable Chief Carter to discriminate against Nancy O'Loughlin on the basis of her sex, and to retaliate against her for having filed charges of discrimination and a lawsuit alleging discrimination.  Indeed, the question must be raised of whether the reason that Lieutenant Fleming was given the same discipline as was Lieutenant O'Loughlin was merely to attempt to hide the discriminatory and retaliatory nature of the discipline accorded Lieutenant O'Loughlin in August, 2004.[8]

7.    Finally, the behavior of Chief Carter towards Lieutenant O'Loughlin subsequent to her March 2006 Arbitration Award reinstating her to the position of Lieutenant, proves that Lieutenant O'Loughlin was retaliated against even after being reinstated to her position, and reinforces Plaintiff's argument that her demotion was based on retaliation and discrimination.

The Arbitration Decision held that Lieutenant O'Loughlin was to be "reinstated to her former position and made whole for lost pay and benefits resulting from this demotion."  The MBTA did no such thing.

Although the MBTA placed Lieutenant O'Loughlin back in her position as a Lieutenant within days of receiving the Arbitrator's Decision, it continued paying her at her Patrol Officer's rate of pay (rather than the rate of pay of a Lieutenant) for approximately six weeks after receiving the Award.  There is

---

[7] The only prior "discipline" of any sort which Lieutenant O'Loughlin had received was an informal counseling for calling a coworker a "lunkhead."  This informal counseling some 12 years prior to her discipline for the tape recorded conversations and to the best of her knowledge, does not even appear in her personnel file.

[8] The holdings of the Arbitrator that arguably Lieutenant Fleming should have had more severe discipline than Lieutenant O'Loughlin, and that in making its penalty decision the MBTA "disregarded all of O'Loughlin's prior service record and did not consider whether a lesser penalty might correct the shortcomings in her performance," are subject to the doctrine of issue preclusion, and should be deemed established for the purposes of this case.

simply no legitimate excuse for this delay.  With regard to the Arbitrator's order that it make Lieutenant O'Loughlin whole for her demotion (in other words pay her the Lieutenant's pay and benefits she would have received during the nearly two years she suffered the demotion) the MBTA did not pay even a portion of those monies to Lieutenant O'Loughlin until approximately 8 weeks after receiving the Award.

Even as of this date, nearly five months after the receipt of the Award, Lieutenant O'Loughlin has still not been made whole.  She has not been paid for the value of being denied the use of a police cruiser during her demotion (which would be worth approximately $8,000.00 to her) and she has not been paid fully for the loss of detail work she would have received had she not been demoted (which is worth approximately $15,000.00 to her).  Additionally, Lieutenant O'Loughlin has not been allowed to be placed in one of the Command positions which she would have received (due to seniority and qualifications) had she been able to bid for those positions during the period of demotion.

Perhaps most importantly, Lieutenant O'Loughlin has been placed in a position at the MBTA Police Department which is basically fit for a low level civilian employee performing low level clerical work that is absolutely not suitable for a superior officer to be performing.  Lieutenant O'Loughlin does not have anyone she supervises, and her coworkers regularly refer to her as the "Lieutenant in Charge of Nothing."

Finally, in this regard, Chief Carter is still refusing requests from other Police Departments and others requesting that Lieutenant O'Loughlin be allowed to work on graffiti investigations.

All of these instances of conduct by the MBTA and Chief Carter subsequent to the issuance of the Arbitration Award reinstating Lieutenant O'Loughlin, are indicative of both continued retaliation against her and prove that her demotion was both discriminatory and retaliatory.

For all of the foregoing reasons, it is respectfully requested that the Motion for Summary Judgment be denied in relation to the demotion of Lieutenant O'Loughlin.

**LIEUTENANT O'LOUGHLIN WAS DEFAMED BY THE MBTA AND ITS AGENTS**

As is discussed in greater detail in Plaintiff's Opposition to the Motion for Summary Judgment of Michael Mulhern (which is incorporated by reference herein) the actions of MBTA General Manager Mulhern and MBTA Spokesman Pesaturo resulted in Lieutenant O'Loughlin being named in the Boston Globe as being possibly being the subject of criminal charges. This statement was false, was made with actual malice and is actionable.

The Motion for Summary Judgment must be denied as to the Counts for defamation against the MBTA.

**THE MOTION FOR SUMMARY JUDGMENT MUST BE DENIED IN TOTAL**

In summary fashion, the Defendants have claimed that the Counts against Carter and/or the MBTA under 42 U.S.C. §1983 and M.G.L. c.12 §11(i) must be dismissed. They are wrong.

As Plaintiff has shown above, she can indeed prove that Chief Carter discriminated against her or retaliated against her in violation of 42 U.S.C. §2000e. Accordingly her claim under 42 U.S.C. §1983 against Chief Carter must stand.

As Chief Carter's actions were retaliatory, these actions can be deemed to have been threatening to Lieutenant O'Loughlin, and to have put her in fear for the purpose of deterring conduct such as the filing of discrimination charges. The deprivations which Chief Carter subjected Lieutenant O'Loughlin to in depriving her of protected rights, did indeed occur by way of threats, intimidation and coercion. For a period of nearly two years, Lieutenant O'Loughlin suffered a severe loss of pay and dignity in the workplace. This indeed constitutes a deprivation caused by threats, intimidation and coercion. Accordingly, the claims under M.G.L. c.12 §11(i) must stand.

Finally, Chief Carter had to realize that his actions in retaliating and discriminating against Lieutenant O'Loughlin were illegal, and were not reasonable. He is not entitled to any qualified immunity.

The Summary Judgment Motion must be denied as to the claims asserted by Lieutenant O'Loughlin under 42 U.S.C. §1983 and M.G.L. c.12 §11(i).

**CONCLUSION**

For all the foregoing reasons it is respectfully requested that the Motion for Summary Judgment filed by Defendants, MBTA and Joseph Carter be denied in its entirety.

Respectfully submitted,
NANCY O'LOUGHLIN
By her attorney,

/s/Mitchell J. Notis

_____
MITCHELL J. NOTIS, BBO# 374360
*Law Office of Mitchell J. Notis*
370 Washington Street
Brookline, MA 02445
Tel: 617-566-2700