UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-10933-JLT

---

NANCY O'LOUGHLIN
*Plaintiff*

v.

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY
and
JOSEPH CARTER
and
MICHAEL MULHERN
*Defendants*

---

**PLAINTIFF'S STATEMENT PURSUANT TO LOCAL RULE 56.1
OF MATERIAL FACTS OF RECORD AS TO WHICH THERE EXISTS
A GENUINE ISSUE TO BE TRIED, AS TO SUMMARY JUDGMENT MOTION OF
DEFENDANT MICHAEL MULHERN**

Pursuant to Local Rule 56.1, Plaintiff Nancy O'Loughlin submits this concise statement of material facts of record as to which it is contended that there exists a genuine issue to be tried.[1]

Due to the extensive statements of fact set forth in the Summary Judgment Motions filed by Defendants as well as the fact that Plaintiff does not disagree with many of the statements of fact set forth in those Rule 56.1 Statements submitted by Defendants, Plaintiff only sets forth herein those facts which are either not touched upon by the Defendants in their Statements, or which are contrary to the factual statements set forth by the Defendants.

---

[1] For the convenience of the Court, Plaintiff has submitted identical Rule 56.1 Statements in support of her Opposition to both the Motion for Summary Judgment of the Massachusetts Bay Transportation Authority and Joseph Carter, as well as the Motion for Summary Judgment of Michael Mulhern. Excerpts from relevant deposition transcripts and Nancy O'Loughlin's Affidavit, are appended to the Statement of Facts submitted in opposition to the summary judgment motion of Defendants MBTA and Joseph Carter. For purposes of efficiency and economy, these attachments are not appended to this Statement of Facts.

1

I.  **ASSIGNMENT TO THE DETAIL UNIT WAS VIEWED AS A PUNISHMENT ASSIGNMENT WITHIN THE MBTA POLICE DEPARTMENT**

   1. William Fleming (formerly the interim Chief of the MBTA Police Department, later a Deputy Chief under Chief Carter and then a Lieutenant) testified at his deposition that assignment to the detail unit position in the MBTA Police Department was viewed as a punishment assignment. Fleming Deposition Volume II at 251-253. Fleming testified that it was considered "the Siberia of the Police Department." Id. at 253. Several former Chiefs had assigned superior officers to the Detail Unit in order to punish them. Id. at 251, 255-256; 260. Being Head of the Detail Unit would inhibit an officer's opportunity for advancement under the regime in power at the time of his or her appointment to the Detail Unit. Id. at 265. It was perceived as a punishment assignment. Id. at 266-267; Fleming Deposition Volume III at 47-48.

   2. Lieutenant O'Loughlin also viewed the assignment to the detail unit as being a punishment assignment. Nancy O'Loughlin Deposition at Volume II at 229. According to Lieutenant O'Loughlin, Deputy Chiefs of the MBTA Police Department have testified in Federal Court that it was a punishment assignment, and that it was known throughout the Department as being a punishment assignment. Id.

II. **PRIOR TO TRANSFERRING NANCY O'LOUGHLIN TO BE HEAD OF THE DETAIL UNIT, CHIEF CARTER KNEW THAT THE POSITION OF HEAD OF THE DETAIL UNIT WAS VIEWED WITHIN THE MBTA POLICE DEPARTMENT AS A PUNISHMENT POSITION**

   3. Shortly after Chief Carter became Chief of the MBTA Police Department, in the course of explaining various personnel moves he had made as interim Chief, then Deputy Chief Fleming informed Chief Carter, that Deputy John Martino had been punished by a former Chief by being placed in the Detail Unit. Fleming Deposition Volume II at 268-270. Deputy Chief Fleming informed Chief Carter that the Detail Unit position was viewed as a punishment position. Id. at 272-273; Fleming Deposition Volume III at 148. Deputy Fleming had this discussion with Chief Carter about the Head of Detail Unit being a punishment assignment, prior to Nancy O'Loughlin being assigned to the Detail Unit. Id. at 149. Deputy Fleming testified that other than for special health considerations or if a person specifically requested the position, assignment of someone above the rank of

       Sergeant to Head the Detail Unit was never appropriate, and that the position was viewed throughout the Department as a punishment position. Id. at 151-152.

