# EXCERPTS FROM DEPOSITION OF WILLIAM FLEMING

# VOLUME 1

Volume: 1
Pages: 1-191
Exhibits: 1-13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
C.A. No. 04-10933 JLT

* * * * * * * * * * * * * * * *

NANCY O'LOUGHLIN,

    Plaintiff,

vs.

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY, JOSEPH CARTER, and
MICHAEL MULHERN,

    Defendants.

* * * * * * * * * * * * * * * *

DEPOSITION of WILLIAM FLEMING, a witness called by counsel for the Defendants MBTA and Joseph Carter, taken pursuant to Rule 30 of the Massachusetts Rules of Civil Procedure before Alene M. Jennette, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of Prince, Lobel, Glovsky & Tye, LLP, 585 Commercial Street, Boston, Massachusetts on Friday, December 16, 2005, commencing at 11:00 a.m.

---

I N D E X

| WITNESS: | DIRECT | CROSS |
|---|---|---|
| WILLIAM FLEMING | | |
| By Mr. Edwards | 4 | |

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Special Order, 6/13/01 | 90 |
| 2 | Special Order, 7/26/02 | 121 |
| 3 | Briefing Summary, 1/13/03 | 132 |
| 4 | Briefing Summary, 1/17/03 | 134 |
| 5 | Briefing Summary, 1/7/03 | 139 |
| 6 | Briefing Summary, 1/7/03 | 148 |
| 7 | Transition Report, 1/6/02 | 149 |
| 8 | O'Loughlin Resume and Briefing Summary, 1/7/03 | 152 |
| 9 | Letter, 1/8/03 | 157 |
| 10 | Transitional Report, 1/7/03 | 159 |
| 11 | Letter, 1/7/03 | 160 |
| 12 | Memo, 1/13/03 | 162 |
| 13 | The Plan of Action with Attachment | 169 |

(Exhibits attached.)

---

APPEARANCES:

BY MITCHELL J. NOTIS, ESQ.
370 Washington Street
Brookline, Massachusetts 02445
   On Behalf of the Plaintiff

PRINCE, LOBEL, GLOVSKY & TYE, LLP
By Joseph L. Edwards, Esq.
585 Commercial Street
Boston, Massachusetts 02109
   On Behalf of the Defendants MBTA
   and Joseph Carter

WILLIAM CUTLER PICKERING
HALE and DORR, LLP
By Gregory M. Reiser, Esq.
60 State Street
Boston, Massachusetts 02109
   On Behalf of the Defendant Michael Mulhern

ALSO PRESENT:
Ms. Mary Katherine Heller, Law Clerk
Prince, Lobel, Glovsky & Tye, LLP

---

P R O C E E D I N G S
* * * * *

WILLIAM FLEMING, a witness called for examination by counsel for the Defendants MBTA and Joseph Carter, having been satisfactorily identified by the production of his Commonwealth of Massachusetts Police Department Identification Card and duly sworn by the notary public, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. EDWARDS:

   Q. Good morning.
   A. Good morning.
   Q. Would you please state your name?
   A. William Fleming.
   Q. My name is Joseph Edwards. I represent the MBTA and Chief Joseph Carter in this action that was brought by Nancy O'Loughlin. What is your current position and current rank?
   A. Lieutenant.
   MR. NOTIS: Excuse me, Joe. Can you just inform the lieutenant of his right to read

Page 57

she was a more than qualified female who had done her time, you know, suffered some pretty bad beatings over the years, too, for her fearlessness. And she was -- the one thing that everybody will agree there is that she was a hard worker.
    Q. What do you mean, it's not easy being a female --
    A. It's never been easy to be a female in policing.
    Q. Why not?
    A. Well, it's a male dominated -- I'll flip the argument. When I got out of school, I was a social worker, which was a female dominated thing. And they just looked at me differently being a male. It's just a male dominated thing. And certain officers resent female officers for getting positions, getting certain positions.
    Q. Who resented Nancy O'Loughlin for getting certain positions?
    A. I -- there were officers -- I don't have specific names. I don't...
    Q. Let's try to think of specific names.

Page 58

    A. Well, let me go back to one incident that -- Nancy and I were assigned by John O'Donovan to do graffiti investigation. That was when graffiti started to be a major problem on the MBTA. And we were utilizing the lieutenant's office with a reporter, Laura Brown, for the Herald, who wanted to do a story on graffiti. We heard a commotion outside.
    The shade was ripped down from the window, and I was told that the supervisor pointed to the giant picture of the whales over there by Pine Street, that you drive by it every day. And he said, That's fucking graffiti. They don't know what they're doing. And walked away.
    Q. Okay. So that was an example. You were there?
    A. I was -- when I am came outside and seen the shade down, that's what the officer told me. That's what the supervisor said.
    Q. You were doing graffiti with Nancy?
    A. Yes.
    Q. What makes you think that this person was talking about her?

