# EXCERPTS FROM DEPOSITION OF WILLIAM FLEMING

## VOLUME 3

Page 1

```
                            VOL. III
                         Pp. 1 - 273
                         Exhibits 15 - 23

                 UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS

                     C.A. NO. 04-10933 JLT

  * * * * * * * * * * * * * * * *

  NANCY O'LOUGHLIN,

       Plaintiff

  VS.

  MASSACHUSETTS BAY TRANSPORTATION
  AUTHORITY, JOSEPH CARTER, AND
  MICHAEL MULHERN,

       Defendants

  * * * * * * * * * * * * * * * *

       Continued Deposition of WILLIAM FLEMING, a
  witness called by counsel for the Defendants,
  Massachusetts Bay Transportation Authority and Joseph
  Carter, pursuant to the applicable rules, before
  Lorreen Hollingsworth, CSR/RPR, CSR NO. 114793, and
  Notary Public in and for the Commonwealth of
  Massachusetts, at the Offices of Prince, Lobel,
  Glovsky & Tye, LLP, 585 Commercial Street, Boston,
  Massachusetts, on Tuesday, April 4, 2006, at
  10:20 a.m.
```

Page 2

```
APPEARANCES:

MITCHELL J. NOTIS, ESQUIRE
  370 Washington Street
  Brookline, Massachusetts 02445
  On behalf of the Plaintiff,
  Nancy O'Loughlin

JOSEPH L. EDWARDS, ESQUIRE
  Prince, Lobel, Glovsky & Tye, LLP
  585 Commercial Street
  Boston, Massachusetts 02109
  On behalf of the Defendants,
  Massachusetts Bay Transportation Authority and
  Joseph Carter

GREGORY M. REISER, ESQUIRE
  Wilmer Cutler Pickering Hale and Dorr LLP
  60 State Street
  Boston, Massachusetts 02109
  On behalf of the Defendant,
  Michael Mulhern
```

Page 3

```
                    I N D E X

Deposition of:        DIRECT    CROSS    REDIRECT

WILLIAM FLEMING

(by Mr. Edwards)        4                  186

(by Mr. Notis)                   109


                    E X H I B I T S

No.                                              For Ident.

15   The two-page document from the                17
     Guardroom website, Bates M174 and
     M175

16   The memo dated 7/3/02 to Frank                23
     Oglesby from Thomas O'Loughlin,
     Bates M340 and M341

17   The memo dated 9/19/02 to                     27
     distribution from William Fleming,
     Bates No. M5

18   The memo to file from Mark                    27
     Gillespie, Bates M343 through M345

19   The memo dated 3/3/03 to William              31
     Fleming from Mark Gillespie, Bates
     M3469

20   The letter dated 9/16/04 to                   55
     William Fleming from Joseph Carter

21   The letter dated 4/16/04 to                   258
     William Fleming from Joseph Carter

22   The letter dated 9/19/04 to                   261
     William Fleming from Joseph Carter

23   The memo dated 12/8/03, Bates 465             261
     through 467
```

Page 4

STIPULATIONS

It is hereby stipulated and agreed by and between counsel for the respective parties that the deposition will be read and signed by the witness, under the pains and penalties of perjury, and that the sealing, filing, and notarization of the deposition are waived.

It is further stipulated and agreed that all objections, except as to form, and motions to strike are reserved until the time of trial.

WILLIAM FLEMING, a witness called on behalf of the Defendants, Massachusetts Bay Transportation Authority and Joseph Carter, having first been duly sworn, deposes and says as follows:

CONTINUED DIRECT EXAMINATION
BY MR. EDWARDS

Q   Good morning, Lieutenant.
A   Good morning, Joe.
Q   You were already back in your position the last deposition?

Page 45

1 A Because I didn't see it coming either.
2 Q So is it the same for both lieutenants?
3 A It was the same day, yes.
4 Q I mean, were you surprised at the moves for
5   the same reasons?
6 A Yes, exact same reasons.
7 Q Because you didn't see it coming?
8 A Yes.
9 Q And because Chief Carter had not said
10  anything to you about the reassignments?
11 A No.
12 Q Okay.
13 A My recollection of that day was that the
14  chief had told me to meet him at 7:30.
15  Now, I was there at 7:30, but the door was
16  shut. So I never -- you have to -- you've
17  been in the chief's office. I never
18  knocked on the door or anything.
19      And then about -- I think it
20  was shortly before 9 he called me and said,
21  you know, I told you to be here at 7:30.
22  And I said, I came down and the doors were
23  shut and there was nobody here. I told the
24  secretary when the chief comes in to tell

Page 46

1   me.
2       So I think he probably would
3   have told me at that time. But it
4   wasn't -- do you understand? Because the
5   door was shut and it was my understanding
6   he wasn't in the office -- he was, I guess,
7   in the office.
8 Q Just to clarify something in the record,
9   there's an allegation in this case that
10  when Chief Carter came to the police
11  department that one of his first acts was
12  to disband the unit Nancy O'Loughlin was
13  commanding?
14 A Yes.
15 Q And we talked about that last time?
16 A Yes.
17 Q And we identified that unit as the vandal
18  squad?
19 A Yes.
20 Q And it is your testimony that as far as you
21  were concerned, there was no vandal squad?
22 A There was no vandal squad at that time.
23 Q Okay. I wanted to touch on something about
24  the detail unit.

Page 47

1       You said that the detail unit
2   was perceived as a punishment position?
3 A Yes.
4 Q Throughout the department?
5 A Yes.
6 Q But that -- and this is the way I
7   understood the testimony -- if a person
8   wanted to be in the position such as
9   Sergeant Morris, then it wasn't a
10  punishment position?
11 A Correct.
12 Q See, the problem I had with that -- and
13  I'll let you try to explain it to me, if
14  you can -- is that it seems to depend upon
15  the perception of the person who was put
16  into the position as to whether it was a
17  punishment or not.
18      MR. NOTIS: Objection.
19 Q You can answer, if the question makes
20  sense. If I need to try to rephrase it, I
21  will.
22 A When I -- Deputy Chief Martino sued the
23  authority and claimed that the detail
24  office was a punishment assignment to him.

