# EXCERPTS FROM DEPOSITION OF JOSEPH CARTER

## VOLUME 1

## Page 1

```
  1
  2        UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MASSACHUSETTS
  3        C.A. NO: 04-10933-JLT   VOLUME 1
  4   *****************************************
       NANCY O'LOUGHLIN,
  5           Plaintiff
           vs.
  6   MASSACHUSETTS BAY TRANSPORTATION
       AUTHORITY and JOSEPH CARTER and MICHAEL
  7   MULHERN,
              Defendants
  8   *****************************************
  9
 10
 11        DEPOSITION of JOSEPH C. CARTER,
 12   a witness called on behalf of the Plaintiff,
 13   pursuant to the Massachusetts Rules of
 14   Civil Procedure, before Lisa E. Berkland,
 15   a Certified Shorthand Reporter and Notary
 16   Public in and for the Commonwealth of
 17   Massachusetts, at the offices of Prince,
 18   Lobel, Glovsky & Tye, 585 Commercial
 19   Street, Boston, Massachusetts, on Friday,
 20   January 6, 2006, commencing at 1:30 p.m.
 21
 22
            LISA E. BERKLAND, CSR
 23         P.O. Box 286
            Westwood, MA 02090
 24         (508) 850-5171
```

## Page 2

```
  1   APPEARANCES:
  2
      LAW OFFICE OF MITCHELL J. NOTIS
  3      (By Mitchell J. Notis, Esquire)
         370 Washington Street
  4      Brookline, Massachusetts 02445
         (617) 566-2700
  5        On behalf of the Plaintiff.
  6
      PRINCE, LOBEL, GLOVSKY & TYE
  7      (By Joseph L. Edwards, Esquire)
         585 Commercial Street
  8      Boston, Massachusetts 02109-1024
         (617) 456-8131
  9        On behalf of the
           Defendant/MBTA.
 10
 11   WILMER HALE
         (By Gregory M. Reiser, Esquire)
 12      60 State Street
         Boston, Massachusetts 02109
 13      (617) 526-6527
           On behalf of Defendant/Michael
 14      Mulhern.
 15
      ALSO PRESENT:
 16   Timothy F. Cullen, Special Counsel, MBTA
      Police Department, Office of the Chief
 17
```

## Page 3

```
                                            INDEX
  1
  2   WITNESS:              DIRECT   CROSS
      JOSEPH CARTER
  3   (By Mr. Notis)          4
  4
  5
  6
  7              EXHIBITS
  8   Number     Description     Page
  9   1     Complaint                   32
 10   2     3/8/04 correspondence 104
```

## Page 4

```
  1              P-R-O-C-E-E-D-I-N-G-S
  2         MR. NOTIS: Same stipulations,
  3   Gentlemen?
  4         MR. EDWARDS: That's fine.
  5         MR. NOTIS: The same
  6   stipulations as in the previous
  7   depositions, which are all objections,
  8   with the exception of objections as to
  9   form, are reserved until the time of
 10   trial; and all motions, including motions
 11   to strike, are reserved until the time of
 12   trial.
 13         I assume the witness will
 14   reserve his right to read and sign the
 15   transcript, and if it's not signed within
 16   30 days of being sent to Mr. Edwards,
 17   then it will be deemed to be read and
 18   signed. We will waive notarization and
 19   filing. Is that acceptable to everyone?
 20         MR. EDWARDS: It is.
 21         MR. REISER: That's fine with
 22   me.
 23         That, JOSEPH C. CARTER, having
 24   first been duly sworn, on oath, deposes
```

Page 25

1 Q. Based on what? Let me rephrase that.
2  Why was it sound to remove the unit from
3  its function in the department?
4     MR. EDWARDS: Objection. You
5  can answer.
6 A. Based on the controversy that the unit
7  allegedly caused for the department and
8  within the community.
9 Q. Okay. Had you formed any opinion as to
10  whether the unit had engaged in any
11  wrongful activities or misconduct?
12 A. Again, my knowledge was based on the
13  substance and the findings of the report.
14 Q. You knew, though, that Nancy O'Loughlin
15  had been head of the anti-crime unit?
16 A. Yes, I knew that.
17 Q. Okay. Now, you are familiar with what's
18  called the "Detail Unit" within the MBTA
19  Police Department?
20 A. Yes, I am familiar with it.
21 Q. When is the first time you became
22  familiar with the Detail Unit within the
23  MBTA Police Department?
24 A. Prior to taking the position and studying

Page 26

1  the makeup of the department and its
2  organization, that it is a unit, part of
3  the organizational structure of the
4  department.
5 Q. Was there ever a time that you were
6  informed that the assignment of a
7  superior officer to head the Detail Unit
8  was deemed the punishment assignment?
9 A. No.
10 Q. Did anyone ever inform you of that?
11 A. I learned it through this entire process
12  and the discipline in this matter and
13  associated folks in this matter.
14 Q. When you say "this process" and "this
15  matter," you mean the lawsuit we are here
16  about today?
17 A. Well, it was the discipline that led to
18  the lawsuit.
19 Q. Okay. Are you aware that Lieutenant
20  Flemming has testified he informed you
21  when you came in as Chief that the
22  position of head of the Detail Unit was
23  deemed a punishment assignment for a
24  superior officer?

