# EXCERPTS FROM DEPOSITION OF MACDONALD DANIEL

Page 1

```
 1                                      VOLUME I
                                        PAGES 1 - 71
 2                                      EXHIBITS: 1-3
 3                  UNITED STATES DISTRICT
             FOR THE DISTRICT OF MASSACHUSETTS
 4
                         C.A. NO. 04-10933-JLT
 5
 6   NANCY O'LOUGHLIN,                   )
           Plaintiff,                    )
 7                                       )
     vs.                                 )
 8                                       )
     MASSACHUSETTS BAY                    )
 9   TRANSPORTATION AUTHORITY and        )
     JOSEPH CARTER and MICHAEL           )
10   MULHERN,                            )
           Defendants.                   )
11
12
13       DEPOSITION OF MACDONALD DANIEL, taken on
14   behalf of the Defendant, Michael Mulhern,
15   pursuant to the Federal Rules of Civil
16   Procedure before Tina M. Sarcia, Registered
17   Professional Reporter and Notary Public
18   within and for the Commonwealth of
19   Massachusetts, at the law offices of Wilmer,
20   Cutler, Pickering, Hale and Dorr, LLP, 60
21   State Street, Boston, Massachusetts, on
22   Friday, January 20, 2006, commencing at 2:06
23   p.m.
24
```

COPY

Page 12

```
 1        you?

 2   A.   Again, I'm sorry.  I can't recall the

 3        specifics, but the general tone was that -- I

 4        think I was calling just simply to kind of

 5        confirm what was in The Herald, and Mulhern

 6        and Pesaturo were saying that the

 7        investigation involved more than just Where's

 8        Waldo's incident, and that it involved

 9        allegations over misuse of the department's

10        CORI system, and so they were letting me know

11        that it was -- that it involved these

12        incidents.

13   Q.   Were both Mr. Pesaturo and Mulhern on the

14        phone with you during the entire

15        conversation?

16   A.   Maybe off and on.  They might have switched

17        phones.  Typically they put you on

18        speakerphone, but I don't recall.

19   Q.   Do you know if anyone else was on the

20        conversation?

21   A.   Not that I'm aware of.  I usually ask if

22        there is anybody else in the room if they put

23        me on speakerphone.

24   Q.   You testified this occurred in March of 2004,
```

1      you think?

2   A.  Correct.

3   Q.  Do you know about how many days before this

4       article came out this conversation took

5       place?

6   A.  It would have been the day before.  It would

7       have been on the 10th prompted by the article

8       in The Herald that came out on the 10th.

9   Q.  Did Mulhern tell you that the investigation

10      had nothing to do with Where's Waldo?

11  A.  Yes.  He told me that those were the initial

12      reports, or he said it was more serious than

13      that.

14  Q.  Did Mr. Mulhern mention Nancy O'Loughlin's

15      name during that conversation?

16  A.  Mike Mulhern, I had been talking to other

17      sources that day and used the opportunity to

18      ask Mulhern to confirm whether Nancy

19      O'Loughlin was one of the people involved,

20      and he -- I can't recall exactly what he

21      said, but I think he more or less said that

22      he couldn't neither confirm nor deny that

23      O'Loughlin was involved.  My recollection of

24      the conversation is hazy.  I don't know the

Page 16

1    Q.   This is the only on-the-record information

2         that Mr. Mulhern provided you that was used

3         in the article?

4    A.   Yes.

5    Q.   And based on your earlier testimony, is it

6         true that the only off-the-record information

7         he provided you was that he wouldn't confirm

8         or deny whether Nancy O'Loughlin was involved

9         and that the investigation involved more than

10        just Where's Waldo?

11   A.   Right.  But the -- yes, that's correct.

12   Q.   So the first paragraph, "Three MBTA police

13        officers were suspended after an

14        investigation showed they were illegally

15        checking background records to either dig up

16        dirt on colleagues or track down addresses

17        and phone numbers of attractive women who

18        caught the eye of male officers, an agency

19        official and two others who were briefed on

20        the investigation said yesterday".

