# EXCERPTS FROM DEPOSITION OF MICHAEL MULHERN

```
                    Volume:  I
                    Pages: 1 to 102
                    Exhibits:  See Index

     UNITED STATES DISTRICT COURT
      DISTRICT OF MASSACHUSETTS
              C.A. No. 04-10933-JLT
```

NANCY O'LOUGHLIN,                       )
            Plaintiff                   )
                                        )
                                        )
        vs.                             )
                                        )
                                        )
MASSACHUSETTS BAY TRANSPORTATION        )
AUTHORITY, JOSEPH CARTER AND            )
MICHAEL MULHERN,                        )
            Defendants                  )

DEPOSITION of MICHAEL H. MULHERN,
a witness called on behalf of the
Plaintiff, pursuant to the applicable
provisions of the Federal Rules of
Civil Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth
of Massachusetts, at the Office of
Hale & Dorr, 60 State Street, Boston,
Massachusetts 02109, on Thursday, August
4, 2005, commencing at 12:00 p.m.

\* \* \* \*

EYAL COURT REPORTING, INC.
4 Fanueil Hall Marketplace
South Market Building- 4th Floor
Boston, Massachusetts 02109
(617) 964-4317

| | |
|---|---|
| 1  Q. And are you currently employed, sir?<br>2  A. Yes.<br>3  Q. And where are you employed?<br>4  A. Jacob's Engineering.<br>5  Q. How long have you worked for Jacob's<br>6     Engineering?<br>7  A. Since June 1st, 2005.<br>8  Q. What do you do for them, sir?<br>9  A. I'm vice-president national transit<br>10    principal.<br>11 Q. And, just briefly, what are your duties<br>12    as vice-president?<br>13 A. To organize a national and international<br>14    transit practice within the engineering<br>15    firm to work with the regional directors<br>16    to identify resources of both facilities<br>17    and people to pursue large transit<br>18    projects throughout the country.<br>19 Q. Is your office in Massachusetts?<br>20 A. Yes.<br>21 Q. And where is it?<br>22 A. Two Center Plaza, Boston.<br>23 Q. Can you briefly tell me your educational<br>24    background, Mr. Mulhern?<br>Page 6 | 1     in 1985 I was promoted into management as<br>2     a transportation construction project<br>3     coordinator. I did that until February<br>4     of 1989.<br>5         I took over the Red Line<br>6     district supervisor's position in<br>7     1989 through 1993, chief of Red Line<br>8     operations through 1995. In 1995 I<br>9     was promoted to director of subway<br>10    operations. And in 1997 I was promoted<br>11    to chief operating officer. And in 2000<br>12    I was promoted to deputy general manager,<br>13    and in 2001 to general manager. November<br>14    of 2001 I was acting general manager,<br>15    and then I was sworn in by the board<br>16    in February of 2002 as permanent general<br>17    manager.<br>18 Q. When did you leave the MBTA, sir?<br>19 A. May 13th.<br>20 Q. Of this year?<br>21 A. Yeah.<br>22 Q. So, in either an acting or permanent role<br>23    you were general manager of the MBTA from<br>24    2001 through May '05?<br>Page 8 |
| 1  A. I have two undergraduate degrees,<br>2     associate's in civil engineering from<br>3     Wentworth Institute of Technology, a<br>4     bachelor's of science in construction<br>5     management from Wentworth Institute of<br>6     Technology and a master's in public<br>7     administration from Suffolk University.<br>8  Q. Have you ever been convicted of any<br>9     felony, sir?<br>10 A. No.<br>11 Q. And, again, just briefly, can you give<br>12    me an employment history, sir?<br>13 A. I joined the MBTA as a track laborer<br>14    in 1979. Prior to that I worked various<br>15    jobs as a kid, you know, for construction<br>16    laborer, that sort of thing, different<br>17    building contractors, roadway<br>18    contractors. I transferred from the<br>19    track division to the operations<br>20    division. I worked in various operating<br>21    capacities from a bus driver to Orange<br>22    Line platform official or Orange Line<br>23    motor person. Eventually worked as an<br>24    operations control center dispatcher, and<br>Page 7 | 1  A. Yes.<br>2  Q. And can you tell me, briefly, your<br>3     duties as general manager for the MBTA?<br>4  A. I had responsibility to manage the<br>5     administrative units within the<br>6     organization through a collection<br>7     of assistant general managers. I<br>8     had overall responsibility in final<br>9     sign-off on the budget preparation,<br>10    the operating plans for the agency<br>11    from one year to the next as well<br>12    as the identification and assembly of<br>13    resources for the organization to carry<br>14    out its mission, whether it was personnel<br>15    funding or contract services. And I<br>16    did that through approximately 15 direct<br>17    reports. I was responsible to align<br>18    the organization's agenda with the<br>19    board of directors and the secretary of<br>20    transportation.<br>21 Q. Now, unless I tell you otherwise, my<br>22    questions are directed to your role<br>23    as general manager of the MBTA.<br>24 A. Okay.<br>Page 9 |

