# EXHIBIT 3

```
                                                    Page
 1                         VOL. III
                          Pp. 1 - 273
 2                       Exhibits 15 - 23

 3              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 4
                      C.A. NO. 04-10933 JLT
 5

 6   * * * * * * * * * * * * * * * * *

 7   NANCY O'LOUGHLIN,

 8        Plaintiff

 9   VS.

10   MASSACHUSETTS BAY TRANSPORTATION
     AUTHORITY, JOSEPH CARTER, AND
11   MICHAEL MULHERN,

12        Defendants

13   * * * * * * * * * * * * * * * * *

14

15        Continued Deposition of WILLIAM FLEMING, a

16   witness called by counsel for the Defendants,

17   Massachusetts Bay Transportation Authority and Joseph

18   Carter, pursuant to the applicable rules, before

19   Lorreen Hollingsworth, CSR/RPR, CSR NO. 114793, and

20   Notary Public in and for the Commonwealth of

21   Massachusetts, at the Offices of Prince, Lobel,

22   Glovsky & Tye, LLP, 585 Commercial Street, Boston,

23   Massachusetts, on Tuesday, April 4, 2006, at

24   10:20 a.m.
```

```
                                                    Page
 1   APPEARANCES:

 2

 3   MITCHELL J. NOTIS, ESQUIRE
        370 Washington Street
 4      Brookline, Massachusetts 02445
        On behalf of the Plaintiff,
 5      Nancy O'Loughlin

 6   JOSEPH L. EDWARDS, ESQUIRE
        Prince, Lobel, Glovsky & Tye, LLP
 7      585 Commercial Street
        Boston, Massachusetts 02109
 8      On behalf of the Defendants,
        Massachusetts Bay Transportation Authority and
 9      Joseph Carter

10   GREGORY M. REISER, ESQUIRE
        Wilmer Cutler Pickering Hale and Dorr LLP
11      60 State Street
        Boston, Massachusetts 02109
12      On behalf of the Defendant,
        Michael Mulhern
13

14

15

16

17

18

19

20

21

22

23

24
```

Shea Court Reporting Services (617) 227-3097

Page 48

1  When I came in, I viewed it as a punishment
2  assignment to him, and I put him --
3  reassigned him to patrol.
4  Q  So Captain Martino?
5  A  Yes. When I put out the memo, I asked if
6     any officer or supervisor was interested in
7     commanding the detail office.
8         Prior to that, Mike Morris had
9     called me and said he'd like to go into
10    details. So it just naturally assumes that
11    he didn't think he was being punished for
12    going to the detail office; that's what he
13    wanted to do.
14 Q  I think -- maybe it's a difficulty on my
15    part on framing the question and trying to
16    get across what I want to know.
17 A  In police work, too, some people like to
18    work, say, outside in the streets and some
19    people like to work inside an office, so to
20    speak.
21        So if you have always worked
22    out in the street or liked to work on the
23    street, if you're reassigned to an office
24    job that you don't want, the perception

Page 49

1  would be that you're being punished.
2  Q  Okay.
3         MR. NOTIS: Move to strike
4     that.
5  Q  That makes sense to me.
6         Let me ask you this then: If
7     a person who likes details but doesn't like
8     patrol duty is placed into patrol, that
9     person could see that as a punishment?
10 A  If a person was reassigned from, say, an
11    office job -- forgot the detail office.
12    Say, we'll take planning and research. If
13    a person does not -- and he can come into
14    work every day in plainclothes and does not
15    like to work -- wear a uniform with the
16    MBTA Police logo or Transit Police logo,
17    yes, he's -- and he's reassigned to patrol,
18    he probably -- he could -- if it was
19    purposely to put him back into patrol, to
20    put him back into uniform, you know,
21    because they know -- the person knows he
22    doesn't want to wear the uniform, then I
23    guess it would be perceived as punishment.
24 Q  So it's a function of what the person

Page 50

1     making the assignment intends to do --
2        MR. NOTIS: Objection.
3  A  If the person --
4  Q  -- making the assignment -- if I know you
5     don't like patrol and I assign you to
6     patrol knowing that you don't like it -- is
7     that what you're saying?
8        MR. NOTIS: Objection.
9  A  Yes.
10 Q  Then that would be a punishment?
11       Here's a different truth,
12    Lieutenant -- I guess we can kind of get
13    right at this. Every officer doesn't like
14    every assignment to which they are ordered
15    to fill, is that correct?
16 A  Yes. But union -- being in a union, you
17    have a right to bid out of almost every
18    assignment you're assigned to.
19 Q  Okay. But sometimes that's not possible,
20    is that right?
21 A  The detail officers -- supervisors is one
22    of them, yes. It's probably the only one
23    that I know of.
24 Q  Well, if a person -- I mean we can go down

