# **EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NANCY O'LOUGHLIN,
    Plaintiff,

v.                                  C.A. No. 04-10933 JLT

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY, et al.,
    Defendants.

                                            /

## EXPERT REPORT OF LOU REITER

1.    My name is Lou Reiter. I have been actively involved in police practices and law enforcement since 1961. I was an active police officer for 20 years. Since my retirement in 1981 as an active police officer, I have been involved in police and law enforcement practices as a private police consultant.

2.    Since 1983 I have been providing law enforcement consultation in police training and management. I provide law enforcement training in the following areas:

- Investigation of critical incidents - officer involved shootings, use of force, and pursuits.
- Managing the Internal Affairs function.
- Police discipline.
- Use of force and deadly force issues.
- Police pursuit issues.
- Investigative procedures and supervision.
- Jail intake procedures
- Personnel practices.
- Supervisory techniques
- Crowd control procedures.
- Liability management.

1

- Policy and procedure development.
- Management effectiveness.

I consult with police departments of 3 to 39,000 employees, performing internal audits for the police organization. My primary areas of focus during these audits are:

- Citizen complaint procedures.
- Discipline, internal affairs and early warning systems.
- Personnel practices including selection, hiring, EEOC/AA, promotion, assignment and retention.
- Specialized operations including traffic, investigations, narcotics, vice, intelligence, emergency response teams and unusual occurrence units.
- Organizational structure and command responsibilities.
- Police department governance.
- Policy and procedures development.
- Use of force policy and procedures.
- Investigation of critical incidents.

3. Since 1983, I have been retained in over 950 police related cases. This involvement has been on a mix of approximately 2/3 plaintiff and 1/3 defense. Assistance provided includes case analysis and development and expert witness testimony. I have been qualified in state and Federal courts, including the District of Columbia, Massachusetts and Puerto Rico, to provide trial testimony in many areas including:

- Field procedures including tactics, arrest techniques and pursuits.
- Standards of police misconduct investigations.
- Use of force and deadly force.
- Supervision.
- Investigative procedures.
- Jail intake procedures
- Police management and personnel practices.
- Investigation of citizen complaints and discipline.
- Police policy and procedures development.

2

- Police training.

4. I am a former Deputy Chief of Police of the Los Angeles Police Department. I served as a police officer in the Los Angeles Police Department for over twenty years until I retired in 1981. During that period of time I served as a patrol and traffic officer, supervisor, manager, command officer and executive staff officer. I was involved in police training, investigating allegations of police misconduct, Chairman of the Use of Force Review Board, member of the Unusual Occurrence Command Post Cadre, and researcher and author of the chapters on internal discipline, training and management/employee relations for the <u>Police Task Force Report</u> of the National Advisory Commission on Criminal Justice Standards and Goals. In 1993 I published the manual/guide <u>Law Enforcement Administrative Investigations</u>; the Second Edition in 1998, and the current Third Edition in 2006.

5. My experience, training and background is more fully described in the attached resume. A complete list of my testimony during the past four (4) years is attached.

6. I have reviewed the following materials to date regarding this case:

- First Amended Complaint and Demand for Jury Trial
- Statement of Undisputed Material Facts of Defendants with attachments
- Memorandum of Law in Support of the Motion for Summary Judgment of Defendants
- Plaintiff's Statement Pursuant to Local Rule 56.1
- Opposition to Plaintiff's Rule 56.1 notice
- Response of Plaintiff to Reply Brief of Defendants
- Opposition of Plaintiff to Motion for Summary Judgment
- Affidavit of Joseph Carter
- Transcript of recorded telephone conversations between Lt. O'Loughlin

