# AMERICAN ARBITRATION ASSOCIATION

In the Matter of the Arbitration Between

MBTA Police Superior Officers Association

-and-

Massachusetts Bay Transit Authority

A.A.A. Case No.1139-2105-04

Date Issued: March 20, 2006

---

Grievance: Nancy O'Loughlin, Demotion

Arbitrator: Timothy J. Buckalew

Appearances: Philip G. Boyle, Esq., for Massachusetts Bay Transit Authority (Employer); Stephen L. Jones, Esq., for MBTA Police Superior Officers Association (Union)

## ARBITRATOR'S OPINION AND AWARD

### PRELIMINARY STATEMENT

On March 21, May 25-26, August 30-31, September 1 and November 8 of 2005, the parties appeared before the Arbitrator at a hearing conducted in Boston, Massachusetts according to the terms their collective bargaining agreement and the rules of the American Arbitration Association. The following Opinion and Award is based on the evidence presented at the hearing, the parties' collective bargaining agreement and arguments made at the hearing and in post hearing memoranda which were received by February 8, 2006.

### ISSUES

By agreement:
" Was there just cause for the demotion of the grievant, and if not, what shall be the remedy?"

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 2

## BACKGROUND

The grievant, Nancy O'Loughlin is employed by the Massachusetts Bay Transit Authority (MBTA) Police Department and was demoted from the rank of Lieutenant to Police Officer on August 19, 2004 by Chief of Police Joseph Carter following a departmental investigation and hearing. The departmental investigation focused on Ms. O'Loughlin's conversations on a recorded telephone line and based on her statements to other officers using the line, the MBTA hearing officer found O'Loughlin in violation of the MBTA Police Department's Manual of Policies, Rules and Regulations Chapter 62, Section 2.0 (Supervisory Span of Control); Chapter 62, Section 3.0 (Duties and Responsibilities of All Supervisors); Chapter 101, Section 2.1 (Loyalty and Integrity); Chapter 101, Section 2.11 (Interference with Work); Chapter 101, Section 2.3 (Behavior); Chapter 101, Chapter 101, Section 3.18, Section VI (Harassment-Supervisor and Manager Responsibilities); and Chapter 101, Section 3.7 (Discourtesy). Ms. O'Loughlin and the Union grieved the demotion. The grievance was denied and advanced to this arbitration under the parties' labor agreement.

## SUMMARY OF RELEVANT FACTS

O'Loughlin has been employed by the Massachusetts Bay Transit Authority (MBTA) Police Department since 1983, first as a Police Officer. She earned the rank of Sergeant in 1989 and Lieutenant in 1996. During her tenure with the MBTA she has held a variety of posts and specializations: notably as a canine handler and as a graffiti investigator focusing on the prosecution of graffiti related crime. In that capacity she also was frequently called on to testify as an expert in criminal trials around the state. She has received many awards and was the first female police officer to receive the George L. Hannah Medal for Valor for preventing a stabbing. She has had perfect attendance for the past thirteen years, and seventeen of her twenty-two years on the force. Her record shows one incident of prior discipline in 1992, when she received formal counseling for calling Officer Hector Fernandez "dopey" and a "lunkhead" to a superior

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 3

officer.

In January 2003 Chief Joseph Carter became the MBTA Chief of Police, replacing Chief Thomas O'Loughlin, a cousin of the grievant's husband. Chief Carter made swift changes to the department. He promoted Thomas McCarthy one of his Deputy Chiefs. Deputy McCarthy had once been a Deputy Chief previously, but had been demoted by Chief O'Loughlin. Based on his perception that Department morale and public trust was low, and that MBTA Police relations with the public were poor, Chief Carter called for immediate changes in the Department with the purpose of restoring public trust. In February 2003, he began requiring all officers to take an "oath of honor," and in June 2003 issued a "Plan of Action" establishing new standards for police conduct and calling for MBTA Police to be driven by a set of core values: fairness, truthfulness, professionalism, perseverance, treating all persons with dignity and respect, service before self, and integrity.

In June 2003, for reasons undeveloped in the record here, O'Loughlin filed a complaint against Chief Carter and Michael Mulhern, the past General Manager of the MBTA, with the Massachusetts Commission Against Discrimination (MCAD). The MCAD case is currently pending. In August of 2003, Chief Carter informed. O'Loughlin that she was being reassigned to supervise police detail operations throughout the MBTA Police. According to O'Loughlin's testimony, Chief Carter told Ms. O'Loughlin at the time of the reassignment, she would no longer be doing any graffiti investigations or offering assistance as an expert to any other police departments. O'Loughlin stated that supervising police details was considered a punishment assignment by supervisory officers and that Deputy Chief Martino, who had once himself been demoted by Chief O'Loughlin from Deputy Chief to detail supervisor agreed with her that it was akin to discipline.

According to O'Loughlin, in the months preceding her March 2004 suspension, which eventually resulted in her demotion, there was "discontent in the ranks, a feeling that the rank-and- file wasn't being represented correctly." A key incident identified as

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 4

the source of the morale issues arose from a murder at the Dudley Square T station on February 14, 2004. The crime received much notoriety in the press but and many officers were alarmed and angry after a Boston Globe article quoted Chief Carter as refusing to say whether delays in union contract negotiations had somehow played a role in the crime. In addition there was consternation with rank-and-file officers and much criticism of Chief Carter and the MBTA command staff for not showing up at the murder scene at the Dudley Square T Station. One symptom of the morale problems and rancor between the force and Chief Carter was an anonymously produced poster plastered around the department in the style of the children's book Where's Waldo, entitled "No-Show Joe." In response to these jibes, management initiated a departmental investigation to locate the author of the poster and apparently decided to review the logs of recorded telephone conversations made to a phone in the communications center commonly used by police officers calling into the station.

The charges here came about from management's review of conversations that Ms. O'Loughlin had between December 29, 2003 and March 3, 2004 with Officers Robert MacKay and Officer Carl Rubino line when O'Loughlin was off-duty but Mackay and Rubino were working. Most of these conversations are with dispatch Officer MacKay, whom she described as both a personal friend for many years and a "central figure in the department that everyone likes, and everyone calls and talks to if you need some information, need to reach somebody, and also to hear rumor, gossip, scuttlebutt, and have locker room banter." O'Loughlin knew that the particular phone line was a recorded line, although it is not a published number for the MBTA police and is apparently used mainly by officers calling the department for information. She also stated that during the time period in question, Officer MacKay served as a sounding board, if not a safety valve where everyone, including officers, Sergeants and other Lieutenants besides her could let off steam while keeping discontent in-house.

