## MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
## POLICE DEPARTMENT

IN THE MATTER OF            REPORT OF THE HEARING OFFICER
LIEUTENANT NANCY O'LOUGHLIN     (pursuant to G.L. c.31, § 41)

BEFORE:          Kevin S. McDermott
                     Assistant General Counsel
                     Designated Hearing Officer
                     MBTA Law Department
                     10 Park Plaza, Suite #7760
                     Boston, MA 02116
                     (617) 222-4756

AT:                  MBTA Police Department
                     May 21, 2004 (day 1)
                     and
                     June 15, 2004 (day 2)

APPEARANCES:    Phillip G. Boyle, Esq.
                     Morgan, Brown and Joy
                     One Boston Place
                     Boston, MA 02108-4472

                     and

                     Patricia Lucek, Esq.
                     Labor Relations Representative
                     MBTA Labor Relations Department
                     10 Park Plaza, Suite #7550
                     Boston, MA 02116
                     for the Appointing Authority

                     and

                     Stephen L. Jones, Esq.
                     Jones and Mulligan
                     80 Washington Square-Building J
                     Norwell, MA 02061
                     for Lieutenant Nancy O'Loughlin

TESTIMONY:      Deputy Chief Thomas McCarthy
                     MBTA Police Department

ISSUE:           Whether just cause exists to support the charges against Lieutenant Nancy O'Loughlin?[1]

---

[1] This report makes no recommendation regarding the appropriate discipline, if any, to impose.

M000104

## INTRODUCTION

A hearing was held pursuant to G.L. c.31, § 41 in the matter of Lieutenant Nancy O'Loughlin ("Lt. O'Loughlin") regarding the Notice of Hearing that she received (Notice of Hearing attached). At issue is whether just cause exists to sustain the violations alleged in such Notice of Hearing. If there is a finding of just cause, also at issue is the appropriate discipline, if any, to impose. This report finds that there is just cause to sustain the alleged violations. This report makes no recommendation regarding the appropriate discipline, if any, to impose.

The facts pertinent to the issue of just cause are outlined in the Notice of Hearing, dated May 14, 2004. Simply stated, Lt. O'Loughlin spoke to Officer Robert MacKay and to Officer Carl Rubino on various occasions between December 29, 2003 and March 3, 2004 when those officers were manning the recorded "1205" line in the MBTA Police Department's Operations Center. During the course of these conversations, Lt. O'Loughlin made remarks, and allowed subordinates to make remarks, that were rank, discourteous, disparaging to her superior officers, and certainly violated the MBTA Police Department Manual of Policies, Rules and Procedures as outlined in the Notice of Hearing. The audiotapes and transcripts of these conversations were entered as evidence at the hearing.

## FACTS

The pertinent findings of facts are as follows:

1) Lt. O'Loughlin has been a police officer in the MBTA Police Department for over twenty (20) years;

2) Lt. O'Loughlin has received various awards and commendations in her career with the MBTA Police Department, including: Boston Police Academy Academic Excellence (1983); Officer of the Month (February 1984); Silas Award, US K-9 Association (1989); MBTA Police Department Humanitarian Award (1990); Boston Police Department Citation for Outstanding Service (1992); Certificate of Appreciation, Knights of Columbus (1993); Massachusetts Pride and Performance Award (1994); City of Boston Certificate for Outstanding Service (1996); Boston Police Department Certificate of Appreciation (1997); Commonwealth House of Representatives Certificate of Appreciation (1997); Boston Police Department Certificate of Appreciation (1998); Massachusetts Pride and Performance Award] (1999); George L. Hanna Medal of Valor (first female) (2000); and Certificates of Bravery from the Massachusetts House and Senate (2000);

M000105

Aug 18 2004 11:33

3) Lt. O'Loughlin had no disciplinary issues within the MBTA Police Department prior to the Notice of Hearing at issue that is dated May 14, 2004;

4) Between December 29, 2003 and March 3, 2004, Lt. O'Loughlin made the calls that are identified and described in the Notice of Hearing. The speech by Lt. O'Loughlin and the other officers took place as described;

5) The transcripts and the audio recordings of the calls were entered as evidence at the hearing;

6) The "1205" line is a recorded phone line to the MBTA Police Department's Operations Center; and

7) At the time of the calls referenced above, Lt. O'Loughlin knew, or should have known, that her conversations were being recorded.

