UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NANCY O'LOUGHLIN,<br>             Plaintiff,<br><br>v.<br><br>MASSACHUSETTS BAY<br>TRANSPORTATION AUTHORITY,<br>JOSEPH CARTER, and MICHAEL<br>MULHERN,<br>             Defendants. | )<br>)<br>)<br>)       C.A. No. 04-10933 JLT<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PRETRIAL MEMORANDUM OF DEFENDANTS MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY AND JOSEPH CARTER**

In accordance with the Court's Trial Order, Defendants Massachusetts Bay

Transportation Authority (the "Authority") and Joseph Carter ("Carter")(collectively the

"defendants") submit this Pretrial Memorandum.  It should be noted at the outset that the

parties have agreed:

a.      Defendants do not contest the authenticity of the decision of the arbitrator

who heard O'Loughlin's grievance pursuant to the Authority's collective

bargaining agreement with her union.  However, defendants do challenge

the admissibility of the decision or any evidence regarding the arbitration,

and have moved in limine to exclude such evidence.

b.      Plaintiff does not contest the authenticity of audio recordings and

transcripts of conversations she engaged in on a recorded police

department telephone line.  However, plaintiff reserves the right to

challenge how the audio tapes and transcripts will be presented to the jury

at trial.

c.      Plaintiff has limited her claim for damages to August 2003 when she was assigned to the department's detail unit and events going forward.  She does not seek damages for any events or actions that occurred prior to her reassignment in August 2003.

**1(b).    Summary Of The Evidence That Will Be Offered By The Defendants**

Defendants expect to offer the following evidence:

<u>**Overview**</u>

As chief of the Authority's Transit Police Department (the "department"), Carter did not take any action with the intention of discriminating against O'Loughlin on the basis of her gender.  In fact, at all relevant times, she was treated exactly the same as, or more favorably than, similarly situated male employees.  Defendant Michael Mulhern did not defame O'Loughlin and as a result, the Authority is not liable for slander or defamation.  Defendants are entitled to a judgment in their favor.

**A.      Background Evidence**

Thomas O'Loughlin served as chief of the department from October 1997 until August 2002.  One of Chief O'Loughlin's initiatives was the staffing of an Anti-Crime Unit, an undercover (plainclothes) unit designed to address "quality of life" issues such as disorderly conduct, simple assaults, batteries, petty larcenies, and panhandling.  Chief O'Loughlin placed O'Loughlin in command of the ACU.  Over time, the ACU became very controversial and generated a lot of negative publicity for the Authority.  Among other things, the ACU was criticized internally and externally for arresting too many youths, particularly younger children, for minor, "quality of life" offenses.  It was alleged that the ACU was overzealous, that the zero tolerance policy implemented by the unit

2

was out of control, that the unit engaged in racial profiling, and that the members of the unit were rogue officers. The ACU was disbanded in June 2001 and O'Loughlin and the officers in the ACU were reassigned to uniformed duty.

In July 2002, Chief O'Loughlin assigned O'Loughlin to the position of day shift commander of the detective unit. He also made her responsible for conducting graffiti investigations when they arose. By the same order, Chief O'Loughlin assigned Lieutenant Joseph Leuchte to command the detective unit on the night shift.

In June 2002, racist, sexist, and nasty comments about Chief O'Loughlin, his secretary, his wife, O'Loughlin, and other male and female members of the department appeared on an Internet website called Guardroom.com. Chief O'Loughlin reported the posting to the Authority's Office of Diversity and Civil Rights. Deputy Chief William Fleming initiated an investigation to determine whether the comments were posted from inside the department. Despite an investigation that lasted almost two years, it was never determined who posted the comments.

In July 2002, Chief O'Loughlin left his position with the Authority and Deputy Chief Fleming became interim chief.

In December 2002, Carter was appointed Chief. He was sworn in as chief on January 23, 2003. His overall goals, as he discussed with the Authority's Board of Directors during the interview process, included creating a cohesive, professional department, getting the department accredited by state and federal authorities, developing a more sophisticated approach to dealing with youth, ensuring that the department was prepared to meet the challenges posed by the threat of terrorism to the transit system, dispelling any public perception that the department engaged in racial profiling, and

restoring public trust in the department, which had been eroded by the controversy surrounding the ACU.

