# EXHIBIT B

*Filed 6/18/96*

*Cashier*

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
DOCKET NO.

96-3303 G

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DOLORES FORD-MURPHY,

Plaintiff

v.

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY, a political subdivision of the
Commonwealth, and JOHN O'DONOVAN
individually

Defendants

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### COMPLAINT
#### (Jury Trial Demanded)

#### Introduction

This is an action pursuant to G.L. c. 151B for redress of discrimination against the Plaintiff, Delores Ford-Murphy, by the MBTA and by John O'Donovan, Chief of the MBTA Police Department, in its failure to promote her and in the terms and conditions of her employment, because of her sex and in retaliation for her opposition to practices made unlawful by G.L. c. 151B. The Plaintiff also seeks damages against John O'Donovan individually for his intentional infliction of emotional distress and interference with her employment relationship with the MBTA.

#### Parties

1.    Dolores Ford-Murphy ("Ford-Murphy") is an individual residing in Hyde Park, Suffolk County, Massachusetts.

2

2.    The Massachusetts Bay Transportation Authority ("MBTA") is a body politic and corporate and a political subdivision of the Commonwealth organized pursuant to G.L. c. 161A §2, responsible for providing mass transportation service within the cities and towns set forth in said c. 161A. Its principal place of business is at 10 Park Plaza, Boston, Suffolk County, Massachusetts.

3.    John O'Donovan ("O'Donovan") is an individual residing in Belmont, Middlesex County, Massachusetts.

### Facts

4.    Ford-Murphy has been employed by the MBTA in its Police Department ("Department") since 1981. In 1983, she was promoted to the rank of Sergeant. In 1984, she was promoted to the rank of Lieutenant. In 1986, she was appointed as Acting Captain, and attained the rank of Captain by promotional examination later the same year. She is the senior Captain in the Department and the only female to hold that rank.

5.    In February, 1991, O'Donovan was appointed as Chief of the MBTA Police. At that time Ford-Murphy was the Commander of the Special Services Unit with responsibilities for public information programs, public safety programs, supervision of the Detective and Anti-Crime Units, the Court Case Management Unit, and the Juvenile Unit. She also oversaw the representation of the MBTA Police at community events, served as liaison with the MBTA Marketing and Ridership Directorate, administered the Unit, and performed other duties.

6.    Since his appointment, O'Donovan has exercised all effective authority and control over the Department, including but not limited to determination

of promotions, assignments, transfers, command and reporting responsibilities, resource allocations, and disciplinary decisions.

7. On March 29, 1991, O'Donovan instructed staff to page Ford-Murphy, who was off duty, on her Department-issued pager to respond to a crime scene. At the time of the incident there were specific directives in the Department procedural manual as to who must be paged to respond to a crime scene. Neither the manual nor any other Departmental rule or policy required that an off-duty commander monitor a Department-issued pager so that he or she could be called to a crime scene. O'Donovan reprimanded Ford-Murphy for failure to respond to the pager. After learning of the reprimand, she brought the appropriate manual references to the attention of the Deputy Chief who had initially investigated the incident. Upon reconsideration, the Deputy Chief agreed that she should not have been reprimanded. However, O'Donovan refused to remove the reprimand.

8. By May, 1991, O'Donovan had reassigned Ford-Murphy from her command position to a position as a Supervisor of Training. This reassignment had the symbolic effect of a demotion. After her reassignment, a male lieutenant replaced her as Commander of Special Services. Command positions were traditionally held by captains. Her new assignment had previously been filled with a male lieutenant. At the time, several positions classified as Captains' positions were left unfilled or were filled with lower-ranking personnel.

9. On June 15, 1991, O'Donovan rehired John O'Loughlin as a captain. O'Loughlin had retired from the MBTA Police on July 1, 1990. At that time O'Donovan knew or had reason to know that Robert Cochrane, Deputy Chief of the Special Services Section, was planning to retire in the near future.

4

10.  Upon O'Loughlin's return, O'Donovan assigned him as Night Commander, a second-in-command position classified as a Captain's position, while Ford-Murphy remained in the Supervisor of Training position, classified as a Lieutenant's position.

11.  On October 31, 1991, Deputy Chief Cochrane retired.  Five days later, on November 4, 1991, O'Donovan appointed Captain O'Loughlin to replace Cochrane as Deputy Chief of Special Services.  Ford-Murphy remained in the Supervisor of Training position.

12.  Had O'Donovan not rehired Captain O'Loughlin, Ford-Murphy would have been the only captain available to assume Deputy Chief Cochrane's duties, and the presumptive successor to Cochrane as Deputy Chief of Special Services.

13.  In July, 1991, O'Donovan changed the radio call signs for all MBTA Police command and supervisory staff.  Call signs are issued to command staff members primarily by status ranking.  In a paramilitary organization such as the MBTA Police Department, status symbols affect the perception of an officer's authority in the Department, and thus affect the officer's ability to exercise that authority.  A low call sign number is a symbol of high status in the Department.  O'Donovan assigned Ford-Murphy a significantly higher call number by leaving unused numbers between her and the next tier of the command staff.  The change in Ford-Murphy's call number thus functioned as a signal to her peers and subordinates that her status was greatly diminished.

14.  By August 7, 1991, a sign-out sheet was instituted ostensibly for staff members.  Ford-Murphy was notified and specifically instructed that she was required to sign out if she left the building for any reason.  Upon information

and belief this requirement was enforced for her only, as she was required to sign out, but her male counterparts were not.

15.   On August 7, 1991 while performing duties related to her position as Training Supervisor, Ford-Murphy was involved in a minor motor vehicle incident while driving an unmarked MBTA cruiser. The incident did not result in any injuries. In accordance with established practice, she called for an MBTA patrol supervisor to respond to the scene. The other operator admitted fault to the patrol supervisor. Upon returning to the station Ford-Murphy was publicly berated by Chief O'Donovan, who wanted to know where and by whose authority she had been out of the building.

16.   Chief O'Donovan assigned an MBTA Police captain to investigate the accident. Contrary to consistent Department practice, O'Donovan further ordered the Captain to call in a State Police Accident Investigation Unit officer to perform an accident reconstruction at the scene. Upon performing the reconstruction, the State Trooper confirmed the original report and concluded that Ford-Murphy was not at fault.

17.   Even though Ford-Murphy was exonerated, O'Donovan reprimanded her.

18.   In May, 1992, Ford-Murphy was transferred to the Day Patrol Unit. Her predecessor in this position, with a rank of captain, had been the second-in-command of the Day Shift. Historically, that was the role assumed by a captain working in this position. However, she was instructed specifically that she was not the second in command, but was simply a duty supervisor, in charge only of the shift she was assigned to and then only when performing a tour of duty. This further diminished her stature as a captain in the Department, as she was the only captain working in the role of Duty Supervisor. Her counterparts as duty supervisors were lieutenants

and sergeants. At the time of this reassignment she was replaced as
Supervisor of Training by a lieutenant.

19.    In November, 1992, Ford-Murphy was reassigned from Day Patrol Duty
Supervisor to Staff Inspections, classified as a lieutenant's position. For two
full years, from November, 1992 until November, 1994, she had no specific
assignments and no authority. She was relegated to the role of a clerical
staff person. She was sporadically given unimportant work. She was not
assigned a desk or an office, and was instructed to use the desks of civilian
secretarial staff or others who were not at their assigned positions. She was
required to find another work location when they returned She
continuously sought work from other staff members because of the extreme
shortage of work given to her. Other staff members told her they were
limited in what they could allow her to assist them with. This two-year
episode completely eroded any remaining authority she had within the
Department.

20.    In May, 1994, while assigned to Staff Inspections, Ford-Murphy
requested an upgraded car. It had been past practice to assign newer cars
to higher-ranked officers, if they desired one, and pass the older cars down
to lower ranked officers. O'Donovan had recently followed this practice in
assigning newer cars to himself and the Deputy Chiefs, and passing their
older vehicles down. The assignment of the newest cars thus became a
symbol of status and authority within the Department. There were several
unassigned cars at that time which were newer than Ford-Murphy's.
Nevertheless, rather than upgrade her car, O'Donovan responded that he
was not assigning cars at that time.

21.    On or shortly before October 19, 1994, Ford-Murphy learned that
O'Donovan had assigned a newer car to at least one male sergeant. Because

7

the assignment of vehicles, like radio call numbers, is symbolic of an officer's status in the Department. Ford-Murphy initiated an internal complaint of discrimination by contacting the MBTA Organizational Diversity Office. After several weeks, O'Donovan agreed to make certain changes, including assigning her to a command position and an appropriate vehicle and radio call number.

22.    On November 4, 1994, O'Donovan announced that Ford-Murphy had been named as Captain of the Administrative Services Unit, in full charge of the Unit. Her male predecessor in that position had held the title of Commander. On the same day, O'Donovan announced that a lieutenant had been named as Commander of the Special Services Unit. Ford-Murphy was required to protest in order to be given the title of Commander.

23.    As Commander of the Administrative Services Unit, Ford-Murphy was informed that the major part of her function was managing the reaccreditation process which was scheduled for completion by the end of 1995. Prior to her assignment no substantive work had been done on this project for approximately four years. Despite her protests, she was given insufficient personnel and authority to accomplish this work. Instead of giving her resources, O'Donovan caused extensions to be requested.

24.    As Commander of Administrative Services, Ford-Murphy was responsible for attending or assigning staff to attend various community meetings. On May 18, 1995, she attended a meeting which she had always covered, and found that O'Donovan had assigned an officer not under her command to attend the meeting, without her knowledge. This officer had not been properly briefed, and the Department would have lost available grant funds had Ford-Murphy not been there.

