# EXHIBIT C

The Commonwealth of Massachusetts
Commission Against Discrimination

16C972906

DOCKET NUMBER:97BEM2412
FILING DATE:07/21/97

EEOC/HUD NUMBER:
VIOLATION DATE:07/17/97

-------------------------------------------------------------------------------

Name of Aggrieved Person or Organization:
Thomas F. McCarthy
17 Grove Street
Norfolk, MA 02056
Telephone Number: (508) 528-9485
(617) 222-1122

-------------------------------------------------------------------------------

Named is the employer, labor organization, employment agency, or state/local
government agency who discriminated against me:
John R, O'Donovan/Mbta
240 Southampton Street
Boston, MA 02118
Telephone Number:(617) 222-1100    No. of Employees:20 +

-------------------------------------------------------------------------------

Cause of Discrimination based on:
~~Other~~     P4 - RETALIATION
-------------------------------------------------------------------------------

The particulars are:
I, Thomas F. McCarthy, the Complainant believe that I was
discriminated against by John R, O'Donovan/Mbta, on the basis of my
Other. This is in violation of M.G.L. Chapter 151B S4 p .

I, Thomas F. McCarthy, a major for the MBTA for the past eighteen
years, feel that I have been discriminated against on the basis of
retaliation. I have been treated unfairly by John R. O'Donovanan.
Also, Joseph Saccardo and Roger Ford I feel, are acting in concert
with Mr. O'Donovan.  The retaliation began after I testified at a
deposition that occured on November 1,1997. See attached document to
complaint.

-------------------------------------------------------------------------------

I swear or affirm that I have read this complaint and that it is
true to the best of my knowledge, information and belief.

_Thos. F. McCarthy_
(Signature of Complainant)

SWORN TO AND SUBSCRIBED BEFORE ME THIS 21st Day of July, 1997

NOTARY PUBLIC: _Eric P. Klein_

SIGNATURE   NOTARY   PUBLIC: _Eric P. Klein_     MY   COMMISSION
EXPIRES:_8/04/03_

Form: MCAD Complaint



**MBTA Police**

Page 1 of 2

To: John R. O'Donovan, Chief of Police
Major Roger A. Ford, Patrol Operations
Division Commander

From: Major Thomas McCarthy

Date: July 18, 1997

Subject: Response to allegations

1.    On July 17, 1997, you, in the presence of Major Roger Ford,
ordered me to respond to the following accusations of misconduct:

A.    On June 12, 1997, that I failed to respond to a train/pedestrian fatality
in Andover, MA.

B.    On June 13, 1997, that I failed to respond to a train/pedestrain fatality
in Billerica, MA.

C.    On July 11, 1997, that I was observed at Police Headquarters at or about
6:00PM having my supper break; in violation of a patrol procedures directive
issued by you in February, 1997.

2.    You further ordered that I submit this report on July 18, 1997 not later that 4:30PM,
fully aware that I was on a vacation request immediately after the meeting and would
not report for duty again until 3:15PM July 18, 1997. The following is as complete
and accurate a report I could complete in the time frame given.

3.    Let me respond to allegations in the sequence above:

A.    On the evening of June 12, 1997 the MBTA Police were advised of a train and
pedestrian accident in Andover. Dispatch began to send the appropriate units,
Lieutenant Gary Fredericks came on the air and advised that he was minutes
from the location and would respond. I instructed Lieutenant Fredericks that upon
arrival to confirm and assess the situation.

Upon arrival, some twelve (12) minutes later, Lieutenant Fredericks reported
that the scene was secured by the Andover Police and Fire Departments. He
further reported that portions of the victim were on the right of way and portions
were on the street below -- that indeed it was a fatality.

Lieutenant Fredericks also advised that the Chief of Staff, Mr. Philip Puccia,
was on scene. I inquired if there were media at the scene and if he saw a
reason for me to respond. Lieutenant Fredericks responded that there were no
media on scene and that my presence was unnecessary.

Therefore, I remained at police headquarters to answer media requests and
direct normal operations.

B. At 2:00PM, on June 13, 1997, the MBTA Police were notified of a train and pedestrian fatality at Billerica, MA. To the best of my recollection, I became aware of the incident sometime between 3:00PM and 3:30PM. Since Major Ford did not provide me with any information or instructions, I assumed that since the accident occurred during the day shift that he was had ordered the appropriate response.