4. Chief Carter testified that he was never told that the assignment of a superior officer to Head the Detail Unit was a punishment assignment. Joseph Carter Deposition Volume I at 26. Chief Carter specifically denied that he had ever had a conversation with Deputy Chief Fleming in which Fleming informed him that the assignment of Deputy Martino to the Detail Unit had been a punishment assignment. Id. at 27-28; 31. Chief Carter testified that there was never a time that he was informed that the assignment of a superior officer to Head the Detail Unit was deemed a punishment assignment. Id. at 26.

### III. THE ASSIGNMENT OF NANCY O'LOUGHLIN TO BE HEAD OF THE DETAIL UNIT WAS A PUNISHMENT ASSIGNMENT

5. Former interim Chief Fleming testified that it was indeed a punishment assignment to place Nancy O'Loughlin as Head of the Detail Unit. Fleming Deposition Volume III at 147. Former interim Chief Fleming testified that there was no reason to transfer Nancy O'Loughlin from the Detective Unit to the Detail Unit. Id. at 162. Then Deputy Chief Fleming was "stunned" when Chief Carter transferred Nancy O'Loughlin to be Head of the Detail Unit. Id. at 156; Fleming Deposition Volume II at 273-274.

### IV. CHIEF CARTER DID NOT INFORM DEPUTY CHIEF FLEMING OF HIS INTENTION TO TRANSFER NANCY O'LOUGHLIN TO THE DETAIL UNIT BEFORE ACTUALLY INFORMING NANCY O'LOUGHLIN OF THAT TRANSFER

6. Then Deputy Chief Fleming testified that Chief Carter did not discuss moving Nancy O'Loughlin to the Detail Unit with him prior to making that move, and indeed never said anything about it to him. Fleming Deposition Volume II at 248. Prior to the change, Chief Carter had never indicated to Deputy Fleming that he was in any way dissatisfied with the job Nancy O'Loughlin was doing in the Detective Unit. Id. at 248-249; 251. Deputy Fleming first learned of Nancy O'Loughlin's assignment to the Detail Unit when she was called into Chief Carter's office along with Deputy Fleming. Id. at 274-275; Fleming Deposition Volume III at 45.

7. Chief Carter testified that prior to Nancy O'Loughlin being informed of her being assigned to the Detail Unit, he had discussions with Deputy Chief Fleming about that assignment of Nancy O'Loughlin to that unit. Chief Carter stated that he specifically recalled discussing this matter with Deputy Fleming. Carter Deposition Volume II at 86.

8. Chief Carter testified that Deputy Fleming had been directed to speak to Nancy O'Loughlin about her change in assignment to the Detail Unit prior to her speaking with Chief Carter. Carter Deposition Volume I at 50. Chief Carter stated that he "directed him to speak to her about the assignment before she came to speak to me." Id. at 50-51. Chief Carter claims that Deputy Fleming told him that "he spoke to Nancy and brought Nancy to my office for me to talk to her." Chief Carter also claimed that Deputy Fleming would have had a conversation with Nancy O'Loughlin about no longer being assigned to the Detective Unit and the Graffiti Investigation function and being transferred to the Detail Unit and that the Chief wanted to speak to her about that transfer to the Detail Unit. Id. at 79. Chief Carter testified that Deputy Fleming "would have done that based on our discussion." Id. at 79.

V. **IMMEDIATELY AFTER INFORMING NANCY O'LOUGHLIN THAT SHE WAS BEING TRANSFERRED TO THE DETAIL UNIT, CHIEF CARTER MADE NEGATIVE COMMENTS ABOUT THE WAY NANCY O'LOUGHLIN DRESSED**

9. Immediately after informing Nancy O'Loughlin that she was being transferred to the Detail Unit, while leaving that area with Deputy Fleming, Chief Carter stated to Deputy Fleming "look at the way she dresses." Fleming Deposition Volume II at 276, 280; Fleming Deposition Volume III at 165-166. Deputy Fleming took this to be a negative comment. Id. Deputy Fleming did not feel there was anything inappropriate about the way Nancy O'Loughlin was dressed at the time. Id.