Page 59

    A. Because he did not -- he did not like her.
    Q. How do you know that?
    A. He had -- well, you're right. I shouldn't assume. That's why I don't want to get particular names. But I'm just saying he did not like the O'Loughlin family.
    Q. But maybe I phrased my question improperly. I was addressing her as a woman, not her as an O'Loughlin. Okay? So was that an example of something being addressed to her because she was a woman or because she was an O'Loughlin?
    A. Probably because she was doing graffiti more than anything. I'm not exactly sure. I don't know what the motives of the gentleman...
    Q. You were doing graffiti as well?
    A. Yes.
    Q. How do you know it wasn't directed to you?
    A. Now that I think of it, it could have been.
    Q. Okay. Was the position of head of

Page 60

ACU posted?
    A. I don't believe so.
    Q. Now, the ACU was alleged by some to have engaged in racial profiling, correct?
    A. The whole department was alleged to have engaged in it.
    Q. Okay. I want to focus on the ACU. Was the ACU ever alleged to have engaged in it?
    A. Yes, yes.
    MR. NOTIS: Can we get the question before you answer?
    THE WITNESS: Yes. I apologize.
    Q. That unit.
    A. Yes.
    Q. That unit -- go ahead.
    A. The number one critic of the ACU unit who accused them of racial profiling stated that at the Dudley Square meeting that this is not about racial profiling. This is about child abuse.
    Q. Okay. Who was that?
    A. Lisa Thurau-Gray.
    Q. Be that as it may, isn't it true that Secretary of Transportation, Kevin Sullivan,

**53**

Q. What was the criticism that was coming from within the police department, the same thing? That the anti-crime unit was overstepping?

A. There was --

Q. Go ahead.

A. -- different types of criticism. There were criticisms because of -- just the sheer logistics of the rising amount of arrests, so the duty supervisor -- you have to process several arrests.

And we had a new computer system that was breaking down, the notification of parents, just the inherent problems we had with -- if a patrolman makes an arrest in Lowell, he transports the individual back to Southampton Street.

And just, if it's a juvenile, and they're held overnight, you could have to transport them now to New Bedford to get a holding facility. So, we were losing cars. Just the logistics. And the duty supervisor's trying to keep track. And then you have parents coming in and trying to figure out

**54**

where their kids are and everything else.

Q. What was the external criticism that was in the media?

A. It was two-pronged. At first, the media was applauding the efforts of the anti-crime unit, and they had received several awards. And then the media turned, and there were stories of that -- what I just said about youth being held for several hours, detained with their parents -- one of the problems we've had at the MBTA police is, if I was to call this gentleman here and say that, you know, he gets it from a neighbor that your son's been arrested, call the local police. They'll call the police. And the Boston Police will say, We don't have anybody like that.

And the person has to go around -- the one -- I remember an outcry from Belmont parents. Nineteen Belmont High School students were arrested while they were crossing the tracks. And they didn't notify the Belmont Police. Nobody knew where the kids were.

And when the parents, when they did find out, say at rush-hour, had to come into

**55**

Boston, which they didn't even know where they were going, try and locate their kids for a problem.

And it's for a problem -- that's where I see the inherent problem with zero tolerance, where the kids have been crossing tracks every day for several years. And all of a sudden, they're rounded up and arrested.

Q. So that's in Belmont. We're still talking about a Commuter Rail line?

A. Yes, but it just -- you asked me about what a problem was. And that would also -- say in Boston, as I just explained, if the kids got arrested in Boston, they assume that the Boston Police have arrested them.

So they call the Boston Police and they talk to a desk guy. The person would go down to the booking station, and then they'd have to find out where we are. And it's, you know, there was several inherent problems.

And then parents, as any parents, you know, would look and say, What have you been arrested for? And the kid would say, Trespassing or something. And the parents

**56**

would, you know, who ride the T, would say, Why don't you address, you know, bigger problems? You know, ou got kids getting stabbed and you're arresting my kid for not paying his fair or trespassing? That type of thing.

Q. Did you think any of those complaints that came from different quarters, internally, externally, from parents, from the media, did you think they were legitimate?

A. Yes.

Q. Let me back up. How did Nancy O'Loughlin come to command the anti-crime unit?

A. I believe it was -- it could have been -- I recommended her. I don't know if anybody else did.

Q. Do you know of anybody that thought she should not have the position?

A. No. Well, I'm sure that any position, that there's people who say she shouldn't have the position. But as I said, I looked at this as the inauguration of a vandal type of squad. And she was the best at it.

And she was also -- you know, and it's not easy to be a female in policing. And