Page 48

1   When I came in, I viewed it as a punishment
2   assignment to him, and I put him --
3   reassigned him to patrol.
4 Q So Captain Martino?
5 A Yes. When I put out the memo, I asked if
6   any officer or supervisor was interested in
7   commanding the detail office.
8       Prior to that, Mike Morris had
9   called me and said he'd like to go into
10  details. So it just naturally assumes that
11  he didn't think he was being punished for
12  going to the detail office; that's what he
13  wanted to do.
14 Q I think -- maybe it's a difficulty on my
15  part on framing the question and trying to
16  get across what I want to know.
17 A In police work, too, some people like to
18  work, say, outside in the streets and some
19  people like to work inside an office, so to
20  speak.
21      So if you have always worked
22  out in the street or liked to work on the
23  street, if you're reassigned to an office
24  job that you don't want, the perception

Page 53

1  Q  Did you hear anything prior to her
2     assignment -- well, you didn't know she was
3     going to be assigned until that day?
4  A  No.
5  Q  Are we talking about you heard this within
6     hours of her reassignment?
7  A  I don't even remember, Joe. And just for
8     the record, I never heard Martino say that.
9  Q  Well, what I'm trying to get at is whether
10    you as a deputy chief had any reason to
11    believe that Chief Carter deliberately put
12    Nancy O'Loughlin -- I mean, that Chief
13    Carter put Nancy O'Loughlin in details to
14    punish her deliberately.
15 A  No.
16 Q  Now, prior to the reassignment of Nancy
17    O'Loughlin to the detail unit, do you
18    recall Chief Carter saying anything
19    negative about Nancy O'Loughlin in her role
20    as commander of the detective unit?
21 A  No.
22 Q  And, I guess, maybe it's the same question.
23    Do you not recall or did he not say
24    anything to you?

Page 54

1  A  I do not recall Chief Carter ever saying
2     anything with negative personal
3     connotations about Nancy O'Loughlin.
4  Q  At all?
5  A  At all.
6  Q  And I don't know whether I asked you this,
7     but do you recall whether any other woman
8     has been commander of the detail unit,
9     during your experience at the MBTA?
10 A  I don't think so.
11       MR. EDWARDS: Can we take a
12    break now, Mitch?
13       MR. NOTIS: Sure.
14       (Off the record)
15       (A short break was taken.)
16 Q  Now, Lieutenant, at some point you went
17    back from being a deputy chief to your
18    civil service position as a lieutenant, is
19    that correct?
20 A  Yes.
21 Q  And when did that occur?
22 A  I think it was October of 2003.
23 Q  And why did that occur?
24 A  I was disciplined.

Page 55

1  Q  And disciplined by Chief Carter?
2  A  Yes.
3  Q  And why were you disciplined by Chief
4     Carter?
5  A  Joe, that's in civil service that we have
6     to -- without my own lawyer here -- I've
7     appealed it to civil service.
8  Q  I understand. What reason did Chief Carter
9     give you for disciplining you?
10 A  Chief's argument was that I had released
11    some prime statistics without
12    authorization.
13 Q  And did you do that?
14 A  I would argue that I was authorized to.
15       MR. EDWARDS: Let me show you
16    the letter. Have you had a chance to look
17    it over?
18       MR. NOTIS: Are you going to
19    mark it, Joe?
20       MR. EDWARDS: Yes.
21       (Exhibit No. 20, The letter
22    dated 9/16/04 to William
23    Fleming from Joseph Carter,
24    was marked for

Page 56

1     identification.)
2  Q  Do you recognize that document, Lieutenant?
3  A  Yes.
4  Q  And it's been marked as Exhibit 20. And
5     what is that, please?
6  A  That's a notice from the chief of my
7     suspension.
8  Q  And part of what this letter does, if I can
9     paraphrase it, is discuss from his
10    perspective steps that were taken to find
11    out who released information, particular
12    pieces of information --
13 A  Yes.
14 Q  -- to newspapers, is that right?
15 A  That's right.
16 Q  Or to a newspaper reporter?
17       MR. NOTIS: Objection.
18 Q  Is that right?
19 A  Correct.
20 Q  And this letter was given to you
21    September 19, 2003?
22 A  Yes.
23 Q  And if I'm understanding you correctly,
24    what you said before, you would contend

Page 57

1   that you had authorization to release this
2   material?
3 A Yes.
4 Q Now, the letter indicates on the last page
5   in particular, first paragraph, that you
6   admitted being the person at Staples to
7   send -- and it calls it blind faxes --
8   blind faxes to four media outlets. Do you
9   see that?
10 A Yes.
11 Q And that's what you told the chief that you
12   had done?
13 A Yes.
14 Q You initially told him that you had not
15   done it?
16 A Once again, Joe, it's in civil service, and
17   I don't think I've got to debate my case
18   right here.
19      MR. NOTIS: I'm going to move
20   that the whole line of questioning be
21   stricken, if we're going to have partial
22   answers.
23      MR. EDWARDS: What do you mean
24   "partial answers"?

Page 58

1      MR. NOTIS: If we're not going
2   to have answers to the questions.
3      MR. EDWARDS: I'm going to try
4   my best to get answers. And you're going
5   to try your best to get answers. We'll see
6   where this goes.
7      THE WITNESS: My only question
8   is can my lawyer -- can you contact my
9   lawyer, Doug Louison, who is in charge of
10   my civil service appeal to, you know -- I
11   don't know if this is proper to have my
12   case tried at a deposition.
13      MR. NOTIS: Why don't we go
14   off the record for a moment.
15      (Off the record)
16 Q How were you disciplined for this matter?
17 A I was demoted and given a five-day
18   suspension.
19 Q And when you say demoted, you were not --
20   you did not remain as Chief Carter's deputy
21   chief?
22 A Correct.
23 Q And the position of deputy chief is
24   appointed, correct?

Page 59

1 A Correct.
2 Q He could have moved you for any reason?
3 A Yes.
4 Q At any time, right?
5 A Yes.
6 Q He chose this particular time --
7 A Yes.
8 Q And you went back to your civil service
9   rank of lieutenant, correct?
10 A Yes.
11 Q And he also issued a five-day suspension?
12 A Yes.
13 Q And you appealed that suspension?
14 A Correct.
15 Q Through the civil service process?
16 A Yes.
17 Q And that suspension was arbitrated, was it
18   not?
19 A No, it was not.
20 Q That never went to arbitration?
21 A No.
22 Q It went to a just cause hearing?
23 A It went to a just cause hearing with Kevin
24   McDermott.

Page 60

1 Q And it was found just cause to uphold the
2   suspension?
3 A Yes.
4 Q And the just cause hearing --
5      MR. NOTIS: Go ahead. That's
6   all right.
7 Q The just cause hearing is a hearing
8   internal to the police department or to the
9   MBTA?
10 A To the Authority.
11 Q To the Authority?
12      MR. NOTIS: Joe, do you mind
13   if I ask one question so I understand the
14   line?
15      MR. EDWARDS: Yes.
16      MR. NOTIS: What you have
17   pending in the civil service, is that just
18   the suspension or is it removal from the
19   deputy chief?
20      THE WITNESS: It's just the
21   suspension.
22      MR. NOTIS: Okay, thanks.
23 Q Could you have appealed through civil
24   service your removal from the position of

Page 73

1  Q  And you were charged with what?
2  A  Failure to supervise.
3  Q  No. I thought you said something about
4     your bed in your house.
5  A  No, I said I was charged with failure to
6     supervise from my bedroom of my house.
7  Q  In regards to?
8  A  Not having McKay swearing on the phone
9     line.
10 Q  Now, what happened after you were relieved
11    of duty with pay, in terms of your -- the
12    charges?
13 A  I was relieved of duty without pay.
14 Q  Did you have a just cause hearing?
15 A  Yes.
16 Q  You went to the just cause hearing?
17 A  Yes.
18 Q  You testified?
19 A  Yes.
20 Q  Were the charges sustained?
21 A  Yes.
22 Q  All of them?
23 A  I believe so, yes.
24 Q  And you arbitrated the decision?