Page 27

1     MR. EDWARDS: Objection. You
2  can answer.
3 A. No.
4 Q. Did you ever have any conversation with
5  Lieutenant Flemming about whether or not
6  a superior officer being assigned to the
7  Detail Unit would be deemed a punishment
8  position?
9 A. I never recall that conversation.
10 Q. Did you ever have any conversation with
11  Lieutenant Flemming in which he informed
12  you that an assignment of John Martino to
13  head the Detail Unit had been a
14  punishment assignment?
15     MR. EDWARDS: Objection.
16 A. No.
17 Q. If Lieutenant Flemming testified that he
18  had such a conversation with you, would
19  he be lying?
20     MR. EDWARDS: Objection. You
21  don't have to answer the question.
22 A. It's not for me to rule on it. I'm
23  telling you he didn't have that
24  conversation with me.

Page 28

1 Q. Okay. Just so I'm clear, when was the
2  first time then that you heard that it
3  was felt by some that assignment to the
4  Detail Unit is a punishment assignment?
5 A. When I was getting sued.
6 Q. Okay. But not before that?
7 A. No.
8 Q. Okay. Have you ever discussed with John
9  Martino his assignment to the Detail
10  Unit?
11 A. Again, all associated with this case, the
12  discipline and everything else. It
13  wasn't until all of this arose that that
14  was exposed to me.
15 Q. Okay. When you had that discussion with
16  John Martino, was counsel present?
17 A. Don't know. Don't recall. I'm sorry, I
18  don't recall. Counsel would be -- I
19  mean, he is the counsel of the
20  department. It could have been at a
21  command staff meeting.
22 Q. I'll ask the question, and then these
23  gentlemen can do what they want to do.
24  (Indicating.)

Page 29

1   What conversation about his
2   assignment to the Detail Unit did you
3   have with John Martino?
4 A. Don't recall the specifics.
5 Q. Do you recall him telling you that he at
6   one point had been assigned to head the
7   Detail Unit?
8 A. What I can tell you is I don't recall a
9   sit-down meeting that was specifically on
10   the Detail Unit.
11 Q. Right.
12 A. I recall conversations that I had with
13   command staff members just about this
14   case and a number of things that were
15   related to it.
16 Q. All right. What I want to do for a
17   moment is focus on anything you remember
18   about conversations you had with Martino
19   about his assignment to the Detail Unit.
20 A. Nothing other than he was assigned to it
21   at one time. That's the general gist of
22   it.
23 Q. Do you recall him indicating to you in
24   any way that he felt his assignment to

Page 30

1   the Detail Unit was a punishment
2   assignment?
3 A. I don't recall that.
4 Q. Do you recall him saying to you anything
5   to the effect that Tom O'Loughlin's
6   assignment of him to the Detail Unit was
7   either a punishment or retaliation?
8 A. No, I don't recall that either.
9 Q. Okay. You are aware of the fact that he
10   filed suit against the department in
11   relation to that?
12 A. Again, only in the time frame of this
13   whole matter that I have learned all of
14   that. Some I heard from him and some I
15   have heard from other people. So, again,
16   that all blends together.
17 Q. Okay.
18 A. I don't believe John Martino sat me down
19   and told me from A-to-Z as it related to
20   his matter.
21 Q. Do you have any knowledge of any superior
22   officers in the department testifying at
23   any point in federal lawsuits that the
24   assignment of a superior officer to the

Page 31

1   detail unit was a punishment assignment?
2       MR. EDWARDS: Objection. You
3   can answer.
4 A. No.
5 Q. Do you have any knowledge of John Martino
6   ever testifying that the assignment of a
7   superior officer to the Detail Unit would
8   be a punishment assignment?
9       MR. EDWARDS: Objection.
10 A. No.
11 Q. Do you have any knowledge of Tom McCarthy
12   ever testifying that the assignment of a
13   superior officer to the Detail Unit was a
14   punishment assignment?
15 A. No.
16 Q. Do you have any knowledge of Bill
17   Flemming ever saying that?
18 A. No.
19 Q. I'm sorry if I asked you this a moment
20   ago, but Flemming never told you that, in
21   his opinion, the assignment of Martino to
22   the Detail Unit was a punishment
23   assignment?
24 A. No.

Page 32

1 Q. Okay.
2       MR. NOTIS: Let's mark this as
3   Exhibit 1.
4       (Exhibit 1, marked for
5   identification.)
6 Q. Take a look at the document which has
7   been handed to you which is marked as
8   Exhibit 1 and tell me what that is,
9   please?
10 A. It says it's a Complaint, Civil Action
11   Number 04-10933-JLT, "Nancy O'Loughlin,
12   Plaintiff, versus Massachusetts Bay
13   Transportation Authority and Joseph
14   Carter and Michael Mulhern, Defendants."
15 Q. It says it's the First Amended Complaint,
16   correct?
17 A. Yes.
18 Q. Going briefly back to that Detail Unit
19   discussion, in your opinion, Chief, is it
20   a punishment to assign a superior officer
21   to head the Detail Unit?
22 A. No, it is not.
23 Q. Okay. What are the responsibilities of
24   the head of the Detail Unit?