21             Is Mr. Mulhern the agency official

22        or one of the two others that are referenced

23        in that paragraph?

24   A.   Mulhern is the agency official.

1      the MBTA authority officials referenced in

2      that sentence?

3    A.  No, because that sentence refers to

4      statements made by Pesaturo on the record

5      about this -- about -- the quote is basically

6      down below where it says, "There is an

7      ongoing internal investigation that concerns

8      egregious violations of the department's

9      policies, rules and regulations as well as

10     allegations of criminal conduct."

11            And it says officials there, and I

12     think that was my fault.  I think I should

13     have been more specific in going over this,

14     but it's not more than one MBTA official.

15     I'm simply trying to summarize what Pesaturo

16     said down below up higher in the story and

17     used officials in kind of plural as opposed

18     to the singular.  I probably should have used

19     the singular.

20    Q.  Turning to the next sentence, "MBTA officials

21     would not release the names or ranks of the

22     four who were suspended with pay this week".

23            Is it true that Mr. Mulhern would

24     not release to you the names or ranks of the

1   A.   No.   Mulhern is the official.   I'm using his

2        -- yes, he is the official I'm referring to

3        in that paragraph based on -- I recall --

4        thinking back -- I've tried to think about

5        this.   I believe he is -- I can't say with a

6        lot of certainty, so I'm hesitant.   I don't

7        know.

8   Q.   Before you testified that Mulhern didn't give

9        you the names of anybody.   All he would say

10       in response to your questions when you would

11       give him names is that he couldn't confirm or

12       deny and that included Nancy O'Loughlin.

13       That was your testimony before.

14            So I'm just trying to confirm or

15       find out if that testimony would be the same

16       as to this sentence because that would seem

17       to contradict what you had said earlier?

18  A.   I should probably go back to what I said

19       earlier then.   If I recall, I believe that

20       beyond the statement of -- Mulhern is the

21       agency official who confirmed that Nancy

22       O'Loughlin was involved in this case.   He did

23       say that he could neither confirm nor deny,

24       but I believe that was in a response to an

Page 22

1     on-the-record statement which I didn't end up

2     using.

3               He didn't though say that she --

4     that the probe could lead to criminal

5     charges.  That's based on Pesaturo's quote

6     down below as we talked about before.  You

7     have to forgive me.  It's been a long time,

8     and I've written a lot of pieces between this

9     one and the present day.

10  Q.  So to the best of your understanding then,

11    Mr. Mulhern never said to you that this probe

12    could lead to criminal charges?

13  A.  That's correct.

14  Q.  However, you think he did or may have said

15    that Nancy O'Loughlin was one of the four who

16    were suspended; is that correct?

17  A.  He's the agency official referred to in the

18    lead.

19  Q.  Referred to in the lead.  Does that mean the

20    first paragraph?

21  A.  The first paragraph.

22  Q.  Is he also the agency official referred to in

23    the fifth paragraph where it says, "But

24    speaking on condition of anonymity"?