1  Q. As general manager did the general
2     counsel of the MBTA report directly
3     to you?
4  A. Yes.
5  Q. And as general manager did the chief
6     of the MBTA Police Department report
7     directly to you?
8  A. Yes.
9  Q. And as general manager, how was it --
10    you reported to the board, I take it?
11 A. Yes.
12 Q. And how did that reporting relationship
13    work?
14 A. For the most part the interaction with
15    the board took place at formal board
16    meetings, monthly board meetings,
17    although there was an awful lot of
18    informal interaction that would take
19    place between various board members
20    from one week to the next. It would
21    often depend on what the upcoming
22    board agenda was, but the board's
23    responsibility was primarily to approve
24    any expenditures over a half a million

Page 10

1     dollars. Aside from that, the board
2     granted me wide latitude and authority
3     to manage the organization within my
4     contract.
5  Q. Would you have periodic management
6     meetings that you would conduct?
7  A. Yes.
8  Q. And what types of periodic management
9     meetings would you conduct?
10 A. They would range from staff meetings
11    sometimes more frequent than not, never
12    more than weekly. We'd have intermittent
13    meetings with my direct reports on an
14    as-needed basis. And when issues arose,
15    I dealt with my managers directly in the
16    context of resolving or addressing those
17    issues.
18 Q. And would you be informed of litigation
19    in which the MBTA was a defendant on a
20    regular basis?
21        MR. LUKEY: Objection. You may
22    answer.
23 A. It depends on what you term regular.
24    I certainly was kept abreast of

Page 11

1     litigation. Not all litigation was not
2     required. If it was significant exposure
3     or required a timely response from me,
4     I certainly would be notified by the
5     general counsel, but the vast majority
6     of litigation took place below my radar
7     screen at the agency.
8  Q. Just so I understand your testimony,
9     you're saying, then, that there was
10    litigation in which the MBTA was
11    involved, which might not even
12    pass over your desk in any form?
13 A. Probably most of it, yeah.
14 Q. And I take it that --
15 A. Until such time it was resolved, and
16    required a signature on my behalf.
17 Q. And you're familiar with a Massachusetts
18    Commission Against Discrimination?
19 A. I am.
20 Q. And when I use the term litigation,
21    I'm also talking about the cases filed
22    against the MBTA at the Commission
23    Against Discrimination?
24 A. Okay.

Page 12

1  Q. Would your answers be any different
2     then considering that?
3  A. No.
4  Q. I take it then that you wouldn't
5     necessarily be informed of all charges
6     in which the MBTA was made a defendant
7     at the Commission Against Discrimination?
8  A. That's correct. I would not be informed
9     of all charges.
10 Q. And would you be informed of all charges
11    of discrimination if one of your
12    department heads was named a defendant?
13 A. No.
14 Q. During the time you were manager, were
15    you informed of all MCAD charges where
16    the chief of the MBTA Police Department
17    was named as a defendant?
18 A. No.
19 Q. At the time of monthly board meetings
20    of the MBTA, was there a portion of the
21    meeting devoted to a litigation report?
22 A. Only to the extent that it would
23    require a board authorization to settle
24    litigation.

Page 13

**Page 38**

1  around the turn of the year.
2  Q. Early 2003 Chief Carter took over.
3  A. Early 2003, yeah.
4  Q. Do you recall prior to any discussions
5     about the taped conversations having any
6     conversations with Chief Carter about
7     Nancy O'Loughlin?
8  A. I don't recall.
9  Q. Again, you don't recall ever discussing
10    with Chief Carter Exhibit 1, Nancy
11    O'Loughlin's charge of discrimination?
12 A. I don't recall, no.
13 Q. Are you aware of the fact that in
14    February of 2003 Nancy O'Loughlin was
15    moved to the detective unit within the
16    MBTA police department?
17 A. Today I am aware that at some point Nancy
18    O'Loughlin was reassigned to a detective
19    unit.
20 Q. Do you recall when you first became aware
21    of that?
22 A. My recollection is I first became aware
23    of it during briefings with counsel.
24 Q. Again, I don't want to know about that.