Page 51

1     this road.
2        My question is this -- let me
3     ask it this way. As far as you know, in
4     your experience at the MBTA, do officers
5     always get assignments they like and enjoy?
6  A  No.
7  Q  Sometimes they get assignments they don't
8     like and that they don't enjoy?
9  A  Correct.
10 Q  And if they had their choice, they wouldn't
11    take those assignments?
12 A  Correct.
13 Q  But people have to fill assignments?
14 A  Correct.
15 Q  And sometimes -- and you as interim
16    chief -- and maybe just for the brief
17    period -- I don't know whether this
18    occurred. But sometimes the chief has to
19    make assignments whether an officer likes
20    it or not?
21 A  Oh, correct.
22 Q  Now, I understand that the chief never said
23    to you -- Chief Carter never said to you
24    that he was punishing Nancy O'Loughlin by

Page 52

1     putting her in details?
2  A  No.
3  Q  Do you have any reason to believe anything,
4     based on what you've heard or seen, that
5     would lead you to believe that he intended
6     to punish her by putting her in details?
7  A  Not from Chief Carter, no.
8  Q  Well, from whom?
9  A  And I don't even know who this quote --
10    said this quote. It was something about
11    Deputy Martino said something to someone, I
12    spent five years down there and, something
13    about, Now she can. But Chief Carter, no.
14       And since I wasn't the deputy
15    chief, Martino never said that to me. I
16    just want to make that clear.
17 Q  Who did he say it to?
18 A  I don't know.
19 Q  Who told you?
20 A  I don't remember that either.
21 Q  When was it said?
22 A  Back when she was reassigned.
23 Q  After?
24 A  After she was reassigned.

1  Q  Did you hear anything prior to her
2     assignment -- well, you didn't know she was
3     going to be assigned until that day?
4  A  No.
5  Q  Are we talking about you heard this within
6     hours of her reassignment?
7  A  I don't even remember, Joe. And just for
8     the record, I never heard Martino say that.
9  Q  Well, what I'm trying to get at is whether
10    you as a deputy chief had any reason to
11    believe that Chief Carter deliberately put
12    Nancy O'Loughlin -- I mean, that Chief
13    Carter put Nancy O'Loughlin in details to
14    punish her deliberately.
15 A  No.
16 Q  Now, prior to the reassignment of Nancy
17    O'Loughlin to the detail unit, do you
18    recall Chief Carter saying anything
19    negative about Nancy O'Loughlin in her role
20    as commander of the detective unit?
21 A  No.
22 Q  And, I guess, maybe it's the same question.
23    Do you not recall or did he not say
24    anything to you?

Page 95

1  Q  I think my question was whether anybody
2     told you that the chief intended to fire
3     you, that they heard the chief say that?
4  A  Nancy Walsh said the termination papers
5     were put in for me and Nancy.
6  Q  Okay. For you and Nancy O'Loughlin, as
7     well?
8  A  Yes. And Gary Fredericks told my wife that
9     I would be fired on the phone on Monday.
10    That the chief was in a firing mode.
11 Q  But my question was about what people heard
12    the chief say.
13 A  That's what he said he heard the chief say.
14 Q  The chief said that he was in a firing
15    mood?
16 A  Yes.
17 Q  Did you ever see any termination papers?
18 A  No.
19 Q  Now, at some point the chief did issue
20    discipline, is that correct?
21 A  Yes.
22 Q  And you were not fired, were you?
23 A  No.
24 Q  What was the discipline?

Page 94

1     that?
2  A  Lieutenant Wheeler said that he was in the
3     chief's office when the chief said that,
4     Vengeance will be mine.
5  Q  Okay. And what does that have to do with
6     anything?
7  A  That was over this whole investigation.
8  Q  When was that?
9  A  This was after. Herman Wheeler told me
10    that.
11 Q  After what?
12 A  After we had come back. He told me after I
13    came back, I was assigned as a patrolman to
14    work for Herman Wheeler. And he told me be
15    careful.
16 Q  Maybe you misunderstood my question. I'm
17    sorry. Go ahead and finish, please.
18 A  The chief said that, Vengeance will be mine
19    because of the lawsuits.
20 Q  Because of what lawsuits?
21 A  I think because of this one and because of
22    the other one that's the union find.
23 Q  You don't have a lawsuit, do you?
24 A  No.