3

  and Officer Mackay 12/29/03 to 3/4/04
- MBTA Police documents relating to disciplinary actions against Lt. O'Loughlin
  - March 8, 2004   Violations and relief from duty notice
  - May 14, 2004   Amended Notice of Hearing
  - August 19, 2004   Notice of Reduction in Rank
  - July 3, 1992   Notice of derogatory comments on phone line
- Memo from Lt. O'Loughlin re: hostile work environment
- Deposition of Lt. O'Loughlin Volumes 1-3 with attachments
- Depositions of Chief Carter (2 Volumes) with attachments
- Deposition of William Fleming (3 Volumes) with attachments
- Deposition of Thomas O'Loughlin with attachments
- "The Plan of Action: A Commitment to Excellence"
- Police texts not specifically referenced in the body of the report:
  - <u>Police Supervision</u>, International Association of Chiefs of Police, 1985
  - <u>Character and Cops: Ethics in Policing, Second Edition</u>, Edwin J. Delattre,, 1994
  - <u>Police Administration, Fifth Edition</u>, Swanson, Territo and Taylor, 2001
  - <u>The Police in America, Fourth Edition</u>, Walker and Katz, 2002
  - <u>Local Government Police Management</u>, International City Management Association, 1977
  - <u>The Managing of Police Organizations, Second Edition</u>, Whisenand and Ferguson, 1978

7.   These opinions are based upon the totality of my specialized knowledge in the field of police practices. This experience is derived from my personal police experience, knowledge and training. This expertise has been developed during my 45 years involvement in law enforcement at all various capacities as a practitioner and my continued experience as a trainer, auditor and litigation consultant. This experience has provided me with extensive personal and specialized training, experience and

knowledge of police operations and generally accepted police practices. The body of knowledge that I have reviewed over the years coupled with my personal and professional experiences, my continued auditing of police agencies, my constant training of police supervisors, managers and executives, my continuous interaction with other police professionals, organizations and training personnel, all form the foundation for the opinions I am rendering in this matter.

There is a large body of knowledge and literature about the practices and standards which modern, reasonably managed and administered police agencies across the U.S. should follow and apply to its operations. These generally accepted practices have developed over time to encourage and assist police agencies to deliver police services to communities serviced which are professional, reasonable, effective and legal. Many of these generally accepted practices have been developed from law enforcement critical analysis of field incidents and examinations of incidents reported to cause police liability, deficiencies and employee misconduct. These generally accepted practices have been a response to reported cases of police misconduct and liability and a desire by law enforcement to create a system to ensure that police conduct remains within acceptable legal and constitutional bounds. I am familiar with this body of knowledge and through my continuous training and audits assist law enforcement with this requirement for reasonable and legal police response to field incidents and for constant improvement.

My examination of the factors involved in this police practices incident embodies the basic fundamentals which I employ in my professional examination of police

agencies during my audits and when working as a consultant with the U.S. Department of Justice. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision.

The terminology I use in my Expert Report is not meant to invade the purview of the court or the final jury determination. I use these terms in my training of police supervisors, managers and command officers when instructing on administrative investigations and civil liability. These are products of my continuous review of case law which should guide a reasonable police agency in supervising its employees. These terms have become common terms within law enforcement supervision, management and risk management; just as the terms of probable cause, reasonable suspicion and the prima facie elements of crimes have become common terminology for police field personnel and detectives.

8.  It is my understanding that this litigation stems from employment assignment changes and disciplinary actions initiated by Chief Carter against Lt. O'Loughlin. These allegations surfaced during an unrelated internal investigation being conducted by the Police Department and involved a review of a recorded police telephone line routinely used by MBTA police personnel. It was discovered that there were numerous conversations between Lt. O'Loughlin and principally one first level police officer. These conversations formed the basis for the employee disciplinary actions against Lt. O'Loughlin for numerous agency violations of conduct unbecoming an officer, discourtesy, disrespect and supervisory failures.

9.  This expert report will address the reasonableness of the disciplinary

actions taken by the MBTA Police Department against Lt. O'Loughlin, based upon generally accepted police employment and supervisory practices.

### Paramilitary nature and chain of command of police agencies

10. Law enforcement agencies are typically different than other public employment sectors and private employment concerns. Law enforcement agencies and specifically uniformed police agencies have historically been considered paramilitary organizations very similar to the military. Police agency employees wear uniforms, have a designated rank structure often the same as the military, are trained in manners similar to branches of the military, and are often required to function in a team concept under the direct command and responsive to supervisory orders. Police officers historically have also been held to higher standards of personal performance, both on and off the job, due to the nature of their job, the role they exhibit in the community, and the authorities given to them to exercise tremendous control over citizens.