One group of tape-recorded conversations took place between December 29, 2003 and January 7, 2004. In their meanderings, O'Loughlin and Officer MacKay at one

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 5

point discussed an individual who, Officer MacKay stated, "thought he was dragging 30 yards of fence," to which Ms. O'Loughlin, replied "He's such an idiot," which was followed by laughter. On direct examination, Chief Carter testified that he thought that the individual Officer MacKay and Ms. O'Loughlin were referring to was Union President Greg Lee. On cross-examination, Chief Carter stated that he thought the individual was Officer Sean Conway.

Also, during this same time period, Ms. O'Loughlin voiced her displeasure to Officer MacKay about the appointment of Ms. Shirley Osteen to the Police Officer's Association pension board. In her testimony, Ms. O'Loughlin stated that Ms. Osteen replaced a more vocal, active member. At one point, Ms. O'Loughlin told Officer MacKay, " That's because he [union president Greg Lee] thinks he can browbeat Shirley." and, "he [Mr. Lee] wants a stupid idiot."

Also, between December 29, 2003 and January 7, 2004, in a conversation between Ms. O'Loughlin asked Officer MacKay, Ms. O'Loughlin asked Officer MacKay, "How is No-show Joe [referring to Chief Carter]." Officer MacKay responded, "I haven't seen him since he started here. " and laughed. Ms. O'Loughlin responded by saying, "Unbelievable."

According to O'Loughlin's testimony, in either December 2003 or January 2004 her supervision of police details at the MBTA Greenbush line Construction Project in Hingham started taking more of her time as the project moved from the planning to construction phase. Around this time, she met with Deputy Chief Martino who put her in contact with Sergeant Richard Corcoran of the Hingham Police Department. According to the testimony of Sgt. Corcoran, there had been a history of problems with the Hingham MBTA detail predating Ms. O'Loughlin's arrival. Sergeant Corcoran testified that he telephoned Chief Carter prior to O'Loughlin's assignment to Hingham, but the issues were not corrected until after O'Loughlin arrived. Sgt. Corcoran said that she met with O'Loughlin on almost a daily basis after she assumed supervision of the details. He described. O'Loughlin as very professional and responsive to the concerns and

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 6

complaints of the Hingham police. O'Loughlin's states that after talking with Sgt. Corcoran, she informed Patrolmen Union President Greg Lee that this was high profile detail work that MBTA police could lose if the officers working there did not do the right thing. Chief Carter, in his testimony, believed that Sergeant Corcoran telephoned him, not before, but after O'Loughlin arrived at Hingham and that the Town's complaints about the work of MBTA police officers continued unabated under the grievant's watch.

Several serious charges against O'Laughlin relate to conversations she had with Officer MacKay over the Hingham details. On January 26, 2004, Ms. O'Loughlin told Officer MacKay, "that whoever did the detail one day last week fucking unleashed a vulgarity-laden tirade at some poor fucking old lady down there, and she was horrified. If you have a problem like that, just call me…[Officer MacKay responds "yeah" and laughs]…and I'll talk to the guy. You know I'm sure you have your fair share of knuckleheads. We have more than our share."

On the same day, Ms. O'Loughlin and Officer MacKay discussed the problem of MBTA detail officers in Hingham not attending to their duties. According to Ms. O'Loughlin's testimony, she spoke with Officer MacKay, knowing that Officer MacKay would "put the word out to the troops" that Sgt. Corcoran's concerns needed heeding. In recorded conversations, Ms. O'Loughlin told Officer MacKay that Sgt. Corcoran told her "I'm not trying to bust your balls. I'm just trying to …you don't understand the people down here, " to which. O'Loughlin claims on the phone to MacKay that she told Sergeant Corcoran "Yeah, I do. They are rich spoiled bastards…you don't understand us. We're city cops. We could give a fuck less." Ms. O'Loughlin went on to tell Officer MacKay, " But I understand what you're saying, but they are going to fuck the details up for themselves, so I have to talk to Colbert [referring to a union officer] tomorrow and tell them just to give these guys a heads up because I met with the Sergeant [referring to Sgt. Corcoran] and he's not a bad shit."

Ms. O'Loughlin eventually banned two officers from the detail who were a continuous problem, and subsequently informed Deputy Chief Martino of this, which is

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 7

confirmed by Department documents.   In her testimony, O'Loughlin repudiated these coarse remarks she made about the citizens of Hingham and the police and represents that her words to MacKay were not accurate renditions of what she in fact said to Sgt. Corcoran, but were, "a bit of bravado . . . you know to make yourself look good in the eyes of your co-workers."

In the same conversation,  O'Loughlin is heard trying to recollect the name of Sergeant Corcoran whom O'Loughlin described as redheaded. When Sgt. MacKay said that someone named Feltrup knows Sgt. Corcoran, and referred to him as an older guy with red hair, O'Loughlin replied "Tell him its fucking red, the retard [referring to Feltrup]." O'Loughlin also, on the same date told Officer MacKay of a conversation that she had with Sergeant Corcoran where she reports she told Corcoran, "Look it. I'm being punished so anything I can do to help you guys out, you must let me know and I'll back you 100 percent. I said, it may not go beyond me, but whatever you want I'll do." Officer MacKay replied "yeah" and O'Loughlin replied, "I don't give a fuck." In her testimony, Ms. O'Loughlin stated that the "I don't give a fuck" statement meant, "I don't care. I'll do whatever they want me to do." Ms. O'Loughlin stated her reference to being "punished" referred to her being reassigned to the detail operation.

The next recorded conversations of note occurred on February 17, 2004, three days after the Dudley Square murder.   In a recorded conversation, she told Officer MacKay, "I just called to see if there is any command staff around tonight, or they are all, you know, so worried about the 15th swearing in on Friday that they can't worry that some kid got stabbed." ... "we have a chief who won't even show." At the hearing, O'Laughlin did not disavow her harsh statements about Chief Carter but reiterated that she and other officers were "disgusted" by the incident and that their anger led to coining the "No-Show Joe" nickname for Carter.