## LT. O'LOUGHLIN'S SPEECH IS NOT PROTECTED BY THE FIRST AMENDMENT.

The legal analysis to apply to determine whether or not a particular speech of a public employee is protected by the First Amendment has evolved since Justice Holmes' famous comment on disciplining a police officer for his speech: "The petitioner may have the constitutional right to talk politics, but he has no constitutional right to be a policeman". *McAuliffe v. City of New Bedford*, 155 Mass. 266, 216-217 (1892). Until the late 1960's, it was commonly observed that public employment was a privilege granted by the government and not a right itself. Therefore, the public employee could not claim absolute rights otherwise guaranteed a private citizen. *See, genl, Adler v. Board of Education of N.Y.C.*, 342 U.S. 485, 491-493 (1952) (the court discussed the rights/privileges distinction and essentially nullified a teacher's right to free association because of her employment by the state).

In the late 1960's, the Supreme Court recognized that governmental bodies have a dual nature. As a sovereign, the governmental body's arbitrary exercise of authority against a citizen is restricted by the Constitution. As an employer, the governmental body functions in the same manner as a private business, charged with maintaining an efficient and productive workplace.

By the same token, the public employee has a dual nature. As a citizen of the United States, the public employee enjoys the constitutional protections afforded to all citizens – including the right to free speech under the First Amendment. Yet, as an employee of the government, the public employee must expect to compromise

3

those rights in order to contribute to the efficient functioning of the governmental employer.

The first Supreme Court case to abandon the rights/privileges view was *Keyishian v. Board of Regents*, 385 U.S. 589 (1967) (requiring teachers to sign a form that they were not affiliated with certain organizations violated their First Amendment rights). The seminal case regarding free speech in the public employment setting is *Pickering v. Board of Education*, 391 U.S. 563 (1968).

In *Pickering*, the Court evaluated the discharge of a public high school teacher who was fired because of a letter he submitted to the local paper that accused the Board of Education of forcing faculty to support a tax proposal at the expense of the teacher's own views. The Board of Education held a full hearing and determined that the letter disrupted the efficiency of the school system. The teacher's employment was then terminated. The Supreme Court held that the termination violated the teacher's First Amendment right to free speech. It engaged in a balancing test, weighing the employer's needs against the employee's rights. The Court stated that a balance must be struck "between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees". *Id.* at 568. Thus was born the *Pickering* balancing test.

In *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court expanded the *Pickering* balancing test. In *Connick*, the District Attorney fired an Assistant District Attorney because she circulated among her co-workers a questionnaire asking questions regarding the morale in the office and specifically asking whether employees felt pressured to work on political campaigns. Such pressure to work on political campaigns was unlawful. The District Attorney viewed the questionnaire as having the potential to cause a serious decrease in morale at the office and as attacking the capabilities of the Assistant District Attorney's superiors.

The Court ruled in the District Attorney's favor. In doing so it elaborated on the *Pickering* balancing test. The first prong in the analysis is whether the speech is a matter of public concern. If not, there is no First Amendment protection. If it is a matter of public concern, the courts must balance the value of the speech against the potential for disruption in the workplace. In the *Connick* fact pattern, the Court found the question regarding whether employees were pressured to work on political campaigns to be a matter of public concern, but the questionnaire's potential for disruption outweighed the First Amendment value of that single question. So, *Connick* elaborated on the *Pickering* analysis by viewing the degree of public concern (*i.e.*, the value of the speech) as a separate question for a court to consider. The Court also emphasized that the disruption in the workplace is the main concern behind the regulation of public employee speech.

4

M000107

The Supreme Court's third significant case in the evolution of the *Pickering/Connick* balancing test is *Waters v. Churchill*, 511 U.S. 661 (1994) (plurality). In *Waters*, Cheryl Churchill was an obstetrics nurse in a public hospital. She had a private conversation with a fellow nurse while on dinner break in the hospital's cafeteria regarding that nurse's opportunity to work in obstetrics. Her conversation was overheard by others who informed Churchill's supervisor that Churchill warned the nurse that obstetrics was a bad environment and that the supervisor was not a good supervisor. The hospital discharged Churchill because of this private conversation.