### B.    Carter Inherits A Department That Is Plagued With Problems

Prior to actually assuming command of the department, Carter asked Fleming to gather transitional materials for his review, including memoranda from each unit commander regarding their commands and identifying major problems, primary concerns, and morale issues.  Based on the information he received from commanders and information he gathered from others in the department over the next several months, Carter concluded that serious morale problems existed in the department caused by: (a) the public perception that officers engaged in racial profiling, a residual effect of the charges against the ACU; (b) the belief among officers that discipline was not administered fairly and that favoritism played a major role in which officers received choice assignments; and (c) the profound disrespect many officers appeared to have for the command staff, superior officers, for each other, and for members of the public. Carter resolved to change what he saw as a culture of disrespect, improve morale, and promote fairness in discipline and promotions.

### C.    Carter Determines That O'Loughlin Should Command The Detective Unit, The Position To Which She Had Been Assigned By Chief O'Loughlin

Upon assuming command of the department, Carter learned that O'Loughlin was not commanding the detective unit on the day shift, the position to which she had been assigned by Chief O'Loughlin in July 2002.  Instead, she and two patrol officers conducted graffiti/ vandalism investigations on the commuter rail lines every day.  A sergeant commanded the detective unit day to day.  Carter determined that it was a waste

of resources and talent to have a lieutenant (O'Loughlin) commanding two patrol officers conducting vandalism and graffiti investigations because he believed that lieutenants were managers rather than first line supervisors. He told Deputy Chief Fleming to instruct O'Loughlin to manage the personnel and issues in the detective unit, rather than spend all of her time conducting investigations; however, nothing seemed to change. Chief Carter concluded that O'Loughlin did not want to command the unit.

### D. Carter Informs All Officers Of His Expectations For Them And The New Direction In Which He Wanted To Take The Department

In June 2003, Carter released a "Plan of Action" for the department that described his vision of transit policing, the direction in which he wanted to move the department, problems he saw, and his proposed solutions. The Plan of Action described seven standards Carter characterized as "core values," which were to "serve as the cornerstone of the department's revised disciplinary system." The core values were: (1) fairness; (2) truthfulness (officers were expected to "admit mistakes . . . and take responsibility for their decisions even when it is not in their own best interests to do so"); (3) professionalism ([i]nternal criticism offered secretly and without constructive basis will be unacceptable and dealt with harshly"); (4) perseverance; (5) treating all persons with dignity and respect ("[t]his statement represents the true nature of policing at its best. Procedures will be established to detect bias in its earliest manifestations, both internally and externally, so that dignified and respectable treatment can be assured"); (6) service before self; and (7) integrity (officers will not be held to one standard at work and another while off duty; officers should be "committed to adhering to the highest standards of integrity whether on or off duty"). Carter indicated that "priority status will be given to the investigation of any allegation of misconduct regarding one or more of [the] core

values."  Officers were informed that investigations of possible violations of the core values would be "given the highest priority by Internal Affairs, and [that] sustained allegations will be decided and acted on by the Chief."  (Ex. 20, pp. 12-13)

### E.    Carter Reassigns O'Loughlin And Lieutenant Detective Leuchte Out Of The Detective Unit

After several months, Carter became concerned because he was not receiving the status reports from the detective unit that he expected from its commanders.  It also concerned him that O'Loughlin seemed to continue conducting investigations, despite his directive that she manage the detective unit.  He could never find her at headquarters during critical periods of the day.  Carter received information about the detective unit from the sergeant who was still managing the unit.  Carter believed that Lt. Leuchte, who was O'Loughlin's counterpart in the detective unit on the night shift, also exhibited deficiencies in the way he commanded his shift.  On August 8, 2003, Carter issued an order reassigning O'Loughlin and Lt. Leuchte out of the detective unit.

Carter appointed Lieutenant Thomas McCarthy, who had served as deputy chief commander of the detective unit in previous administrations, to command the entire detective unit.  He believed that McCarthy was better able to implement the changes he planned in the detective unit than O'Loughlin and Lt. Leuchte.  In addition, Carter thought that Investigative Services (of which the detective unit was a part) was top heavy with managers.  In fact, a third lieutenant (male) was later transferred out of Investigative Services and not replaced.