25.    On divers occasions, O'Donovan has interfered with Ford-Murphy's ability to determine the activities and whereabouts of officers under her command.  Upon her inquiry, they have told her that O'Donovan had assigned them to "secret" work which he instructed them not to tell her about.  This undermined her authority.  Her male counterparts have not been prevented from knowing what their subordinates are doing.

26.    In June, 1995, shortly after Ford-Murphy protested the above violations of the chain of command, O'Donovan removed her from her day shift command and reassigned as Night Patrol Unit Commander.

27.    In September, 1995, O'Donovan imposed assignment restrictions on two  officers under Ford-Murphy's command without consulting or informing her.  This undermined her authority.  Her male counterparts were not subjected to such interference with the daily assignment of officers under their command.

28.    When Ford-Murphy protested the derogation of her authority, she was reassigned to work on reaccreditation of the Authority.  In contrast with her previous assignment to work on reaccreditation from November, 1994 through June, 1995, she did not have the title of Commander, had no assignments other than the re-accreditation work, and had no one reporting to her except one female lieutenant for a brief period of time.  Ford-Murphy is still in that assignment.

29.    On October 5, 1995, O'Donovan called a staff meeting to discuss reaccreditation.  O'Donovan spent most of the time telling a story about "panty raids" on the "girls" who "had" to be "quarantined" at the FBI academy.  He spent only a few minutes discussing reaccreditation.  After the meeting, a group of lieutenants indicated to Ford-Murphy  that they perceived O'Donovan's support for the reaccreditation effort to be low.

9

30.    On divers occasions. O'Donovan has refused to allow Ford-Murphy to attend law enforcement community events which male command staff members, including those below her rank, were permitted to attend.

31.    On divers occasions O'Donovan has made demeaning references to and remarks to and about women officers and civilian employees of the Department, referring in public speeches to the "men and girls of the MBTA Police Department," and referring to women officers as "girlie-girls." Upon information and belief, during the 1993 Christmas party, he told one of the secretaries that the "girls" should get up on the tables and dance to get the party started. When she retorted that perhaps the men should dance on the tables, he said. "Have another drink, dear." On many occasions, including staff meetings, and despite Ford-Murphy's requests through the chain of command to desist, O'Donovan referred to her and other female police supervisors, officers and civilian staff members as "Dear." On one occasion, he barred a majority of the female civilian executive staff members from participation in a sexual harassment seminar which all MBTA executives were required to attend.

32.    At the end of a Christmas party in 1995, Chief O'Donovan stood at the top of the exit stairwell shaking hands with command staff members as they left, wishing them a merry Christmas and handling them a gift of a bottle of vodka. As Ford-Murphy approached she held her hand out to shake his hand. He reached past her hand, grasped her wrist, pulled her forward and kissed her cheek.

33.    On November 4, 1995, Ford-Murphy was bypassed for a promotion to Major. O'Donovan promoted four individuals to the newly-created rank of Major, and appointed two others from outside the Department. Two of the promoted individuals held the appointed rank of Deputy Chief. One held the

civil service rank of Captain, and the other held the civil service rank of Lieutenant. One of the individuals appointed from outside the Department had held the rank of Captain of the State Police, and had limited experience in transit policing. The other held the rank of Lieutenant of the State Police and had no experience in transit policing. Ford-Murphy outranked two of the promotees, who had held the rank of Lieutenant of the MBTA police. She was more qualified for the position than at least four of those promoted. All those promoted are men.

34.    On April 1, 1996, Major Cuervels retired, leaving an open Major's position. Ford-Murphy is the only Captain in the Department and the most qualified to be promoted to Major. O'Donovan has not filled the position.

### CLAIMS FOR RELIEF

### I.    Discrimination

### MBTA and O'Donovan

For her first cause of action the Plaintiff realleges the allegations of Paragraphs one through thirty-four above, incorporating them by reference herein as if set forth in full, and further alleges:

35.    Since his appointment, O'Donovan has engaged in a deliberate and systematic campaign to demean and denigrate Ford-Murphy, to discredit her authority and diminish her position within the MBTA because of her sex, including but not limited to:

a.     demoting her from her position of Commander of Special Services, classified as a Captain's position, to the position of Supervisor of Training, a Lieutenants' position, in May, 1991;

b.     assigning her a lower-status radio call number in July, 1991;

c.     assigning her as a duty supervisor in the Day Patrol Unit in May, 1992;

d.    requiring her to sign out when other superior officers were not required to sign out;

e.    assigning her to Staff Inspections from November, 1992 until November, 1994, without duties, without an office, and without a desk, and instructing staff members not to allow her to perform any responsible work;

f.    filling Command positions in the Department with lower ranking male officers;

g.    refusing to assign her an appropriate vehicle;

h.    assigning her a lower-status job title as head of the Administrative Services Unit, in November 1994, than a similarly situated male unit head;

i.    assigning her to work on Departmental reaccreditation without assigning adequate personnel or authority to accomplish the work;

j.    assigning work to officers under her command without her knowledge;

k.    removing her day shift command and reassigning her to a night shift command in June, 1995;

l.    reassigning her in September, 1995 to work on re-accreditation without assigning sufficient personnel to report to her;

m.    bypassing her for promotion to Major in November, 1995, in favor of lower-ranking and less qualified male officers;

n.    failing to promote her on April 1, 1995 to a Major's position vacated by a retirement.

36.    Since his appointment, O'Donovan has repeatedly bypassed Ford-Murphy for promotion because of her sex.

37.    Since his appointment, O'Donovan has created a hostile work environment for Ford-Murphy and other women, because of her and their sex, including but not limited to using demeaning language to and when referring to women; singling Ford-Murphy out for adverse treatment;

12

imposing disparate discipline on her; and excluding women from important training, such as sexual harassment training, and from other opportunities.

38.   As a result of the discrimination set forth hereinabove, Ford-Murphy has lost wages and has suffered emotional distress, embarrassment and humiliation, and has been otherwise injured.

39.   On March 7, 1996, Ford-Murphy filed a charge of discrimination against the MBTA and O'Donovan with the Massachusetts Commission Against Discrimination.  A true copy of the charge is attached hereto as Exhibit A and incorporated herein by this reference as if set forth in full.

40.   On April 12, 1996, Ford-Murphy filed an Amended Charge of Discrimination with the said Commission.  A true copy of the charge is attached hereto as Exhibit B and incorporated herein by this reference as if set forth in full.

41.   On May 8, 1996, the Massachusetts Commission Against Discrimination granted leave to the Plaintiff to file a civil action pursuant to G.L. c. 151B §9.  A true copy of the Commission's assent is attached hereto as Exhibit C and incorporated herein by this reference as if set forth in full.

## II.     Retaliation

### MBTA and O'Donovan

For her second cause of action the Plaintiff realleges the allegations of Paragraphs one through forty-one hereinabove, incorporating them by reference herein as if set forth in full, and further alleges:

42.   On or before June 14, 1994, Ford-Murphy informed the General Manager and General Counsel of the MBTA of O'Donovan's discriminatory and retaliatory conduct.

13

43.    Since at least October, 1994, O'Donovan has engaged in a deliberate and systematic campaign to demean and denigrate Ford-Murphy, to discredit her authority and diminish her position within the MBTA, has bypassed her for promotion, and has created a hostile working environment for her, in retaliation for her opposition to practices made unlawful by G.L. c. 151B.

44.    As a result of the retaliation set forth hereinabove, Ford-Murphy has lost wages and has suffered emotional distress, embarrassment and humiliation, and has been otherwise injured.

45.    On March 7, 1996 Ford-Murphy filed a charge of retaliation against the MBTA and O'Donovan with the Massachusetts Commission Against Discrimination.  A true copy of the charge is attached hereto as Exhibit A and incorporated herein by this reference as if set forth in full.

46.    On April 12, 1996, Ford-Murphy filed an amended charge of retaliation discrimination with the said Commission.  A true copy of the charge is attached hereto as Exhibit B and incorporated herein by this reference as if set forth in full.

47.    On May 8, 1996, the Massachusetts Commission Against Discrimination granted leave to the Plaintiff to file a civil action pursuant to G.L. c. 151B §9.  A true copy of the Commission's assent is attached hereto as Exhibit C and incorporated herein by this reference as if set forth in full.

### III.    Negligent Supervision

### MBTA

For her third cause of action the Plaintiff realleges the allegations of Paragraphs one through forty-seven hereinabove, incorporating them by reference herein as if set forth in full, and further alleges:

14

48.    At all times relevant hereto the MBTA has negligently, willfully or intentionally failed to supervise O'Donovan by permitting him to discriminate against Ford-Murphy in the terms and conditions of her employment, to bypass her for promotion because of her sex, and in retaliation for her opposition to practices made unlawful by G.L. c. 151B.

49.    From and after June 14, 1994, when Ford-Murphy informed the General Manager and General Counsel of the MBTA of O'Donovan's discriminatory and retaliatory conduct, the MBTA failed to take remedial action to prevent and control O'Donovan's discriminatory and retaliatory conduct and to discipline him for such conduct.

50.    As a direct and proximate result of the MBTA's negligent failure to supervise O'Donovan, Ford-Murphy has lost wages and has suffered emotional distress, embarrassment and humiliation, and has been otherwise injured.

## IV.    **Negligent Retention**
## **MBTA**

For her fourth cause of action the Plaintiff realleges the allegations of Paragraphs one through fifty hereinabove, incorporating them by reference herein as if set forth in full, and further alleges:

51.    From and after June 14, 1994, despite O'Donovan's continued discriminatory and retaliatory conduct against Ford-Murphy, the MBTA has negligently, willfully or intentionally retained O'Donovan in a position to continue such conduct.