C. In reviewing your "Assignment Overview" memo dated 2/7/97, I observe in paragraph two (Evening Shift) instructions to establish a patrol sector during the rush hour. In traditional transit police practice, the evening rush hour is defined as 4:00PM to 6:00PM, hence the number of Directed Patrols assigned a 4:00PM to 6:00PM assignment. No where do I observe specific instructions on when I should take my supper break

I felt that returning for supper at or after 6:00PM met the requirements of your directive. If that is not the case please establish a specific time frame so that I may be in compliance. It was certainly not my intention to disobey your instructions.

4. I hope these explanations satisfy your inquiry.

5. I wish to advise you that I consider this inquiry, like two previous inquiries, part of a pattern of harassment, intimidation, and retaliation for my participation in pending state and federal cases and/or complaints of misconduct brought against you and other members of the department.

I wish to further advise, that I have consulted with Mr. Allen W. Levy, United States Department of Justice, concerning this endless stream of unfounded allegations. Pursuant to his advice, I intend, on Monday, July 28, 1997, to file a formal complaint with the EEOC. Further, I intend to file a complaint and seek an investigation by the Attorney General's Office to determine if a criminal conspiracy exists by members of the police command staff and members of the senior staff of the MBTA to harass, intimidate, and retaliate against me for my participation as a witness in the above mentioned state and federal cases or investigations, or other complaints of misconduct which I dutifully reported.

Respectfully Submitted,

*Thomas F. McCarthy*

Thomas F. McCarthy, Major

CC. Robert H. Prince
General Manager

Attachment

RECEIVED
JUL 18 1997
By _____ 4:22 P.M.

## COMMONWEALTH OF MASSACHUSETTS
## COMMISSION AGAINST DISCRIMINATION

THOMAS F. McCARTHY,  )
                      )
     Complainant,  )
                      )
v.                      )
                      )
MASSACHUSETTS BAY  )
TRANSIT AUTHORITY and)
JOHN R. O'DONOVAN  )
     Respondent.  )

**Docket No.:**  97-BEM-2412
**EEOC No.:**  16C972906

### AMENDMENT TO COMPLAINT

Pursuant to the Commission's Rules of Procedure, 804 C.M.R. 1.10(6)(a), the above-referenced complaint is hereby amended to clarify and amplify the allegations contained in the original complaint. The additional facts in support of the claim are set forth in the attachments, Exhibits A and B, submitted by Complainant.

Additionally, the above-referenced complainant is hereby amended to allege a pattern of ongoing acts of retaliation, pursuant to M.G.L. c. 151B § 4(4), against Complainant since filing the present complaint. The facts in support of the claim are set forth in the attachments, Exhibits B, C and D, submitted by Complainant.

So ordered this _25th_ day of _March_, 1999.

_____
Charles E. Walker, Jr.
Investigating Commissioner

# EXHIBIT "A"

July 21, 1997

I, Thomas F. McCarthy, a police officer of the Massachusetts Bay Transportation Authority Police Department file this statement in support of my claim that Police Chief John R. O'Donovan, and others at the MBTA, are engaged in a pattern of threatening, intimidating, punitive, and retaliatory behavior towards me for my support of, and participation in, the claims of women and minority officers who have filed claims of discriminatory conduct on the part of Chief O'Donovan and the MBTA.

I have been a police officer within the Commonwealth of Massachusetts for twenty-three years. I have been employed with the MBTA for eighteen years. My title is Major and my position is the Patrol Operations Night Commander.

In early 1996, Captain Dolores Ford-Murphy filed a complaint with the Massachusetts Commission Against Discrimination alleging that John R. O'Donovan had discriminated against her causing her to suffer both personal and professional loss.

On May 8, 1996, I was asked by the MBTA (Authority) to participate in an investigation, sponsored by the Board of Directors, being conducted by Hutchins, Wheeler, and Dittmar. My participation consisted of a four hour interview with Ms. Sally A. VanderWeele of that firm. Ms. VanderWeele began the interview by assuring confidentiality and expressing the objective of the investigation. Ms. VanderWeele stated that the assigned task of investigating the validity of Captain Ford-Murphy's complaint had been extended to examine the management practices of Chief O'Donovan.