10. According to Chief Carter, on several occasions prior to informing Nancy O'Loughlin of her transfer to the Detail Unit, in other words, while she was still Commander of the Detective Unit, he informed Deputy Fleming that Nancy O'Loughlin was dressed inappropriately. Carter Deposition Volume I at 53-56. He claims that he instructed Deputy Fleming to talk with Nancy O'Loughlin about that and that Deputy Fleming claimed that he did indeed speak to Nancy O'Loughlin about that. Id.

VI. **CHIEF CARTER INSTRUCTED DEPUTY FLEMING TO GUARD NANCY O'LOUGHLIN'S OFFICE AND WATCH HER WHILE SHE WAS EMPTYING OUT HER OFFICE**

11. The same day that Chief Carter informed Nancy O'Loughlin that she was being transferred to the Detail Unit, he instructed Deputy Fleming to "go down and guard her office to watch what she was taking out of her office." Fleming Deposition Volume II at 281. By guarding her office, Deputy Fleming understood that to mean to make sure that "she does not take anything out that she is not supposed to." Fleming Deposition Volume III at 163. Deputy Fleming did not recall that being done at the Police Department prior to that date. Id.

12. The same day that Nancy O'Loughlin was transferred, Lieutenant Leuchte, a male, was also transferred. Deputy Fleming was not instructed to guard Lieutenant Leuchte's office. Id. at 163.

13. Chief Carter testified that he did not recall instructing Deputy Fleming to guard Nancy O'Loughlin's office and watch what she was taking out after her reassignment. Carter Deposition Volume I at 92.

VII. **NANCY O'LOUGHLIN'S TRANSFERE TO THE DETAIL UNIT WAS NOT NECESSARY**

14. In the opinion of Deputy Chief Fleming, Nancy O'Loughlin was doing a good job in her work as the Detective Unit Commander. Fleming Deposition Volume III at 168. In the mind of Deputy Fleming, there was no reason to transfer Nancy O'Loughlin from the Detective Unit to the Detail Unit. Fleming Deposition Volume III at 162.

15. At the time that Nancy O'Loughlin was assigned to the Detail Unit, she could have been assigned back to the position she had previously held in the Patrol Unit. Fleming Deposition Volume II at 283-284; Fleming Deposition Volume III at 170. Deputy Fleming had no idea why Nancy O'Loughlin was assigned to the Detail Unit instead of to the Patrol Unit. Id. at 170.

VIII. **AT VARIOUS TIME CHIEF CARTER EXPRESSED EITHER A DISLIKE OF NANCY O'LOUGHLIN OR AN APPARENT DESIRE TO DISCIPLINE HER**

16. As is set forth above, after informing Nancy O'Loughlin of her transfer to the Detail Unit, Chief Carter had Deputy Fleming guard Nancy O'Loughlin's office and watch her while she was cleaning out her office in the Detective Division.

5

Additionally, shortly after informing Nancy O'Loughlin of her transfer, Chief Carter made negative remarks about Nancy O'Loughlin's clothing.

17. At one point, which appears to be while Nancy O'Loughlin was in the Detective Unit, Chief Carter berated Deputy Fleming and yelled at him because Deputy Fleming had allowed a memo to be signed and distributed by Nancy O'Loughlin when he (Deputy Fleming) was out of work due to an emergency. Fleming Deposition Volume II at 324. Chief Carter did this despite the fact that other officers in the Detective Unit (including individuals at the patrol level) had issued memos under their names. Id.

18. At some point apparently between April, 2005 and April, 2006, Chief Carter was overheard by a superior officer stating "vengeance will be mine" due to the lawsuits which had been filed against him. Fleming Deposition Volume III at 94 and 110-112. It was Deputy Fleming's belief that this statement was made by Chief Carter in relation to the lawsuit filed by Nancy O'Loughlin as well as an additional lawsuit regarding a similar matter. Id. at 94. Deputy Fleming testified of his knowledge regarding an incident when Nancy O'Loughlin was on patrol [apparently after August, 2004 when she was demoted] in which several superior officers including Deputy Chief Martino and Chief Carter were made aware that a female patrol officer was in the Stop & Shop Supermarket in Quincy doing shopping. Chief Carter, Lieutenant Herman Wheeler and Deputy Martino immediately went to the Stop & Shop and obtained the surveillance tape. It was Deputy Fleming's belief that Deputy Martino and Chief Carter thought that they had caught Nancy O'Loughlin in an act of misconduct and had been so interested in the matter and wanted to immediately obtain a surveillance tape specifically because they had thought they had caught Nancy O'Loughlin in an act of misconduct. Fleming Deposition Volume III at 131-132 and 218-220.