Page 74

1  A  Yes.
2  Q  And what was the outcome of the
3     arbitration?
4  A  The arbitrator ruled that I didn't violate
5     any harassment -- EEOC policies or anything
6     else, but she imposed a 20-day suspension
7     for a flip remark I made.
8  Q  What was the flip remark?
9  A  We were talking about the media, and I --
10    we were comparing how the media used to
11    call us racist and now they were calling us
12    cowards.
13         So I said, Better to be called
14    a racist than a coward; it carries a
15    connotation you could fight, or something
16    to that effect.
17 Q  And the arbitrator found that a 20-day
18    suspension was warranted?
19 A  Yes.
20 Q  How many conversations did you engage in on
21    this telephone line?
22 A  Two.
23 Q  Two different days?
24 A  No. I had received a phone call from my

Page 75

1     house that day. I was talking to an
2     officer who was a nurse. And I was asking
3     her about her neck.
4          And she told me that her
5     sister, Shelly, had been listening to Howie
6     Carr. And he was calling us Carter's
7     Cowards in relationship to a murder of a
8     young kid at Dudley. And she ended it by
9     saying how the officers wanted to put a
10    noose around my neck. I was talking about
11    my neck. And she was blaming me for the
12    mess we were involved in. She was a friend
13    of mine. She was saying it jokingly. And
14    then she said, Call Bobby McKay.
15         I called Bobby to find out
16    what they were saying about me. I was out
17    injured. And we decided -- we were talking
18    about a Globe article. And then we were
19    interrupted by a foot chase -- Detective
20    Peter McCarron was chasing someone down the
21    Red Line tracks. And they couldn't find
22    him.
23         And I had the -- I was in bed
24    at the time. And I turned -- I had the

Page 76

1     radio on, and I called back to give them
2     the location. And right when I called back
3     is when they caught the kid at IBEW. So
4     that was the second conversation. So we
5     started talking again.
6  Q  So it was a continuation of --
7  A  The first one.
8  Q  -- the first conversation?
9  A  Yes.
10 Q  They occurred the same day?
11 A  Yes.
12 Q  Were you charged with violations for any
13    subsequent or prior conversations?
14 A  No.
15 Q  Just the ones that occurred on that day?
16 A  Yes.
17 Q  Is that correct?
18 A  Correct.
19 Q  And after the just cause hearing -- I
20    skipped a step. After the just cause
21    hearing, cause was found that you violated
22    department rules, correct?
23 A  Correct.
24 Q  And there was a written decision by the

Page 93

1  the punishment he intended to mete out
2  because he received phone calls from
3  politicians and --
4  A  No.
5  Q  Okay. It's your understanding that the
6  chief intended to fire Nancy O'Loughlin?
7  A  Yes.
8  Q  And how did you come to understand that?
9  A  Nancy Walsh.
10 Q  Why do you think -- and maybe this is the
11    same answer -- in your opinion, did the
12    chief intend to fire you either because he
13    didn't like you or he thought of you as a
14    threat? Are those reasons that you were
15    given for why you think the chief wanted to
16    fire you?
17 A  I have no idea why he would take it to that
18    extreme.
19 Q  Okay. But it is true that everything you
20    heard about the chief initially wanting to
21    fire you came secondhand? He never said
22    that to you?
23 A  He never said that, no.
24 Q  Did anybody tell you they heard him say

Page 94

1  that?
2  A  Lieutenant Wheeler said that he was in the
3     chief's office when the chief said that,
4     Vengeance will be mine.
5  Q  Okay. And what does that have to do with
6     anything?
7  A  That was over this whole investigation.
8  Q  When was that?
9  A  This was after. Herman Wheeler told me
10    that.
11 Q  After what?
12 A  After we had come back. He told me after I
13    came back, I was assigned as a patrolman to
14    work for Herman Wheeler. And he told me be
15    careful.
16 Q  Maybe you misunderstood my question. I'm
17    sorry. Go ahead and finish, please.
18 A  The chief said that, Vengeance will be mine
19    because of the lawsuits.
20 Q  Because of what lawsuits?
21 A  I think because of this one and because of
22    the other one that's the union find.
23 Q  You don't have a lawsuit, do you?
24 A  No.

Page 95

1  Q  I think my question was whether anybody
2     told you that the chief intended to fire
3     you, that they heard the chief say that?
4  A  Nancy Walsh said the termination papers
5     were put in for me and Nancy.
6  Q  Okay. For you and Nancy O'Loughlin, as
7     well?
8  A  Yes. And Gary Fredericks told my wife that
9     I would be fired on the phone on Monday.
10    That the chief was in a firing mode.
11 Q  But my question was about what people heard
12    the chief say.
13 A  That's what he said he heard the chief say.
14 Q  The chief said that he was in a firing
15    mood?
16 A  Yes.
17 Q  Did you ever see any termination papers?
18 A  No.
19 Q  Now, at some point the chief did issue
20    discipline, is that correct?
21 A  Yes.
22 Q  And you were not fired, were you?
23 A  No.
24 Q  What was the discipline?

Page 96

1  A  Demotion.
2  Q  And you were demoted two ranks?
3  A  Yes.
4  Q  From lieutenant down to --
5  A  Patrolman.
6  Q  Patrolman. Nancy O'Loughlin received the
7     same discipline?
8  A  Yes. Well, at the time, yes.
9  Q  Yes, at the time.
10 A  Yes, well --
11 Q  Did she receive other discipline at another
12    time?
13 A  No, she received no discipline after the
14    arbitration.
15 Q  Okay. But I think I asked you about the
16    discipline that she received.
17 A  Yeah.
18 Q  Have you ever filed a discrimination
19    complaint against the MBTA?
20 A  Just on the -- the Internet postings.
21 Q  You complained to -- the letter we saw?
22 A  Yes.
23 Q  Actually, maybe it's not. That was written
24    by Tom O'Loughlin.