Page 49

1  A. I'm not aware of that at that time.
2  Q. My questions refer to that period of
3     time.
4  A. No.
5  Q. Okay. You just mentioned to me that you
6     thought that it was felt by some that the
7     Detective Unit had more prestige than
8     patrol?
9        MR. EDWARDS: Objection.
10 Q. I think you just testified to that,
11    Chief?
12 A. What I testified to is, among police
13    officers, being in plain clothes and
14    being a detective has a little more
15    prestige.
16 Q. And doesn't being in the Detective Unit
17    have more prestige than being in the
18    Detail Unit?
19 A. I didn't testify to that. I don't get
20    your question.
21 Q. I'm asking, in August of 2003, was it
22    felt by officers under your command that
23    it was more prestigious to be in the
24    Detective Unit than to be in the Detail

Page 50

1     Unit?
2  A. No. I don't recall anybody ever couching
3     that to me.
4  Q. Okay.
5  A. No.
6  Q. In your opinion, sir, is it more
7     prestigious to be a detective than in the
8     Detail Unit?
9  A. No.
10 Q. Okay. Before moving Nancy O'Loughlin to
11    the Detail Unit from being Detective Unit
12    Commander, did you discuss that move with
13    her?
14 A. Yes.
15 Q. Did you discuss that move with her before
16    actually informing her that this was
17    going to be her new assignment?
18 A. That would have been Deputy Flemming that
19    would have been directed to speak to her
20    about the change in assignment.
21 Q. Do you recall if he actually was assigned
22    to speak to her about that?
23 A. Yes. I know for a fact that I directed
24    him to speak to her about the assignment

Page 51

1     before she came to speak to me.
2  Q. Okay. Do you know if he actually did
3     that?
4        MR. EDWARDS: Objection. You
5     can answer.
6  A. He asserted to me that he spoke to Nancy
7     and brought Nancy to my office for me to
8     talk to her.
9  Q. Did he ever inform you about his
10    conversation with her about that?
11 A. Not that I recall.
12 Q. All right. Why don't you tell me then
13    what you recall about the conversation
14    when you were in the meeting with Nancy
15    and Flemming about that reassignment?
16 A. I indicated to her that she was being
17    transferred to that unit because of our
18    dire need for strong management, that we
19    had a number of problems in that unit, we
20    needed a lieutenant back in that unit, we
21    were moving the sergeant out, and that I
22    felt she had what we needed there, that I
23    was really looking for her to go there
24    and do the job effectively. Then I asked

Page 52

1     her if she had any questions or any
2     issues with that reassignment.
3  Q. And her response?
4  A. She did not respond.
5  Q. She said nothing at all?
6  A. She could have grunted or made a noise,
7     but she did not. I don't recall her
8     saying anything of substance.
9  Q. Do you recall her saying, "No, I don't
10    have any questions"?
11 A. No.
12 Q. Okay. Did you press her for a response?
13 A. I think I asked her did she hear me, and
14    she nodded, and, like, gave me a yes,
15    sir, and that was it. That was the limit
16    of the conversation.
17 Q. Did she appear upset?
18 A. No.
19 Q. Did she appear surprised?
20       MR. EDWARDS: Objection.
21 A. No.
22 Q. Did she appear angry?
23 A. No.
24 Q. Were you surprised that she had no

Page 53

1  comments for you?
2  A. No.
3  Q. Did you consider this to be an
4     advancement for her?
5  A. No. It was a lateral move.
6  Q. After informing her of her reassignment,
7     did you have any discussion with Flemming
8     about this?
9  A. Just say it again, so I understand your
10    question.
11 Q. After you had the discussion with Nancy
12    O'Loughlin where you reassigned her, did
13    you have any discussion with Flemming
14    about her reassignment?
15 A. I think generally about her not having
16    anything to say; just general discussion
17    about that.
18 Q. Okay. Do you recall either immediately
19    or shortly after that discussion telling
20    Flemming that Nancy O'Loughlin was
21    dressed inappropriately?
22 A. That was during her tenure in the
23    Detective Unit. Yes, as the commander of
24    the Detective Unit. Yes.