Page 29

```
 1        criminal nature and could lead to criminal

 2        charges against her, not like the falsely led

 3        the Boston Globe reporter.

 4                  MR. REISER:  Nothing further at this

 5        time.

 6                  EXAMINATION BY MR. NOTIS

 7   Q.   Mr. Daniel, my name Mitchell Notis, and I

 8        represent Nancy O'Loughlin in this

 9        litigation.  How do you do?

10   A.   Very well.

11   Q.   Let me ask you, sir, in the conversation you

12        had with Mike Mulhern, did Mr. Mulhern say to

13        you that Nancy O'Loughlin was absolutely not

14        involved in any allegations of criminal

15        misconduct?

16   A.   I can't recall.  I mean, that specific

17        wording?

18   Q.   Did he -- do you recall that specific

19        wording?

20   A.   No.

21   Q.   Did he say anything to that effect?

22   A.   I really can't recall.  I can't recall the

23        specifics of the conversation.

24   Q.   I think you just mentioned that he didn't say
```

```
 1        anything to you about her being involved in
 2        criminal conduct, right?
 3    A.  No.  I think the word criminal never -- as I
 4        recall, it never came up.  All I was asking
 5        him for was to confirm with Nancy
 6        O'Loughlin's name.
 7    Q.  So if the word "criminal" never came up, he
 8        never said to you that she was absolutely
 9        never involved.  She wouldn't be involved in
10        criminal conduct due to this?
11             MR. EDWARDS:  Objection.  You can
12        answer.
13    A.  I can't recall.  I don't recall that
14        statement being made.
15    Q.  Do you recall anything about her being
16        involved in criminal misconduct being said?
17    A.  No, I don't recall.  I don't believe so.
18    Q.  Do you recall Mr. Mulhern saying that Nancy
19        O'Loughlin had nothing to do with the
20        so-called CORI violations?
21    A.  I don't think we spoke about that, no.
22    Q.  Did you -- during this conversation did you
23        indicate to Mr. Mulhern that you were going
24        to include Nancy O'Loughlin in your story,
```

1      and you were also going to include the fact

2      that she could be facing potential criminal

3      charges?

4   A. I think -- I can't recall what I asked him,

5      so I don't know.  I was coming to Mike

6      Mulhern to confirm Nancy O'Loughlin's

7      involvement.  I can't recall the specifics.

8   Q. So you don't recall then if you indicated to

9      him that you were going to say she might be

10     found criminally responsible?

11  A. I can't.

12  Q. Again, if you don't recall him saying to you

13     that that was misinformation or that was

14     absolutely not true?

15  A. No, I don't.  No.  Based on what I know, I

16     don't think that would -- I can't recall.

17     Based on what I reported, if he did say that,

18     I wouldn't have written the things I wrote.

19  Q. Why is that?

20  A. Because if it was a denial on his part, then

21     I wouldn't have -- read that section to me

22     again, please.

23  Q. Well, what my question to you was again, if

24     you indicated to Mr. Mulhern you were going

```
 1            to include in your story that Nancy
 2            O'Loughlin could be facing potential criminal
 3            charges and if in response he said to you
 4            that was absolutely not true and you had
 5            misinformation --
 6       A.   I don't recall that.
 7       Q.   If he had said that to you or something like
 8            it, would you have written in your story that
 9            the probe could lead to criminal charges
10            against the four?
11       A.   I don't believe I would have, but I don't
12            recall that statement being made.
13       Q.   Let me ask you this:  Did Mr. Mulhern warn
14            you not to go down that road because nothing
15            could be further from the truth?
16                  MR. EDWARDS:  Objection.
17       A.   I don't recall about wording.
18       Q.   Did he say anything to that effect?
19       A.   I don't recall.  I really can't.  I wouldn't
20            have written -- I don't believe I would have
21            written what I wrote had words to that effect
22            been said to me by someone like Mulhern.
23       Q.   Do you recall having the impression that
24            Mr. Mulhern was trying to dissuade you from
```

Page 33

```
 1        writing in your story that Nancy O'Loughlin

 2        could be found criminally responsible?

 3   A.   I don't remember that.

 4   Q.   And the next day after the story ran, did you

 5        call Mr. Mulhern up and call him some name

 6        like an asshole?

 7   A.   No.

 8   Q.   You never did that?

 9   A.   No.

10   Q.   Did you tell him that the sources you'd been

11        given said that Mr. Mulhern completely misled

12        you?

13   A.   No.

14   Q.   And did he say to you the day after your

15        first conversation or the day after that

16        story ran, Mac, it's absolutely not true?  I

17        gave you accurate information.  It had

18        nothing to do with Where's Waldo.  Did he

19        ever say that to you?

20   A.   I don't recall, sir.

21   Q.   And, indeed, do you recall ever having any

22        such second conversation with Mulhern?

23   A.   Not to my recollection.

24   Q.   Now, when you say that the information about
```