**Page 39**

1     Let me rephrase that somewhat. Prior to
2     finding out that you were a defendant in
3     this lawsuit, did you have any knowledge
4     of Nancy O'Loughlin being moved to the
5     detective unit in February of '03?
6  A. I don't think so. There was a tremendous
7     amount of personnel movement in a
8     6000-person organization. I simply could
9     not keep up with all that movement. It
10    wouldn't be relevant to me. She is not
11    that important. I would have no way
12    of -- I wouldn't even know the
13    significance of her being assigned to
14    the detective unit. You had asked me
15    she was a detective before that. I
16    wouldn't know whether she was or she
17    wasn't.
18 Q. Just for the record then; so you don't
19    recall having any knowledge?
20 A. No. I don't know the significance of
21    the question. It doesn't mean anything
22    to me.
23 Q. Prior to the filing of this, knowing
24    that you were a defendant in this

**Page 40**

1     lawsuit, did you have any knowledge
2     of Nancy O'Loughlin being moved to the
3     detail unit in the MBTA police department
4     in August of '03?
5  A. I will tell you that I don't understand
6     how the department is organized, although
7     the senior below the senior levels,
8     I don't know the significance of one
9     assignment versus another. I certainly
10    don't have any recollection if it was --
11    you know, if somebody informed me of
12    such, it was certainly not significant
13    enough for me to remember. I don't have
14    any recall.
15 Q. That's all we're here to find out
16    today, sir. Prior to knowing you were
17    a defendant in this lawsuit, did you have
18    any knowledge of Nancy O'Loughlin being
19    suspended from her position in the MBTA
20    police department in March of '04?
21 A. My recollection is that there was an
22    investigation into police misconduct
23    within the department, internal police
24    misconduct, involving a collection of

**Page 41**

1     police officers and their behavior on
2     some taped lines. Some of it involved
3     Lieutenant O'Loughlin as well as another
4     lieutenant and subordinates. My
5     recollection is that investigation
6     resulted in discipline for up to six
7     people, including Nancy O'Loughlin,
8     but I don't recall the exact nature
9     of the discipline.
10 Q. And do you recall when you first became
11    aware of that investigation?
12 A. Yes.
13 Q. When was that?
14 A. I don't remember the exact time frame,
15    but I remember receiving a call from
16    the chief, or I may have met him, and
17    he may have shared it during one of our
18    breakfast meetings that we have from
19    time to time, but I do remember the
20    chief informing me of some egregious
21    conduct.
22 Q. Do you recall what he said to you?
23 A. He told me that there was pretty vile
24    conversations on taped lines within

| | |
|---|---|
| 1   the police department. That they were<br>2   conducting an investigation into it,<br>3   and he would keep me apprised of the<br>4   developments.<br>5  Q. And did he tell you which officers were<br>6      involved in these vile conversations?<br>7  A. I remember he -- the only two names I<br>8      remember -- well, the only two names I<br>9      remember are Flemming and O'Loughlin.<br>10     I think there was four other people<br>11     involved. Two of whom were accessing<br>12     the state CORI system, the system we<br>13     use to do background, the system law<br>14     enforcement agency does -- uses to do<br>15     background checks.<br>16 Q. He never informed you that Nancy<br>17     O'Loughlin had done that, did he?<br>18 A. No. I think he informed me otherwise.<br>19     I think I specifically asked, because<br>20     the part of the conversation that most<br>21     concerned me was when he told me that<br>22     some of the officers were involved in<br>23     potentially criminal misconduct.<br>24 Q. Did he explain to you how some of them<br>Page 42 | 1   about Nancy O'Loughlin was strictly<br>2   limited to administrative issues.<br>3   Questioned her ability to supervise, and<br>4   never rose to anything that would result<br>5   in criminal charges.<br>6  Q. And sitting here today do you have any<br>7      reason to believe that anything Nancy<br>8      O'Loughlin has done, while an employee of<br>9      the MBTA, could rise to criminal charges<br>10     against her?<br>11 A. No, I don't have any reason to think<br>12     that she was ever guilty of criminal<br>13     misconduct.<br>14 Q. Did you have any other meetings or<br>15     discussions with Chief Carter about<br>16     this taped conversation issue?<br>17 A. Yes.<br>18 Q. How many other conversations or meetings<br>19     with him did you have about it?<br>20 A. At least one more conversation. After<br>21     the investigation was complete, he<br>22     called, as he said he would, and let<br>23     me know that the investigation was<br>24     complete. He identified up to six<br>Page 44 |
| 1      could have been involved in criminal<br>2      misconduct?<br>3  A. Yes.<br>4  Q. And what did he say?<br>5  A. He explained to me how serious a<br>6      violation it is if somebody was to access<br>7      the CORI system, and use it for purposes<br>8      other than legitimate law enforcement<br>9      purposes. He told me it was a very<br>10     serious offense. Officers are required<br>11     to sign a document prior to being<br>12     authorized to have access to the system,<br>13     and they are held to a very high<br>14     standard. He told me that there had<br>15     been some serious compromises to those<br>16     standards.<br>17 Q. And did he indicate to you anything<br>18     about Ms. O'Loughlin having done that?<br>19 A. I believe I asked, and he expressly<br>20     told me no. That's my recollection.<br>21 Q. Did he indicate to you any other activity<br>22     that Nancy O'Loughlin had engaged in,<br>23     which might result in criminal charges?<br>24 A. My recollection is that any conversation<br>Page 43 | 1      people. Again, I don't recall who or<br>2      the exact number. He told me that he<br>3      was preparing to take disciplinary<br>4      action, and that would be in the context<br>5      of some formal proceedings that would<br>6      occur in the police department. He had<br>7      some -- he had a formal process that<br>8      I understood to be governed by civil<br>9      service procedures. And it was a very<br>10     formal process in which he brought the<br>11     officers in.<br>12         They all were given hearings, a<br>13     chance to testify on their own behalf. I<br>14     was advised of that procedure. Then once<br>15     that process was complete, I was advised<br>16     that the process was complete, and that<br>17     he would be taking disciplinary action.<br>18     It was over a time line as I recall.<br>19 Q. Did he discuss with you what discipline<br>20     he was proposing Nancy O'Loughlin be<br>21     subjected to?<br>22 A. I'm sure he did, but I can't recall today<br>23     what that discipline was.<br>24 Q. Did he at any point ask for your opinion<br>Page 45 |