Page 96

1  A  Demotion.
2  Q  And you were demoted two ranks?
3  A  Yes.
4  Q  From lieutenant down to --
5  A  Patrolman.
6  Q  Patrolman. Nancy O'Loughlin received the
7     same discipline?
8  A  Yes. Well, at the time, yes.
9  Q  Yes, at the time.
10 A  Yes, well --
11 Q  Did she receive other discipline at another
12    time?
13 A  No, she received no discipline after the
14    arbitration.
15 Q  Okay. But I think I asked you about the
16    discipline that she received.
17 A  Yeah.
18 Q  Have you ever filed a discrimination
19    complaint against the MBTA?
20 A  Just on the -- the Internet postings.
21 Q  You complained to -- the letter we saw?
22 A  Yes.
23 Q  Actually, maybe it's not. That was written
24    by Tom O'Loughlin.

Page 110

1   were taken, did you have conversations with
2   Attorney Edwards?
3  A  I think I had conversations with his
4   office. But that was just in reference
5   to --
6  Q  -- scheduling. Other than scheduling, did
7   you discuss any of the facts of this matter
8   with Attorney Edwards between depositions?
9  A  Not that I recall, no.
10 Q  Between the depositions, did you discuss
11   either the depositions or what you
12   discussed in them with anyone else, other
13   than perhaps your wife?
14 A  I said to Nancy O'Loughlin, I think one
15   day, a phone -- You complained about a
16   phone? That was it.
17 Q  You mentioned towards the end of your
18   testimony today about Lieutenant Herman
19   Wheeler having commented to you about a
20   statement the chief made. And I think you
21   said, Vengeance will be mine?
22 A  Yes.
23 Q  Tell me exactly -- well, when did Wheeler
24   tell you that?

Page 111

1  A  Down in Quincy.
2  Q  Do you remember date-wise when he said that
3   to you?
4  A  No, Herman was the commander of the TPSA3.
5  Q  Did he say it to you in the last six
6   months?
7  A  I'm not exactly sure. It was on the same
8   day he told another officer -- I think he
9   told Wil Smith to get out of the building.
10 Q  But is there any way you can put that in,
11   like, terms of chronological order for me?
12 A  No.
13 Q  Do you know if it was within the last year?
14 A  It was definitely within the last year.
15 Q  Okay. And, again, that you were told about
16   this in the last year?
17 A  Yes, by Herman Wheeler.
18 Q  And tell me exactly what you recall
19   Lieutenant Wheeler saying to you about
20   this.
21 A  Herman said that -- I think he said he was
22   upstairs in the chief's office and the
23   chief was saying, Vengeance will be mine
24   over the lawsuits and that he was saying

Page 112

1   that, Billy, be careful.
2  Q  From the conversation you had with
3   Lieutenant Wheeler about this remark, do
4   you have any understanding of when the
5   chief supposedly made the remark?
6  A  No. He said it in his office at Quincy
7   Center, so I didn't have date or time
8   reference.
9  Q  The chief said it in his office in Quincy
10   Center?
11 A  No, Herman said it to me in his office in
12   Quincy Center.
13 Q  I understand you don't recall when Wheeler
14   said it. But based on when Wheeler said
15   it, do you know when the chief might have
16   made that remark?
17 A  No.
18 Q  Was it, in your understanding, after you
19   came back from being on duty at home?
20     MR. EDWARDS: Objection.
21 A  Yes.
22     THE WITNESS: Excuse me, I'm
23   sorry.
24     MR. EDWARDS: No, you can