11. This paramilitary nature of the police job brings with it the concept of the chain of command. Most police agencies are organized in a traditional hierarchical structure. Employees are expected to adhere to this chain of command to enable the agency to maintain consistency in its delivery of police services to the community being served. It is a form of organizational control to ensure that the employees perform within clearly established parameters of acceptable conduct both on and off the job.

The concept of "24/7" is a traditional and accepted philosophy for a police agency. Officers are allowed to carry weapons off-duty. Officers are expected to and held accountable for taking appropriate action when they become aware of criminal activity regardless of whether they are on or off duty and even outside their own jurisdiction.

12. This concept of chain of command takes on greater significance in a public safety agency that distinguishes it from private employment sectors and even most public employment sectors. Police officers are expected to respond to immediate public safety issues when orders are given to them by superior officers, even though the first level "street cop" may not have the full picture or understanding of the scope of the police assignment. This immediacy must rely upon the employee's belief in the professional competency of the superior officers and that these superiors will be making reasonable decisions and assignments based upon their professional competency. This immediate, positive response can mean the difference between public safety and social order or a chaotic and hazardous public situation. Common examples of this time sensitive response to the police agency's chain of command decision-making are setting up a perimeter to catch a criminal or contain a natural or manmade disaster; an order to stop a vehicle in traffic or a pedestrian by a superior; blocking streets during a sudden public incident; the necessity to evacuate a building or school; performance at a demonstration; or the order to assume a perimeter post in a remote location without any understanding of the operation.

13. When the professional image and reputation of persons in the chain of command is diminished by personal character attacks, derogatory remarks about their

professional capabilities and other forms of "trash talk," the stature of the command officer is compromised. First level employees who may be called upon to respond to chain of command decisions and be expected to do so without questioning the authority and/or competency of the decision-maker may not respond in a timely and effective manner. This delay, in police work, can result in threats to public safety and a reduction in public social order. People and property can be jeopardized.

### Conduct unbecoming within a police organization

14. "Conduct unbecoming an officer" is a historical police disciplinary charge. It has its origin in the military and has been adopted by police agencies. An example from an acceptable and current police publication of this concept is:

> "A relationship of trust and confidence between the employees of this police department and the citizens of the community is essential to the successful accomplishment of law enforcement objectives. All police employees are expected to conduct themselves, whether on or off duty, in such a manner as to reflect favorably upon themselves and the department. The consistently high quality of this standard of conduct establishes and maintains the reputation of the department and encourages the support of the community for police purposes and goals."[1]

The policy of the MBTA Police closely follows acceptable police practices in this area of employee conduct,

> "Police Officers whether on or off duty, shall be governed by the ordinary and reasonable rules of good conduct and behavior, and shall not commit any act tending to bring reproach or discredit upon themselves of the Department. 'Conduct Unbecoming a Police Officer' shall include that which tends to indicate that the Police Officer is

---

[1] Massachusetts Chiefs of Police, Municipal Police Institute, Inc., Model Policies, "Policy 4.01"

9

unable or unfit to continue as an MBTA Police Officer or tends to impair other employees or the operation of the Department. Both sworn and civilian members of the Department shall conduct themselves, at all times, both on and off duty, in such a manner as to reflect most favorably on the Department."[2]

### Essential role of the supervisor in a police agency

15. The paramilitary, hierarchical, and rigid chain of command concepts require that police agency supervisors exercise very specific authoritative roles and positions within the police agency. Mid-level managers are the vital link between the command level decision-makers and the implementation of agency directives, goals and missions. These mid-level managers must ensure that accurate, professional information flows both ways in the agency. The manner in which they exercise their supervisory functions demonstrates to first level employees the mid-level managers' acceptance of these agency directives, goals and missions. When these mid-level managers act in unprofessional and/or biased ways, their actions can defeat the goals of the agency executive.

### Adoption of core values within police organizations

---

[2] MBTA Police Department Rule, Chapter 101, Section 2.3

16.     Law enforcement agencies have been encouraged to adopt mission statements and core values for many years. This has become more pronounced in police agencies since the advent of the movement for accreditation begun in the mid 1980s. While the Commission for Accreditation of Law Enforcement Agencies has been the leader in this movement since its inception in 1984, several other similar programs have been created by other professional organizations and State bodies. The creation of core values was one of the elements of the International Association of Chiefs of Police 2000 Conference and its "Police Corruption Plan." These core values have supplemented the historical police practice of delineating a myriad of rules and regulations of dos and don'ts.