On the same day,  O'Loughlin and  MacKay criticized Chief Carter's response to the murder-- an expanded police presence in Dudley Square in the form of directed patrols where officers assigned to Dudley Station were ordered not leave the T Station as

Demotion of Nancy O'Loughlin
A.A.A. Case No. 1139-2105-04
Page 8

part of a priority assignment. In the conversation, Officer MacKay told Ms. O'Loughlin, "They don't give a fuck who is down there." O'Loughlin responded in agreement. Mr. MacKay then stated that he thought that Chief Carter was "doing a hell of a fucking job," to which Ms. O'Loughlin responded "What is this the fourth murder under his tenure, under his watch...I don't think there's been four murders is the 20 years I've been on."

On the same day, Ms. O'Loughlin is overheard in a conversation with Officer Rubino about Deputy Chief Thomas McCarthy in which Officer Rubino referred to seeing Chief McCarthy (who he refers to as "little Tom") giving a press conference and says he thought Deputy Chief McCarthy's "head was going to blow up then." Ms. O'Loughlin replied, "You know, I'd love to know where he is getting the 35 people that he's going to put at Dudley," a reference to the common feeling among officers that there were not enough officers available to work the existing assignments. Officer Rubino then recounted an incident in which Chief McCarthy screamed at him. Ms. O'Loughlin responded, "Oh, and who the hell did you people think they were?" and asked, "Did he stomp his feet too?" Officer Rubino responded that Chief McCarthy "looked like Khrushchev banging the desk with his shoe." O'Loughlin replied, "Who the hell do you think you people are?" Also on that day, O'Loughlin said to Officer Rubino, "Well it's great when your command staff won't even show up to a murder." Officer Rubino, responded "twice" and Ms. O'Loughlin responded, "No, four times, buddy."

Also on February 17, 2004, O'Loughlin telephoned Officer MacKay, and after Officer MacKay said hello, O'Loughlin replied "You pork man," to which MacKay replied "Oh, yeah." Ms. O'Loughlin then asked, "you cloning?" to which MacKay replied " I'm going to rest now, okay?" Both then laughed, and O'Loughlin said to MacKay, "Dumb fuck." During her testimony, Ms. O'Loughlin said that in saying "dumb fuck," she was teasing MacKay.

On February 18, 2004, Ms. O'Loughlin and Officer MacKay are overheard in a long discussion over a Boston Globe article implying that Chief Carter believed delays in union contract negotiations played a role in the death of the murder victim. In the

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 9

conversation O'Loughlin asked MacKay, "Can you believe he said that." Officer MacKay responded "Un-fucking believable." Ms. O'Loughlin then said "Can't do anything about it," Officer MacKay responded, "Yup," and Ms. O'Loughlin responded, "are you shitting me, you dope?" MacKay then told O'Loughlin "they had a meeting with their PR guy today so we'll see what happens in tomorrow's newspaper, apology, but it's not going to cut it. We're going to launch our missile and then we're even, okay" to which O'Loughlin responded, "yup."    At another point on the same date, Officer MacKay discussed with O'Loughlin Chief Carter's letter to the Boston Globe in response to the article. Officer MacKay told O'Loughlin, "Let me see, I happen to have a copy of it right here...Letter to the Editors...and he writes—" which was followed by Ms. O'Loughlin saying, "saying what—I'm a fucking moron?"

On March 1, 2004, Ms. O'Loughlin and Officer MacKay discuss an incident they had heard about where a police officer told other officers that his mail carrier had criticized the MBTA police force, telling the officer, "You people should have been ashamed of yourself. You call yourself cops. You're not cops; you're security guards." O'Loughlin asked Officer MacKay. "Who the fuck is this guy?" and then stated, "I would have fucking pummeled him." O'Loughlin's stated at the hearing that this was just "banter," and that, "I probably would have done the same thing the kid did, shut the door."

Also that day, MacKay and O'Laughlin engage in extended gossip over the appearance of Deputy Chief Martino at a function where MacKay relates that an Officer Gillespie had told him that the pregnant woman standing next to Deputy Chief Martino at a press-conference was Martino's girlfriend. O'Loughlin responded by saying, "Really" and "Very nice," and then stated "All right, yeah, now she's got him by the balls." Officer MacKay continued, saying that what Officer Gillespie said has to be confirmed and that he didn't know if he could take it as "etched in stone." Ms. O'Loughlin responded, "Unbelievable. They should be fucking ashamed of themselves." In her testimony, O'Loughlin stated that she and MacKay take monogamy very seriously

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 10

and she was upset that "a member of the command staff was openly cheating on his wife." After Ms. O'Loughlin's testimony at this hearing, the parties stipulated that the woman in question was actually Deputy Chief Martino's daughter, though this fact was apparently not known to Ms. O'Loughlin at the time of the incident, and during her testimony.

On March 2, 2004, O'Loughlin and MacKay discussed the investigation that Chief Carter had initiated to determine who was posting the "No-show Joe" posters. In the conversation, O'Loughlin referred to Officer Hennessey, who O'Loughlin stated was rumored to be one of the subjects of the investigation. In the conversation, MacKay stated that Deputy Chief McCarthy was taking control of the investigation and that "he's doing more things now than he did for the murders down there at Dudley." O'Loughlin responded, "No kidding, I heard that he supposedly pulled out a fingerprint card between the letters I and P. I said, Yeah, okay." Officer MacKay responded, "Oh, God.". O'Laughlin then said, " I said you got to be—and when they find out who did it, if they found out who did it, what are they going to discipline him for? There is no crime there. It's a political satire." Later in the conversation Ms. O'Loughlin stated, "Okay, if that's conduct unbecoming, when we have ranking officers running around with extramarital affairs." In her testimony, Ms. O'Loughlin stated that "everybody was talking about" that someone had pulled a fingerprint card, and that she did not think she was revealing anything because it was "gossip around the station."

Ms. O'Loughlin also stated, "...if Hennessy thinks he is in danger of any type of finger pointing, then he should just let them know that he has witnessed people being in the company of other people when they have been on duty." When Officer MacKay stated "I imagine they would make an example of whoever they think it is," Ms. O'Loughlin replied "Yeah, they would try, but there's no—you can't discipline them, for what Bobby?"