In upholding Churchill's discharge, the Court elaborated on its concern that the lower courts were not giving enough deference to the government's interest as an employer when utilizing the *Pickering/Connick* balancing test.[2] The Court stated that the "key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer...where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions [on First Amendment speech] may well be appropriate". Id. at 675. To account for the public employer's interest, the First Amendment analysis requires a court to "look to the facts as the employer <u>reasonably</u> found them to be". Id. at 677 (emphasis in original). *See*, Meaney v. Dever, 326 F.3d 283, 288 (1st Cir. 2003) (the First Circuit explained that the *Waters* principle that courts must defer to the employer's view of whether a governmental employee's speech was a matter of public concern was agreed upon by a majority of the Supreme Court and, thus, has the force of law.)

After elaborating on the *Pickering/Connick* analysis, the Court then viewed the speech of Churchill. She was concerned that nurses were being asked to cover in specialized units for which they had no training in order to cover staffing deficiencies at the hospital. This put the public at risk. The Court did not decide whether her speech addressed a public concern. Rather, it found that this concern was outweighed by the potential disruptiveness of her speech as found by her supervisor. The Court found that Churchill's speech: discouraged people from working in obstetrics; was unkind and inappropriate; was negative; and, if not dealt with, threatened to undermine management in the eyes of other employees. Id. at 680-681. Additionally, the Court found that Churchill's comments that it "wasn't possible" to "wipe the slate clean" between her and her supervisor reasonably made management doubt that Churchill could have a productive future at the hospital. The Court found that "As a matter of law, this potential disruptiveness was enough

---

[2] In post-hearing memoranda submitted during Officer MacKay's representation in a related case, reference was made to the Civil Service Commission decision of *Abbott v. Town of Plymouth*, CSC #D-1434 (1992). That case is helpful to illustrate why, in 1994, the *Waters* Court was so concerned with the faulty *Pickering/Connick* analysis of lower courts and administrative bodies. In the *Abbott* case, a police officer wrote publicly that the Board of Selectmen were "pigs, liars, and cheats." This was held to be protected speech. Given the Court's elaboration in *Waters*, today there would be a different outcome.

M000108

to outweigh whatever First Amendment value the speech might have had". Id. at 681.

Applied to the instant case, *Waters* provides a useful analogy. Like Churchill, Lt. O'Loughlin had a private conversation in the workplace with co-workers. Unlike the *Pickering* or *Connick* facts, Lt. O'Loughlin was not pressing a grievance with a supervisor or bringing her concerns to the public. Also, because it is a private conversation, the Supreme Court has held that the employer should look at more factors than just the content of the speech, but the context, manner and place in which it was delivered to ascertain whether the institutional efficiency of the workplace is threatened. *See, Givhan v. Western Line Consolidated School District*, 99 S.Ct. 693, 697 n.4 (1979). *See also, Connick*, 461 U.S. at 147-148 ("whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record").

In the present case, it makes no difference whether Lt. O'Loughlin subjectively thought that her calls were not being recorded at the time she made them. This is because she could have no objectively reasonable expectation of privacy in her calls. The recording of the "1205" line was and is standard practice within the MBTA Police Department. In 2000, the Appeals Court decided *Dillon v. MBTA*, 49 Mass. App. Ct. 309, in which MBTA employees accused the administration of violating the wire-tap statute by listening to recorded lines. Significantly, the Court found that since 1979, it was common practice for the MBTA to record lines to its operations centers. Moreover, Lt. O'Loughlin is imputed with having the knowledge that the line was recorded because she received specific notice of it and because it is general knowledge among MBTA police personnel that the "1205" line is recorded. Of course, the steady beeping heard on the audiotapes that were admitted as evidence would inform all reasonable people that the line is recorded.

Also weighing in on the calculus needed to address the First Amendment issue in this case is that law enforcement agencies are qualitatively different than other governmental branches because of their paramilitary structures and because police are entrusted with the most awesome power that a free society bestows upon its members – the power to seize one's liberty and to use lethal force to achieve its ends. Therefore, law enforcement employees are subject to greater First Amendment restraints than most other public employees. *See, genl, Wagner v. Holyoke*, 241 F. Supp. 2d 78, 91 (D. Mass. 2003) (quoting *McMullen v. Carson*, 754 F. 2d 936, 938 (11th Cir. 1985). *See also, Janusatis v. Middlebury Volunteer Fire Dept.*, 607 F. 2d 17, 26 (2d Cir. 1979) (greater deference must be shown to the employer when police or fire forces are involved).