**F.    Carter Assigns O'Loughlin, But Not Lt. Leuchte To Another Position Of Command**

Carter assigned O'Loughlin to command of the detail unit.  There were problems in the unit and he thought she could bring needed leadership to the unit, despite her unwillingness to command the detective unit.  Moreover, since 1995, the detail unit had been commanded by either a lieutenant or a captain, with the exception of a brief period when Fleming was interim chief.  The position remains one held by a lieutenant.  Carter did not assign Leuchte to another command position because of his management deficiencies.  Instead, he was assigned to the patrol unit.

**G.    O'Loughlin Files An MCAD Complaint**

In October 2003, O'Loughlin filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD"), in which she alleged that Carter and the Authority discriminated against her because of her gender.  Her complaint included allegations that Carter discriminated against her by disbanding the unit she commanded within the detective unit (the so called "vandal squad") and assigning her to command the detective unit, and then reassigning her from command of the detective unit to commander of the detail unit.  In his over twenty-five years in law enforcement, O'Loughlin is the only female officer who has ever claimed that Carter discriminated against her on the basis of sex.

**H.    Carter Appoints New Deputy Chiefs**

In December 2003, Carter appointed Captain Dolores Ford-Murphy, Captain John Martino, and Lieutenant Thomas McCarthy to the positions of deputy chief pursuant to a competitive process he established for the positions.

I.     **Several Officers, Including O'Loughlin, Become The Subjects Of An Internal Investigation**

In early 2004, detectives began conducting an investigation which required them to review recordings of telephone conversations made on a taped department telephone line.  The telephone line in question comes into the dispatch area at headquarters and is referred to as the "1205 line."  Officers use this line for warrant checks and other department queries.  The line is also connected to "talk back" telephone boxes located in MBTA stations – when a caller picks up the phone, it automatically rings on the 1205 line.  O'Loughlin was not a subject of this investigation.

During the course of their investigation, the detectives overheard unrelated but inappropriate conversations between officers that they believed might be violations of department rules, policies, and core values.  The detectives reported what they heard to Deputy Chief McCarthy, who commanded Investigative Services at the time.  Deputy McCarthy brought the conversations to Carter's attention.  Carter authorized Deputy Chief McCarthy and Deputy Chief Ford-Murphy, who commanded internal affairs, to conduct a further investigation of conversations on the 1205 line to determine the extent of the violations.  At this stage, O'Loughlin was not a subject of the investigation.

During this further investigation, the investigating officers listened to a number of recorded conversations between O'Loughlin and Patrolman McKay on the 1205 line. The investigating officers believed that in these conversations O'Loughlin's acted inappropriately and in violation of department rules and core values.

At the conclusion of the preliminary investigation, Carter determined that by engaging in the conversations, several officers, including O'Loughlin, had violated the rules, regulations and core values of the department.  Specifically with respect to

O'Loughlin, Carter believed that statements she made during conversations on the 1205 line undermined the proper administration of the department because they were made to subordinate officers.

### J.    O'Loughlin And Five Male Officers Are Placed On Administrative Leave With Pay

Based on his review of tapes of the 1205 line conversations, Carter decided to charge several of the officers, including O'Loughlin, with violations of departmental rules and policies.  He also decided to place those officers, who in his opinion committed the most egregious violations, on administrative leave with pay pending the outcome of the investigation, which was ongoing.  On March 8, 2004, O'Loughlin, Officers Robert MacKay, Douglas Hennessey, and Ronald Jordan were summoned separately to department headquarters.  They were told by Deputies Ford-Murphy, Martino, and McCarthy that they were under investigation for violating various rules, policies, and procedures of the police department during their conversations on the 1205 line.[1]  Each of the officers was placed on administrative leave with pay while the investigation was ongoing, and each was asked to turn in their department issued weapon, badge and Police I.D.  In addition, O'Loughlin was required to turn in the keys to her cruiser (she was the only officer in the suspended group to have a take-home cruiser).  Lt. Fleming and Police Officer James Floyd were not at work that day, but were later placed on administrative leave.[2]

---

[1] MacKay and Jordan were also notified that they were under criminal investigation for possible criminal violations by conducting Board of Probation, Registry of Motor Vehicle, and Criminal Offender Records Information (CORI) checks on individuals without a legitimate law enforcement purpose.