52.    As a direct and proximate result of the MBTA's negligent retention of O'Donovan, Ford-Murphy has lost wages and has suffered emotional distress, embarrassment and humiliation, and has been otherwise injured.

### V.    Intentional Infliction of Emotional Distress

#### O'Donovan

For her sixth cause of action the Plaintiff realleges the allegations of Paragraphs one through fifty-two hereinabove, incorporating them by reference as if set forth in full, and further alleges:

53.    O'Donovan's deliberate and systematic campaign to demean and denigrate Ford-Murphy, to discredit her authority and diminish her position within the MBTA in the absence of any legitimate official reason constituted extreme and outrageous conduct, intolerable in any workplace in a civilized society.

54.    O'Donovan intended by the above course of conduct to cause Ford-Murphy emotional distress.

55.    O'Donovan's above course of conduct caused Ford-Murphy severe emotional distress.

### VI.    Intentional Interference with Employment Relationship

#### O'Donovan

For her sixth cause of action the Plaintiff realleges the allegations of Paragraphs one through fifty-five hereinabove, incorporating them by reference as if set forth in full, and further alleges:

56.    Before and until O'Donovan's appointment as chief of the MBTA Police, Ford-Murphy enjoyed a successful employment relationship with the MBTA.

57.    From and after his appointment, O'Donovan abused his authority to direct and manage the MBTA Police to demean and denigrate Ford-Murphy, to discredit her authority, to diminish her position within the MBTA, and to deny her promotional opportunities and other benefits to which her rank, seniority and performance otherwise entitled her.

16

58.   O'Donovan's above conduct was malicious and without any legitimate official justification.

59.   As a direct and proximate result of O'Donovan's conduct, Ford-Murphy has lost wages and has suffered emotional distress, embarrassment and humiliation, and has been otherwise injured.

**WHEREFORE** the Plaintiff demands a jury trial and prays judgment:

1.   Ordering the Defendants to promote her forthwith to the rank of Major, retroactive to November 4, 1991.

2.   Ordering the Defendants to cease and desist from discriminating against her because of her sex and from retaliating against her because of her opposition to employment practices made unlawful by G.L. c. 151B;

3.   For compensatory and punitive damages with interest, for her costs, and for reasonable attorney's fee, all pursuant to G.L. c. 151B §9; and

4.   For such other and further relief as the court deems just and proper.

Respectfully submitted

For the Plaintiff,
Dolores Ford-Murphy

By her attorneys,

Alan J. McDonald, BBO #330960
Vida K. Berkowitz, BBO #039720
McDonald & Associates
One Gateway Center, Suite 401 West
Newton, MA  02158
Tel: (617) 928-0080

Dated:   June 18, 1996

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
DOCKET NO. 96-3303G

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DOLORES FORD-MURPHY,

      Plaintiff

    v.

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY, a political subdivision of the
Commonwealth, and JOHN O'DONOVAN
individually

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

\*
\*
\*
\*
\*
\*
\*
\*
\*
\*
\*

### AMENDED COMPLAINT
### (Jury Trial Demanded)

### Introduction

This is an action pursuant to G.L. c. 151B for redress of discrimination against the Plaintiff, Dolores Ford-Murphy, by the MBTA and by John O'Donovan, Chief of the MBTA Police Department, in its failure to promote her and in the terms and conditions of her employment, because of her sex, in retaliation for her opposition to practices made unlawful by G.L. c. 151B, and in the alternative, in violation of her rights to due process of law. The Plaintiff also seeks damages in tort against John O'Donovan individually and against the MBTA.

### Parties

1. Dolores Ford-Murphy ("Ford-Murphy") is an individual residing in Hyde Park, Suffolk County, Massachusetts.

2.    The Massachusetts Bay Transportation Authority ("MBTA") is a body politic and corporate and a political subdivision of the Commonwealth organized pursuant to G.L. c. 161A §2, responsible for providing mass transportation service within the cities and towns set forth in said c. 161A. Its principal place of business is at 10 Park Plaza, Boston, Suffolk County, Massachusetts.

3.    John O'Donovan ("O'Donovan") is an individual residing in Belmont, Middlesex County, Massachusetts.

### Facts

4.    Ford-Murphy has been employed by the MBTA in its Police Department ("Department") since 1981. In 1983, she was promoted to the rank of Sergeant. In 1984, she was promoted to the rank of Lieutenant. In 1986, she was appointed as Acting Captain, and attained the rank of Captain by promotional examination later the same year. She is the senior Captain in the Department and the only female to hold that rank.

5.    In February, 1991, O'Donovan was appointed as Chief of the MBTA Police. At that time Ford-Murphy was the Commander of the Special Services Unit with responsibilities for public information programs, public safety programs, supervision of the Detective and Anti-Crime Units, the Court Case Management Unit, and the Juvenile Unit. She also oversaw the representation of the MBTA Police at community events, served as liaison with the MBTA Marketing and Ridership Directorate, administered the Unit, and performed other duties.

6.    Since his appointment, O'Donovan has exercised all effective authority and control over the Department, including but not limited to determination

of promotions, assignments, transfers, command and reporting
responsibilities, resource allocations, and disciplinary decisions.

7.    On March 29, 1991, O'Donovan instructed staff to page Ford-Murphy,
who was off duty, on her Department-issued pager to respond to a crime
scene.  At the time of the incident there were specific directives in the
Department procedural manual as to who must be paged to respond to a
crime scene.  Neither the manual nor any other Departmental rule or policy
required that an off-duty commander monitor a Department-issued pager so
that he or she could be called to a crime scene.  O'Donovan reprimanded
Ford-Murphy for failure to respond to the pager.  After learning of the
reprimand, she brought the appropriate manual references to the attention
of the Deputy Chief who had initially investigated the incident.  Upon
reconsideration, the Deputy Chief agreed that she should not have been
reprimanded.  However, O'Donovan refused to remove the reprimand.

8.    By May, 1991, O'Donovan had reassigned Ford-Murphy from her
command position to a position as a Supervisor of Training.  This
reassignment had the symbolic effect of a demotion.  After her
reassignment, a male lieutenant replaced her as Commander of Special
Services.  Command positions were traditionally held by captains.  Her new
assignment had previously been filled with a male lieutenant.  At the time,
several positions classified as Captains' positions were left unfilled or were
filled with lower-ranking personnel.

9.    On June 15, 1991, O'Donovan rehired John O'Loughlin as a captain,
O'Loughlin had retired from the MBTA Police on July 1, 1990.  At that time
O'Donovan knew or had reason to know that Robert Cochrane, Deputy Chief
of the Special Services Section, was planning to retire in the near future.

10.    Upon O'Loughlin's return, O'Donovan assigned him as Night Commander, a second-in-command position classified as a Captain's position, while Ford-Murphy remained in the Supervisor of Training position, classified as a Lieutenant's position.

11.    On October 31, 1991, Deputy Chief Cochrane retired.  Five days later, on November 4, 1991, O'Donovan appointed Captain O'Loughlin to replace Cochrane as Deputy Chief of Special Services.  Ford-Murphy remained in the Supervisor of Training position.

12.    Had O'Donovan not rehired Captain O'Loughlin, Ford-Murphy would have been the only captain available to assume Deputy Chief Cochrane's duties, and the presumptive successor to Cochrane as Deputy Chief of Special Services.

13.    In July, 1991, O'Donovan changed the radio call signs for all MBTA Police command and supervisory staff.  Call signs are issued to command staff members primarily by status ranking.  In a paramilitary organization such as the MBTA Police Department, status symbols affect the perception of an officer's authority in the Department, and thus affect the officer's ability to exercise that authority.  A low call sign number is a symbol of high status in the Department.  O'Donovan assigned Ford-Murphy a significantly higher call number by leaving unused numbers between her and the next tier of the command staff.  The change in Ford-Murphy's call number thus functioned as a signal to her peers and subordinates that her status was greatly diminished.

14.    By August 7, 1991, a sign-out sheet was instituted ostensibly for staff members.  Ford-Murphy was notified and specifically instructed that she was required to sign out if she left the building for any reason.  Upon information

and belief this requirement was enforced for her only, as she was required to sign out, but her male counterparts were not.

15.    On August 7, 1991 while performing duties related to her position as Training Supervisor, Ford-Murphy was involved in a minor motor vehicle incident while driving an unmarked MBTA cruiser. The incident did not result in any injuries. In accordance with established practice, she called for an MBTA patrol supervisor to respond to the scene. The other operator admitted fault to the patrol supervisor. Upon returning to the station Ford-Murphy was publicly berated by Chief O'Donovan, who wanted to know where and by whose authority she had been out of the building.

16.    Chief O'Donovan assigned an MBTA Police captain to investigate the accident. Contrary to consistent Department practice, O'Donovan further ordered the Captain to call in a State Police Accident Investigation Unit officer to perform an accident reconstruction at the scene. Upon performing the reconstruction, the State Trooper confirmed the original report and concluded that Ford-Murphy was not at fault.

17.    Even though Ford-Murphy was exonerated, O'Donovan reprimanded her.

18.    In May, 1992, Ford-Murphy was transferred to the Day Patrol Unit. Her predecessor in this position, with a rank of captain, had been the second-in-command of the Day Shift. Historically, that was the role assumed by a captain working in this position. However, she was instructed specifically that she was not the second in command, but was simply a duty supervisor, in charge only of the shift she was assigned to and then only when performing a tour of duty. This further diminished her stature as a captain in the Department, as she was the only captain working in the role of Duty Supervisor. Her counterparts as duty supervisors were lieutenants

and sergeants.  At the time of this reassignment she was replaced as Supervisor of Training  by a lieutenant.