I accepted Ms. VanderWeele's assurances and spoke candidly about those issues that I had either personal knowledge or observations concerning both Captain Ford-Murphy and Chief O'Donovan, and others.

On November 1, 1996, I was required to participate in a deposition before Captain Ford-Murphy's attorney, Vida K. Berkowitz, Esq. and David C. Casey, Esq. (representing the Authority), and Nancy Shilipsky, Esq. (representing Chief O'Donovan). Also present for the deposition were Chief O'Donovan and Captain Ford-Murphy.

The preceding day I was required to prepare for the deposition by participating in a pre-deposition session with Mr. Casey and Ms. Shilipsky. In both sessions, I presented testimony which could be characterized as supportive of the captain's claims and damaging to Chief O'Donovan.

Prior to the deposition, I was approached by Mr. Casey who apologized for the presence of Chief O'Donovan. He stated that Ms. Shilipsky had arranged for the chief to be there without his approval. Mr. Casey went on to assure me that he and the Authority would insure that Chief O'Donovan would not be allowed to retaliate against me for my testimony. Mr. Casey then instructed me to answer the questions as asked and to not embellish, elaborate, or offer information not asked.

The atmosphere at the deposition, between the attorneys, was contentious and hostile. Chief O'Donovan was visibly upset on a number of occasions during my testimony; specifically, when I testified concerning his mistreatment of other employees of the police department, including Ms. Donna Taylor and Major James Marshall and his unfair treatment of women and minority employees in general.

Although my relationship with Chief O'Donovan, prior to the deposition, could be described as civil, I was now excluded from most, if not all, staff meetings and often met with glares of hostility.

About this time, I became aware that Chief O'Donovan had stated to both Major John Martino and Ms. Donna Taylor that he would "shoot down those people who were not loyal." In addition, I learned that Chief O'Donovan was referring to me as, "the adviser to these women." I understood that to mean that Chief O'Donovan believed I was advising Officers G. Walsh, L. Davis, G. Andrews, A. Parkman-Lyles who by know had also filed complaints with MCAD.

In early March, 1997, I overheard police officers complaining that Major Joseph Saccardo, a retired state trooper and appointed by Chief O'Donovan, had caused the release of a man arrested for Malicious Destruction of Property (threw a large rock through the window of a moving bus), and resisting arrest (fighting with an MBTA police officer).

I interviewed the officer involved, Louis Castro (who was still on probation), and the sergeant, Gloria Andrews-Ward (who had just been promoted) and verified the complaint. I reported the incident to Major John Martino, who had been designated to overview the operations and decisions of Major Saccardo and Roger Ford.

As a result of my report, Major Saccardo was given a three day suspension for misconduct.

On March 10, 1997, I was approached by an MBTA police officer who made the following statement to me, "I don't know what's going on but be careful. The chief thinks you broke into his office and copied some documents." I asked the officer how he knew this and he would only state that he had been told by someone very close to the chief. Records pursuant to an investigation being conducted by the Attorney General's Office had been requested of and provided by Major Martino.

On March 11, 1997, I was approached by members of the Police Patrolman's Association and advised that Officer Kevin Betts (president) and Kevin Cryts (vice president) had been called to the chief's office and asked if I had approached them and elicited their participation in seeking the removal of Chief O'Donovan by the General Manager. As a result of these incidents and now worried that Chief O'Donovan was beginning to retaliate against me, I called Mr. Philip Puccia, Chief of Staff to the General Manager, and Attorney David Casey's office to seek their assistance.

On Wednesday, March 12, 1997, I received a telephone call at my residence from Mr. David Nelvin, an associate of David Casey. I explained my concerns and asked for relief from the chief's unwarranted allegations and inquiries. Mr. Nelvin stated that he would bring this information to the attention of Mr. Casey and the Authority. He asked that I take no additional action until they had a chance to resolve the situation.



On Tuesday, March 18, 1997, I was berated and threatened by Chief O'Donovan for not returning his telephone page immediately. This despite the fact that I was not working at the time of the page.

On Wednesday, March 19, 1997, Major Roger Ford, called me to his office and ordered me to prepare a report on the "Saccardo matter" for Chief O'Donovan.