19. At the time that Chief Carter informed Nancy O'Loughlin of her transfer to the Detail Unit, he also informed her that she was no longer to perform or offer assistance in the investigation and prosecution of graffiti cases. Nancy O'Loughlin Deposition Volume II at 232-233. Chief Carter did this despite the fact that Nancy O'Loughlin was an expert in graffiti investigations. Fleming Deposition at Volume II at 232. Indeed, Deputy Fleming stated in his deposition that Nancy O'Loughlin was "the number 1 expert in the Northeast" regarding graffiti, and that other officers just did not have the capability as did Nancy O'Loughlin to do these types of investigations. Id.

20. Nancy O'Loughlin wrote up Sergeant Gillespie for insubordination and inappropriate behavior. Her disciplinary write-up was forwarded to Chief Carter, but Chief Carter took no action. The very next day, Nancy O'Loughlin was transferred to the Detail Unit.

## IX. MISCELLANEOUS FACTS TESTIFIED TO BY CHIEF CARTER

21. Chief Carter does not agree that woman face resentment from male colleagues in law enforcement. Carter Deposition Volume I at 97. Chief Carter does not agree that it is not easy to be a female in policing. Id. During his time as Chief of the MBTA Police Department, Chief Carter has not been aware of any resentment of females holding superior officer positions. Id. During the time that Chief Carter spent on the Boston Police Department he was not aware of any resentment of females holding superior officer positions. Id. at 98.

22. Chief Carter recalls being served with this lawsuit at his home in Oak Bluffs. Carter Deposition Volume I at 102. Chief Carter was in fact served with this lawsuit on July 27, 2004 when a copy of the Summons and Complaint were served in hand to his wife in Oak Bluffs. See docket entries and return of summons. This service upon Chief Carter's wife occurred approximately three weeks before Nancy O'Loughlin was informed that she was being demoted two ranks as a result of a disciplinary decision made by Chief Carter, and presumably less than three weeks after Chief Carter made his disciplinary decision.

23. Chief Carter signed the Affirmation contained in the Position Statement submitted by himself and the MBTA in response to Nancy O'Loughlin's Charge of Discrimination on March 4, 2004. Carter Deposition Volume I at 107-108. Chief Carter does not recall how much time went by between when he first saw the MCAD Charge and when he signed the Verification. Id. at 108. Chief Carter signed the Verification 4-days before the Position Statement was submitted to the MCAD. The date on which the Position Statement was submitted to the MCAD, March 8, 2004, was the same date on which Nancy O'Loughlin was informed that she was being suspended with pay.

24. With regard to the decision to demote Nancy O'Loughlin from Lieutenant to Patrolman which was made in August, 2004, this decision was made by Chief Carter. Carter Deposition at 129. It was solely Chief Carter's decision as to how severely Nancy O'Loughlin should be disciplined. Carter Deposition Volume II at 55.

25. In relation to the acts of alleged misconduct for which Nancy O'Loughlin was suspended and then demoted, Chief Carter testified that there were never any criminal charges against Nancy O'Loughlin and there was nothing he knew which would have given him reason to believe that Nancy O'Loughlin could have been subjected to criminal charges. Carter Deposition Volume I at 145-147.

26. Chief Carter claims that he has never discussed Nancy O'Loughlin's claims in this lawsuit with MBTA General Manager Michael Mulhern. Carter Deposition Volume II at 105.

### X. MISCELLANEOUS FACTUAL STATEMENTS MADE BY FORMER INTERIM CHIEF FLEMING

27. In describing Nancy O'Loughlin, former Chief Fleming stated the following: "You know, and it's not easy to be a female in policing. And she was a more than qualified female who had done her time, you know, suffered some pretty bad beatings over the years, too, for her fearlessness. And she was—the one thing that everybody will agree there is that she was a hard worker." Fleming Deposition Volume I at 57.