Page 109

1   said, Why weren't they given the
2   opportunity to apologize back then?
3       I think union President Powers
4   had gone to the chief and said that
5   everybody involved would apologize.
6 Q And what came of that?
7 A And that was only for his membership at
8   that time. So that was -- no.
9 Q The --
10 A McKay, Jordan, and the other -- the
11   patrolmen.
12 Q And they chose not to do it?
13 A No, they were never given the opportunity
14   to.
15       MR. EDWARDS: Let's stop now.
16       (A lunch break was taken.)
17       CROSS-EXAMINATION
18       BY MR. NOTIS
19 Q Lieutenant, I want to pick up on some of
20   the matters you've discussed during the
21   various three days of your deposition so
22   far.
23       By the way, at any point
24   between the dates when your depositions

Page 110

1   were taken, did you have conversations with
2   Attorney Edwards?
3 A I think I had conversations with his
4   office. But that was just in reference
5   to --
6 Q -- scheduling. Other than scheduling, did
7   you discuss any of the facts of this matter
8   with Attorney Edwards between depositions?
9 A Not that I recall, no.
10 Q Between the depositions, did you discuss
11   either the depositions or what you
12   discussed in them with anyone else, other
13   than perhaps your wife?
14 A I said to Nancy O'Loughlin, I think one
15   day, a phone -- You complained about a
16   phone? That was it.
17 Q You mentioned towards the end of your
18   testimony today about Lieutenant Herman
19   Wheeler having commented to you about a
20   statement the chief made. And I think you
21   said, Vengeance will be mine?
22 A Yes.
23 Q Tell me exactly -- well, when did Wheeler
24   tell you that?

Page 111

1 A Down in Quincy.
2 Q Do you remember date-wise when he said that
3   to you?
4 A No, Herman was the commander of the TPSA3.
5 Q Did he say it to you in the last six
6   months?
7 A I'm not exactly sure. It was on the same
8   day he told another officer -- I think he
9   told Wil Smith to get out of the building.
10 Q But is there any way you can put that in,
11   like, terms of chronological order for me?
12 A No.
13 Q Do you know if it was within the last year?
14 A It was definitely within the last year.
15 Q Okay. And, again, that you were told about
16   this in the last year?
17 A Yes, by Herman Wheeler.
18 Q And tell me exactly what you recall
19   Lieutenant Wheeler saying to you about
20   this.
21 A Herman said that -- I think he said he was
22   upstairs in the chief's office and the
23   chief was saying, Vengeance will be mine
24   over the lawsuits and that he was saying

Page 112

1   that, Billy, be careful.
2 Q From the conversation you had with
3   Lieutenant Wheeler about this remark, do
4   you have any understanding of when the
5   chief supposedly made the remark?
6 A No. He said it in his office at Quincy
7   Center, so I didn't have date or time
8   reference.
9 Q The chief said it in his office in Quincy
10   Center?
11 A No, Herman said it to me in his office in
12   Quincy Center.
13 Q I understand you don't recall when Wheeler
14   said it. But based on when Wheeler said
15   it, do you know when the chief might have
16   made that remark?
17 A No.
18 Q Was it, in your understanding, after you
19   came back from being on duty at home?
20       MR. EDWARDS: Objection.
21 A Yes.
22       THE WITNESS: Excuse me, I'm
23   sorry.
24       MR. EDWARDS: No, you can

Page 129

1  put in the position where they have to
2  prove themselves more --
3  Q  Do you know if Nancy O'Loughlin has been
4     placed in that position?
5  A  I would say yes, over the years, yeah.
6  Q  Any specific examples you can come up with?
7  A  I remember once when we were doing
8     canine -- and I was thinking of this with
9     Kathy Barrett the other day. A state
10    trooper who just died of cancer; Kathy was
11    the first female canine officer in the
12    state police. And to prove her methods, we
13    put her in a room. And they let a police
14    dog loose on her. And she was tough enough
15    to get bitten and walked right out.
16        So Nancy, I was with when we
17    were doing canine -- and I don't think it
18    was deliberate.
19        Walter Morris sent a 140-pound
20    Rottweiler on her. And the dog just picked
21    her up. And I remember her getting slammed
22    to the ground. I thought she was dead.
23    And she just kept fighting the dog.
24        And I know from myself, I

Page 130

1  said, I'm not fighting that thing. So I
2  think Nancy had times when she had to prove
3  the -- prove herself and, you know, she
4  received -- she was beaten up several times
5  in an effort to prove herself.
6  Q  You're aware of the fact, of course, that
7     she was awarded that Hanna Award for Valor,
8     correct?
9  A  Yes.
10 Q  Do you know any other police officers who
11    have been awarded the Hanna Award for
12    Valor?
13 A  Yes.
14 Q  Who's that?
15 A  Omar Ricketts; Jason Morris; I think, Joe
16    O'Connor. There are several officers. I
17    voted Mark Gillespie for the Hanna Award.
18 Q  Do you know any other female police
19    officers at the MBTA that won the Hanna
20    Award for Valor?
21 A  I believe Toby Valenti -- whether she got
22    it or not -- was nominated for -- with
23    several officers including Nancy's husband,
24    I think for an incident at Andrews Station

Page 131

1  where they crawled under a train and where
2  a person was hit -- was hit by a train.
3  Q  Do you know of any instances where Nancy
4     O'Loughlin was treated differently by Chief
5     Carter due to her gender or her sex?
6  A  Gender or sex? No.
7  Q  Do you know her being treated differently
8     by Carter for any other reason?
9  A  Only this was related to Herman Wheeler to
10    me -- and I don't know if this is any
11    different treatment or whatever, that
12    the -- they had got a call at the Stop &
13    Shop on Newport Ave. that a female was in
14    there shopping for a thing. The chief and
15    Herman and Martino went and grabbed the
16    tape out of the Stop & Shop. And Herman
17    was convinced that they thought it was
18    Nancy, when it turns out to be another
19    officer.
20 Q  Was it unusual for the chief and deputy
21    chief to go down and view a tape like this?
22        MR. EDWARDS: Objection. You
23    can answer.
24 A  Like I said, I don't even know if the chief

Page 132

1  went down and viewed it. But to go down
2  and grab a tape, yeah, anything like that
3  would be -- but not for probably, say,
4  Herman Wheeler who was the commander, just
5  receive a phone call and, say, Herman go
6  down.
7  Q  But for the commands to go down was
8     unusual?
9  A  Yes.
10 Q  And you think they were doing that just
11    because it was Nancy O'Loughlin?
12 A  Well, that was Herman's version. I don't
13    know.
14 Q  Do you know of any officers at the MBTA
15    police who resent female officers?
16        MR. EDWARDS: Objection. You
17    can answer.
18 A  I'm sure there's officers that resent
19    female officers.
20 Q  Do you know any officers of the command
21    staff who resent female officers?
22        MR. EDWARDS: Objection. Are
23    we talking about a time period?
24 Q  You can answer.