Page 54

1  Q. Okay.
2  A. Not on an assignment to the Detail Unit,
3     no.
4  Q. So you do recall at least one discussion
5     with Flemming about Nancy O'Loughlin's
6     attire?
7  A. As the commander of the Detective Unit,
8     yes.
9  Q. How many discussions about that do you
10    recall with him?
11 A. Several.
12 Q. Just so we can be clear, you recall them
13    as being prior to O'Loughlin's assignment
14    to the Detail Unit?
15 A. I'm clearly aware that they were before
16    her assignment to the Detail Unit. It
17    was during her assignment and management
18    of the Detective Unit.
19 Q. Do you recall any discussions about her
20    attire with Flemming after you reassigned
21    her to details?
22 A. No, I do not recall a discussion with
23    Flemming.
24 Q. Tell me everything you recall about the

Page 55

1     discussions with Flemming about
2     O'Loughlin's attire while she was head of
3     the Detail Unit?
4        MR. EDWARDS: Objection. I
5     think you misstated that.
6  A. None.
7        MR. EDWARDS: You said "Detail
8     Unit."
9        MR. NOTIS: Let me rephrase
10    it.
11 Q. Please tell me, sir, everything you
12    recall about your discussions with
13    Flemming regarding Nancy O'Loughlin's
14    attire while she was head of the
15    Detective Unit?
16 A. I mentioned to him that she was not
17    wearing appropriate attire as a manager
18    and as the commander of that unit, that
19    her dress was extraordinarily casual.
20 Q. Okay. What was her attire that you were
21    commenting on?
22 A. Wearing -- I guess you would call it --
23    oh, man. Just a shirt, jeans and work
24    boots, or work shoes.

Page 56

1  Q. What would you have liked her to be
2     attired in?
3  A. As a minimum, business casual attire,
4     which is what I had a discussion with the
5     deputy about.
6  Q. What do you mean by -- how would you
7     describe "business casual attire," sir?
8  A. A jacket, slacks, a business-like blouse
9     or shirt; it could be open collar.
10    Business casual.
11 Q. Okay. Did you instruct Deputy Flemming
12    to talk to O'Loughlin about that?
13 A. Yes, I did.
14 Q. Did he do that?
15       MR. EDWARDS: Objection.
16 A. Yes. He asserted to me that he did.
17 Q. Did her attire change after that?
18 A. No.
19 Q. How many times did you instruct Deputy
20    Flemming to talk to Lieutenant O'Loughlin
21    about her attire?
22 A. As I stated earlier, several times. I
23    don't have the exact number.
24 Q. Each of those times, sir, did he inform

Page 77

1  how he should act in relation to the
2  dispute?
3  A. No.
4  Q. The third paragraph of that subparagraph
5  reads, "Despite the fact that Lieutenant
6  O'Loughlin is recognized as an expert in
7  relation to graffiti related crime and
8  has testified as an expert on behalf of
9  the MBTA and the Commonwealth of
10 Massachusetts on such matters on a number
11 of occasions, Chief Carter informed her
12 (on the same day that he transferred her
13 to the Detail Unit) that she would no
14 longer be allowed to investigate and/or
15 testify as an expert on graffiti related
16 crime, but that her former assistant, who
17 was not recognized as an expert on these
18 matters, would do any such testifying."
19 Is that a true statement?
20 A. No.
21 Q. Do you recall any discussions with Nancy
22 O'Loughlin about her not testifying in
23 relation to graffiti crime?
24 A. No.

Page 78

1  Q. Do you have any idea what this is
2  discussing then?
3     MR. EDWARDS: Objection. You
4  can answer.
5  A. I know what it says.
6  Q. Does it bear any relation to any
7  discussions you had with Nancy
8  O'Loughlin?
9  A. None that I recall or I'm aware of.
10 Q. Okay. On the day that you informed her
11 of her reassignment, did you have any
12 discussion with her about her graffiti
13 testimony?
14 A. No.
15 Q. Did you ever inform her that she was not
16 to testify in graffiti crime cases?
17 A. I never talked to her about graffiti
18 crime cases, no.
19 Q. Did you ever instruct any officer who was
20 a subordinate of yours to talk to her
21 about that?
22 A. Not specifically.
23 Q. What does that mean, sir?
24 A. What that means is, it would have been

Page 79

1  Flemming's responsibility to speak to her
2  about her transfer from the Detective
3  Unit. As I testified earlier, when we
4  started, one of the associated
5  responsibilities was graffiti
6  investigations that she was responsible
7  for.
8  A. So he would have had a conversation with
9  her about her no longer being assigned to
10 that function and being transferred to
11 the Detail Unit and the Chief wanted to
12 talk to you about that transfer to the
13 Detail Unit. So, generally, he would
14 have done that based on our discussion.
15 Q. All right. Just so I can understand
16 then, in your discussions with Flemming
17 about O'Loughlin's reassignment, was
18 there discussion about her no longer
19 testifying about graffiti crime?
20 A. Not that I recall.
21 Q. Do you have any understanding as to
22 whether Flemming discussed with Nancy
23 that she shouldn't testify about graffiti
24 crime?