- 14

Page 34

```
 1        this possibly leading to criminal charges,

 2        you got that from Pesaturo.  When would you

 3        get that information from Pesaturo?

 4   A.   That was on the first day.  That would have

 5        been on the 10th.

 6   Q.   The same day you spoke with --

 7   A.   The same day I spoke with Mulhern.  I don't

 8        know when I got it.  I don't know whether he

 9        said Pesaturo had given me that quote prior

10        to speaking to Mulhern or afterwards.

11   Q.   I think what you said initially was -- let me

12        read my notes here.  I don't want to

13        misphrase your testimony.  I think you said

14        something about they may have been on a

15        speakerphone.  Pesaturo may have been on and

16        off the phone during your conversations with

17        Mulhern; is that correct?

18   A.   Yes.  More than likely -- this wasn't just

19        one conversation once in the day.  More than

20        likely it was several conversations with

21        Pesaturo mainly during the day to try to set

22        something up, and typically we'd get the

23        general manager on the speakerphone later in

24        the day but just once and that would be it.
```

Page 41

1      record; is that true?

2  A.  Yes.  As best as I can recall, that's the

3      case.

4  Q.  Prior to that conversation with Mulhern, you

5      had spoken to him before, correct?

6  A.  Yes.

7  Q.  Do you know how many times you had spoken to

8      him before?

9  A.  Numerous.  I couldn't say.

10 Q.  At that point in time, March 10, 2004, when

11     Michael Mulhern would say to you I can

12     neither confirm nor deny a certain fact, did

13     that mean anything to you?

14 A.  Any time anybody says something like that to

15     me as a reporter, it's an indication that I'm

16     on the right track.  That the information is

17     -- that it's not a denial and not a

18     confirmation neither, so it's better than

19     just a firm denial.

20 Q.  Doesn't it mean that the information is true

21     but they can't acknowledge that to you?

22          MR. EDWARDS:  Objection.

23 A.  To some degree.

24 Q.  Is that what you understood Mr. Mulhern said

Page 65

```
 1        O'Loughlin's name, did he actually give you

 2        the name or was that just his confirming when

 3        you brought the name up?

 4   A.   Confirming it.

 5   Q.   So that -- what you just testified to, that's

 6        your best memory of what Mr. Mulhern provided

 7        -- the information he provided you with that

 8        was subsequently used in this article?

 9   A.   Yes.

10             MR. REISER:  Nothing else.  Thank

11        you.

12             EXAMINATION BY MR. NOTIS

13   Q.   Briefly, if you look at paragraph 6 it says

14        there, "In several of the cases, officers

15        performed the checks while being recorded by

16        the police department's emergency dispatch

17        system, according to the three familiar with

18        the investigation".

19             Does that mean Mulhern said that to

20        you as well?

21   A.   I don't recall Mr. Mulhern giving me

22        specifics about the case.  I'm pretty sure

23        that came from the union officials.

24   Q.   So then the attribution of the quote is
```

Page 66

1       somewhat inaccurate; is that correct?

2   A.  If I'm saying three and I'm including Mulhern

3       there, although I don't -- the three

4       obviously in some way refers the original

5       three that I quote in the lead graph, then

6       that would be inaccurate.

7   Q.  At the time that you had the conversation

8       with Mulhern, did he know that Pesaturo had

9       indicated to you that there were allegations

10      of criminal conduct?

11  A.  I don't know.

12              MR. EDWARDS:  I object.  You can

13      answer.

14  A.  I can't recall when Pesaturo gave me that

15      quote.

16  Q.  You don't know if Mulhern was present when he

17      gave that, do you?

18  A.  I can't say.  I don't know.

19  Q.  Or on the phone?

20  A.  It might have been via e-mail.  I don't know.

21  Q.  Have you ever spoken to Chief Carter about

22      any of this?

23  A.  I think I tried to reach him for this piece.

24      I don't believe we connected or else he