**Page 46**

1  about that discipline?
2  A. No. I don't think he asked for my
3  opinion, but it was implicitly understood
4  if I had any issues, that was the time to
5  raise the issues.
6  Q. Was he seeking your approval on whether
7  the discipline should be carried out?
8       MS. LUKEY: Objection.
9  A. No, no, but I understood if I had an
10  issue with it, I could raise an objection
11  and I did not.
12  Q. You've mentioned two discussions with him
13  about this so far. Do you recall any
14  other discussions with Carter about this?
15  A. Well, I tried to modify my answer as
16  it went on. There was a conversation
17  initially about the investigation, and
18  then certainly about the process when
19  it took place, and then during the
20  conclusion of the process, prior to
21  issuing discipline. There was a
22  minimum of three conversations.
23  Q. Okay.
24  A. One, when the investigation began. Two,

**Page 47**

1  when the proceedings were about to take
2  place, and how they were going to take
3  place, and, three, prior to issuing the
4  discipline.
5  Q. During any conversations you had with
6  Carter about this, did he indicate that
7  Nancy O'Loughlin had discrimination
8  charges pending against the T?
9  A. I don't remember. I don't remember.
10  Q. During any of these conversations, did
11  you feel that Carter had any bias against
12  O'Loughlin or dislike of her?
13       MS. LUKEY: Objection.
14       MR. EDWARDS: Objection.
15  A. No.
16  Q. During any of these conversations, did
17  you have any reason to believe that
18  Carter was treating Nancy O'Loughlin
19  unfairly?
20  A. No.
21  Q. Did you have any role in the decision
22  to suspend Nancy O'Loughlin in March of
23  2004?
24  A. No.

**Page 48**

1  Q. Are you aware of the fact that Miss
2  O'Loughlin was demoted in September
3  of '04 from lieutenant to patrolman?
4  A. I recall she was demoted. I don't know
5  if she was demoted all the way down to
6  patrolman. I know Flemming was demoted
7  to patrolman. I don't recall whether
8  Nancy was or not. I know she was
9  demoted. Flemming had prior discipline.
10  Q. How many years did you work for the T,
11  sir?
12  A. Twenty-six.
13  Q. Based upon your 26 years working for the
14  T, and your role in team management, do
15  you have an opinion as to whether it was
16  out of the ordinary to demote an MBTA
17  police person more than one rank for
18  discipline?
19       MS. LUKEY: Objection.
20       MR. EDWARDS: Objection.
21  A. Do I have an opinion?
22  Q. Yes.
23  A. No.
24  Q. I'm sorry, did you have any role in the