Page 113

1   answer it.
2  Q It was after that. Was it your
3    understanding it was before your
4    arbitration decision came down?
5  A I don't recall.
6  Q Okay. Do you know if the chief supposedly
7    made the remark after you were reinstated?
8  A No, the only remarks that I heard anything
9    in reference to me and the chief was that
10   the chief had gone to General Manager
11   Gribouskis and requested that the appeal go
12   into superior court, which was very rare,
13   and that he said it's personal.
14 Q So, in other words, he wanted to appeal
15   your arbitration decision?
16 A Yes.
17 Q And, again, all I'm trying to figure out is
18   because there are a lot of lawsuits flying
19   around here -- I'm trying to figure out
20   which lawsuits the chief might have been
21   talking about if he made this statement and
22   when he might have made this statement?
23 A I don't know.
24 Q Did Wheeler tell you that the chief was

Page 114

1    angry when he made the statement?
2  A Yes.
3  Q Did Wheeler tell you anything in particular
4    that happened that made the chief angry?
5  A No.
6  Q Did you have any indication whether it was
7    that the chief had just gotten served with
8    a lawsuit?
9  A The only reference I heard to the chief
10   being served with a lawsuit was the day the
11   union served him with a lawsuit over the
12   First Amendment issues.
13 Q Do you know if the "Vengeance will be mine"
14   statement relates to that?
15 A I don't know what the Vengeance --
16 Q So you just don't know?
17 A Yeah.
18 Q What was the reason that Lieutenant Wheeler
19   was telling you this?
20 A As a friend, he was warning me to be
21   careful.
22 Q Because his understanding was that you
23   might be one of the people who might be
24   subject to the chief's vengeance?

Page 115

1        MR. EDWARDS: Objection.
2  A He was not the only one.
3  Q Was it your understanding that was his
4    feeling, Wheeler's feeling?
5  A Yes.
6  Q When you just said he wasn't the only one,
7    who were the other people who thought you
8    might be subject to the chief's vengeance?
9  A The day I came back from the cancer
10   recovery, I had to go to the range to
11   qualify.
12 Q Yes.
13 A And the two officers at the range told me
14   there was a bounty on my head.
15 Q Who told you that?
16 A Lieutenant Fitzgerald and Sergeant Jerry
17   Collins. To be extra careful.
18 Q Did they tell you what they meant by that?
19 A No. They said, Don't talk to anybody here.
20   You know, people will sell out for
21   positions and stuff; there's a bounty on
22   your head.
23 Q Did they tell you who put the bounty on
24   your head?

Page 116

1  A No.
2  Q What did you understand that to mean?
3  A It means don't talk to anybody, to avoid
4    people.
5  Q And you said that was when you came back
6    from the cancer surgery?
7  A Yes.
8  Q And when was that?
9  A I believe it was 1/2 of this last year.
10 Q So January 2, '06?
11 A Yes.
12 Q Okay. Did you understand that statement to
13   mean that the chief was gunning for you?
14 A Among others, yes.
15 Q And who else is it that you understood that
16   referred to?
17 A He didn't -- I didn't -- I don't know.
18 Q How long have you known Chief Carter?
19 A Probably about three or four years.
20 Q And in your opinion, is Chief Carter
21   someone who would try to seek vengeance
22   against someone who had filed a lawsuit
23   against him or filed a complaint against
24   him?

Page 127

1  made on your behalf?
2  A  No.
3  Q  But you believe he did respond to them?
4       MR. EDWARDS: Objection.
5  A  No.
6  Q  Well, wasn't it your testimony that you
7     felt that as a result of the calls you were
8     suspended and assigned to duty at home
9     rather than being fired?
10 A  The only one who can sign off on the final
11    termination papers is the general manager.
12 Q  Well, do you know if Mulhern refused to
13    sign off on your termination papers?
14 A  That's what I was told, yes.
15 Q  I'm sorry if I'm going to be jumping around
16    a bit. But you've been testifying over
17    three days so I have a variety of material.
18       At some point, sir, you
19    testified, I believe, that it's not easy to
20    be a female in policing and it's never been
21    easy. Do you believe that?
22 A  Yes.
23 Q  Are there any ways, to your knowledge, it's
24    been difficult for Nancy O'Loughlin being a

Page 128

1     female in the MBTA police department?
2  A  Yes.
3  Q  And what are those ways?
4  A  Well, let's start from the basics. And
5     this is -- just the uniform itself.
6        A state trooper uniform,
7     wearing boots; breeches is not the easiest
8     thing for a female to do. You have to --
9     at the time when she first came on or
10    20 years ago, there was no such thing as
11    specially-fitted bulletproof vests or
12    specially-fitted gun belts. There was a
13    standard size gun. There was no -- I don't
14    even think -- thought of what happens when
15    a female gets pregnant; what are the
16    restrictions placed on her?
17        Sometimes they challenge
18    more -- not from within, but from without,
19    that, you know ... particularly drunks will
20    scream obscenities -- it's one thing to
21    scream obscenities and call me whatever you
22    want and spit in my face. But I think it's
23    a different position for a female officer.
24    And I think sometimes female officers are