"Value statements can be very valuable and helpful in determining the appropriateness of police employees' conduct. These are concise statements of foundational concepts to guide agency employee's conduct and delivery of services..

Today, law enforcement still has the need for these foundational values which delineate and define the parameters of the police agency performance. But, the mission of most police agencies has expanded from those early years. Now there is more involvement with the community served. Most communities are much more diverse economically and culturally...

Note that these value statements are concise and can be easily learned and remembered. They must be concise, preached, trained, vocalized, lived by, reiterated at all possible occasions, and enforced. They must become the watchword for Chiefs and Sheriffs, as well as all command officers. Each and every employee of the agency must know that he or she will be held accountable for conduct which does not meet these organizational values. It will fail your agency and its employees if they simply become window-dressing on the walls of the lobby of the police station. Common trends for publishing these

values are plaques in the entrance to the police facilities, presentation in police agency web sites, and having them printed on the reverse side of agency business cards...

Value statements or core values of the agency are brought to life by the manner in which administrative investigations are conducted. The IAU/OPS function is the "palace guard." The investigations conducted reinforce these foundational principles and either support or undermine the parameters of acceptable conduct for the agency's employees."[3]

17. Chief Carter when he was appointed to his executive position of the MBTA Police Department developed an in-depth, professional document, "THE PLAN OF ACTION: A Commitment to Excellence." This document included his vision in the form of the agency mission statement and its core values (Fairness, Truthfulness, Professionalism, Perseverance, Treating All Persons with Dignity and Respect, Service Before Self, and Integrity.) According to Chief Carter's deposition in this matter, this document and direction were integral to his plan to further professionalize the agency, restore community confidence, and begin the agency's drive to National accreditation. The document, as well as the depositions of command officers and the Plaintiff, indicates that all agency personnel were informed of the principles of the document and acknowledged that it was their responsibility to perform within the parameters delineated in the document.

---

[3] <u>Law Enforcement Administrative Investigations, Third Edition</u>, Reiter, Public Agency Training Council, 2006

## Police supervision and the role of discipline

18.     Law enforcement officers are unique public employees. They are the only persons in the country with the authority to use force on others and to deprive persons of their personal freedom. In most police agencies this authority is exercised with little oversight within the police agency. The field officer functions in the field normally with total autonomy and without immediate supervision. The decision to use force or make an arrest is left to the discretion of the individual officer. While most officers exercise this authority in a reasonable manner, some do not. This grave responsibility is controlled through proper selection, training and supervision. Supervision of the field officer is the most essential element to ensure that he/she exercises this authority in a reasonable manner. When this authority is compromised, reasonable discipline functions are eroded and this sends an inaccurate message to the individual officer and the police agency as a whole. The ultimate aim of reasonable discipline is to correct individual and agency misuse of this authority and the improper use of discretion. Discipline ensures that the mission and values of the police agency are followed by all of its employees. Without effective discipline the exercise of this authority and discretion to use force and deprive a person of his/her liberty is compromised and the public good is placed in serious jeopardy.

19.     Supervisory failures, whether overt or acts of omission, have contributed to undermining the morale, operations and effectiveness of police agencies and diluted community support for the agency in police organizations throughout the country. Most of these are the outcomes of supervisory failures and the intense familiarity of

supervisors with subordinates supported by personal friendships with motives different and in conflict with agency goals and directions.

- The Rampart CRASH scandal in the Los Angeles Police Department beginning in 1998 was documented to have been the result of supervisory failures, the development of an exclusive clique by these officers, and repeated violations of Constitutional rights of citizens.
- The on-going scandal with the Baltimore City FLEX (anti-crime unit) was similar in outcome. The officers are facing charges of inappropriate sex in the unit headquarters, improper sexual materials in the unit office, use of steroids, and repeated violations of Constitutional rights of citizens. Again much of this outcome has been blamed on supervisory failures and omissions.
- The Oakland Police Department has been thrust into a Court ordered consent decree as an outcome of the Constitutional violations of a small band of officers referred to as "The Riders." The agreement was based in part upon the supervisory failures and supervisors becoming overly familiar with these officers on the graveyard shift.
- The New Jersey State Police entered into its Consent Decree with the U.S. Department of Justice in 2000 based primarily upon allegations of racial profiling. The investigations disclosed that field supervisors were aware of the practice and encouraged or acquiesced to it, contrary to the mission statement and directions of the State Police agency.