On March 3, 2004, O'Loughlin and MacKay had a conversation discussing advice that she gave to Officer Jimmy Floyd. According to Ms. O'Loughlin's testimony, Officer

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 11

Floyd was going to have brain surgery and planned to take Family Medical Leave Act
(FMLA) time. Officer Floyd called O'Loughlin and was crying because he had received
a termination notice from the MBTA, despite the fact that a union official and Deputy
Chief Martino had okayed the FMLA time. O'Loughlin told Officer MacKay, "I said,
brother [referring to Officer Floyd], they can't do that to you. You had a Union official
sit down with you and that little puke [referring to Deputy Chief Martino], and he gave
you the okay to do?" As the conversation over Floyd's situations continued, she told
MacKay "Don't deal with [union president] Greg Lee. Deal with Brian Carey [union vice
president] to give you the advice that you need." O'Loughlin also told Officer MacKay,
"I told him, Jimmy [referring to Officer Floyd], get a lawyer, and sue them for
harassment." Ms. O'Loughlin testified that she advised Floyd to speak to the Union
Vice President rather than the President, because she knew Union Vice President Carey
was familiar with FMLA time because he has a disabled child and had used FMLA
leave. O'Loughlin said that an hour later, Deputy Chief Martino informed Officer Floyd
that the termination notice had been sent in error.

    Also on that day, O'Loughlin also spoke with MacKay about Patrolmen's Union
Business Agent Paul Burns' alleged ineffectiveness in dealing with the administration on
the issue of overtime pay for an Officer Zelinski. In her testimony, O'Loughlin stated
that Officer Zelinski approached her for advice. In the transcripts of the taped
conversations she tells Officer MacKay, "and I looked at Zelinski and I said are you
shitting me, kid. You're paying this guy 700 bucks a week. You think he's actually going
to tell you the truth?"

    On March 8, 2004, Officer O'Loughlin was called to Chief Carter's office, told
that she was put on administrative leave and escorted out of the building. According to
Ms. O'Loughlin's testimony, she was then confined to her house, and on the same day,
the MBTA also responded to Ms. O'Loughlin's MCAD complaint.

    On April 16, 2004, O'Loughlin received notice of a hearing that under
Massachusetts General Laws Chapter 31. On May 14, 2004, formal charges were issued

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 12

as well as a notice of suspension. The Chapter 31 hearing took place on May 21, 2004 and June 15, 2004. At no point during the investigation was O'Loughlin asked to make a statement, nor did she volunteer to do so.  Deputy Chiefs Dolores Ford-Murphy and Thomas McCarthy conducted the investigation. O'Loughlin did not testify at the Chapter 31 hearing.

On August 9, 2004, the Chapter 31 Hearing Officer submitted a report, finding that there was just cause to find that O'Loughlin violated the policies practices and procedures as charged. On August 19, 2004, Chief Carter demoted O'Loughlin from Lieutenant to Police Officer. O'Loughlin and the Union subsequently appealed the decision to this forum.

In March 2005, prior to the first arbitration date, according to the testimony of Chief Carter and Sgt. Corcoran, Chief Carter telephoned Sgt. Corcoran. According to Sgt. Corcoran, Chief Carter asked Sgt. Corcoran if he had put anything in writing in regard to the Hingham detail and whether he had any issues with Officer O'Loughlin. Sgt. Corcoran, in his testimony stated that he told Chief Carter that he had no issues with Officer O'Loughlin and thought she handled the issues in a very professional manner.

## EMPLOYER POLICIES, RULES AND PROCEDURES:

### Supervisory Span of Control

MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 62, Section 2.0, also reference Chapter 101, Section 1.0 states in part, "It is the policy of the Department that all Supervisors will immediately report all violations of law committed by Officers under their command or control through the chain of command.  Furthermore, all Supervisors will immediately report through the chain of command violations of Department policies, rules or procedures committed by Officers under their command or control that require further disciplinary action. Failure to do so, in either case will be considered neglect of duty. The reports will include a recommendation concerning any further action or disposition."

### Duties And Responsibilities of All Supervisors

MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 62, Section

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 13

3.0 states in part, "Supervisors will ensure that all subordinates perform their duties in a professional, efficient and effective manner, and act in compliance with all Department policies, rules and procedures..."

### Loyalty and Integrity

MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 101, Section 2.1 states, "A Police Officer shall be faithful to his/her Oath of Office, Oath of Honor, Code of Ethics, the principles of professional police work and the Goals and objectives of the Department. He/she shall not allow personal motives to govern his/her decisions and conduct. The public demands that the integrity of its Police Officers be above reproach. The dishonesty of a single Police Officer may cast suspicion on the entire Department. Each Police Officer must scrupulously avoid any conduct that might compromise the integrity of themselves, fellow Police Officers, or the Department."

### Interference With Work

MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 101, Section 2.11 states, "Police Officers shall not interfere with cases assigned to other Officers except with the consent of the assigned Officer. Officers shall not unnecessarily interfere with the work or operation of any unit of the judicial system."

### Behavior

MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 101, Section 2.3 states, "Police Officers whether on or off duty shall be governed by the ordinary and reasonable rules of good conduct and behavior, and shall not commit any act tending to bring reproach or discredit upon themselves or the Department. "Conduct Unbecoming a Police Officer" shall include that which tends to indicate that the Police Officer is unable or unfit to continue as an MBTA Police Officer or tends to impair other employees or the operation or the Department. Both sworn and civilian members of the Department shall conduct themselves, at all times, both on and off duty, in such a manner as to reflect most favorably on the Department."

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 14

### Discourtesy

MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 101, Section 3.7 states in part, "No employee shall conduct him/herself in a manner that is rude, impolite, contemptuous or insolent to or about a Superior Officer, or a fellow employee, or representatives of other agencies, or to the public."

### Harassment-Supervisor and Manager Responsibilities

MBTA Police Department Manual of Policies, Rules and Procedures, Chapter 101, Section 3.18 Section VI states in part, "It is the responsibility of each supervisor and manager to enforce terms of this policy. Supervisors, managers or department heads who become aware of incidents of harassment in their departments, even in the absence of a formal complaint, should take immediate and appropriate actions to eliminate the conduct. Supervisors and managers must also report all incidents to the Office of Diversity and Civil Rights."

### POSITIONS OF THE PARTIES- DISCUSSION

The Employer contends that the record plainly shows that O'Laughlin violated the Department's rules as alleged in the demotion action: O'Loughlin's many disparaging, unprofessional and sometimes vulgar remarks in reference to Department Command Staff and civilians in violation of the Department's rules; . O'Loughlin allowed and encouraged subordinates to make contemptuous and insolent remarks about superiors, neglecting her responsibility to ensure that her subordinates abide by Department rules; by so doing she subverted Chief Carter's efforts to maintain high standards of professionalism in the Department. The Employer claims that because Ms. O'Loughlin knew MacKay's role as a source of gossip and innuendo in the Department, she knew or should have known that MacKay would likely broadcast all of her disparaging comments to other officers.