The above must be understood to fully consider the three-prong First Amendment inquiry presently utilized by courts. As a court recently expressed, this

6

M000109

inquiry is: (1) a court must decide whether speech involves a matter of public concern; (2) it must weigh the First Amendment interests of the employee and the public against the government's interest in functioning efficiently; and (3) it must decide whether the protected speech was a substantial or motivating factor in the employer's action. *Bates v. MacKay,* 321 F. Supp.2d 173 (D. Mass. 2004).

After a review of the testimony and exhibits, I find that no part of Lt. O'Loughlin's conversations involved matters of public concern. To the extent that she argues that sharing with Officers MacKay and Rubino her own personal opinions of Chief Joseph Carter, Deputy Chief John Martino and other officers is, somehow, public speech, I find that, as the Court in *Waters* found in regard to Churchill's speech concerning the public's safety in nursing assignments, the disruption caused by Lt. O'Loughlin so outweighs any value that her comments might have had that there is no First Amendment violation for holding Lt. O'Loughlin accountable for her speech.

As to the third prong of the First Amendment analysis, I find that if one excerpts the comments which might, in the broadest sense, be on matters of public concern, then viewing the remaining comments in context shows that Lt. O'Loughlin is nevertheless violating the MBTA Police Department policies, practices and procedures and causing great disruption in the workplace.

In sum, the First Amendment does not protect the speech of Lt. O'Loughlin.

### JUST CAUSE EXISTS TO FIND THAT LT. O'LOUGHLIN VIOLATED THE POLICIES, PRACTICES AND PROCEDURES AS CHARGED.

The issue whether just cause exists to sustain the charges against Lt. O'Loughlin requires little discussion. She is a superior officer who is entrusted with carrying out her duties in a respectful and competent manner. Specifically, she is to "ensure that all subordinates perform their duties in a professional, efficient and effective manner, and act in compliance with all Department policies, rules, and procedures...." MBTA Police Manual, Chapter 62, § 3.0. However, as described in the Notice of Hearing, she allowed Officers MacKay and Rubino to engage in disrespectful diatribes against other MBTA police personnel. These officers were subordinates of Lt. O'Loughlin. Moreover, she identified situations wherein other subordinate police personnel were violating their duties while performing paid details. Yet, she did nothing to address these situations. Surely she violated the letter and spirit of the above policy, rule, and procedure.

Lt. O'Loughlin, herself, engaged in profanity-riddled conversations regarding superior officers as described in the Notice of Hearing. Thus, she violated MBTA Police Department Manual, Chapter 101, § 3.7 because such language clearly meets

that section's prohibition against conducting one's self in a manner that is "rude, impolite, contemptuous or insolent to or about a Superior Officer ...".

Lt. O'Loughlin was also apprised of a situation of alleged harassment against a subordinate officer. Rather than addressing the situation as mandated by the MBTA Policy and Procedures for the Prevention of Harassment in the Workplace by informing the MBTA's Office of Diversity and Civil Rights, Lt. O'Loughlin merely suggested that that officer sue the MBTA. Such behavior is disruptive to the operation of the MBTA Police Department because it frustrates, rather than furthers, the MBTA's efforts to prevent harassment in the workplace.

Along this line, Lt. O'Loughlin intentionally attempted to frustrate and disrupt the efficient operation of the MBTA Police Department when she discussed with Officer MacKay the internal investigations by Deputy Chief McCarthy and discussed strategies to thwart these internal investigations.

Based on her remarks appearing in the Notice of Hearing, just cause exists to find that Lt. O'Loughlin violated MBTA Police Department Manual, Chapter 101, §§ 2.1, 2.3, 2.11, 3.7 & 3.18 and Chapter 62, §§ 2.0 & 3.0, as well as the MBTA Policy and Procedures for the Prevention of Harassment in the Workplace.

## CONCLUSION

For all the foregoing reasons, there is ample just cause to sustain all of the charges against Lt. O'Loughlin and, in the circumstances of this case, nothing in the speech of Lt. O'Loughlin warrants First Amendment protection. No recommendation for discipline is made in this report. Her attorney argues that her otherwise spotless record should be considered when making the decision regarding discipline. Indeed, she had a good record within the MBTA Police Department. However, notwithstanding her prior record, I find that her actions in this case are incompatible with the duties and responsibilities of a superior officer.

Respectfully submitted

Kevin S. McDermott
Assistant General Counsel
Designated Hearing Officer