[2] Other officers were cited for less serious offenses on the 1205 line than those of the six officers who were placed on administrative leave.  Officer Carl Rubino was charged with being untruthful and contemptuous in a single conversation he had with O'Loughlin and Sergeant Stephen Douglas was issued a letter of

O'Loughlin received written notice that it was anticipated that she would be charged with violations of various rules and regulations of the department and the Oath of Honor because on diverse dates she:

> engaged in conversation, on a tape recorded Department telephone line, with subordinate police officer(s) that was demeaning, derogatory, untruthful, vile, profane, and meant to harm the reputations of the Chief of Police and members of the Command Staff.  By virtue of her rank, the oath of office, and the oath of honor, Lieutenant O'Loughlin had an affirmative responsibility to take decisive action to stem and dissuade such conversations.

> misused her authority by engaging in conversations on a tape recorded Department telephone line, with subordinate police officer(s) where she ridiculed the Chief of Police and members of the Command Staff.  During these conversations, she actively conspired to bring forward untruthful accusations in the media and gave explicit instruction to subordinate police officers to subvert the Chief of Police and the administration of the Police Department.

> participated in conversations, on a tape recorded Department telephone line, with subordinate police officer(s) where she used vulgar and obscene language to refer to the Chief of Police and members of the Command Staff.  Lieutenant O'Loughlin's actions served to undermine the effective management of the Police Department.

### K.    As A Precautionary Measure, Members Of The Special Operations Team Are Present At Headquarters While Officers Were Relieved Of Duty

Carter decided that members of the Special Operations Team ("SOT") should be present at headquarters on the day O'Loughlin and the other officers were placed on administrative leave in the event one of them reacted negatively to being relieved of their badge and weapon and placed on administrative leave.  He wanted to protect unarmed, civilian employees who worked on the floor where the deputy chiefs were to meet with the officers.

---

reprimand for allowing a subordinate to speak to him in an insubordinate and vulgar manner on the 1205 line and for not reporting or disciplining the officer.

**L.    O'Loughlin Receives Notice That She Is Entitled To A Just Cause Hearing**

On May 14, 2004, O'Loughlin received an "Amended Notice of Hearing", which indicated that a disciplinary hearing would be held to determine if there was just cause for her to be "discharged, demoted, suspended, or otherwise disciplined." The letter detailed thirty instances in which Carter believed O'Loughlin violated department policies, rules and procedures and the Oath of Honor during multiple conversations she had with patrol officers on the 1205 line over the course of several months.[3]

**L.    O'Loughlin Had Been Disciplined In The Past For The Similar Behavior**

In 1992, O'Loughlin was disciplined by her brother in law, then Deputy Chief John O'Loughlin, for referring to a subordinate officer as "dopey" and a "lunkhead" when she was speaking on a recorded police department telephone line to another lieutenant. O'Loughlin was off duty at the time she called in to the station to speak with the lieutenant.

**M.    O'Loughlin Has A Just Cause Hearing But Does Not Testify**

Pursuant to the collective bargaining agreement between O'Loughlin's union and the Authority and civil service rules, a hearing was held to determine whether "just cause" existed to discipline her. O'Loughlin chose not to testify at the hearing. The hearing officer issued a detailed decision explaining why he determined that just cause existed to sustain the charges against her. He concluded that O'Loughlin's conduct was "incompatible with the duties and responsibilities of a superior officer."[4]

---

[3] In contrast, Fleming was charged with violating the rules and regulations during conversations he had with a patrol officer during a single day.
[4] Just cause was also found in the cases of Jordan, MacKay, Hennessey, Fleming, and Floyd.

### M.    Based On The Just Cause Decision, Carter Disciplines O'Loughlin And All Of The Male Officers

After the just cause findings, Carter initially considered terminating O'Loughlin from the department because of the seriousness of her violations.   In his opinion, the statements O'Loughlin made to subordinate officers (and the statements she allowed subordinates to make to her unchecked) undermined the good order of the department, were not the actions of a competent supervisor, and contributed to the morale issues he and other managers were trying to correct.  The fact that O'Loughlin was a lieutenant played a critical role in the discipline Carter imposed on her.  She committed egregious violations of the standards he outlined in his Plan of Action and disqualified her from a leadership position in the department.