19.    In November, 1992, Ford-Murphy was reassigned from Day Patrol Duty Supervisor to Staff Inspections, classified as a lieutenant's position.  For two full years, from November, 1992 until November, 1994,  she had no specific assignments and no authority.  She was relegated to the role of a clerical staff person.  She was sporadically given unimportant work.  She was not assigned a desk or an office, and was instructed to use the desks of civilian secretarial staff or others who were not at their assigned positions. She was required to find another work location when they returned  She continuously sought work from other staff members because of the extreme shortage of work given to her.  Other staff members told her they were limited in what they could allow her to assist them with.  This two-year episode completely eroded any remaining  authority she had within the Department.

20.    In May, 1994, while assigned to Staff Inspections, Ford-Murphy requested an upgraded car.  It had been past practice to assign newer cars to higher-ranked officers, if they desired one, and pass the older cars down to lower ranked officers.  O'Donovan had recently followed this practice in assigning newer cars to himself and the Deputy Chiefs, and passing their older vehicles down.  The assignment of the newest cars thus became a symbol of status and authority within the Department.  There were several unassigned cars at that time which were newer than Ford-Murphy's. Nevertheless, rather than upgrade her car, O'Donovan responded that he was not assigning cars at that time.

21.    On or shortly before October 19, 1994, Ford-Murphy learned that O'Donovan had assigned a newer car to at least one male sergeant.  Because

the assignment of vehicles, like radio call numbers, is symbolic of an officer's status in the Department, Ford-Murphy initiated an internal complaint of discrimination by contacting the MBTA Organizational Diversity Office. After several weeks, O'Donovan agreed to make certain changes, including assigning her to a command position and an appropriate vehicle and radio call number.

22.    On November 4, 1994, O'Donovan announced that Ford-Murphy had been named as Captain of the Administrative Services Unit, in full charge of the Unit. Her male predecessor in that position had held the title of Commander. On the same day, O'Donovan announced that a lieutenant had been named as Commander of the Special Services Unit. Ford-Murphy was required to protest in order to be given the title of Commander.

23.    As Commander of the Administrative Services Unit, Ford-Murphy was informed that the major part of her function was managing the reaccreditation process which was scheduled for completion by the end of 1995. Prior to her assignment no substantive work had been done on this project for approximately four years. Despite her protests, she was given insufficient personnel and authority to accomplish this work. Instead of giving her resources, O'Donovan caused extensions to be requested.

24.    As Commander of Administrative Services, Ford-Murphy was responsible for attending or assigning staff to attend various community meetings. On May 18, 1995, she attended a meeting which she had always covered, and found that O'Donovan had assigned an officer not under her command to attend the meeting, without her knowledge. This officer had not been properly briefed, and the Department would have lost available grant funds had Ford-Murphy not been there.

25.    On divers occasions, O'Donovan has interfered with Ford-Murphy's ability to determine the activities and whereabouts of officers under her command.  Upon her inquiry, they have told her that O'Donovan had assigned them to "secret" work which he instructed them not to tell her about.  This undermined her authority.  Her male counterparts have not been prevented from knowing what their subordinates are doing.

26.    In June, 1995, shortly after Ford-Murphy protested the above violations of the chain of command, O'Donovan removed her from her day shift command and reassigned as Night Patrol Unit Commander.

27.    In September, 1995, O'Donovan imposed assignment restrictions on two  officers under Ford-Murphy's command without consulting or informing her.  This undermined her authority.  Her male counterparts were not subjected to such interference with the daily assignment of officers under their command.

28.    When Ford-Murphy protested the derogation of her authority, she was reassigned to work on reaccreditation of the Authority.  In contrast with her previous assignment to work on reaccreditation from November, 1994 through June, 1995, she did not have the title of Commander, had no assignments other than the re-accreditation work, and had no one reporting to her except one female lieutenant for a brief period of time.  Ford-Murphy is still in that assignment.

29.    On October 5, 1995, O'Donovan called a staff meeting to discuss reaccreditation.  O'Donovan spent most of the time telling a story about "panty raids" on the "girls" who "had" to be "quarantined" at the FBI academy.  He spent only a few minutes discussing reaccreditation.  After the meeting, a group of lieutenants indicated to Ford-Murphy  that they perceived O'Donovan's support for the reaccreditation effort to be low.

30.    On divers occasions, O'Donovan has refused to allow Ford-Murphy to attend law enforcement community events which male command staff members, including those below her rank, were permitted to attend.

31.    On divers occasions, O'Donovan has made demeaning references to and remarks to and about women officers and civilian employees of the Department, referring in public speeches to the "men and girls of the MBTA Police Department," and referring to women officers as "girlie-girls." Upon information and belief, during the 1993 Christmas party, he told one of the secretaries that the "girls" should get up on the tables and dance to get the party started. When she retorted that perhaps the men should dance on the tables, he said, "Have another drink, dear." On many occasions, including staff meetings, and despite Ford-Murphy's requests through the chain of command to desist, O'Donovan referred to her and other female police supervisors, officers and civilian staff members as "Dear." On one occasion, he barred a majority of the female civilian executive staff members from participation in a sexual harassment seminar which all MBTA executives were required to attend.

32.    At the end of a Christmas party in 1995, Chief O'Donovan stood at the top of the exit stairwell shaking hands with command staff members as they left, wishing them a merry Christmas and handling them a gift of a bottle of vodka. As Ford-Murphy approached she held her hand out to shake his hand. He reached past her hand, grasped her wrist, pulled her forward and kissed her cheek.

33.    On November 4, 1995, Ford-Murphy was bypassed for a promotion to Major. O'Donovan promoted four individuals to the newly-created rank of Major, and appointed two others from outside the Department. Two of the promoted individuals held the appointed rank of Deputy Chief. One held the

civil service rank of Captain, and the other held the civil service rank of Lieutenant. One of the individuals appointed from outside the Department had held the rank of Captain of the State Police, and had limited experience in transit policing. The other held the rank of Lieutenant of the State Police and had no experience in transit policing. Ford-Murphy outranked two of the promotees, who had held the rank of Lieutenant of the MBTA police. She was more qualified for the position than at least four of those promoted. All those promoted are men.

34. On April 1, 1996, Major Cuervels retired, leaving an open Major's position. Ford-Murphy is the only Captain in the Department and the most qualified to be promoted to Major. O'Donovan has not filled the position.

### CLAIMS FOR RELIEF

### I.    Discrimination

### MBTA and O'Donovan

For her first cause of action the Plaintiff realleges the allegations of Paragraphs one through thirty-four above, incorporating them by reference herein as if set forth in full, and further alleges:

35. Since his appointment, O'Donovan has engaged in a deliberate and systematic campaign to deprive Ford-Murphy of rights, privileges, responsibilities and incidents customarily and usually pertaining to her rank, seniority and performance as a Captain of the MBTA Police, to demean and denigrate her, to discredit her authority and diminish her position within the MBTA because of her sex, including but not limited to:

a.    demoting her from her position of Commander of Special Services, classified as a Captain's position, to the position of Supervisor of Training, a Lieutenants' position, in May, 1991;

b.    assigning her a lower-status radio call number in July, 1991;

c.      assigning her as a duty supervisor in the Day Patrol Unit in May, 1992;

d.      requiring her to sign out when other superior officers were not required to sign out;

e.      assigning her to Staff Inspections from November, 1992 until November, 1994, without duties, without an office, and without a desk, and instructing staff members not to allow her to perform any responsible work;

f.      filling Command positions in the Department with lower-ranking male officers;

g.      refusing to assign her an appropriate vehicle;

h.      assigning her a lower-status job title as head of the Administrative Services Unit, in November 1994, than a similarly situated male unit head;

i.      assigning her to work on Departmental reaccreditation without assigning adequate personnel or authority to accomplish the work;

j.      assigning work to officers under her command without her knowledge;

k.      removing her day shift command and reassigning her to a night shift command in June, 1995;

l.      reassigning her in September, 1995 to work on re-accreditation without assigning sufficient personnel to report to her;

m.      bypassing her for promotion to Major in November, 1995, in favor of lower-ranking and less qualified male officers;

n.      failing to promote her on April 1, 1995 to a Major's position vacated by a retirement.

36.      Since his appointment, O'Donovan has repeatedly bypassed Ford-Murphy for promotion because of her sex.

37.      Since his appointment, O'Donovan has created a hostile work environment for Ford-Murphy and other women, because of her and their sex, including but not limited to using demeaning language to and when

referring to women; singling Ford-Murphy out for adverse treatment; imposing disparate discipline on her; and excluding women from important training, such as sexual harassment training, and from other opportunities.

38.    As a result of the discrimination set forth hereinabove, Ford-Murphy has lost wages and has suffered emotional distress, embarrassment and humiliation, and has been otherwise injured.

39.    On March 7, 1996, Ford-Murphy filed a charge of discrimination against the MBTA and O'Donovan with the Massachusetts Commission Against Discrimination. A true copy of the charge is attached hereto as Exhibit A and incorporated herein by this reference as if set forth in full.

40.    On April 12, 1996, Ford-Murphy filed an Amended Charge of Discrimination with the said Commission. A true copy of the charge is attached hereto as Exhibit B and incorporated herein by this reference as if set forth in full.

41.    On May 8, 1996, the Massachusetts Commission Against Discrimination granted leave to the Plaintiff to file a civil action pursuant to G.L. c. 151B §9. A true copy of the Commission's assent is attached hereto as Exhibit C and incorporated herein by this reference as if set forth in full.

## II.    **Retaliation**

### **MBTA and O'Donovan**

For her second cause of action the Plaintiff realleges the allegations of Paragraphs one through forty-one hereinabove, incorporating them by reference herein as if set forth in full, and further alleges:

42.    On or before June 14, 1994, Ford-Murphy informed the General Manager and General Counsel of the MBTA of O'Donovan's discriminatory and retaliatory conduct.