The report was to specifically include the name(s) of the officer reporting the incident (release of prisoner) to me. I advised Major Ford that I was afraid that the information would be used to retaliate against the officer(s) and that I would not comply and that I was filling a Dignity in the Workplace violation with the MBTA's Office of Diversity; complaining of a hostile work environment.

I also learned that Lieutenant Donna Mahoney and Ms. Janet Rivera-Jones had been ordered to submit reports on the telephone paging incident. I further learned that Chief O'Donovan had attempted to persuade Ms. Jones and Lieutenant Mahoney to change the times in their reports so as to place me on duty and thereby guilty of not responding.

I telephoned Philip Puccia and advised him that I was filing an official complaint of harassment, intimidation, and retaliation against Chief O'Donovan.

I submitted the requested "Saccardo incident" report absent the officer(s) names.

On March 31, 1997, I received a memo from Major Ford instructing me that I was not to communicate directly to Chief O'Donovan, but rather all written communications were to be addressed in a specific form through him.

Also on March 31, 1997 I was called to Major Ford's office and the major apologized for "what was occurring between me and the chief." He then instructed me to complete two separate reports, using the new form of communication, on the following subjects; using profanity in an interview with lateral transfer candidates, and making racially insensitive comments at a meeting at English High School. I asked who the complainants were in each incident but Major Ford would not provide further details.

I later learned that Major Saccardo filed a complaint with the chief that I used the term "asshole" and had my sleeves rolled under at the interview of a candidate and that this misconduct brought discredit to the department.

I offer for a point of interest that after this order for reports, Major Martino conducted a similar discussion with another candidate using similar language the following day, with all majors present and without any complaint being made against him.

The complaint of my making racially insensitive remarks was based on Major Ford reporting a discussion that occurred at English High School to resolve the growing difficulties between their students and the MBTA police. The comments made at that meeting were part of a discussion attempting to explain and find a solution to the growing problem. To my knowledge no one complained about my comments and in fact I recommended a program to effectively deal with the problem. The program was met with praise by school officials and the General Manager but was never instituted by Chief O'Donovan.

I submitted the reports as required. Once again no further discussion or action was taken.

In early May, 1997, I learned that Chief O'Donovan was making public statements accusing me of being responsible for all the complaints against him. I again contacted David Casey and expressed my concerns that Chief O'Donovan was doing serious damage to my professional reputation. Mr. Casey expressed sympathy and arranged for a meeting with MBTA General Counsel William Mitchell. A three hour meeting occurred at David Casey's office; after which I was assured that the matter would be dealt with promptly.

On May 21, 1997, Ms. Virginia Turner, Personnel Compliance Officer, Organizational Diversity Office of the MBTA decided that Chief O'Donovan had acted within his rights as a department head. She further recommended that I receive a reprimand for the use of profanity in the candidate interview. I reported this to both Philip Puccia and David Casey, both found the ruling preposterous and the reprimand was not issued.

On May 22, 1997, Chief O'Donovan issued a memo designating Major Martino to assume Major Ford's duties while Major Ford was on vacation. On all other occasions the second in command of the Division has been designated officer in charge. At both the 3:30 pm and 11:30 pm roll calls I was asked by officers why the chief was slighting me; causing me considerable embarrassment.

During June, 1997 I was instructed to meet with David Casey and Mr. Allen Levy, United States Department of Justice. A two hour interview was held in Chief O'Donovan's conference room, in full view of all who walked by. Again I answered the questions asked of me in a candid and professional manner.

Also during June, 1997, I met with representatives of Linder Associates, who are conducting a management review of the police department for the Board of Directors. I attended two meetings each lasting in excess of two hours. Again confidentiality was assured and again I answered the inquiries in a professional and candid manner.

On July 14, 1997, I was called to the chief's office along with the other majors. I had not been so summonsed for the past six months. The other majors meet with Chief O'Donovan at least once a day and usually several times. Even when asked if I should be included, the chief replies no. The chief asked the following question, "which one of you has been in touch with the justice department in the past four to six weeks." When we responded in the negative, the chief stated "then why would the law department call and ask." Based on my exclusion from all other meetings, I formed the opinion that the question was directed at me and the following action was taken as result of Chief O'Donovan's belief that I am participating in a justice department investigation.