28. When Nancy O'Loughlin was promoted to Lieutenant there was resentment towards her. Nancy O'Loughlin's promotion (which was accomplished by the utilization of calling for "lists" of qualified females) resulted in several lawsuits being filed by white, male officers who resented the fact that a female had been promoted over them who may have had lower test scores. Fleming Deposition Volume II at 199.

### XI. MBTA GENERAL MANAGER MICHAEL MULHERN INFORMED BOSTON GLOBE REPORTER MAC DANIEL THAT NANCY O'LOUGHLIN WAS ONE OF THE MBTA OFFICERS UNDER INVESTIGATION, AND HE FURTHER INFORMED REPORTER DANIEL OF THE FALSE INFORMATION THAT NANCY O'LOUGHLIN COULD BE SUBJECT TO CRIMINAL CHARGES. MR. MULHERN DID THIS KNOWING THAT THE INFORMATION HE WAS PROVIDING REGARDING LIABILITY FOR CRIMINAL CHARGES WAS FALSE.

29. From February, 2002 through May, 2005, Michael Mulhern was the General Manger of the MBTA. Mulhern Deposition at 8. In his position as General Manger, both the General Counsel of the MBTA and the Chief of the MBTA Police Department reported directly to him. Id. at 10.

8

30. During 2004, Mr. Mulhern was informed that an investigation was going on regarding alleged police misconduct within the MBTA Police Department, having to do with certain police officers and their behavior on phone lines which were taped. He was aware that some of this involved Lieutenant O'Loughlin as well as another Lieutenant and subordinate officers. Id. at 40-41. Mr. Mulhern became aware of the investigation when he was informed of it by Chief Carter. Id. at 41. From the time that he first learned of the investigation until the time of his deposition, Mr. Mulhern never had any reason to believe that Nancy O'Loughlin had been involved in any potentially criminal misconduct regarding the acts being investigated. Mulhern Deposition at 42-44.

31. Mr. Mulhern does not recall whether in any conversations he had with Chief Carter about the investigation or its aftermath, he was informed that Nancy O'Loughlin had discrimination charges pending against the MBTA. Id. at 47.

32. In March of 2004, Mr. Mulhern spoke to Boston Globe Reporter Mac Daniel regarding the investigation of the statements made on the recorded phone lines. Mulhern Deposition at 60-66.

33. Mr. Mulhern testified that during the course of their conversation, he informed Mr. Daniel that it was absolutely not true that Nancy O'Loughlin could face criminal charges, that Mr. Daniel was not to "go down that road" with his story, because "nothing could be further from the truth" and that he "warned" Mr. Daniel not to write that in his newspaper article. Id. at 63-64. Mr. Mulhern claims that Reporter Daniel said to him "okay, if she is not involved in any criminal investigation, is she one of the individuals involved in the investigation," Id. at 64, thus implying that he (Mr. Mulhern) informed Reporter Daniel that Nancy O'Loughlin was not subject to criminal charges. Mr. Mulhern testified that he had "crystal clear recall that I told him that she was absolutely not involved in any allegations of criminal misconduct, crystal clear recollection of that." Id. at 64.

34. Mr. Mulhern claims that the day after he first spoke with Mac Daniel about this matter, Mr. Daniel "called me up and called me an asshole, because the sources he had been given said that I completely misled him." Id. at 66. Mr. Mulhern claims that in response to Reporter Daniel's questions whether Nancy O'Loughlin was involved in the investigation, he (Mr. Mulhern) stated that he would neither confirm or deny whether or not Nancy O'Loughlin was involved in the investigation. Id. at 64.

9

35. Mr. Mulhern claims that at the time he had the conversation with Mr. Daniel he did not have any bad will against Nancy O'Loughlin. Id. at 82.

**36.** Mr. Mulhern claims that after he found out that he was a party to this suit, he called Chief Carter and had a very brief conversation with him regarding the fact that the suit had been filed. Id. at 92.