Page 145

1  A   I have no idea.
2  Q   Let's talk about the head of the detail
3      unit for a moment.
4             Now, you testified that at one
5      point you told Tom O'Loughlin that using
6      Martino as head of the detail unit was a
7      punishment assignment, correct?
8  A   Yes.
9  Q   Tell me exactly what you said to him and
10     what he said to you.
11 A   I said, It's a punishment assignment. I
12     said, It's a punishment assignment. I also
13     said it's also a powerful assignment.
14 Q   Also a what?
15 A   Powerful assignment.
16 Q   And why did you feel it was a punishment
17     assignment to put Martino in that role?
18 A   Because I thought that John Martino had --
19     was a captain who had good command skills
20     and that I didn't think that Tom O'Loughlin
21     had disciplined him fairly for an incident
22     at Forest Hills, and I told the chief that,
23     where Martino wasn't even working.
24 Q   Well, do you think, in your opinion, is it

Page 146

1      ever appropriate for a captain to be the
2      head of the detail unit?
3  A   No. You're only supervising two people.
4  Q   In your opinion, is it ever appropriate for
5      a lieutenant to be the head of the detail
6      unit?
7  A   As I said, when I put out that memo, if a
8      lieutenant had requested -- say a
9      lieutenant had requested the detail
10     unit because of the day position and that
11     he's going to law school at night, you
12     know, I would have put him in.
13 Q   I understand that. If someone has not
14     requested -- if a lieutenant has not
15     requested to be put in as the head of the
16     detail unit, is it appropriate to pick a
17     lieutenant and place them in as a head of
18     the detail unit?
19 A   I can only speak for myself. I would not
20     have done it that way.
21 Q   Why not?
22 A   Because I don't think it would have been
23     appropriate.
24 Q   And why wouldn't it be appropriate to put a

Page 147

1      lieutenant as head of the detail unit?
2  A   Because I would have used -- I would have
3      preferred my lieutenants to be out in the
4      system.
5  Q   If the lieutenant is placed as head of the
6      detail unit, do you feel that's a
7      punishment assignment?
8             MR. EDWARDS: Objection.
9  A   I think I just answered that, in some
10     cases, yes; in some cases, no.
11 Q   Do you think it was a punishment assignment
12     to place Nancy O'Loughlin as head of the
13     detail unit?
14 A   Yes.
15 Q   Why is that?
16 A   Because Nancy, as I explained before --
17     there is a -- some officers like to work
18     inside; some officers -- I mean, their
19     forte is working outside with the troops;
20     she was well-liked by the troops; she was
21     in command; she knew what she was doing;
22     she liked being a cop.
23 Q   Do you think it was a punishment assignment
24     to place you as head of the detail unit?

Page 148

1  A   Yes.
2  Q   And why do you feel that, sir?
3  A   Based on my background, I think it was a
4      punishment.
5  Q   Do you think Chief Carter was punishing
6      Nancy O'Loughlin by placing her as head of
7      the detail unit?
8  A   I don't know what the chief's motives are
9      or who told him to put her there. So I
10     can't answer that -- in fairness to the
11     chief, I can't answer that, what his --
12     what he even -- what his perception of the
13     detail unit was, or even if he knew he had
14     a detail unit, I don't know.
15 Q   Well --
16 A   I just don't know what his motives were.
17 Q   Well, isn't it correct, sir, that you told
18     Chief Carter that the appointment of
19     Martino to the detail unit had been a
20     punishment assignment?
21 A   Yes, I did.
22 Q   And what do you recall about that
23     conversation?
24 A   I was explaining why I made moves. And I

Page 149

1  said, I reassigned him because I viewed
2  that as a punishment assignment.
3  Q  Did you have that discussion before or
4    after Nancy O'Loughlin was assigned to the
5    detail unit?
6  A  Before.
7  Q  And what did he say to you when you told
8    him that?
9  A  I think we just went on to the next person.
10   So I don't think we ever had a long
11   discussion about it.
12 Q  And did you also discuss that with the
13   general manager at some point, with Michael
14   Mulhern?
15 A  That putting Nancy in detail --
16 Q  No. Putting Martino in detail was a
17   punishment?
18 A  Yes.
19 Q  Do you recall when you had that
20   conversation with Mulhern?
21 A  It was -- we would meet at Mul's Restaurant
22   for breakfast. We discussed it there.
23 Q  Again, that it was a punishment assignment
24   to put Martino in that position?

Page 150

1  A  Yes.
2  Q  Did you have that discussion with Mulhern
3    while Martino was in that position or
4    later?
5  A  I think he was in that position at the
6    time. I told him I was going to move him.
7  Q  Okay. And did you ever discuss Nancy --
8    how often did you have breakfast at --
9    Mul's, was it?
10 A  Yes.
11 Q  -- with General Manager Mulhern?
12 A  Two or three times.
13 Q  Did you ever discuss Nancy O'Loughlin with
14   him?
15 A  I don't think her name ever came up.
16 Q  Did you ever discuss Nancy O'Loughlin with
17   him around November '02?
18 A  I really don't remember. You'd have to
19   take me back to that one.
20 Q  I was looking in my notes, sir. All right.
21     In your opinion, if someone
22   has not asked to be placed as head of the
23   detail unit, is it ever appropriate for
24   someone above the rank of sergeant to be

Page 151

1  placed as head of the details?
2     MR. EDWARDS: Objection.
3  A  Once again, if a sergeant or lieutenant,
4    say, had serious enough health problems
5    that there would be -- that it could
6    jeopardize himself or other officers while
7    working on -- you know, working on the
8    subway system and he didn't -- I'm just
9    giving you an example -- and he did not
10   wish to be reassigned, but several people
11   complained, you know, saying he's going to
12   get hurt out here.
13 Q  Right.
14 A  You know, if, say, his family had called
15   and said something, Can you find him a
16   position, you know, even though it was
17   against his will, you'd have to give some
18   consideration to that.
19 Q  All right. If there were not these special
20   considerations, special health
21   considerations and if the person didn't
22   request it, would it be ever appropriate to
23   assign someone above the rank of sergeant
24   to the head of the detail unit?