Page 80

1  A. No.
2  Q. Did you ever tell her she would no longer
3  be allowed to investigate graffiti crime?
4  A. No, sir.
5  Q. Do you know if Flemming ever told her
6  that?
7  A. I don't recall. No.
8  Q. Did you instruct Flemming to tell her
9  that?
10 A. Not specifically, no.
11 Q. Did you have an opinion when you
12 reassigned Nancy O'Loughlin to details as
13 to whether she would still be allowed to
14 testify as an expert on graffiti-related
15 crime?
16 A. My opinion was she was no longer
17 responsible for that because of her
18 command of the Detail Unit and her
19 responsibilities therein.
20 Q. Well, I understand that she would no
21 longer be responsible for investigating
22 graffiti-related crime, correct?
23 A. That's correct. Yes.
24 Q. But did that mean that she would no

Page 89

1  I would talk to anybody who was in my
2  path. I would greet them, speak to them,
3  ask them about their family, ask them how
4  things were going with work, what are
5  they working on.
6  Q. I'm not at all familiar with the setup of
7    the MBTA Police Department Headquarters,
8    at Southampton Street, is it?
9  A. Yes, it is.
10 Q. Is the Detective Unit located within the
11    headquarters at Southampton Street?
12 A. Yes.
13 Q. Is it physically designated in any way?
14 A. It is clearly identified as part of the
15    unit. It has names on the door,
16    "Detective Unit."
17 Q. Very basically, sir, just tell me the
18    physical setup of Southampton Street?
19 A. The Detective Unit is on the first floor.
20 Q. Okay.
21 A. As well as the cell block and the booking
22    area, the communications and dispatch
23    area, the information management area,
24    the then community service office.

Page 90

1  Q. How many floors are there in the
2    headquarters?
3  A. Two.
4  Q. Your office is up on the second floor?
5  A. Yes.
6  Q. And the deputies are up there?
7  A. Yes.
8  Q. Who else is up on the second floor?
9  A. The Fiscal Unit, the Intelligence Unit,
10    the Planning Research/Community
11    Partnerships.
12 Q. Okay. If I walked into the first floor
13    of headquarters, would I have to go into
14    a separate door somewhere to get into the
15    Detective Unit?
16 A. If you walked into the police
17    headquarters, you would come into a foyer
18    that's a secure area. You couldn't get
19    into any unit or any other room other
20    than that foyer when you walked in.
21 Q. Okay. Someone who didn't have security
22    problems going in there, would they walk
23    into a separate room or separate door
24    where the Detective Unit was?

Page 91

1  A. They have their own door, as every office
2    does.
3  Q. Within the Detective Unit, is it a big
4    room with a lot of desks or does everyone
5    have a separate office? How does that
6    work?
7  A. There are a number of separate offices
8    reserved for officers of rank, commander,
9    sergeant detective, et cetera; and the
10    detectives have cubicles within a larger
11    space within that office area that's
12    known as the Detective Unit.
13 Q. Okay. Do you recall any occasions when
14    you would go into the Detective Unit and
15    both Sergeant Gillespie and Lieutenant
16    O'Loughlin were present, and you would go
17    to speak to Gillespie and not O'Loughlin?
18 A. No.
19 Q. Okay. Let's go to Subparagraph 5, sir.
20    It says, "Lieutenant O'Loughlin was
21    summarily and immediately moved to the
22    Detail Unit the same day that this change
23    was announced, rather than receiving
24    reasonable notice, as is the customary

Page 92

1    practice of the MBTA Police Department."
2  A. The same day that this change was
3    announced? What's the context.
4  Q. Well, the day you informed her of her
5    reassignment, that's when she was
6    reassigned, correct? There wasn't any
7    delay, was there?
8  A. I will have to read the Order to refresh
9    my memory.
10 Q. Okay. Let me ask you this: Do you have
11    any recollection of ordering Deputy
12    Flemming to watch over Lieutenant
13    O'Loughlin when she moved her things out
14    of her office in the Detective Unit?
15 A. Don't recall any such discussion.
16 Q. Do you recall telling Deputy Flemming to
17    guard her office and watch what she was
18    taking out of it after her reassignment?
19 A. Don't recall.
20 Q. Is that something you would expect to
21    have said to Deputy Flemming?
22        MR. EDWARDS: Objection. You
23    can answer.
24 A. No.

Page 97

1  in general, a difficult time in law
2  enforcement?
3  A. There have been instances and cases where
4  I am aware of where women have a
5  problem. But, generally, women don't
6  have a problem performing in law
7  enforcement, and, in fact, excel.
8  Q. Would you agree that women, though, face
9  resentment from male colleagues in law
10  enforcement?
11      MR. EDWARDS: Objection.
12  A. I would not agree.
13  Q. Do you think -- would you agree with the
14  statement "It's not easy to be a female
15  in policing"?
16  A. I would not agree.
17  Q. So you think, in general, females are
18  given a fair shake in law enforcement
19  jobs?
20  A. Women in policing have the same
21  opportunities as males, and many avail
22  themselves of those opportunities,
23  compete, and do well.
24  Q. In your time as Chief of the MBTA Police

Page 98

1  Department, have you been aware of any
2  resentment of females holding superior
3  officer positions?
4  A. No.
5  Q. During the time you spent in the Boston
6  Police Department, were you aware of any
7  resentment of females holding superior
8  officer positions?
9  A. Never.
10  Q. You said you gave some speeches to that
11  organization?
12  A. As recently as last October.
13  Q. How many speeches have you given?
14  A. Several.
15  Q. Can you give me the names of the
16  different speeches?
17  A. No.
18  Q. What were the subjects of the different
19  speeches?
20  A. I believe last October I talked about
21  opportunities, in general; and, in
22  general, I talked about supporting their
23  agenda and program.
24  Q. Okay.