**Page 49**

1  decision to demote Miss O'Loughlin?
2  A. No.
3  Q. Did you discuss that with Chief Carter
4  before it was accomplished?
5  A. I'm sure I did.
6  Q. What do you recall about that discussion?
7  A. As I stated earlier, the chief was very
8  respectful in terms of keeping me abreast
9  of the situation as it unfolded, and
10  he promised to let me know the outcome
11  of the proceedings, and what his final
12  decision would be. He advised me
13  accordingly.
14  Q. Just so we're clear, do you understand
15  that Miss O'Loughlin was suspended in
16  March of '04, and then demoted in
17  September of '04?
18       MS. LUKEY: Are you asking if
19  he knows that now?
20       MR. NOTIS: Yes.
21  A. I don't. I couldn't tell you. I
22  don't know what the facts -- as far as
23  the exact facts as it relates to her
24  discipline, I can't tell you.

### Page 58

1  file. And she had been making some
2  very unprofessional statements about
3  the department and the chief. And those
4  statements, if they weren't addressed
5  decisively, could lead to a corrosion of
6  his forward efforts and forward progress
7  in terms of bringing the department
8  along.
9      I can remember really calling
10 into question after that conversation
11 whether or not Lieutenant O'Loughlin
12 should be supervising people. Never
13 mind, you know -- taking the police
14 department out of the picture for a
15 moment, and just wondering what really --
16 having serious reservations about whether
17 or not she was fit to be a supervisor,
18 because the conduct was so unbecoming of
19 a supervisor. I will tell you, and I
20 can't attribute this to Nancy or anybody
21 else, but there were some comments that
22 had -- some racial issues were raised,
23 just some very vile conduct. I don't
24 remember if those were attributed to

### Page 59

1  her or not, but I was worried for the
2  department.
3  Q. There aren't any racial comments
4     you heard that you can attribute to
5     Lieutenant O'Loughlin, can you, sir?
6         MS. LUKEY: Objection.
7         MR. EDWARDS: Objection.
8  A. I don't know. I don't know. I was
9     getting a briefing about O'Loughlin
10    in the context of other people.
11 Q. I understand, but sitting here today
12    you're not aware of any comments that
13    are racial comments that there was
14    claimed she made?
15 A. I can't tell you one way or the other.
16 Q. Do you recall what any of these
17    comments or things she said were that
18    were inappropriate?
19 A. Today I can't. I would share them with
20    you. I can only share the impression I
21    was left with during the conversation.
22 Q. I understand your impression. I
23    appreciate you're making me aware of
24    that, but you don't recall any of the

### Page 60

1  comments, which gave you that impression?
2  A. No. I don't have that type of vivid
3     recollection of the conversation.
4  Q. Okay.
5         MR. NOTIS: Off the record for
6  a five-minute break.
7         (Back on the record.)
8  Q. I think, Mr. Mulhern, you had stated
9     earlier that after speaking with Mr.
10    Pesatoro, you spoke to the Boston Globe
11    reporter.
12 A. Yes.
13 Q. And who is that Boston Globe reporter?
14 A. Mac Daniel.
15 Q. Do you recall when that conversation was?
16 A. It was in the afternoon.
17 Q. Was it in March of 2004?
18 A. I think so.
19 Q. And prior to March of 2004 had you spoken
20    to Mr. Daniel before?
21        MS. LUKEY: On any subject?
22        MR. NOTIS: Yes.
23 A. Yes.
24 Q. You have spoken to him many times?

### Page 61

1  A. Many times, absolutely.
2  Q. Would you speak to him once a week
3     perhaps?
4  A. Like I said earlier, typically I dealt
5     with a reporter once or twice a week.
6     There were weeks I might have more
7     conversations, and weeks maybe I would
8     have less.
9  Q. Did you understand Mr. Daniel to be a
10    Globe reporter whose beat, if you will,
11    is the MBTA?
12 A. Yes.
13 Q. Were there other Globe reporters whose
14    beat was the MBTA?
15 A. They would change from time to time, but,
16    yes, certainly during my tenure there
17    were several beat reporters assigned to
18    the MBTA.
19 Q. Was Shawn Murphy one of them?
20 A. I don't think so.
21 Q. So, in any event, you spoke with
22    Mr. Daniel, correct?
23 A. Yes.
24 Q. Why don't you tell me everything you