### Page 129

1  put in the position where they have to
2  prove themselves more --
3  Q  Do you know if Nancy O'Loughlin has been
4     placed in that position?
5  A  I would say yes, over the years, yeah.
6  Q  Any specific examples you can come up with?
7  A  I remember once when we were doing
8     canine -- and I was thinking of this with
9     Kathy Barrett the other day. A state
10    trooper who just died of cancer; Kathy was
11    the first female canine officer in the
12    state police. And to prove her methods, we
13    put her in a room. And they let a police
14    dog loose on her. And she was tough enough
15    to get bitten and walked right out.
16       So Nancy, I was with when we
17    were doing canine -- and I don't think it
18    was deliberate.
19       Walter Morris sent a 140-pound
20    Rottweiler on her. And the dog just picked
21    her up. And I remember her getting slammed
22    to the ground. I thought she was dead.
23    And she just kept fighting the dog.
24       And I know from myself, I

### Page 130

1     said, I'm not fighting that thing. So I
2     think Nancy had times when she had to prove
3     the -- prove herself and, you know, she
4     received -- she was beaten up several times
5     in an effort to prove herself.
6  Q  You're aware of the fact, of course, that
7     she was awarded that Hanna Award for Valor,
8     correct?
9  A  Yes.
10 Q  Do you know any other police officers who
11    have been awarded the Hanna Award for
12    Valor?
13 A  Yes.
14 Q  Who's that?
15 A  Omar Ricketts; Jason Morris; I think, Joe
16    O'Connor. There are several officers. I
17    voted Mark Gillespie for the Hanna Award.
18 Q  Do you know any other female police
19    officers at the MBTA that won the Hanna
20    Award for Valor?
21 A  I believe Toby Valenti -- whether she got
22    it or not -- was nominated for -- with
23    several officers including Nancy's husband,
24    I think for an incident at Andrews Station

### Page 131

1     where they crawled under a train and where
2     a person was hit -- was hit by a train.
3  Q  Do you know of any instances where Nancy
4     O'Loughlin was treated differently by Chief
5     Carter due to her gender or her sex?
6  A  Gender or sex? No.
7  Q  Do you know her being treated differently
8     by Carter for any other reason?
9  A  Only this was related to Herman Wheeler to
10    me -- and I don't know if this is any
11    different treatment or whatever, that
12    the -- they had got a call at the Stop &
13    Shop on Newport Ave. that a female was in
14    there shopping for a thing. The chief and
15    Herman and Martino went and grabbed the
16    tape out of the Stop & Shop. And Herman
17    was convinced that they thought it was
18    Nancy, when it turns out to be another
19    officer.
20 Q  Was it unusual for the chief and deputy
21    chief to go down and view a tape like this?
22       MR. EDWARDS: Objection. You
23    can answer.
24 A  Like I said, I don't even know if the chief

### Page 132

1     went down and viewed it. But to go down
2     and grab a tape, yeah, anything like that
3     would be -- but not for probably, say,
4     Herman Wheeler who was the commander, just
5     receive a phone call and, say, Herman go
6     down.
7  Q  But for the commands to go down was
8     unusual?
9  A  Yes.
10 Q  And you think they were doing that just
11    because it was Nancy O'Loughlin?
12 A  Well, that was Herman's version. I don't
13    know.
14 Q  Do you know of any officers at the MBTA
15    police who resent female officers?
16       MR. EDWARDS: Objection. You
17    can answer.
18 A  I'm sure there's officers that resent
19    female officers.
20 Q  Do you know any officers of the command
21    staff who resent female officers?
22       MR. EDWARDS: Objection. Are
23    we talking about a time period?
24 Q  You can answer.