20.     Discipline within a police organization is a critical element in the development of morale and the maintenance of the effective operation of the agency. The exact level of discipline or other sanction depends on a variety of factors including the nature of the offense, the employee involved, the moment in the agency's history considering organizational changes in direction and community relations, and a knowledge of similar acts of misconduct and resultant discipline in the past.

21.     An example that I use during my training programs involves a Connecticut State Police Trooper. She was involved in disciplinary actions with the agency and was in the hallway of a police facility talking with her union representation. As the principle lieutenant involved in her disciplinary action was passing by she uttered profane and derogatory comments regarding the lieutenant. Her defense was that she intended to have the comment only for her union representative. The resulting disciplinary action was upheld by the Court.[4] The Court stated, "Tuskowski aggrandizes the conduct at the issue. Tuskowski was talking to McGuire in the hallway of the personnel department, where other officers could walk by. Tuskowski saw Marchio walk by and referred to him, audibly in inappropriate language, which he overheard and then reported to his supervisor. Tuskowski cannot escape discipline for insubordination simply because she addressed her words to her union representative."

---

[4] Tuskowski v. Griffin, et al., *359 F. Supp. 2d; 2005 U.S. Dist. LEXIS 3837*

15

## Conclusions

22.  Lt. O'Loughin's conversations on the police agency's recorded phone line, especially as they were with subordinates, were the type of inappropriate "trash talk" that have the real potential to undermine the professional image and competency of the agency decision-makers within the chain of command.  This conduct is even more egregious when it is lieutenant speaking with first level police officers as I understand is the case in this matter.  When first level employees hear these types of derogatory comments being made by a tenured supervisor, such as Lt. O'Loughlin, the comments take on greater significance than just idle disputes or gripes and have the real potential of being spread through the grapevine of the organization.  The fact that a superior officer of a police agency is off-duty while making such calls is immaterial, where the superior officer is accessing a police agency line, talking to an on-duty officer, and conducting job related business during the telephone calls.

23.  Chief Carter disciplined Lt. O'Loughlin for her conduct unbecoming and disrespect for her superiors and the chain of command.  This decision to find her conduct contrary to organizational goals and directions and to discipline, in my opinion, would be considered reasonable in any police agency.  The specific range of discipline for these acts of police misconduct could traverse the entire spectrum of available sanctions up to and including termination.  The final decision must be made considering all the factors mentioned above and reflect the specific necessities of the police agency during that moment of its history.  Agencies under transition in mission directions and community expectations may need to consider sanctions greater than those imposed

during earlier times in the organization. The discipline of Lt. O'Loughlin was within this reasonable range of sanctions, in my opinion.

24.     At this point I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

25.     My fees for this professional service is a flat Expedited Case Development Fee of $8500 and a fee of $2000 for a deposition in Rhode Island or $2500 per day plus expenses for services away from Rhode Island including depositions and trial appearances.


This report is signed under penalty of perjury on this 5th day of April, 2007, in Greenville, RI.


_____

Lou Reiter

all the factors mentioned above and reflect the specific necessities of the police agency during that moment of its history. Agencies under transition in mission directions and community expectations may need to consider sanctions greater than those imposed during earlier times in the organization. The discipline of Lt. O'Loughlin was within this reasonable range of sanctions, in my opinion.

24. At this point I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool, I will assure that they are made available for review, if requested, prior to their use.

25. My fees for this professional service is a flat Expedited Case Development Fee of $8500 and a fee of $2000 for a deposition in Rhode Island or $2500 per day plus expenses for services away from Rhode Island including depositions and trial appearances.

This report is signed under penalty of perjury on this 5th day of April, 2007, in Greenville, RI.

*[signature]*

Lou Reiter