The Employer argues that it should not be seen as a conventional employer, but rather the MBTA Police is a paramilitary organization with a lower tolerance in some to disciplinary issues, particularly the criticism of superior officers. It argues that the

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 15

MBTA's unique mandate to protect the life and limb and property of millions of individuals, particularly in light of the events of September 11, 2001, gives the MBTA a right to impose regulations strictly in a fashion that might not pass muster in another place and time.  In the context of these heightened standards needed for paramilitary discipline, the Employer claims that Ms. O'Loughlin lost her compass and forgot to lead, forgot to set an example and neglected her duty to maintain order and neglected her duty both to her co-workers and to private citizens.   The Employer asks the Arbitrator to agree that the evidence supports the conclusion that O'Laughlin neglected her sworn duties as a member of the command staff, and accordingly must be deemed no longer capable of being a supervisor and role model in the Department.

The Union's case starts with the observation  that the charges against O'Loughlin do not stem from on-the-job complaints from co-workers, superiors or civilians, but, rather from the unexplained decision of Chief Carter's closest staff to listen to recorded phone lines. The Union contends that the type of "locker room" speech heard on the tapes is normal and unremarkable for  police department employees and should be deemed protected under the First Amendment.  With respect to the complaints arising from O'Loughlin's role in advising subordinates and the discretion that she exercised in the disciplining of employees, the Union contends that her actions were consistent with workplace norms and not a violation of departmental regulations.  It argues that the objected-to conversations took place in the context of what were assumed and intended to be private phone calls in a room not open to the public with a friend while off duty.  The Union cites testimony that the phone line was not intended for emergency use, and states that while the public can make requests to hear portions of tapes for court proceedings, there was nothing in the testimony that would cause these conversations to be requested by the public, nor is there evidence that O'Loughlin herself ever voiced any of the criticisms of the department or Chief Carter or of Union officers in a public setting.

The Union raises objections about the investigation of O'Loughlin's alleged misconduct, including Chief Carter's minimal involvement in the investigation, the

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 16

failure of the Employer to call the deputy chiefs who conducted the investigation to testify at the hearing, and the fact that despite the Employer did not follow it's own policy by failing to require or request that O'Loughlin make a statement, as well as the failure to interview O'Loughlin prior to charging her. The Union concludes that considering O'Loughlin's long career, her many commendations, the fact that she has virtually no prior history of disciplinary activity, and the fact that she is not accused of any criminal violations, the penalty of demotion is disproportionate and instead Ms. O'Loughlin should receive a letter of reprimand.

**Charges relating to O'Loughlin's Reporting Subordinates at The Hingham Detail:**

O'Loughlin is charged with violating MBTA regulations in regard to Supervisory Span of Control and Duties and Responsibilities of All Supervisors in regard to her supervision of the Hingham detail.

The Employer states that O'Loughlin became Detail Unit Commander in August 2003 and several months later; the Hingham detail became the source of complaints against the MBTA police by Hingham residents and police. The Employer cites Ms. O'Loughlin's comments to Officer MacKay in which she calls Hingham residents "rich spoiled bastards" and that, "we could give a fuck less" as injurious to community relations and setting a bad example to subordinates by legitimizing stereotyping of a community. The Employer criticizes O'Loughlin for: failing to discipline a MBTA Officer who unleashed the "vulgarity-laden tirade" at the Hingham resident; for not following up with Union President Greg Lee to make sure he had "passed the word along" to the detail officers regarding complaints that the officers were receiving, and for never issuing a letter to the officers telling them to refrain from unprofessional actions. The Employer also finds some fault with Sgt. Corcoran's testimony due to Sgt. Corcoran's apparent error when he stated that the MBTA Police detail began in the Summer of 2003 when it apparently began on October 31, 2003.

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 17

The Union paints a far more responsible picture of O'Loughlin in regard to the
Hingham detail. It cites testimony from O'Loughlin and Sgt. Corcoran detailing her
meeting on a regular basis with Sgt. Corcoran, his statement at the hearing that she had
satisfactorily addressed any issues raised by the Hingham police department. O'Laughlin
testified that she had acted to end the detail abuses identified by the Hingham police by
telling Union President Lee and Officer MacKay that the problems with the details had
to stop, and by banning two officers from the job after problems with the two officers
persisted. The Union asserts that discipline per se was not mandated by law or
department rules as Chapter 62 Section 2.0 gives an officer discretion in determining
which violations of subordinates to report. Chief Carter affirmed that this reading of
Section 2.0 is correct. The Union notes that O'Loughlin's testimony that she removed
the officer is corroborated by Department documents, but contradicts Chief Carter who
based his decision to demote O'Laughlin on his believe that O'Loughlin had not taken
any action with respect to the reported problems in Hingham.

The Union faults Carter's testimony that Sgt. Corcoran, and by implication the
Hingham Police Department, was dissatisfied with O'Loughlin. Sgt. Corcoran testified,
contrary to Chief Carter's recollections, that Chief Carter called him with concerns about
the Hingham detail before O'Loughlin took active control over supervising the details.
According to Sgt. Corcoran, then, O'Loughlin was not responsible for the detail's
problems that existed in the summer of 2003, rather, things improved once O'Loughlin
arrived. Sgt. Corcoran also stated that O'Loughlin was very professional, that she
addressed any needs he voiced in a timely and efficient manner, that he never had any
problem with her on the job, and that he has no recollection of O'Loughlin making
comments to him that were attributed to her in the charges. This corroborates
O'Loughlin's testimony that she never insulted him or the Town of Hingham, but was
"pounding her chest" and blustering when she made objectionable remarks to MacKay on
the recorded line.

The Union also notes Sgt. Corcoran's testimony that Chief Carter called him just

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 18

prior to first arbitration date, asking Sgt. Corcoran about a prior phone call in which the Chief recalled that Sgt. Corcoran had allegedly complained about O'Loughlin to Chief Carter and Deputy Chief Martino. In his testimony, Sgt. Corcoran's stated that he told Chief Carter that no such conversations had taken place, and that he was pleased with O'Loughlin's work. Sgt. Corcoran testified that he had called Chief Carter to voice complaints about the detail when Deputy Martino was in charge of the detail because Deputy Martino did not return his phone calls.