Carter ultimately decided to demote her two levels to the rank of patrol officer. On August 19, 2004, Chief Carter notified O'Loughlin in writing that he was demoting her to the rank of patrol officer.

 While, Carter believed that then Lt. Fleming's violations on the recorded line were far less serious than O'Loughlin's (because there were fewer violations and they occurred on one day), Carter also considered terminating Fleming from his position with the Authority, in part, based on prior discipline Fleming received in the recent past.  As with O'Loughlin, Carter ultimately decided to demote Fleming two ranks to the rank of patrol officer.

Carter understood that the discipline he imposed was harsher than that imposed by previous administrations.  However, he believed that harsh discipline was warranted because officers who committed violations on the 1205 line undermined his efforts to improve the morale of officers in the department.

### N.    O'Loughlin Arbitrates Her Discipline

O'Loughlin arbitrated her discipline pursuant to the terms of her collective bargaining agreement.  The arbitrator determined that just cause did not exist to warrant the two level demotion.  He ordered her reinstated to the position of lieutenant with back pay.  Fleming was also reinstated with back pay after an arbitration before a different arbitrator.[5]

The MBTA and Carter have filed a motion in limine to exclude evidence of the arbitration decision.

### O.    Michael Mulhern Did Not Defame O'Loughlin

Michael Mulhern did not tell Mac Daniel, the author of the *Boston Globe* article in which O'Loughlin claims she was defamed, that she faced criminal charges as a result of the ongoing investigation or that she was engaged in criminal misconduct because of the 1205 line investigation.  In fact, in response to questions from Mr. Daniel, Mr. Mulhern told him that it was "absolutely not true" that O'Loughlin could be subjected to criminal charges.  More importantly, Mr. Daniel concedes that his article was based on "an amalgamation of facts" he gathered during the day, including information from an Authority spokesman, who said "[t]here is an ongoing internal investigation that concerns egregious violations of the department's policies, rules and regulations as well as allegations of criminal conduct", and from members of the police officer's union, who told him that O'Loughlin had been suspended.

---

[5]The patrol officers who were relieved of duty with pay also pursued arbitration.  An arbitrator reduced MacKay's discipline from termination to a 5 day suspension and reduced Jordan's discipline from termination to a 1 day suspension.  Hennessey's discipline was reduced from a 60 working day suspension to a 5 day suspension.  Floyd's suspension was affirmed by an arbitrator.

2. **Facts Established By The Pleadings**

A.    Nancy O'Loughlin began working for the Authority's Transit Police Department in 1983.

B.    In July 2002, Thomas O'Loughlin assigned O'Loughlin to command the detective unit on the day shift.  He also assigned her to conduct graffiti investigations when they arose.

C.    In August, 2003, O'Loughlin was a Lieutenant with the department.

D.    In August 2003, Carter assigned O'Loughlin to command the department's Detail Unit.

E.    Nancy O'Loughlin filed an MCAD Charge regarding her transfer to the Detail Unit on October 2003, alleging that her transfer was based upon gender discrimination.

F.    On March 8, 2004, Lieutenant O'Loughlin was relieved of her badge and weapon and assigned to duty at home.

G.    On March 8, 2004, the Authority filed its Position Statement in response to Lieutenant O'Loughlin's Charge of Gender Discrimination.

H.    Chief Carter signed the Verification attached to that Position Statement on March 6, 2004.

I.    On March 11, 2004**,** an article appeared in the *Boston Globe* regarding Nancy O'Loughlin's suspension and the suspension of several male officers.

J.    On May 11, 2004, Nancy O'Loughlin filed this lawsuit, claiming that her transfer to the Detail Unit was based on illegal gender discrimination, and that her suspension was based upon illegal retaliation as well as gender discrimination.

K.    O'Loughlin was entitled to a hearing to determine whether just cause existed to discipline her because of statements she made to subordinate police officers on a tape recorded department telephone line.