43.    Since at least October, 1994, O'Donovan has engaged in a deliberate and systematic campaign to deprive Ford-Murphy of rights, privileges, responsibilities and incidents customarily and usually pertaining to her rank, seniority and performance as a Captain of the MBTA Police, to demean and denigrate her, to discredit her authority and diminish her position within the MBTA, has bypassed her for promotion, and has created a hostile working environment for her, in retaliation for her opposition to practices made unlawful by G.L. c. 151B.

44.    As a result of the retaliation set forth hereinabove, Ford-Murphy has lost wages and has suffered emotional distress, embarrassment and humiliation, and has been otherwise injured.

45.    On March 7, 1996 Ford-Murphy filed a charge of retaliation against the MBTA and O'Donovan with the Massachusetts Commission Against Discrimination.  A true copy of the charge is attached hereto as Exhibit A and incorporated herein by this reference as if set forth in full.

46.    On April 12, 1996, Ford-Murphy filed an amended charge of retaliation with the said Commission.  A true copy of the charge is attached hereto as Exhibit B and incorporated herein by this reference as if set forth in full.

47.    On May 8, 1996, the Massachusetts Commission Against Discrimination granted leave to the Plaintiff to file a civil action pursuant to G.L. c. 151B §9.  A true copy of the Commission's assent is attached hereto as Exhibit C and incorporated herein by this reference as if set forth in full.

### III.    Due Process of Law

#### MBTA and O'Donovan

For her third cause of action the Plaintiff realleges the allegations of Paragraphs one through fifty-two hereinabove, incorporating them by reference as if set forth in full, and further alleges:

48.    In February, 1989, Ford-Murphy was indicted by a federal grand jury on charges connected with the alleged purchase and sale of civil service police promotional examinations (hereinafter, "the charges").

49.    Upon her indictment, Ford-Murphy was suspended from her position with the MBTA police, in accordance with G.L. c. 30 §59.

50.    On February 6,1990, after trial, Ford-Murphy was acquitted of all the charges.

51.    Following her acquittal, Ford-Murphy was restored to her position as an MBTA Police Captain with full back pay and credit for time in service, in accordance with the said statute.

52.    In July, 1990 Ford-Murphy was made Commander of the Special Services Unit.

53.    Richard Egen ("Egen") is an FBI agent who was involved in the failed prosecution of the charges, and upon information and belief was acquainted with O'Donovan for ten to fifteen years prior to O'Donovan's appointment as Chief of the MBTA Police.

54.    Upon information and belief, at some time between O'Donovan's appointment as Chief of the MBTA Police and May 7, 1991, Egen allegedly asserted to O'Donovan that he believed Ford-Murphy was guilty of the charges and had been acquitted because of deceptive conduct which caused a witness to fail to identify her.

55.    The Defendants took no actions to investigate Egen's alleged assertions or the circumstances of Ford-Murphy's acquittal, and did not institute administrative charges against her at any time.

56.    The Defendants have never chosen to bring any administrative charges against her (as is permitted by G.L. c. 31 §41 after a civil service employee is acquitted of criminal charges) connected with the alleged purchase and sale of civil service police promotional examinations.

57.    From and after May 7, 1991, when O'Donovan effectively demoted Ford-Murphy, and continuing to the present day, notwithstanding that the Defendants declined to bring administrative charges against her, O'Donovan has intentionally engaged in a deliberate and systematic campaign to deprive Ford-Murphy of privileges, responsibilities and incidents customarily and usually pertaining to her rank, seniority and performance as a Captain of the MBTA Police, to demean, humiliate and punish Ford-Murphy, to discredit her authority and diminish her position within the MBTA, and to inflict emotional distress upon her by actions including but not limited to the following:

   a.    demoting her from her position of Commander of Special Services, classified as a Captain's position, to the position of Supervisor of Training, a Lieutenants' position, in May, 1991;

   b.    assigning her a lower-status radio call number in July, 1991;

   c.    assigning her as a duty supervisor in the Day Patrol Unit in May, 1992;

   d.    requiring her to sign out when other superior officers were not required to sign out;

   e.    assigning her to Staff Inspections from November, 1992 until November, 1994, without duties, without an office, and without a desk, and instructing staff members not to allow her to perform any responsible work;

    f.     filling Command positions in the Department with lower-ranking male officers;

    g.    refusing to assign her an appropriate vehicle;

    h.    assigning her a lower-status job title as head of the Administrative Services Unit, in November 1994, than a similarly situated male unit head;

    i.     assigning her to work on Departmental reaccreditation without assigning adequate personnel or authority to accomplish the work;

    j.     assigning work to officers under her command without her knowledge;

    k.    removing her day shift command and reassigning her to a night shift command in June, 1995;

    l.     reassigning her in September, 1995 to work on re-accreditation without assigning sufficient personnel to report to her;

    m.   bypassing her for promotion to Major in November, 1995, in favor of lower-ranking and less qualified male officers;

    n.    failing to promote her on April 1, 1995 to a Major's position vacated by a retirement.

58.    O'Donovan asserts that his above actions were motivated by his belief that the Plaintiff was guilty of the charges and should not have been acquitted.

59.    To the extent that O'Donovan's above denials of the privileges, responsibilities and incidents customarily and usually pertaining to Ford-Murphy's rank, seniority and performance as a Captain of the MBTA Police were motivated by his belief that she was guilty of the charges and should not have been acquitted, such actions were arbitrary and capricious and deprived Ford-Murphy of her rights under Articles I, X, and XII of the Constitution of the Commonwealth of Massachusetts to due process of law.

60.    As a result of the above deprivation of her rights to due process of law, Ford-Murphy has lost wages and has suffered emotional distress, embarrassment and humiliation, and has been otherwise injured,

### IV.    Negligent Supervision

### MBTA

For her fourth cause of action the Plaintiff realleges the allegations of Paragraphs one through sixty hereinabove, incorporating them by reference herein as if set forth in full, and further alleges:

61.    At all times relevant hereto the MBTA has negligently, willfully or intentionally failed to supervise O'Donovan by permitting him to discriminate against Ford-Murphy in the terms and conditions of her employment, and to bypass her for promotion because of her sex, in retaliation for her opposition to practices made unlawful by G.L. c. 151B, and/or in violation of her right to due process of law.

62.    From and after June 14, 1994, when Ford-Murphy informed the General Manager and General Counsel of the MBTA of O'Donovan's discriminatory and retaliatory conduct, the MBTA failed to take remedial action to prevent and control O'Donovan's discriminatory, retaliatory, arbitrary and capricious conduct, and to discipline him for such conduct.

63.    As a direct and proximate result of the MBTA's negligent failure to supervise O'Donovan, Ford-Murphy has lost wages and has suffered emotional distress, embarrassment and  humiliation, and has been otherwise injured.

## V.    Negligent Retention

### MBTA

For her fifth cause of action the Plaintiff realleges the allegations of
Paragraphs one through sixty-three hereinabove, incorporating them by
reference herein as if set forth in full, and further alleges:

64.    From and after June 14, 1994, despite O'Donovan's continued
discriminatory, retaliatory, arbitrary and capricious conduct against Ford-
Murphy, the MBTA has negligently, willfully or intentionally retained
O'Donovan in a position to continue such conduct.

65.    As a direct and proximate result of the MBTA's negligent retention of
O'Donovan, Ford-Murphy has lost wages and has suffered emotional distress,
embarrassment and humiliation, and has been otherwise injured.

## VI.    Intentional Infliction of Emotional Distress

For her sixth cause of action the Plaintiff realleges the allegations of
Paragraphs one through sixty-five hereinabove, incorporating them by
reference as if set forth in full, and further alleges:

66.    O'Donovan took the above actions in order to compel Ford-Murphy to
leave the MBTA Police by causing her such emotional distress that the
conditions of her employment would be unendurable.

67.    O'Donovan's deliberate and systematic campaign to deprive Ford-
Murphy of the privileges, responsibilities and incidents customarily and
usually pertaining to her rank, seniority and performance as a Captain of the
MBTA Police, to demean and denigrate her, to discredit her authority and
diminish her position within the MBTA, in the absence of any legitimate

official justification constituted extreme and outrageous conduct, intolerable in any workplace in a civilized society.

68.   O'Donovan's above course of conduct caused Ford-Murphy severe emotional distress.

### VII.   **Intentional Interference with Employment Relationship**

### **O'Donovan**

For her seventh cause of action the Plaintiff realleges the allegations of Paragraphs one through sixty-eight hereinabove, incorporating them by reference as if set forth in full, and further alleges:

69.   Before and until O'Donovan's appointment as chief of the MBTA Police, Ford-Murphy enjoyed a successful employment relationship with the MBTA.

70.   From and after his appointment, O'Donovan abused his authority to direct and manage the MBTA Police by using that authority to deprive Ford-Murphy of the privileges, responsibilities and incidents customarily and usually pertaining to her rank, seniority and performance as a Captain of the MBTA Police, to engage in a deliberate and systematic campaign to demean and denigrate her, to discredit her authority and diminish her position within the MBTA.

71.   Upon information and belief, O'Donovan's above actions were malicious, without legitimate official justification, and were taken because of her sex.

72.   In the alternative, O'Donovan's above actions were arbitrary, capricious, malicious, without legitimate official justification, and were taken both because of his arbitrary and capricious beliefs concerning the federal charges and because of her sex.

73.    Upon information and belief, from and after his appointment, O'Donovan also asserted to persons employed by and otherwise associated with the MBTA, the MBTA police, and the law enforcement community, that Ford-Murphy was guilty of the charges and should not have been acquitted.

74.    Upon information and belief O'Donovan made the said assertions maliciously, without legitimate official justification, and in order to deflect charges that his actions against her were motivated by her sex, and to deter her from pursuing charges of sex discrimination.