On July 17, 1997, I was called to the chief's office and instructed to complete a report concerning two charges of dereliction of duty (failed to respond to serious incidents) and a charge of failure to obey a written directive. These allegations are once again without any merit and I have filed that report and currently await the outcome of this "investigation."

I submit that Chief O'Donovan along with Majors Saccardo and Ford are engaged in a conspiracy to retaliate against me for my participation in the Captain Ford-Murphy civil suit, the Officer Gabriella Walsh civil suit, the MCAD complaints of Officers Lynn

Davis and Adrena Parkman-Lyles, as well as the investigations of mismanagement and/or misconduct by Chief O'Donovan and Major Saccardo.

The deliberate exclusion from command staff meetings and the constant false allegations brought against me have caused me loss of professional standing both within the police department and the larger law enforcement community.

Mr. Philip Puccia, Chief of Staff, Mr. William Mitchell, General Counsel, and Mr. David Casey, outside counsel, have all failed, after repeated complaints, to exercise any intervention or conduct any investigation of my complaints. The outcome of my complaint with the Office of Diversity by their own comments was preposterous and not executed. The apparent inquiry from the "law department" which led to this latest round of baseless allegations of misconduct cause me great concern and anxiety.

I am literally sick to my stomach each day reporting to work. I have suffered weight loss over the past year. In addition, I suffer from sleep deprivation and have over the course of this relationship sought psychological counseling.

I feel I have exhausted all internal avenues of remedy.

I complain that Chief John R. O'Donovan, and Majors Joseph Saccardo and Roger Ford are violating my civil rights by engaging in a conspiracy to retaliate against me for my participation in the prior described civil rights complaints and that they are in violation of Massachusetts General Law.

I further complain that the Massachusetts Bay Transportation Authority, in the persons of Mr. Philip Puccia, Mr. William Michell, and Mr. David Casey, outside counsel, have allowed the violation of my civil and statutory rights by taking no affirmative action to prevent the retaliation.

Thomas F. McCarthy

July 27, 1998

Ms. Betsy Allen
Massachusetts Commission Against Discrimination
One Ashburton Place - Room 601
Boston, Massachusetts 02108

Ms. Allen,

Re: Response to MBTA Position Statement
    Docket No. 97-BEM-2412

Please consider this an amended filing to complaint N0. 97-BEM-2412.

I would hope that the Commission would extend to me the same forbearance shown
the MBTA and accept this as a modified complaint; in that the MBTA failed
to respond, and the Commission took no action, for almost one year.

The MBTA in its position statement (pg 4 - para 3) lists the four necessary elements for a
prima facie case of retaliation:

    1. that he engaged in protected activity,

    2. that the employer was aware of the activity,

    3. that he was subsequently subjected to an adverse employment action;
       and absent other evidence establishing a retaliatory motive,

    4. that the adverse employment action followed the protected activity within such time
       that retaliatory motive can be inferred.

To fulfill the above requirements, I offer the following:

    A. The activity was my testimony in the Dolores Ford-Murphy v. John R. O'Donovan
      & MBTA civil suit. I was given notice of my scheduled appearance by Mr. David
      Casey representing the MBTA.



B. Chief O'Donovan and the MBTA were aware of my participation in a protected activity. Chief O'Donovan was present for my testimony in the Ford-Murphy suit, as was Mr. David Casey - representing the authority.

Mr. David Casey, both at the deposition and the pre-deposition, repeatedly volunteered assurance that he would not allow Chief O'Donovan to retaliate against me for my testimony. Mr. Casey brought up the subject of retaliation, not I. Mr. Casey went so far as to give me his business card (with home number) and suggested I contact him, day or night, if I felt I was being retaliated against. I took advantage of that offer on two occasions, both are listed below.

C. The original complaint contained specific instances of hostile and threatening behavior directed at me by Chief O'Donovan. I will reiterate for the record. Through a period of time from November 1, 1996 to March 1, 1997, the overtly threatening activity was being ostracized by Chief O'Donovan. I was deliberately excluded from all staff meetings. I was prohibited from making any command decisions. In effect, I was constructively demoted from my position as Major.