37. Reporter Mac Daniel testified that in his conversation with Mr. Mulhern nothing came up regarding Nancy O'Loughlin being involved in criminal conduct. Mac Daniel Deposition at 29-30. Mr. Daniel does not recall Mr. Mulhern stating that Nancy O'Loughlin was absolutely never involved in criminal conduct and he does not recall Mr. Mulhern saying to him that it was either misinformation or absolutely not true that Nancy O'Loughlin might be found criminally responsible. Id. at 30-31. However, Mr. Daniel also testified that if Mr. Mulhern had indeed said these things to him, he (Mr. Daniel) would not have written the things he wrote in his article. Id. at 31. Specifically, if Mr. Mulhern had said the things he claimed he said to Mr. Daniel, Mr. Daniel does not believe he would have written in his story that the probe could lead to criminal charges against the four individuals referred to in his story (of whom Nancy O'Loughlin was one). Id. at 32. Mr. Daniel did not recall Mr. Mulhern warning him "not to go down that road because nothing could be further from the truth" but Mr. Daniel also stated that he did not believe he would have written what he wrote had words to that effect been said to him by someone like Mr. Mulhern. Id. at 32. Mr. Daniel did not recall having the impression that Mr. Mulhern was trying to dissuade him from writing in his story that Nancy O'Loughlin could be found criminally responsible. Id. at 32-33. Mr. Daniel also stated that he did not recall having a second conversation with Mr. Mulhern about this matter, and that he specifically did not call Mr. Mulhern a name such as "asshole," and that he did not tell Mr. Mulhern that the sources he had been given said that Mr. Mulhern had misled him. Id. at 33.

38. Mr. Daniel testified that in speaking to Mr. Mulhern, Mr. Mulhern stated that he could neither confirm nor deny that Nancy O'Loughlin was involved in the investigation. Id. at 13 and 41. When a statement such as a source saying that they could "neither confirm or deny a certain fact" is made to Mr. Daniel, that meant to him that it was an indication that he was on the right track, that the statement was better than a firm denial, and that to some degree it meant that the information was true but the source could not acknowledge that. Id. at 41.

39. Mr. Mulhern was the "agency official" that was referred to in Mr. Daniel's article. Id. at 16.

10

40. The information that Mr. Daniel wrote in his story about an investigation about allegations of criminal conduct was based upon statements made to him by Joseph Pesaturo. Id. at 19 and 22. Mr. Pesaturo is the MBTA's spokesperson. Mr. Daniel was not sure whether he spoke to Mr. Pesaturo and Mr. Mulhern at the same time, whether they were both on the phone or whether a speakerphone was involved. Id. at 12. It was Mr. Pesaturo who stated that the probe could lead to criminal charges. Id. at 22. Mr. Daniel was not sure whether or not Mr. Pesaturo was on the phone during his conversations with Mr. Mulhern. Id. at 34. He was also not sure whether he had received the quote regarding criminal charges from Mr. Pesaturo before or after speaking to Mr. Mulhern. Id. at 34.

41. It was Mr. Mulhern who was the "agency official" who confirmed that Nancy O'Loughlin was involved in the investigation. Id. at 21 and 65.

42. Mr. Daniel did not know if Mr. Mulhern was aware that Mr. Pesaturo had indicated that there were allegations of criminal conduct involved in the investigation and he did not know if Mr. Mulhern was present or on the phone when Mr. Daniel was given that information by Mr. Pesaturo. Id. at 66.

43. Former MBTA Chief of Police Tom O'Loughlin also testified in this action. Mr. O'Loughlin testified that he spoke to Mac Daniel regarding the Boston Globe article in which Nancy O'Loughlin was named and which it was indicated that the four officers involved (including Nancy O'Loughlin) could be subject to criminal charges. Tom O'Loughlin Deposition at 163. Mr. Daniel indicated to Tom O'Loughlin that he obtained his information from Mike Mulhern. Id. at 163-164.

44. Mr. Daniel indicated to Tom O'Loughlin that Mike Mulhern had told him both that Nancy O'Loughlin was the subject of a criminal investigation or proceedings as well as that she was Tom O'Loughlin's sister. Id. at 164. Tom O'Loughlin testified that he was informed by Mr. Daniel that it was Mike Mulhern who had informed him that Nancy O'Loughlin was one of the officers subject to the investigation and was also the subject of investigation for criminal conduct. Id. at 165.

45. Former Chief Tom O'Loughlin testified that in a legal proceeding, Deputy Chief Martino and Former Deputy Chief McCarthy had testified that the assignment of a superior officer to the Detail Unit would be a punishment assignment. Tom O'Loughlin Deposition at 185.