Page 152

1     MR. EDWARDS: Objection.
2  A  I don't think so.
3  Q  Now, is the position of head of the detail
4    unit viewed in the department as a
5    punishment position?
6     MR. EDWARDS: Objection.
7  A  Yes.
8  Q  What are you basing that on?
9  A  Well, first John Martino.
10 Q  Yeah.
11 A  Secondly, Nancy O'Loughlin.
12 Q  Yeah?
13 A  And then third me.
14 Q  Now, is it correct -- I mean, do you
15   believe that other officers in the
16   department view your assignment to detail
17   as a punishment to you?
18 A  Yes.
19 Q  And is it your belief that officers within
20   the department viewed Nancy O'Loughlin's
21   assignment to detail to be punishment to
22   her?
23 A  Yes.
24 Q  And is it your belief that officers within

Page 153

1  the department viewed John Martino's
2  assignment to details as punishment to him?
3  A  Yes.
4  Q  Do you know if Martino has testified in a
5    deposition or in court that assignment of
6    someone above the rank of sergeant to
7    details was a punishment?
8        MR. EDWARDS: Objection.
9  A  I have no idea.
10 Q  Do you know if Mr. McCarthy testified to
11   that?
12       MR. EDWARDS: Objection.
13 A  Oh, that was in the Globe article that I
14   was talking about earlier.
15 Q  What was that, sir?
16 A  They were talking about the detail unit, I
17   think.
18 Q  And do you recall what was said in that
19   article?
20 A  That -- that's what they based their
21   vendetta thing on.
22 Q  Martino and McCarthy?
23 A  Yes.
24 Q  But you don't know whether they testified

Page 154

1  under oath about that?
2  A  No.
3  Q  You also, I think, mentioned something
4    about a Lieutenant LeRay being punished by
5    being put in the detail unit?
6  A  Yes.
7  Q  Tell me about that.
8  A  It was my recollection at that time Herman
9    Wheeler, who was head of the patrolman's
10   union, had a chance to become deputy chief,
11   which I supported.
12       Lieutenant McCarthy circulated
13   a petition to get all the superior officers
14   who happened to be white at the time, to
15   sign it, as a way of saying Herman wasn't
16   qualified.
17 Q  Okay.
18 A  And then LeRay refused to sign it. And my
19   recollection at the time was, he was put in
20   the detail unit.
21 Q  In your opinion was that a punishment for
22   refusing to sign that petition?
23 A  Yes.
24 Q  All right. Now, let's talk a little bit

Page 155

1  about when you found out that Nancy
2  O'Loughlin was being assigned to head of
3  detail unit.
4      How did you find that out?
5  A  Nancy was sitting there in the office with
6    Chief Carter.
7  Q  Were you present in the room?
8  A  Yes.
9  Q  And what did the chief say? What did Nancy
10   say, and what if anything did you say?
11 A  I don't think Nancy said anything. The
12   chief just said that he was making changes
13   and that the -- he was reassigning her for
14   administrative skills to the detail unit or
15   something.
16 Q  Okay. And that was the reason that he gave
17   her, her administrative skills?
18 A  Yeah -- I'm just doing this by memory, yes.
19 Q  All right. And did he say anything in that
20   conversation about her ability to testify
21   in graffiti cases?
22 A  I don't remember that part about testifying
23   in any graffiti cases. I know there was
24   mention of graffiti. But I don't remember

Page 156

1  anything about testifying. I don't think
2  chief can have her not testify at a court
3  case.
4  Q  You don't remember what discussion there
5    was?
6  A  There was something about graffiti, but I
7    don't know whether the chief was -- and
8    I'm -- if he was commending her on her
9    graffiti skills or something else. I don't
10   remember. The word "graffiti" was
11   mentioned.
12 Q  Okay. Now, you've testified both before
13   today and today that you were "stunned"
14   when Carter did that?
15 A  Yes.
16 Q  I think those were your words.
17 A  Yes.
18 Q  Why were you stunned when Carter did that?
19 A  Well, one, because I didn't see it coming;
20   and, two, because the next day was the raid
21   on the money room.
22 Q  Do you think the two are related somehow?
23 A  (Pause.)
24 Q  Are you able to answer that?

Page 161

1 Q Do you recall what it said about that?
2 A Just the reassignment or something.
3 Q Can you elaborate on that?
4 A Why don't I get -- I'll fax you the
5    document.
6       (Off the record)
7 Q Again, just because we don't have that
8    document in front of us, Lieutenant, and to
9    possibly avoid coming back here again, what
10    do you recall it saying about Nancy
11    O'Loughlin?
12 A If you take a five-minute break I'll have
13    it for you.
14       (A short break was taken.)
15 Q Lieutenant, it's my understanding you just
16    tried to find that memo, and you weren't
17    able to get it right away?
18 A Correct.
19 Q And you're going to find that and send it
20    to Attorney Edwards?
21 A Yes.
22 Q Okay, thank you. Since you don't have it,
23    what do you recall it saying in the memo
24    about Nancy O'Loughlin, please?

Page 162

1 A I just -- I think I said on -- you notified
2    me that you would be reassigning Nancy
3    O'Loughlin and Joseph Leuchte.
4 Q And what did you say about that?
5 A I said, we'd work it out the best we could.
6 Q Work out the transfer, you mean?
7 A I'd be in contact with McCarthy.
8 Q Did you ever question him why he had done
9    it?
10 A No.
11 Q Did he ever explain to you why he had done
12    it?
13 A No.
14 Q Do you have any understanding why he did it
15    on that particular day?
16 A No. Well -- no.
17 Q Sir?
18 A No.
19 Q In your mind, was there any reason to
20    transfer Nancy O'Loughlin from detectives
21    to details?
22       MR. EDWARDS: Objection.
23 A No.
24 Q Do you have any reason to believe -- after

Page 163

1    that transfer, did you discuss the transfer
2    of Nancy O'Loughlin?
3 A Briefly.
4 Q And tell me about that discussion, please.
5 A The chief told me to guard her office.
6 Q Right. Yeah. What did he mean to guard
7    her office?
8 A To make sure that she doesn't take anything
9    out that she's not supposed to.
10 Q Was that usual procedure?
11 A I've had it done to me a few times, so --
12    but not up until then. No, to my
13    recollection, not at the police department.
14    I don't remember ever having anybody -- we
15    didn't at Leuchte's office.
16 Q All right. Because the chief had
17    transferred Leuchte at the same time he
18    transferred Nancy O'Loughlin, right?
19 A Yes.
20 Q And he asked you to guard Nancy's office,
21    but not Leuchte's office?
22 A Yes.
23 Q Did he tell you why he was asking you to
24    guard Nancy's office and not Leuchte's

Page 164

1    office?
2 A No.
3 Q Do you have any idea why he did that?
4 A No.
5 Q Did he express to you that he wanted you to
6    do that because of some distrust of Nancy
7    O'Loughlin?
8 A No.
9 Q To this day do you have any reason to know
10    why he did that?
11 A No.
12 Q And to this day, do you know why he wanted
13    her office guarded and not Leuchte's?
14 A No.
15 Q And did you, indeed, do that?
16 A Yeah.
17 Q So you stood there while she moved the
18    things from her office?
19 A Yes.
20 Q Did she express anything to you about that?
21 A She said, What did he say?
22 Q And what did you say?
23 A I said, The only thing he said was, Look at
24    the way she dresses.