Page 99

1  A. Programs.
2  Q. How about any of the other speeches you
3  have given to them, what have you
4  discussed in those speeches?
5  A. They are all in the same general area of
6  speaking to areas that they are concerned
7  with in terms of their goals and
8  objectives as an organization.
9  Q. Can you give me some of those areas of
10  concern?
11  A. I just don't recall my discussion.
12  Q. Did you say you gave one last week, was
13  it?
14  A. No, I didn't. I said in October.
15  Q. Okay. I'm sorry. Is there a transcript
16  of your remarks before them available
17  anywhere?
18  A. No.
19  Q. Do you have copies of the speeches you
20  gave to them?
21  A. Extemporaneously.
22  Q. Okay. Do you know if there are any
23  records made of those remarks?
24  A. Not that I'm aware of.

Page 100

1  Q. Do you know if they are videotaped at
2  all?
3  A. I know that there are photos of me
4  speaking to them and being with their
5  leadership; and I'm in their last
6  newsletter that was just published a week
7  ago.
8  Q. Okay. Do you recall when you first
9  became aware that Nancy O'Loughlin had
10  filed a charge of discrimination against
11  you?
12  A. Say the beginning again.
13  Q. Do you recall when you first became aware
14  that Nancy O'Loughlin had filed a charge
15  of discrimination against you?
16  A. No.
17  Q. Do you recall becoming aware of it?
18  A. Yes.
19  Q. What do you remember about that?
20  A. I believe initially it was the MCAD
21  complaint and/or a complaint internal to
22  the MBTA's Office of Civil Rights.
23  Q. Well, do you remember seeing the MCAD
24  charge filed by Lieutenant O'Loughlin?

**Page 101**

1  A. Yes.
2  Q. I understand you don't recall the date
3     when you first saw that. Do you recall
4     how that came into your possession?
5  A. In the general course of business of the
6     MCAD and a complaint being processed, a
7     copy was sent to me through mail or
8     delivered to the office. I'm not
9     certain. I don't recall when or how it
10    was telegraphed to me.
11 Q. Do you recall if it was mailed to you by
12    the MCAD or if counsel or other officials
13    of the MBTA presented it to you?
14 A. Don't recall.
15 Q. Do you recall going over the charge and
16    reading it?
17 A. As I testified, I recall reading the
18    document.
19 Q. Do you recall being aware of the fact
20    that you were named as an individual
21    defendant in the MCAD charge?
22 A. Yes.
23 Q. What did you think about that?
24 A. I thought it was ludicrous.

**Page 102**

1  Q. Did it get you angry at all?
2  A. No.
3  Q. You weren't pleased by it?
4  A. No one is pleased to be sued.
5  Q. Were you pleased by it -- again, just to
6     differentiate, sir, I'm talking about the
7     MCAD charge and not the lawsuit.
8  A. The MCAD charge I read; and, again, like
9     any normal person, I'm not pleased to be
10    sued or to be charged with anything.
11 Q. I understand that.
12 A. Okay.
13 Q. But you recall there was a point where
14    the lawsuit was served at your home in
15    Oaks Bluff?
16 A. I do recall that, yes.
17 Q. Okay. What we are talking about now, the
18    MCAD charge, is before that, correct?
19 A. I don't recall the period of time,
20    getting the MCAD complaint, or this
21    Complaint, if this was the one that was
22    delivered at Oaks Bluff.
23 Q. Well, I will represent to you that the
24    original Court Complaint is what was

**Page 103**

1     delivered to you in Oaks Bluff.
2  A. Of this Complaint? (Indicating.)
3  Q. Yes.
4  A. Okay.
5  Q. If I remember your testimony earlier
6     today, that MCAD charge would have been
7     the first time you were named
8     individually in a charge of
9     discrimination, correct?
10 A. The first time that I have been named in
11    an MCAD complaint, yes.
12 Q. From what you said, I think it's the only
13    time you have been named in an MCAD
14    charge; is that correct?
15 A. That's what I said.
16 Q. And you weren't angry at Nancy O'Loughlin
17    for naming you in that charge?
18 A. No.
19 Q. Why not?
20       MR. EDWARDS: Objection. You
21    can answer.
22 A. Again, it's part of being a chief.
23 Q. You don't have any problem with inferior
24    officers filing charges of discrimination

**Page 104**

1     against you?
2        MR. EDWARDS: Objection.
3  A. It has only happened once. Again, I have
4     no pattern or anything else to base it
5     on, officers, in the plural sense, as you
6     have presented it. Again, I have been
7     accused of a lot of things in public,
8     internally. It goes with the position.
9        MR. EDWARDS: Mitchell, can we
10    have five minutes?
11       MR. NOTIS: Yes.
12       (Exhibit 2, marked for
13    identification.)
14       CONTINUING DIRECT EXAMINATION
15    BY MR. NOTIS:
16 Q. Back on the record.
17 A. If we are back on, I just want to correct
18    the record concerning MCAD complaints.
19    There are two fresh complaints of
20    discrimination by me as the Chief in a
21    promotional matter, two people that were
22    not selected for sergeant.
23 Q. Do those complaints involve sex or gender
24    at all?