**Page 62**

1  remember Mr. Daniel saying to you, and
2  everything you remember saying to Mr.
3  Daniel in that conversation in March
4  of 2004?
5  A. This is all to the best of my
6  recollection. I can remember talking
7  to Mac Daniel, and the primary objective
8  in my mind was to knock down the story,
9  you know, to put to rest this whole
10 allegation that people were being
11 disciplined in retaliation for putting
12 up Where's Waldo posters, which I thought
13 utter nonsense. I explained to Mac
14 Daniel that the discipline involved
15 had nothing to do with Where's Waldo
16 posters. I explained to him, in general
17 terms, what the nature of the rules
18 violations were that precipitated the
19 discipline. He pressed me on the Where's
20 Waldo stuff quite a bit. I recall that
21 I was pretty effective in getting him
22 to believe, appropriately so, that the
23 discipline had nothing to do with Where's
24 Waldo. A fair amount of conversation was

**Page 63**

1  about this Where's Waldo stuff.
2       The conversation turned to
3  the details of which I was very reluctant
4  to give him any. He was knowledgeable
5  that some of the conduct would result
6  in potential criminal charges, or could,
7  let me say, could result in potential
8  criminal charges. Somebody had given
9  him Nancy O'Loughlin's name. And he was
10 going to include her in the story that
11 she could be potentially found -- she
12 could be facing potential criminal
13 charges. I told him that was absolutely
14 not true. That he had misinformation.
15 And I warned him he best not go down that
16 road, because nothing could be further
17 from the truth. I thought I pretty
18 effectively dissuaded him from his notion
19 that Nancy O'Loughlin was going to be
20 potentially confronted with criminal
21 charges. I told him it was absolutely
22 not true. She had nothing to do with the
23 so-called CORI violations. And I warned
24 him not to write that in the newspaper

**Page 64**

1  article. I did so with the same vigor
2  that I addressed the Where's Waldo issue,
3  and the same vigor that I addressed the
4  issue when somebody called Nancy a rogue
5  cop a few years earlier.
6       He then badgered me for
7  names of police officers involved in
8  the discipline. I would not give him
9  those names. He went back to Nancy
10 O'Loughlin, and said, "Okay, if she
11 is not involved in any criminal
12 investigation, is she one of the
13 individuals involved in the
14 investigation?" He badgered me quite a
15 bit. To the best of my recollection, I
16 wouldn't confirm or deny whether or not
17 she was involved in the investigation.
18 But I have crystal clear recall that I
19 told him that she was absolutely not
20 involved in any allegations of criminal
21 misconduct, crystal clear recollection
22 of that.
23 Q. Is there anything else about the
24 conversation with Mr. Daniel that

**Page 65**

1  you recall?
2  A. No.
3  Q. Did you write any notes, or memos, or
4  anything else about the conversation
5  during or immediately after the
6  conversation?
7  A. No.
8  Q. Was anyone else present during the
9  conversation with Mr. Daniel?
10 A. Pesatoro may have been.
11 Q. Do you know if he was or he wasn't?
12 A. No. He may have been. Like I said
13 earlier, it would not have been unusual
14 for him, nor was it required. I didn't
15 require it of him, but it certainly was
16 not unusual for him to sit and listen
17 to what I was saying to a reporter.
18 Typically Pesatoro would use that
19 opportunity to gain as much information
20 about an issue as possible. It was
21 just an economical use of our time.
22 Q. When Pesatoro would be present with you
23 during an interview, would he take notes?
24 A. No, I don't think so. No, I don't ever

**Page 66**

1 remember Joe Pesatoro taking notes.
2 Q. Was anyone else listening in on the
3    conversation?
4 A. No, no.
5 Q. Was the conversation taped?
6 A. No, I don't think so. You would have
7    to ask Mac Daniel on that.
8 Q. It wasn't taped on your end?
9 A. It wasn't taped on my end.
10 Q. Have you ever had occasion to discuss
11    with Mac Daniel this particular
12    conversation we're talking about?
13 A. The next day.
14 Q. The next day?
15 A. Yeah.
16 Q. And tell me about that, please?
17 A. He might have called me up and called me
18    an asshole, because the sources that he
19    had been given said that I completely
20    misled him. That the discipline was
21    in relation to Where's Waldo, which I
22    thought was silly. I said,
23           "Mac, it's absolutely not
24    true. I gave you accurate information.

**Page 67**

1    It had nothing to do with Where's Waldo."
2    Whoever was planting these stories with
3    the Globe was upset that it didn't have
4    anything to do with Where's Waldo.
5    Apparently the intention was to paint
6    the picture of an irrational police chief
7    that was responding to Where's Waldo
8    cartoons. They didn't achieve what they
9    set out to achieve, and they were upset
10   about it. Mac called me, and I think he
11   was testing me. I told him -- I assured
12   him that I, in fact, had given him good,
13   honest information.
14 Q. Do you recall anything else about that
15    second conversation with Mr. Daniel?
16 A. No.
17 Q. Other than that conversation, have you
18    had any other occasion to discuss with
19    Mr. Daniel these conversations that we've
20    been talking about?
21 A. No.
22 Q. Have you ever discussed with Mr. Daniel
23    the allegations against you in this
24    lawsuit?