Page 147

```
 1     lieutenant as head of the detail unit?
 2  A  Because I would have used -- I would have
 3     preferred my lieutenants to be out in the
 4     system.
 5  Q  If the lieutenant is placed as head of the
 6     detail unit, do you feel that's a
 7     punishment assignment?
 8           MR. EDWARDS: Objection.
 9  A  I think I just answered that, in some
10     cases, yes; in some cases, no.
11  Q  Do you think it was a punishment assignment
12     to place Nancy O'Loughlin as head of the
13     detail unit?
14  A  Yes.
15  Q  Why is that?
16  A  Because Nancy, as I explained before --
17     there is a -- some officers like to work
18     inside; some officers -- I mean, their
19     forte is working outside with the troops;
20     she was well-liked by the troops; she was
21     in command; she knew what she was doing;
22     she liked being a cop.
23  Q  Do you think it was a punishment assignment
24     to place you as head of the detail unit?
```

Page 146

```
 1     ever appropriate for a captain to be the
 2     head of the detail unit?
 3  A  No. You're only supervising two people.
 4  Q  In your opinion, is it ever appropriate for
 5     a lieutenant to be the head of the detail
 6     unit?
 7  A  As I said, when I put out that memo, if a
 8     lieutenant had requested -- say a
 9     lieutenant had requested the detail
10     unit because of the day position and that
11     he's going to law school at night, you
12     know, I would have put him in.
13  Q  I understand that. If someone has not
14     requested -- if a lieutenant has not
15     requested to be put in as the head of the
16     detail unit, is it appropriate to pick a
17     lieutenant and place them in as a head of
18     the detail unit?
19  A  I can only speak for myself. I would not
20     have done it that way.
21  Q  Why not?
22  A  Because I don't think it would have been
23     appropriate.
24  Q  And why wouldn't it be appropriate to put a
```

Page 148

```
 1  A  Yes.
 2  Q  And why do you feel that, sir?
 3  A  Based on my background, I think it was a
 4     punishment.
 5  Q  Do you think Chief Carter was punishing
 6     Nancy O'Loughlin by placing her as head of
 7     the detail unit?
 8  A  I don't know what the chief's motives are
 9     or who told him to put her there. So I
10     can't answer that -- in fairness to the
11     chief, I can't answer that, what his --
12     what he even -- what his perception of the
13     detail unit was, or even if he knew he had
14     a detail unit, I don't know.
15  Q  Well --
16  A  I just don't know what his motives were.
17  Q  Well, isn't it correct, sir, that you told
18     Chief Carter that the appointment of
19     Martino to the detail unit had been a
20     punishment assignment?
21  A  Yes, I did.
22  Q  And what do you recall about that
23     conversation?
24  A  I was explaining why I made moves. And I
```

```
                                                              Page 152
1              MR. EDWARDS: Objection.
2    A   I don't think so.
3    Q   Now, is the position of head of the detail
4        unit viewed in the department as a
5        punishment position?
6              MR. EDWARDS: Objection.
7    A   Yes.
8    Q   What are you basing that on?
9    A   Well, first John Martino.
10   Q   Yeah.
11   A   Secondly, Nancy O'Loughlin.
12   Q   Yeah?
13   A   And then third me.
14   Q   Now, is it correct -- I mean, do you
15       believe that other officers in the
16       department view your assignment to detail
17       as a punishment to you?
18   A   Yes.
19   Q   And is it your belief that officers within
20       the department viewed Nancy O'Loughlin's
21       assignment to detail to be punishment to
22       her?
23   A   Yes.
24   Q   And is it your belief that officers within
```

Page 149 - Page 152

Page 213

1  Q  She said she was escorted out by the SWAT
2     team?
3  A  Yes. McKay told me he was escorted out by
4     the SWAT team, Jordan, Floyd, Hennessey.
5  Q  Did you talk to all of them and they each
6     said the same thing?
7  A  Didn't talk to them all that same day, no.
8  Q  Well, I mean, at different times?
9  A  Yes.
10 Q  Jordan, Floyd, Hennessey, Nancy. Who else,
11    McKay?
12 A  McKay.
13 Q  Now, you were asked a question about
14    whether it was tough to be a woman -- a
15    female police officer.
16       Do you recall that question?
17 A  Yes.
18 Q  And, you know, one way you said it was
19    tough because 20 years ago the way the
20    bulletproof vest fits. Is that a proper
21    understanding of your testimony?
22 A  No, I said it's an evolvement. If you take
23    from the uniforms on, the gun belts, the
24    guns, the -- just the bulletproof vests,