I find Sgt. Corcoran's testimony to be crucial on these charges, as since he is from an outside police department, had no interest in the disposition of the matter and because of his lack of involvement in the dispute was the most objective witness on O'Laughlin's conduct as the detail officer overseeing the conduct of MBTA police officers on the construction work in Hingham. Sgt. Corcoran's testimony is most favorable to the credibility and the integrity of O'Loughlin and while it is true that his memory on the start time of the construction project is sketchy, his recollections of his conversations and interactions with O'Laughlin is on balance clearer and more credible than other witnesses. Consequently, I am inclined to believe that O'Loughlin adequately supervised the Hingham detail, and did not abuse her discretion that she had under the Department regulations with regard to disciplining subordinates. Her comments to Officer MacKay about Hingham residents were rude, but they were not public utterances, and did not affect the public's perspective on the department. In sum, there is no evidence that O'Loughlin did anything to hurt damage the department's interest in improving community relations between the MBTA and Hingham or to undermine the effectiveness of the command staff with respect to her oversight of the construction details.

### Reporting Subordinates Comments in Regard To The Dudley Station Murder

The Employer contends that O'Loughlin's failure to correct the offensive statements of MacKay and Rubino amount to tacit approval of their bad conduct and

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 19

amounted to neglect of her responsibilities as a superior officer. The Employer points out that at no time did O'Loughlin make effort to stop or indicate disapproval of these comments. Consequently, The Employer argues, O'Loughlin undermined the authority of the command staff. The Employer also suggests that O'Loughlin's failure to report Officers MacKay and Rubino was a form of special treatment based on friendship, citing instances when O'Loughlin had disciplined officers in 1992 for minor offenses.

The Union, in response, cites the decision of the arbitrator in a case arising out of the same telephone intercepts as are at issue here, where the arbitrator found that MacKay's remarks did not violate Departmental regulations. If that is so, the Union opines, there was no violation of the rules for O'Loughlin to report. The Union states that even if MacKay or Rubino's statements were serious enough to report, Ch. 101 Section 1.0 only would have required O'Loughlin to report Officers MacKay and Rubino to superiors only if they had violated the law.

The Union also states that MacKay's comments should be seen in light of the difficult time that the Department was having at the time of the Dudley Square murder, and the fact that it is exceedingly common in workplaces for one to complain about one's boss.

While it might have been advisable for O'Loughlin to caution Officer MacKay and Rubino when their comments got out of hand, and her penchant for gossip is grounds for censure, I agree with the Union that O'Loughlin was not clearly mandated by regulation to report the officers while she was in off-duty status. The mere fact that she listened to her friends' gripes about their bosses is not worthy of severe discipline where the record shows no consequences to the department from her participation in the recorded "bull sessions." Indeed, in the entire record, there is no persuasive evidence that O'Laughlin's gossiping and griping, however immature and offensive, had any effect on her or any subordinate officer's conduct on the job, willingness to follow orders or that her ostensible failure to act otherwise influenced the actual conduct of any officer in the department.

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 20

### O'Loughlin's Comments Regarding Various Individuals and Command Staff

O'Loughlin is charged with violating MBTA regulations in regard to Loyalty,
Integrity and Discourtesy, specifically being rude and impolite to superior officers and
subordinates, or otherwise unprofessional. Here, the Employer cites a number of
instances where O'Loughlin criticizes command staff and calls various individuals names
such as "retard," "Idiot," "dumb fuck," "dope," and "little puke," including calling Chief
Carter a "fucking moron." The Employer states that O'Loughlin's comments reflected a
gross display of contempt and disrespect for the chain of command, and that the
comments were particularly deleterious as they were expressed to on-duty subordinate
officers MacKay and Rubino, proving a "green light" for subordinate officers to likewise
engage in these types of remarks and maintain an insolent attitude toward the chain of
command. The Employer also alleges that O'Loughlin took part in purely malicious
rumor mongering when she fostered the fallacy that Deputy Chief Martino's pregnant
daughter was his mistress. The Employer also contends that even though O'Loughlin's
comments were made while she was off-duty, they were made to on-duty officers on an
official MBTA phone line. The Employer notes that Rule 2.3 requires officers to conduct
themselves in such a manner to reflect favorably on the Department both on and off duty.

The Union counters that O'Loughlin's sarcastic and critical comments, many of
which take place in the aftermath of the Dudley Station murder must be seen in the
context of media and public criticism of the Department as a whole, and particularly
Chief Carter's inference to the Boston Globe that problems with the Unions may have
been responsible for the lack of coverage at Dudley Station which was particularly
offensive to O'Loughlin and other officers. The Union cites Chief Carter's testimony
where he admits that command staff did not show up at the murder scene, yet they had
time for ceremonial events. The Union notes the frustration of O'Loughlin and other
officers when MBTA police officers' work is  not mentioned in a news article, provoking
the statement from O'Loughlin in which she is charged for responding,  "Can you blame

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 21

them?...We have a chief that won't even show." The Union also refers to Chief Carter's testimony where he acknowledges, "all managers know that police officers banter. There's locker room talk. The Union contends that given this acknowledgment and the climate at the time, it is understandable that superiors might share in subordinates' frustration.

The Union also contends that many other comments that O'Loughlin is charged with are misrepresented, taken out of context by the employer, and in some cases too vague to understand. These include O'Loughlin calling her friend Officer MacKay a "dumb fuck," which was said teasingly, and instances where Chief Carter appeared unsure who particular statements were referring to, and importantly, that he could not state the standards for determining the threshold between acceptable "banter" and actionable insults. The Union minimizes O'Loughlin's mistakes made about Officer Martino's daughter, by noting that Chief Carter was also laboring under the mistaken impression that the woman in question was Martino's wife, since Chief Carter calls her, "Martino's better half." Thus does gossip and innuendo vex both the righteous and the wicked.

While there is no question that O'Loughlin's comments were extremely critical of the Department and other individuals, my starting point is that not all criticism of a superior officer and command staff is per se actionable by an employer. In fact, if all such comments were actionable, police departments would have to devote precious resources away from protecting the public safety in an attempt to squelch out all private dissent within a department.