L.    At the hearing, O'Loughlin was represented by counsel but she did not testify.

M.    The hearing officer issued a written decision in which he found that just cause existed to discipline O'Loughlin.

N.    On August 19, 2004, Chief Carter disciplined Nancy O'Loughlin for the activities for which she was suspended in March, 2004, by demoting her two ranks to the rank of patrol officer.

O.      Lieutenant William Fleming was similarly demoted two ranks to the rank of patrol officer for statements he made on the recorded telephone line after a hearing and a just cause finding.

P.      Lieutenant O'Loughlin contested her demotion through the grievance and arbitration process available to her.

Q.      An arbitrator determined that just cause did not exist for the demotion. He ordered O'Loughlin reinstated to the position of Lieutenant with full back pay.

R.      Fleming also grieved his demotion and it was overturned by a second arbitrator. He was also reinstated with back pay.

**3.      Contested Issues Of Fact**

A.      Defendants contest all factual assertions related to plaintiff's claims that Carter (or Mulhern) acted with a discriminatory or retaliatory motive.

B.      Defendants contest all assertions by plaintiff that she was defamed by anyone for whom the Authority can be found liable.

C.      Defendants contest all assertions by plaintiff that she suffered any emotional distress as a result of unlawful acts of defendants.

**4.      Jurisdictional Questions** - none

**5.      Any Questions Raised By Pending Motions**

A.      Whether Defendants will be allowed to present the testimony of a late disclosed expert witness.

B.      Whether Plaintiff will be allowed to present the testimony of a late disclosed witness.

C.      Whether witnesses presented by either the plaintiff or defendants should be allowed to testify about past or current discrimination complaints against the Authority.

D.      Whether plaintiff will be allowed to refer to or present evidence related to the arbitration proceedings or the decision of the arbitrator.

E.      Whether Chief Carter will be allowed to appear at trial only during his testimony.

6.      **Issues of law, including evidentiary issues**

a)   Whether plaintiff has set forth a *prima facie* case of gender discrimination or retaliation.

b)   Whether plaintiff has set forth sufficient evidence of threats, intimidation, or coercion as a prerequisite to proving a claim under the Massachusetts Civil Rights Act.

c)   Whether plaintiff can state a Massachusetts Civil Rights Act claim against individuals, or based upon claims, that were not first presented to the MCAD. *Green v Wyman-Gordon Co.*, 422 Mass 551 (1996).

d)   Whether a plaintiff can assert a Massachusetts Civil Rights Act claim where the conduct is can be redressed under 151B. *Guzman v. Lowinger*, 422 Mass. 551 (1996).

e)   Whether for purposes of her discrimination claims she has alleged adverse employment actions. _Suarez v. Pueblo Int'l, Inc_., 229 F.3d 49, 54-55 (1st Cir. 2000) (federal law); and _MacCormack v. Boston Edison Company_, 423 Mass. 652, 662, 672 N.E.2d 1 (1996) (c. 151B).

f)   Whether for purposes of her retaliation claims she has alleged adverse employment actions. *Burlington Northern & Santa Fe Railway Company v. White*, 126 S. Ct. 2405, 2415,165 L. Ed. 2d 345, 359-360 (2006);

*Caromona-Rivera v. Puerto Rico*, 464 F.3d 14, 19-20 (1st Cir. 2006);

*Pedicini v. United States*, 2007 U.S. Dist. LEXIS 23035, *26-29 (D. Mass.

2007)(Tauro, J.); EEOC Compliance Manual § 8, pp. 8-13 and 8-14

(1998); *MacCormack v. Boston Edison Co*., 423 Mass. 652, 663-664

(1996); *Cohen and MCAD v. National Railroad Passenger Corp.*, 28

MDLR 97, 107 (Mass. Comm. Discrim. 2006).

g)  Whether plaintiff can introduce evidence or seek damages for post-

complaint conduct that was neither the subject of an administrative charge,

an amendment or discovery. *Melli v Gillette*, 19 Mass. App. Ct. 511

(1985).