75.    As a result of O'Donovan's deliberate and systematic campaign to discredit her, Ford-Murphy was denied promotional opportunities and other privileges, responsibilities and other customary and usual incidents of her rank, seniority and performance as a Captain of the MBTA Police.

76.    As a direct and proximate result of O'Donovan's conduct, Ford-Murphy has lost wages, has suffered emotional distress, embarrassment and humiliation, and has been otherwise injured.

**WHEREFORE** the Plaintiff demands a jury trial and prays judgment:

1.    Ordering the Defendants to promote her forthwith to the rank of Deputy Chief retroactive to November 4, 1991 and Major retroactive to November 4, 1995.

2.    Ordering the Defendants to cease and desist from discriminating against her because of her sex and from retaliating against her because of her opposition to employment practices made unlawful by G.L. c. 151B;

3.    Ordering the Defendants to cease and desist from representing that she is guilty of the charges, or that she was acquitted because of deceptive conduct or for any other reason than the reasons expressed by the Court in connection with said acquittal;

4.    Ordering the Defendants to cease and desist from discriminating against her because of the charges or anything in connection therewith;

5.    For compensatory and punitive damages with interest.

6.    For her costs herein.

7.    For a reasonable attorney's fee pursuant to G.L. c. 151B §9; and

8.    For such other and further relief as the court deems just and proper.

Respectfully submitted

For the Plaintiff,
Dolores Ford-Murphy

By her attorneys,

Alan J. McDonald, BBO #330960
Vida K. Berkowitz, BBO #039720
McDonald & Associates
One Gateway Center, Suite 401 West
Newton, MA  02158
Tel: (617) 928-0080

Dated:  October 24, 1996

## CHARGE OF DISCRIMINATION

ͳ form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse are completing this form.

| ENTER CHARGE NUMBER |
| --- |
| ☐ FEPA |
| ☐ EEOC |

__Massachusetts Commission Against Discrimination__ ___ and EEOC
(State or local Agency, if any)

| NAME (Indicate Mr., Ms., or Mrs.) Captain Delores Ford-Murphy | HOME TELEPHONE NO. (Include Area Code) (617) 361-3339 | |
| --- | --- | --- |
| STREET ADDRESS 933 Metropolitan Avenue, Hyde Park, MA  02136 | CITY, STATE AND ZIP CODE | COUNTY Suffolk |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME Mass Bay Transportation Authority | NO. OF EMPLOYEES/MEMBERS 6800 | TELEPHONE NUMBER (Include Area Code) (617) 222-5000 |
| --- | --- | --- |
| STREET ADDRESS 10 Park Plaza, Boston, MA  02116 | CITY, STATE AND ZIP CODE | |
| NAME      See Attachment | | TELEPHONE NUMBER (Include Area Code) |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN ☐ AGE  ☒ RETALIATION  ☐ OTHER(Specify) | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year) 11/4/95 and continuing |
| --- | --- |

THE PARTICULARS ARE(If additional space is needed, attached extra sheet(s)):

See Attachment

Exhibit A

| ☒ I also want this charge filed with the EEOC. 'll advise the agencies if I change my address or telephone ber and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements) I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| --- | --- |
| I declare under penalty of perjury that the foregoing is true and correct.                    _Delores J. Ford-Murphy_ Date                    Charging Party (Signature) | SIGNATURE OF COMPLAINANT      _Delores J. Ford-Murphy_ SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)      _my Commission Expires 5-2-97_ |

EEOC  FORM  5      PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

**Attachment**

Additional Respondents:

MBTA Police
240 Southampton Street
Roxbury, MA 02118
(617) 222-1000

John O'Donovan
56 Partridge Lane
Belmont, Ma 02178
(617)489-0022

Particulars of Charge of Discrimination:

1.     On November 4, 1995 and divers other occasions, the Massachusetts Bay Transportation Authority (hereinafter, "MBTA") and John O'Donovan, Chief of the MBTA Police Department discriminated against me in the terms and conditions of my employment, in violation of G.L. c. 151B and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*, and more particularly:

2.     I have been employed by the MBTA Police since 1981. In 1983, I was promoted to the rank of Sergeant. In 1984, I was promoted to the rank of Lieutenant. In 1986, I was appointed as Acting Captain. I took the promotional examination and attained the rank of Captain the same year. I am the senior Captain in the department and the only female to hold that rank.

3.     In February, 1991, Chief O'Donovan was appointed as Chief of the MBTA Police. At that time I was the Commander of the Special Services Unit, with responsibilities for public information programs, public safety

2

programs, supervision of the Detective and Anti-Crime Units, the Court Case Management Unit, the Juvenile Unit and other functions, such as oversight of representation of the MBTA Police at community events, liaison with MBTA Marketing and Ridership Directorate, administration of the Unit, and other duties.

4.    On March 29, 1991, Chief O'Donovan instructed that I be paged on my Department-issued pager to respond to a crime scene. I was off duty. At the time of the incident there were no procedural requirements for the monitoring of the beeper off duty, or for me to be summoned to a crime scene. Specific requirements were clearly defined by the Department manual. Chief O'Donovan had me reprimanded for failure to respond to the beeper off duty. When I became aware of the finding that I was at fault, I brought the appropriate manual references to the attention of the Deputy Chief who had investigated the incident. He agreed that upon reconsideration, he would not have found me at fault. However, when I informed Chief O'Donovan of this, he refused to reopen the matter.

5.    By May, 1991, Chief O'Donovan had reassigned me from my command position to a position as a Supervisor of Training. This reassignment had the symbolic effect of a demotion. After my reassignment, a male Lieutenant replaced me as Commander of Special Services. My new assignment had previously been filled with a male Lieutenant. At the time, there were several unfilled Captain's positions.

6.    In July, 1991, Chief O'Donovan changed the radio call signs. The call signs are issued to command staff members primarily by status ranking. He assigned me a significantly lower status number by leaving unused numbers

between me and the next tier of the command staff. In a paramilitary organization such as the MBTA Police Department, such status symbols affect the perception of an officer's effective authority in the Department, and thus affect his or her ability to exercise that authority. The change in my call number thus functioned as a signal to my peers and subordinates that my status was greatly diminished.

7.    In May, 1992, I was transferred to the Day Patrol Unit. My predecessor in this position, with a rank of Captain, had been a second-in-command. However, I was informed specifically that I was not in charge of the Day Patrol Unit as my male predecessor had been, responsible for all day squad issues and concerns. I was told that I was simply a duty supervisor, in charge of the shift only when performing a tour of duty. Again, this diminished my stature as a Captain in the Department. I was the only Captain in the role of Duty Supervisor. My counterparts as duty supervisors were Lieutenants and Sergeants. At that time I was replaced as Supervisor of Training by a Lieutenant.

8.    By August 7, 1991, a sign-out sheet was instituted ostensibly for staff members. I was notified and specifically instructed that I was required to sign out if I left the building for any reason. This requirement was rigorously enforced for me only. I was the only member of the command staff required to sign out. My counterparts were not required to sign out.

9.    On August 7, 1991, I was involved in a minor motor vehicle incident (no injuries) while driving an unmarked MBTA vehicle from a training meeting. An MBTA Sergeant was dispatched to the scene. The other operator admitted fault to the Sergeant. Upon returning to the station I was

4

instructed that Chief O'Donovan wanted to know where and by whose
authority I had been out of the building.

10.    An MBTA Police Captain was assigned to investigate the accident.  He
had been ordered by Chief O'Donovan to secure assistance from the State
Police Accident Investigation Unit officer.  Therefore a State Trooper from
that Unit performed an accident reconstruction analysis and concluded that
there was no evidence of any negligence on my part.  The State Police have
never been called in before or since for an investigation of this nature.

11.    Even though I was exonerated, Chief O'Donovan gave me a reprimand.

12.    In November, 1992, I was reassigned to Staff Inspections, another
Lieutenant's position.  From that time until November, 1994, two full years,
I had no specific assignments and no authority.  I was sporadically given
unimportant work.  I was not assigned a desk or an office, and was
instructed to use the desks of personnel who were not at their assigned
positions.  When they returned, I was required to seek another work
location.  I sought work from other staff members because of the extreme
shortage of work given to me.  Other staff members told me they were
limited in what they could allow me to assist them with.

13.    In May, 1994, I requested an upgraded car.  It had been past practice
to assign newer cars to higher-ranked officers, if desired, and pass the older
cars down to lower ranked officers.  This had recently been done with Chief
O'Donovan and the Deputy Chiefs.  There were several unassigned cars at
that time.  Chief O'Donovan responded that he was not assigning cars at that
time.

14.    On or shortly before October 19, 1994, I learned that Chief O'Donovan
had assigned newer cars to at least one male Sergeant.  Because the
assignment of vehicles, like radio call numbers, is symbolic of an officer's
status in the Department, I initiated an internal complaint of discrimination
by contacting the MBTA Organizational Diversity Office.  After several weeks,
Chief O'Donovan agreed to make certain changes, including assigning me to
a command position and an appropriate vehicle and radio call number.

15.    On November 4, 1994, Chief O'Donovan announced that I had been
named as Captain of the Administrative Services Unit, in full charge of the
Unit.  My male predecessor in that position had held the title of
Commander.  On the same day, he announced that a Lieutenant had been
named as Commander of the Special Services Unit.  I was required to
protest in order to be given the title of Commander.

16.    As Commander of the Administrative Services Unit, I was informed
that the major part of my function was managing the re-accreditation
process which was scheduled for completion by the end of 1995.  Prior to
my assignment no substantive work had been done on this project for
approximately four years.  Despite my protests, I was given insufficient
personnel and authority to accomplish this work.  Instead of giving me
adequate resources, Chief O'Donovan caused extensions to be requested.