The chronicle of events that occurred from March 3, 1997 through October 20, 1997, include false accusations and investigations for the sole purpose of causing damage to my professional reputation and to create as hostile a work environment as possible. Chief O'Donovan's advising other members of the organization, including union officers, and patrol officers, that I was being investigated - only served to undermined my ability to command respect within the organization. The combination of these events caused immeasurable stress, fear, and anxiety for me and my family.

1. Saccardo Incident, March 3, 1997 - Major Saccardo was accussed of the unlawful release of person under arrest. After reporting the incident through the chain of command, I was ordered to submit the names of the officers who complained about the release.

2. Chief O'Donovan's inquiry with union officers, Kevin Betts & Kevin Cryts, of my conspiracy to oust Chief O'Donovan March, 1997.

3. Chief O'Donovan's accusation that I committed a B&E to his Office, March, 1997.

4. Incidents with the chief & Major Ford, March 17, 18, 19.
   a. 3/17/97 - Encounter with chief - glaring, threatening facial expressions.
   b. 3/18/97 - Incident over returning page - chief asked for false reports from Janet Rivera Jones & Lt. Donna Mahoney.

   c. 3/19/97 - Major Ford ordered detailed report on Saccardo incident.

On March 19, 1997, I complained to Mr, Philip Puccia - Chief of Staff and to Mr. David Casey - Outside Counsel. In addition, I filed an internal complaint with the Office of Diversity.

On March 31, 1997, I was instructed, in writing, by Major Ford to address all communications to the chief through him, per order of Chief O'Donovan.

On March 31, 1997, Major Ford called me into his office and expressed the following: "I don't know what's going on between you and the chief, but I'm in the middle, I'm almost to the point of quitting." Major Ford then ordered me to complete two separate reports to Chief O'Donovan; First, to submit a report on a racially insensitive comment I allegedly made at a meeting at English High School. Second, a separate report on using profanity during an interview with a lateral transfer candidate and why I had my shirt sleeves rolled in a "marine tuck."

Mr. David Casey invited me to attend a secret meeting, held on May 13, 1997 at 5:00 pm at his office, with Mr. William Mitchell, MBTA General Counsel. Mr. Casey called the meeting because, "Bill Mitchell needs to know what's going on." The meeting lasted two hours. At the end of the meeting, Mr. Mitchell expressed sympathy for my situation and advised that he would bring the matter to the attention of the General Manager and that the harassment would stop. The harassment did not stop.

In addition, Chief O'Donovan brought false charges of misfeasance to the General Manager, that caused a consultant to be hired to conduct an investigation; knowing those allegations to be false.

1. Accusations of negligence to perform duty - July, 1997.
   John Alyward hired to investigate - July, 1997.

On October 20, 1997, Thomas O'Loughlin was appointed chief of police. I was demoted to my civil service rank of Lieutenant. I suffered a loss of salary of $15,000. and significant personal and professional reputation. Chief O'Loughlin offered no explanation as to why I was demoted.

I allege that the adverse employment action was the continuing mistreatment by Chief O'Donovan and Major Saccardo. I further contend that the MBTA, in the persons of Philip Puccia, William Mitchell, and David Casey (representing the Authority) were aware of this continuing mistreatment. The action to demote on October 20, 1997 was merely the formalizing of the constructive demotion that had occurred after my testimony in the Ford-Murphy suit.

Please be advised that as of this filing, I am no longer represented by an attorney.

Sincerely,

Thomas F. McCarthy

# EXHIBIT "C"

February 9, 1999

Ms. Allison Hazen
Massachusetts Commission Against Discrimination
One Ashburton Place
Boston, Massachusetts

Dear Ms. Hazen,

A new issues has arisen since I last spoke with you. I seek your instruction on how to proceed.

I received a subpoena to appear in the Gabriella Walsh v. MBTA civil trial in Suffolk Superior Court on March 10, 1999. Attached to the subpoena was a check for fifteen dollars for a witness fee. Over the course of my career I have received a number of similar subpoenas and witness fees both to appear for the plaintiff and defendant (MBTA).

As always, I submitted the subpoena and fee to the police administration as required by department rules. In this case, I was initially instructed by Deputy Chief Ann McCall that I would be attending the trial on either a tour of duty or time owed basis. I was required to endorse the check and surrender it to the department.