XII. **THE CONDUCT ENGAGED IN BY THEN LIEUTENANT FLEMING WAS MORE SEVERE THAN THE CONDUCT ENGAGED IN BY LIEUTENANT O'LOUGHLIN, AND MERITED MORE SEVERE DISCIPLINE**

46. In October of 2003, Deputy Fleming was demoted by Chief Carter and given a five day suspension. Fleming Deposition Volume III at 54-55 and 58. Chief Carter had claimed that Deputy Fleming had released certain information without authorization. Id. As a result of the disciplinary action, Deputy Fleming was demoted to the grade of Lieutenant. Id. Additionally, under the prior Police Chief, Thomas O'Loughlin, Lieutenant Fleming had been disciplined as well. Fleming Deposition Volume III at 185-186. The discipline received by Lieutenant Fleming on that occasion was two or three punishment tours, during which Mr. Fleming had to work without pay. Id. at 186. After he was demoted by Chief Carter, then Lieutenant Fleming filed a grievance over his demotion. The demotion was eventually taken to arbitration. As a result of the arbitration, the arbitrator ruled that Lieutenant Fleming's demotion to patrolman should be overturned and that he should be reinstated to the position of Lieutenant, but he was given a twenty day suspension in relation to a remark he had made. Fleming Deposition Volume III at 74. The remark Lieutenant Fleming made consisted of words stating that he felt it was better to be called a racist than a coward. Id. at 74.

47. Prior to being suspended with pay by Chief Carter, during her 21-years with the MBTA Police Department, Nancy O'Loughlin had not received any formal discipline prior to Chief Carter suspending her and then demoting her, nor was there any discipline in her personnel file at that time. Affidavit of Nancy O'Loughlin at par. 1. The only prior discipline, formal or informal, which Nancy O'Loughlin had previously received was some 11-years previously when in 1992 she received an informal counseling for having supposedly called another employee a "lunk-head." Id. at par. 1.

### XIII. THE MBTA HAS CONTINUED TO RETALIATE AGAINST NANCY O'LOUGHLIN AFTER THE FILING OF THIS LAWSUIT

48. After being demoted by Chief Carter from Lieutenant to Patrolman, Nancy O'Loughlin utilized the Union Grievance Process to contest her demotion. Nancy O'Loughlin Affidavit at par. 2. After many days of hearings and extensive briefing, an arbitrator issued a decision in which he determined that Nancy O'Loughlin's discipline was not warranted, and he ordered her reinstated to her position of Lieutenant with full back pay. Id. at par. 3.

49. The Arbitration Decision ordering Nancy O'Loughlin reinstated to the position of Lieutenant with full back pay was issued in March 2006. Despite that, it was not until approximately six weeks later that Nancy O'Loughlin was again receiving Lieutenant's pay. Id. at par. 5. It was not until approximately eight weeks later than Nancy O'Loughlin received even a portion of the back pay to which she was entitled. Id. at par. 6. Even as of the current date, the MBTA has not made Nancy O'Loughlin whole as was required by the Arbitration Award. Specifically, the MBTA has failed to pay her approximately $23,000.00 of back pay to which she claims she is entitled, and she has not been allowed to be placed in one of the variety of command positions she would have bid for and would have received if not for her demotion. Id. at par. 7. Additionally, the MBTA has not placed now Lieutenant O'Loughlin in a meaningful work assignment as a Lieutenant. Lieutenant O'Loughlin's coworkers refer to her as the Lieutenant in Charge of Nothing. Id. at par. 8. Her duties consist of low level clerical work duties which cis not suitable for Lieutenant to perform, and she does not supervise any other employees. Id. at par. 8. Chief Carter still refuses requests from other police departments and others asking that Nancy O'Loughlin be allowed to work with them on graffiti crime matters. Id. at par. 9.

>
> Respectfully submitted,
> NANCY O'LOUGHLIN
> By her attorney
>
> /s/MITCHELL J. NOTIS
>
> _____
> MITCHELL J. NOTIS, BBO# 374360
> *Law Office of Mitchell J. Notis*
> 370 Washington Street
> Brookline, MA 02445
> Tel: 617-566-2700

13

Case 1:04-cv-10933-JLT   Document 45   Filed 08/14/2006   Page 14 of 14