Page 165

1  Q  Let's go back a step. When did Chief
2     Carter say, Look at the way she dresses?
3  A  After he left her office.
4  Q  He has the conversation with Nancy; she
5     leaves the room and --
6  A  Look at the way she's dressed. I'm not --
7  Q  Understood. She leaves the room and then
8     he has a conversation with you, yes?
9  A  No, that's all he said.
10 Q  I'm just trying to find out everything the
11    chief said after Nancy left the room.
12 A  Yes. My recollection, that's all he said
13    about it. He said, Why don't you go
14    downstairs and guard her office and then he
15    said that one remark.
16 Q  Look at the way she dresses?
17 A  Yeah.
18 Q  Did you ask him about either of those
19    remarks?
20 A  No.
21 Q  Was Lieutenant O'Loughlin dressed
22    inappropriately when she was in the
23    meeting?
24 A  No.

Page 166

1  Q  Do you recall what she was wearing?
2  A  No.
3  Q  But it didn't strike you in any way as
4     being inappropriate?
5  A  No.
6  Q  Do you know what he was referring to?
7  A  No.
8  Q  Did you ask him what he was referring to?
9  A  No.
10 Q  Had he ever commented on her attire in the
11    past?
12 A  Never, not to me.
13 Q  Have you ever heard Chief Carter comment
14    favorably or unfavorably about the attire
15    of female employees in the police
16    department?
17 A  The entire employees?
18 Q  Attire of female employees, the way they're
19    dressed.
20 A  No, he never did to me.
21 Q  Has he ever commented in your presence or
22    to you about the appearance of any females
23    on the police department?
24    MR. EDWARDS: Objection.

Page 167

1  A  Females in the police department, no, no.
2  Q  Has he ever commented to you about the
3     appearance of females who are in the police
4     department headquarters, whether they're
5     employees or not?
6     MR. EDWARDS: Objection.
7  A  Once.
8  Q  Tell me about that, please.
9  A  I can't.
10 Q  Why not?
11 A  It's related to the money room.
12 Q  You're saying the chief's comment about the
13    appearance of some other female is somehow
14    related to the money room investigation?
15 A  Yes.
16 Q  Oh, oh, I see. I see. Was this a sexual
17    comment?
18 A  I wouldn't take what the chief --
19 Q  Let me go back a step. I can make it
20    easier for you.
21    MR. EDWARDS: I'd like to hear
22    the whole answer.
23    MR. NOTIS: I asked it.
24    You're entitled to the entirety of the

Page 168

1  answer.
2  A  It was in my office at the time. I just
3     don't want to get myself into further
4     jeopardy by what I'm saying.
5     It was in response to the
6     attributes of another sergeant. And the
7     chief was talking about reassigning this
8     person -- putting this person in a
9     specialized unit. And my advice was, Don't
10    do it now. And the other person in the
11    room -- and the chief asked why. And the
12    other person in the room said because he
13    was blanking her, too.
14    I don't want to -- I just got
15    to be careful with where I go with this.
16    And the chief said, What? He didn't know.
17    And the person responded by saying, She's a
18    party girl. And the chief said, A party
19    girl? I know what that is. And that was
20    it.
21 Q  In your opinion, was Nancy O'Loughlin doing
22    a good job in her work as the detective
23    commander?
24 A  Yes.

Page 169

1  Q  Did you have any -- in your opinion -- and
2     did she report to you in that position, by
3     the way?
4  A  Yes.
5  Q  And in your opinion were there any problems
6     with the work she was doing?
7  A  The only thing I remember saying to Nancy
8     is, Nancy, I want you to supervise
9     Gillespie. I want you to supervise him.
10    It was in regards to Mark Gillespie.
11 Q  But other than that, though, you didn't
12    have any problems with her work?
13 A  (Nodding.)
14 Q  Prior to this transfer, did the chief ever
15    criticize Nancy O'Loughlin's work to you?
16 A  The only -- and it wasn't a criticism. She
17    was doing a graffiti investigation, and she
18    was -- she had arrested some vandals, and
19    she was obtaining search warrants. And the
20    chief had called me in. At the same time,
21    the kids are coming in under arrest saying,
22    What's going on?
23        And he said, What's this about
24    the search warrants? And I said, Well,

Page 170

1     they're related to the T, the reservoir,
2     and all the other places or Riverside, one
3     of those stations.
4         And he said, I don't want any
5     search warrants; tell them no search
6     warrants. And I went down, and I said, No
7     search warrants; just stop it; leave it at
8     this.
9  Q  Did the chief tell you to guard Nancy's
10    office or did he say to guard her office to
11    watch what she was taking out?
12 A  It was just guard her office.
13 Q  In your understanding, was there anywhere
14    else the chief could have reassigned Nancy,
15    other than the detail unit, if he took her
16    out of detectives then?
17 A  Patrol.
18 Q  And do you have any idea why he assigned
19    her to details instead of patrol?
20 A  No.
21 Q  I think you mentioned something during one
22    of your days of testimony about the chief
23    feeling someone had bugged his office.
24 A  Yes.

Page 171

1  Q  Do you recall that, sir? What was that all
2     about?
3         MR. EDWARDS: Objection.
4  A  Detective Peter Pasciucco called my house
5     one night and he asked me if I had gone to
6     the Feds. I said, No. And he said, Well,
7     why do the Feds want to talk to me? I
8     said, I have no idea.
9         And the FBI wanted to talk to
10    him. And he was brought into FBI, met with
11    the agent who accused him of bugging --
12    well, bugging the chief's office.
13 Q  And whatever happened with that?
14 A  Peter was interviewed by the FBI, and he --
15    what it was was -- my understanding was
16    that they discovered wires going into the
17    chief's office from Peter Pasciucco's
18    office. And they were actually left over
19    from -- John O'Donovan had put hidden
20    cameras in there because he claimed that
21    McCarthy had broken into his office.
22 Q  You mentioned at one point the chief had
23    yelled about Nancy O'Loughlin signing a
24    memo?

Page 172

1  A  He came into my office and he -- what it
2     was -- the chief told me to get two things
3     out right away -- memos. And one of them,
4     I think, had to do with -- something about
5     youthful offenders or graffiti or robberies
6     or something. And I was trying to get one
7     out, and I asked Victor Diaz and Nancy to
8     get the other one out. And the memos went
9     out, and her name was signed on it. And he
10    said -- he came into my office, and he
11    said, Who can sign these memos? I said,
12    Well, I put them out. I didn't know where
13    he was going. I said, Detective Best put
14    them out all the time. And he said, Nancy,
15    who told you to put her out? I explained
16    it to him, You said to get these things out
17    right away.
18        He said, Well, I didn't mean
19    right away. You could have done it in a
20    few days. Why is her name on it? And I
21    said, Because she wrote it with Victor
22    Diaz.
23 Q  Was he angry about this?
24 A  He was just shaking his head.