Page 105

1  A. No.
2  Q. Okay. Any other way you need to correct
3     your prior answers after conferring with
4     counsel?
5        MR. EDWARDS: Objection.
6  Q. Any other ways you want to correct your
7     testimony?
8  A. No, just that there are fresh MCAD
9     complaints. I believe I said that there
10    are none.
11 Q. Okay. Understood. You testified a
12    little while ago about receiving that
13    MCAD charge. Do you have any
14    recollection as to the month in which you
15    received it, sir?
16 A. I said I don't remember the time frame.
17    That's what I testified to.
18 Q. You don't remember it at all?
19 A. No.
20 Q. Okay.
21 A. Just like earlier I thought something was
22    in '04, and it was in '03. Without
23    refreshing my memory, no.
24 Q. Let me ask you this, Chief: Do you

Page 106

1     recall that Nancy O'Loughlin was assigned
2     to duty at home in March of 2004?
3     Actually, don't answer that yet, sir.
4     Let me just make sure I'm correct.
5        (Pause.)
6  Q. Yes, that she was assigned to duty at
7     home in March of 2004?
8  A. That sounds generally correct.
9  Q. Okay. Do you have any recollection of
10    how long before her reassignment to duty
11    at home you became aware of her MCAD
12    charge?
13 A. I think it was after that point, I
14    believe. I'm not certain of the time
15    frame. Again, I'm not certain of the
16    time frame.
17 Q. All right. Well, let's take a look now
18    at Paragraph 24 of the Complaint, Exhibit
19    1.
20       That says, sir, first sentence,
21    "On the same day that the Answer to her
22    Charge of Discrimination was filed by the
23    MBTA and Chief Carter, March 8, 2004,
24    Lieutenant O'Loughlin was relieved of

Page 107

1     duty with pay and assigned to duty at her
2     home."
3        Do you have any reason to
4     believe that isn't correct?
5        MR. EDWARDS: Objection.
6  A. Not correct.
7  Q. It's not correct?
8  A. I don't know that it's correct. I do not
9     recall receiving a complaint on the same
10    day that I did that.
11 Q. Okay. Well, that's actually not what
12    that says.
13       Take a look at Exhibit 2, sir,
14    the document that was given to you a
15    moment ago. Why don't you take a moment
16    to look through that. You might also
17    want to direct your attention to the page
18    that's six pages in.
19       (Pause.)
20 A. Okay.
21 Q. That page six pages in, is that an
22    affirmation containing your signature?
23 A. Absolutely.
24 Q. That is your signature?

Page 108

1  A. Yes.
2  Q. Okay. And it says under your signature,
3     "Signed and sworn under the pains and
4     penalties of perjury this 4th day of
5     March, '04," correct?
6  A. Okay.
7  Q. You have no reason to doubt that was the
8     date you signed this, right?
9  A. True.
10 Q. And if Sharon April, Notary Public, put
11    that down here, you don't doubt that was
12    the correct date?
13 A. Correct.
14 Q. And that's someone who works in your
15    office?
16 A. Yes.
17 Q. What is it you are swearing to, in a
18    general way?
19 A. This Answer to her Complaint.
20 Q. Okay. Fine. Do you recall how much time
21    went by between when you first saw her
22    Complaint and when you signed your name
23    to this document?
24 A. I don't recall.

Page 129

1  than one day. The hearing officer
2  rendered a written decision based on the
3  evidence that was presented. I reviewed
4  the hearing officer's report, the
5  evidence that was submitted to support
6  that decision, and I made a decision to
7  discipline a number of people.
8  Q. Okay.
9  A. Did I answer the question?
10 Q. That's what I was looking for. Just so
11    I'm clear, in the hearing officer's
12    decision, the hearing officer found
13    facts, if I'm correct, but did not
14    recommend any particular discipline,
15    correct?
16 A. He recommended -- yes, a finding as to
17    the standard of proof in the charges that
18    were before him for the individual
19    officers, yes, but did not recommend what
20    the discipline should be.
21 Q. And in terms of Lieutenant O'Loughlin,
22    you were the one who decided on her
23    discipline?
24 A. Yes.

Page 130

1  Q. Did you do that in consultation with
2     anyone else?
3  A. What I can say is that I did have a
4     discussion with the deputies on my
5     decision, but I didn't consult them for
6     their approval or disapproval.
7  Q. At that point in time, sir, had you made
8     your decision, when you consulted with
9     them -- strike that.
10        Was your consultation with them
11    to inform them of your decision?
12 A. Yes.
13 Q. So you had made the decision when you
14    talked to them about it?
15 A. Yes.
16 Q. Just so we are clear, if you could --
17    just so I'm clear, who are the other
18    officers involved in this investigation
19    who were placed on administrative leave?
20 A. Oh, my God. Flemming -- do you have them
21    all there?
22 Q. Well, I have some documents.
23 A. McKay, Jordan. I'm sorry to use last
24    names.