**Page 68**

1 A. No, I don't believe so, no.
2 Q. You don't believe so or you --
3 A. No, I haven't talked to Mac Daniel about
4    this lawsuit.
5 Q. In the two conversations with Mac Daniel,
6    were the names of any other T officers
7    discussed?
8 A. Unless he brought them up, I didn't. I
9    don't -- I didn't bring up the names of
10   any police officers.
11 Q. Do you recall what names he brought up
12    other than Officer O'Loughlin?
13 A. No.
14 Q. Do you know if he did bring up any other
15    names?
16 A. I don't recall. I don't recall. I
17    recall that he pressed me on O'Loughlin.
18 Q. Sitting here today do you know how he got
19    Nancy O'Loughlin's name?
20 A. I have no idea.
21 Q. Do you know if Mac Daniel kept any notes
22    of his conversation with you?
23 A. I have no idea.
24 Q. Other than your attorneys, have you

**Page 69**

1    discussed those conversations with
2    Mac Daniel with anyone?
3 A. No.
4 Q. And as a result of your conversations
5    with Mac Daniel, he published an article
6    in the Boston Globe?
7        MS. LUKEY: Objection.
8        MR. EDWARDS: Objection.
9        MS. LUKEY: As a result of his
10   conversation?
11 Q. Well, after the conversations you had
12    with Mac Daniel, there was an article
13    that appeared in the Boston Globe about
14    these matters, correct?
15 A. After I talked to Mac Daniel, the
16    following day there was an article in
17    the Boston Globe.
18 Q. And you read that article?
19 A. I read that article.
20 Q. What did you feel when you read that
21    article?
22 A. I don't have any recollection at all.
23 Q. Were you angry?
24        MS. LUKEY: Objection.

18 (Pages 66 to 69)

```
 1  Q. In your conversation with Mac Daniel,
 2     who was the first one to mention Nancy
 3     O'Loughlin's name?
 4  A. Mac Daniel.
 5        MR. EDWARDS: I object to that
 6     question, even though it's answered.
 7  Q. At the time you had your conversation --
 8     strike that. At the time you had the
 9     conversation with Mac Daniel about this
10     probe, did you have any bad will towards
11     Nancy O'Loughlin?
12  A. Absolutely not.
13  Q. At the time that you had this
14     conversation with Mac Daniel, did you
15     have any bad will towards Tom O'Loughlin?
16        MS. LUKEY: Objection.
17  A. Absolutely not.
18  Q. I understand you told Mr. Daniel that
19     Nancy O'Loughlin would not be the subject
20     of any criminal charges, correct?
21  A. Yeah.
22  Q. Did you indicate to Mr. Daniel that Nancy
23     O'Loughlin was involved in this probe?
24  A. He pressed me on that. I told you
```
Page 82

```
 1     earlier my recollection is I would not
 2     confer or deny whether or not, but I was
 3     very clear that she had no exposure in
 4     terms of criminal misconduct.
 5  Q. When you spoke to Mr. Daniel and you
 6     refused to confirm or deny that Nancy
 7     O'Loughlin was involved in the probe,
 8     wasn't that a way of letting Mr. Daniel
 9     know that she was, indeed, involved?
10        MS. LUKEY: Objection.
11  A. It's a way for me not to give him any
12     misinformation.
13  Q. Well, wouldn't he have known that if she
14     was not involved, he would have stated
15     she's not involved?
16        MS. LUKEY: Objection.
17  A. I don't recall. He was badgering me,
18     and my recollection is I wouldn't confirm
19     or deny. That's my recollection.
20  Q. Well, based on your past conversations
21     with Mr. Daniel prior to this, wouldn't
22     he know if you -- that if you wouldn't
23     confirm or deny something, that
24     essentially you were admitting it,
```
Page 83

```
 1     but he couldn't attribute it to you?
 2        MS. LUKEY: Objection.
 3        MR. EDWARDS: Objection.
 4        MS. LUKEY: What do you expect
 5     him to do, lie? Objection. You asked
 6     him several times.
 7  A. I was not conferring, and I was not
 8     denying. You have to ask the reporter
 9     how he was interpreting that. I have no
10     idea. I know what I meant when I said
11     it.
12  Q. Did you use the phrase, I won't confirm
13     or deny it?
14  A. We're going back a few years. That's
15     the best of my recollection.
16  Q. That you did use that phrase?
17  A. Yeah.
18  Q. In relation to the probe about the taped
19     phone lines, or the discipline to be
20     given certain officers about the taped
21     phone lines, did you ever speak about
22     that matter to any reporter from the
23     Bay State Banner?
24  A. No.
```
Page 84

```
 1  Q. Did you ever speak to someone named
 2     Yahwhe Miller about that?
 3  A. No.
 4  Q. And do you know if any other T officials
 5     spoke to the Bay State Banner about that?
 6  A. No.
 7  Q. Do you know if the Bay State Banner
 8     published an article about this matter?
 9  A. I'm not sure it came up in this
10     complaint. As of yesterday we were
11     trying to track down the article.
12  Q. Other than conversations with counsel,
13     and other than the conversation --
14     strike that. The second conversation
15     with Mr. Daniel that you told me about
16     on this subject, the one that happened
17     the day after the first conversation?
18  A. Uh-huh.
19  Q. You have to answer yes or no, sir.
20     Rather than saying uh-huh, you have to
21     answer yes or no.
22  A. You didn't ask me a question. I will be
23     glad to answer the questions.
24  Q. When you had the second conversation with
```
Page 85