Page 214

1     everything has evolved in police work now.
2        When females first came on,
3     say, 20 years ago, everybody had the same
4     standard uniform, male, female, everything
5     else. So, I mean, it's been a pretty
6     steady progression of evolvement.
7        I mean, I don't think they had
8     special bulletproof vests back then just
9     for females. They have special -- we all
10    had the same gun. But now -- well, my
11    hands are tiny, too. They went to two sets
12    of guns because it's easier to shoot if you
13    have a smaller hand. So there have been
14    several adaptations along the way.
15 Q  But 20 years ago, if I'm understanding you,
16    these things weren't -- you know, the
17    differences in equipment, for instance --
18    weren't there. I mean, everybody had the
19    same thing?
20 A  Right.
21 Q  And you think that that made it tougher on
22    woman. That's one way?
23 A  That's just one example.
24 Q  And you mentioned pregnancy?

Page 215

1  A  Yes, because that was -- the -- chiefs and
2     I remember being at the union at the time.
3     Nobody really understood how to -- what the
4     policy on -- if a pregnant female comes off
5     the street when she first announces she's
6     pregnant or is it at her own discretion, do
7     you let her work as long as she wants to?
8     And it wasn't so much -- I don't think male
9     officers knew how to handle that one
10    because it was something new to them.
11 Q  Now --
12 A  I think that's nationwide, though.
13 Q  Now, this female state trooper, did you
14    give her name?
15 A  Kathy Barrett.
16 Q  Kathy?
17 A  Barrett.
18 Q  Is Kathy Barrett still a state trooper?
19 A  She died the other day.
20 Q  A friend of yours?
21 A  Yes.
22 Q  Sorry to hear that. You said that a dog
23    was released to attack her?
24 A  Yes.

Page 216

1  Q  Was that a standard training process?
2  A  None that I've ever heard of, none that I
3     know of, no.
4  Q  Who did this, the State Police?
5  A  Yes.
6  Q  They did it because she was a woman?
7  A  She was the first female. They wanted to
8     see how tough she was. That's what I was
9     told.
10 Q  And when was that?
11 A  Years ago. Kathy's been on the force for
12    15 or 20 years.
13 Q  Was it within the past five years, as far
14    as you know?
15 A  No.
16 Q  Past 10 years?
17 A  15, say.
18 Q  15 years ago?
19 A  Yes.
20 Q  Did you say the same thing happened to
21    Nancy O'Loughlin?
22 A  No. I said what Nancy -- when she was in
23    canine, there was a -- I remember a time
24    there was 140-pound Rottweiler -- all

Page 217

1  canine officers, you have to -- you train
2  by fighting other people's dogs.
3       And Rottweilers were
4  particularly -- I had a German shepherd.
5  His bite wouldn't go through a sleeve, and
6  he was a tough dog. But the Rottweiler,
7  the bite would go right through the sleeve.
8  You had special equipment to handle
9  Rottweilers. And I just remember a time
10 there was a 140-pound Rottweiler put on
11 Nancy to see how tough she was.
12 Q  Okay. I understood you to say in the
13    beginning of that that that's the way
14    people were trained or was this done
15    because she was a woman?
16 A  I never had the 140-pound Rottweiler sent
17    on me, so -- thank God. Maybe she
18    volunteered for it. Knowing her, she
19    probably volunteered to fight the foolish
20    thing.
21 Q  So you don't know how this came about?
22 A  I don't have any clue whether Nancy would
23    volunteer to fight it or whatever.
24 Q  Do you have any reason to believe that --

Page 218

1  A  -- it was put on her because she was a
2     woman? No.
3  Q  That's right. That this dog was put on her
4     because she was a woman?
5  A  No.
6  Q  Now, when you said that Nancy O'Loughlin
7     was treated differently by Chief Carter,
8     you talked about something about shopping,
9     when some woman was shopping.
10       What is that about? You
11    talked about people raced down and got --
12 A  No, I don't think I said Chief Carter did.
13       I said there was an incident.
14 Q  Maybe I wrote it down wrong. Nancy
15    O'Loughlin was treated differently by
16    Carter.
17 A  No, no, I did not say that. What I said
18    was there was an incident where somebody
19    complained that an MBTA police cruiser was
20    parked in front of the Stop & Shop and the
21    officer was in there shopping and it was a
22    female officer. It was Herman Wheeler's
23    belief -- and he was the TPSA commander --
24    and he got a call from the chief and