Employers can, however, draft reasonable regulations prohibiting insubordination and other conduct with clear restrictions on what is acceptable verbal conduct on-duty and in a more limited fashion, while off-duty. The two rules that Ms. O'Loughlin is charged with violation in this instance, (Chapter 101, Section 2.1 (Loyalty and Integrity) and Chapter 101 Section 3.7 (Discourtesy) plainly pertain to the public, on-duty actions of employers. (The Employer makes reference to another rule, Chapter 101;

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 22

Section 2.3, which limits certain off-duty behavior by officers, but. O'Loughlin is not charged with violating Chapter 2.3 on these violations. Rather, she is only charged with violating Chapter 2.3 in connection with her alleged interference with union business.)

Consequently, I find that O'Loughlin did not violate either of the rules that she is charged with violating. O'Loughlin, while off-duty, called regularly what was indisputably known as the department's gripe and groan line. She did not call with any intent to change the actions of the officers in the conversation with respect to their obligations as police officers or to undermine the authority of the Command Staff. With all the damaging actions that a disloyal or discourteous employee could take to harm the department, it is hard to see exactly how Ms. O'Loughlin's venting in this fashion harmed the department. Her comments are immoderate, ill-considered and unprofessional, but as noted before there is simply no showing that any of her ill-considered discussions with Officers MacKay and Officer Rubino affected their conduct or responsibility to carry out the orders of the command staff. If fact, in her many phone calls, she never proposes or encourages Officers MacKay or Rubino to do or not do anything. Merely voicing an opinion to another officer in a putatively private telephone conversation cannot be deemed insubordinate even if the underlying sentiment is rude and offensive.

The Employer contends that she gave other employers a green light to maintain an insolent attitude toward the chain of command, but I am not persuaded that she promoted such an attitude, or if so, that her remarks about widely perceived unfairness within the department caused any change in conduct, as opposed to reflecting the morale of the officers at that point. There is no showing that O'Loughlin intended her comments to be heard in public or to cause any change in the officers' duty to follow orders or to implement the goals identified as priorities by management.

## Interference With Union Business and Failure To Report Harassment

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 23

These charges regard the March 3, 2004 advice that O'Loughlin gave to Officer Floyd and Officer Zelinski. O'Loughlin is charged with violations of MBTA regulations in regard to Behavior, and with regard to Officer Zelinski, the MBTA rule that outlines Supervisor and Manager Responsibilities to report unlawful harassment to management.

The Employer contends that O'Loughlin should have stayed out of matters involving the relationship between subordinate officers and their unions, and should not have given advice about how their business agent was performing nor criticized management's handling of an FMLA leave request. In the case of Officer Floyd, the Employers position is that O'Loughlin should have reported Officer Floyd's complaint to the Office of Diversity and Civil Rights in accordance with the EEO Compliance Program between the MBTA and various parties.

The Union replies that normal supervisory duties include advising subordinates on a wide variety of workplace matters, and more so when a superior possesses advanced knowledge and experience and where they believed that someone was not acting in a co-worker's interest. The Union cites O'Loughlin's testimony that she advised Officer Floyd to seek advice with regard to medical leave because Officer Carey had experience with the forms and procedures as the result of having a disabled child. The Union also notes that prior to charging Ms. O'Loughlin, the Department neglected to investigate why Ms. O'Loughlin gave this advice, and in his testimony, Chief Carter remained unaware that Officer Carey had experience with Family Medical leave due to having a disabled child.

The Union's position with regard to the other instance of alleged interference is that Officer Zelinski approached Ms. O'Loughlin for her opinion about the business agent, and Ms. O'Loughlin gave him her opinion, including her contention that the business agent was not acting in Officer Zelinski's best interest. The Union also cites testimony of Chief Carter acknowledging that there is no MBTA rule forbidding officers who are members of their own union, from giving advice to a member of a different union.

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 24

The allegation that Ms. O'Loughlin failed to report harassment regards the situation with Officer Floyd, in which a miscommunication (a mistakenly sent letter of termination to Officer Floyd) was found to have happened an hour after Ms. O'Loughlin advised Mr. Floyd. The Union contends that consequently, there was no allegation of harassment to report, just a false alarm.

I find that these charges clearly exceed the evidence presented at the hearing. The mere fact that O'Laughlin offered her opinion on these common work place concerns cannot be construed as interfering in the business of the patrol officers' union. This is not a case where she exercised her role as a superior officer to direct or dissuade a subordinate to undertake, or avoid, a course of action that would be antithetical to the interest of the subordinate's union. Her claim that management's rejection of officer's Floyd's FMLA claim was "harassment" is clearly nothing more than reactive hyperbole and not a conclusion that the officer had a cause of action under the law for improper discrimination, or that Floyd had made such a claim (as opposed to her emotional reaction to his supposed mistreatment) warranting investigation.

**Interference with Ongoing Investigation**

The Employer claims that O'Loughlin interfered with the Department's investigation by participating with MacKay in a discussion of the steps management was taking to investigate the posting of the "No-Show Joe" and by proffering her opinion on whether management had the authority to discipline an officer for making or posting what she called a satirical message.

The Union rejects this claim and notes that this was a discussion of an existing rumor where Officer Hennessey was one of the individuals being investigated. As testified by O'Loughlin, "everybody was talking about" rumors that someone had pulled fingerprint cards for officers with names from I to P. The Union states that while the investigation was private and Ms. O'Loughlin was never a party to it, all persons of rank were aware of the investigation. From my reading of the facts, I conclude that Ms.

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 25

O'Loughlin, who was not part of the investigation, lacked the ability to divulge confidential police information to unauthorized sources because she possessed no such information. There is no evidence that Ms. O'Loughlin did in fact or intended to thwart the investigation.

### Other Arbitration Awards

The Employer and Union both address the weight to be given a quartet of parallel arbitration award addressing the question of just cause for police officers who like O'Laughlin, received discipline following management's review of the recorded police line.

The first award is Arbitrator Canavan's decision overturning the discharge of MacKay. The Employer asserts that MacKay's case was incorrectly rendered largely because the arbitrator did not give proper weight to the distinctive nature of police employment. There, as here, the Employer argued that where police departments are paramilitary entities, police officers are held in higher standards than in other professions. Moreover, the Employer asserts, the award in MacKay's favor ignores the special circumstances that called for Chief Carter's Plan of Action. If not incorrect, the MacKay award is not a suitable yardstick for this grievance because O'Loughlin, as a Lieutenant and part of the command staff had a higher responsibility than MacKay to be a role model and adherent to the values the Plan of Action promotes. Likewise the Employer suggests the decision of Arbitrator Garraty setting aside the demotion of Lt. Flemming is either inapplicable because Flemming did not use the same coarse and vulgar language, did not disparage other officers and Command Staff and his misconduct was only indirectly related to his supervisory functions.