h)  Whether the doctrine of qualified immunity protects Carter and/or

Mulhern from personal liability for civil damages under 42 U.S.C. § 1983

and G.L. c. 12, §§ 11H and I. *Jarrett v. Town of Yarmouth*, 309 F.3d 54

(1st Cir. 2002)(citations omitted); *Guierrez v. Massachusetts Bay

Transportation Authori*ty, 437 Mass. 396, 403 (2002)(qualified immunity

principles as developed under federal law protect public officials charged

with violations of the Massachusetts Civil Rights Act)(citations omitted).

i)  Whether plaintiff should be estopped from making a

discrimination/retaliation claim relating to her demotion where she failed

to participate in the just cause hearing, and Chief Carter had to make a

disciplinary decision without her side of the story.

j)  Whether plaintiff can establish discrimination/retaliation with respect to

discipline where, there is no direct evidence, and she cannot point to a

similarly situated person treated differently. *Matthews v. Ocean Spray Cranberries Inc.* 426 Mass. 122 (1997).

k)  Whether plaintiff can state a retaliation claim with respect to discipline where, she has no direct evidence, and the time period between the protected activity and the discipline is too attenuated as a matter of law. <u>*King v. Town of Hanover*</u>, 116 F.3d 965, 968 (1st Cir. 1997)(there is no causal relationship between complaint of discrimination and discipline that occurred five months later).

l)  Whether plaintiff can state a defamation claim based on an MBTA official's "no comment" comment to a reporter's question about whether plaintiff was being investigated for criminal conduct in that such a comment is not, nor could it reasonably be construed, to state facts about plaintiff. *Milkovich v. Lorain Journal Co.,* 497 US 1 (1990)

m)  Whether or not the article/statement at issue in plaintiff's defamation claim is susceptible of a defamatory meaning.  <u>*Foley v. Lowell Sun Publishing Co.*</u>, 404 Mass. 9, 11 (1989).

n)  Whether the legal question in l) and n) above are legal questions for the court. <u>*Foley v. Lowell Sun Publishing Co.*</u>, 404 Mass. 9, 11 (1989).

o)  Whether plaintiff is a public official for purposes of defamation law. *New York Times Co.  v. Sullivan*, 376 US 254 (1964); <u>Rotiewicz v. Sadowsky</u>, 431 Mass. 748, 752 (2000)(citation omitted).

p)  Whether plaintiff must prove actual malice for purposes of her defamation claim. *New York Times Co.  v. Sullivan*, 376 US 254 (1964); <u>*Rotiewicz v. Sadowsky*</u>, 431 Mass. 748, 752 (2000)(citation omitted).

q)  Whether a conditional privilege protects the MBTA from liability for MBTA official's "no comment" comment to a reporter.

r)  Whether former Chief Thomas O'Loughlin can testify to what a Boston Globe reporter allegedly said to him about what an MBTA official said to the Globe reporter.

s)  Evidentiary issues as raised in the defendant's motions in limine described below.

**7.    Any requested amendments to the pleadings** - none

**8.    Any additional matters to aid in the disposition of the action** – revisit the possibility of settling the case.

**9.    The probable length of trial**

**Defendant estimates the trial will take ten (10) days.**

**10.    The names of defendant's witnesses to be called and the expected length of their direct testimony**

A.    Joseph Carter        4-5 hours

B.    Thomas McCarthy      3-4 hours

C.    Delores Ford-Murphy 3 hours

D.    Thomas O'Loughlin   2 hours

E.    Michael Mulhern      3-4 hours

F.    Mac Daniel          2-3 hours

G.    Joe Pesaturo         1-2 hours

H.    Lou Reiter (expert)    3 hours

## 11.    The proposed exhibits

Defendants' Proposed Exhibits – defendants respectfully request the right to amend this list as necessary prior to or during trial, with seasonable notice to the plaintiff and the Court.