17.    As Commander of Administrative Services, it was my responsibility to
assign staff to attend various community meetings.  On May 18, 1995, I
attended a meeting which I had always covered, and found that Chief
O'Donovan had assigned one of my officers to attend the meeting, without

6

my knowledge. This officer had not been properly briefed, and the Department would have lost available grant funds had I not been there.

18.    On divers occasions, I was unable to determine the activities and whereabouts of officers under my command: upon my inquiry, they told me that Chief O'Donovan had assigned them to "secret" work which they were instructed not to tell me about. This undermined my authority.

19.    In June, 1995, shortly after I protested the above violations of the chain of command, I was removed from my day shift command and reassigned as Night Patrol Unit Commander.

20.    In September, 1995, Chief O'Donovan reassigned an officer under my command without consulting or informing me. This undermined my authority. My male counterparts were not subjected to interference with their assignment of officers under their command.

21.    When I protested about the derogation of my authority, I was reassigned to work on re-accreditation of the Authority. In contrast with my assignment from November, 1994 through June, 1995, I now had no assignments other than the re-accreditation work, and initially, I had no one reporting to me. After repeated protests, I was assigned one patrol officer full time and one Sergeant part-time. I am still in that assignment.

22.    On October 5, 1995, Chief O'Donovan called a staff meeting to discuss re-accreditation. Chief O'Donovan spent most of the time telling a story about "panty raids" on the "girls" who "had" to be "quarantined" at the FBI academy. He spent only a few minutes discussing re-accreditation. After

the meeting, a group of Lieutenants indicated to me that they perceived Chief O'Donovan's support for the re-accreditation effort to be low.

23.    I now had no assignments other than the re-accreditation work.

24.    On divers occasions, Chief O'Donovan has made demeaning references to and remarks about women officers, referring in public speeches to the "men and girls of the MBTA Police Department, and referring to women officers as "girlie-girls." Upon information and belief, at the 1993 Christmas party, he told one of the secretaries that the "girls" should get up on the tables and dance to get the party stared. When she retorted that perhaps the men should dance on the tables, he said, "Have another drink, dear." On many occasions, including staff meetings, and despite my requests through the chain of command to desist, Chief O'Donovan referred to me and other female police supervisors, officers and civilian staff members as "Dear." On one occasion, he barred a majority of the female civilian executive staff members from participation in a sexual harassment seminar, which all MBTA executives were required to attend.

25.    On divers occasions, Chief O'Donovan refused to allow me to attend law enforcement community events which male command staff members, including those below my rank, were permitted to attend.

26.    On November 4, 1995, I was bypassed for a promotion to Major. Chief O'Donovan promoted four individuals to the newly-created rank of Major, and appointed two others from outside the Department. Two of the promoted individuals held the appointed rank of Deputy Chief. One holds the civil service rank of Captain, and the other holds the civil service rank of Lieutenant. One of the individuals appointed from outside the Department

had held the rank of Captain of the State Police: he has limited experience in transit policing. The other held the rank of Lieutenant of the State Police and had no experience in transit policing. I outranked two of the promotees, who had held the rank of Lieutenant of the MBTA police. I was more qualified for the position than at least four of those promoted. All those promoted are men.

27.   At the end of a Christmas party in 1995, Chief O'Donovan stood at the top of the exit stairwell shaking hands with command staff members as they left, wishing them a merry Christmas and handing them a gift of a bottle of vodka. As I approached I held my hand out to shake his hand. He reached past my hand, grasped my wrist, pulled me forward and kissed my cheek.

28.   Chief O'Donovan has engaged in a deliberate and systematic campaign to demean and denigrate me, to discredit my authority and diminish my position within the MBTA. I believe that I have been bypassed for promotion and have been otherwise discriminated against in the terms and conditions of my employment because of my sex and in retaliation for my opposition to practices made unlawful by 42 U.S.C. §2000e-1 *et seq.* and G.L. c. 151B, in violation of those statutes.

| Amended   **CHARGE OF DISCRIMINATION** | ENTER CHARGE NUMBER |
|---|---|
| This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form. | ☐ FEPA  ☐ EEOC |

**Massachusetts Commission Against Discrimination** ____ and EEOC
(State or local Agency, if any)

| NAME (Indicate Mr., Ms., or Mrs.) Captain Delores Ford-Murphy | HOME TELEPHONE NO. (Include Area Code) (617) 361-3339 |
|---|---|
| STREET ADDRESS CITY, STATE AND ZIP CODE 933 Metropolitan Avenue, Hyde Park, MA  02136 | COUNTY Suffolk |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME Mass Bay Transportation Authority | NO. OF EMPLOYEES/MEMBERS 6800 | TELEPHONE NUMBER (Include Area Code) (617)222-5000 |
|---|---|---|
| STREET ADDRESS 10 Park Plaza, Boston, MA  02116 | | CITY, STATE AND ZIP CODE |

| NAME      See Attachment | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| STREET ADDRESS | CITY, STATE AND ZIP CODE |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))  ☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN  ☐ AGE   ☒ RETALIATION   ☐ OTHER(Specify) | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (Month, day, year) 11/4/95 and continuing |
|---|---|

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s)):


    See Attachment


Exhibit B

| ☐ ' also want this charge filed with the EEOC. I ..I advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT *Delores J. Ford-Murphy* |
| *Delores J. Ford-Murphy* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |
| Date                   Charging Party (Signature) | *Vicki ...* My Commissi... Expires |

## Attachment to Amended Charge of Discrimination

Additional Respondents:

MBTA Police
240 Southampton Street
Roxbury, MA  02118
(617)  222-1000

John O'Donovan
56 Partridge Lane
Belmont, Ma  02178
(617)489-0022

Particulars of Charge of Discrimination:

1.    On November 4, 1995 and divers other occasions, the Massachusetts
Bay Transportation Authority (hereinafter, "MBTA") and John O'Donovan,
Chief of the MBTA Police Department discriminated against me in the terms
and conditions of my employment, in violation of G.L. c. 151B and Title VII
of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*, and
more particularly:

2.    I have been employed by the MBTA Police since 1981.  In 1983, I was
promoted to the rank of Sergeant.  In 1984, I was promoted to the rank of
Lieutenant.  In 1986, I was appointed as Acting Captain.  I took the
promotional examination and attained the rank of Captain the same year.  I
am the senior Captain in the department and the only female to hold that
rank.

3.    In February, 1991, Chief O'Donovan was appointed as Chief of the
MBTA Police.  The Chief of the MBTA Police exercises total control and
authority over the entire police department, including but not limited to all

2

decisions regarding promotions, assignments, transfers, command and reporting responsibilities, allocation of resources and disciplinary decisions.

4.    At that time I was the senior civil service Captain in the Department. I was functioning in the role of Commander of the Special Services Unit. This unit was responsible for all public information programs, all public safety programs, supervision of the Detective and Anti-Crime Units, the Court Case Management Unit, the Juvenile Unit and other functions, such as oversight of the MBTA Police Community Service office, and the Police Department's liaison with the MBTA Marketing and Ridership Directorate. As Commander of this unit, Ford-Murphy was responsible for almost all of the detective and plainclothes personnel assignments, specialty unit functions, public safety programs and resources of the entire MBTA Police Department.

5.    On March 29, 1991, Chief O'Donovan instructed staff to page me on my Department-issued pager to respond to a crime scene. I was off duty. At the time of the incident there were no procedural requirements for an off-duty Commander to monitor a pager, or to respond to a crime scene. Specific requirements were clearly defined by the Department manual. Chief O'Donovan had me reprimanded for failure to respond to the beeper off duty. When I became aware of the finding that I was at fault, I brought the appropriate manual references to the attention of the Deputy Chief who had investigated the incident. He agreed that upon reconsideration, he would not have found me at fault. However, when I informed Chief O'Donovan of this, he refused to remove the reprimand.

3

6.    By May, 1991, Chief O'Donovan had reassigned me from the Commander's position I held when he was hired to a position as a Supervisor of Training. This reassignment had the symbolic effect of a demotion. A male Lieutenant replaced me as Commander of Special Services. My predecessor as Training Supervisor was a male Lieutenant. At the time, several Captain's positions were left unfilled or filled with lower-ranking personnel.

7.    On June 15, 1991, John O'Loughlin, who had retired as a Captain of the MBTA Police on July 1, 1990, was rehired by O'Donovan as a Captain. Upon information and belief, prior to his return from retirement, O'Donovan actively solicited his return. At that time O'Donovan knew or had reason to know that Robert Cochrane, Deputy Chief of the Special Services Section, was planning to retire in the near future. Upon his return, Captain O'Loughlin was assigned as Night Commander, a second-in-command position designated as a Captain's position, while I remained in the Supervisor of Training (Lieutenant's) position.

8.    On October 31, 1991, Robert Cochrane retired. Five days later, on November 4, 1991, O'Donovan appointed Captain O'Loughlin as Deputy Chief of Special Services. I remained in the Supervisor of Training (Lieutenant's) position.

9.    Had O'Donovan not actively solicited Captain O'Loughlin to come out of retirement, I would have been the only Captain available to assume Cochrane's duties, and his presumptive successor to Deputy Chief Cochrane in the Special Services area.

4

10.    In July, 1991, Chief O'Donovan changed the radio call signs for all MBTA Police command and supervisory staff.  The call signs are issued to command staff members primarily by status ranking:  the higher the officer's rank, the lower the call sign.  In a paramilitary organization such as the MBTA Police Department, a low call sign affects the perception of an officer's authority in the Department, and thus the officer's ability to exercise that authority.  O'Donovan assigned me a significantly higher call number by leaving unused numbers between me and the higher command tier.  The change in my call number functioned as a signal to my peers and subordinates that my status was greatly diminished.