On Monday, February 8, 1999 I received a memo from Ms. Elaine Malone, a civilian employee working in Chief O'Loughlin's office, stating that Chief O'Loughlin had instructed her to return the check to me as "it was my fee for testifying against the authority." The memo directed me to contact Deputy Chief McCall for further clarification.

Deputy Chief McCall informed me that the authority had no intention in calling me as a witness therefore I would not be compensated for my appearance. I questioned this decision, explaining that my testimony was only relative to my official duties as a police department representative. Deputy Chief McCall iterated that Chief O'Loughlin had decided that since "I was a witness against the authority, I would not be compensated."

The Gabriella Walsh Case is a claim of discrimination and sexual harassment brought by Officer Walsh against the MBTA and Chief John R. O'Donovan. The Walsh case is an integral part of my MCAD claim of retaliation for my deposition testimony. My deposition testimony, in this matter, was a factual and truthful account of circumstances and statements made by parties relative to Ms. Walsh's claim. They are neither for or against the authority. In addition, my testimony is as a result of my official duties as an MBTA Police Major. In fact, I was compensated for my deposition in this matter.

There is no precedent within the MBTA police department for denial of compensation for an appearance in a criminal or civil matter before the state or federal courts. Compensation has been denied for appearance at administrative hearings, when subpoenaed by the appellant.

Clearly, this action by Chief O'Loughlin is intended to be punitive and retaliatory and cause me further financial and emotional distress.

Please advise. I can be contacted at 781-317-5509 (pager).


Sincerely,

Thomas F. McCarthy

# EXHIBIT "D"

February 26, 1999

Mr. Quoc Tran
Massachusetts Commission Against Discrimination
One Ashburton Place
Boston, Massachusetts 02108

Re:  Docket No. 97-BEM-2412

Dear Mr. Quoc,

Pursuant to our conversation on Tuesday, February 23, 1999, I am forwarding the list of adverse actions taken against me by Chief Thomas J. O'Loughlin.

I faxed the original list to Ms. Allison Hazen on February 13, 1999; as a result of her request for this information. It was my understanding that Ms. Hazen intended to include these allegations in her request from the MBTA for a final position statement.

In addition, Ms. Hazen advised me on February 10, 1999 that my amended complaint filed on July 28, 1998, had been approved by the Commission, to include the actions of Thomas O'Loughlin.

Sincerely,

Thomas F. McCarthy

February 13, 1999

Ms. Allison Hazen
Massachusetts Commission Against Discrimination
One Ashburton Place
Boston, Massachusetts

Re:  Docket No. 97-BEM-2412

Dear Ms. Hazen,

I wish to submit for investigation the following actions taken by Chief Thomas J. O'Loughlin of the MBTA Police Department. It is my contention that these adverse actions are retaliatory and have increased in intensity since Chief O'Loughlin became aware that I had sought to amend my original complaint to include the adverse employment action of my demotion on October 20, 1997.

1.  **Demotion and loss of salary of $25,000.00 per year.** I contend that Chief O'Loughlin and the Authority took this action as a direct result of my deposition testimony in the Dolores Ford-Murphy and the Gabriella Walsh v. MBTA discrimination law suits. On October 7, 1997 at a pre-deposition meeting on the Walsh case I was threatened with "a negative impact on my career," by Mr. David Casey. Mr. Casey is outside counsel representing the authority in the Walsh case.

2.  **Press Release - Emotional distress to myself and family.** Chief O'Loughlin issued a press release which appeared in, at least, the Boston Globe, Patriot Ledger, and The Middlesex News which announced the demotions of Major John Martino and Thomas McCarthy. Superintendent Komola's response to my complaint was, "that's the way we do things -- get use to it."

3.  **Written Reprimand - March 13, 1998.** On March 13, 1998, Deputy Chief Taylor-Miller issued me a Written Reprimand charging me with being "rude, impolite, and contemptuous and insolent to a superior officer." I asked Chief O'Loughlin for a hearing on the charges; and informed him that I would produce several witnesses that would testify that Deputy Taylor-Miller was mistaken or lying. Chief O'Loughlin responded "I don't care if you have a hundred witnesses -- the deputy says your guilty -- your guilty. There won't be a hearing and there is no appeal."