## Page 185

1   with that?
2 A I have no idea.
3       MR. NOTIS: Give me a minute.
4   I may be done; although, I do want to
5   reserve my right to come back, depending on
6   what's in that memo.
7       MR. EDWARDS: Okay.
8 Q Lieutenant, at the time you were suspended
9   and assigned to duty at home because of the
10  recorded conversations, you had this prior
11  discipline from September '03 regarding the
12  faxes, correct?
13 A Correct.
14 Q Did you have any other prior discipline?
15 A Yes.
16 Q What other prior discipline?
17 A I had under Thomas O'Loughlin there was an
18  incident in Roslindale Village involving
19  young kids being arrested. And when I was
20  told that they were arrested for walking on
21  tracks, I ordered their immediate release,
22  which is my understanding of the rules and
23  regulations.
24 Q And you were disciplined for doing that?

## Page 186

1 A Yes, I was.
2       MR. NOTIS: I have no further
3   questions.
4       REDIRECT EXAMINATION
5       BY MR. EDWARDS
6 Q The situation in Roslindale Village, what
7   was the discipline you received?
8 A Two or three punishment tours.
9 Q I'm sorry?
10 A Two or three punishment tours.
11 Q What does that mean?
12 A I would work with no pay.
13 Q Now, Tom O'Loughlin issued that punishment?
14 A Yes.
15 Q And it was for releasing juveniles that had
16  been arrested?
17 A Yes.
18 Q And you released them because you didn't
19  think they should be arrested?
20 A Correct.
21 Q Who arrested them?
22 A The anti-crime unit.
23 Q Nancy O'Loughlin?
24 A Yes.

## Page 187

1 Q And her unit?
2 A Yes.
3 Q And there was an issue about one of the
4   juveniles being related to a Boston City
5   police officer, wasn't there?
6 A Yes.
7 Q And Tom O'Loughlin thought that it gave the
8   wrong impression to release these
9   juveniles?
10 A That was a 12-year-old girl who was already
11  ordered released. I ordered release of the
12  other kids.
13 Q My question, though -- and maybe I phrased
14  it improperly.
15      Did Tom O'Loughlin say to you
16  that it gave the wrong impression to
17  release the child of a Boston police
18  officer?
19 A I hadn't released the child of the Boston
20  police officer. The 12-year-old daughter
21  of the Boston police officer was already
22  released. I released the other people
23  involved.
24 Q Who released the Boston police officer's

## Page 188

1   child?
2 A I believe that was determined by the
3   anti-crime unit.
4 Q All of the children were arrested?
5 A Yes. They felt because that girl was
6   12 years old, they had -- they were going
7   to release her to the custody of her
8   parents.
9       My argument was, If you
10  release one, you release them all. And
11  then I got a call from dispatcher Anne
12  Marie Collins, who seems to call me
13  whenever I get into trouble, and said, Come
14  down here; there are a bunch of angry
15  parents here. And when I talked to the
16  anti-crime officers, and said, What did you
17  arrest these kids for? And they said, For
18  walking on tracks. I said, How can you
19  arrest them for walking on tracks when the
20  T puts planks across those tracks to walk
21  across?
22      So I said, You better release
23  all these kids right now. That was my
24  decision. And then I said, Call the

Page 217

1  canine officers, you have to -- you train
2  by fighting other people's dogs.
3    And Rottweilers were
4  particularly -- I had a German shepherd.
5  His bite wouldn't go through a sleeve, and
6  he was a tough dog. But the Rottweiler,
7  the bite would go right through the sleeve.
8  You had special equipment to handle
9  Rottweilers. And I just remember a time
10 there was a 140-pound Rottweiler put on
11 Nancy to see how tough she was.
12 Q Okay. I understood you to say in the
13   beginning of that that that's the way
14   people were trained or was this done
15   because she was a woman?
16 A I never had the 140-pound Rottweiler sent
17   on me, so -- thank God. Maybe she
18   volunteered for it. Knowing her, she
19   probably volunteered to fight the foolish
20   thing.
21 Q So you don't know how this came about?
22 A I don't have any clue whether Nancy would
23   volunteer to fight it or whatever.
24 Q Do you have any reason to believe that --

Page 218

1  A -- it was put on her because she was a
2    woman? No.
3  Q That's right. That this dog was put on her
4    because she was a woman?
5  A No.
6  Q Now, when you said that Nancy O'Loughlin
7    was treated differently by Chief Carter,
8    you talked about something about shopping,
9    when some woman was shopping.
10       What is that about? You
11   talked about people raced down and got --
12 A No, I don't think I said Chief Carter did.
13       I said there was an incident.
14 Q Maybe I wrote it down wrong. Nancy
15   O'Loughlin was treated differently by
16   Carter.
17 A No, no, I did not say that. What I said
18   was there was an incident where somebody
19   complained that an MBTA police cruiser was
20   parked in front of the Stop & Shop and the
21   officer was in there shopping and it was a
22   female officer. It was Herman Wheeler's
23   belief -- and he was the TPSA commander --
24   and he got a call from the chief and

Page 219

1    Martino, and they went down and grabbed the
2    tape right away.
3       He told me that it was his
4    thing that they were out to get Nancy when,
5    in fact, it was another officer, Minn Vo,
6    and she had only been in there for two
7    minutes.
8  Q Why did -- was it lieutenant then --
9  A Yes.
10 Q -- Lieutenant Wheeler think that it was
11   because this was supposedly Nancy
12   O'Loughlin?
13 A I don't know.
14 Q Did you ask him?
15 A No.
16 Q And he didn't volunteer that information,
17   obviously?
18 A No.
19 Q Is there something with an MBTA officer
20   shopping?
21 A Going in to get her lunch on duty, no.
22 Q Well, is that a valid complaint that
23   there's an MBTA officer shopping?
24 A At a Stop & Shop to get her lunch, no.

Page 220

1  Q Who made the complaint?
2  A No.
3  Q I don't understand this.
4      As far as you understand, it
5    was not Chief Carter that --
6  A That was in Stop & Shop and complained, no.
7  Q No, that it wasn't Chief Carter that asked
8    that the tape be retrieved?
9  A I can only go by what Lieutenant Wheeler
10   said. He said it was Martino and Chief
11   Carter, yeah.
12 Q Martino and Chief Carter?
13 A That's what Herman said, yes.
14 Q Not McCarthy?
15 A No.
16 Q And, I guess, my question is: Even if it
17   had been Nancy O'Loughlin, what's the
18   violation?
19 A I don't know.
20 Q And maybe I'm asking the wrong question.
21      Is it presumed that Deputy
22   Martino and Chief Carter allegedly asked
23   that the tapes be retrieved because they
24   thought it was some kind of violation? Is