Page 131

1  Q. That's all right.
2  A. Jordan. Oh, my God. Jordan, McKay,
3     Flemming, O'Loughlin, Hennessey, and
4     Sergeant Douglas, Floyd. That's it.
5  Q. So that's Floyd, Douglas, Hennessey,
6     O'Loughlin, McKay, Flemming and Jordan,
7     correct?
8  A. Yes. Again, I would have to review my
9     reports or the reports. This really
10    doesn't tell me what I want to say, so
11    can I say it?
12 Q. Yes, sure.
13 A. I don't believe the sergeant there --
14 Q. Douglas?
15 A. Yes, was placed on administrative leave.
16    I don't think he was placed on
17    administrative leave.
18 Q. Okay. Of these people, was everyone,
19    other than Douglas, placed on
20    administrative leave?
21 A. I believe so.
22 Q. Why was Douglas not placed on
23    administrative leave?
24 A. Because I believe very early on -- I

Page 132

1  recall when he was confronted with the
2  charges that were alleged against him, he
3  immediately admitted to them, wanted to
4  offer an apology, was embarrassed, was of
5  the utmost candor and integrity and
6  stepped up to the plate, and said, you
7  know, "I don't want to lose my job."
8  That's what I recall around him. With
9  the union, we agreed on -- they agreed to
10 accept the discipline that I handed out
11 to him.
12 Q. What was the discipline for Douglas?
13 A. He received a written reprimand.
14 Q. Okay. And, eventually, what was Floyd's
15    discipline?
16 A. I would have to -- I know I just flipped
17    through it. I don't recall
18    specifically.
19        Yes, Douglas --
20 Q. Hold off for a second, Chief.
21        (Pause.)
22 Q. I think you were answering something,
23    sir?
24 A. Yes. Floyd received a six-month

**Page 145**

1  possible that someone could act out.
2  It's not unusual, whether it's private
3  enterprise or whether it's the police
4  department. In my experience, in Boston,
5  if there is a potential that somebody
6  could go "postal," or perhaps be
7  assaultive as a result of being told that
8  they were taking their weapon and their
9  badge, that there is security provided.
10 I, using my experience, thought that this
11 was a situation, given the number of
12 people, given again the nature of the
13 charges that were being alleged against
14 them, that, again, I would ensure the
15 security of the civilians, in particular,
16 to make sure that we had police security,
17 in case there was an incident.
18 Q. I'm going to ask you about that in a
19 moment.
20      By the way, there were never
21 any criminal charges against Nancy
22 O'Loughlin in relation to any of this,
23 was there?
24 A. There were no criminal charges against

**Page 146**

1  Nancy, correct.
2  Q. Was there ever any possibility of any
3  criminal charges against Nancy due to
4  this?
5     MR. EDWARDS: Objection.
6  Q. In your opinion?
7     MR. EDWARDS: Can we have a
8  time period?
9  A. On March 8th, I don't know. It was still
10 an active investigation.
11 Q. You are saying you didn't know what would
12 come of it?
13 A. It was an active investigation. Yes, I
14 didn't know.
15 Q. Well, at the time you placed her on
16 administrative leave, is there any
17 conduct you knew her to have engaged in
18 which could have been criminal?
19 A. What I did know at the time was there
20 were at least two people that were
21 alleged to have violated the law and
22 specifically the CORI law.
23 Q. Understood. But at the time you placed
24 Nancy O'Loughlin on administrative leave,

**Page 147**

1  was there anything that you knew about
2  the situation that would have indicated
3  she might be subject to criminal charges?
4  A. At the time, I didn't know one way or the
5  other. Again, I didn't know.
6  Q. But you had no reason to believe there
7  was anything she had done which would
8  subject her to criminal liability,
9  correct?
10 A. Don't know. At the time, I didn't know.
11 Q. Is there anything you knew about the
12 conduct she had engaged in at the time
13 which gave you reason to think there was
14 any possibility she would be subject to
15 criminal charges?
16    MR. EDWARDS: Objection.
17 Q. Is there anything you knew which would
18 give you reason to believe that she could
19 be subjected to criminal charges?
20 A. No.
21 Q. Okay. Let's go back to the issue of the
22 SOT officers. Prior to placing these --
23 strike that. Was Hennessey -- I'm
24 sorry. Douglas was never placed on

**Page 148**

1  administrative leave, right? You said
2  that before.
3  A. Don't recall.
4  Q. I think you said that he and the union
5  agreed on discipline?
6  A. On Sergeant Douglas. You might be
7  confusing these names. You have me
8  confused right now. I thought it was
9  Douglas.
10 Q. That's what I meant, sir, Douglas.
11 A. But you said Hennessey.
12 Q. My apologies. Was Douglas ever placed on
13 administrative leave?
14 A. No.
15 Q. Was he brought into these meetings with
16 the deputy chiefs?
17 A. He was brought into a meeting with his
18 deputy, as a minimum, absolutely.
19 Q. Understood. So he was also brought into
20 a meeting while the SOT officers were
21 present?
22 A. I don't recall when he was confronted.
23 Q. Okay. Do you recall the order in which
24 people were confronted?