22 (Pages 82 to 85)

```
 1    police officers. The chief's goal was
 2    to promote from within, and create equal
 3    opportunity for everybody within the
 4    department, and he wanted very much
 5    to develop, train, and invest in the
 6    department; so that the next police
 7    chief would come from within.
 8            He was determined to go it
 9    alone during the early stages unlike his
10    predecessors. He did not bring in his
11    own command staff from the outside. He
12    was determined to promote from within.
13    And I think he sacrificed a great deal
14    in terms of his time, effort and energy
15    early on to develop a very fair process
16    for people to apply for new positions
17    within the command staff. That included
18    both a written examination as well as
19    oral presentations by the candidates.
20    He told me about the process before it
21    took place. During its implementation he
22    kept me abreast of the process. And when
23    he made his final decisions, he informed
24    me of those decisions as well, and asked
                                         Page 90
```

```
 1    my support in signing the personnel
 2    authorization forms for his new command
 3    staff.
 4 Q. Did you in any way change his
 5    reorganization plan?
 6 A. No.
 7 Q. Were you asked if you had any changes
 8    to make in the reorganization plan?
 9 A. No.
10 Q. When you had the conversations with
11    Mac Daniel, which we've discussed
12    earlier, you were acting in your position
13    as the general manager of the MBTA,
14    correct?
15 A. Yes.
16 Q. Are you aware of the fact, sir, that
17    in the complaint in this action, Ms.
18    O'Loughlin has made allegations against
19    Chief Carter as well as against yourself,
20    correct?
21 A. Yes.
22 Q. Have you ever discussed with Chief Carter
23    whether any of the allegations made
24    against him in the charge -- in the
                                         Page 91
```

```
 1    complaint are correct?
 2 A. No, no.
 3 Q. Other than when counsel was present,
 4    have you ever had any conversations with
 5    Chief Carter about the complaint in this
 6    action?
 7 A. I think one.
 8 Q. When was that?
 9 A. I think when I was -- when I found out I
10    was being sued by Nancy, I was kind of
11    surprised by that. And I called him, and
12    the conversation probably went something
13    like this. "What the hell am I being
14    sued for?" He says, "I'm being sued
15    too." That was the extent of the
16    conversation.
17 Q. How long was the conversation?
18 A. Very brief.
19 Q. Give me some idea?
20 A. Very brief conversation. We probably
21    moved on to something else. There was no
22    conversation about any of the facts or
23    anything. It was just my shock that I
24    was being sued, and his response was, you
                                         Page 92
```

```
 1    know, misery loves company. He didn't
 2    say that, but that was kind of the flavor
 3    of the conversation.
 4 Q. Have you ever had any conversations with
 5    him about the factual allegations in the
 6    complaint against him?
 7 A. No, I don't know the exact nature of it.
 8    I don't recall ever seeing the complaint
 9    against him. I don't know the nature of
10    it.
11 Q. Did he ever tell you what he was being --
12    what Nancy was charging him with?
13 A. No. I don't think I told him what I was
14    being charged with.
15 Q. Do you have any understanding, sitting
16    here today, of what Nancy is charging
17    Chief Carter with?
18 A. No, no.
19 Q. When you had the conversations
20    with Mac Daniel, you knew that the
21    conversations related to an article
22    he would be writing for the Boston
23    Globe, correct?
24         MS. LUKEY: Objection.
                                         Page 93
```