Page 219

1  Martino, and they went down and grabbed the
2  tape right away.
3       He told me that it was his
4  thing that they were out to get Nancy when,
5  in fact, it was another officer, Minn Vo,
6  and she had only been in there for two
7  minutes.
8  Q  Why did -- was it lieutenant then --
9  A  Yes.
10 Q  -- Lieutenant Wheeler think that it was
11    because this was supposedly Nancy
12    O'Loughlin?
13 A  I don't know.
14 Q  Did you ask him?
15 A  No.
16 Q  And he didn't volunteer that information,
17    obviously?
18 A  No.
19 Q  Is there something with an MBTA officer
20    shopping?
21 A  Going in to get her lunch on duty, no.
22 Q  Well, is that a valid complaint that
23    there's an MBTA officer shopping?
24 A  At a Stop & Shop to get her lunch, no.

Page 220

1  Q  Who made the complaint?
2  A  No.
3  Q  I don't understand this.
4       As far as you understand, it
5  was not Chief Carter that --
6  A  That was in Stop & Shop and complained, no.
7  Q  No, that it wasn't Chief Carter that asked
8     that the tape be retrieved?
9  A  I can only go by what Lieutenant Wheeler
10    said. He said it was Martino and Chief
11    Carter, yeah.
12 Q  Martino and Chief Carter?
13 A  That's what Herman said, yes.
14 Q  Not McCarthy?
15 A  No.
16 Q  And, I guess, my question is: Even if it
17    had been Nancy O'Loughlin, what's the
18    violation?
19 A  I don't know.
20 Q  And maybe I'm asking the wrong question.
21       Is it presumed that Deputy
22    Martino and Chief Carter allegedly asked
23    that the tapes be retrieved because they
24    thought it was some kind of violation? Is

Page 221

1   that the implication?
2 A That would be the implication, yes.
3 Q But you don't know what the violation would
4   be?
5 A No.
6 Q When was that?
7 A I don't know. It was sometime last year.
8 Q Was it this year?
9 A Yes.
10 Q This year, in 2006?
11 A Yes. She was reassigned. It could have
12  been -- she was reassigned as a patrolman,
13  I know that. I was out sick for a portion
14  of that, a couple of months, so I'm not
15  exactly sure.
16      So take it from the time she
17  was demoted to reinstated, a year and a
18  half time, say.
19 Q Until she was reinstated to lieutenant?
20 A Yes.
21 Q That was just last week?
22 A Okay. So it would be --
23 Q Right, last week, the week before.
24 A My point is I don't have the exact date.

Page 222

1       MR. NOTIS: If you want me to
2   jump in --
3       MR. EDWARDS: Yeah.
4       MR. NOTIS: During the period
5   of time when this incident occurred, was
6   Nancy O'Loughlin assigned to either the
7   Braintree or the Quincy areas?
8       THE WITNESS: Yes.
9       MR. NOTIS: And this incident
10  occurred in either Braintree or Quincy?
11      THE WITNESS: Quincy.
12      MR. NOTIS: All right. So is
13  that why someone thought, to your
14  knowledge, Nancy O'Loughlin might be
15  involved in this?
16      THE WITNESS: Yes.
17      MR. NOTIS: And, again, the
18  question I would have is -- well, you don't
19  know who called this in?
20      THE WITNESS: I know nothing
21  of --
22      MR. NOTIS: I understand. I'm
23  wondering if you might have knowledge from
24  other sources.

Page 223

1       And do you know if it was a
2   citizen or an MBTA employee who called it
3   in?
4       THE WITNESS: I have no idea.
5       MR. NOTIS: And other than if
6   the person was shopping during a time when
7   they were supposed to be on duty, there's
8   nothing that's necessarily automatically
9   improper about an officer parking a
10  cruiser, going into a supermarket, and
11  getting something, right?
12      THE WITNESS: No.
13      MR. NOTIS: But, on the other
14  hand, if they were supposed to be on duty
15  when they did that, it would be improper?
16      THE WITNESS: If they did not
17  call out for, what we refer to as a 20, a
18  lunch break. If they had to direct a
19  patrol at, say, Fields Corner Station, and
20  they're getting their lunch in Quincy at
21  the same time, that would be improper.
22      MR. NOTIS: Or if they were
23  supposed to be doing some patroling and
24  they're in there doing their weekly

Shea Court Reporting Services (617) 227-3097