In contrast, the Employer suggests that I find guidance Arbitrator Canavan's decision denying the grievance of Officer Hennessey, and a similar decision by Arbitrator Fink denying Officer Floyd's grievance, where the phone calls were found to violate the department rules and regulations at issue here, in part.

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 26

While I concur with the employer that these decisions are not authoritative, I do not agree that Arbitrator Cannavan did not consider the need for heightened discipline in a police department. Rather, Arbitrator Cannavan found that Mr. MacKay's frank comments, expressed in the "idiom of the day," were expressed in private conversations between officers, were not known to the public and caused no harm to the department. Thus, even assuming for the sake of argument, that the hierarchy of the MBTA police required more flexibility in administering its rules than might be allowed in a non-police context, if there was no demonstrable harm to the command structure from MacKay's or O'Laughlin's conversations, discipline based on putative damage to the department's standing or order in the department would still be unjustified.

Arbiter Canavan's finding in the Hennessey arbitration that just cause existed for finding some of Hennessey comments in violation of MBTA rules can be distinguished from both MacKay and this case because some or all of Hennessey's remarks were not said in private, and some of his particularly vulgar statements had nothing to do with working conditions and other public issues as is the case here. The decision in the Floyd arbitration can also be distinguished from this case, because Floyd, unlike O'Loughlin, was deemed to have violated MBTA Police harassment regulation because of he uttered a racial slur ("nigger") in violation of the department's zero tolerance policy for such offensive language.

Finally, while the Employer struggles to distinguish the Fleming arbitration and the case at hand, I find the reasoning of the Arbitrator in that case instructive. There, as here, the grievant was a lieutenant demoted because of private conversations on the recorded line with Officer MacKay. The substance of Fleming's conversations with MacKay touched on some of the same topics—the Dudley Square murder and the subsequent Globe Article— and there, as here, the demotion was based on premised on Fleming's failure to correct offensive and disparaging remarks from MacKay such as "fucking retarded" and "fucking morons." In at least one case, Lt. Fleming's language was as or more offensive than O'Loughlin's when he states to MacKay, "Better to be a

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 27

racist than a chicken... At least racist carries the connotation you can fight." It is also
noteworthy that in contrast to O'Laughlin, Fleming had been subject to progressive
discipline (a demotion and suspension) prior to the recent suspension and thus would
have arguably warranted more severe discipline than O'Laughlin.

To sustain the demotion under the just cause standard, the Employer must show
by a quantum of probative evidence that the employee engaged in conduct that was
prohibited by known rules and standards, that the employee knew or should have known
of the consequences of violating the department's rules, and that there is at some rational
relation between the alleged infraction and the severity of the discipline, and finally,
where appropriate that progressive discipline was followed.

Virtually all of the evidence in this case consists of recorded phone conversations
that the grievant initiated while off-duty and not engaged in department business. To find
the grievant in violation of Departmental regulations, one must find that the very words
that the grievant used consist of misconduct per se, or that some misconduct that the
grievant or dispatcher described, actually happened. What is noticeably absent in this
case are statements from her superior officers, subordinates, co-workers or civilians
alleging that the grievant's speech conduct, such as making negative comments about the
Command Staff diminished in any way the reputation of the department or its managers.
The only testimony from a witness who regularly interacted with Ms. O'Loughlin was
offered by Sgt. Corcoran, who found Ms. O'Loughlin very professional and was happy
with her work as a supervisor of her crew.   O'Laughlin's effectiveness as a supervisor
and how her employment impacted the community could have been readily discovered
during the disciplinary investigation by interviewing Sgt. Corcoran.  The fairness of the
investigation is also tarnished by the disinterest of the department in obtaining any
statement from Ms. O'Loughlin, and the appointment of Deputy Chief McCarthy—a
known antagonist of O'Loughlin— to co-lead the investigation.

Since the statements were made with the expectation of privacy and while Ms.
O'Loughlin was off duty, Ms. O'Loughlin lacked clear notice that her actions were in

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 28

potential violation of Department rules. The Employer also lacked a clear policy in regard to penalties.  Notably, Chief Carter, was unable to articulate a clear policy such as a table of penalties, or guidelines on how to penalize first and subsequent offences for the sorts of misconduct alleged here.  Chief Carter also testified that progressive discipline is not required for violations of any of the core values within the Plan of Action. Given the fact that the core values appear to have been broadly construed to encompass practically any infraction,  I have determined that despite Employer's insistence that the penalty is valid, there is no coherent basis for the severity of the penalty, the Department disregarded all of O'Laughlin's prior service record and did not consider whether a lesser penalty might correct the shortcomings in her performance.

Ms. O'Loughlin has heretofore been regarded as  professional and capable officer.  It is hardly news and more accurate to say that it is excessively common to complain about one's boss.  The language used by O'Laughlin while spicy and intemperate is quite common fodder in any institution, and even Chief Carter admits that the type of language that Ms. O'Loughlin used is within the norm of what is heard in police banter.  Where there is no evidence that prior to these incidents the rules and regulations of the department had ever been extended to encompass off-duty conversations, and  no evidence that any supervisor had been demoted for failure to correct a subordinate's verbal misconduct, charges emanating from the conversations alone cannot survive just cause scrutiny.  As noted in the discussion above, the facts do no support the charge that O'Laughlin had failed to control the police officers assigned to work on the Hingham details or had otherwise failed to properly represent the department in her relations with the Hingham police department and therefore those charges too cannot support the demotion.

In summary, the balance of the evidence, convinces me that the Employer did not have just cause to demote Ms. O'Loughlin. Even with the evidence seen in the best light, and with all deference to the unique and essential role that law enforcement plays in today's troubled world, the evidence properly weighed does not support the discipline

Demotion of Nancy O'Laughlin
A.A.A. Case No. 1139-2105-04
Page 29

imposed here. I conclude that the Employer did not have just cause to demote the
grievant and accordingly the grievance is affirmed.

### AWARD

The Employer did not have just cause to demote Ms. O'Loughlin. The grievance
is allowed. O'Loughlin shall be reinstated to her former position and made whole for
lost pay and benefits resulting from this demotion.

Respectfully submitted,

Timothy Buckalew, Arbitrator.