| Exhibit # | Exhibit Description | Bates Number |
|---|---|---|
| 1. | Report of the task force on racial profiling | M000353-371 |
| 2. | Pierce Report | M000409-442 |
| 3. | Transfer Order 6/8/95 LeRay assigned to detail unit (reports to Martino) | M000533-34 |
| 4. | Transfer Order 1/6/99 Martino to Detail Unit | M00735-36 |
| 5. | Transfer Order 6/7/01 – NOL from ACU | M00001 |
| 6. | Transfer Order 7/19/02 NOL and LEUCHTE | M00003-4 |
| 7. | Transfer Order 11/7/02 Sgt. Morris to Detail Unit | M000211 |
| 8. | Transfer Order 11/14/02 Martino from Detail Unit; Ford-Murphy from Patrol | M000213 |
| 9. | NOL Transition Memo 1/7/03 | M000443-462 |
| 10. | Transfer Order 8/4/03 McCarthy to Detectives; NOL to Detail Unit | M00012 |
| 11. | Posting for Commander of Details (any supervisor) 10/31/02 | M000210 |
| 12. | Fleming memo to Gillespie 7/31/03 | M000303-304 |
| 13. | Announcement of Promotional Examination for Deputy Chiefs 7/30/03 | M00024-27 |
| 14. | Promotion Order – Deputy Chiefs 12/18/03 | M00730 |
| 15. | NOL request for vacation time 1/7/04 | M00035-39 |
| 16. | Martino response to NOL request for vacation time 2/2/04 | M00055 |
| 17. | Explanation of Oath of Honor 2/21/03 | M00790-791 |
| 18. | Oath of Honor signed by NOL | M000678 |
| 19. | Plan of Action cover sheet | M000372 |
| 20. | Plan of Action | M000373-407 |
| 21. | NOL Relief from Duty letter 3/8/04 | M00057-M00062 |
| 22. | Boston Globe article 3/11/04 | 3 pages |
| 23. | Martino memo to NOL re: duties of supervisor of details | M00053-54 |
| 24. | | |
| 25. | NOL Formal Counseling 7/3/92 | M00679-683 |
| 26. | Amended Notice of Hearing 5/14/04 | M00077-M00081 |
| 27. | Just Cause hearing decision | M000104-111 |

| 28. | NOL Notice of Reduction in Rank 8/19/04 | M000266-268 |
| 29. | Telephone conversation transcripts | M000537-663 |
| 30. | Chapter 62 – department manual | M00093-94 |
| 31. | Chapter 101 – department manual | M00095-101 |
| 32. | MBTA Anti-Harassment Policy 1/31/04 | M00045-49 |
| 33. | MBTA EEO Policy 1/31/04 | M00050-52 |
| 34. | Fleming briefing summary to Carter 1/13/03 re "cancer in the department" | M000194-196 |
| 35. | Martino briefing summary 1/7/03 | M000467-470 |
| 36. | Frederick's Transitional Memo 1/7/03 | M000486-489 |
| 37. | Salisbury Transition Report  1/6/02 [sic] | M000481-485 |
| 38. | Gillespie report re: Detective Unit | M000350-351 |
| 39. | Lenehan Transition Memo 1/7/03 | M000475-479 |
| 40. | McCarthy Transition Memo 1/7/03 | M000244-247 |
| 41. | Fleming memo to Pesatura 1/13/03 re: "cancer in the department" | NOD00564 |
| 42. | Guardroom.com internet postings 6/17/02 | M000174-175 |
| 43. | Thomas O'Loughlin letter to Organizational Diversity 7/3/02 | M000340-341 |
| 44. | Internet Policy 9/19/02 | M00005 |
| 45. | Gillespie Memo re: Internet Postings 12/20/02 | M000343-345 |
| 46. | Gillespie Memo to Fleming re: Internet Postings 3/3/03 | M000346-349 |
| 47. | NOL Notice of Reduction in Rank 8/19/04 | M000266-268 |
| 48. | Fleming reduction in rank 8/19/04 | M000269-70 |
| 49. | Martino memo to NOL re: Detail Unit | M00056 |

**12.    Motions in limine**

A.    Defendants' Motion in Limine to Exclude Arbitrator's Decision.

B.    Defendants' Motion in Limine to Exclude Other Claims of discrimination and/or retaliation.

Respectfully submitted,

MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY AND
JOSEPH CARTER,

By their attorneys,


/s/ Joseph L. Edwards, Jr._____
Walter B. Prince, BBO# 406640
Joseph L. Edwards, Jr., BBO# 564288
Prince, Lobel, Glovsky & Tye LLP
100 Cambridge St. Suite 2200
Boston, MA 02114
(617) 456-8000