11.    In May, 1992, I was transferred to the Day Patrol Unit.  My predecessor in this position, with a rank of Captain, had been the second-in-command of the Day Shift.  Historically, this was the role assumed by a Captain in this position.  However, I was instructed that I was not in the second in command of the Day Shift, but was simply a duty supervisor, in charge only of the shift I was assigned to.  This further diminished my stature as the senior Captain in the Department.  I was the only Captain in the role of Duty Supervisor.  My counterparts as duty supervisors were Lieutenants and Sergeants.  At that time I was replaced as Supervisor of Training by a Lieutenant.

12.    By August 7, 1991, a sign-out sheet was instituted ostensibly for staff members.  I was notified and specifically instructed that I was required to sign out if I left the building for any reason.  This requirement was rigorously enforced for me only.  I was the only member of the command staff required to sign out.  My male counterparts and subordinates were not required to sign out.

5

13.    On August 7, 1991, while performing duties related to my position as Training Supervisor, I was involved in a minor motor vehicle incident (no injuries) while driving an unmarked MBTA cruiser.  In accordance with established practice, I called for an MBTA Patrol Supervisor to respond to the scene.  The other operator admitted fault to the Sergeant.  Upon returning to the station I was publicly berated by Chief O'Donovan, who wanted to know where and by whose authority I had been out of the building.

14.    Chief O'Donovan then assigned an MBTA Police Captain to investigate the accident.  He further ordered that a State Police Accident Investigation Unit officer be called in to perform an accident reconstruction at the scene. Upon performing the reconstruction, the State Trooper confirmed the original report and concluded that I was not at fault.  The State Police have never been called in before or since for an investigation of an accident involving the MBTA Police.

15.    Even though I was exonerated, Chief O'Donovan gave me a reprimand.

16.    In November, 1992, I was reassigned from Day Patrol Duty Supervisor to Staff Inspections, another Lieutenant's position.  From that time until November, 1994, two full years, I had no specific assignments and no authority.  I was relegated to the role of a clerical staff person.  I was sporadically given unimportant work.  I was not assigned a desk or an office, and was instructed to use the desks of secretarial staff or others who were not at their assigned positions.  When they returned, I was required to seek another work location.  I continuously sought work from other staff members because of the extreme shortage of work given to me.  Other staff

6

members told me they were limited in what they could allow me to assist them with. This two-year episode completely eroded my authority within the Department.

17. During this period, on August 16, 1993, Chief O'Donovan named a male Sergeant as the Commander of the Investigative Unit, and a male Lieutenant to the office of the Chief as the Staff Inspections Unit Commander. Commander positions had traditionally been filled by Captains.

18. In May, 1994, while assigned to Staff Inspections, I requested an upgraded car. It had been past practice to assign newer cars to higher-ranked officers, if desired, and pass the older cars down to lower ranked officers. This consistently happened with Chief O'Donovan and the Deputy Chiefs. The assignment of new cars thus became a symbol of authority within the Department. There were several unassigned cars at that time which were newer than mine. Nevertheless, rather than upgrade my car, Chief O'Donovan responded that he was not assigning cars at that time.

19. On or shortly before October 19, 1994, I learned that Chief O'Donovan had assigned newer cars to at least one male Sergeant. Because the assignment of vehicles, like radio call numbers, is symbolic of an officer's status in the Department, I initiated an internal complaint of discrimination by contacting the MBTA Organizational Diversity Office.

20. After my filing of this complaint, Chief O'Donovan agreed to make certain changes, including assigning me to a command position, assigning me an office and a desk, upgrading my vehicle, and lowering my radio call number.

21.    On November 4, 1994, Chief O'Donovan announced that I had been named as Captain of the Administrative Services Unit, in full charge of the Unit.  My male predecessor in that position had held the title of Commander.  On the same day, he announced that a Lieutenant had been named as Commander of the Special Services Unit.  I was required to protest in order to be given the title of Commander.

22.    As Commander of the Administrative Services Unit, I was informed that the major part of my function was managing the re-accreditation process which was scheduled for completion by the end of 1995.  Prior to my assignment no substantive work had been done on this project for approximately four years.  Despite my protests, I was given insufficient personnel and authority to accomplish this work.  Instead of giving me adequate resources, Chief O'Donovan caused extensions to be requested.

23.    As Commander of Administrative Services, it was my responsibility to assign staff to attend various community meetings.  On May 18, 1995, I attended a meeting which I had always covered, and found that Chief O'Donovan had assigned one of my officers to attend the meeting, without my knowledge.  This officer had not been properly briefed, and the Department would have lost available grant funds had I not been there.

24.    On divers occasions, I was unable to determine the activities and whereabouts of officers under my command:  upon my inquiry, they told me that Chief O'Donovan had assigned them to "secret" work which they were instructed not to tell me about.  This undermined my authority.

25.    In June, 1995, shortly after I protested the above violations of the chain of command, I was removed from my day shift command and reassigned as Night Patrol Unit Commander.

26.    In September, 1995, Chief O'Donovan reassigned an officer under my command without consulting or informing me. This undermined my authority. My male counterparts were not subjected to interference with their assignment of officers under their command.

27.    When I protested about the derogation of my authority, I was reassigned to work on re-accreditation of the Authority. In contrast with my assignment from November, 1994 through June, 1995, I now had no assignments other than the re-accreditation work, and initially, I had no one reporting to me. After repeated protests, I was assigned one patrol officer full time and one Sergeant part-time. I am still in that assignment.

28.    On October 5, 1995, Chief O'Donovan called a staff meeting to discuss re-accreditation. Chief O'Donovan spent most of the time telling a story about "panty raids" on the "girls" who "had" to be "quarantined" at the FBI academy. He spent only a few minutes discussing re-accreditation. After the meeting, a group of Lieutenants indicated to me  that they perceived Chief O'Donovan's support for the re-accreditation effort to be low.

29.    I now had no assignments other than the re-accreditation work.

30.    On divers occasions, Chief O'Donovan has made demeaning references to and remarks about women officers, referring in public speeches to the "men and girls of the MBTA Police Department, and referring to women officers as "girlie-girls." Upon information and belief, at the 1993

9

Christmas party, he told one of the secretaries that the "girls" should get up on the tables and dance to get the party started. When she retorted that perhaps the men should dance on the tables, he said, "Have another drink, dear." On many occasions, including staff meetings, and despite my requests through the chain of command to desist, Chief O'Donovan referred to me and other female police supervisors, officers and civilian staff members as "Dear." On one occasion, he barred a majority of the female civilian executive staff members from participation in a sexual harassment seminar, which all MBTA executives were required to attend.

31.    On divers occasions, Chief O'Donovan refused to allow me to attend law enforcement community events which male command staff members, including those below my rank, were permitted to attend.

32.    On April 1, 1995, Deputy Chief O'Loughlin retired for the second time. I was the senior ranking civil service officer in the Department, and the only Captain. As such, I was the presumptive successor to Deputy Chief O'Loughlin. O'Donovan chose not to fill the open position.

33.    On November 4, 1995, I was bypassed for a promotion to Major. Chief O'Donovan promoted four individuals to the newly-created rank of Major, and appointed two others from outside the Department. Two of the promoted individuals held the appointed rank of Deputy Chief. One holds the civil service rank of Captain, and the other holds the civil service rank of Lieutenant. One of the individuals appointed from outside the Department had held the rank of Captain of the State Police: he has limited experience in transit policing. The other held the rank of Lieutenant of the State Police and had no experience in transit policing. I outranked two of the

10

promotees, who had held the rank of Lieutenant of the MBTA police. I was more qualified for the position than at least four of those promoted. All those promoted are men.

34.    At the end of a Christmas party in 1995, Chief O'Donovan stood at the top of the exit stairwell shaking hands with command staff members as they left, wishing them a merry Christmas and handing them a gift of a bottle of vodka. As I approached I held my hand out to shake his hand. He reached past my hand, grasped my wrist, pulled me forward and kissed my cheek.

35.    On April 1, 1996, Major Cuervels retired, leaving an open Major's position. I am the only Captain in the Department and the most qualified to be promoted to Major. O'Donovan has not filled the position.

36.    Chief O'Donovan has engaged in a deliberate and systematic campaign to demean and denigrate me, to discredit my authority and diminish my position within the MBTA. I believe that I have been bypassed for promotion and have been otherwise discriminated against in the terms and conditions of my employment because of my sex and in retaliation for my opposition to practices made unlawful by 42 U.S.C. §2000e-1 *et seq.* and G.L. c. 151B, in violation of those statutes.

THE COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
1 ASHBURTON PLACE, ROOM 601, BOSTON 02108
(617) 727-3990

DATE: MAY 0 8 1996

TO: Vida K. Berkowitz
McDonald & Associates
Attorneys at Law
One Gateway Center-Suite 401 West
Newton, MA. 02158-2806

RE:  Ford-Murphy V. MBTA
NO:  96-BEM-0819

PRIVATE RIGHT OF ACTION (Chapter 478)

Dear Mr. Berkowitz:
    Pursuant to M.G.L. Chapter 151B, Section 9, this
Commission hereby assents to your request to remove the
above-referenced complaint for the purpose of filing a civil
action in the same matter in court.  The complaint before
the Commission has been dismissed without prejudice as to
the merits.

    Please be advised that no complaint on the same matter
may be brought before this Commission.

                          Very truly yours,

                          Charles F. Walker, Jr.
                          INVESTIGATING COMMISSIONER

cc.:MBTA
    General Counsel's Office
    c/o Walter M. Foster
    Chief Labor Law Unit

Exhibit C