4.  **March 30, 1998 meeting with Chief O'Loughlin.** On March 30, 1998 I asked for a meeting with Chief O'Loughlin to try and reduce my concern of being targeted for harassment and retaliation. Chief O'Loughlin's demeanor was condescending stating, "I'm am tired of the phone calls and every time I go to a function people speaking to me on your behalf -- telling me you're a great cop."

Also at that meeting, I complained that the sudden loss of $20,000 in income had seriously hurt my family. I sought and was given permission by Chief O'Loughlin to work police details in the Town of Wrentham.

5. **Excluded from every aspect of the command function.** Despite having a major role in the Linder Management Study, both raising concerns and making suggestions, I have been systematically excluded from any involvement in the department's future. I have recognized experience and expertise in patrol, investigations, recruitment, community policing, crime prevention, and media relations, yet I was excluded from the Strategic Planning Committee, excluded from recruit selection and training, and the police academy. All of these actions serve to diminish my standing and reputation within the MBTA.

New initiatives by me have been given either lip service or totally ignored.

6. **Assigned duties and responsibilities of a Sergeant.** On January 9, 1999, Chief O'Loughlin assigned me the position of swing shift replacement supervisor to Sergeants John Shannon and Daniel Fitzgerald. I now report to Lieutenant Herman Wheeler, who was promoted this past year. I have been a lieutenant and command level officer since 1987.

7. **Superintendent Komola's Investigation.** On February 4, 1999, Superintendent Komola conducted an inspection of the Forest Hills police substation. He observed two officers inside the substation and inquired if they were playing computer games. The officers responded that they were not and the superintendent appeared to accept their explanation. Lieutenant Wheeler was the superior officer in charge of Area B and the police substation. Later that day, I was instructed to submit a report for Superintendent Komola on "why the officers were playing computer games and not riding trains." Inferring that he is investigating me.

The officers were not asked for reports. Lieutenant Wheeler was not asked for a report. Despite the fact that I was on the radio and on patrol, supervising a regular school dismissal at New England Medical Center Station, I was asked to submit a report. Once again causing extreme anxiety and distress.

8. **Denied compensation for court appearance.** On February 4, 1999 I was served with a subpoena for my appearance in the Suffolk Superior Court in the Walsh v. MBTA case. As required by rules and regulations, I submitted the subpoena and fee to Deputy Chief Ann McCall. Deputy McCall advised that I endorse the check over to the Authority and that I would appear either on a tour of duty or for time owed. I assented, as this is the normal process.

On February 9, 1999, I received the check back with the explanation that Chief O'Loughlin stated it was " my fee for testifying against the authority." I sought out Deputy McCall who informed me that my testimony would be on my own time. I asked if there was a change in policy as I had been subpoenaed in the past, by the plaintiff, and been compensated. Deputy Chief McCall would only repeat that Chief O'Loughlin had decided that I would not be paid.

In November, 1998, I appeared in the Middlesex Superior Court in response to a plaintiff subpoena in the Eluteri wrongful death case. I was compensated. On each occasion that I have appeared for deposition, for the plaintiff, in the Ford-Murphy and Walsh cases I have been compensated  There is no precedent for not compensating an MBTA police official testifying in civil or criminal court about their official duties.

9. **Denied opportunity for outside employment.** On March 30, 1998, as previously stated in #4, I was granted permission to work police details for the Wrentham Police Department. My instructions, at that time, were to coordinate my activities with the detail office. On each occasion that I performed work for the Town of Wrentham, I notified either Lieutenant David LeRay or Captain John Martino. Chief Collamati appointed me as a Special Police Officer in the following manner: Lt. Thomas McCarthy of the MBTA as Special Police Officer. Chief Collamati sought to eliminate any jurisdictional issues.

Chief O'Loughlin now claims that he did not give me permission. The rules and regulations of the MBTA Police Department do not require that I be given permission but rather that I notify the department of my intention.

Chief O'Loughlin allows officers to own and operate private businesses. In addition, on a daily basis officers are assigned details outside the jurisdictional authority of the MBTA, as MBTA police officers working for either the authority, the other agency, or a private contractor.

It now appears that the Authority and Chief O'Loughlin are not satisfied with causing me to suffer internal adverse employment conditions and actions but also wish to deny me the opportunity to adequately support my family.

Your attention to this matter is greatly appreciated.

Sincerely,

Thomas F. McCarthy